# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

SHERIDAN THOMAS, MIRANDA
MELSON, JANE DOE 1, JANE DOE 2,
SYDNEY BRUN-OZUNA, JANE DOE 3,
CAPRI DAVIS, JANE DOE 4, JANE DOE 5,
and OTHER UNIDENTIFIED FEMALE
DOES,

    Plaintiffs,

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA, and
individuals PETE JEYARAM, LAURIE
BELLOWS, JAKE JOHNSON, MATTHEW
HECKER, TAMIKO STRICKMAN, JEFF
LAMOUREAUX, MEAGAN COUNLEY,
RYAN FETTE, BRIANA PALLAS-SEARS,
SUE KELLY MOORE, SANDRA CHAVEZ,
and JAMIE PEER, individually and in their
official capacities, and OTHER
UNIDENTIFIED DEFENDANTS;

    Defendants.

Case No. 4:20-cv-03081

Hon. Robert F. Rossiter, Jr.

Magistrate Judge Susan M. Bazis

| | |
|---|---|
| Karen Truszkowski | Elizabeth K. Abdnour |
| TEMPERANCE LEGAL GROUP, PLLC | ELIZABETH ABDNOUR LAW, PLLC |
| Attorney for Plaintiffs | Attorney for Plaintiffs |
| 503 Mall Court #131 | 1100 W. Saginaw St., Ste. 4A-2 |
| Lansing, MI 48912 | Lansing, MI 48915 |
| (844) 534-2560 phone | (517) 292-0067 phone |
| (800)531-6527 fax | elizabeth@abdnour.com |
| karen@temperancelegalgroup.com | |

## SECOND AMENDED COMPLAINT AND JURY DEMAND

NOW COME Plaintiffs SHERIDAN THOMAS, MIRANDA MELSON, JANE DOE 1,

JANE DOE 2, SYDNEY BRUN-OZUNA, JANE DOE 3, CAPRI DAVIS, JANE DOE 4, and

JANE DOE 5, by and through their attorneys, KAREN TRUSZKOWSKI and ELIZABETH K.

ABDNOUR, and hereby file the following First Amended Complaint against Defendants as captioned above.

## **INTRODUCTION**

01. Plaintiffs are all current or former students of the University of Nebraska-Lincoln ("UNL") who attended the school at some point from 2015 to present.

02. Plaintiffs are all female students who were victims of sex discrimination, including rape, sexual assault, sexual harassment, and/or stalking, perpetrated by male UNL students.

03. Title IX of the Education Amendments of 1972 ("Title IX") is a federal law requiring that any educational institutions receiving federal funds are free of sex discrimination.  Title IX is implemented through the Code of Federal Regulations.

04. Pursuant to federal guidance issued by the U.S. Department of Education, all educational institutions that receive federal funding are required to designate a Title IX Coordinator, whose responsibilities include overseeing and coordinating efforts to ensure compliance with Title IX on campus.

05. Nebraska state law is also clear regarding UNL's obligation to maintain a campus free of sex discrimination, both through the Constitution of Nebraska and the Charter establishing the University of Nebraska.

06. The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act") contains required procedures institutions must follow in addressing cases of alleged dating violence, domestic violence, sexual assault, or stalking.

07. UNL's Office of Institutional Equity and Compliance ("IEC"), led by UNL's Title IX Coordinator, is responsible for preventing, responding to, and investigating alleged violations of Title IX on campus.

2

08. Reports made to UNL as described in this Complaint were made directly to the IEC either by one of the Plaintiffs or by another individual.

09. All the Plaintiffs experienced numerous violations of their rights in the IEC reporting and investigation process.

10. UNL's investigation and response to each of the Plaintiffs' sex discrimination complaints was insufficient and did not comply with basic due process requirements; accepted Title IX response requirements as outlined in guidance from the U.S. Department of Education, Office for Civil Rights; or the Nebraska State Constitution and the University of Nebraska Charter's prohibitions on sex discrimination.

11. UNL's response to each of the Plaintiffs constituted sex discrimination in a variety of ways as outlined later in this complaint.

12. UNL repeatedly denied due process to Plaintiffs in the investigation process in a variety of ways as outlined later in this complaint.

13. UNL routinely failed to follow its own policies in responding to and investigating claims of sexual misconduct, including sexual assault and other forms of sex discrimination, in a variety of ways as outlined later in this complaint.

14. Plaintiffs were denied the opportunity for a hearing in their investigations and were further denied hearings in their appeal processes when they chose to appeal the initial findings by IEC.

15. UNL's failure to allow the opportunity for a hearing or some type of cross examination in both the investigations and the appeals processes contradicts the "University of Nebraska-Lincoln Response to Allegations of Student Sexual Conduct" procedures adopted pursuant to Defendant UNL Board of Regents' Policy 5.3.3 and contained in UNL's Student

3

Code of Conduct:[1]

> 5.g. A Respondent and the Complainant have the right to hear all evidence, present evidence, testify, and to hear and submit questions for witnesses during formal hearings
>> i. Direct questioning of the witnesses by the Respondent and Complainant may be limited. The conduct [sic] Officer presiding at the hearing or Chair of the Conduct Board may control questioning by requiring the Respondent and Complainant to submit questions in writing to determine if the questions are appropriate, and then the presiding Conduct Officer or Chair may pose questions to the witness.[2]

16. On October 18, 2016, the UNL Executive Committee met with Defendant Tamiko Strickman ("Strickman"), the recently appointed interim Title IX Coordinator and Director of IEC. UNL's Faculty Senate Executive Committee raised concerns about due process issues in IEC meetings.

17. The following notes were recorded from that meeting:

> [Professor Richard] Leiter asked what would happen if a person does not agree with the findings of her office. Strickman stated that if it involves a student the case would go to a hearing board which is comprised of trained individuals. If either party disagrees with the findings of the panel the matter goes to the Chancellor who gets an outside mediator involved.[3]

18. Strickman's statement to the Faculty Senate Executive Committee was false.

19. As this complaint details, female students who appealed the findings of IEC decision letters were repeatedly denied the opportunity for a hearing, and their appeals were summarily dismissed without due process.

20. UNL's failure to appropriately respond and investigate the Plaintiff's claims, as well as the sex and race discrimination and other harms perpetrated by UNL against the Plaintiffs; caused severe harms to each of the Plaintiffs as outlined later in this complaint; denied them

---

[1] UNIVERSITY OF NEBRASKA-LINCOLN STUDENT CODE OF CONDUCT AND DISCIPLINARY PROCEDURES 1 (May 2014), https://studentconduct.unl.edu/Student%20Code%20of%20Conduct%20May%20Rev%202014%20a.pdf (last visited Apr. 30, 2020) [hereinafter "STUDENT CODE OF CONDUCT"].
[2] *Id.* at 18-19.
[3] UNL Faculty Senate Executive Committee Minutes 3 (Oct. 18, 2016), https://www.unl.edu/facultysenate/exec/16oct18mins.pdf (last visited Apr. 30, 2020).

due process; and denied them their ability to participate fully in their education as UNL students.

21. In three cases, Plaintiffs were forced to leave UNL due to the severity of the harm caused to them.

**JURISDICTION AND VENUE**

22. This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, et seq.

23. This is also an action to redress violations of Plaintiffs' rights under Title IV of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq.

24. This is also an action to redress the deprivation of Plaintiffs' constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

25. This is also an action to redress the deprivation of Plaintiffs' state constitutional rights under the Constitution of Nebraska, prohibiting discrimination based on sex and color in public education.[4]

26. This is also an action to redress the deprivation of Plaintiffs' rights under the Charter of the University of Nebraska as codified in the Act to Establish the University of Nebraska, Neb. Rev. Stat. §§ 85-101 et seq., which states, "No person shall be deprived of the privileges of this institution because of age, sex, color or nationality."[5]

27. Subject matter jurisdiction is based on 28 U.S.C. § 1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to

---

[4] Neb. Const. art. I, § 30, https://nebraskalegislature.gov/FloorDocs/Current/PDF/Constitution/constitution.pdf.
[5] Neb. Rev. Stat. § 85-116 (1869), https://nebraskalegislature.gov/laws/laws-index/chap85-full.html.

be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.  This Court has subject matter over state law claims pursuant to 28 U.S.C. § 1367.

28. This Court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

29. Plaintiffs' claims are cognizable under the United States Constitution, 42 U.S.C. §§ 1681 et seq., and under Title VI and Title IX.

30. The events giving rise to this lawsuit occurred in the city of Lincoln, Nebraska, County of Lancaster, which sits in the federal District of Nebraska.

31. Venue is proper in the United States District Court for the District of Nebraska, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

## PARTIES

32. Plaintiff Sheridan Thomas ("Thomas") is an adult and a former student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska.  Thomas is a resident of the State of Nebraska.  Thomas was a minor at the time of the assault detailed in this complaint.[6]

33. Plaintiff Miranda Melson ("Melson") is an adult and a former student at UNL, and at all

---

[6] Nebraska law contains a tolling provision applicable when a cause of action accrues when a plaintiff is under the age of majority, which is 21 years under Nebraska law. N.R.S. § 25-213.

times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska.  Melson is a resident of the State of Nebraska.

34. Plaintiff Jane Doe 1 ("Jane Doe 1")[7] is an adult and a current student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska.  Jane Doe 1 is a resident of the State of Iowa.

35. Plaintiff Jane Doe 2 ("Jane Doe 2")[8] is an adult and a former student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska.  Jane Doe 2 is a resident of the State of New Jersey.

36. Plaintiff Sydney Brun-Ozuna ("Brun-Ozuna") is an adult and a current student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska.  Brun-Ozuna is a resident of the State of Texas.

37. Plaintiff Jane Doe 3 ("Jane Doe 3")[9] is an adult and a former student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska.  Jane Doe 3 is a resident of the State of Nebraska.

38. Plaintiff Capri Davis ("Davis") is an adult and a former student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska. Davis is a resident of the

_____

[7] Jane Doe 1 is a pseudonym.
[8] Jane Doe 2 is a pseudonym.
[9] Jane Doe 3 is a pseudonym.

State of Texas.

39. Plaintiff Jane Doe 4 ("Jane Doe 4")[10] is an adult and a current student at UNL and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska. Jane Doe 4 is a resident of the State of Nebraska.

40. Plaintiff Jane Doe 5 ("Jane Doe 5")[11] is an adult and a current student at UNL, and at all times pertinent to this suit resided either on campus at UNL, located in the city of Lincoln, Nebraska, or in private housing in the city of Lincoln, Nebraska. Jane Doe 5 is a resident of the State of Nebraska.

41. Plaintiffs Other Unidentified Female Does are natural persons and, at all times relevant to this complaint, were students at UNL.

42. Defendant Board of Regents of the University of Nebraska ("Board of Regents") is the governing body of the University of Nebraska system, which includes UNL, a public, state university located in Lincoln, Nebraska, County of Lancaster, with its principal place of business at 1400 R St., Lincoln, Nebraska, 68588.

43. At all material times, Defendant Pete Jeyaram ("Jeyaram"), in his official capacity, was an agent and/or employee of the University of Nebraska, acting or failing to act within the scope, course, and authority of his employment and his employer.

44. At all material times, Jeyaram was the Chief Compliance Officer of the University of Nebraska, responsible for oversight of Title IX compliance for the University of Nebraska system.

45. At all material times, Defendant Laurie Bellows ("Bellows"), in her official capacity, was an

---

[10] Jane Doe 4 is a pseudonym.
[11] Jane Doe 5 is a pseudonym.

agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

46. From around August 2017, after the death of former Vice Chancellor Juan Franco, to present, Bellows has been the Interim Vice Chancellor for Student Affairs for UNL.

47. At all material times, Defendant Jake Johnson ("Johnson"), in his official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of his employment and his employer.

48. At all material times, Johnson was the Assistant Vice Chancellor for Student Affairs Advocacy & Support for UNL.

49. From around 2013 to around April 2018, Defendant Matthew Hecker ("Hecker"), in his official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of his employment and his employer.

50. From around 2013 to around April 2018, Hecker was the Dean of Students for UNL.

51. At all material times, Defendant Tamiko Strickman ("Strickman"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

52. At all material times prior to an unknown date in 2016, Strickman was an Investigator and Deputy Title IX Coordinator at UNL.  Upon information and belief, Strickman resigned from that position for a brief period in 2016. After former IEC Director Susan Foster's departure at some point in 2016, Strickman was rehired and named Interim Director of the Office of Institutional Equity and Compliance for UNL.   In 2016 until around November 2019, Strickman was Associate to the Chancellor, Title IX Coordinator, and Director of the Office

of Institutional Equity and Compliance for UNL.  Upon information and belief, Strickman was terminated from her position at UNL in December 2019.

53. For an unknown period of time including June to December 2017, Defendant Jeff Lamoureaux ("Lamoureaux"), in his official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of his employment and his employer.

54. For an unknown period of time including at least June to December 2017, Lamoureaux was Investigator and/or Deputy Title IX Coordinator for UNL.

55. At all material times, Defendant Meagan Counley ("Counley"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

56. From an unknown date until around December 2019, Counley was Investigator and/or Deputy Title IX Coordinator for UNL.  In or around December 2019, after Strickman's departure for a position at the University of Michigan, Counley was named Interim Title IX Coordinator for UNL.

57. From an unknown date until present, Defendant Ryan Fette ("Fette"), in his official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of his employment and her employer.

58. From an unknown date until present, Fette was Investigator and/or Deputy Title IX Coordinator for UNL.

59. For an unknown period of time, Defendant Briana Pallas-Sears ("Pallas-Sears"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

60. For an unknown period of time, Pallas-Sears was Investigator and/or Deputy Title IX Coordinator for UNL.

61. At all material times, Defendant Sue Kelly Moore ("Moore"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

62. At all material times, Moore was the Associate Director for Student Conduct for UNL.

63. At all material times, Defendant Sandra Chavez ("Chavez"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

64. At all material times, Chavez was a Professor of Military Science and Lieutenant Colonel for the UNL ROTC.

65. At all material times, Defendant Jamie Peer ("Peer"), in her official capacity, was an agent and/or employee of UNL, acting or failing to act within the scope, course, and authority of her employment and her employer.

66. At all material times, Peer was a Professor of Military Science and Lieutenant Colonel for the UNL ROTC.

67. Other Unidentified Defendants may be identified in the course of this litigation and Plaintiffs reserve the right to amend this Complaint to add them as defendants as they become known.

## APPLICABLE LAW AND POLICY

68. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681(a) et seq., states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

11

69. Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d states that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

70. Title IX and Title VI are implemented through the Code of Federal Regulations.  See 34 C.F.R. Part 106, 34 C.F.R. Part 100, and 28 C.F.R. § 42.104.

71. Regarding Title IX, 34 C.F.R. § 106.8(b) provides:

> …A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

72. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

73. In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

74. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

> a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and
> b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

> *Davis*, 526 U.S. at 1669-76.

75. Regarding Title VI, 28 C.F.R. § 42.104 provides:

(a) General. No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this subpart applies.

(b) Specific discriminatory actions prohibited.

(1) A recipient to which this subpart applies may not, directly or through contractual or other arrangements, on the ground of race, color, or national origin:

(i) Deny an individual any disposition, service, financial aid, or benefit provided under the program;

(ii) Provide any disposition, service, financial aid, or benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

(iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any disposition, service, financial aid, or benefit under the program;

(iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program…

76. In *Cannon v. University of Chicago*, 441 U.S. 677 (1979), the United States Supreme Court held that there is a private right of action under Title VI.

77. In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the United States Supreme Court limited the private right of action under Title VI to instances of disparate treatment discrimination.

78. The Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

79. The Nebraska State Constitution protects individuals from discrimination on the basis of gender and color in public education. Neb. Const. art I, sec. 30.

80. The Charter of the University of Nebraska states: "No person shall be deprived of the privileges of this institution because of age, sex, color or nationality." Neb. Rev. Stat. § 85-116.

13

## **BACKGROUND FACTS RELEVANT TO ALL PLAINTIFFS**

81. The Board of Regents are vested by the Nebraska State Constitution with the authority to supervise, control, and govern UNL.

