IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE 1 AND JANE DOE 2, | Case No. 4:20-cv-03081 |
| Plaintiffs, | |
| vs. | **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE PLAINTIFFS' EXPERTS AND TO STRIKE** |
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, | |
| Defendant. | |

Defendant Board of Regents of the University of Nebraska ("BRUN") pursuant to FED. R. CIV. P. 56 and Local Rules NECIVR 56.1(a) and 7.1, submit the following Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Motion to Exclude Plaintiffs' Experts and to Strike.

## I.    STUDENT CODE OF CONDUCT

### A.    UNIVERSITY'S POLICY AGAINST SEXUAL MISCONDUCT AND OTHER MISCONDUCT.

1.    During the relevant period, from 2015 through 2020, the University of Nebraska-Lincoln ("University") had a policy against sexual misconduct. [Declaration of Meagan Counley with respect to Jane Doe 1 ("Dec. of Counley, Doe 1") ¶ 5, Exhibit P, Student Code of Conduct ("Ex. P, Student Code of Conduct"); Declaration of Meagan Counley with respect to Jane Doe 2 ("Dec. of Counley, Doe 2"), ¶ 5.]

2.     The University adopted a Student Code of Conduct, in order to: "(1) promote a campus environment that supports its educational, research, and outreach missions; (2) protect the members of the community and its resources from disruption and harm; (3) provide a guide to appropriate individual and group behavior; and (4) foster ethical standards and civic virtues..." [Ex. P, Student Code of Conduct, Preamble.]

3.     During the relevant period, the University of Nebraska investigated and addressed sexual misconduct, including sexual assault, sexual violence, dating violence, domestic violence, or stalking, in accordance with the "University of Nebraska—Lincoln Response to Allegations of Student Sexual Conduct," adopted pursuant to Board of Regents Policy 5.3.3., attached to the Student Code, as Appendix, "A," or as "Appendix "A" may be hereafter amended. [Id.]

4.     The Student Code of Conduct provides that "no person shall be deprived of the privileges of this institution because of sex," and explicitly provides that the "University will investigate reported allegations of sexual misconduct and may take appropriate remedial action...." [Ex. P, Student Code of Conduct, App. A, § 1a, 1c.]

5.     "Stalking" is defined "as the act of engaging in a knowing and willful course of conduct directed at a specific person or a family or a household member of such person with the intent to injure, terrify, threaten, or intimidate." [Ex. P, Student Code of Conduct, App. A, § 10ii.]

6.     "Sexual assault" is defined as:

2

> "S*exual assault" is* committed when an actor subjects a person to sexual penetration (i) without the consent of the person, (ii) when the actor knew or should have known that the person was mentally or physically incapable of resisting or appreciating the nature of the person's own conduct, or (iii) when the actor is nineteen years of age or older and the person is at least twelve but less than sixteen years of age. Sexual assault is also committed when an actor subjects a person to sexual contact (a) without consent of the person, or (b) when the actor knew or should have known that the person was physically or mentally incapable of resisting or appraising the nature of the person's own conduct. . . .

[Ex. P, Student Code of Conduct, App. A, § 10cc.]

7.      "Sexual harassment is unwelcome conduct or behavior of sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors and other verbal, nonverbal, or physical conduct of sexual nature." "Examples of sexual harassment include but are not limited to: (1) an exposure of an actor's genitals done with the intent to affront or alarm any person and (2) viewing a person in state of undress without his or her consent or knowledge." [Ex. P, Student Code of Conduct, App. A, § 10ee.]

8.      Once the University receives a complaint or report of sexual misconduct (defined in Ex. A, App. A, § 1b), the Title IX Coordinator begins the investigation to determine if the allegations have merit and shall conclude such investigation within (60) calendar days of receipt of a report. [Ex. P, Student Code of Conduct, App. A, § 2b.] The Title IX Coordinator "may be permitted a longer completion period under extraordinary circumstances, but both parties must be informed in writing of the extension of the timeline."

> Upon completion of the investigation: If the investigator determines by the greater weight of the evidence that a violation occurred, a recommended disposition should be included in the investigator's report. If the investigation determines it is more likely than not that

the Respondent did not violate the Student Code, the complaint may
be dismissed without further proceedings.

[Id.]

9.      While the investigation is pending, "[c]omplainants have access to
other available University assistance in changing academic and living situations
after an alleged incident, if so requested by the student or Complainant and if
such changes are reasonably available," such as change of on-campus student's
housing to a different on-campus location; rescheduling an exam, paper, or
assignment; taking an incomplete in a class; alternative course completion
options; arranging to complete a course or lectures via distance education
methods with the assistance of technology; providing increased security at
location or activities; transferring between class section, etc. [Ex. P, Student
Code of Conduct, App. A., § 3b.]

10.     While the investigation is pending, "any student charged with sexual
misconduct has the right to maintain status as a student and attend classes
while the case is pending final resolution within the University Conduct process,
unless it is determined by the Student Affairs Officer or his/her designee that
the student's continued participation as a student, whether inside or outside of
the classroom, would seriously disrupt normal operation of the University or
constitute an immediate harm, threat of harm, hostile environment and/or
danger to the health, safety, or welfare of the Respondent, the Complainant, any
person allegedly subject to sexual misconduct, or any member of the University
community." [Ex. P, Student Code of Conduct, App. A., § 3c.]

11.    The student charged with sexual misconduct may be temporarily suspended pending the completion of an investigation only "when the Student Affairs Officer finds and believes from information coming to his or her attention that the presence of the Respondent on the University premises would seriously disrupt normal operation of the University or constitute an immediate harm, threat of harm, hostile environment and/or danger to the health, safety, or welfare of the Respondent, the Complainant, any person allegedly subject to sexual misconduct, or any member of the University community." [Ex. P, Student Code of Conduct, App. A., § 1f.]

12.    "The determination of the merits of each case shall be made using a greater weight of the evidence standard, meaning it is more likely than not that a proposition (such as violation of the Code) was proven, and until such time that the Conduct Officer or Complainant bringing the misconduct satisfy their burden of proof, the respondent is presumed not to be in violation of the Code." [Ex. P, Student Code of Conduct, App. A., § 4f.]

13.    In relevant part, the University provides the following rights to the Complainant and the Respondent in Sexual Misconduct Proceedings:

- Right for the investigation to be conducted by a trained University official to provide a prompt, fair, and impartial process from initial investigation to the final result;
- Right for both Respondent and Complainant to see the sexual misconduct charges in written form;
- All charges to be presented to Respondent and Complainant in written form within seven University business days after the investigation is complete;

- Right to prepare a written statement in advance of a formal hearing;
- Right to view each other's statement;
- Right to be assisted by any advisor they choose;
- Right to hear all evidence, present evidence, testify, and to hear and submit questions for witnesses during a formal hearing;
- Right to pose direct questions to the witnesses, with possible limitations, and, specifically, the Conduct Officer or Chair of the Conduct Board may control questioning requiring Respondents and Complainant to submit questions in writing to determine if questions are appropriate and Chair may pose questions to the witnesses;
- Right to inspect all documents to be used as evidence and a list of all witnesses for the formal hearing, in advance of the hearing; and
- Right to be notified of the decision rendered, including a statement of any University sanction imposed, together with the rationale for the decision.

[Ex. P, Student Code of Conduct, App. A, § 5.]

14.    In formal hearings, in cases of alleged sexual misconduct, the University provides the following rights to the Respondent and the Complainant:

- Right to attend a pre-hearing conference, to be held at least two days prior to the scheduled hearing, to discuss the issues and facts that will be presented at the hearing, to exchange information about witnesses likely to be called, answer procedural questions, and settle those matters which may be agreeably concluded;
- Right to be instructed about the use of past sexual behavior of the Complainant or past sexual assault by the Respondent as evidence at the hearing, and that, in most situations, evidence of the past sexual history of either the Respondent or the Complainant will not be admitted at the hearing except in very limited situations;
- Right to a hearing, not less than three nor more than fourteen University business days after parties have been notified that the complaint was

6

referred to the hearing (subject to extension at the discretion of the Conduct Officer);

- Right to a hearing to be held before a conduct Board composed of at least three members;

- For any real or perceived conflict of interest or bias to be resolved two University business days in advance of the hearing;

- The Respondent, Complainant, and Conduct Officer are responsible for presenting their respective cases to the Conduct Board;

- Right to hear all evidence, present evidence, testify, and to hear and question witnesses; and

- Opportunity in advance to inspect documents and a list of witnesses for the hearing, no less than two University business days in advance of the hearing.

[Ex. P, Student Code of Conduct, App. A, § 7.]

15.    After the hearing concludes, "the Conduct Board shall determine by simple majority vote whether or not the University Suspension or University Expulsion is warranted. The decision of a presiding Conduct Officer or Conduct Board shall be based solely upon evidence introduced and received at the hearing...." [Ex. P, Student Code of Conduct, App. A, § 7d.]

16.    Within seven University business days following the conclusion of formal hearing proceedings, the presiding Conduct Board Chair or the Conduct Officer shall inform the Respondent, the Complainant, and the Title IX Coordinator, in writing, of its findings and of the sanction(s) imposed. [Ex. P, Student Code of Conduct, App. A, § 7e.]

17.    The Respondent or Complainant may appeal a decision reached after a formal hearing within seven University business days of delivery of the decision to the parties involved in the formal hearing, for the following purposes:

i.    To determine whether the original hearing was conducted fairly in light of the charges and the evidence presented, and in conformity with prescribed procedures giving the complaining party a reasonable opportunity to prepare and present evidence that the Code was violated, and giving the Respondent a reasonable opportunity to prepare and to present a rebuttal of those allegations; and

ii.    To determine whether the sanction(s) imposed were appropriate.

[Ex. P, Student Code of Conduct, App. A., §§ 9a., 9c.]

18.    "The appeal shall be limited to review of the record of the initial hearing and supporting documents unless the Appeals Officer, after notice to the Complainant and Respondent, requests additional information from the presiding Conduct Officer, Chair of the Conduct Board, Complainant or Respondent…[and] "the Appeals Officers shall complete review of the appeal normally within fourteen (14) University business days after receipt of the record and any additional information, and shall promptly issue a written decision…." [Ex. P, Student Code of Conduct, App. A., §§ 9e., 9f.]

19.    Furthermore, the Student Code of Conduct identifies other misconduct, that is not Sexual Misconduct. [Ex. P, Student Code of Conduct, Article III.B.]

20.    In relevant part, the University prohibits: "Physical abuse, verbal abuse, threats, intimidation, harassment, coercion, and/or other conduct that

8

threatens or unreasonably endangers the mental or physical health, safety or reputation of any person or oneself, including any such conduct achieved through means of social media or any other means of electronic communication." [Ex. P, Student Code of Conduct, Article III.B.5.]

21.    Moreover, the University prohibits, "Failure to comply with direction of University officials or law enforcement officer acting in the course and scope of their University job duties. . . ." [Ex. P, Student Code of Conduct, Article III.B.9.]

### B. INDIVIDUALS AUTHORIZED TO INSTITUTE CORRECTIVE MEASURES AND DISCIPLINARY ACTIONS AGAINST STUDENTS FOR SEXUAL MISCONDUCT ON BEHALF OF THE UNIVERSITY.

22.    "Any member of the University community may submit allegations of sexual misconduct against a student." [Ex. P, Student Code of Conduct, App. A, § 2b.] As such, complaints regarding sexual misconduct against a student by a student are to be made to:

> UNL Student Affairs Officer
> Laurie Bellows, PhD
> 402-472-3755
> 106 Canfield Administration Building
> Email: lbellows1@unl.edu
>
> UNL Title IX Coordinator
> Tami Strickman
> 402-472-3417
> 128 Canfield Administration Building
> Email: tami.strickman@unl.edu.

[Ex. P, Student Code of Conduct, App. A, § 1a.]

23.    "The 'Student Affairs Officer' is the individual authorized by the University and the University Chancellor to be responsible for the administration

of the Code, and in certain circumstances includes his or her designee." [Ex. P, Student Code of Conduct, App. A, § 10kk.]

24.    "The 'Title IX Coordinator' is the individual designated by the campus to respond to allegations of sexual misconduct by students, and in some circumstances can include his or her designee." [Ex. P, Student Code of Conduct, App. A, § 10ll.]

25.    Accordingly, the Title IX Coordinator, who works in the department of Institutional Equity and Compliance ("IEC"), and his/her designee are the conduct officers authorized to investigate allegations of sexual misconduct and determine whether the Code has been violated. [Dec. of Counley, Doe 1, ¶ 6; Dec. of Counley, Doe 2, ¶ 6; Declaration of Tami Strickman with respect to Jane Doe 1 ("Dec. of Strickman, Doe 1"), ¶ 7; Declaration of Tami Strickman with respect to Jane Doe 2 ("Dec. of Strickman, Doe 2"), ¶ 7.]

26.    The Title IX Coordinator and his/her designee are the individuals with authority to institute corrective measures/disciplinary action against students for sexual misconduct on behalf of the University. [Dec. of Counley, Doe 1, ¶ 7; Dec. of Counley, Doe 2, ¶ 7; Dec. of Strickman, Doe 1 ¶ 8; Dec. of Strickman, Doe 2, ¶ 8.]

27.    During the relevant period, IEC is the department that served (and still serves) as the Civil Rights office for the University and handled all matters that involved any form of discrimination and/or harassment based on protected status and any form of sexual misconduct. [Dec. of Counley, Doe 1, ¶ 8; Dec. of

Counley, Doe 2, ¶ 8; Dec. of Strickman, Doe 1 ¶ 8; Dec. of Strickman, Doe 2, ¶ 8.]

28.    IEC was (and still is) responsible for enforcing Title IX and conducting investigations into Title IX complaints. [Dec. of Counley, Doe 1, ¶ 8; Dec. of Counley, Doe 2, ¶ 8; Dec. of Strickman, Doe 1 ¶ 8; Dec. of Strickman, Doe 2, ¶ 8.]