82. As stated in the UNL Student Code of Conduct, pursuant to the University of Nebraska charter, Nebraska law provides that no person shall be deprived of the privileges of this institution because of sex. The UNL Student Code of Conduct also states that discrimination on the basis of sex is also prohibited by federal law.

83. At the time of the conduct alleged herein, Appendix A of the UNL Student Code of Conduct addressed UNL's responsibility for responding to and investigating sexual misconduct and initiating discipline when a member of the UNL community was found responsible for engaging in sexual misconduct or other Title IX violations.

84. As detailed in the individual Plaintiffs' fact sections below, Defendants engaged in discriminatory, retaliatory, and other unlawful actions in the process of investigating and responding to each separate Plaintiff's reports of experiencing Title IX violations and violations of UNL's Student Code of Conduct.

85. Upon information and belief, the training UNL provides for students on its sexual misconduct policies, definitions, and investigation and reporting procedures falls far short of what is considered industry standard in terms of educating students at higher education institutions about their rights and obligations with respect to sexual misconduct on campus.

86. Upon information and belief, the only information UNL provides to students about sexual misconduct or Title IX is a short generic YouTube video about consent[12] during orientation, an online Title IX video that is supposed to be watched prior to enrollment, and a flyer.

---

[12] *Consent: It's as Simple as Tea*, YOUTUBE.COM, https://www.youtube.com/watch?v=oQbei5JGiT8 (last visited June 18, 2020).

87. Upon information and belief, there is no oversight by UNL over whether students watch the videos, and many choose to simply skip them.

88. There are numerous consulting and training resources available to higher education administrators to assist them with the task of training their campuses on sexual misconduct prevention and response as required by federal guidance, the Clery Act, and as a matter of basic due diligence.

89. Upon information and belief, institutions of the size and scale of UNL generally provide much more comprehensive training to students to inform them of their rights and obligations under the institution's Title IX policy than UNL provides.

90. Upon information and belief, UNL's IEC staff and Title IX investigators had not received proper training in investigating sexual assaults.

91. Upon information and belief, IEC and Strickman handled sexual misconduct complaints against student-athletes in a different manner than how other complaints were handled.

92. Upon information and belief, Strickman engaged in retaliation against employees who raised concerns about investigations being improperly investigated and addressed within IEC.

93. Defendants' actions and inactions in response to Plaintiffs' reports of Title IX violations subjected Plaintiffs to additional harassment and created a sexually hostile environment for Plaintiffs on campus.

94. Plaintiffs suffered harm as a direct and indirect result of Defendants' actions and inactions, as detailed in the individual Plaintiffs' fact sections below.

**BACKGROUND FACTS RELEVANT TO PLAINTIFF THOMAS**

95. In August 2015, Sheridan Thomas had been accepted to and was preparing to begin her freshman year as an undergraduate student at UNL.   Thomas was legally a minor who turned eighteen years old in October 2015.

96. Thomas was a promising and accomplished student in high school looking forward to attending UNL as a freshman.

97. August 12, 2015 was "fan day," when students would normally socialize and meet each other in preparation for the upcoming athletic season.

98. That day, Thomas accompanied a friend, "Sally,"[13] to meet some UNL student-athletes with whom Sally was acquainted. They gathered in the Cather Hall dorm room of one of the student-athletes.

99. The student-athletes, "John Roe 1" ("JR1")[14] and "John Roe 2" ("JR2"),[15] procured alcohol for the group to drink.

100.    Thomas did not normally drink alcohol, so the alcohol she consumed had a rapid and substantial effect on her.

101.    Thomas told Sally that she wanted to leave.

102.    Sally told Thomas to lie down because Thomas had been drinking and shouldn't drive.

103.    Thomas lay down on JR1's bed.

104.    JR1 then went to his bed and lay down next to Thomas.

105.    Though Thomas was trying to sleep, JR1 began to touch Thomas's genitals and breasts.

106.    JR1 then raped Thomas.

107.    Afterward, Thomas and Sally escaped Cather Hall.

---

[13] Sally is a pseudonym.
[14] John Roe 1 is a pseudonym.
[15] John Roe 2 is a pseudonym.

16

108.    Thomas was terrified and wanted to report the incident to the police, but Sally talked her

out of it because Sally feared they would get in trouble for drinking alcohol underage.

109.    Thomas started receiving harassing text messages from JR1 and JR2 that night.

110.    The harassing text messages sent to Thomas from JR1 and JR2 referenced the size of

JR1's penis as being "too big to fit into" Thomas.

111.    The text messages were unwelcome to Thomas and constituted both sexual harassment[16]

and stalking[17] under UNL's Student Code of Conduct.[18]

112.    Thomas told another friend what had happened.

113.    Thomas' friend also tried to talk Thomas into going to the hospital to get a Sexual

Assault Nurse's Examination ("SANE").

114.    Thomas did not go to the hospital because she was afraid and did not want to worry her

mother.

115.    Thomas started classes at UNL the following Monday, August 17, 2015, in a state of

extreme fear, depression, and shock from the rape and subsequent sexual harassment.

116.    The beginning of Thomas' freshman year at UNL was a blur for her.

117.    On or around September 18, 2015, no longer able to cope with what had happened,

Thomas sought sexual assault counseling assistance from an on-campus advocacy

organization after seeing a flyer advertising their services.

118.    Thomas missed an excessive number of classes due to her emotional and mental state.

119.    On or around November 6, 2015, Thomas met with the UNL's Office of Institutional

Equity and Compliance ("IEC") and requested assistance with withdrawing from a class.

---

[16] "'Sexual harassment' is unwelcome conduct or behavior of a sexual nature." STUDENT CODE OF CONDUCT, *supra* note 1, at 23.
[17] "'Stalking' means to engage in a knowing and willful course of conduct directed at a specific person…with the intent to injure, terrify, threaten, or intimidate." *Id*. at 24.
[18] Thomas turned over these text messages to law enforcement and no longer has access to them.

120.    Strickman, the Title IX Coordinator and director of IEC, told Thomas that IEC would not assist her with the academic accommodation unless she filed a complaint against JR1 and initiated a formal Title IX investigation against JR1.

121.    Strickman's assertion to Thomas that she had to initiate a formal investigation against JR1 in order to obtain academic accommodations violated both federal Title IX guidance[19] and UNL's own Student Code of Conduct.[20]

122.    Thomas was terrified of initiating the Title IX investigation process and withdrew her request for assistance from IEC.

123.    In December 2015, Thomas began counseling to help her address the emotional and psychological damage of the rape.

124.    On or around December 16, 2015, Thomas met with Hecker to discuss withdrawing from one of her classes.

125.     Thomas told Hecker the details of her rape and detailed for Hecker the difficulties she had been having in school as a result of the immense trauma, stress, and Post-Traumatic Stress Disorder-like symptoms she was experiencing as a result of the rape.

126.    After this meeting, Hecker granted Thomas late withdrawal from one of her classes.

127.    Hecker did not offer Thomas any other assistance, services, or interim measures.

128.    Hecker did not advise Thomas that JR1's assault was a potential violation of University policy or that JR1 could face discipline for raping Thomas.

129.    On or around January 22, 2016, Thomas made an anonymous report of her rape to the University of Nebraska-Lincoln Police Department ("UNLPD").

---

[19] "In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v)."  U.S. Dep't of Ed., Office for Civil Rights, Q&A ON CAMPUS SEXUAL MISCONDUCT 3, FN 10 (Sept. 2017) https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

[20] "Persons who have been subjected to sexual misconduct may be able to receive assistance from the University regardless of whether a charge or report of any kind is filed." STUDENT CODE OF CONDUCT, *supra* note 1, at 16.

130.    Thomas did not intend to make a report to IEC.

131.    Sometime between January 22, 2016 and January 29, 2016, Thomas' advocate called her and said, "Tami [Strickman] called me and said she received an anonymous tip about a report. [Strickman] said, 'It sounds like Sheridan.'" Thomas' advocate told Thomas, "They know."

132.    Thomas was terrified that Strickman knew Thomas had made the anonymous tip and had contacted her advocate, as Thomas did not want JR1 to know she had reported him. Thomas also did not want her parents to know what had happened to her out of concern that they would worry.

133.    On or around January 29, 2016, Thomas decided she was willing to identify herself as the victim in the criminal matter and met with her advocate and a detective from UNLPD to discuss reporting options.

134.    That same day, Thomas also decided to move forward with a Title IX investigation with IEC regarding JR1's violations of UNL's Title IX policy and Student Code of Conduct.

135.    On or around February 12, 2016, Thomas had a formal interview with UNLPD to provide her statement for the criminal investigation.

136.    On that same day, Thomas also had a meeting with Strickman and another IEC staff member to share her account of her rape for the IEC investigation.

137.    Thomas told Strickman and the IEC staff member that JR1 had groped her, kissed her, and raped her, all without her consent and while she repeatedly told him, "No."

138.    Thomas told Strickman and the IEC staff member that JR1 had repeatedly called and texted her after the rape, against her wishes, and that his texts included unwelcome sexual content.

139.  Thomas told Strickman and the IEC staff member that she had several witnesses she wanted IEC to interview during the investigation.

140.  The witnesses were friends Thomas had talked to in the immediate aftermath of the rape who could share their contemporaneously observed information about Thomas' account and demeanor.

141.  IEC never interviewed Thomas' witnesses.

142.  Thomas also received a notification letter from Strickman advising her that the investigation was not going to be completed within the UNL policy's timeline of sixty (60) days but did not provide a reasonable rationale for the delay.

143.  UNLPD asked Thomas to "cold call" JR1 to attempt to get him to admit to the rape, which Thomas agreed to do.

144.  On February 18, 2016, Thomas attempted to "cold call" JR1 as requested by UNLPD. However, JR1's phone was restricted and unable to receive incoming calls from unknown numbers.

145.  During this time period, Thomas also learned from UNLPD that JR1 had been interviewed in the criminal investigation.

146.  UNLPD told Thomas that JR1 had initially admitted to the rape, then changed his story and said they had engaged in consensual sex, then changed his story another time and said he and Thomas had performed oral sex on one another.

147.  On or around March 11, 2016, the UNLPD investigation was concluded and no charges were filed against JR1.

148.  On or around March 15, 2016, Thomas met with the Lancaster County Attorney, who informed Thomas that if she went to court, she "wasn't going to win," so she was "wasting [her] time."

149.    On or around April 22, 2016, Thomas received a letter from Strickman stating that IEC "determined [JR1's] version of events surrounding the parties' interaction on the bed aligns more closely with the evidence provided by the parties."[21]

150.    IEC never gave Thomas an opportunity for a hearing or any opportunity to cross-examine JR1.

151.    The April 22, 2016 letter from IEC was riddled with factual errors and discriminatory statements.

152.    The letter provided no explanation or rationale as to why IEC found JR1 more credible than Thomas.

153.    The letter erroneously stated, "You stated that you were not intoxicated, and you were in full control when the parties engaged in sexual activity."  In fact, Thomas had reported to IEC staff that she had consumed alcohol, was feeling "tipsy," and that she was trying to sleep when JR1 got in bed with her and began groping, kissing, and raping her.[22]

154.    The letter erroneously stated that JR1 said Thomas had "guided [JR1's] penis toward [her] vagina."[23]

155.    Thomas had not touched JR1's penis, let alone guided it to her vagina.  However, IEC staff made no inquiry into whether Thomas had touched JR1's penis, therefore failing in their duty to investigate properly, and denying Thomas the opportunity to refute this allegation.

156.    The letter erroneously stated:

> You provided conflicting versions on whether [JR1] was able to vaginally penetrate you.  During one interview, you stated when [JR1] attempted to vaginally penetrate you, you said no and [JR1] did not vaginally penetrate you. During another interview, you indicated [JR1] vaginally penetrated you "halfway."[24]

---

[21] *See* Exhibit 1.
[22] *Id.*
[23] *Id.*
[24] *Id.*

In fact, Thomas did not state either of these things.  Thomas told IEC that JR1 had vaginally penetrated her.

157.    The letter provided no explanation or rationale as to why IEC found JR1 more credible than Thomas, in violation of the Student Code of Conduct.[25]

158.    The letter also stated the following: "…it is advised that you continue to refrain from contact with [JR1]…," putting a discriminatory and unlawful burden on Thomas to separate herself from her rapist.[26]

159.    The letter contained none of the information Thomas had shared about JR1's repeated unwelcome texts and calls.

160.    The letter contained no analysis as to whether JR1 had engaged in sexual harassment or stalking directed at Thomas.

161.    The letter contained no evidence that IEC had interviewed any of the witnesses Thomas had named and her friends told Thomas that they had not been contacted for an interview.

162.    Thomas filed an appeal of the finding in the April 22, 2016 letter, challenging the multiple factual errors in the letter.

163.    On or around May 2, 2016, Thomas again met with Hecker to request late withdrawal from a Spanish class.

164.    Thomas wanted to withdraw from the class due to concerns about her grades slipping resulting from the stress and anxiety she was suffering from both the sexual assault itself as well as the protracted, difficult, and flawed Title IX investigation process.

165.    Hecker granted Thomas' request for a late withdrawal from the Spanish class.

---

[25] "Any initial, interim, and final decision to resolve disciplinary matters must include…the rationale for the decision."  STUDENT CODE OF CONDUCT, *supra* note 1, at 19.

[26] *See* Exhibit 1.

166.    Hecker assured Thomas that she would not be academically dismissed from UNL regardless of her withdrawal from the Spanish class.

167.    On or around May 13, 2016, Thomas met with Defendant Moore and former Vice Chancellor of Student Affairs Juan Franco,[27] to discuss her appeal of the IEC determination.

168.    On or around May 17, 2016, Thomas met again with Moore, the appeal officer, to discuss the appeal process and request an appeal hearing.

169.    Moore notified Thomas that she was denying her the opportunity for an appeal hearing.

170.    When Thomas asked Moore why she was not being permitted to have a hearing, Moore said, "Because you're not going to win.  You said two different things."

171.    Thomas explained to Moore that the statement in IEC's April 22, 2016 letter stating that she had said two different things was inaccurate and was the very basis for her appeal.

172.    In violation of the Student Code of Conduct, Moore refused to allow Thomas a hearing on her appeal and told Thomas she would be making the decision herself without a hearing.[28]

173.    On or around June 7, 2016, Thomas met with Moore, who notified her that she was denying Thomas' appeal.  Moore provided Thomas with a letter notifying her of the decision.

174.    Moore's June 7, 2016 letter denying Thomas's appeal addressed the false statements as Thomas had challenged them but did not alter the finding that JR1 had not violated any University policy.

175.    Moore's June 7, 2016 letter is filled with erroneous and incomprehensible statements and is difficult to decipher.

---

[27] Dr. Franco passed away in August 2017.
[28] "If the Complainant wishes to pursue a disciplinary hearing, a formal hearing will be held by a Conduct Officer, or in cases where University Suspension or University Expulsion is sought, a hearing before a Conduct Board must be held." STUDENT CODE OF CONDUCT, *supra* note 1, at 17.

176.    Moore's letter again erroneously mischaracterizes Thomas' account of her rape.  Moore writes: "In reviewing information, I understood you to say that [JR1] did not vaginally penetrate you."[29]

177.    UNL's policies did not provide for any further avenues for appeal of the erroneous finding by IEC and the appeal officer.

178.    Most shockingly, while Thomas was going through the Title IX appeal process, she was academically dismissed from UNL.

179.    On May 14, 2016, Thomas received an email from Richard Morrell, the University Registrar, informing her that she had been "academically dismissed" from UNL and that she could not apply for readmission for at least two semesters.[30]

180.    The letter admonished Thomas, "Readmission, however, is not assured," and ordered her, "Please do not respond to this email."[31]

181.    As Thomas had repeatedly explained to UNL officials, her poor academic performance directly resulted from the emotional, psychological, and physical damage the rape caused her.

182.    Thomas was devastated by her dismissal from UNL, with no chance to reenroll for at least a year, and with daunting restrictions on her ability to be readmitted.