29.    From September 2016 through 2019, Tamiko Strickman ("Strickman") served as the Title IX Coordinator at IEC. Strickman also served as the Interim Assistant to the Chancellor at the University, which position's title was changed to Assistant in 2017 and Associate to the Chancellor in 2018. [Dec. of Strickman, Doe 2, ¶ 3; Dec. of Strickman, Doe 2, ¶ 3]

30.    From 2016 through 2019, Meagan Counley ("Counley") served as the Title IX Investigator and Deputy Title IX Coordinator at the University. Since approximately January 2020, Counley has been serving as Title IX Coordinator at the University. In these roles, Counley was an individual designated by the University and had authority to respond to and investigate allegations of sexual misconduct by students and take disciplinary action(s) against students for sexual misconduct.  [Dec. of Counley, Doe 1 ¶ 3, 6 – 8; Dec. of Counley, Doe 2, ¶ 3, 6 -8.]

31.    From April 2016 through October 2017, Jeff Lamoureaux ("Lamoureaux") was the Deputy Title IX Coordinator and Investigator at the University. [Dec. of Lamoureaux, ¶ 4.]

32.    During the relevant period, Title IX Coordinator Strickman and her designees, Counley and Lamoreaux, were the individuals designated by the University and had authority to respond to and investigate allegations of sexual misconduct by students and take disciplinary action(s) against students for sexual misconduct. [Dec. of Counley, Doe 1, ¶ 3, 6-8; Dec. of Counley, Doe 2, ¶ 3, 6-8; Dec. of Strickman, Doe 1, ¶ 4 - 8; Dec. of Lamoureaux, ¶ 6; Dec. of Strickman, Doe 2, ¶ 4 - 8.]

33.    Strickman was trained to provide a prompt, fair, and impartial process from the initial investigation to final finding with respect to matters of Title IX. [Dec. of Strickman, Doe 1, ¶ 9; Dec. of Strickman, Doe 2, ¶ 9.]

34.    Counley was/is trained to provide a prompt, fair, and impartial process from the initial investigation to the final result. [Dec. of Counley, Doe 1, ¶ 4; Dec. of Counley, Doe 2, ¶ 5.]

35.    Lamoreaux was trained to provide a prompt, fair, and impartial process form the initial investigation to the final result. [Dec. of Lamoureux, ¶ 5.]

36.    During the relevant period, Dona-Gene Barton ("Barton") was an Assistant Professor at the University, Department of Political Science. [Dec. of Counley, Doe 2, ¶ 10; Dec. of Strickman,  Doe 2, ¶ 10.]

37.    During the relevant period, Barton did not have authority to respond to and investigate allegations of sexual misconduct by students. [Dec. of Counley, Doe 2, ¶ 11; Dec. of Strickman,  Doe 2, ¶ 11.]

12

38.     During the relevant period, Barton did not have authority to recommend or take disciplinary action against students pursuant to an investigation into alleged sexual misconduct. [Dec. of Counley, Doe 2, ¶ 12; Dec. of Strickman,  Doe 2, ¶ 12.]

39.     During the relevant period, IEC encouraged members of the University community to communicate to IEC reports of sexual misconduct or harassment. [Dec. of Counley, Doe 1, ¶ 9; Dec. of Counley, Doe 2, ¶ 9.]

## II.     UNDISPUTED FACTS PERTAINING TO JANE DOE 1 ("DOE 1")

### A.     DOE 1'S EDUCATION AT THE UNIVERSITY.

40.     Doe 1 was a student at the University from August 2015 to August 2020. [Filing No. 29, ¶ 235, 341, 342; Declaration of Alisha Hanshaw ("Dec. of Hanshaw"), ¶ 4, Ex. G, the Official UNL Graduate Academic Record ("Ex. G, Doe 1, Transcript").]

41.     In 2017, Doe 1 was 24 years old. [Dec. of Counley, Doe 1 ¶, 11.]

42.     Doe 1's degree objective was a Ph.D. in Biological Sciences, with specialization in Genetics, Cell and Molecular Biology. [Ex. G, Doe 1, Transcript.]

43.     From Fall[1] 2015 through Spring 2019, Dr. Debra Brown ("Dr. Brown") served as Doe 1's advisor. From Fall 2015 through August 2020, Dr. Angela Pannier ("Dr. Pannier") served  as co-advisor to Doe 1. [Declaration of Lily Amare ("Dec. of Amare") ¶ 5, Ex. Z, Deposition of Jane Doe 1 ("Ex. Z, Dep. of Doe 1") at 19:15 -20, 21:19- 22:11.]

---

[1] For purposes of clarity, fall semester runs from August through December; spring semester runs from January through May; and summer semester runs from June through July.

44.    In each of the Annual Reports she submitted, Doe 1 expressed her desire and goal to graduate in 5 years. [Declaration of Angela Pannier, ¶¶ 5 – 8, Exs. H, I, J, K, Annual Reports for academic years 2015–16, 2016–17, 2017–18, 2018-19, respectively.]

45.    In fact, on May 24, 2018, Doe 1 identified "August 2020" as her projected graduation month and year. [Dec. of Counley, Doe 1, ¶ 29, Ex. S, Recording of Doe 1's IEC Interview on May 24, 2018, at approximately 41:21 ("Ex. S, May 24 Recording"); Dec. of Amare, Ex. CC, Transcript of May 24 Recording.]

46.    In Fall 2015 and Spring 2016, Doe 1 served as a Research Assistant. In Fall 2016, Spring 2017, Fall 2017, and Spring 2018, Doe 1 served as a fellow for the Molecular Mechanisms of Disease predoctoral training program. [Ex. K, Annual Report 2018-19 at p. 2.]

47.    In the Fall 2018 and Spring 2019, Doe 1 served as a Teaching Assistant for laboratory courses, BIOS 101L and 111L, respectively. Doe 1 taught the Fall 2019 lab course at Morrison Center and taught the Spring 2019 lab course at Beadle Center.  Both of these laboratories in which she taught were controlled access laboratories, meaning an individual needed either a keycard or a key to access these laboratories. [Ex. K, Annual Report 2018-19 at p. 2; Ex. Z, Dep. of Doe 1 at 35:3-23]

48.    From approximately Spring 2015 through Spring 2019, Doe 1 conducted her work related to the positions identified in Statement of Undisputed Facts, ¶¶ 46, 47 and her research at the Brown laboratory located

in Morrison Center. The Brown laboratory was a controlled access laboratory, meaning an individual needed a keycard to access this laboratory. [Ex. Z, Dep. of Doe 1 at 40:11 – 41:22.] In addition, Morrison Center is a controlled access building, meaning an individual must have a keycard access to enter the building. [Id. at 156:10 – 157:15.]

49.    In the Fall 2019 and August 2020, Doe 1 served as Research Assistant.  [Ex. K, Annual Report 2018-19 at p. 2.] From Fall 2019 through March 2020, Doe 1 had the opportunity to utilize the Pannier laboratory located in Chase Hall. [Id.] Both Pannier laboratory and her office in Chase Hall were controlled access rooms, meaning an individual needed a key to access these areas. [Ex. Z, Dep. of Doe 1 at 39:14 -40:5.]

50.    Prior to March 2020, Doe 1 had completed her research. [Ex. Z, Dep. of Doe 1 at 276:8 – 21.]

51.    In March 2020, the University shut down because of COVID-19. Thereafter, Doe 1 completed her education from and worked at home. [Id.]

52.    After March 2020, Doe 1 did not use or visit any of the laboratories located at the University. [Id.]

53.    From Fall 2015 through August 2020, as remuneration for each of the positions she held at the University, the University covered her entire tuition for each of the semesters and provided Doe 1 with a stipend.  [Ex. Z, Dep. of Doe 1 at 26:23 – 12, 27:3 – 22.]

54.    From June to July 2019—for eight weeks—Doe 1 was a visiting scholar at Trudeau Institute located in Saranac Lake, NY. [Dec. of Amare, ¶ 4,

Ex. Y, Doe 1 Resume.] Doe 1 went to Trudeau because that is where her advisor, Dr. Debra Brown, had moved. Doe 1 assisted Dr. Brown with setting up her lab and while there, Doe 1 finished the experiments she needed to complete her research.  [Ex. Z, Dep. of Doe 1 at 273:16 – 274:8.]

55.    By Spring 2018, Doe 1 had completed all of her required courses for her major and specialization. From Summer 2018  on, Doe 1 only worked on her dissertation and did not attend any classes as a student.   [Ex. G, Doe 1 Transcript.]

56.    Although there was no requirement to publish articles while pursuing her Ph.D. at the University, Doe 1 published five articles—two in 2016, one in 2018 and two in 2020. She served as first author for two of the articles she published in 2020. [Ex. Y, Doe 1 Resume.]

57.    In August 2020, Doe 1 graduated with her Ph.D. in Biological Sciences, with specialization in Genetics, Cell and Molecular Biology, with a 4.0 grade point average. [Ex. G, Doe 1 Transcript.]

58.    Since her graduation in August 2020, Doe 1 has been maintained employment in her profession or field of study. [Ex. Y, Doe 1 Resume.]

59.    The position she held after she graduated was a position she wanted and found prior to graduation in 2020. [Ex. Z, Dep. of Doe 1 at 259:19 – 260:13.]

**B.    COMMUNICATION REGARDING JR4 IN JUNE 2017 AND THE UNIVERSITY'S REASONABLE RESPONSE IN LIGHT OF THE KNOWN CIRCUMSTANCES.**

60.    On June 27, 2017, a student at the University reported an incident involving Doe 1 and JR4 ("JR4") to Dr. Mathew Hecker ("Dr. Hecker"). [Dec. of

Sarah Haake ("Dec. of Haake"), ¶ 4, Ex. L, UNLPD Full Incident Report, June 2017 ("Ex. L, UNLPD Report, June 2017").]

61.     JR4 was 28 years old in 2017. [Dec. of Counley, Doe 1, ¶ 11.]

62.     On June 28, 2017, Dr. Hecker notified IEC and UNLPD of what was reported to him. [Ex. L, UNLPD Report, June 2017; Dec. of Lamoureaux, ¶ 7; Dec. of Strickman, Doe 1, ¶ 28.]

63.     On the same day, UNLPD, through Officer Kristy Beitler ("Officer Beitler"), reached out to Doe 1.  Doe 1 told Officer Beitler that she was out of town, in a safe place. [Ex. L, UNLPD Report, June 2017 at p. 2.] Doe 1 also reported that she received messages from JR4, a man she dated for approximately one year and broke up with in early April 2017. [Id.]

64.     Doe 1 described the contents of communications to include "pleas of getting back together, apologies, and calling her mean and heartless for not responding to him." [Id.]

65.     Doe 1 reported to Officer Beitler that JR4 did not make any threats—direct or veiled—towards himself, towards her, or towards others throughout his correspondence. Doe 1 did not provide any reasons to be concerned for his physical and/or mental welfare, nor was she aware of any information to suggest he may pose an imminent threat or danger to himself or others. [Id.]

66.     Furthermore, Doe 1 reported JR4 had never exhibited violent or aggressive behavior or physically sought her out to this point. She also reported JR4 had no history of substance/alcohol abuse and did not have access to weapons. [Id.]

17

67.    Officer Beitler told Doe 1 UNLPD would locate JR4 and give him a no contact directive. [Id.] In addition, Officer Beitler provided her with resource information, including IEC and Voices of Hope. At that time, Doe 1 expressed interest in obtaining a No Contact Order. [Id.]

68.    After her communication with Doe 1, Officer Beitler met with Strickman, Lamoureaux  and Dr. Hecker, and told them Doe 1 was interested in obtaining a No Contact Order. [Id.]

69.    On June 28, 2017, UNLPD directed JR4 to cease all contact with Doe 1. [Id.] At this time, JR4 explained the reason he sent so many messages to Doe 1 was because he wanted her to "answer one last question," and wanted closure. [Id.]

70.    On June 28, 2017, Lamoureaux sent a letter to Doe 1 stating IEC has received a notification that she "may have been subjected to sexual harassment or violence," and outlined the details of what he had learned thus far. [Dec. of Lamoureaux, ¶ 10, Ex. A, Letter to Doe 1 on June 28, 2017 ("Ex. A, June 28 Letter to Doe 1").]

71.    In the June 28 letter, Lamoureaux expressly provided Doe's options:

You have the right to file a complaint with local law enforcement. Those entities conduct an investigation into whether a crime has been committed. Our office conducts neutral investigations of sexual harassment and violence complaints to determine whether there has been a violation of university policy. You have the option to file complaints with both law enforcement and our office.

[Ex. A, June 28 Letter to Doe 1.]

72.    In the June 28 letter, Lamoureaux enclosed "Know Your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence Where You Go to School,"

and "Institutional Equity and Compliance Information for Complainants and Respondents," which explained Doe 1's rights and the University's responsibilities regarding complaints of sexual misconduct. [Id.] Lamoureaux also provided a link for information about the University's reporting protocol and investigation process. [Id.]

73.    In the June 28 letter, Lamoureaux notified Doe 1 of the resources that are available to her. [Id.]

74.    On June 29, 2017, Officer Beitler contacted Doe 1 to inform her that a cease contact directive was communicated to JR4. Doe 1 did not have additional concerns or request further assistance at that point. [Ex. L, UNLPD Report, June 2017 at p. 5.]

75.    On June 30, 2017, Lamoureaux and Officer Beitler met with Doe 1, at which time Doe 1 provided her version of events. [Dec. of Lamoureaux, ¶¶ 11, 22, Ex. C, June 30, 2017, Investigation Report ("Ex. C, June 30 Doe 1 Investigation Report") at p. 1.]

76.    Specifically, Doe 1 reported that she and JR4 dated for approximately one year until they broke up in April 2017. Doe 1 reported he was never abusive or threatening in any way during their relationship. [Ex. C, June 30 Doe 1 Investigation Report at p. 2.]