183.    Thomas lost all hope after learning she had lost her appeal of the IEC finding in her Title IX case.

184.    Thomas decided not to return to UNL as her mother felt it was too dangerous and Thomas felt hopeless.

---

[29] *See* Exhibit 2.
[30] *See* Exhibit 3.
[31] *Id.*

185.     Thomas fell into a deep depression, began consuming alcohol to cope, and lost her sense of purpose in life.

186.     Thomas felt discouraged from continuing her college education at any other school.

187.     As a direct and indirect result of Defendants' actions and inactions, Thomas was deprived of educational opportunities and/or benefits, and has suffered severe emotional and physical distress, including but not limited to PTSD, alcohol abuse, depression, and anxiety, and she was forced to abandon not only her career as a student at UNL, but her dreams of attending and graduating from college altogether.

**BACKGROUND FACTS RELEVANT TO PLAINTIFF MELSON**

188.     Miranda Melson began her academic career at UNL in August 2015.

189.     On July 23, 2016, Melson met a UNL student, John Roe 3 ("JR3"),[32] for a first date.

190.     Prior to the date, Melson had explicitly notified JR3 that she did not want a "one-night stand" and wanted to get to know him before engaging in sexual activity.

191.     During the date, JR3 undressed down to his underwear, to Melson's shock.

192.     JR3 asked Melson to take off her clothes, and she said no.

193.     JR3 then began unbuttoning Melson's shirt without her consent.

194.     JR3 began trying to kiss Melson without her consent.

195.     JR3 then began touching Melson in a sexual manner without her consent and eventually raped her.

196.     Melson froze and was unable to verbalize her objection to JR3's conduct.

197.     Melson eventually escaped JR3's apartment.

198.     After the rape, JR3 continued contacting Melson against her wishes.

199.     On July 26, 2016, Melson told JR3 that she did not want him to contact her anymore.

---

[32] John Roe 3 is a pseudonym.

25

200.   JR3 continued sending unwelcome text messages to Melson after she had told him to stop contacting her.

201.   On August 4, 2016, Melson again told JR3 not to contact her anymore.

202.   On August 4, 2016, JR3 contacted Melson and asked her to give him another chance after she had told him a second time to stop contacting her.

203.   On September 13, 2016, JR3 sent another unwelcome text message to Melson.

204.   In September 2016, Melson reported her rape and subsequent stalking to IEC.

205.   Melson's case was assigned to Strickman, who was an IEC investigator at the time.

206.   Melson met with Strickman several times for interviews to provide information about her sexual assault.

207.   During one meeting, Strickman told Melson, "This would be different if I were your parent, but I'm not your parent."

208.   Melson asked Strickman to record the conversations, which Strickman refused to do.

209.   Shockingly, Melson later learned that Strickman had recorded her interviews of JR3.[33]

210.   Strickman canceled and rescheduled numerous meetings with Melson in the investigation process, which caused stress, anxiety, and confusion for Melson.

211.   Both parties provided IEC with the name and contact information of witnesses to be interviewed in the investigation.

212.   IEC interviewed JR3's witness.

213.   IEC did not interview Melson's witness.

214.   Melson's witness was a friend she had called before and after he raped Melson while he was still on the date with Melson, who had relevant information which should have been considered in the investigation.

---

[33] IEC permitted Melson to listen to the audio recordings.

215.   On November 30, 2016, Melson received an email from Strickman with a letter attached notifying her of the findings in her investigation.

216.   This email came just before the last week of classes and finals for the semester.

217.   Strickman's letter was rife with errors, misstatements, and factual inaccuracies.

218.   Strickman's letter switched between the first and third person, referring to Melson as "you" in an accusatory manner with respect to her failure to affirmatively deny consent to her assailant.

219.   There was no investigation or analysis of Melson's stalking claims, in violation of both UNL policy and federal guidance regarding Title IX investigations.

220.   No finding was made about Melson's stalking claims against her assailant.

221.   Most shockingly, Strickman's letter provided the following as justification for not making any finding against JR3: "During the parties' sexual interaction, you did not inform Respondent through words or actions [that] you did not consent to the sexual activity. Therefore, no sanction is deemed to be appropriate or necessary."[34]

222.   Requiring an  affirmative rejection of JR3's advances directly violated the UNL Student Code of Conduct's definition of consent: "'Consent' means agreement, approval or permission as to some act or purpose, given voluntarily by a competent person…A person need not resist verbally or physically where it would be useless or futile to do so."[35]

223.   Strickman's finding also directly violated the definition of consent outlined on IEC's website:

> "Consent" is an agreement, approval, or permission as to some act or purpose, given voluntarily by a competent person. In the context of sexual activity, *consent is an affirmative decision to engage in mutually acceptable sexual activity by clear actions or words*. It is an informed decision, freely made by both parties…

---

[34] *See* Exhibit 4.
[35] STUDENT CODE OF CONDUCT, *supra* note 1 at 22.

The following guidelines are helpful when considering whether consent is given:
- Consent can be withdrawn at any time. If a person communicates consent, but then changes his or her mind, consent no longer exists.
- It is not safe to rely solely upon nonverbal communication. Nonverbal communication can lead to misunderstanding.
- One should not assume consent is given.
- *Silence does not equal consent. Moreover, passivity, or lack of active resistance alone does not equal consent.*
- Consent to one form of sexual activity does not imply consent to other forms of sexual activity…[Emphasis added][36]

224.   Melson was never provided with a copy of her final investigative report.

225.   On January 3, 2017, Melson met with former Vice Chancellor for Student Affairs Juan Franco, who is now deceased.

226.   Melson expressed her concerns about the process to Franco.

227.   On January 13, 2017, Franco sent Melson a follow up letter.

228.   In his letter, Franco wrote that he would "meet with the respondent to help him better understand 'consent.'"[37]

229.   Franco's letter clearly indicated that UNL staff understood that JR3 had not obtained Melson's consent and that he had, therefore, sexually assaulted her.

230.   The Title IX investigation process at UNL severely traumatized Melson, due to the lack of transparency, victim blaming, and lack of consideration for the trauma she had experienced.

231.   For Melson, the Title IX investigation process at UNL was actually more traumatic than the rape and stalking.

232.   The experience caused Melson to want to drop out of college, caused her to become suicidal, and negatively impacted her ability to complete her coursework.

---

[36] *About Title IX*, UNL Institutional Equity and Compliance, https://www.unl.edu/equity/about-title-ix (last visited May 18, 2020).
[37] *See* Exhibit 5.

233.   Melson's grades suffered as a result of going through the Title IX investigation process.

234.   As a direct and indirect result of Defendants' actions and inactions, Melson has suffered severe emotional and physical distress, including but not limited to depression, anxiety, suicidal ideations, and a negative impact to her academics.

### BACKGROUND FACTS RELEVANT TO PLAINTIFF JANE DOE 1

235.   Jane Doe 1 began her academic career at UNL in August 2015 as a Ph.D. student in the School of Biological Sciences.

236.   During the course of her time at UNL, Jane Doe 1 dated John Roe 4 ("JR4").[38]  Jane Doe 1 broke up with JR4 in early April 2017.

237.   On May 17, 2017, JR4 began sending Jane Doe 1 what amounted to be hundreds of unwelcome text messages, emails, and Facebook messages over the course of the next several weeks.

238.   The unwelcome text messages included repeated pleas to get back together, to meet JR4 for dinner, and to try to be friends.

239.   At first, Jane Doe 1 ignored the text messages.

240.   On May 20, 2017, Jane Doe 1 told JR4 twice to stop contacting her.

241.   From May 21, 2017 to May 31, 2017, JR4 continued to text, call, and send Facebook messages to Jane Doe 1, repeatedly begging her to respond to him.  These contacts were unwelcome, and Jane Doe 1 did not respond.

242.   On June 1, 2017, after many unwelcome texts, Jane Doe 1 again told JR4 to stop contacting her and that she considered further contacts to be harassment.

243.   After that text message, JR4 continued to text Jane Doe 1 multiple times per minute for over three hours, and he left her a voicemail.

---

[38] John Roe 4 is a pseudonym.

244.    From June 13, 2017 to June 24, 2017, JR4 continued sending unwelcome Facebook messages until Jane Doe 1 blocked him on June 24, 2017.

245.    From June 24, 2017 to June 26, 2017, JR4 sent unwelcome emails to Jane Doe 1.

246.    On June 26, 2017, JR4 tried to break into Jane Doe 1's email account.

247.    On June 27, 2017, JR4 sent Jane Doe 1 fourteen emails, 115 text messages, and he called her four times.

248.    Jane Doe 1 told her friends about the stalking she was experiencing from JR4.  Jane Doe 1's roommate, "Tina,"[39] contacted JR4's mother via Facebook.  Jane Doe 1's friend, "Phil,"[40] reported JR4 to UNL.

249.    On June 28, 2017, JR4 texted Jane Doe 1 41 times, called her four times, and left at least one voicemail message.

250.    Later that day, UNLPD and UNL IEC contacted Jane Doe 1.

251.    On June 30, 2017, Jane Doe 1 met with Jeff Lamoureaux, an investigator in UNL's IEC office.

252.    Lamoureaux told Jane Doe 1 that IEC could not help her.

253.    Lamoureaux told Jane Doe 1 that he would initiate a no-contact directive as part of an informal resolution process.

254.    Lamoureaux told Jane Doe 1 that she was not allowed to talk to anyone about her report outside of her family[41] – a violation of her First Amendment rights and contrary to guidance issued by the U.S. Department of Education's Office for Civil Rights and basic human decency.[42]

---

[39] Tina is a pseudonym.

[40] Phil is a pseudonym.

[41] *See* Exhibit 6.

[42] "Restricting the ability of either party to discuss the investigation (e.g., through 'gag orders') is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable."  Q&A ON CAMPUS SEXUAL MISCONDUCT, *supra* note 18 at 4.

255.    On July 19, 2017, Jane Doe 1 met with Lamoureaux and told him that she was concerned about taking fall classes with JR4.

256.    On August 7, 2017, JR4 sent a text message to Jane's friend Tina apologizing for his conduct.

257.    On October 17, 2017, Lamoureaux contacted Jane Doe 1 and told her that JR4 had contacted Lamoureaux on two occasions and asked if it was possible to "work things out" with Jane Doe 1.

258.    Lamoureaux wrote, "I wanted to share this information with you in case you wanted to work it out with him…"[43]

259.    By sending Jane Doe 1 this email, Lamoureaux made himself complicit in JR4's ongoing efforts to harass and stalk Jane Doe 1, as the no-contact directive specifically advised JR4 not to attempt to contact Jane Doe 1 via third parties.[44]

260.    Jane Doe 1 responded to Lamoureaux that she did not want to have any contact with JR4.

261.    Instead of notifying Jane Doe 1 that JR4's attempts to contact Jane Doe 1 via Lamoureaux were potential violations of the no-contact directive, Lamoureaux simply told Jane Doe 1, "I will advise him to avoid contact. If he doesn't listen, we will take further steps."[45]

262.    On November 14, 2017, JR4 appeared at a seminar that Jane Doe 1 participated in.  JR4 was not a part of the seminar series and did not normally attend the seminars.

263.    From December 7 to December 9, 2017, JR4 repeatedly attempted to contact Tina and Phil via text message and Facebook in an attempt to indirectly communicate with Jane Doe 1. These contacts were unwelcome to Jane Doe 1.

---

[43] *See* Exhibit 7.
[44] *See* Exhibit 8.
[45] *See* Exhibit 7.

31

264.   On December 11, 2017, Jane Doe 1 met with Counley.

265.   Later that day, JR4 sent a message to Tina stating that he was "waging war" on Dr. Brown, Jane Doe 1's advisor and supervisor.

266.   From December 11 to December 13, 2017, JR4 sent people emails about Jane Doe 1 and Dr. Brown.

267.   On December 13, 2017, Jane Doe 1 met with Officer Eric Fischer from UNLPD.

268.   On December 15, 2017, UNL staff told Jane Doe 1 that Fischer had reached out to JR4.

269.   On December 19, 2017, Jane Doe 1 contacted Counley and told her that she was concerned about having to take spring-term classes with JR4.

270.   On December 21, 2017, Counley told Jane Doe 1 there was nothing IEC could do to help Jane Doe 1, and that she would have to continue taking classes with JR4 in the spring.

271.   On January 8, 2018, UNL staff contacted Jane Doe 1 and told her there was nothing they could do about the repeated text messages and emails because JR4 had not broken the no-contact directive.

272.   On January 13, 2018, Jane Doe 1 met with Fischer to create a safety plan.

273.   On January 24, 2018, Jane Doe 1 met with IEC staff regarding IEC's decision not to investigate JR4's ongoing stalking of Jane Doe 1.

274.   On May 5, 2018, Jane Doe 1 received an email from JR4 using the pseudonym "John Smith."

275.   In that email, with the subject line "You are a fucking coward," JR4 told Jane Doe 1 to "pack diapers so you dont [sic] shit your fucking pants again," told her "you are not a strong independent woman," and called her a "cowardly little girl," a "cunt bitch," a "fucking cunt

coward weak little girl," a "STUPID CUNT BITCH," and an "IGNORANT SHIT PANTS LITTLE ATTENTION NEEDING GIRL."[46]

276.    IEC took no action to investigate or address this stalking and harassment of Jane Doe 1.

277.    On May 9, 2018, Jane Doe 1 learned that JR4 had also contacted Phil in another attempt to indirectly reach Jane Doe 1.

278.    Phil notified the School of Biological Sciences that JR4 had also contacted him.

279.    On May 10, 2018, Jane Doe 1 met with LPD to report JR4's ongoing stalking.

280.    Later that day, UNLPD also contacted Jane Doe 1 and asked her to meet with them as soon as possible.

281.    Jane Doe 1 met with UNLPD and was surprised to find that Strickman was also in the meeting.

282.    Jane Doe 1 was not told that Strickman would be at the meeting.

283.    Jane Doe 1 went to the meeting without her advocate because Jane Doe 1 could not reach her advocate on such short notice.

284.    UNLPD and Strickman forced Jane Doe 1 to go through JR4's email line-by-line and explain what she thought JR4 meant.

285.    Inexplicably, UNLPD and Strickman also made Jane Doe 1 provide a list of all awards she had won since starting at UNL.

286.    Strickman told Jane Doe 1 that she had the following options with regard to a Title IX complaint: file a formal complaint, not proceed with a complaint, or file an anonymous complaint.

287.    On May 11, 2018, Jane Doe 1 met with Fischer and Counley.

---

[46] *See* Exhibit 9.

288.  At that meeting, Jane Doe 1 asked Counley what IEC had done to make UNL a safe learning environment for her.

289.  Counley told Jane Doe 1 that it was not her job to create a safe learning environment for Jane Doe 1.

290.  Counley told Jane Doe 1 she had "given up" her right to an investigation regarding all events that occurred prior to June 2017.

291.  On May 14, 2018, Jane Doe 1's advocate sent an email to IEC with Jane Doe 1's signed complaint form requesting a formal investigation.

292.  On May 17, 2018, Jane Doe 1 sought a protection order in civil court, which was granted without a hearing.

293.  Later that day, Jane Doe 1 also learned that JR4 had sent 50 threatening messages to Phil from April 28, 2018 to May 5, 2018.  In one of these messages, JR4 threatened to kick Phil in the teeth.

294.  On May 21, 2018, JR4 was served with the civil protection order.

295.  On May 24, 2018, Jane Doe 1 met with Counley and Fischer to be interviewed for the Title IX investigation that was initiated based on her May 14, 2018 complaint.

296.  On June 6, 2018, Counley called Jane Doe 1 and told her that she had contacted two of Jane Doe 1's professors about her complaint, but had not contacted JR4, and had not interviewed any of the witnesses Jane Doe 1 had named.

297.  On June 11, 2018, 28 days after Jane Doe 1 had filed her formal complaint, Counley emailed Jane Doe 1 and notified her that Counley would be contacting JR4.

298.  On June 13, 2018, Jane Doe 1 received a phone call from Counley and Fischer.

299.  During that call, Counley told Jane Doe 1 that Counley had interviewed JR4 and he had admitted to sending all of the messages.