77.    Doe 1 reported she and JR4 attended a conference in Washington D.C. as part of their graduate program. During the trip, JR4 expressed his desire to continue a relationship with Doe 1. Doe 1 told him she was not interested in dating him and that it would be best for them to stop their friendship. [Id.]

19

78. On May 17, 2017, JR4 sent Doe 1 text messages asking her to give him another chance and to reconsider dating him again. After several text messages, in which Doe 1 told him she was not interested and to stop contacting her, JR4 continued texting Doe 1. [Id.]

79. Thereafter, JR4 sent Doe 1 messages via Snapchat and Facebook. Doe 1 blocked JR4 on Facebook and deleted his account from her Snapchat. [Id. at 2-3.]

80. On June 27, 2017, Doe 1 received several texts from JR4. [Id. at 3.]

81. All of the reported communications between JR4 and Doe 1 were on their private cell phone devices and non-UNL email addresses. There was no requirement for JR4 or Doe 1 to utilize any social media for purposes of any educational program or activity in which they were participating. [Dec. of Lamoureaux, ¶ 13 -14.]

82. Doe 1 told Officer Beitler and Lamoureaux that none of JR4's text messages had been threatening to her. Instead, his messages were to request a second chance. Doe 1 shared she has never witnessed any threatening behavior or conduct that would cause her concern for her safety. [Ex. C, June 30 Doe 1 Investigation Report at p. 2.]

83. Moreover, at her deposition, Doe 1 admitted that the general gist of messages from JR4 in May and June 2017 were that "he wanted to try to get back together again. He wanted to communicate with me. He wanted to meet in person in order to work out our relationship." Doe 1 admitted that he did not

threaten to harm her physically in any of the messages in May and June 2017. [Ex. Z, Dep. of Doe 1 at 86:8 – 14.]

84.　None of the messages contained offensive sexual connotations. [Dec. of Counley, Doe 1, ¶ 41, Ex. X, Messages between Doe 1 and JR5 in May and June 2017.]

85.　None of the messages contained name calling. [Id.]

86.　At the June 30 meeting, Lamoureaux advised Doe 1 of her reporting options and the process. Doe 1 elected to report the incident to both entities— IEC and UNLPD—but was not desirous of criminal prosecution, nor did she want to file a complaint with IEC. [Ex. C, June 30 Doe 1 Investigation Report at p. 2; Dec. of Lamoureaux, ¶¶ 15 – 17.]

87.　With that said, at the June 30 meeting, Doe 1 again expressed her desired goal of obtaining a No Contact Order. [Ex. C, June 30 Doe 1 Investigation Report at p. 2.]

88.　On June 30, 2017, Lamoureaux met with JR4. JR4 acknowledged his prior relationship with Doe 1 and her request for him to stop contacting her. JR4 stated he continued to contact Doe 1 to get an answer to a question and to get closure. JR4 stated he had no intention of making any further contact with Doe 1. [Ex. C, June 30 Doe 1 Investigation Report at pp. 2 -3; Dec. of Lamoureaux, ¶ 18.]

89.　JR4 stated he is also interested in informal resolution and would agree to a No Contact Order. [Id. at 4; ; Dec. of Lamoureaux, ¶ 19.]

90.    On June 30, 2017, Lamoureaux informed Doe 1 of the outcome of her allegation that JR4 engaged in repeated behavior directed towards her that made her feel uncomfortable. Lamoreaux expounded:

> Between May 17, 2017 and June 28, 2017, Respondent [JR4] is alleged to have made numerous attempts to contact you electronically, despite your repeated requests for him to stop, which made you feel uncomfortable. This behavior, if determined to be his intent, could be a violation of Student Code of Conduct, ***Appendix A, Stalking***. Stalking is defined as a knowing and willful course of conduct directed at a specific person...with the intent to injure, terrify, threaten or intimidate. In order to determine whether a violation of the university's policy prohibiting sexual misconduct occurred, the standard of proof required is a preponderance of evidence, i.e., the evidence demonstrates that is more likely than not that the conduct occurred."

[Dec. of Lamoureaux, ¶¶ 20, 21, Ex. B, June 30 Letter to Doe 1.]

91.    In the June 30 letter, Lamoureaux stated "You [Doe 1] informed IEC that you wished to resolve the matter through informal resolution. You were seeking a permanent No Contact Order between the Parties." [Id.]

92.    In the June 30 letter, Lamoureaux told Doe 1 that JR4 has agreed to a permanent No Contact Order. [Id.] And, that a permanent No Contact Order will be issued. [Id.]

93.    In the June 30 letter, Lamoureaux stated that, because Doe 1 and JR4 agreed to an informal resolution, IEC did not fully investigate the allegations and, therefore, would not issue a determination in this matter. [Id.]

94.    As it relates to the No Contact Order, Lamoureaux advised Doe 1 that it will remain in effect so long as JR4 is a member of the University, and therefore, JR4 "may not have any contact, direct or indirect," with her. [Id.]

95.     At no point did Doe 1 contact Lamoureaux with any questions or concerns about the informal process or the fact that a full investigation was not conducted. [Dec. of Lamoureaux, ¶ 23.]

96.     At no point did Doe 1 contact Lamoureaux to indicate any of the statements included in the June 30 letter were a misrepresentation of what she had asked of IEC, including the statement that she informed IEC that she wished to resolve the matter through informal resolution and was seeking a permanent No Contact Order. [Dec. of Lamoureaux, ¶ 25; Ex. Z, Dep. of Doe 1 at 97:4 – 23.]

97.     On June 30, 2017, Strickman issued a No Contact Order, stating, in relevant part:

> The purpose of this letter is to direct you to immediately cease all contact and all communication, verbal or non-verbal, with Complainant. This includes, but is not limited to text messages, phone calls, e-mails, instant messages,....You should not attend any classes at the University of Nebraska-Lincoln for which you are not currently registered and/or enrolled, nor should you be loitering around any classroom in which Complainant is attending.
>
> Please be aware that if you should violate this directive the University Police Department may be contacted. In addition, should you violate the order, you may be charged with violating the Student Code of Conduct...

[Filing No. 29-8; Dec. of Strickman, Doe 1, ¶ 11, 12.]

98.     On July 3, 2017, the following email exchange occurred between Lamoureaux and Doe 1:

> ***Lamoureaux to Doe 1:***
> It has been brought to my attention that either you or your friend has been sharing information about what occurred. Please make sure if you have shared any information about what occurred you stop. Additionally, please advise your friend(s) not to share any information regarding what occurred. If you have question please contact me.

23

***Doe 1 to Lamoureaux:***
I have not discussed the situation with anyone outside of my family and advisor since our meeting....
I was also not aware that I am not allowed to share information about what is going on with other people. I would like more information on that if possible. I have a few specific questions about sharing information. First, am I allowed to continue to discuss this issue with my advisor? Second, I have another roommate who is currently not aware of what happened last week because she was out of town. Can I fill her or my other friends who also attend UNL in about what happened? Finally, can I discuss it with the person who reported it in the first place?

***Lamoureaux to Doe 1:***
Title IX matters are to be kept as confidential as possible. As students you both have an expectation of privacy. If you feel you need to discuss with your family please just ask that they don't say anything to anyone else. As for your advisor or another friend that asks you questions please let them know you both have a No Contact Order in place. If you would like to discuss this further I will be in the office tomorrow.

[Filing No. 29-6; Dec. of Lamoureaux,¶ 26, Ex. D, Communication between Lamoureaux and Doe 1 on or about July 3 – 4, 2017.]

99.     Doe 1 did not contact Lamoureaux or go to his office to discuss the matter of the July 3 email exchange. [Ex. Z, Dep. of Doe 1 at 99:16 – 100:18, 102:21 – 106:121.]

100.   Doe 1 admits that by July 3, 2017, she already had the opportunity to talk to her advisor, her family and a couple of her friends about what had transpired between Doe 1 and JR4. [Id.]

101.   Doe 1 admits she was able to tell other individuals that there was a No Contact Order between Doe 1 and JR4. [Id.]

102.   On July 19, 2017, Lamoureaux addressed Doe 1's questions as to the parameters of the No Contact Order. [Dec. of Lamoureaux, ¶ 27, Ex. E, Communication between Lamoureaux and Doe 1 on July 19, 2017.]

103. Specifically, the following email exchange occurred between Lamoureaux and Doe 1:

***Doe 1:***

I have some questions regarding the terms of the no contact order when [JR4] and I have to take the same required courses for the next two semesters. This is once a week seminar course where students present and then we critique each other. We are required to take it for the first three years of our program, so we both have a year left. I just want to make sure that I ***am aware of what is expected from both of us so that I can prepare and am not caught off guard***. Would I be able to meet with you to get more information?

***Lamoureaux:***

It would be a violation of the NCO if the contact was intentional. If you both have a class together it would be expected to see each other in class. However, it would be expected that both parties avoid interaction as much as possible. If a person were to wait before or after class for another person that would violate the NCO. I can meet with you today or tomorrow if you would like to discuss this in person. Please let me know what date and time works best for you.

[Id.]

104. Thereafter, Doe 1 met with Lamoureaux to discuss further the parameters of the No Contact Order. When she expressed concern about having to take a class with JR4, Lamoureaux expressed to her that they could still see each other as long as JR4 did not initiate contact. [Ex. Z, Dep. of Doe 1 at 61:3 – 62:16.]

105. During her deposition, Doe 1 admitted that both Doe 1 and JR4 were required to take BIOS 915A, Genetic, Cellular and Molecular Biology (BIOS 915A) for the first three years of their graduate program. [Id.]

106. As a result, Doe 1 and JR4 took the BIOS 915A class in the Fall 2017. [Id.]

107. Doe 1 admitted: (a) JR4 did not initiate any contact with her during the BIOS 915A class; (b) JR4 never approached her in class; and (c) she does not recall JR4 ever talking to her in that class. [Ex. Z, Dep. of Doe 1 at 51:19 – 52:18.]

108. Doe 1 passed BIOS 915A class. [Ex. G, Doe 1 Transcript.]

109. On October 17, 2017, the following email exchange occurred between Lamoureaux and Doe 1:

**Lamoureaux to Doe 1**
I have been contacted on two separate occasions with [JR4] asking if it was possible to work things out with you. ***I have advised him that he needed to move on.*** I wanted to share this information with you in case you wanted to work it out with him or ***find out if he has been bothering you at all.***

**Doe 1 to Lamoureaux**
[JR4] has not been bothering me, but I do not want to try to work things out with him and do not want contact with him. It concerns me that he has not moved on and still wants to contact me. Do you think there is a cause for concern and do you have any suggestions about steps I should take?
Am I able to tell my advisor about this? I would feel more comfortable in the lab during the day and evenings if she was aware of the entire situation.

**Lamoureaux to Doe 1**
I will advise him to avoid contact. If he doesn't listen we will take further steps.

[Filing No. 29-7; Dec. of Lamoureaux, ¶ 28, Ex. F, Communication between Lamoureaux and Doe 1 in October 2017.]

110. After this, Lamoureaux advised JR4 that Doe 2 was not interested in trying to work things out with him and to not communicate with Doe 1 in any way. [Dec. of Lamoureaux, ¶ 29.]

111.   JR4 did not contact her or disturb her in any way from the time the permanent No Contact Order was issued through November 2017. [Ex. O, Transcript from May 10 meeting at p. 10; Dec. of Lamoureaux, ¶ 30.]

### C.    COMMUNICATION REGARDING JR4 IN DECEMBER 2017 AND THE UNIVERSITY'S APPROPRIATE RESPONSE IN LIGHT OF THE CIRCUMSTANCES.

112.   On December 7, 8, and 11, 2017, JR4 sent text messages to Tina, roommate[2] of Doe 1, from his private device to her private device, i.e. a non-UNL sponsored cell phone. [Dec of Amare, ¶ 6, at Ex. AA, Messages JR4 sent to Tina on December 7, 8 and 11, 2017; Dec. of Counley, Doe 1, ¶ 10.]

113.   JR4 sent these messages to Tina using his private device to Tina's private device. [Dec.  of Counley, Doe 1, ¶ 15; Ex. AA, JR4 message to Tina in December 2017.]

114.   Neither JR4, nor Tina were using a University sponsored cell phone in December 2017. [Dec.  of Counley, Doe 1, ¶ 16.]

115.   There was no report that JR4 and Tina were participating in the same class or program in December 2017. [Dec.  of Counley, Doe 1, ¶ 22.]

116.   On December 13, 2017, Doe 1 and Tina met with Counley and Officer Eric Fischer ("Officer Fischer"), UNLPD. [Dec. of Haake, ¶ 4, Ex. M, UNLPD Full Incident Report, December 2017 to January 2018 ("Ex. M, UNLPD Report, Dec. 17 – Jan. 18"); Dec. of Counley, Doe 1, ¶ 13.]

117.   At this time, Tina reported the text messages she received from JR4. In these messages, JR4 described an event where another UNL affiliate was

---

[2] Defendant will continue using a pseudonym for the non-party students to preserve the anonymity of the students, Doe 1 and JR4.

rumored to have shown genitalia to a board of interviewers and asked Tina to respond to his messages in order to bring to light how the department chair started this false rumor about the UNL affiliate. JR4 also expressed his frustration about the consequences of the events in Fall 2017 involving Doe 1 and JR4. JR4 further stated that he has an embarrassing story about Doe 1 that he could tell other people but expressly stated, "I don't do that shit even though you people have single handedly made me incapable of making friends with anyone at the NCV." [Ex. AA, JR4 message to Tina in December 2017.]

118.   In the messages to Tina, JR4 did not ask Tina to pass along any of the messages to Doe 1 or ask Tina to tell Doe 1 to communicate with JR4. [Id.; Dec. of Counley, Doe 1, ¶ 14; Ex. AA, JR4 message to Tina in December 2017.]