34

300.    On June 14, 2018, Jane Doe 1 saw JR4 drive by her while she was walking on campus.

301.    On June 15, 2018, Fischer told Jane Doe 1 that he had issued a stalking citation to JR4.

302.    On June 29, 2018, Counley sent Jane Doe 1 a notice stating that the IEC investigation was going to take more than 60 days.

303.    On July 10, 2018, Jane Doe 1 met with Counley and Fischer to review documents submitted to IEC by JR4 and to answer questions JR4 had submitted.

304.    On July 17, 2018, Jane Doe 1 received a call from Counley and Fischer.

305.    During that call, Fischer told Jane Doe 1 that JR4 was going to be in her building on Wednesdays and Fridays, and that Jane Doe 1 may want to avoid the building on those days.

306.    UNL did not make any offer to Jane Doe 1 to protect her from encountering JR4 in or around the building.

307.    On July 27, 2018, Jane Doe 1 received a decision in the Title IX investigation from IEC.

308.    The IEC decision found JR4 in violation of three sections of the Student Code of Conduct.

309.    The findings recommended the following sanctions against JR4: one-year probation and maintaining the no-contact directive that was in place.

310.    On July 30, 2018, Jane Doe 1 filed an appeal of the sanctions as she felt they were not sufficient given the seriousness of the offenses.

311.    On August 29, 2018, Jane Doe 1 met with Moore and Counley for a prehearing conference.

312.    At the prehearing conference, Moore and Counley told Jane Doe 1 that she was not permitted to talk about her concerns about how IEC handled her complaint at the hearing.

313.    In violation of the Student Code of Conduct Moore and Counley also told Jane Doe 1 that even though JR4 had not submitted a written statement, they would still allow him to make a statement at the hearing without allowing Jane Doe 1 to review it.[47]

314.    In violation of the Student Code of Conduct, JR4 could review Jane Doe 1's written statement, but Jane Doe 1 was not allowed to review JR4's statement.[48]

315.    Jane Doe 1 also learned that IEC had recorded their interviews of JR4.

316.    Jane Doe 1 asked Moore and Counley if she could listen to the interview recordings.

317.    On September 4, 2018, Moore sent Jane Doe 1 an email denying her request to listen to the IEC interview recordings.[49]

318.    On September 7, 2018, an appeal hearing was held with Moore as the hearing officer.

319.    On September 18, 2018, Moore sent Jane Doe 1 an email notifying her of the outcome of the appeal hearing.

320.    JR4 was again found in violation of all three sections of the Student Code of Conduct.

321.    JR4 was given the following sanctions:

    a.    The probation was extended for the duration of JR4's time at UNL.

    b.    The no-contact directive stayed in place.

    c.    An additional sanction of restricted access to the Morrison Center, where Jane Doe 1 worked, was imposed against JR4.

322.    On September 27, 2018, Jane Doe 1 again appealed these sanctions.

323.    On October 4, 2018, Bellows contacted Jane Doe 1 and notified her that she would be the decisionmaker for the second appeal.

---

[47] "Both a Respondent and the Complainant have a right to prepare a written statement in advance of a formal hearing. Both parties will have the right to view each other's statement." STUDENT CODE OF CONDUCT, *supra* note 1, at 18.

[48] *Id.*

[49] This contrasts with the experience of Plaintiff Melson, who was permitted to listen to the audio recordings of her assailant's interviews, as detailed previously in this Complaint.

324.   Jane Doe 1 contacted Bellows on October 24, 2018 and notified her that JR4 violated the no-contact order by entering the Morrison Center on October 10, 2018; October 17, 2018; October 23, 2018; and October 24, 2018.

325.   Bellows referred Jane Doe 1 to Moore.

326.   On October 31, 2018, Bellows notified Jane Doe 1 that her second appeal had been denied.

327.   Throughout November and December 2018, Jane Doe 1 repeatedly contacted Moore and Johnson to try to find out how the no-contact directive would be enforced and to find out how she would be notified if JR4 was in the Morrison Center.

328.   Jane Doe 1 notified Moore and Johnson that JR4 had repeatedly entered the Morrison Center without her receiving any warning.

329.   Moore and Johnson said they would "try to warn" Jane Doe 1 if JR4 was going to come to the Morrison Center

330.   Jane Doe 1 asked for 24 hours' notice of JR4 was going to be in the Morrison Center.

331.   Moore and Johnson said they could not guarantee 24 hours' notice.

332.   Later, Jane Doe 1 notified Moore and Johnson that she was no longer working in the Morrison Center and needed to modify the no-contact directive to ban JR4 from her new building.

333.   Moore and Johnson told Jane Doe 1 they could not do this.

334.   Moore and Johnson did not provide any reasonable rationale for their failure to modify the no-contact directive or their conclusion that the no-contact directive was intended to protect the Morrison Center rather than Jane Doe 1.

37

335.   On or about December 2018, upon information and belief, the School of Biological Sciences removed JR4 from their program due to him stalking a second ex-girlfriend in the program.

336.   In spring semester 2019, upon information and belief, the University of Nebraska system forced the School of Biological Sciences to allow JR4 back into the program, despite the fact that JR4 created an ongoing hostile environment for multiple women in the School.

337.   On or around September 11, 2019, JR4 contacted the Dear UNL advocacy group, knowing that Jane Doe 1 was a part of the group.

338.   JR4 sent the message from the email address "gofuckyourself@hotmail.com."  The message read, "Get a fucking life you stupid cunts. If you can't convince the kangaroo court that is Title IX that you were violated then you have no case. Go fuck yourselves."[50]

339.   Jane Doe 1 reported this contact to Moore.

340.   Moore told Jane Doe 1 that she did not consider this to be a violation of the no-contact directive and that no investigation or sanctions would be initiated regarding this contact.

341.   Jane Doe 1 had been on track to complete her dissertation and graduate from UNL with her Ph.D. degree in May 2020.

342.   As a result of all the time, effort, and appeals she had to put into the Title IX process, Jane Doe 1's graduation date was extended until at least August 2020.

343.   For Jane Doe 1, the Title IX investigation, hearing, and resolution process was more stressful and difficult than the stalking she experienced.

344.   As a direct and indirect result of Defendants' actions and inactions, Jane Doe 1 was denied educational opportunities and/or benefits and has suffered severe emotional and physical distress, including but not limited to depression, anxiety, adjustment disorder,

---

[50] *See* Exhibit 10.

insomnia, nightmares, trouble eating, and financial costs including extending her Ph.D. program.

## BACKGROUND FACTS RELEVANT TO PLAINTIFF JANE DOE 2

345.    Jane Doe 2 began her academic career at UNL in August 2015 as a master's student who later converted to becoming a Ph.D. student in the Department of Political Science.

346.    Prior to enrolling at UNL, Jane Doe 2 was an extremely accomplished scholar, having earned her B.A. *magna cum laude* with honors at Rutgers University.  Jane Doe 2 had also spent close to three years working in India prior to her graduate program, and she showed exceptional academic promise after she started at UNL, leading the graduate chair to invite her to join the Ph.D. program.

347.    Sometime during summer 2017, Jane Doe 2 reported to a professor that she was sexually assaulted, harassed, and abused by a male student in her Ph.D. program who she used to date, John Roe 5 ("JR5").[51]

348.    Upon information and belief, several other students reported abuse by JR5 to Jane Doe 2's professor.

349.    Upon information and belief, Jane Doe 2's professor reported the sexual assaults by JR5 to IEC in or around November 2017.

350.    On November 21, 2017, Jane Doe 2 met with IEC investigators Counley and Fette, along with Strickman, to notify them that she wanted to proceed with a formal investigation against JR5.

351.    IEC staff failed to offer Jane Doe 2 appropriate accommodations or interim measures, and she was forced to remain in an office across the hall from her assailant's classes, where he would come to try to see her when he was going to class.

---

[51] John Roe 5 is a pseudonym.

352.   All of the interim measures IEC offered to Jane Doe 2 wrongly placed the onus on her to remove herself, such as offering to allow her to move into undergraduate dorms and changing the locations of all of the classes she taught.

353.   None of the interim measures placed any burden on JR5.

354.   Further, upon information and belief, IEC refused to allow political science department faculty to implement their own interim measures or remove JR5 from their classes.

355.   On November 28, 2017, Counley sent Jane Doe 2 a letter confirming that IEC would be moving forward with investigating sexual assaults which Jane Doe 2 reported to have occurred in March 2016 and on July 14 and 24, 2017.

356.   During the course of the investigation, JR5 engaged in numerous intimidating and retaliatory acts towards Jane Doe 2, including: sharing a private photograph of Jane Doe 2 with others, stalking Jane Doe 2 online, sending nude photographs of Jane Doe 2 to IEC, and changing his social media profile picture to display a picture of Jane Doe 2.

357.   In violation of the UNL Student Code of Conduct and federal Title IX guidance UNL did not initiate any investigation into these intimidating acts of retaliation and stalking.

358.   Jane Doe 2 identified numerous witnesses who had relevant information about JR5's past unwelcome touching of others, demonstrating a pattern of conduct.

359.   IEC dismissed Jane Doe 2's witness' information as irrelevant and prejudicial so the board was never able to hear this information during the appeal process.

360.   The investigation dragged on significantly beyond the 60-day timeline of which Jane Doe 2 had been advised by IEC.

361.   Jane Doe 2 repeatedly attempted to contact IEC staff to inquire about what was taking so long and what the rationale was for the extensive investigation timeline.

362.    Counley misled Jane Doe 2 by repeatedly telling her that the investigation would be completed "by the end of the week," which was not true.

363.    As the investigation came to a close, and in blatant violation of the Student Code of Conduct, Counley, Fette, and Strickman strongly pressured Jane Doe 2 to drop the formal investigation and agree to a "mediation" with her assailant on multiple occasions.[52]

364.    Jane Doe 2 declined and repeatedly stated that she wanted to move forward with a formal investigation and hearing.

365.    These confrontations occurred on occasions when Jane Doe 2 was present in the IEC office without her advocate who IEC staff had either told Jane Doe 2 not to bring or told to wait outside while they spoke with Jane Doe 2.

366.    IEC staff's refusal to meet with Jane Doe 2 with her advocate present caused Jane Doe 2 to feel intimidated and pressured.

367.    Finally, on April 6, 2018, Counley sent Jane Doe 2 a letter outlining her findings.

368.    Counley's letter found JR5 responsible for one incident of sexual assault on July 24, 2017.

369.    Counley's findings with respect to the other sexual assault incidents Jane Doe 2 had reported were problematic and lacked sufficient justification.

370.    There was no mention anywhere in the findings letter of any analysis or finding related to the incidents of retaliation and stalking.

371.    Without fully analyzing the evidence, and without conducting any credibility analysis of the parties, Counley found that there was insufficient evidence to find JR5 in violation regarding the other three incidents.

---

[52] "Mediation shall not be used to resolve sexual assault complaints."  STUDENT CODE OF CONDUCT, *supra* note 1 at 19.

372.   Counley's letter notified Jane Doe 2 that JR5 was recommended for expulsion from UNL based on the sexual assault on July 24, 2017.

373.    On April 30, 2018, Jane Doe 2 received a letter from Johnson notifying her that JR5 had appealed the decision and had requested and been granted a hearing.

374.   UNL granted JR5 a hearing even though he missed the deadline to file his appeal.

375.   Johnson's letter notified Jane Doe 2 that a prehearing conference would be held before him on May 16, 2018 and that a hearing would be held before the University Conduct Board on May 23, 2018.

376.   JR5 delayed the hearing, and due to this delay, the police officer who obtained a recorded confession from JR5 was unavailable to testify.

377.   IEC staff also told Jane Doe 2 that they were not going to allow the police officer to testify as a witness.

378.   Classes ended for the semester on April 28, 2018, and final exams were held April 30 to May 4, 2018.

379.   Jane Doe 2 is from New Jersey and had not planned to remain in Lincoln, Nebraska, past the end of the semester.

380.   Jane Doe 2 felt she had to appear personally at the hearing due to the pressure she had been under from Strickman, Counley, and Fette, as she did not believe UNL would actually move forward with a fair hearing if she did not appear.

381.   Due to the timing of the hearing, Jane Doe 2 was forced to abandon her summer plans and remain in Lincoln, Nebraska a month past the end of the semester.

382.    The afternoon before the hearing, on May 22, 2018 at around 4:30 p.m., Strickman called Jane Doe 2 and said, "Will you accept an agreement? If not, we will probably have to cancel the hearing tomorrow anyway."

383.    Strickman told Jane Doe 2 she had a half hour – until 5:00 p.m. – to make a decision regarding whether she wanted to accept a mediation agreement rather than proceed with a hearing.

384.    Jane Doe 2 told Strickman she did not want to adjourn the hearing and wanted to proceed as scheduled.

385.    Strickman then told Jane Doe 2, "You could very well lose."

386.    Jane Doe 2 insisted on proceeding with the hearing the following day as scheduled.

387.    The hearing itself, held on May 23, 2018, was extremely difficult and traumatic, as JR5 was permitted to verbally attack Jane Doe 2 during the hearing.

388.    Jane Doe 2's grades and academic success suffered, as she was forced to take several incompletes due to the stress of the ongoing investigation and hearing process.

389.    During the course of the Title IX investigation, IEC learned that JR5 carried a gun on campus, in violation of UNL's Weapons Policy,[53] and that his concealed carry license was expired.

390.    No action was taken by UNL to address JR5's repeated violations of the UNL Weapons Policy or the threat he posed to Jane Doe 2 and other students in carrying a gun on campus.

---

[53] "Possession of dangerous weapons - concealed or unconcealed - on University property, on the worksite, in University vehicles, or in personal vehicles when on University property shall be a violation of UNL policy. A dangerous weapon shall include guns, knives, explosives, or any other device defined by statute or as determined by the University, which in the manner used or intended is capable of producing death, harm to person or property, or bodily injury. Violation of this policy shall make the offender subject to appropriate disciplinary or legal action." *Weapons Policy*, UNL University Police, https://police.unl.edu/weapons-policy (last visited May 18, 2020).

391.    After the hearing on May 23, 2018, Jane Doe 2 dropped out of the Ph.D. program at UNL, as she was so emotionally devastated by the prolonged, abusive Title IX investigation and hearing process, and her timeline to complete her Ph.D. had been so severely disrupted.

392.    Jane Doe 2 spent over a year underemployed, even though she had been an exceptional student and had a bachelor's and master's degree.

393.    Eventually, Jane Doe 2 was able to obtain employment as a technical writer at a company where a family member is employed.

394.    Jane Doe 2 has struggled emotionally, financially, and professionally due to the harms caused to her by the UNL Title IX investigation and hearing process.

395.    Prior to going through the investigation, Jane Doe 2 had been diagnosed with a heart arrhythmia.

396.    During and after the investigation process was completed, Jane Doe 2 experienced increased symptoms of arrhythmia, as well as seizures.  She was also diagnosed with PTSD and began counseling at UNL's on-campus counseling program, CAPS.

397.    Jane Doe 2's CAPS counselor had scheduled several transitional appointments with her to conclude her treatment, which was the normal course of treatment for students who were leaving UNL.

398.    Upon information and belief, after the investigation and hearing process completed, a UNL official contacted Jane Doe 2's CAPS counselor and told her to cancel all future appointments with Jane Doe 2.

399.    After dropping out of UNL, Jane Doe 2 lost her health insurance and spent months uninsured while trying to get approved for Medicaid.

400.   After the investigation was completed and Jane Doe 2 left UNL, Jane Doe 2 has had numerous health issues which her doctors have connected to the stress and trauma of the sexual assaults and related reporting process, including reproductive health issues.

401.   Jane Doe 2 also lost a fellowship which funded her education at UNL.

402.   Jane Doe 2 must now repay the fellowship funds with interest as she did not complete her program.

403.   After leaving UNL, Jane Doe 2 sent an email to UNL Chancellor Ronnie Green to advise him of her concerns about the Title IX investigation and complaint resolution process at UNL.

404.   Upon information and belief, neither Green nor any other defendant named has taken any action to address Jane Doe 2's concerns.