119.   At this meeting, other than the messages to her roommate, Doe 1 did not express any other safety concern. [Ex. M, UNLPD Report, Dec. 17 – Jan. 18; Dec. of Counley, Doe 1, ¶ 18.]

120.   On December 14, 2017, Counley and Officer Fischer met with JR4 and gave him a directive not to contact Doe 1 or her roommates. [Dec. of Counley, Doe 1, ¶ 19; Ex. M, UNLPD Report, Dec. 17 – Jan. 18; Filing No. 29, ¶ 267-268.]

121.   On December 15, 2017, UNLPD notified Doe 1 about the directive given to JR4 as described in Statement of Undisputed Facts ¶ 120. [Ex. M, UNLPD Report, Dec. 17 – Jan. 18.]

122.   On January 13, 2018, Doe 1 met with Officer Fischer and created a safety plan. [Filing No. 29, ¶ 270.] At this meeting, Doe 1 reported that JR4 was

attending seminars she is attending, but that he had not caused any incident at that time. [Ex. M, UNLPD Report, Dec. 17 – Jan. 18, at  4.]

123.   At this meeting, Officer Fischer told her to call UNLPD, if she wants a police escort. [Dec. of Amare,  ¶ 7, Ex. BB, Email Communication between Morgan Beal, Doe and roommates.]

124.   Between December 13, 2017 through January 13, 2018, Counley looked into the matter further and analyzed the messages to Tina, to determine whether it violated the No Contact Order issued in June 2017. [Dec. of Counley, Doe 1, ¶ 20.]

125.   Counley determined the message to Tina in December 2017 did not violate the No Contact Order as JR4 did not ask Tina to pass along any of the messages to Doe 1 or ask Tina to tell Doe 1 to communicate with JR4. [Dec. of Counley, Doe 1, ¶ 21.]

126.   In Spring 2018, Doe 1 asked her department for accommodation to attend a seminar other than the required BIOS 915A. This request was granted. Doe 1 passed this course. [Ex. Z, Dep. of Doe 1 at 54:7 – 25 and 128:12 – 129:11.]

127.   In Spring 2018, Doe 1 and JR4 took one course together, Signal Transduction. The Signal Transduction class is a course that is offered every other Spring semester. During the entirety of the course, JR4 never talked to her in a personal manner or approached her outside of the classroom.  [Ex. Z, Dep. of Doe 1 at 55:4 – 56:22.]

128. In Spring 2018, Doe 1 asked the lab in which JR4 taught be moved. This request was granted and JR4's lab was moved. [Ex. Z, Dep. of Doe 1 at 234:10 – 22.]

129. Since December 2017, JR4's keycard was restricted from accessing Morrison Center. [Ex. N, UNLPD Report, May 18 at 3.]

130. During Spring 2018, Doe 1 did not request a police escort. [Ex. Z, Dep. of Doe 1 at 126:24 – 127:4.]

**D.    REPORT IN MAY 2018 AND THE UNIVERSITY'S RESPONSE IN LIGHT OF THE CIRCUMSTANCES.**

131. On May 5, 2018, Doe 1 received an email from JR4 using the pseudonym "John Smith." [Dec. of Counley, Doe 1, ¶ 23, Ex. Q, Email Communication between Counley, Doe 1, and Officer Fischer on May 6, including the May 5 email received by Doe .]

132. On May 6, 2018, Doe 1 forwarded the email she received on May 5 to Counley and Fischer, with the following message:

> I received the message below last night to [] one of my non-unl email addresses. I believe that it is from [JR4]. This is the email address of mine that he was sending messages to last summer and the one he tried to log into twice. I am currently in Austin, Texas for a conference that [JR4 ]is also attending, so he is also here. I will be in Austin through Tuesday and would like to meet when I return.

[Id.]

133. Officer Fischer immediately responded. Officer Fischer, Doe 1 and Counley agreed to meet on May 11, 2018. [Id.; Dec. of Counley, Doe 1, ¶ 25.]

134. On May 9, 2018, Doe 1's boyfriend visited IEC expressing concern about the safety of Doe 1 and the interactions of Doe 1 and JR4. [Dec. of Strickman, Doe 1, ¶ 9; Dec. of Haake, ¶ 6, Ex. N, UNLPD Full Incident Report

from May 2018 to October 2018 ("Ex. N, UNLPD Report May 18 – Oct. 18") at p. 3; Dec. of Counley, Doe 1, ¶ 26.]

135.   On May 10, 2018, UNLPD and IEC received notice that Doe 1's boyfriend sent multiple emails on May 9, 2018, to the members of the Board of Regents, Chancellor and President of the University of Nebraska, therein stating his great concern for the safety of Doe 1 and his dissatisfaction related to the University's response. [Dec. of Strickman, Doe 1, ¶ 14 -15; Ex. N, UNLPD Report May 18 – Oct. 18 at p. 3.]

136.   Based on the communications from Doe 1's boyfriend, UNLPD and IEC decided to contact Doe 1 ahead of the meeting on May 11 to ensure her safety. Officer Fischer called Doe 1 and asked her to come to UNLPD office. Doe 1 agreed to come and meet with UNLPD on the same day, May 10, 2018 ("May 10 meeting"). Strickman joined this meeting. [Id.]

137.   At the May 10 meeting, Strickman introduced herself, and Doe 1 agreed to having Strickman in the meeting. [Ex. N, UNLPD Report May 18 – Oct. 18 at p. 2; Dec. of Strickman, Doe 1, ¶ 18; Ex. O, Transcript of May 10 meeting at p. 2.]

138.   Thereafter, Officer Fischer expressed the confusion as to what was going on.  Doe 1 was unaware that her boyfriend had sent these emails. Doe 1 confirmed the only contact she received from JR4 was the May 5 email. [Ex. N, UNLPD Report May 18 – Oct. 18 at p. 3; Dec. of Strickman, Doe 1, ¶ 19; Ex. O, Transcript of May 10 meeting at pp. 1 – 3.]

139.   When Doe 1 expressed concern that she had seen JR4 in Morrison Center, Officer Fischer confirmed that JR4 cannot access Morrison Center as his keycard access had been restricted from entering that building. [Id.] Office Fischer asked for additional information of when and what time she had observed JR4 in the restricted area. [Ex. N, UNLPD Report May 18 – Oct. 18 at p. 3; Dec. of Strickman, Doe 1, ¶ 20.]

140.   Furthermore, at this meeting, Strickman and Officer Fischer requested Doe 1 to send the header information of the email to help with identification of the IP address. [Ex. N, UNLPD Report May 18 – Oct. 18 at p. 3.]

141.   At the May 10 meeting, Strickman communicated to Doe 1 her options with regard to Title IX: pursue a formal complaint; decline to file a complaint; or file an anonymous complaint. [Filing No. 29, ¶ 286; Dec. of Strickman, Doe 1, ¶ 21; Ex. O, Transcript of May 10 meeting at pp. 21 – 24.]

142.   On May 17, 2018, Doe 1 got a protection order from the County Court of Lancaster Court against JR4, which was served on JR4 on May 21, 2018. [Filing No. 29, ¶ 292 – 294.]

143.   On May 14, 2018, Doe 1 communicated she wanted to move forward with a formal complaint and investigation. [Dec. of Counley, Doe 1, ¶ 27.]

144.   On May 23, 2018, Doe 1 submitted an intake form. [Filing No. 29, ¶ 291; Dec. of Counley, Doe 1,¶ 27, Ex. R, Intake Form.]

145.   On May 24, 2018, Counley gave Doe 1 the opportunity to provide a detailed account of her allegations. [Dec. of Counley, Doe 1, ¶ 28; Ex. S, Recording of May 24 meeting; Ex. CC, Transcript of May 24 Recording.]

146. On May 24, 2018 ("May 2018 letter"), Counley sent Doe 1 a letter outlining Doe 1's allegations against JR4 and informing Doe 1 that the University has commenced an investigation into her complaint. [Dec. of Counley, Doe 1, ¶ 30, Ex. T, May 24 letter.]

147. In the May 24 letter, Counley stated that IEC conducts a neutral investigation of sexual harassment and violence complaints to determine whether there has been a violation of university policy. [Id.]

148. In the May 24 Letter, Counley enclosed "Know Your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence Where You Go to School," which explained Doe 1's rights and the University's responsibilities with regard to complaints of sexual misconduct. [Id.] Counley also enclosed a more detailed description of the investigation conducted by IEC. [Id.]

149. Counley also provided a link for information about the University's reporting protocol and investigation process, to the Student Code of Conduct, Appendix A. [Id.]

150. In the May 24 letter, Counley notified Doe 1 of the resources that are available to her. [Id.]

151. Thereafter, IEC, through Counley, began its formal investigation. [Filing No. 29, ¶ 295 – 297; Dec. of Counley, Doe 1, ¶ 31, Ex V, Investigation Report, completed July 27, 2018 ("Ex. V, Doe 1 Investigation Report").]

152. During the investigation, Doe 1 was:

- provided an opportunity to provide a detailed account of her allegations against JR4;

33

- provided an opportunity and did provide information and documents in support of her complaint;
- informed of the investigation process and her rights and options;
- informed of resources available to her;
- provided the opportunity and did review and inspect statements and documents generated by Counley as part of her investigation into the allegations against JR4;
- provided the opportunity and did respond to JR4's response to her allegation in detail;
- provided the opportunity to provide any and all information that she thought was pertinent to the investigation;
- provided the opportunity to and did provide questions she wanted Counley to ask of JR4; and
- Provided information and documents.

[Dec. of Counley, Doe 1, ¶ 32; Ex. V, Doe 1 Investigation Report at pp. 2 – 6, 13 - 17; Ex. Z, Dep. of Doe 1 at 170:5 – 171:14.]

153.   On June 15, 2018, UNLPD issued JR4 a stalking citation. [Filing No. 29, ¶ 301.]

154.   On June 6, 2018, Counley provided Doe 1 with an update and asked for clarification with respect to Doe 1's statement. [Ex. V, Doe 1 Investigation Report at p. 15.]

155.   On June 29, 2018, Counley sent a letter to Doe 1 notifying her that the investigation will exceed 60 days. [Dec. of Counley, Doe 1, ¶ 33, Ex. U, Letter to Doe 1 dated June 29, 2018.]

156.   On July 17, 2018, Counley and Officer Fischer communicated with Doe 1 to provide her with an update, including regarding JR4's presence in the

Morrison Center. Particularly, Doe 1 was told he still did not have keycard access to Morrison Center but that he was being let in for a collaboration with a faculty member who offices in Morrison Center. [Dec. of Counley, Doe 1, ¶ 34; Ex. V, Doe 1 Investigation Report at 16.]

157. During the investigation, Counley reached out to all of the witnesses identified by Doe 1 and interviewed them. [Ex. V, Doe 1 Investigation Report.]

158. On July 27, 2018—64 days after IEC began its formal investigation—Counley issued her decision. [Filing No. 29, ¶ 307; Dec. of Counley, Doe 1, ¶ 36.]

159. On July 27, Counley communicated to Doe 1 the determination. Therein, Counley identified App. A., § 10ii as the section of the Student Code of Conduct that the correspondence of May - June 2017, December 2017 and April-May 2018 may have violated. Furthermore, Counley identified Article III.B.5 & 9 as the sections of the Student Code of Conduct the email of May 2018 may have violated. [Dec. of Counley, Doe 1, ¶ 37, Ex. W, Letter to Doe 1 dated July 27, 2018 ("Ex. W, July 27 Letter to Doe 1").]

160. Counley determined that based on the totality of the circumstances and the information obtained pursuant to the investigation, the greater weight of the evidence shows JR4 violated Student Code of Conduct, Appendix A, Section 10ii, Stalking and Sections 5 and 9 of the Student Code of Conduct. [Ex. W, July 27 Letter to Doe 1.]

161. Counley took all of the interactions between Doe 1 and JR4 from May 2017 through May 2018, and the other interactions involving JR4 into

consideration to reach her determination. [Dec. of Counley, Doe 1, ¶¶ 38 - 40; Ex. W, July 27 Letter to Doe 1; Ex. V, Doe 1 Investigation Report.]

162.  Counley recommended the following sanctions against JR4: one-year probation and maintaining the no-contact directive that was in place.  [Id.]

163.  The July 2018 letter provided Doe 1's appeal rights. [Id.]

164.  Both Doe 1 and JR4 appealed the sanctions. [Filing No. 29, ¶ 309.]

165.  On August 13, 2018, Moore sent a letter to Doe 1 notifying her that the University had received the appeals of Doe 1 and JR4, including the process. [Dec. of Amare, ¶ 9, Ex. DD, Letter from Moore to Doe 1 dated August 13.]

166.  A pre-hearing conference was conducted on August 28, 2018. [Id.]

167.  On September 7, 2018, a hearing on the appeal of Doe 1 was held with Moore as the hearing officer. [Filing No. 29, ¶ 310; Dec. of Amare, ¶  10, Ex. EE, Letter from Moore to Doe 1 dated September 18.]

168.  On September 18, 2018, Moore issued a letter to Doe 1, notifying her of the outcome of the hearing. Specifically, Moore upheld the finding that JR4 violated all three sections of the Student Code of Conduct. In addition, Moore issued the following sanctions:

a.  Extended JR4's probation to the duration of JR4's time at the University;

b.  Ordered the no-contact directive to stay in place; and

c.  ***Restricted*** JR4's access to the Morrison Center, where Doe 1 worked.

[Ex.  EE, Letter from Moore to Doe 1 dated September 18.]

169.  With respect to the restriction on access to Morrison Center, Doe 1 provided that JR4 may only enter and be present in Morrison Center for

academic purposes between the hours of 8 a.m. and 5 p.m., Monday through Friday. Moore defined "academic purposes" as only attending meetings with Eric Weaver, committee members, securing reagents, collaborating with specific labs, and attending scheduled seminars. [Id.]

170.  On September 24, 2018, Doe 1 posed questions to Moore with respect to the restricted access to the Morrison Center. Moore responded on September 25, 2018. [Dec. of Amare, ¶ 11, Ex. FF, Email Communication between Moore and Doe 1 on September 25, 2018.]