405.   As a direct and indirect result of Defendants' actions and inactions, Jane Doe 2 was denied educational opportunities and/or benefits and has suffered severe emotional and physical distress, including but not limited to PTSD, increased physical symptoms of heart arrhythmia, anxiety, depression, reproductive health issues, loss of income, loss of fellowship funds, loss of employability.

406.   Jane Doe 2 was forced to abandon not only her career as a student at UNL, but her dreams of attending and graduating from a Ph.D. program altogether.

**BACKGROUND FACTS RELEVANT TO PLAINTIFF BRUN-OZUNA**

407.   Sydney Brun-Ozuna began her undergraduate academic career at UNL in August 2017.

408.   On or around September 9, 2017, less than one month into her freshman year at UNL, Brun-Ozuna went to the off-campus apartment of another UNL student who was a junior at the time, "John Roe 6" ("JR6") to watch a movie.

409.   During the movie, JR6 began kissing Brun-Ozuna without her consent.

410.   Brun-Ozuna was unable to move due to fear.

411.   JR6 then became more forceful.   He began kissing and groping Brun-Ozuna's breasts without her consent.

412.   JR6's conduct escalated.   He began to untie Brun-Ozuna's shirt and put his hands up her skirt, again without her consent.

413.   Brun-Ozuna became fearful and tried to pull away from JR6.   However, he was holding her down tightly and she could not push him off of her.

414.   JR6 continued non-consensually kissing Brun-Ozuna and groping and molesting her breasts and buttocks until he eventually loosened his grip.

415.   Brun-Ozuna was then able to escape from JR6's grip and left his apartment.

416.   JR6 tried to text, call, and contact Brun-Ozuna on social media for several days after the sexual assault, but she ignored all of his contacts after letting him know she had gotten home.

417.   On or around September 14, 2017, Brun-Ozuna reported the sexual assault to her resident assistant ("RA").

418.   Brun-Ozuna's RA told Brun-Ozuna that the RA was a responsible employee under UNL's Title IX policy.

419.   Upon information and belief, Brun-Ozuna's RA reported the sexual assault to the Resident Director, who reported it to IEC.

420.   IEC reached out to Brun-Ozuna.

421.   While Brun-Ozuna was considering whether to move forward with an IEC investigation, she decided to anonymously report her sexual assault to the Lincoln Police Department ("LPD").

422.   After consideration, Brun-Ozuna requested that IEC move forward with a formal investigation of the sexual assault.

423.   The IEC investigator assigned to the investigation was Counley.

424.   Brun-Ozuna met with Counley multiple times.

425.   During the first meeting, Counley told Brun-Ozuna that she would need to make a statement for the investigation.

426.   During that meeting, Counley also asked Brun-Ozuna if she had anything that could corroborate the sexual assault.

427.   Brun-Ozuna told Counley that she had filed an anonymous police report.

428.   Counley asked for a copy of the police report and told Brun-Ozuna that it would help to show that Brun-Ozuna's story hadn't changed.

429.   Brun-Ozuna provided Counley with a copy of the police report.

430.   During her meetings with Counley, Brun-Ozuna was very uncomfortable, because Counley would make inappropriate, harassing statements to her, making her feel that Counley blamed her for the sexual assault.

431.   Counley asked Brun-Ozuna numerous inappropriate questions.

432.   Counley asked Brun-Ozuna, "What were you wearing?"

433.   Counley asked Brun-Ozuna, "What underwear were you wearing?"

434.   Counley asked Brun-Ozuna, "Were you showing any cleavage?"

435.   Counley asked Brun-Ozuna, "How short was your skirt?"

436.   Counley made Brun-Ozuna essentially re-live the sexual assault, forcing her to recount whether JR6 had put his tongue in her mouth, and asking what positions he placed her body in.

437.   At one point, Counley made Brun-Ozuna stand up and show Counley on her body how short her skirt had been on the night in question.

438.   None of these questions were relevant to an analysis as to whether it was more likely than not that Brun-Ozuna was sexually assaulted by JR6.

439.   Further, these questions made Brun-Ozuna uncomfortable with Counley and made it difficult for her to share private information with her, thus disenfranchising her from participating fully in the investigation process.

440.   At some point during the investigation, Counley told Brun-Ozuna that JR6 had told contradictory accounts.

441.   Counley told Brun-Ozuna that JR6 had initially told Counley that "nothing happened" with Brun-Ozuna.

442.   Counley told Brun-Ozuna that JR6 later "recanted" and said that he wanted to take back his denial of sexually assaulting Brun-Ozuna.

443.   Counley told Brun-Ozuna that, after that, JR6 had "unrecanted" and gone back to saying that nothing had happened.

444.   Counley told Brun-Ozuna that the reason JR6 had "unrecanted" was because Counley had told him that recanting his statement could hurt his credibility in her investigation, so he decided against it.

445.   Brun-Ozuna did not understand why Counley would have given JR6 advice about what to say to her in the investigation, as Counley had previously told Brun-Ozuna that UNL's Title IX officers were not allowed to give advice to parties about how to proceed in an IEC investigation.

446.   Brun-Ozuna named two witnesses in the investigation – "Friend A,"[54] who she had spoken with about the sexual assault in the immediate aftermath, and her roommate "Friend B,"[55] who she talked with about a week afterwards.

447.   Friend B also knew where Brun-Ozuna was on the night of the assault, as Brun-Ozuna had told her that she was going to an apartment complex to meet someone for a date.

448.   JR6 did not name any witnesses.

449.   Brun-Ozuna had to repeatedly contact Counley requesting updates on the status of her investigation.

450.   Brun-Ozuna also received a notification letter from Counley advising her that the investigation was not going to be completed within the UNL policy's timeline of sixty days but did not provide any reasoning for the delay.

451.   IEC never gave Brun-Ozuna an opportunity for a hearing or any opportunity to cross-examine JR6.

452.   On or around November 27, 2017, Brun-Ozuna received a letter from Counley stating: "Based on the totality of the circumstances and the information obtained pursuant to this investigation, and a more likely than not standard of proof, the evidence shows Respondent **did not** engage in sexual misconduct…"[56] (Emphasis in original)

453.   Counley's November 27, 2017 letter provided the following "rationale" for her finding that Respondent had not sexually assaulted Brun-Ozuna:

- Your statement to IEC and your written statement in the Google Document[57] were inconsistent
- The information obtained from the Incident Report and your witnesses was too vague for comparison to your statement.  The Incident Report and

---

[54] Friend A is a pseudonym.
[55] Friend B is a pseudonym.
[56] *See* Exhibit 11.
[57] Brun-Ozuna had shared the police report with Counley via a Google document.

statements made to witnesses only contained information that you alleged unwanted kissing and touching occurred, but there were no specific details about the number of occurrences or where you were touched.

- You alleged you were sexually assaulted by contact. Respondent denied the allegations. Respondent provided evidence that corroborated pieces of his statement, but there were no witnesses or evidence that opposed the allegation of sexual assault. IEC does not have sufficient information or evidence to determine whether or not the alleged sexual contact was made.[58]

454.   Brun-Ozuna had no idea what the "Incident Report" was as she did not create it and was not provided with a copy of it.

455.   Instead of using the police report to corroborate Brun-Ozuna's story, as Counley had said she would, she used it to pick apart Brun-Ozuna's credibility by highlighting minor discrepancies between what Brun-Ozuna had reported to LPD and what Brun-Ozuna stated to Counley in her investigative interview.

456.   Counley's letter provided no rationale for why she found Brun-Ozuna not credible, when she had maintained consistent accounts, whereas JR6 had changed his story twice.

457.   Counley's letter provided no explanation for her finding both that she did not have sufficient information to determine whether or not JR6 made sexual contact with Brun-Ozuna, and her finding that JR6 did not engage in sexual misconduct.

458.   Brun-Ozuna requested a meeting with Counley as she did not understand the decision or how Counley had come to the finding that she did, as Counley's decision lacked a sufficient rationale for her contradictory findings, in violation of the Student Code of Conduct.[59]

459.   Brun-Ozuna met with Counley in or around late November or early December 2017 to review her case file and ask questions about Counley's finding.

---

[58] *Id.*
[59] "Any initial, interim, and final decision to resolve disciplinary matters must include…the rationale for the decision." STUDENT CODE OF CONDUCT, *supra* note 1, at 19.

460.   In the case file, Brun-Ozuna saw a reference to someone named Ryan Fette who was involved in the investigation.

461.   Brun-Ozuna asked Counley who Fette was, and Counley said he was "the other investigator."

462.   Until that moment, Brun-Ozuna had had no idea a second investigator was involved in the investigation.

463.   Fette never met with Brun-Ozuna, but he did meet with and interview JR6 with Counley.

464.   During the meeting, Brun-Ozuna asked Counley why Counley did not find Brun-Ozuna credible, and why Counley did not discount JR6's credibility even though he had "recanted" and "unrecanted" his story.

465.   Counley accused Brun-Ozuna of falsifying her statement because the LPD report indicated that Brun-Ozuna had said JR6 kissed her four times, whereas Counley said Brun-Ozuna told Counley JR6 kissed her three times when Brun-Ozuna was interviewed by Counley.

466.   Brun-Ozuna tried to explain to Counley that she had not been lying, but simply had a difficult time remembering exactly what happened each time she had to retell the story because she had been so emotional while trying to recall the events of the sexual assault.

467.   Eventually, Counley became so frustrated that she told Brun-Ozuna, "You're not going to change my mind."

468.   Brun-Ozuna left Counley's office completely discouraged and embarrassed and went to a bathroom and began crying.

469.   Brun-Ozuna tried to contain her crying because she did not want Counley to know she had hurt her, but she was unable to remain quiet, due to the overwhelming emotion she felt.

470.    Brun-Ozuna then went and sat in a windowsill on the third floor of the administration building where the IEC office is located because she was unable emotionally to go to class after the meeting.

471.    While sitting in the windowsill, Brun-Ozuna thought, "I wonder if I jump if they would finally take me seriously.  I wonder if I jump out and hurt myself if someone would finally listen to me."

472.    Brun-Ozuna did not attempt to jump, but her suicidal thoughts made her realize how negatively the investigation process had affected her.

473.    Brun-Ozuna had never had thoughts of self-harm before that day she and had been a joyful and happy person before that.

474.    Brun-Ozuna's thoughts of self-harm were caused by the fact that Counley did not believe her, not because of the sexual assault itself.

475.    Brun-Ozuna decided to request a hearing to appeal Counley's findings.

476.    In December 2017, Brun-Ozuna communicated with Moore via email regarding an appeal.

477.    Brun-Ozuna wrote to Moore that she wanted to appeal Counley's decision.

478.    Moore informed Brun-Ozuna that the decision was being appealed.

479.    Moore never contacted Brun-Ozuna to allow her the opportunity to explain the reasons for her appeal.

480.    On or around December 20, 2017, Brun-Ozuna received a letter from Moore.

481.    Brun-Ozuna's name was misspelled twice in Moore's letter.

482.    In violation of the Student Code of Conduct Moore denied Brun-Ozuna the opportunity for a hearing.[60]

483.    Moore's December 20, 2017 letter erroneously stated: "There were no other witnesses to support your claim that sexual contact occurred."[61]

484.    Moore's letter provided no information about what information she based her erroneous decision on other than Counley's letter of findings.

485.    Moore's letter included no information from Brun-Ozuna about the basis for her appeal.

486.    Moore's letter upheld Counley's letter's findings without considering any other information.

487.    UNL's policies did not provide for any further avenues for appeal of the erroneous finding by IEC and the appeal officer.

488.    Brun-Ozuna suffered emotionally and psychologically because of both the sexual assault and the discriminatory, unlawful Title IX complaint resolution process at UNL, and began counseling as a result.

489.    Brun-Ozuna's counselor has also told her that she likely has anxiety because of the dysfunctional, traumatizing process she went through.

490.    On March 26, 2019, Brun-Ozuna decided to reach out to Chancellor Green and several other administrators at UNL to express her concerns about the Title IX investigation process and request a meeting with Green.[62]

---

[60] "If the Complainant wishes to pursue a disciplinary hearing, a formal hearing will be held by a Conduct Officer, or in cases where University Suspension or University Expulsion is sought, a hearing before a Conduct Board must be held." STUDENT CODE OF CONDUCT, *supra* note 1, at 17.
[61] *See* Exhibit 12.
[62] *See* Exhibit 13.

491.    Twenty other students, including several other plaintiffs in this lawsuit, also sent letters to Green regarding their concerns about the UNL Title IX process and requested that he meet with them.

492.    Brun-Ozuna received no response to her letter from any UNL administrator for over two weeks.

493.    On April 10, 2019, Green responded to Brun-Ozuna with a generic email, notifying her that "In the summer of 2018, UNL took several steps to improve our support for victims of sexual violence…."

494.    Green's email also stated that Brun-Ozuna could meet with Jeyaram.

495.    Green's email provided no explanation as to what Jeyaram could do for Brun-Ozuna or why the significant information included in the lengthy letter Brun-Ozuna had already written detailing her experiences with the Title IX process at UNL was not sufficient for Green and Jeyaram to act on.

496.    Further, Brun-Ozuna wanted to meet with Green, not Jeyaram.  Therefore, Brun-Ozuna did not reach out to Jeyaram.

497.    On April 26, 2019, Brun-Ozuna and the other students who had sent emails to Green put up fliers on campus asking why Green refused to meet with survivors.

498.    The group also made a website notifying the community that Green was refusing to meet with them.

499.    Green refused to meet with Brun-Ozuna until she posted flyers and created a website with twenty other students, publicly disclosing her sexual assault.

500.    Finally, on May 1, 2019, Green's Chief of Staff, Mike Zeleny, sent an email to Brun-Ozuna and the other survivors saying Green would meet with them.

501.    Upon information and belief, neither Green nor any other defendant named has taken any action to address Brun-Ozuna's concerns.

502.    The degrading and confusing Title IX investigation process caused serious negative impacts to Brun-Ozuna's mental well-being and sense of self.

503.    It took over a year for Brun-Ozuna to start feeling "normal" again after the sexual assault.

504.    The sexual assault and resulting IEC investigation process failures negatively impacted Brun-Ozuna's confidence, happiness, and ability to trust.

505.    The Title IX investigation process was more damaging to Brun-Ozuna than the sexual assault itself.

506.    Brun-Ozuna had to meet with Counley numerous times.

507.    Each meeting with Counley took at least an hour and was emotionally and mentally exhausting for Brun-Ozuna.

508.    The numerous appointments took away from Brun-Ozuna's ability to participate in class, work, and other commitments.

509.    Brun-Ozuna's attempt to appeal Counley's decision and to speak with Green about her experiences took an even more significant toll, as Brun-Ozuna was forced to fight the very institution that was supposed to be helping her learn and grow as a college student.

510.    The experience of going through the Title IX investigation process and the resulting challenges Brun-Ozuna faced with UNL caused her to lose trust in other people and she has permanently lost some of her ability to take joy in life.

511.    As a result of Defendants' and UNL's actions and inactions in response to Brun-Ozuna's report of sexual assault, Brun-Ozuna was deprived of educational opportunities and/or benefits, and has suffered severe emotional and physical distress, including but not limited to depression, feelings of anxiety, and suicidal ideation.

55

## BACKGROUND FACTS RELEVANT TO PLAINTIFF JANE DOE 3

512.    In August 2016, Jane Doe 3 began her undergraduate career at UNL.

513.    Jane Doe 3 was a scholarship contracted cadet with the UNL Army National Guard Reserve Officers' Training Corps ("ROTC") from January 19, 2017 through graduation and commissioning earlier this month.  Jane Doe 3 also received E-5 pay through the National Guard and all benefits entitled to drilling soldiers.

514.    During her time in ROTC, Jane Doe 3 experienced repeated sexual harassment and racial discrimination from a male cadet, John Roe 7 ("JR7").[63]

515.    Jane Doe 3 is African American.

516.    During the 2016-2017 academic year, JR7 referred to Jane Doe 3 derogatorily as "the black cadet."

517.    JR7 also told Jane Doe 3 that she had not been subject to racism; bragged about a political flag he had at home in an attempt to intimidate her based on her race; and tried to explain that he was not racist because he had friends who were minorities.