171.  On September 27, 2018, Doe 1 appealed Moore's sanctions. [Filing No. 29, ¶ 322; Dec. of Amare, ¶ 12, Ex. GG, Letter from Bellows to Doe 1 dated October 4.]

172.  On October 4, 2018, Laurie Bellows notified Doe 1 that JR4 also appealed the decision, and that  she has been appointed as appeal officer. In the letter, Bellows explained the process she would follow. [Ex. GG, Letter from Bellows to Doe 1 dated October 4.]

173.  On October 30, 2018, Bellows decided to affirm Moore's decision. [Filing No. 29, ¶ 323, 326; Dec. of Amare, ¶ 14, Ex. HH, Letter from Bellows to Doe 1 dated October 30.]

174.  On December 3, 2018, Johnson sent the following to Doe 1 after learning of Doe 1's concerns related to JR4's access to buildings:

> I learned on Friday that the Respondent has had his access to Morrison, Manter, Beadle, and the Density building withdrawn. The University Police have confirmed that the Respondent only has the standard student access for campus and Harden Hall. This would effectively limit the student's access to the building after hours. In addition, I have learned from Susan Moore that the Respondent's

collaborations in Morrison are winding down. He indicated that he was still using the Flow Cytometry facility (Morrison 160), but that he was doing so by appointment only. Those appointments occur early afternoons. I have a call into the Flow Cytometry staff to confirm the dates and times of those appointments, if any remain for fall semester. The Respondent agreed to inform Susan Moore if he was to attend any special events or talks that were related to his research. To this point in time, Ms. Moore has not shared any additional information from the Respondent, but if she does I will share that information with you. Between his communications with Susan Moore and the removal of building access by the Department, the Respondent is significantly limited in what he can do within facilities operated by the Department of Biological Sciences. I would encourage you to contact University Police if you are concerned about your safety and wellbeing at any given moment. If I receive information about dates and times the Respondent intends to use Morrison Hall, I will forward that information to you, but my understanding from Biological Sciences is that these incidental uses may be ending by virtue of its actions related to the Respondent. Please let me know if you have additional questions or concerns. I have copied those parties who have shared information with me.

[Dec. of Amare, ¶ 15, Ex. II, Email Communication between Jake Johnson and Doe 1 on December 3, 2018.]

175.    Doe 1 responded to Johnson as follows:

Thank you for the update. The respondent has been in the Morrison Center multiple times since this sanction was imposed in October, and I have not yet received any notification of when he will be present. In addition, I was under the impression that the respondent has not had N card access to the Morrison Center since December 2017. However, he has still been inside the building, including the locked parts of the building, fairly frequently in the last year.
Therefore, for clarity I have a few questions. I will always receive notification before the respondent will be present in the Morrison Center, correct? Will this include notification before he will be in the Flow Cytometry lab? What will the timeline for notification be, will I receive notice of the respondent being in the Morrison Center at least 24 hours before he will be in the building? Will notification to me be sent through email? If the respondent is in the building and I have not received notification, who should I report that to?

Johnson responded:

The Flow Cytometer Lab manager has indicated that the Respondent only goes to the lab when he has scheduled an appointment. At this time, there are no pending appointments. In the future, if the Respondent has an appointment at the lab, he should let us know and we can notify you in advance. I've also asked the lab manager to notify me if the Respondent has scheduled an appointment. Sue and I will do our best to give you as much notice as possible. My understanding is that appointments are scheduled a few days before use, so I am hopeful we can get you 24 hours of notice. We prefer to communicate by email.

…

If you see the Respondent in the building or an area where he should have not have access, I would recommend you notify the Department of Biological sciences and Susan and me. If necessary, you should also contact the University police department.

[Id.]

176. During her deposition, Doe 1 admitted that she knew that the sanctions provided that JR4 could have access to Morrison Center for academic purposes between the times of 8:00 a.m. to 5:00 p.m. Doe 1 admitted that she cannot recall seeing JR4 after 5:00 p.m. in the Morrison Center. [Ex. Z, Dep. of Doe 1 at 192:1 – 13, 209:11 – 211:16.]

### E.  REPORT IN SEPTEMBER 2019 AND THE UNIVERSITY'S RESPONSE IN LIGHT OF THE CIRCUMSTANCES.

177. In September 2019, Doe 1 submitted a complaint to the office of student code of conduct with respect to a comment made, by an unverified individual, on a non-university affiliated public forum, Dear UNL website, in response to an invitation to do so to the question "anything to add?". [Dec. of Amare, ¶¶ 16, 17 Ex. JJ, Letter from Sue Moore dated October 29, 2019; Ex. KK, Email between Individual to Doe 1 on October 16, 2019.]

178. In September 2019, the Dear UNL group was not a Recognized Student Organization, nor was it affiliated with the University of Nebraska-Lincoln. [Dec. of Counley, Doe 1, ¶ 42.] In September 2019, the University did

39

not own or operate any Dear UNL website or the website from which the Dear
UNL group was soliciting responses. [Dec. of Counley, Doe 1, ¶ 43.]

179.  After a preliminary investigation, on October 29, 2019, Moore
notified Doe 1 of the outcoming of such investigation. Specifically, Moore
provided:

> I conducted a preliminary investigation and determined that the
> available facts do not support that the submission was directed to
> you. The DearUNL website submission does not include your name
> or initials. The language contained in the submission uses the plural
> rather than singular form of nouns and pronouns indicating that
> the sender directed the message to the group rather than a single
> individual. The submission was shared with you by a third party.

[Id. ___.]

180.  Doe 1 admitted that JR4 has never threatened to harm her
physically. [Ex. Z, Dep. of Doe 1 at 110:2 – 8.]

181.  Doe 1 admitted that she was aware that JR4 was suspended from
school for the entire Spring 2019 semester. Throughout that time, Doe 1 did not
see JR4 on campus. [Ex. Z, Dep. of Doe 1  at 212:4 -213:8.]

182.  Doe 1 admitted that from June 2017 through her graduation from
the University in August 2020, JR4 never approached her or attempted to talk
to her in person. [Ex. Z, Dep. of Doe 1 at 56:12 – 22.]

183.  Doe 1 admitted that from June 2017 through her graduation from
the University in August 2020, JR4 never came into any of the rooms from which
she taught or worked. [Ex. Z, Dep. of Doe 1  at 48:5 – 22.]

184.  Doe 1 admitted that in 2019, JR4 was made to attend Journal Club
via zoom.  When Doe 1 requested that JR4 not be allowed to attend the session

in which she presented, her request was granted. [Ex. Z, Dep. of Doe 1 at 215:15 – 216:21.]

185.   Doe 1 admitted she never saw JR4 in Chase Hall. [Ex. Z, Dep. of Doe 1 at 200:3 – 8.]

186.   Doe 1 admitted, other than a hearing for a protection order in October 2019, Doe 1 never saw JR4 in 2019 or 2020. [Ex. Z, Dep. of Doe 1 at 212:17 – 213:8.]

187.   At no time did Doe 1 report JR4 was bothering her in class. [Dec. of Counley, Doe 1, ¶ 46.]

188.   At no time after June 2017 did Doe 1 report JR4 came into any of the rooms from which she taught or used for research. [Dec. of Counley, Doe 1, ¶ 45.]

189.   At no time was the University aware of any verbal or nonverbal conduct of JR4 where he threatened to harm Doe 1 physically. [Dec. of Counley, Doe 1, ¶ 44.]

**F.    DOE 1'S MENTAL HEALTH HISTORY**

190.   Doe 1's medical record does not show a diagnosis of Post-Traumatic Stress Disorder ("PTSD"). [Dec. of Amare, ¶ 28.]

191.   On June 1, 2017, Doe 1 was diagnosed with relationship distress with an intimate partner and anxiety disorder, unspecified. On or about July 6, 2017, Doe 1 was diagnosed with Adjustment Disorder with Anxiety. [Dec. of Amare, ¶ 18, Ex. FFFF, Medical Records for dates June 1, 2017, June 29, 2017 and July 6, 2017, with redactions.]

192.   No experts have been disclosed to opine that any of Doe 1's diagnoses were caused by actions or inactions of the University. [Dec. of Amare, ¶ 30.]

193.   There are no experts opining any of Doe 1's diagnoses were caused by the alleged deliberate indifference of the University. [Dec. of Amare, ¶ 31.]

194.   There is no medical record that opines that Doe 1's alleged symptoms and diagnoses were caused by the University's actions or inactions. [Dec. of Amare, ¶ 31.]

195.   There is no medical record that opines that Doe 1's alleged symptoms and diagnoses were caused by alleged deliberate indifference of the University. [Dec. of Amare, ¶ 32.]

196.   Doe 1 has not disclosed any expert to opine on the issue of whether any mental health condition prevented or prevents her from pursing jobs within her profession. [Dec. of Amare, ¶ 33.]

III.    **UNDISPUTED FACTS PERTAINING TO JANE DOE 2 ("DOE 2")**

A.    **DOE 2 AND HER EDUCATION AT THE UNIVERSITY.**

197.   Doe 2 was a student at the University from August 2015 through May 2018.  [Dec. of Hanshaw, ¶ 4, Ex. LL, the Official UNL Graduate Academic Record ("Ex. LL, Doe 2 Transcript"); Dec. of Amare ¶ 3, Ex. HHH, Deposition of Jane Doe 2 ("Ex. HHH, Dep. of Doe 2").]

198.   Doe 2 was 27 years old in 2017. [Dec. of Counley, Doe 2, ¶ 15.]

199.  Doe 2's degree objective was a Master of Art in Political Science and a minor in Geography. [Dec. of Hanshaw, ¶ 5, Ex. MM, Memorandum of Courses.]

200.   In November 2017, Doe 2 submitted a memorandum of courses for the master's degree. [Id.]

201.  While she was pursuing a Master of Art as described above, Doe 2 was unsure as to whether she wanted to pursue a Ph.D. in Political Science. [Ex. HHH, Dep. of Doe 2 at 122:5 – 14.]

202.  Throughout her time at the University, Doe 2 did not submit a formal Application for Admission into the Ph.D. program.  [Ex. HHH, Dep. of Doe 2 at 323:22 – 327:7.]

203.  Doe 2 does not recall ever submitting a memorandum of courses indicating her intent to pursue her Ph.D. [Ex. HHH, Dep. of Doe 2 at 53:17 – 54:10.]

204.  When she began her Master's, Doe 2 was a recipient of the James Madison Memorial Fellowship Foundation, which paid Doe 2's tuition and fees to earn her masters. To receive the funds from this Foundation, Doe 2 agreed to teach American history, American government, social studies or political science on a full-time basis to students in secondary school for two years, within a certain period of time after graduation. [Dec. of Amare, ¶ 28, Ex. LLLL, James Madison Fellow Letter.]

205.  In addition, in May 2017, Doe 2 was awarded funding for academic year 2017-18, which provided a funding package that consisted of paid tuition,

health care benefits and assistantship stipend of $16,000. In turn, Doe 2 agreed to assist a faculty person in teaching or research. [Dec. of Amare, ¶ 5, Ex. III, May 1, 2017, Offer Letter.]

206. Doe 2 accepted the May 2017 award. Doe 2 served as a Teaching Assistant from August 2017 through May 2018, and taught four classes of American Politics and four classes of International Politics. Doe 2 felt supported by the faculty members that led these courses. [Ex. HHH, Dep. of Doe 2 at 64:13 – 21, 72:5 – 75:12.]

207. Doe 2 successfully graduated with a Master of Art in Political Science, and minor in Geography in May 2018. [Id.]

208. Thereafter, from June 2018 through  August 2018, Doe 2 taught an American Politics class as the lead instructor. Doe 2 testified her class was one of the classes that received the best reviews. [Ex. HHH, Dep. of Doe 2 at 69:8 – 70:9.]

209. Throughout her time at the University, Doe 2 had never experienced a panic attack while teaching a class. [Ex. HHH, Dep. of Doe 2 at 66:13 – 17.]

210. At no time did Doe 2 live in a University-owned apartment. [Ex. HHH, Dep. of Doe 2 at 232:23 – 233:5; Dec. of Counley, Doe 2, ¶ 19 – 21.]

**B.    DOE 2'S RELATIONSHIP AND COMMUNICATION WITH JOHN ROE 5 ("JR5") PRIOR TO NOVEMBER 2017.**

211. In or around February 2016, Doe 2 began a romantic relationship with JR5, a fellow student pursuing a Ph.D. in political science. [Ex. HHH, Dep. of Doe 2 at 97:3 - 6, 159:14 -160:4.]

44

212.  Doe 2 kept her relationship with JR5 a secret until approximately March 2017. [Ex. HHH, Dep. of Doe 2. at 161:18 – 22.]

213.  From February 2016 through July 2017, Doe 2 and JR5 had a on again and off again romantic relationship. [Ex. HHH, Dep. of Doe 2. at 241:1 – 10.]

214.  In April 2017, Doe 2 expressed to JR5 that she did not believe that he would physically harm her, and that she wanted to remain in an unattached sexual relationship with him. [Ex. HHH, Dep. of Doe 2 at 168:3 – 169:9.]

215.  In August 2017, Doe 2 contacted Voices of Hope to receive services relating to allegations of sexual assault against JR5. [Ex. JJJ, Doe 2 and Morgan Beal ("Beal") communication in August 2017; Ex. HHH, Dep. of Doe 2 at 187:3 – 188:15.]

216.  Throughout her time at the University, Doe 2 received confidential services from Voices of Hope, through Morgan Beal, advocate at Voices of Hope. [Ex. HHH, Dep. of Doe 2 at 187:23 – 188:11.]

217.  During the relevant period, Voices of Hope was a confidential resource sponsored by the University. Specifically, Voices of Hope provided confidential intervention services to individuals who are victims of domestic violence, sexual assault and related forms of abuse. [Dec. of Counley, Doe 1, ¶ 13.]