518.    Jane Doe 3 began to come out as bisexual/queer to her ROTC colleagues in January 2018.

519.    In March 2018, JR7 asked Jane Doe 3 inappropriate and unwelcome questions about how she would perform sex acts on other women.

520.    On or around May 15, 2018, JR7 aggressively questioned and harassed Jane Doe 3 about race relations, discrimination, and privilege.

521.    From around June 2018 to October 2018, JR7 uninvited Jane Doe 3 from the cadet carpool due to her race and sexual orientation.

---

[63] John Roe 7 is a pseudonym.

522.   On October 20, 2018, JR7 harassed Jane Doe 3 about her sexuality and about another woman at an ROTC sanctioned extracurricular football color guard event.

523.   On October 22, 2018, JR7 made inappropriate and unwelcome sexual comments to Jane Doe 3 about women with whom he had engaged in sexual activity.

524.   On October 26, 2018, Jane Doe 3 reported these concerns to IEC and requested a formal investigation.

525.   The investigation was assigned to Pallas-Sears.

526.   Jane Doe 3 requested interim measures, or accommodations, to protect her from having to interact with JR7 from ROTC.

527.   ROTC told Jane Doe 3 not to talk about the ongoing investigation, in violation of her rights under the First Amendment.

528.   Upon information and belief, ROTC also told JR7 not to talk about the ongoing investigation.

529.   ROTC denied Jane Doe 3 her interim measures requests and told her that ROTC had to take instructions from IEC.

530.   IEC did not offer Jane Doe 3 any interim measures or accommodations to protect her from further harassment by JR7.

531.   On November 27, 2018, Jane Doe 3 received a letter from Pallas-Sears notifying her that no finding was being made against JR7 regarding any of her complaints.

532.   Pallas-Sears' findings letter inappropriately analyzed each individual incident separately and failed to take into account the totality of the circumstances, which would have led to a finding of a policy violation based on JR7 creating a hostile environment for Jane Doe 3 in ROTC.

533.   Pallas-Sears' findings letter also lacked any credibility analysis.

534.    Later that day, Jane Doe 3 appealed the findings.

535.    On November 28, 2018, Jane Doe 3 met with Strickman to provide Strickman with feedback about problems in the investigation process.

536.    In that meeting, Jane Doe 3 asked Strickman to explain the finding in her case and the discrepancies she noticed with provisions of the UNL Student Code of Conduct prohibiting race discrimination.

537.    Strickman told Jane Doe 3 that race discrimination claims "will never be fully investigated [by IEC] because students on campus have a right to free speech."

538.    Upon information and belief, no action was taken to address Jane Doe 3's concerns.

539.    On December 6, 2018, Jane Doe 3 filed a complaint with the Army National Guard regarding the same incidents, as the IEC complaint had been fruitless.

540.    On December 12, 2018, Jane Doe 3 received an email from Johnson confirming that he had received her appeal of Pallas-Sears' findings.

541.    On January 7, 2019, over a month after she had filed her appeal of the IEC findings, Jane Doe 3 received an email from Moore informing her that Johnson had forwarded her appeal to Moore.

542.    In January 2019, JR7 retaliated against Jane Doe 3 for filing the IEC complaint.

543.    Jane Doe 3 was notified by Peer that JR7 had told cadets through a group message about the ongoing National Guard investigation and the IEC complaint from the previous semester.

544.    On January 16, 2019, Jane Doe 3 notified Moore of the stalking incident.

545.    After the stalking incident, Jane Doe 3 began avoiding campus as much as possible.

546.    Moore notified Jane Doe 3 that she would be forwarding the complaint to Pallas-Sears.

547.    On January 16, 2019, Jane Doe 3 contacted Pallas-Sears to inquire about the status of the investigation into JR7's retaliation against her.  In that email, Jane Doe 3 also notified

Pallas-Sears that JR7's ongoing retaliation against and harassment of her was negatively impacting her ability to participate in ROTC.

548.    Later that day, Pallas-Sears confirmed receipt of Jane Doe 3's email but did not provide her with any information about any interim measures or accommodations or offer to assist her with protecting herself from the ongoing retaliation and harassment.

549.    On January 25, 2019, with no word from IEC, Jane Doe 3's advocate contacted Pallas-Sears by email to inquire about the status of the investigation into retaliation.

550.    Later that day, Pallas-Sears responded to Jane Doe 3's advocate to notify her that IEC had decided that they would simply send a letter to JR7 warning him that he would be punished if he retaliated against Jane Doe 3 again.

551.    Later that day, Jane Doe 3 met with Peer to share her concerns about ROTC's failure to hold JR7 accountable.

552.    In violation of both the UNL Title IX policy and federal Title IX guidance, Peer told Jane Doe 3 that JR7 could not be punished because it was his first instance of retaliation.

553.    That same day, Jane Doe 3 received an email from Moore notifying her that Moore would be responding to her appeal on the following Monday.

554.    On January 28, 2019, Jane Doe 3 received an email from Moore notifying her that she was denying Jane Doe 3's appeal and would not be allowing her to proceed with an appeal hearing.

555.    On April 4, April 5, and April 12, 2019, JR7 continued retaliating against Jane Doe 3.

556.    JR7 stalked Jane Doe 3 downtown at the bars on April 4, April 5, and April 12, 2019.

557.    Jane Doe 3 took it upon herself to remove herself from those situations but was repeatedly followed.

558.   Jane Doe 3 reported these incidents to Peer by text message on April 13, 2019 and followed up with an email to Strickman and Peer on April 15, 2019.

559.   Initially, Strickman agreed to meet with Jane Doe 3 on April 19, 2019.

560.   However, on April 18, 2019, the day before the meeting was to take place, Strickman contacted Jane Doe 3 by email and notified her that Strickman would not meet with Jane Doe 3 because she had "expressed concerns about the IEC office."  Strickman's email notified Jane Doe 3 that the case was being transferred to Jeyaram.

561.   On April 22, 2019, Jane Doe 3 met with Jeyaram to report her concerns of retaliation and to initiate a formal investigation into the retaliatory incidents by JR7.

562.   On May 30, 2019, having heard nothing from Jeyaram in over a month, Jane Doe 3 contacted him for an update on the status of the investigation.

563.   On May 31, 2019, Jeyaram contacted Jane Doe 3 by email and notified her that he had not yet completed interviews in the investigation and had not yet interviewed the respondent. Jeyaram also told Jane Doe 3 that he would be "traveling on business in June" and therefore could not provide her with a completion date for the investigation.[64]

564.   Jeyaram closed the email by placing the onus on Jane Doe 3 to follow up with him to ensure the investigation proceeded: "…please don't hesitate to check in with me periodically and I will provide the best update I can."[65]

565.   On June 18, 2019, Jane Doe 3 again sent an email requesting a status update on the investigation, expressing that she was going to be traveling for ROTC starting on July 7, 2019, and she was concerned that the lingering investigation would negatively impact her ability to participate in ROTC.

---

[64] *See* Exhibit 14.
[65] *Id*.

566.    Later that day, Jeyaram responded with the following message: "Per our discussion, I will try my best to wrap this up quickly, but it is unlikely that I will be able to do so by July 7th."

567.    Jeyaram provided no explanation or rationale for why the investigation was dragging on past the 60-calendar day timeline outlined in the UNL Title IX policy.

568.    On August 1, 2019, three and a half months after her initial report to Peer, Jeyaram sent Jane Doe 3 an email notifying her that he was going to be scheduling an interview with the respondent soon.

569.    During fall semester 2019, Jane Doe 3 had a ROTC class with JR7.

570.     Jane Doe 3 sat as far away as possible from JR7 in the class, but his presence still triggered her anxiety and impacted her ability to focus and participate.

571.    ROTC staff refused Jane Doe 3's request to take the class during an independent study.

572.    On September 13, 2019, with the investigation still dragging on, Jane Doe 3 reached out to Jeyaram to request assistance with implementing an interim measure so she could take the ROTC class as an independent study.

573.    Later that day, Jeyaram left Jane Doe 3 a voicemail telling her that he could not assist her with interim measures or provide her with a no-contact order to prevent JR7 from continuing to harass her.

574.    Shockingly, in his voicemail, Jeyaram specifically stated, "I think that is the right result at this point in time since…there hasn't been an incident where [JR7] has done or said or behaved in a manner that would warrant a no-contact order."

575.    Jane Doe 3 contacted Jeyaram to follow up on his voicemail, at which point Jeyaram told her that he did not understand the authority he had as an investigator and did not fully understand the Student Code of Conduct.

576.    Jeyaram told Jane Doe 3 that only ROTC could implement restrictions on JR7.

577.    Jane Doe 3 then contacted Kara Brant ("Brant"), UNL's Associate Director of Student Support and Advocacy, to request interim measures including a no-contact order.

578.    Jane Doe 3 scheduled a meeting with Brant on September 17, 2019.

579.    On September 18, 2019, Brant contacted Jane Doe 3 via email to notify Jane Doe 3 that Brant had spoken with IEC staff and they had informed Brant that they could not assist with interim measures or accommodations, and that only Jeyaram could do that, because it was "his case."

580.    Brant advised Jane Doe 3 that she had then spoken to Jeyaram, who had told her that only ROTC could implement interim measures that impacted JR7.

581.    Quixotically, Brant then offered to speak with ROTC for Jane Doe 3 to request that they implement interim measures – an attempt that Jane Doe 3 knew would be futile, as she had already attempted to make that request and had been told by ROTC that they would only implement a no-contact directive if told to do so by the University.

582.    Despite knowing that it would not be successful, Jane Doe 3 gave Brant her consent to speak with Chavez.

583.    In violation of both UNL's Title IX policy and federal Title IX guidance, Chavez refused to implement a no-contact directive without a "formal finding" against JR7, which Brant conveyed to Jane Doe 3 via email.

584.    Jane Doe 3 was forced to spend the entire semester sitting across the table from JR7 in the class, causing her severe anxiety.

585.    Throughout her senior year, Jane Doe 3 was forced to be in close proximity to JR7 during ROTC formations.

586.    When Jane Doe 3 was in charge of formations, JR7 would laugh at and mock her, causing her further anxiety.

587.    Jane Doe 3's requests for accommodations or interim measures to separate her from JR7 during formations were repeatedly denied.

588.    On October 23, 2019, Jane Doe 3 received a letter from Jeyaram notifying her that he had completed his investigation and was making no finding against JR7.

589.    Jeyaram's analysis improperly concluded that because JR7 did not directly interact with Jane Doe 3, there was no adverse action taken against her.

590.    Jeyaram's analysis took JR7 at his word and he performed no credibility analysis of either party.

591.    Jeyaram's analysis did not consider the fact that Jane Doe 3 had previously reported numerous incidents of harassment and discrimination by JR7.

592.    Jeyaram wrote that Jane Doe 3 "may have been exposed to annoyances and petty slights" but that JR7 had not retaliated against her.[66]

593.    Upon information and belief, in violation of federal Title IX guidance, Jeyaram has not received proper training in the Title IX investigation process.

594.    On October 25, 2019, Jane Doe 3 received a second findings letter from Jeyaram, which advised her of her appeal rights.

595.    On October 29, 2019, Jane Doe 3 filed an appeal of Jeyaram's findings with Bellows.

596.    In late October 2019, Jane Doe 3 continued attempting to get accommodations in place from both a professor and Jeyaram and was again denied assistance by both.  Brant reached out to IEC again for Jane Doe 3, and IEC again declined to help and told Brant that only Jeyaram could provide accommodations.

597.    On December 11, 2019, Jane Doe 3 received an email from Moore notifying her that she was denying her appeal and affirming Jeyaram's dismissal of her retaliation complaints.

---

[66] *See* Exhibit 15.

598.   Jane Doe 3 was never offered the opportunity for a hearing.

599.   Throughout her time in ROTC, Jane Doe 3 was ostracized by JR7 and a small group of his close friends who spread rumors and openly shared information about the case with other ROTC cadets.

600.   Jane Doe 3 withdrew from almost all of the extracurricular activities she participated in through ROTC because she did not feel safe at them.

601.   With respect to academics, Jane Doe 3 found it increasingly difficult to focus in all of her classes regardless of subject matter due to the stress and anxiety of the ongoing harassment from JR7 and the flawed, time consuming IEC investigations.

602.   The stress and prolonged nature of the investigations also negatively impacted Jane Doe 3's relationship with her partner.

603.   Jane Doe 3 lives about five blocks from JR7 and she has ongoing anxiety and fear surrounding about being followed by JR7 due to his stalking.

604.   Jane Doe 3 avoided the student union as much as possible because JR7 worked at an on-campus bank located in there.  Jane Doe 3 rescheduled meetings to avoid the student union.  When she had to go there, she would choose an entrance to avoid detection as much as possible.

605.   As a result of Defendants' actions and inactions in response to Jane Doe 3's report of sexual assault, Jane Doe 3 was deprived of educational opportunities and/or benefits, and has suffered severe emotional and physical distress, including but not limited to feelings of depression, anxiety, irritability, and insomnia.

**BACKGROUND FACTS RELEVANT TO PLAINTIFFS DAVIS AND JANE DOE 4**

*Background Regarding Plaintiff Davis*

606.   In fall 2017, Capri Davis was in her senior year as a star volleyball player at Lake Ridge High School in Mansfield, Texas.   Davis was named an Under Armour first-team All-American player and was ranked the number 21 overall prospect by PrepVolleyball.com during her senior year of high school.   Davis led the Lake Ridge Eagles to the Texas 5A Regional Girls' Volleyball Quarterfinals and was known nationally as a promising, up-and-coming elite women's volleyball prospect.

607.   Davis had her choice of schools to attend after high school and received numerous athletic scholarship offers from a variety of institutions.

608.   UNL's women's volleyball team is known nationally as one of the best in the country. The team has won five NCAA women's volleyball national championships, including two in the past five years.

609.   At the end of the 2019 season, the University of Nebraska's women's college volleyball team was ranked fifth in the nation by the American Volleyball Coaches Association.

610.   UNL offered Davis a full athletic scholarship and successfully recruited her to play for the UNL women's volleyball team.

611.   In or around November 2017, Davis signed a Letter of Intent, committing to attend UNL and play on the Huskers women's volleyball team.

612.   Davis began her freshman year at UNL in August 2018.

*Background Regarding Plaintiff Jane Doe 4*

613.   Jane Doe 4 began her freshman year as an undergraduate student at UNL in August 2018.

614.    On or around August 17, 2018, Jane Doe 4 was raped by two male student-athletes, "John Roe 8" ("JR8")[67] and "John Roe 9" ("JR9").[68]

615.    At that time, Jane Doe 4 chose not to report the rapes as she had just started her college career and wanted to try to forget what had happened and move on.

**Sexual Assault of Plaintiffs Davis and Jane Doe 4**

616.    In or around March 2019, Davis and Jane Doe 4 were at a party with several other friends.

617.    JR8 and another male student-athlete on the football team, John Roe 10 ("JR10"),[69] appeared at the party and approached Davis and Jane Doe 4, placed their hands on the women's buttocks, and grabbed them without their consent.

618.    In or around April 2019, Davis and Jane Doe 4 called IEC to report JR8 and JR10 groping Davis and Washington's buttocks.

619.    No investigation was initiated at that time and Davis and Jane Doe 4 did not hear from IEC again.

620.    Around that time, Davis spoke with a teacher about the sexual assaults.

621.    Davis' teacher told her that she was a responsible employee under UNL's Title IX policy and advised Davis that she was obligated to report the information to IEC pursuant to that policy.

622.    Neither Davis nor Jane Doe 4 received any contact from IEC after that report.

623.    In or around August 2019, Davis and Jane Doe 4 learned that JR8 and JR10 had been accused of rape by a female UNL student who is not a party to the within action.

---

[67] John Roe 8 is a pseudonym.
[68] John Roe 9 is a pseudonym.
[69] John Roe 10 is a pseudonym.

624.   Davis and Jane Doe 4 decided to attempt to report their sexual assaults to IEC for a third time.

625.   In or around September or October 2019, Davis, Jane Doe 4, and their friend who witnessed the incident went to IEC to make a report about the groping incident.