218.  In August 2017, Doe 2 contacted the Lincoln Police Department to prompt an investigation into allegations of sexual assault against JR5. [Ex. JJJ,

Doe 2 and Beal Communication in August 2017; Ex. HHH, Dep. of Doe 2 at 188:12 -189:7.]

219. From February 2016 until November 2017, Doe 2 maintained communication with JR5. [Ex. HHH, Dep. of Doe 2 at 78:21-80:1.]

220. For approximately 3 months, from August 2017 until November 2017, Doe 2 communicated with JR5, and attempted to gather evidence and information as it relates to the allegations of sexual assault. [Ex. HHH, Dep. of Doe 2 at 206:10 – 13.]

221. In Fall 2017 and Spring 2018, Doe 2 and JR5 did not take the same classes. Doe 2 knew that JR5 was only taking night classes. [Ex. HHH, Dep. of Doe 2 at 206:3 – 9.]

222. Sometime in mid-October 2017, Doe 2 communicated with Barton[3] about the alleged sexual assault. Doe 2 instructed Dona-Gene Barton to keep this confidential and secret. [Ex. HHH, Dep. of Doe 2 at 198:1-3, 205:17 – 210:8.] Doe 2 did not report any alleged sexual assault to Barton prior to mid-October 2017. [Ex. HHH, Dep. of Doe 2 at 207:11 -17.]

223. Doe 2 did not want IEC to learn about her allegations against JR5. [Ex. HHH, Dep. of Doe 2 at 189:19 – 23.]

---

[3] Barton was an Assistant Professor at the University, Department of Political Science. [See Statement of Undisputed Facts, ¶ 36.

**C.   COMPLAINTS/REPORTS OF SEXUAL MISCONDUCT AGAINST JR5 IN NOVEMBER 2017 AND THE UNIVERSITY'S REASONABLE RESPONSE IN LIGHT OF THE KNOWN CIRCUMSTANCES.**

224.   On or about November 3, 2017, Barton contacted IEC and reported a student came to her with concerns regarding inappropriate conduct by JR5. [Dec. of Counley, Doe 1, ¶ 14; Dec. of Counley, Doe 1, ¶ 43, Ex. RR & SS, Investigation Report and Investigation Summary, respectively.]

225.   Prior to November 3, 2017, IEC was not aware of any allegations or complaints of harassment involving JR5. [Dec. of Counley, Doe 1, ¶ 16.]

226.   Shortly thereafter, IEC, through Counley, reached out to Doe 2 to give her an opportunity to provide information with respect to the matter involving JR5.  [Dec. of Counley, Doe 1 ¶ 17; Ex. HHH, Dep. of Doe 2 at 218:23 -219:13.]

227.   Doe 2 was unhappy that Title IX contacted her about JR5. [Ex. HHH, Dep. of Doe 2 at 216:24 – 217:17; 218:23 -219:13.]

228.   On November 21, 2017, Counley met with Doe 2 and her support person to discuss Title IX rights, resources and options available to her. Doe 2 asked for additional time to decide how she wants to proceed, to which Counley agreed. [Dec. of Counley, Doe 1, ¶ 18; Ex. RR, Investigative Report at pp. 3 - 10.]

229.   On November 21, 2017, Doe 2 submitted a formal complaint with IEC against JR5, alleging:

- In March 2016, JR5 sexually assaulted her in his home, while Doe 2 was incapacitated due to intoxication ("March 2016 allegation of sexual assault");

- In August 2016, JR5 stroked her leg during a presentation given during orientation, which made her uncomfortable ("August 2016 allegation of sexual assault");
- In July 2017, approximately 10 days prior to July 24, 2017, JR5 sexually assaulted Doe 2 in her apartment ("July 2017 allegation of sexual assault"); and
- On July 24, 2017, JR5 sexually assaulted her in her apartment ("July 24 allegation of sexual assault").

(Collectively referred to as "complaint"). [Ex. SS, Investigation Summary at p. 1; Ex. RR, Investigation Report at pp. 3 - 10]

230. With respect to the March 2016 allegation, Doe 2 admitted to Counley that she did not feel any contact or penetration by JR5. Doe 2 also admitted to Counley she only had snapshot memory of the night. [Ex. RR, Investigation Report at pp. 4 - 5.]

231. With respect to August 2016 allegation, Doe 2 testified that was "not an assault." [Ex. HHH, Dep. of Doe 2 at 369:19 – 25.] Doe 2 admitted they were dating in August of 2016. [Ex. HHH, Dep. of Doe 2 at 241:1 – 10.]

232. Doe 2 also reported an interaction with JR5 that occurred on March 14, 2017. [Ex. RR, Investigation Report at pp. 4-5.] Specifically, Doe 2 stated:

> On March 14, 2017, Complainant had to give a presentation in a class that she and Respondent had together. Prior to the presentation, Complainant had learned that Respondent was cheating on her, and was upset. Complainant described their relationship at that time as "rocky." Complainant was nervous about the presentation and shared that with Respondent. Respondent "heckled" Complainant under his breath during her presentation. Respondent called Complainant "duplicitous," and commented on a spelling error in one of Complainant's presentation slides.

Complainant advised Respondent's behavior towards Complainant during the presentation made her more nervous, causing her to become "shaky" and her voice to crack.

Mid-way during Complainant's presentation, Complainant gave the class a break. Complainant walked around in the hall behind her classroom to re-compose herself. Complainant overheard Respondent make a comment to another classmate that Complainant's presentation was a "bridge too far." Complainant's classmate told Respondent that maybe her anxiety was due to Respondent's comment about a spelling error. Respondent commented that Complainant must not have much "mental fortitude." Complainant advised she "broke down" after hearing the comment."

[Id.]

233. The same day after the presentation, Doe 2 communicated with JR5. Doe 2 testified she possibly told JR5 that she did not feel comfortable possessing a gun. [Ex. HHH, Dep. of Doe 2 at 129:3 – 21.] When asked why she was expressing that to him , Doe 2 testified "because I don't think you should be in possession of a firearm if you are dealing with anxiety and that level of stress." [Id.]

234. Thereafter, on March 14, JR5 entered Doe 2's apartment and took Doe 2's firearm. Doe 2 called the police to report JR5 took her gun. [Doe 2 had previously given JR5 her code to her apartment. [Ex. HHH, Dep. of Doe 2 at 127:19 – 25.] While the police were at her apartment, Doe 2 made a comment that she wanted to die, at which time she was taken to Bryan Hospital. [Ex. HHH, Dep. of Dep. 2 at 127:9 – 131:15.]

235. Both JR5 and Doe 2 lived-in privately-owned housing. Doe 2 lived in Aerie apartment in Lincoln, Nebraska. JR5 lived in his private residence in Ashland, NE. [Dec. of Counley, Doe 2, ¶ 19.]  The University did not own or operate Doe 2's and JR5's housing. [Dec. of Counley, Doe 2, ¶ 20.]

49

236.   On November 28, 2017, Counley sent a letter to Doe 2 outlining Doe 2's allegations against JR5 and informing Doe 2 that the University has commenced an investigation (the "November 28 letter").   [Dec. of Counley, Doe 2, ¶ 22, Ex. TT, November 28 Letter to Doe 2 ("Ex. TT, November 28 letter").]

237.   In the November 28 letter, Counley notified Doe 2 that IEC is responsible for enforcing Title IX and conducting investigations and that it applies a preponderance of the evidence standard. [Ex. TT, November 28 letter.]

238.   In the November 28 letter, Counley expressly stated that "UNL cares deeply about the safety and educational atmosphere of students. As such, the university takes seriously any complaints, thoroughly investigates them and takes appropriate action to eliminate and prevent sexual misconduct. Our office conducts neutral investigations of sexual harassment and violence complaints. We also provide evidence to the campus community and support to students who have suffered sexual harassment or violence." [Id.]

239.   Counley enclosed "Know Your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence Where You Go to School," which explained her rights and the University's responsibilities with regard to complaints of sexual misconduct. Counley also provided a link to information about the University's reporting protocol, investigation process, and resources available to her.  [Id.]

240.   On November 30, 2017, Beal notified Doe 2 that Eric Fischer, UNLPD Investigator, was available to meet with her the next day. Doe 2 declined to meet with him at that time. [Dec. of Amare, ¶ 7, Ex. KKK, Correspondence between Beal and Doe 2 from December 1 – 5, 2017, November 30, 2017.]

241.  Doe 2 requested accommodation from UNLPD to house her firearm, which request was granted on December 1, 2017. [Dec. of Amare, ¶ 8, Ex. LLL, Email correspondence between M. Beal and Doe 2.]

242.  In November 2017, Doe 2 requested accommodation that Counley wait to notify JR5 until after Doe 2 had left town for break. Counley granted this request. [Dec. of Counley, Doe 2, ¶¶ 23, 24, Ex. UU, December 11-18, 2017, Email Communication between Counley and Doe 2; Ex. HHH, Dep. of Doe 2 at 239:18 – 24, 222:23-12.]

243.  On December 11, 2017, Doe 2 told Counley that she was planning on leaving town on the evening of December 19, 2017, and expressed her gratitude that Counley was holding off notifying JR5 until after Doe 2 left town. [Id.; Ex. HHH, Dep. of Doe 2 at 223:2 – 12.]

244.  On December 21, 2017, Counley sent a letter to JR5 notifying him of the complaints/reports of sexual misconduct allegations against him, and that the University had commenced a Title IX investigation into these allegations ("December 21 letter"). Therein, Counley advised that the alleged conduct may be in violation of the Student of Code of Conduct, particularly Student Code of Conduct, Appendix A, §§ 10cc & 10ee, which make it a violation to engage in sexual assault and harassment, as defined therein. [Dec. of Counley, Doe 2, ¶ 25, Ex. VV, December 21 letter to JR5.]

245.  In the December 21 letter, Counley provided JR5 the opportunity to respond to the allegations asserted against him, including providing documents or evidence.  [Id.]

246.   In the December 21 letter, Counley stated: "Please be assured the university takes complaints seriously and strives to ensure students, staff and faculty are safe and treated fairly. The university prohibits retaliation against persons who filed complaints or persons who have provided information during the course of an investigation. ***You should not engage in any retaliatory conduct as a result of the complaint filed against you***." [Id.] (emphasis added).

247.   On December 21, 2017, Counley notified Doe 2 that JR5 was notified. [Dec. of Counley, Doe 2, ¶ 26, Ex. WW, December 21 Email Communication between Counley and Doe 2.]

248.   On January 8, 2018, in accordance with Student Code of Conduct, App. A, § 2d, Counley informed both Doe 2 and JR5 that the investigation would exceed sixty days in order to accommodate the requests of both Doe 2 and JR5. [Dec. of Counley, ¶ 30, Ex. XX, January 8 Letter to Doe 2; Ex. SS, Investigation Summary at pp. 3 – 4.]

249.   Specifically, in the letter to Doe 2, Counley stated that "as you are aware, you requested we wait an extended period before contacting Respondent, and we agreed," as the reason for the delay. [Id.]

250.   On January 12, 2018, Doe 2 and Beal met with Fischer for safety planning purposes. Although she did not request accommodation at that point, Fischer offered to assign a UNLPD companion to walk her to places. Doe 2 did not take him up on his offer because she does not "recall ever needing to." [Ex. HHH, Dep. of Doe 2 at 283:17 – 25.]

251.   Doe 2 never asked for any other accommodation from Counley, other than what is discussed above. [Ex. HHH, Dep. of Doe 2 at 286:16 – 25.]

252.   From November 21, 2017 to April 6, 2018, Counley investigated the complaint filed by Doe 2. [Ex. RR, Investigation Report.]

253.   Throughout Counley's investigation, Doe 2 was given multiple opportunities to be heard/respond in a meaningful manner, to provide evidence in support of her allegations against JR5, and to review and inspect documents within the possession of Counley.  [Dec. of Counley, Doe 2, ¶ 27 & 28; Ex. RR, Investigation Report at pp. 3 - 10; Ex. SS, Investigation Summary.]

254.   Specifically, at the beginning of the investigation, Doe 2 was provided the opportunity to provide a detailed account of her allegations against JR5, and she did. [Dec. of Counley, Doe 2, ¶ 28; Ex. RR, Investigation Report, pp. 3 -10; Ex. SS, Investigation Summary.]

255.   During the investigation, Doe 2 was:

- provided an opportunity to provide a detailed account of her allegations against JR5;
- provided an opportunity and did provide information and documents in support of her complaint;
- informed of the investigation process and her rights and options;
- informed of resources available to her;
- provided the opportunity and did review and inspect statements and documents generated by Counley as part of her investigation into the allegations against JR5;
- provided the opportunity and did respond to JR5's response to her allegation in detail;

- provided the opportunity to provide any and all information that she thought was pertinent to the investigation;
-  provided the opportunity to and did provide questions she wanted Counley to ask of JR5; and
- Provided information and documents.

[Dec. of Counley, Doe 2, ¶ 29; Ex. RR, Investigation Report at pp. 3 - 10; Ex. SS, Investigation Summary.]

256.  On or about January 8, 2018, Counley met with JR5 and provided him the opportunity to provide information and documents in response to Doe 2's complaint against him. [Dec. of Counley, Doe 2, ¶ 31; Ex. RR, Investigation Report at pp. 14 - 15; Ex. SS Investigation Summary.]

257.  On January 16, 2018, Counley provided Doe 2 with an update regarding the case, including a list of witnesses identified by JR5. [Dec. of Counley, Doe 2, ¶ 32; Ex. YY, Email communication between Counley and  Doe 2 on January 16, 2018; Ex. SS, Investigation Summary.]

258.  On or about January 17, 2018, JR5 provided a 106-page response to Doe 2's complaint. [Dec. of Counley, Doe 2, ¶ 33.]