626.   In or around October 2019, UNL IEC initiated an investigation into Davis and Jane Doe 4's report of groping by JR8 and JR10 at the party.

627.   In or around October 2019, Davis, Jane Doe 4, Jane Doe 5, and several other friends attended an off-campus Halloween party.

628.   The group would not have attended the party had they known their assailants would be in attendance.

629.   At the party, JR10 came up to Davis and began yelling at her.

630.   Jane Doe 4 was nearby and could hear the yelling.

631.   JR10 cornered Davis and yelled at her, "Why the fuck did you report us?"

632.   Davis and Jane Doe's friend, "Mary Poe 1" ("MP1")[70] responded, "Because you're a rapist."

633.   JR10 then said, "I didn't touch you, though."

634.   JR8 then said to Jane Doe 4 and a friend, "Y'all some lame ass hos."

635.   Davis and Jane Doe 4 escaped from JR8 and JR10 before anything further happened and they fled the party.

636.   In or around late October or early November 2019, Davis and Jane Doe 4 reported this incident to both IEC and LPD.

637.   Regarding retaliation, UNL's Student Code of Conduct states: "University policy prohibits retaliation against any person making a complaint of sexual misconduct or against

---

[70] Mary Poe 1 is a pseudonym.

any person cooperating in the investigation, including but not limited to witnesses.  The prohibition of actual or threatened retaliation applies to employees and third parties as well as students."[71]

638.    IEC staff told Davis and Jane Doe 4 that they were not going to investigate the incident, even though it was clearly retaliatory and constituted sexual harassment and in violation of UNL policy.

639.    Throughout the course of the Title IX investigation into the groping incident, IEC staff repeatedly communicated only with Jane Doe 4, and did not communicate with Davis.

640.    No explanation was provided to Davis regarding why she was not receiving the same communications as Jane Doe 4, even though both were named as claimants in the investigation.

641.    In or around November or December 2019, Jane Doe 4, Davis, and MP1 were notified by UNL that they needed to attend a meeting with a student conduct officer regarding the incident in which JR8 and JR9 groped Davis and Washington's buttocks.

**Additional Background Regarding Plaintiff Jane Doe 4 and Her Damages**

642.    At that meeting, the student conduct officer asked Jane Doe 4, "Have you ever had sexual relations with [JR8], [JR9], or [JR10]?"

643.    Although she did not want to talk about the rapes, Jane Doe 4 also did not want to lie, so she told the student conduct officer that JR8 and JR9 had raped her in August 2018.

644.    Within a week of that meeting, Jane Doe 4 went into the UNL IEC office and requested that they initiate a Title IX investigation into JR8 and JR9's rapes of her in August 2018.

645.    Counley interviewed Jane Doe 4 and Jane Doe 4 provided a full account of the rapes.

---

[71] STUDENT CODE OF CONDUCT, *supra* note 1 at 16.

646.    Jane Doe 4 told Counley that she had several witnesses she wanted them to interview in the course of the investigation.

647.    The witnesses were friends Jane Doe 4 had talked to in the immediate aftermath of the rape who shared relevant, contemporaneously observed information about Jane Doe 4's account and demeanor.

648.    Counley did not include any information from those witness interviews in her letter of findings.

649.    Jane Doe 4 stopped enjoying most social outings because she didn't want to run into her assailants or their friends.

650.    Jane Doe 4 began meeting regularly with an advocate from the UNL Center for Advocacy, Response, & Education ("CARE") who provided her with emotional support and information about the UNL Title IX investigation process.

651.    The CARE advocate connected Jane Doe 4 with a mental health therapist.

652.    Jane Doe 4 felt unsafe and uncomfortable on campus and experienced headaches, nausea, and a lack of focus.

653.    On December 5, 2019, Jane Doe 4 received a letter from Counley informing her that no finding was being made against JR8 or JR10 in the investigation into the buttocks groping incident.[72]

654.    In violation of the UNL Student Code of Conduct, IEC never provided Davis or Jane Doe 4 an opportunity for a hearing or an opportunity to cross-examine JR8 or JR10.

655.    In early January 2020, Counley contacted Jane Doe 4 to ask her some follow up questions in the ongoing investigation regarding her rapes by JR8 and JR9.

---

[72] *See* Exhibit 16.

69

656.    During that call, Jane Doe 4 asked Counley if the rapes of other students by JR8 or JR9 could be considered in her ongoing investigation with respect to the credibility of JR8 or JR9.

657.    Counley initially said, "I don't know.  It might be a privacy concern."

658.    Counley told Jane Doe 4 she was going to meet with a lawyer to determine whether that information could be considered.

659.    Later, Counley told Jane Doe 4 that JR8 and JR9's rapes of other students would not be considered in her investigation.

660.    Jane Doe 4 told Counley that she had a class with JR10.

661.    Counley did not offer Jane Doe 4 any accommodations or interim measures, such as removing JR10 from the class or allowing Jane Doe 4 to participate in the class remotely or switch sections.

662.    On January 14, 2020, Jane Doe 4 received a letter from Counley informing her that no finding was being made against JR8 or JR9 in the rape investigation.

663.    IEC never provided Jane Doe 4 an opportunity for a hearing or an opportunity to cross-examine JR8 or JR9.

664.    Counley's findings letter did not include any reference to or relevant information collected from Jane Doe 4's witnesses.

665.    Counley's entire decision was based on a witness statement from an unidentified third party who said she "did not observe" one of the Respondents enter or leave the other Respondent's room.[73]

666.    Counley's findings letter does not have any assessment of the credibility of Jane Doe 4, JR8, or JR9.

---

[73] *See* Exhibit 17.

667.    Counley's findings were not made by a "greater weight of the evidence," as Counley did not appropriately evaluate or weigh the evidence.

668.    Counley's findings letter does not have a sufficient explanation for her rationale, in violation of the Student Code of Conduct.[74]

669.    Jane Doe 4 decided not to file an appeal in either case, as she had heard from other female students that no one was ever successful in appealing an IEC finding.

670.    As a direct and indirect result of Defendants' actions and inactions, Jane Doe 4 was deprived of educational opportunities and/or benefits, and has suffered severe emotional and physical distress, including but not limited to depression, anxiety, panic attacks, social withdrawal, headaches, nausea, and lack of focus.

### **Additional Background Regarding Plaintiff Davis, Further Title IX Violations She Suffered, and Her Damages**

671.    In or around September 2019, Davis became overcome with depression and anxiety.

672.    In or around October 2019, Davis considered whether to take a mental health redshirt, meaning that she would suspend her participation on the women's volleyball team for the year in order to extend her eligibility to play with the National Collegiate Athletic Association ("NCAA"), as the NCAA has strict rules about student-athlete eligibility.

673.    Davis decided to take the redshirt and withdrew from the UNL volleyball team.

674.    Soon after Davis withdrew from the volleyball team, a rumor started that Davis was pregnant and that a friend of hers who was a male student-athlete on the football team, "Mike Loe,"[75] was the father.

675.    The rumor was not true.

---

[74] "Any initial, interim, and final decision to resolve disciplinary matters must include…the rationale for the decision." STUDENT CODE OF CONDUCT, *supra* note 1, at 19.
[75] Mike Loe is a pseudonym.

676.   Davis did not know who started the rumor.

677.   The rumors were well-known within the UNL community, across the country, and online.

678.   Media and communications staff at UNL advised Davis that she should address the pregnancy rumors herself.

679.   Upon information and belief, no UNL staff advised Mike Loe to address the pregnancy rumors.

680.   The burden to address the pregnancy rumors was placed solely on the shoulders of Davis, the female student-athlete.

681.   On November 4, 2019, at UNL staff's suggestion, Davis posted the following message on her Twitter account: "thank you for the concerns for my health this season but just so we're clear, i will not be expecting ANYBODYS child any time soon ;)".[76]

682.   No one from UNL ever reached out to Davis to ask her if she wanted to initiate a Title IX investigation regarding the sexual harassment she was experiencing as a result of the rampant false pregnancy rumors.

683.   No one from UNL ever interviewed Davis about the sexual harassment.

684.   No one from UNL ever offered Davis any accommodations, interim measures, or supports after the pregnancy rumors began tearing through the campus community.

685.   Davis stopped showing up on campus after she redshirted for the season because walking around the UNL athletic facilities surrounded by all the male athletes who supported their teammates was unbearable for her.

686.   Davis's grades began to slip because she was not able to go to class.

687.   Davis also became less social and more withdrawn and she stopped socializing to the extent that she had previously.

---

[76] *See* Exhibit 18.

688.    Previously, Davis had been extremely friendly and had good relationships with all the facilities staff at UNL.

689.    After going through this experience, Davis withdrew and stopped being open with people.

690.    Davis also feared retaliation and physical assault by friends of the male athletes, after the attack on Jane Doe 5, outlined later in this complaint.

691.    Davis fell into depression due to the onerous Title IX process, the rampant sexual harassment, and the lack of support from anyone at UNL other than her coaches and athletic staff.

692.    Eventually, Davis decided she could no longer remain at UNL.

693.    On December 16, 2019, Davis publicly announced that she had signed with and was transferring to the University of Texas at Austin to attend school and play on the women's volleyball team there.

694.    Davis left UNL at the end of the semester in December 2019 and began attending the University of Texas the following semester in January 2020.

695.    Davis told her coaches at the University of Texas that she was terrified to be around male athletes and even considered moving out of the dorms to avoid them.

696.    Davis was never advised by UNL of the outcome of the IEC complaint and investigation she and Jane Doe 4 had initiated against JR8 and JR10 regarding the groping.

697.    Davis was never advised by UNL of her appeal rights in that investigation.

698.    Davis heard from Jane Doe 4 that there had been no finding in the IEC investigation in or around January 2020.

699.    To this day, Davis feels nervous around and avoids male student-athletes.

700.    As a direct and indirect result of Defendants' actions and inactions, Davis was deprived

of educational opportunities and/or benefits, and has suffered severe emotional and physical

distress, including but not limited to diagnoses of severe anxiety and depression, being forced

to change schools and move across the country, spending days at a time in bed, losing a

significant amount of weight, loss of appetite, and nightmares.

## **BACKGROUND FACTS RELEVANT TO PLAINTIFF JANE DOE 5**

701.    In August 2018, Jane Doe 5 began her undergraduate career at UNL.

702.    In or around December 2018, Jane Doe 5 was raped by two other UNL students, John

Roe 11 ("JR11")[77] and John Roe 12 ("JR12")[78] in the Eastside Suites dormitory on campus.

703.    Jane Doe went to the emergency room at a nearby hospital where she was administered a

SANE kit.

704.    Jane Doe 5 was also contacted by UNLPD regarding the rape.

705.    After talking to UNLPD, Jane Doe 5 was contacted by Counley, who left her a voicemail.

706.    Jane Doe 5 was dealing with significant emotional distress after the rape and decided she

did not want to move forward with the reporting process with either UNLPD or IEC because

she did not believe it would lead to anything being done about the rape.

707.    Jane Doe 5 was friends with JR10, referenced earlier in this complaint.

708.    In or around February 2019, Jane Doe 5 was in JR10's dorm room spending time with

him as friends.

709.    JR10's dorm room was also located in the University Suites dormitory.

710.    Although Jane Doe 5, and JR10 were just friends, Jane Doe 5 consented to JR10 kissing

her.

---

[77] John Roe 11 is a pseudonym.
[78] John Roe 12 is a pseudonym.

711.    JR10 then raped Jane Doe 5.

712.    Jane Doe 5 tried to move away to escape from JR10, but his bed was pushed up against the wall and she could not get away.

713.    After JR10 finished raping Jane Doe 5, she was able to escape his dorm room.

714.    After Jane Doe 5 left JR10's dorm room, JR10 began texting Jane Doe 5.

715.    JR10 asked Jane Doe 5, "What the fuck is wrong with you?"  Jane Doe 5 responded, "What do you think?"[79]

716.    JR10 also asked Jane Doe 5, "Why did u wanna stop that's what I wanna ask."[80]

717.    Jane Doe 5 returned to her dorm room crying and told her roommate that JR10 had raped her.

718.    Initially, Jane Doe 5 did not report the rape to any UNL staff.

719.    In or around August 2019, Jane Doe 5 learned via news reports that another female UNL student, "Sherry Moe,"[81] alleged that she had been raped by JR10.

720.    Because Jane Doe 5 learned that JR10 may have sexually assaulted other people, she decided to make a report to LPD.

721.    Jane Doe 5 was close friends with Davis and Jane Doe 4 and had seen firsthand how harmful and destructive the IEC investigation process was to them.

722.    Jane Doe 5 also spoke to Sherry Moe, who told her that she was going through an IEC Title IX investigation after reporting her rape by JR10.

723.    Sherry Moe told Jane Doe 5 that IEC had confused her with another student and had sent emails and confidential information about her investigation and rape to another student who had the same first name as Sherry Moe, but a different last name.

---

[79] *See* Exhibit 19.
[80] *Id.*
[81] Sherry Moe is a pseudonym.

724.    Due to the harm she saw Davis and Jane Doe 4 suffering, and the negative information about the IEC process she learned from Sherry Moe, Jane Doe 5 decided not to report her second rape to IEC.

725.    Jane Doe 5 was afraid an IEC investigation would negatively impact her ability to continue her studies at UNL, as well as her mental and emotional health.

726.    Jane Doe 5 became much less social and became afraid of going to parties or other social events after her rapes.

727.    Jane Doe 5 has developed a fear of men and male friends because JR10 had been her friend before raping her.

728.    Jane Doe 5 understood from her friends' reports that the IEC reporting process was even more harmful to them than the rapes themselves had been, and she did not want to subject herself to that.

729.    In or around October 2019, Jane Doe 5 was at a Halloween party with Jane Doe 4, Davis, and another friend, "Mary Poe 2" ("MP2").[82]

730.    When Jane Doe 5 learned that the party was also a birthday party for JR9, she and MP2 decided to leave the party.

731.    While Jane Doe 5 and MP2 were trying to leave, JR10's girlfriend, "Terri Coe,"[83] walked up to MP2 and punched her.

732.    MP2 continued walking and was able to escape Terri Coe's attack.

733.    Terri Coe then turned her attention to Jane Doe 5.

734.    Terri Coe grabbed Jane Doe 5's hair and began punching her.

735.    Terri Coe punched Jane Doe 5 approximately fifteen to twenty times.

---

[82] Mary Poe 2 is a pseudonym.
[83] Terri Coe is a pseudonym.

736.   Terri Coe then pushed Jane Doe 5's head down and shoved her against a car.

737.   Jane Doe 5 was eventually able to escape and reported the attack to LPD.

738.   Jane Doe 5 was then admitted to the emergency room at a local hospital for a concussion.

739.   Jane Doe 5 believed Terri Coe's attack on her was retaliatory because Jane Doe 5 was friends with Davis and Jane Doe 4 who had reported Terrie Coe's boyfriend to IEC.

740.   In violation of the Student Code of Conduct, after Davis and Jane Doe 4 reported Terri Coe's retaliatory attack on Jane Doe 5 to IEC, IEC refused to investigate it.

741.   After making the report to UNL IEC, Jane Doe 5 began to experience a loss of friends and relationships, because her former friends were angry with her for reporting their friends and teammates.

742.   Jane Doe 5 also began experiencing panic attacks when she would see her assailants' friends on campus.

743.   Jane Doe 5 began going home and missing class to avoid her assailants and their friends.

744.   Jane Doe 5 became afraid to even be on UNL's campus due to these concerns of retaliation.

745.   Jane Doe 5 grew up as a lifelong UNL Huskers football fan, and before the rape by JR10, she attended every football game her freshman year.

746.   After JR10 raped her, Jane Doe 5 stopped going to most UNL football games, and she is uncomfortable even hearing people talk about the football team.

747.   Jane Doe 5's grades dropped significantly after Terri Coe attacked and retaliated against Jane Doe 5, and as Jane Doe 5 began to fully grasp the lack of assistance and support available to her at UNL as a survivor of rape and retaliation.

748.   As a direct and indirect result of Defendants' actions and inactions, Jane Doe 5 was deprived of educational opportunities and/or benefits, and has suffered severe emotional and physical distress, including but not limited to depression, anxiety, panic attacks, and sleeplessness.