259.  On January 19, 2018, Counley notified Doe 2 of the written response provided by JR5 and provided her with the opportunity to review and respond to the information and written statement provided by JR5. [Dec. of Counley, ¶ 34; Ex. SS, Investigation Summary at pp. 4 - 5.]

260.  In January and February 2018, Doe 2 requested accommodations for additional time to review the written statement provided by JR5 and to bring an attorney to review the document. These requests were granted. [Dec. of

Counley, Doe 2, ¶ 35, Ex. ZZ, January 27 – 30, 2018, Email Communication regarding Additional Time for Accommodation; Ex. AAA, February 2 and 4, 2018, Email communication regarding needing additional time; Ex. BBB, February 10, 2018, Email communication between Counley and Doe 2 regarding additional time to review.]

261.   On February 13, 2018, Doe 2 finished reviewing the written statement provided by JR5. [Ex. SS, Investigation Summary at p. 6.]

262.   On February 15, 2018, Counley met with Doe 2, at which time Doe 2 provided additional information. In addition, Doe 2 was provided an opportunity to respond and did respond to JR5's response to her complaint, including questions posed by JR5. [Ex. RR, Investigation Report at pp. 8 – 10.]

263.   Since December 2017, Counley had been attempting to gain access to the transcript of the recorded phone calls maintained by the Lincoln Police Department ("LPD"). [Dec. of Counley, Doe 2, ¶ 36.]

264.   Despite her efforts, Counley was not able to gain access to the recordings until March 2018.  [Dec. of Counley, Doe 2, ¶ 38.] The University, including IEC, does not have the power to subpoena documents from third party entities and witnesses, or to compel individuals to testify or provide information. [Dec. of Counley, Doe 2, ¶ 39; Dec. of Johnson, ¶ 17 - 18.]

265.   Doe 2 wanted Counley to consider the recordings of Doe 2 and JR5's phone calls when making her determination.  [Dec. of Counley, Doe 2, ¶ 37.]

266.   On March 7 and 14, 2018, Counley met with Lincoln Police Department ("LPD") Investigator Matt Franken to review LPD's investigative file. At that time, Counley:

    a.   Reviewed (and took a copy of) transcript of an audio recording of a telephone call/conversation between JR5 and Doe 2;

    b.   Listened to the audio recordings of a telephone call/conversation between JR5 and Doe 2; and

    c.   Listened to the audio recording of the interviews with two witnesses.

[Dec. of Counley, Doe 2, ¶ 40; Ex. SS, Investigation Summary.]

267.   On March 16, 2018, Counley gave Doe 2 the opportunity to review information obtained from LPD. Doe 2 did so on the same day. Doe 2 requested to come back to review transcript notes while listening to the audio at a later date. Counley approved the request. On March 20, 2018, Doe 2 came in again to review LPD evidence. [Dec. of Counley, Doe 2, ¶ 41; Ex. SS, Investigation Summary.]

268.   Throughout the investigation, in addition to gathering information and documents from JR5 and Doe 2, Counley contacted and gathered information and documents from all of the witnesses identified by both JR5 and Doe 2, and other individuals Counley discovered to have relevant information in regard to the complaint, to the extent the witnesses were willing to provide statements.  [Ex. RR, Investigation Report; Ex. SS, Investigation Summary.]

269.   On April 2, 2018, Counley notified JR5 and Doe 2 she had completed her investigation and was reviewing the final draft of her report. She also notified

Doe 2 that a determination would be sent to him by the end of the week. [Dec. of Counley, Doe 2, ¶ 42; Ex. SS, Investigation Summary at p. 8.]

270.   On April 6, 2018, Counley issued a 48-page Investigation Report. [Ex. RR, Investigation Report.]

271.   On April 6, 2018, via email, Counley notified Doe 2 of her decision in a letter dated April 6, 2018, which, in relevant part, outlined her findings and recommendation for discipline ("April 6 letter").   [Dec. of Counley, Doe 2, ¶ 44, Ex. CCC, April 6 Letter to Doe 2 ("Ex. CCC, April 6 Letter").]

272.   Regarding the July 24 allegation of sexual misconduct, Counley concluded the greater weight of the evidence supports JR5 sexually assaulted Doe 2 on July 24, 2017, and therefore, engaged in sexual misconduct, which is a violation of the Student Code of Conduct, App. A, § 10cc. [Ex. CCC, April 6 Letter.]

273.   Regarding the March 2016 and July 2017 allegation of sexual assault, Counley concluded there was insufficient evidence to support either of the allegations. [Id.]

274.   Regarding the August 2016 allegation of sexual harassment, Counley concluded the greater weight of the evidence supports that JR5 stroked Doe 2's thigh in August 2016 but found that it was not sufficiently severe or pervasive to create a hostile environment. [Id.]

275.   Based upon her findings, Counley recommended JR5 be expelled from the University, because the greater weight of the evidence shows that JR5 sexually assaulted Doe 2 by contact and penetration in violation of the Student

Code of Conduct. [Id.] Specifically, Counley provided "University **Expulsion**: Permanent separation of the student from the university, without the possibility of readmission." [Id.]

276.   In the April 6 letter, Counley advised: "If you disagree with this finding, you have the option to request a hearing or administrative resolution. Requests for hearing or administrative resolution must be made within seven (7) University business days to the Vice Chancellor for Student Affairs." [Id.]

277.   On April 6, 2018, a similar letter was sent to JR5. This email did not request read receipt and delivery notification.  [Dec. of Counley, Doe 2, ¶ 45, Ex. DDD, Email to JR5 communicating Finding letter.]

### D.   JR5'S REQUEST FOR A HEARING.

278.   On April 23, 2018, JR5 emailed Jake Johnson, former Assistant Vice Chancellor for Student Affairs at the University, claiming he never received the April 6 letter and requesting an appeal. [Declaration of Jake Johnson ("Dec. Johnson"), ¶ 5; Dec. of Counley, Doe 2, ¶ 46, Ex. EEE, Email Communication between JR5, Johnson and Counley on April 23, 2018.]

279.   On April 24, 2018, based on JR5's claim he did not receive the April 6, 2018 letter, the University decided to grant JR5's request for a hearing. [Dec. of Counley, Doe 2, ¶ 47; Dec. of Johnson, ¶¶ 6 – 7.]

280.   On April 24, 2018, Johnson notified Doe 2 that her complaint would be heard by the University Conduct Board. [Dec. of Amare, ¶ 9, Ex. MMM, April 24,  2018 Email between Johnson to Doe 2 regarding appeal.]

281.   On April 26, 2018, Johnson informed Doe 2 that the University was in the process of scheduling a hearing before the University Conduct Board, and explained the University would need an additional 2 to 3 weeks to get a hearing date, time, and location confirmed, given the time of the year and the challenges faced finding concurrent availability for board members and support staff. [Dec. of Amare, ¶ 10, Ex. NNN, April 26, 2018 Email between Johnson to Doe 2 regarding appeal and hearing.]

282.   On April 30, 2018, Johnson notified Doe 2 that the hearing would be held on May 23, 2018, and the pre-hearing conference would be held on May 16, 2018 ("April 30 letter"). [Dec. of Amare, ¶ 11, Ex. OOO, April 30, 2018 Letter from Johnson to Doe 2 re. notice of hearing; Ex. HHH, Dep. of Doe 2 at 288:3 - 20.]

283.   In the April 30 letter, Johnson notified Doe 2 the issue on appeal was whether the July 24 allegation is supported by a preponderance of evidence such that it would constitute a violation of the Student Code of Conduct. [Ex. OOO, April 30, 2018 Letter from Johnson to Doe 2 re. notice of hearing.]

284.   In the April 30 letter, Johnson outlined the hearing process. [Id.] In addition, Johnson notified Doe 2 that:

- Johnson will present information in support to the allegation and will call Counley as a witness to discuss her investigative report;

- She may be accompanied by one advisor of her choice at the pre-hearing conference and the hearing;

- She is encouraged but not required to attend the hearing;

- Counley will present her findings of her investigative report;

- Doe 2 may submit documents prior to May 14, 2018, and that such documents may be considered as evidence;

- Doe 2 may request the hearing and pre-conference hearing be partitioned by a divider to prevent face to face exchanges with John Doe 5 by emailing him; and

- Doe 2 may inspect the information that will be presented at the hearing, which will be made available to her by May 15, 2018 and at the pre-hearing conference.

[Id.]

285. On May 7, 2018, Johnson provided Doe 2 a table of contents of information submitted to Counley as part of her investigation to aid Doe 2's preparation of any documents she would like to submit. [Dec. of Amare, ¶ 12, Ex. PPP, May 7, 2018 email from Johnson to Doe 2 with information for hearing.]

286. On May 7, 2018, Johnson and Counley met with Beal and Doe 2 with respect to a resolution offer received from JR5. Specifically, JR5 offered he would accept a two-year suspension. Doe 2 declined this resolution offer. [Dec. of Johnson, ¶ 7; Ex. NN, Email communication between Doe 2 and Johnson re. resolution offer and extension on May 7-8, 2018.]

287. On May 7, 2018, Roger Moore, attorney for JR5, requested the hearing be moved to the end of June. [Dec. of Johnson, ¶ 9.]

288. On May 7, 2018, Johnson communicated with Doe 2 via email memorializing the communication regarding the resolution discussion. In this

email, Johnson informed  Doe 2 that JR5's attorney had requested additional time. [Dec. of Johnson, ¶ 10; Ex. NN, Email communication between Doe 2 and Johnson re. resolution offer and extension on May 7-8, 2018.]

289.   On May 7, 2018, Doe 2 affirmed that she had declined the resolution offer and stated that she does not wish to extend the hearing to past May 23, to which Johnson responded:

> I am mindful that the timeframe is challenging for you, and I am working to find a solution that is fair to you and the Respondent. So, I would ask for patience and some flexibility to arrive at a date that permits you and the Respondent to adequately prepare for the hearing.

[Ex. NN, Email communication between Doe 2 and Johnson re. resolution offer and extension on May 7-8, 2018.]

290.   On May 8, 2018, Johnson, responded to JR5 as follows:

> I received an email from your advisor, Mr. Roger D. Moore, requesting a continuance because he is unable to attend the hearing. He requested we move the hearing to late June. By Regents' policy, a timeframe for scheduling hearings is set between 3 and 14 days after the parties have been notified the matter has been referred for hearing (See Appendix A, Section 7b.) Some discretion is allowed to extend the time limits, but weeks beyond that prescribed time frame is unreasonable, and I have already extended past that deadline. Furthermore, of the exhibits included in the investigative file, the majority are already in your possession, and you have been able to review the documents IEC relied upon during its investigation. They informed me that you visited their office multiple times to review documents and speak with the investigator. The role of your advisor is not to advocate for you or represent you in the hearing (See Appendix A, Section 5f & 10c). You will be expected to do that with his assistance. I might add that the purpose of the preconference hearing is to review available evidence and narrow issues.
>
> Some of the information now included may very well be excluded at the hearing. You and your advisor will have access to this information prior to the hearing to prepare your presentation and questions. To schedule the hearing, the University has to consider

the availability of University staff, conduct board members, and the parties. Finding a suitable time is currently complicated by the fact school is not in regular session.

Also, the Complainant indicated she was not interested in your offer of settlement, and absent an agreement of the parties, the policy establishes that a hearing should be held.

For these reasons, I will consider moving the hearing to the last week of May. Please have your advisor indicate times he can be available during that week.

[Dec. of Johnson, Ex. OO, Email Exchanges between Johnson, JR5, and his Attorney on May 8, 2018.]

291.  Again, on May 14, 2018, Johnson reiterated:

The University's Code of Conduct Appendix A indicates that complainants and respondents can expect that "sexual misconduct proceedings should be completed in a reasonably prompt time frame." (See Appendix A, Section 5j.) *[JR5] learned that this matter would go before the Conduct Board on April 24, 2018. He was later notified, on April 30, 2018, of the specific timeline that would have had this matter heard on May 23, 2018. Prior to this time, he had an opportunity to interact with the investigator and the evidence she collected between January and April.*
I share this history to explain that the continuance you have asked for – the end of June or sometime in July – is too much. That said, Thursday, May 31, 2018, was earlier identified by Mr. Moore as a date on which he would be available. I would like to plan for that date (May 31) unless there is no way for Mr. Moore to re-arrange his schedule. If May 31st cannot be accommodated, I will consider the following week of June 4-8, 2018. This continuance strikes me as fair given the history and circumstances.
Please let me know the date that you will both be available for a hearing as soon as possible.

[Dec. of Johnson, Ex. PP, Email Exchanges between Johnson, JR5, and his Attorney on May 14, 2018.]

292.  On May 14, 2018, Johnson acknowledged receipt of Doe 2's information and documents, and asked whether she would be contacting and

having Matt Franken, Investigator at LPD, attend once rescheduled. Johnson expressed to Doe 2 that the University does not have the ability to compel him to attend and had not planned on having him present information. Johnson also clarified that she is only allowed a single advisor at the prehearing and hearing. [Dec. of Johnson, ¶ 13, Ex. QQ, Email exchange between Johnson and Doe 2 on May 14, 2018.]

293.  Doe 2 admitted during her deposition that Matt Franken was not a witness to any of the alleged sexual assaults. [Ex. HHH, Dep. of Doe 2 at 300:17 – 24; Dec. of Johnson, ¶ 14.]

294.  On May 14, 2018, Doe 2 provided a victim impact statement. [Ex. HHH, Dep. of Doe 2 at 302:12 – 21; Dec. of Counley, Doe 2, ¶ 60.]

295.  On May 15, 2018, Johnson notified Doe 2 that the hearing was being rescheduled to May 31, 2018. [Dec. of Johnson, ¶ 13 – 14.]

296.  On May 16, 2018, a pre-hearing conference with Doe 2 was held. [Dec. of Counley, Doe 2, ¶ 48, Ex. FFF, May 16 Audio Recording; Dec. of Amare, ¶ 13, Ex. QQQ, May 16 Audio Recording Transcript Excerpt.]