**COUNT I**
**Violation of Title IX**
**Deliberate Indifference to Sex Discrimination**
**20 U.S.C. §§ 1681, et seq.**
**(Defendant Board of Regents)**

749.   Plaintiffs incorporate by reference previously pled paragraphs as if fully pled herein.

750.   From August 2015 to present, Plaintiffs were subjected to sex-based assault and harassment committed by male students.

751.   From August 2015 to present, Plaintiffs were subjected to deliberate indifference to their complaints by defendants after reporting the sex-based assault and harassment.

752.   The assault and harassment that followed was so severe, pervasive, and objectively offensive that Plaintiffs were deprived of educational benefits and/or programs provided by the University.

753.   Defendant Board of Regents created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 (a) ("Title IX"), because:

a.   Plaintiffs were members of a protected class,

b.   They were subjected to sex discrimination, sexual assault, sexual harassment, and/or stalking by male students;

c.   The discriminatory acts were based on their sex; and

    d.  They were subjected to a hostile educational environment created by the Defendant Board of Regents' lack of effective action to properly prevent, investigate, and address the sexual assault.

754.  Defendant Board of Regents had actual knowledge of the discriminatory acts, which was created by and furthered by the Board of Regents' repeated failure to protect Plaintiffs consistent with the University's own policies and state and federal law.

755.  Defendant Board of Regents repeated failure to promptly and appropriately respond to the sexual assault Plaintiffs experienced resulted in Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in the UNL's education program in violation of Title IX.

756.  Defendant Board of Regents failed to take immediate, effective remedial steps to resolve the complaints of sex discrimination and instead acted with deliberate indifference to Plaintiffs.

757.  Defendant Board of Regents persisted in their actions and inaction despite the fact that they had actual knowledge of the discrimination to which the Plaintiffs have been subjected.

758.  Defendant Board of Regents engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually assaulted and/or harassed from seeking assistance and protection.

759.  This pattern and practice of behavior constitutes disparate treatment of female students and has a disparate impact on female students.

760.  As a direct and proximate result of Defendant Board of Regents' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including

anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

### COUNT II
**Violation of Title IX**
**Retaliation by Withholding**
**Protection Otherwise Conferred by Title IX**
**20 U.S.C. §§ 1681, et seq.**
**(Defendant Board of Regents)**

761.    Plaintiffs incorporate by reference previously pled paragraphs as if fully pled herein.

762.    This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681 et seq.

763.    Title IX and its interpretive regulations prohibit retaliation against any person who complains about what he/she reasonably believes to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

764.    Plaintiffs protected themselves by reporting the sexual assault and harassment they experienced to UNLPD and IEC.

765.    Plaintiffs attempted to appeal their incorrect and error-ridden IEC finding letters.

766.    Plaintiffs' actions were protected by the anti-retaliation provisions of Title IX.

767.    Defendant Board of Regents took adverse actions against Plaintiffs.

768.    Defendant Board of Regents' adverse actions against Plaintiffs were in direct response to and were in retaliation for the exercise of their rights under Title IX.

769.    Defendant Board of Regents' retaliatory adverse actions against Plaintiffs violated Title IX and its interpretive regulations.

770.    As a direct and proximate result of Defendant Board of Regents' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their

fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**COUNT III**
**Violation of Title VI**
**Intentional Discrimination on the**
**Basis of Race and Color in Federally Funded Programs**
**Title VI of the Civil Rights Act of 1964 and 34 C.F.R. §§ 100 et seq.**
**42 U.S.C. § 1983**
**(Defendant Strickman, in her official capacity)**

771.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

772.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

> [N]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected discrimination under any program or activity receiving federal financial assistance.

773.    Federal regulations implementing Title VI prohibit federally funded programs or activities from having a racially discriminatory impact or effect.

774.    The regulations provide that no program receiving financial assistance through the United States Department of Education shall:

> (i) Deny an individual any service, financial aid, or other benefit provided under the program;
> (ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;
> (iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program;
> (iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program;
> (v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program;

(vi) Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program (including the opportunity to participate in the program as an employee but only to the extent set forth in paragraph (c) of this section).
(vii) Deny a person the opportunity to participate as a member of a planning or advisory body which is an integral part of the program.  34 C.F.R. § 100.3(b)(1)

775.   The University of Nebraska receives federal financial assistance from the United States Department of Education, and thus is bound to abide by the terms of Title VI and its implementing regulations, including 34 C.F.R. §§ 100 et seq.

776.   Through her acts and omissions as alleged in this Complaint, Strickman has caused the violations of Jane Doe 3's rights secured by Title VI and its implementing regulations.

777.   Strickman made an express classification in explicitly conditioning receipt of the benefits or services of IEC on race.

778.   Strickman's statement to Jane Doe 3 that race discrimination was not thoroughly investigated was a statement made by a decisionmaker that expressed a discriminatory motive.

779.   Strickman's statement was contemporaneous and causally related to her decision not to thoroughly investigate Jane Doe 3's claims of race discrimination.

780.   Strickman's actions and representations constituted disparate treatment of Jane Doe 3 based on her race.

781.   As a direct and proximate result of Defendant Strickman's acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT IV
### Denial of Due Process
### 42 U.S.C. § 1983, the Fifth Amendment, and the Fourteenth Amendment
**(Defendants Jeyaram, Bellows, Johnson, Hecker, Strickman, Lamoureaux, Counley, Fette, Pallas-Sears, Moore, Chavez, and Peer, in their individual capacities)**

782.   Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

783.   Defendants' failure to comply with the administrative requirements of Title VI and Title IX deprived Plaintiffs of their liberty interest in bodily integrity and their property interest in an education, without due process of law, in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution.

784.   Defendants' failures include, but are not limited to:

a.   Failure to identify for and to allow Plaintiffs review and access all evidence being considered by IEC in a Title VI or Title IX investigation;

b.   Failure to interview relevant witnesses named by Plaintiffs;

c.   Failure to allow Plaintiffs to have hearings when requested;

d.   Failure to allow Plaintiffs to cross-examination or otherwise test the respondents' credibility;

e.   Failure to make a determination by a preponderance of the evidence;

f.   Failure to notify Plaintiffs of their rights under UNL policy and state and federal law; and

g.   Failure to use their own policy definitions in analyzing whether Plaintiffs' allegations against their assailants constituted violations of UNL policy.

785.   Defendants, in their individual capacities and under color of law, subjected Plaintiffs to violations of their liberty interest in bodily integrity and their property interest in their education, by failing to appropriately discipline their perpetrators and by failing to

adequately train and supervise their staff with respect to the handling of Title VI and Title IX complaints.

786.   As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT V
### Denial of Equal Protection
### 42 U.S.C. § 1983 and the Fourteenth Amendment
**(Defendants Jeyaram, Bellows, Johnson, Hecker, Strickman, Lamoureaux, Counley, Fette, Pallas-Sears, Moore, Chavez, and Peer, in their individual capacities)**

787.   Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

788.   Upon information and belief, complaints of sexual harassment, sexual violence, race discrimination and harassment are treated differently than complaints of violence or bringing weapons to the campus.

789.   Defendants knew or should have known that female students are more likely to suffer sexual harassment and sexual violence by a significant margin.

790.   Defendants knew or should have known that students of color are more likely to suffer race discrimination and harassment by a significant margin.

791.   Defendants' treatment of these complaints disparately impacts Defendants' female students and students of color in violation of Plaintiffs' right to equal protection under the law.

792.   Defendants' denial of Plaintiffs' constitutional right to equal protection under the law caused Plaintiffs to forego educational and, in some cases, athletic opportunities, thereby

limiting their ability to participate in, and benefit from, the Defendants' educational programs and activities.

793.   As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

### COUNT VI
**Discrimination on the Basis of Sex and Color**
**Nebraska State Constitution**
**(All Defendants)**

794.   Plaintiffs incorporate by reference previously pled paragraphs as if fully pled herein.

795.   The Nebraska State Constitution protects individuals from discrimination on the basis of gender and color in public education.[84]

796.   The University of Nebraska is a public education institution in the State of Nebraska.

797.   As outlined in this Complaint, Defendants' failure to address, investigate, sanction, and respond to discrimination on the basis of gender and color violated the Nebraska State Constitution.

798.   As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

---

[84] NEB. CONST. art I, § 30 (1875).

## COUNT VII
### Discrimination on the Basis of Gender and Color
### Charter of the University of Nebraska and Neb. Rev. Stat.  §§ 85-101 et seq.
### (All Defendants)

799.    Plaintiffs incorporate by reference previously pled paragraphs as if fully pled herein.

800.    The Charter of the University of Nebraska (hereinafter "Charter") is a state legislative act to establish the institution of The University of Nebraska, codified in Neb. Rev. Stat.  §§ 85-101 et seq.

801.    The Charter reads: "The object of the institution shall be to afford to the inhabitants of this State the means of acquiring thorough knowledge of the branches of literature, science and the arts."[85]

802.    The Charter reads:

> The University of Nebraska shall be composed of a chief governing administrative unit, four universities which shall be the University of Nebraska-Lincoln, the University of Nebraska at Omaha, the University of Nebraska at Kearney, and the University of Nebraska Medical Center, and such other institutions and units as may be designated by the Legislature.[86]

803.    The Charter reads: "The general government of the University shall be vested in a board of eight regents…"[87]

804.    The Charter reads: "The Board of Regents…shall constitute a body corporate, to be known as the Board of Regents of the University of Nebraska, and as such may sue and be sued..."[88]

805.    The Charter provides: "All persons residing within the State, or, being non-residents who pay or whose parents or guardians pay not less than thirty dollars annually of School taxes to the State and who shall fill the requirements of the preceding Section, may be admitted to

---

[85] Neb. Rev. Stat. § 85-102.
[86] Neb. Rev. Stat. § 85-103.
[87] Neb. Rev. Stat. § 85-104.
[88] Neb. Rev. Stat. § 85-105.

any organized college of the University….[89]

806.   The Charter expressly states: "No person shall be deprived of the privileges of this institution because of age, sex, color or nationality."[90]

807.   Plaintiffs are all intended beneficiaries of the Charter and the establishment of the University of Nebraska.

808.   Plaintiffs have been denied their express right to an education at the University of Nebraska based upon their gender and/or their color.

809.   Denial of Plaintiffs' right to an education based upon their gender and/or their color is in direct violation of Section 18 of the Charter as codified in the Nebraska Revised Statutes.

810.   Defendant Board of Regents have a duty to Plaintiffs and all other intended beneficiaries to uphold the objects and mission of the Charter establishing the University of Nebraska.

811.   Defendants have breached their duty as Regents by denying the Plaintiffs an education based upon their gender and/or color.

812.   Defendant Board of Regents' breach of their duty to the Plaintiffs and other intended beneficiaries is a direct and proximate cause of damages to the Plaintiffs and other yet to be identified intended beneficiaries of the Charter.

813.   As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

---

[89] AN ACT TO ESTABLISH THE UNIVERSITY OF NEBRASKA (1869) § 16.
http://unlhistory.unl.edu/legacy/charter/rg01-01-02-charter-unl.html (last visited Jul. 6, 2020).
[90] NEB. REV. STAT. § 85-116.

## COUNT VIII
### Negligence
### (All Defendants)

814.    Plaintiffs incorporate by reference previously pled paragraphs as if fully pled herein.

815.    Defendants owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sex, color, and race-based assault, harassment, and abuse while students at UNL and a duty of ordinary care to conduct investigations of their claims in compliance with UNL's own policies and basic industry standards.

816.    Defendants owed Plaintiffs a duty of ordinary care to communicate with them during the investigations of their Title VI and Title IX claims, to ensure the integrity of the investigations, and to engage in appropriate response and action post-investigation.

817.    Defendants' failure to communicate with Plaintiffs timely during the investigation breached their duty of care.

818.    Defendants' failure to find responsible or discipline to any of the perpetrators identified in this complaint breached their duty of care.

819.    Defendants' failure to follow their own policies in reviewing, investigating, and resolving Plaintiffs' Title VI and IX complaints breached their duty of care.

820.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT IX
### Negligent Infliction of Emotional Distress
### (All Defendants)

821.   Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

822.   Defendants' failure to conduct appropriate investigations, failure to respond appropriately to reports of sex, color, and race-based misconduct, and failure to find responsible or discipline any of the perpetrators constitutes conduct so reckless as to demonstrate a substantial lack of concern for whether Plaintiffs were injured.

823.   The events described above would naturally and probably result in emotional distress.

824.   The events described above caused severe emotional distress to Plaintiffs.

825.   As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT X
### Breach of Contract
### (Defendant Board of Regents)

826.   Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

827.   Section 18 of the Charter of the University of Nebraska reads as follows: "No person shall because of age, sex, color or nationality be deprived of the privileges of this institution; provision shall be made for the education of females apart from male students in separate apartments or buildings; provided that persons of different sexes, of the same proficiency in studies may attend the regular college lectures together."[91]

---

[91] AN ACT TO ESTABLISH THE UNIVERSITY OF NEBRASKA (1869), § 18.
http://unlhistory.unl.edu/legacy/charter/rg01-01-02-charter-unl.html (last visited Jul. 6, 2020).

828.    Defendant Board of Regents entered into a binding agreement with Plaintiffs, codified in the Charter, to ensure that Plaintiffs would not be deprived of the privileges of the institution because of their sex or their color.

829.    As consideration for obtaining an education, and the privileges of attending the institution of the University of Nebraska, Plaintiffs paid tuition, fees, and costs, as well as state taxes.

830.    Defendant Board of Regents accepted Plaintiffs' consideration.

831.    Defendant Board of Regents breached this contract with Plaintiffs by failing to provide Plaintiffs with an appropriate education free of discrimination as provided for in the Charter.

832.    Defendant Board of Regents' failure to provide the Plaintiffs with their contractually owed benefit of an appropriate education free of discrimination is a material breach of the contract between the Plaintiffs and Defendant Board of Regents.

833.    Defendant Board of Regents' material breach resulted in damages to Plaintiffs.

834.    As a direct and proximate result of Defendant Board of Regents' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**DAMAGES**

835.    Plaintiffs incorporate by reference previously pled paragraphs as if fully pled herein.

836.    As a direct and proximate result of the above-described conduct, Plaintiffs suffered general, special, incidental, and consequential injury and damages, past, present, and future, in an amount that shall be fully proven at the time of trial.  These past, present, and future damages include but are not limited to the following:

90

a.  Pain, suffering, and emotional distress;

b.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life;

c.  Medical and medical-related expenses;

d.  Pharmaceutical expenses;

e.  Loss of education and educational opportunities;

f.  Loss of employment and earning capacity;

g.  Travel and travel-related expenses;

h.  Prevention from performing daily activities and obtaining the full enjoyment of life;

i.  Expenses and psychological treatment, therapy, and counseling;

j.  Loss of the ability to perform as athletes on their chosen teams;

k.  A loss of society and companionship; and

l.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

**RELIEF REQUESTED FOR ALL CAUSES OF ACTION**

For all the foregoing reasons, Plaintiffs pray for judgment against Defendants as follows:

A.  For past, present, and future non-economic damages in an amount to be determined at trial;

B.  For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C.  For any appropriate statutory damages;

D.  For costs of this suit;

91

E. For punitive damages, according to proof, as appropriate to the individual cause of action;

F. For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G. For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H. All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## **JURY DEMAND**

Now come Plaintiffs, by and through their attorneys, Karen Truszkowski and Elizabeth K. Abdnour, and demand a trial by jury.

DATED:        November 18, 2020

Respectfully submitted,

**s/ Karen Truszkowski**
Bar Number: P56929 (MI)
Attorney for Plaintiffs
TEMPERANCE LEGAL GROUP, PLLC
503 Mall Court #131
Lansing, MI 48912
Telephone: (844) 534-2560
Fax: (800) 531-6527
Email: karen@temperancelegalgroup.com

**s/ Elizabeth K. Abdnour**
Bar Numbers: 0081795 (OH), P78203 (MI)
Attorney for Plaintiffs
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Email: elizabeth@abdnour.com