297.  Doe 2 was accompanied by her attorney Elizabeth Govaerts, and Ms. Govaerts and Doe 2 were allowed to present their positions and arguments. [Dec. of Counley, Doe 2, ¶ 49, Ex. FFF, May 16 Audio Recording; Ex. QQQ, May 16 Audio Recording Transcript Excerpt.]

298.  On May 29, 2018, Doe 2 was provided the opportunity to and did review the finalized Hearing Packet. [Dec. of Amare, ¶ 14, Ex. RRR, Email exchange on May 29, 2018 regarding review.]

299. The unredacted Hearing Packet was 535 pages. The redacted Hearing Packet was 314 pages. [Dec. of Amare, ¶ 29]

300. On May 30, 2018, after receiving a resolution offer from JR5, Johnson and Strickman met with Doe 2 to provide her information about the settlement offer. [Dec. of Strickman, Doe 2, ¶ 14 – 15, Ex. GGG, Communication between Strickman and Doe 2 on May 30, 2018.]

301. Strickman explained advantages and disadvantages of accepting the settlement Offer. [Dec. of Strickman, Doe 2, ¶ 15.]

302. Doe 2 admitted that Strickman did not tell her she had to accept the offer:

> **Q. Tami Strickman did not tell you to accept this offer; correct?**
> A. She didn't tell me I had to, but she made it seem like it was in my best interest to.
> **Q. She told you that there is an offer of settlement and you should probably consider it; correct?**
> A. Yes.

[Ex. HHH, Dep. of Doe 2 at 309:10 – 17.]

303. Doe 2 asked for additional time to provide a definitive answer, which was granted. Thereafter, Doe 2 declined the resolution offer. [Dec. of Strickman, Doe 2, ¶ 15, 16, 17, Ex. GGG, Communication between Strickman and Doe 2 on May 30, 2018.]

304. On May 31, 2018, the hearing was held before the Conduct Board as planned ("May 31 hearing"). [Dec. of Counley, Doe 2, ¶ 50; Dec. of Johnson, ¶ 15.]

305.  The May 31 hearing lasted approximately 3 hours and 15 minutes, and the following individuals were in attendance: Toni Anaya, Chair of the Conduct Board; Christian Robinson, Conduct Board Member; Anna Witte, Conduct Board Member; Bren Chambers; Jake Johnson, Student Conduct Officer representing the University; JR5; Roger Moore, Attorney/Advisor for JR5; and Doe 2. [Dec. of Counley, Doe 2, ¶ 51.]

306.  Anaya, Chair, provided the procedures that would be followed during the hearing. Specifically, Anaya provided:

- The hearing will be conducted in accordance with the Student Code of Conduct;
- The University Conduct Board is not a court of law, and therefore, is not bound by the strict rules of evidence and procedures prescribed for the civil and criminal courts;
- The hearing before the Conduct Board will permit the Board and the participants to discuss the issues and examine relevant facts surrounding the complaint that has been made; and
- That the procedure is designed to assure all parties in the case have an opportunity to present their respective positions.

[Dec. of Counley, Doe 2, ¶ 52.]

307.  Regarding the evidence that would be considered, Anaya, in relevant part, instructed:

- Discussions should focus only on the charge included in the complaint presented by Johnson, and that because there were no findings on two of the charges listed, the official University correspondence and all information related to those charges have been redacted from the record;
- Discussion on previous sexual history of both the complainant and the respondent should not be introduced except to the extent directly relevant

to the parties' course of conduct during the incident in question and is not unduly prejudicial to either party; and

- Any discussion or speculation regarding the mental health of either party should not be introduced unless it is directly related to any concerns or interactions or informed responses of the participants.

[Dec. of Counley, Doe 2, ¶ 53.]

308.   During the proceedings, the University and JR5 presented their case. [Dec. of Counley, Doe 2, ¶ 55.]

309.   Then, Doe 2 was given the opportunity to present her case and make her opening statement, but she declined. [Dec. of Counley, Doe 2, ¶ 56.]

310.   During the proceeding, there was no direct or cross examination of Doe 2. [Dec. of Counley, Doe 2, ¶ 56]

311.   After the parties rested, the Conduct Board deliberated. After deliberation, the Conduct Board, through Anaya, announced that they had reached a decision, and found JR5 responsible for violating the Student Code of Conduct, App. A. § 10cc. [Dec. of Counley, Doe 2, ¶ 57.]

312.   The Conduct Board then moved into considering sanctions to impose upon JR5 and requested that the Conduct Board be advised of JR5's academic history and disciplinary status. [Dec. of Counley, Doe 2, ¶ 58.]

313.   Johnson recommended expulsion from the University and provided his reasoning for that recommendation. [Dec. of Counley, Doe 2, ¶ 59.]

314.   Doe 2 also asked for expulsion and read a victim impact statement. [Dec. of Counley, Doe 2, ¶ 60.]

315.  JR5 recommended that he be allowed to take a leave of absence and provide his reasoning for that recommendation. [Dec. of Counley, Doe 2, ¶ 61.]

316.  After deliberating on the issue of sanctions, the Conduct Board imposed the sanction of expulsion. [Dec. of Counley, Doe 2, ¶ 62.]

317.  On June 6, 2018, a formal letter was sent to Doe 2 and JR5, notifying them of the Conduct Board's findings and appeal rights.  [Dec. of Amare, ¶ 15, Ex. SSS, June 6 Decision Letter.]

**E.    JR5's Appeal to Chancellor's Office.**

318.  On June 15, 2018, JR5 appealed the Conduct Board's decision, on various grounds. [Dec. of Amare, ¶ 16, Ex. TTT, July 26 Letter from Bellows to Doe 2.]

319.  Laurie Bellows ("Bellows") was appointed as the Appeal Officer by Chancellor Ronnie Green. Bellows was serving as the Interim Vice Chancellor for Student Affairs at that time. [Id.]

320.  On June 22, 2018, Bellows notified Doe 2 of JR5's appeal. Therein, Bellows stated that she has requested and expects to soon receive the record of the conduct hearing. Bellows also gave Doe 2 the opportunity to submit a written response. Bellows stated that once she receives the record of the hearing and any additional information, the appeal will normally be resolved within 14 days. [Dec. of Amare, ¶ 17, Ex. UUU, June 22, 2018 Email Communication between Doe 2 and Bellows.]

321.  In response, Doe 2 declined to provide a written statement, other than to "express the fact that" she agrees "with the decision rendered and the

sanction imposed by the Office of Equity and Compliance." Doe 2 further stated "I believe the campus to be a safer place for me and others because of it." [Id.]

322.  On July 26, 2018, Laurie Bellows issued her decision regarding JR5's appeal  and denied his appeal ("July 26 letter"). [Dec. of Amare, ¶ 18, Ex. TTT, July 26 Letter from Bellows to Doe 2.]

323.  After December 21, 2017—the date JR5 was notified of Doe 2's complaint filed with IEC—JR5 never communicated with Doe 2 orally or in writing. [Ex. HHH, Dep. of Doe 2 at 62:15 – 64:12.]

324.  Beginning August 2017, Doe 2 and JR5 had never taken any classes together. [Id.; Dec. of Counley, Doe 2, ¶ 75.]

325.  After November 2017, JR5 had never approached Doe 2.  [Ex. HHH, Dep. of Doe 2 at 62:10 – 64:12.]

326.  There was no report to IEC that JR5 approached Doe 2 after November 2017. There was no report to IEC that JR5 messaged, texted or communicated with Doe 2 in any way after November 2017. [Dec. of Counley, Doe 2, ¶¶ 76, 77.]

327.  Doe 2 admitted the only place she would have seen him was at the Title IX hearing. [Id.]

**F.    MISCELLANEOUS**

328.  Doe 2 admitted she has never seen JR5 carry his concealed carry from June 2017 on, after his concealed carry permit expired. [Ex. HHH, Dep. of Doe 2 at 212:22 – 213:14.]

329.   The witnesses interviewed denied seeing JR5 carrying a gun on campus. [Dec. of Counley, Doe 2, ¶ 73; Ex. RR, Investigation Report at pp. 37, 40.] So, did JR5. [Id.]

330.   JR5 denied carrying a gun on campus. He reported his concealed carry permit had expired and did not carry his gun with him anywhere. [Dec. of Counley, Doe 2, ¶ 73.]

331.   Both Doe 2 and JR5 owned firearms. [Dec. of Counley, Doe 2, ¶ 73.]

332.   There is no evidence that JR5 disseminated sensitive images of Doe 2. [Dec. of Counley, Doe 2, ¶ 67.]

333.   Both JR5 and Doe 2 submitted images in support of their respective positions. [Dec. of Counley, Doe 2, ¶  63; Ex. HHH, Dep. of Doe 2 at 250:19 – 253: 22.]

334.   Doe 2, in support of her allegations, submitted a sensitive image of another woman she surreptitiously took off JR5's tablet. [Ex. HHH, Dep. of Doe 2 at 250:19 – 22; Dec. of Counley, Doe 2, ¶ 68.]

335.   JR5 submitted one sensitive image of Doe 2, a topless picture of Doe 2, to support his claim that Doe 2 continued engaging in a consensual sexual relationship with him after the alleged sexual assaults. [Dec. of Counley, Doe 2, ¶ 64.]

336.   When Counley received this sensitive image of Doe 2, she notified Doe 2. [Ex. HHH, Dep. of Doe 2 at 368:1 – 23, 371:1 – 22; Dec. of Counley, Doe 2, ¶ 65.]

337.   No other sensitive pictures of Doe 2 or any other women were submitted to Counley.  [Dec. of Counley, Doe 2, ¶ 66.]

338.   There is no evidence that JR5 communicated with anyone about Doe 2, other than IEC, after November 21, 2017. [Dec. of Counley, Doe 2, ¶ 69.]

339.   Doe 2 admitted JR5 never circulated embarrassing pictures of her in the department. Rather, Doe 2 admitted it was simply a Facebook picture of her and two other fellow students, and that she could not even verify whether JR5 indeed made this his profile picture. [Dec. of Counley, ¶ 70; Dec. of Amare, ¶ 18, Ex. VVV, Email Communication between Counley and Doe 2 on February 16, 2018.]

340.   When asked about the picture on Facebook, JR5 reported he was downloading the picture off of his Facebook to provide to Counley when he accidentally posted it. JR5 reported he did not realize that the picture was posted on Facebook briefly for an hour or less. When he realized, JR5 took it down. JR5 reported to Counley that he was not even Facebook friends with Doe 2 at the time. [Dec. of Counley, Doe 2, ¶¶ 70 - 72.]

341.   Doe 2 admitted she knew JR5 was not taking summer classes during the Summer 2018 semester. [Ex. HHH, Dep. of Doe 2 at 327:8 – 328:4.]

**G.    DOE 2'S MENTAL HEALTH HISTORY.**

342.   Prior to November 2017, Doe 2 reported the following symptoms to her medical providers: feelings of PTSD, OCD, Trichotillomania, stress eating, severe anxiety, sleep disturbance, and attention issues. [Dec. of Amare, ¶ 20, Ex.

WWW, Medical Records from February 3, 2017, August 17, 2017 and August 20, 2017.]

343.  Prior to November 2017, to her medical provider, Doe 2 reported a history of depression, anxiety, PTSD and gastrointestinal issues. [Id.]

344.  Prior to November 2017, Doe 2 was diagnosed with generalized anxiety disorder-severe with panic attacks, Trichotillomania, Obsessive Compulsive Disorder, Attention deficit disorder predominate inattentive type. Moreover, on April 20, 2018, a PTSD diagnosis was added. [Id.]

345.  There are no experts opining that any of Doe 2's diagnoses were caused by actions or inactions of the University. [Dec. of Amare, ¶ 30.]

346.  There are no experts opining that any of Doe 2's diagnoses were caused by the alleged deliberate indifference of the University.  [Dec. of Amare, ¶ 31.]

347.  There is no medical record that opines that Doe 2's alleged symptoms and diagnoses were caused by the University's actions or inactions. [Dec. of Amare, ¶ 32.]

348.  There is no medical record that opines that Doe 2's alleged symptoms and diagnoses were caused by alleged deliberate indifference of the University. [Dec. of Amare, ¶ 33.]

349.  Doe 2 has not disclosed any expert to opine on the issue of whether any mental health condition allegedly caused by the alleged deliberate indifference of the University prevents her from pursuing a Ph.D. [Dec. of Amare, ¶ 35.]

350.   Doe 2 has not disclosed any expert to opine on the issue of whether any mental health conditions prevented or prevents her from pursuing a Ph.D. [Dec. of Amare, ¶ 34.]

351.   Doe 2 has not disclosed any expert to opine on the issue of whether any mental health condition prevents her from pursuing a profession in Political Science. [Dec. of Amare, ¶ 36.]

352.   Doe 2 has not disclosed any expert to opine on the issue of whether any mental health condition prevents her from teaching.  [Dec. of Amare, ¶ 37.]

353.   Doe 2 has not disclosed any experts to opine on the issue of whether any physical ailment was caused by a mental health condition. [Dec. of Amare, ¶ 39.]

354.   Doe 2 has not disclosed any experts to opine on the issue of whether any physical ailment was caused by a mental health condition caused by the alleged deliberate indifference of the University. [Dec. of Amare, ¶ 40.]

355.   Doe 2 has not disclosed any experts to opine on the issue of whether any physical ailment was caused by a mental health condition caused by the actions or inactions of the University.  [Dec. of Amare, ¶ 41.]

DATED this 3rd day of September, 2024.

BOARD OF REGENTS OF THE
UNIVERSITY    OF    NEBRASKA,
Defendant

By:    /s/ Lily Amare
Susan K. Sapp #19121
Lily Amare #25735
Cline Williams Wright
  Johnson & Oldfather, L.L.P.
1900 U.S. Bank Building
233 South13th Street
Lincoln, NE 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/ Lily Amare
Lily Amare

4863-7987-4011, v. 1