IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, | Case No. 4:20-cv-03081 |
| Plaintiffs, | |
| vs. | |
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, | |
| Defendant. | |

---

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

Submitted by:

Susan K. Sapp, #19121
Lily Amare, #25735
CLINE WILLIAMS WRIGHT JOHNSON
    & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

September 3, 2024

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................... 4

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ................................ 5

IIII.   STANDARD OF REVIEW .......................................................................... 5

IV.     ARGUMENT ............................................................................................... 6

    A.    BRUN DID NOT HAVE SUBSTANTIAL CONTROL OVER THE CONTEXT IN WHICH THE ALLEGED HARASSMENTS OCCURRED. ............................................................. 7

        1.    BRUN did not have substantial control over any of the means of communication between Doe 1 and JR4. ......................................... 8

        2.    With respect to Doe 2, BRUN did not have substantial control over any of the locations or context in which the actionable sexual harassment or assault occurred. ........................................................ 9

    B.    ONLY UNWELCOME SEXUAL HARASSMENT OR DISCRIMINATION THAT WERE SO SEVERE, PERVASIVE, AND OBJECTIVELY OFFENSIVE ARE ACTIONABLE................ 10

        1.    Doe 1 cannot show actionable sexual harassment or assault prior to and after May 2018. ...................................................................... 11

        2.    Doe 2 cannot show JR5 sexually harassed her in March 2016 and August 2016. ................................................................................ 17

    C.    THE DUTY TO ADDRESS AND TO INSTITUTE CORRECTIVE MEASURE IS TRIGGERED WHEN BRUN RECEIVES ACTUAL NOTICE OF SEXUAL HARASSMENT.................... 19

    D.    BRUN WAS NOT DELIBERATELY INDIFFERENT. ............................................... 20

        1.    BRUN's appropriate and reasonable response under the circumstances involving Doe 1 and JR4.............................................................. 21

        2.    BRUN'S appropriate and reasonable response under the circumstances involving Doe 2 and JR5. ....................................... 27

    E.    PLAINTIFFS CANNOT SHOW BRUN'S DELIBERATE INDIFFERENCE CAUSED THEM TO UNDERGO HARASSMENT OR MAKE THEM LIABLE OR VULNERABLE TO IT.............. 31

        1.    Doe 1 cannot show BRUN's actions or inactions caused her to experience actual further sexual harassment or assault. ............... 31

        2.    Doe 2 did not suffer further harassment after November 21, 2017. . 32

    F.    PLAINTIFFS CANNOT SHOW ANY DAMAGES THAT ARE RECOVERABLE UNDER TITLE IX. ......................................................................................................... 33

        1.    Plaintiffs cannot recover damages related to emotional distress, reputational harm or punitive damages. ........................................ 33

2.  Plaintiffs have not suffered any special damages as a result of BRUN's alleged deliberate indifference........................................................ 37

V.  CONCLUSION...................................................................................................... 39

The Board of Regents of the University of Nebraska ("BRUN" or "Board of Regents") respectfully submits this Brief in support of its Motion for Summary Judgment.

## I. __INTRODUCTION__

On November 18, 2020, Sheridan Thomas, Miranda Melson, Jane Doe 1, Jane Doe 2, Sydney Brun-Ozuna, Jane Doe 3, Capri Davis, Jane Doe 4, Jane Doe 5 and other unidentified female Does filed a Second Amended Complaint against BRUN and various personnel at University of Nebraska-Lincoln ("University"). [Filing No. 29.] On April 1, 2021, Defendants moved to dismiss all counts (Counts I – X). [Filing No. 40.]

On September 9, 2021, this Court dismissed: Counts III, IV, VI, VII, VIII, IX, and X in their entirety and with prejudice. After additional briefing, on May 11, 2022, the Court dismissed:

- Counts II and VI with prejudice;

- Plaintiffs Thomas, Melson, BRUN-Ozuna, Jane Doe 3, Jane Doe 4, Davis and Jane Doe 5's claims under Count I with prejudice; and

- Any and all claims by the "other unidentified does."

Accordingly, the only claims that remain are Jane Doe 1's ("Doe 1") and Jane Doe 2's ("Doe 2") (collectively referred to as Plaintiffs) claims under Count I, Violation of Title IX, 20 U.S.C. § 1681 et seq. ("Title IX"), Deliberate Indifference to Sex Discrimination against BRUN. Doe 1 and 2 present with their own distinct and unique facts.

Because there is no genuine dispute of material fact regarding the elements of Doe 1's and 2's Title IX claim, judgment in BRUN'S favor and against the Plaintiffs' ought to be entered.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to NECivR 56.1(a) & (f), BRUN incorporates its Statement of Undisputed Material Facts filed contemporaneously herewith.

## IV.   STANDARD OF REVIEW

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As such, the movant "bears the initial responsibility of informing the district court of the basis for its motion" and must "identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Rusness v. Becker County*, 31 F.4th 606, 614 (8th Cir. 2022).

Once movant meets its burden, the non-movant must respond by setting forth "specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial." *Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Torgerson*, 643 F.3d at 1042 (quoting *Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on which the finder of fact could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791–92 (8th Cir. 2011). "[T]he nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Putnam v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003) (citation omitted). The Court will "not accept unreasonable inferences or

sheer speculation as fact." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3 797, 800 (8th Cir. 2004).

## V. **ARGUMENT**

Title IX provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

"For a public institution to 'incur liability under Title IX, it must be (1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control.'" *Ostrander v. Duggan,* 341 F.3d 745, 750 (8th Cir. 2003) (citation omitted). Additionally, BRUN can only be liable under Title IX for situations in which it "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* (quoting *Shrum ex. rel. Kelly v. Kluck,* 249 F.3d 773,782 (8th Cir. 2001)).

Specifically, to establish a Title IX violation, the Plaintiffs must establish that:

(1) BRUN is a recipient of Federal financial assistance;

(2) They were each subjected to unwelcome sexual harassment or discrimination that was so severe, pervasive and objectively offensive that it effectively bars access to educational opportunities or benefits provided by the school;

(3) "Appropriate person" had actual knowledge of the sexual harassment or discrimination; and

(4) Despite such knowledge, the person with authority was deliberately indifferent to known acts of harassment in its program or activities, which occur under its control.

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 633 (1999) ("*Davis*"). *See also Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290–91 (1998); *K.T.*

*v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017); *Waters v. Metro. State Univ.*, 91 F. Supp. 2d 1287, 1291 (D. Minn. 2000), *aff'd,* 52 F. App'x 1 (8th Cir. 2002).

In addition, the Plaintiffs must show BRUN's conduct—the alleged deliberate indifference—"cause[d] the student to undergo harassment or make them liable or vulnerable to it." *Doe. v. Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th 419, 424 (8th Cir. Aug. 15, 2023) (quoting *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021) )(cleaned up). "The reason is that Title IX creates liability for schools that accept federal funding only if they 'subject' the student to abuse." *Id.* (citing 20 U.S.C. § 1681(a); *cf. Du Bois v. Bd. of Regents of the Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021)). In other words, an educational institution is only deliberately indifferent if its actions caused or made the individual vulnerable to *actual* further harassment. *See e.g. Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th 419, 424 (holding "[l]inking the college's actions or inactions to emotional trauma the plaintiff experienced in the wake of sexual harassment or assault, even if proven, is not enough."); *Shank,* 993 F.3d at 573 (holding this standard required plaintiff to demonstrate a "'***causal nexus' between the college's conduct and the student's experience of sexual harassment or assault***;'" in other words, there must be a causal nexus between an institution's action or inaction and the plaintiff's experience of *actual* further sexual harassment or assault.) (emphasis added).

Plaintiffs' claims fail for various reasons as discussed below.

**A.    BRUN DID NOT EXERCISE SUBSTANTIAL CONTROL OVER THE CONTEXT IN WHICH THE ALLEGED HARASSMENT OCCURRED.**

Both Doe 1 and Doe 2 cannot show BRUN had substantial control over the harassers in the context in which the alleged actionable harassment occurred. The Supreme Court has limited a school's liability for student-on-student sexual harassment to circumstances where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis,* 526 U.S. at 645 (emphasis added). The Court explained:

The statute's plain language confines the scope of prohibited conduct *based on the recipient's degree of control over the harasser and the environment in which the harassment occurs.* ... [B]ecause the harassment must occur "under" "the operations of" a funding recipient, *the harassment must take place in a context subject to the school district's control.*

*Id.* at 644–45, (emphasis added). "Title IX requires a school to be in a position to control the situation, know of it, and still exhibit indifference." *Bd. of Trustees of the Nebraska State Colleges,* 78 F.4th at 424.

### 1. BRUN did not have substantial control over any of the means of communication between Doe 1 and JR4.

Doe 1's Title IX claim is entirely dependent on alleged activity that took place outside of BRUN's control—interaction over social media, text messages using their personal devices, email exchanges using their personal email addresses, and a testimonial on a non-University affiliated website. Doe 1 admitted JR4 never approached her while they were on University premises. There is no allegation and no evidence that JR4 was using his personal devices to perpetuate sexual harassment during class time or while they were both engaged in a particular school program.

The initial interaction between JR4 and Doe 1 occurred in the months of mid-May and June 2017—while Doe 1 was solely working on her dissertation and therefore not taking any classes with JR4. [See Ex. G, Doe 1 Transcript.] With respect to JR4's December 2017 message to a non-party student utilizing their own personal devices, there is no allegation or evidence that JR4 was taking any classes with the non-party student nor that the communication occurred during class time. With respect to the email from JR4 to Doe 1, it occurred in May 2018, while they were in Austin, TX for a conference and it was sent late at night at 11:48 p.m.—a time when there was no school affiliated programming. [Ex. Q.] Finally, with respect to the testimonial in September 2019, it was posted on a non-UNL affiliated website in response to an invitation to respond to a statement posed on this website, including an opportunity to provide a comment. The University did not own the

Dear UNL website, nor did it have any authority to manage, dictate or police any of the content on, the website, including comments and testimonials. Moreover, JR4 and Doe 1 were not taking any classes on campus in September 2019, as Doe 1 was solely working on her dissertation. "Disciplinary authority over a student is not enough to establish that the school controls the locations or contexts where a student is found." *Brown v. State*, 23 F.4th 1173, 1182  (9th Cir. 2022).

**2. With respect to Doe 2, BRUN did not have substantial control over any of the locations or context in which the actionable sexual harassment or assault occurred.**

All of the actionable and alleged sexual misconduct and abuse involving Doe 2 and JR5 occurred outside of BRUN's control. Specifically, the actionable sexual harassment occurred at a private apartment complex of Doe 2 or private residence of JR5. The Eighth Circuit has expressly held that where a university does not own, possess, or control the premises where the alleged sexual misconduct took place, it cannot be liable under Title IX for deliberate indifference. *Ostrander*, 341 F.3d at 750-751 (finding where a plaintiff did not provide evidence a University owned, possessed or controlled a fraternity, it could not be liable under Title IX); *Roe v. St. Louis Univ.*, case no. 4:08cv1474, 2021 WL 6757558 at *8 (E.D. Mo., December 31, 2012) *affirmed* 746 F.3d 874 (8th Cir. 2014) (holding because the alleged incident occurred at a private, off-campus location, it cannot be said the University "exercised substantial control over both the harasser and the context in which the known harassment occurs."); *Doe v. Univ. of Scranton*, No. 3:19-CV-01486, 2020 WL 5993766, at *9 (M.D. Pa. Oct. 9, 2020) (holding the University did not have substantial control over the off-campus apartment where the alleged harassment occurred).

Similarly in this case, Doe 2 has failed to submit any evidence that the University owned, operated, or had any control over the apartment complex in which Doe 2 lived or the private residence of JR5. And, in fact, the University did not own or control those properties.

9

Accordingly, Title IX is inapplicable in this case as BRUN has no ability whatsoever to control the interactions between two students who live off-campus in privately owned housing.

**B.    ONLY UNWELCOME SEXUAL HARASSMENT OR DISCRIMINATION THAT WAS SO SEVERE, PERVASIVE, AND OBJECTIVELY OFFENSIVE IS ACTIONABLE.**

"Per the language of Title IX, these 'acts of discrimination' must be 'on the basis of sex.'" *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 864 (8th Cir. 2011). The Eight Circuit in *Wolfe* held:

> Proof of sex-based motivation is required for a Title IX deliberate indifference claim. Specifically, Title IX imposes liability on a school district for discrimination only if the discrimination is "on the basis of sex." We glean from this language of the statute a requirement of underlying intent, and therefore motivation, on the part of the actor to discriminate because of one's sex or gender.

*Id.* at 865. In addition, the Plaintiffs must show that the alleged harassment is "so ***severe, pervasive, and objectively offensive*** that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Wolfe*, 648 F.3d at 864 (emphasis added). "Plaintiff must show harassment that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 631. "Whether gender-oriented conduct rises to the level of actionable 'harassment' ... 'depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved.' " *Davis*, 526 U.S. at 651, 119 S.Ct. 1661 (internal citations omitted).

This element contains both objective and subjective components. "The complainant must have subjectively perceived the harassment as severe, and the evidence must objectively show that 'a reasonable person would find [the environment] hostile or abusive.'" *Ellis v. Houston*, 742 F.3d 307, 319 (8th Cir. 2014) (internal citations omitted).  It is an extremely demanding standard for demonstrating the alleged conduct was "subjectively

severe," with the Eight Circuit describing a hostile environment as "an ongoing nightmare for the employee victim." *Van Steenburgh v. Rival Co.*, 171 F.3d 1155, 1159 (8th Cir. 1999). The objectively offensive standard is also a demanding standard that "requires 'extreme' conduct 'rather than merely rude of unpleasant' conduct." *Rester v. Stephens Media, LLC,* 739 F.3d 1127, 1131 (8th Cir. 2014) (citation omitted); *see Henthorn,* 359 F.3d at 1028 (finding that conduct must be "more than merely offensive, immature or unprofessional."). These demanding standards "are designed to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Duncan v. General Motors Corp.,* 300 F.3d 928, 934 (8th Cir. 2002) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)).

Applying these stringent standards, the evidence is clear there was no actionable sexual harassment or assault of Doe 1. Nor were the alleged events of March 2016 and August 2016 actionable sexual harassment of Doe 2.

### 1. Doe 1 cannot show actionable sexual harassment or assault prior to and after May 2018.

Doe 1 alleges four isolated incidents to claim that she was subjected to sexual harassment. Albeit inappropriate at times, the interaction between JR4 and Doe 1 and non-party students, and the random testimonial submitted on a non-UNL affiliated website, were not so severe, pervasive and objectively hostile or abusive that it had a "systemic effect of denying the victim equal access to an educational program or activity." Doe 1 cannot overcome the demanding evidentiary hurdle of showing subjectively severe, pervasive, and objectively offensive conduct.

The pertinent factors to consider in determining whether conduct was sufficiently severe and pervasive include the following: the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or merely an offensive utterance; and whether it unreasonably denied access to an educational program or activity. *See Duncan,* 300 F.3d at 934.

*May and June 2017*

Doe 1 and JR4 were in a relationship for a year and a half while they were at the University. After their relationship ended, JR4 and Doe 1 did not communicate for approximately one month. In mid-May 2017, they connected at a conference. Thereafter, JR4 communicated with Doe 1 seeking closure. [See Ex. X, Messages between JR4 and Doe 1 in May and June 2017.] He wanted to talk about their relationship and its demise. He expressed to her he wanted to talk about the last few weeks of the relationship, with the overarching point of whether "he had just f****** up beyond ever going back." Throughout the communication, JR4 was not asking her out on a date—rather he was asking her to sit and talk with him about their relationship. Doe 1 told him that she did not want to talk about their relationship as she was sure she did not want to rekindle their relationship.

During JR4's communication with Doe 1 in May and June 2017, JR4 did not engage in name calling; he did not engage in sexual proposition or in verbal or physical conduct of a sexual nature or request sexual favors. JR4 never exhibited violent or aggressive behavior or threatened Doe 1 in any way prior to May 2017 or in any of the messages in May and June 2017. JR4 did not engage in any physical touching of Doe 1. Even when JR4 learned UNLPD was looking for him on June 28, 2017, he messaged Doe 1 the following, in relevant part: "I'm sorry and just want to say whatever happens you are the greatest thing that has happened to me in a long time. I'll move on I guess I just wish we didn't have to end it like this. I just needed one more text."  [Ex. X, Messages JR4 sent to Tina in December 2017.]

Notably, Doe 1 reported to Officer Kristy Beitler ("Officer Beitler"), UNLPD, and Jeff Lamoureaux ("Lamoureaux"), Deputy Title IX Coordinator and Investigation, that she never experienced any threatening behavior or conduct of JR4 prior to May 2017 or in any of the messages in May and June 2017 that caused her concern for her safety. Admittedly, as provided above, there were no threats, name calling, or any other offensive language used in any of the messages from May and June 2017.  *See Crutcher-Sanchez v. Cnty. of Dakota,*

687 F.3d 979, 988 (8th Cir. 2012) (holding where a sheriff had authority over the facilitation and operations in which the plaintiff worked, his offer of a box of chocolates to the plaintiff and his asking her out several times was not sufficiently severe or pervasive conduct to create a sexually hostile work environment); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) ("Dating and relationships are an inescapable part of high school, as is the resulting stress. It is a trying time for young people, who experience a wide range of emotions and often lack the skills to control them. J.H. was acting like a typical high-school girl whose ex-boyfriend began dating a younger cheerleader. That is the sort of unpleasant conflict that takes place every day in high schools, and it is not the proper stuff of a federal harassment claim.").

Accordingly, the interaction of Doe 1 and JR4 does not amount to sexual harassment. JR4's plea for Doe 1 to talk to him about their relationship, although unwelcome, cannot be said to have been subjectively severe and objectively offensive to constitute "the proper stuff" of a Title IX claim.

### *December 2017*

In December 2017, JR4 sent text messages to a non-party student. [Ex. AA, Messages between JR4 and Tina.] There was **no** no-contact order between JR4 and the recipient of this message. It did not ask the recipient to communicate any part of the messages to Doe 1. Rather JR4's message to the non-party student expressed he was fine with Doe 1 not talking to him. He widely communicated his frustration so many of his peers knew about what had transpired between Doe 1 and JR4 in May and June 2017, which had made it difficult for him to make friends. In the message, JR4 also stated his opinion about Dr. Debra Brown ("Dr. Brown"), who served as his advisor for a period of time, and stated he would report Dr. Brown for a rumor she spread about another individual. JR4 further stated he had not said anything bad about any of them, although he told the recipient he had an extremely embarrassing story about Doe 1 but wouldn't share it because, "I ***don't do that***

***shit*** even though you people have single handedly made me incapable of making friends with anyone at the NCV." The general gist of the message to the non-party student was that he did not deserve the social implications of what had transpired between Doe 1 and him— that he felt like an "outcast."

A thorough review of the content of December 2017 message to the non-party student shows that it was not "based on sex." Rather, it was based on personal animus regarding prior events. "Acts of bullying based on personal animus do not trigger Title IX's liability standard." *Owens v. Louisiana State Univ.*, No. CV 21-242-WBV-SDJ, 2023 WL 9051300, at *5 (M.D. La. Dec. 31, 2023). *See also Wolfe*, 648 F.3d at 866-67 (quoting *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir.2011)) (stating harassment is actionable under Title IX only if it is "based on sex, per the words of Title IX, and not merely tinged with offensive sexual connotations" and affirming summary judgment where record fails to suggest the harasser "was motivated by anything other than personal animus") (internal quotation marks and citation omitted); *Pedroza v. Cintas Corp. No. 2,* 397 F.3d 1063, 1068 (8th Cir. 2005) ("Based on sex requirement forces a plaintiff to prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior."); *Owens,* 2023 WL 9051300, at *6 ("Harassment, no matter how severe, is actionable under Title IX only if it based on sex," and because "harassment on the basis of sex is the sine qua non of a Title IX sexual harassment case," "a failure to plead that element is fatal.").

Furthermore, there was no threatening behavior or conduct towards Doe 1 in the December 2017 message that would meet the demanding standard of subjectively severe and objectively offensive. To the extent Doe 1 hangs on the statement from JR4 with respect to the "embarrassing story" he claims to know about Doe 1, JR4 expressly stated therein that he would ***not*** share it with anyone. Accordingly, Doe 1 cannot show this exchange with

14

the non-party student, for whom there was **no** no-contact order, was harassment on the basis of sex, that was severe, pervasive, and objectively offensive.[1]

### *May 2018*

On May 5, 2018, JR4 sent an email to Doe 1, claiming that she was not a strong independent woman. And, for the first time, he used inappropriate language in this email. This was the only incident in which JR4 directed such language to Doe 1.

Admittedly, the language of the May 5 email was inappropriate and coarse. However, the May 5 email was an isolated incident that does not rise to the level of severe, pervasive and objectively offensive.  Actionable harassment must be "so intimidating, offensive, or hostile that it tainted the work environment." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999). "More than a few isolated incidents are required." *Id.* (citation omitted). The "[c]onduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment." *Alagna v. Smithville R–II Sch. Dist.,* 324 F.3d 975 at 980 (8th Cir. 2003). "Sporadic use of abusive language" does not meet the demanding standard of severe, pervasive and objectively offensive. *Faragher,* 524 U.S. at 788.

### *September 2019*

In September 2019, an individual—who Doe 1 could not verify to be JR4—submitted a testimonial form to a website over which the University did not have any ownership or authority to regulate. [Ex. KK.] The testimonial did not identify Doe 1 or any other person. The individual disagreed with the statement made by the website, and when it asked for additional comments, the writer provided comments related to his/her collective opposition. In relevant part, the testimonial stated, "if you can't convince the kangaroo court that is Title IX that you were violated then you have no case." This does not even mirror what occurred with Doe 1, meaning, the University's ultimate conclusion was that JR4 violated three

---

[1] Although JR4's messages did not rise to the level of a Title IX violation, after investigation it was determined to violate the University of Nebraska's Student Code of Conduct—which sets forth a different standard for a finding of sexual misconduct than Title IX—and JR4 was subject to disciplinary action as set forth in Section D(1).

sections of the Student Code of Conduct. Accordingly, this unverifiable testimonial, on a non-UNL website, where comment was solicited from individuals responding to the question posed by the website, with no identification of Doe 1 or any individuals with whom she is affiliated, cannot be considered severe, pervasive and objectively offensive conduct directed at Doe 1.

Even considering the incidents collectively, and factoring in the elements of severity and frequency, whether it is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably denies access to educational program, the incidents are not sufficient to show severe, pervasive and objectively offensive conduct, when the alleged incidents were so few and far between. In *Joens v. John Morrell & Co.*, the court cited three cases where courts rejected the sufficiency of the allegations on grounds the alleged incidents were too few and far between:

> See *Duncan,* 300 F.3d at 935 (rejecting the claim based on "four categories" of conduct involving nine or ten incidents); *Scusa,* 181 F.3d at 967 (observing that the plaintiff relied on only nine incidents); *Callanan,* 75 F.3d at 1296 (agreeing with the district court "that the conduct to which [the plaintiff] was subjected was not 'frequent, severe, physically threatening, or humiliating' ").

243 F. Supp. 2d 920, 931 (N.D. Iowa 2003). *See also Duncan, 300 F.3d 928 (8th Cir. 2002)* (holding a supervisor's conduct, which allegedly included sexually propositioning the plaintiff, repeatedly touching her hand, requesting that she make a sketch with sexual implications, displaying a poster portraying the plaintiff as "the president and CEO of the Man Hater's Club of America," and asking her to type a copy of a "He–Men Women Hater's Club" manifesto, is not as a matter of law sufficiently severe or pervasive). At the very least, the facts in this case, make it evident there was no actionable sexual harassment

The undisputed facts are:

- From July 2017 to current: JR4 never approached Doe 1 to talk to her;

- From July 2017 until May 2018 and from May 2018 to current: JR4 never texted or messaged Doe 1;

- From July 2017 through her graduation from the University: JR4 never came into any of the rooms in which Doe 1 taught or the laboratories she used for her research;

- After May 2018: Doe 1 did not even see JR4 other than the hearings related to Title IX; and

- Throughout her time at the University: JR4 never threatened to harm her in any way.

Accordingly, Doe 1 cannot show she suffered actionable sexual harassment that was so severe, pervasive and objectively offensive that it ***denied*** her equal access to the resources and opportunities offered by the University.

2. **Doe 2 cannot show JR5 sexually harassed her in March 2016 and August 2016.**

Doe 2 and JR5 were in an on-again, off-again relationship from February 2016 to July 2017—approximately one year and five months. Doe 2 alleges that JR5 sexually harassed her in March 2016 and August 2016. The March 2016 and August 2016 conduct cannot be deemed actionable sexual harassment as detailed below.

### *March 2016*

Doe 2 claims JR5 raped her in March 2016 at his private residence. Doe 2 cannot show she was sexually assaulted in March 2016 because she admitted to Counley that she did not feel any contact or penetration by JR5. Furthermore, Doe 2 admitted she only had snapshot memory of the night as she was intoxicated. Accordingly, Doe 2 cannot prove she was sexually assaulted in March 2016. Notably, thereafter, Doe 2 continued her relationship with JR5.

### *August 2016*

Doe 2 also alleges she suffered unwelcome sexual harassment in August 2016. Specifically, Doe 2 alleges that JR5 touched her thigh during orientation for new students in August 2016, which made her feel "uncomfortable."

The gravamen of any sexual harassment claim is a showing that the alleged misconduct was "unwelcome." *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 828 (8th Cir. 2017).

Sexual activity among students who are voluntary participants, absent any evidence of unwelcome sexual advances, cannot "be characterized as sexual harassment." *Winzer v. Sch. Dist. for City of Pontiac*, 105 F. App'x 679, 681 (6th Cir. 2004). The proper inquiry as to whether alleged sexual harassment was unwelcome is "whether the plaintiff ***indicated by her conduct that the alleged harassment was unwelcome***." *Blake*, 870 F.3d at 828 (emphasis added).

The interaction of August 2016 was not "unwelcome" or "harassment." Doe 2 does not allege that she verbalized or indicated by conduct to JR5 that he was not welcome to touch her thigh. During her deposition, Doe 2 admitted the August 2016 incident was not "an assault," and that they were in fact dating when this occurred. In fact, Doe 2 maintained a dating relationship with JR5 after the alleged August 2016 event.

Moreover, Doe 2 cannot show the alleged August 2016 touch was "severe, pervasive, and objectively offensive." *Davis*, 526 U.S. at 640. The act of one adult touching the thigh of another adult while they are dating cannot be severe, pervasive and objectively offensive. *See e.g., McMiller v. Metro*, 738 F.3d 185, 188-89 (8th Cir. 2013) (holding a supervisor's behavior of kissing the plaintiff on her face on two occasions, placing his arms around her or attempting to do so three times, and requesting she remove an ingrown hair from an area near his chin is insufficient to establish severe or pervasive harassment); and *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858 (8th Cir. 2009) (holding "White's [plaintiff's supervisor] conduct of rubbing Anderson's shoulders or back at times during her training session, calling Anderson "baby doll" during a telephone conversation [], accusing her of not wanting to be "one of my girls" [], his one-time, long-distance suggestion that she should be in bed with him and a Mai Tai in Florida, and the insinuation that she could go farther in the company if she got along with him, simply were not severe, pervasive or demeaning enough to have altered a term, condition, or privilege of her employment.").

C.    THE DUTY TO ADDRESS AND TO INSTITUTE CORRECTIVE MEASURE IS TRIGGERED WHEN BRUN RECEIVES ACTUAL NOTICE OF SEXUAL HARASSMENT.

Plaintiffs must establish that a school official "who at a minimum has the authority to ***address the alleged discrimination and to institute corrective measures***" on behalf of the institution had actual notice of the alleged sexual discrimination/harassing conduct. *Gebser*, 524 U.S. at 304. "Most significantly, Title IX contains important clues that Congress did not intend to allow recovery in damages where liability rests solely on principles of vicarious liability or constructive notice." *Id.* at 288. School officials "would not be Title IX 'appropriate persons' simply by virtue of being mandatory reporters." *Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937, 958 (E.D. Mich. 2020), *motion to certify appeal denied,* No. 18-13321, 2020 WL 3402013 (E.D. Mich. June 19, 2020). Rather, the inquiry for Title IX applicability is whether the individual is appointed to monitor, address, and institute corrective measures, rather than report the misconduct to others. *See Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 660 (5th Cir. 1997); *Kesterson v Kent State Univ.*, 967 F.3d 519, 527 (6th Cir. 2020) ("appropriate person is someone who at a minimum has the authority to address the alleged discrimination on the school's behalf"). Accordingly, BRUN could only be liable for damages where BRUN "intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of . . . harassment of which it had actual knowledge," and cannot be held liable "under what amounted to a negligence standard." *Davis*, 526 U.S. at 642.

In the Second Amended Complaint, Doe 2 alleges "sometime during summer 2017, Jane Doe 2 reported to a professor that she was sexually assaulted, harassed[] and abused by a male student in her Ph.D. program. . .." [Filing No. 29, ¶ 347.]  Relying on Doe 2's own under oath testimony, BRUN can now prove this is falsehood.

Doe 2 admitted she kept her relationship with JR5 a secret until March 2017. In August 2017, Doe 2 communicated with confidential resources—the Lincoln Police Department ("LPD") and Voices of Hope. She ensured no one, other than LPD and Voices of

Hope, learned about her allegations against JR5 until mid-October 2017. In mid-October 2017, she communicated with Dona-Gene Barton ("Barton"), Assistant Professor, about her allegations of sexual harassment. Doe 1 instructed Barton to keep this confidential. Doe 2 admitted this is the first time she communicated allegations of sexual harassment to a professor.

Under BRUN policy, Barton had no authority to investigate or remedy allegations of sexual misconduct. Regardless, on November 3, 2017, Barton reported a student came to her with concerns regarding inappropriate conduct by JR5. Doe 2 was unhappy about the fact that Title IX learned of her allegations. After further thought, on November 21, 2017, for the first time, Doe 2 reported her allegations of sexual harassment against JR5 to an individual with authority to address and take corrective measures/disciplinary action—Counley.

Accordingly, Doe 2 cannot show she provided actual notice to a school official with authority to address the alleged harassment and institute corrective measures prior to November 21, 2017. BRUN Bylaws are clear that the Title IX Coordinator and her designee are the individuals with authority to address alleged harassment/discrimination and to institute corrective measures.

**D.     BRUN WAS NOT DELIBERATELY INDIFFERENT.**

Deliberate indifference, involves a situation where a school "***turn[s] a blind eye and doe[s] nothing***." *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610 (8th Cir. 1999). "Deliberate indifference is established when a school responds in a clearly unreasonable manner to harassment considering the circumstances known to it," which "is a stringent standard of fault that cannot be predicated upon mere negligence." *Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th at 423 (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d

722, 725 (8th Cir. 2019). "Title IX is not a procedure for courts to second-guess disciplinary decisions made by school administrators." *Id.*

Accordingly, the deliberate indifference element is an onerous standard. The Supreme Court emphasized just how high a bar deliberate indifference sets as follows:

> We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. . . . In fact, as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators. . . . School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is ***clearly unreasonable in light of the known circumstances***. . . . the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. This is not a mere "reasonableness" standard, as the dissent assumes. . . . ***In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.***

*Davis*, 526 U.S. at 648–49 (1999) (emphasis added). *See also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 276 (1998) (holding in order to amount to deliberate indifference to discrimination, the plaintiff must show "an official decision by the recipient not to remedy the violation."); *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019) (a plaintiff's "dissatisfaction with the school's response does not mean the school's response can be characterized as deliberate indifference.").

### 1. BRUN's appropriate and reasonable response under the circumstances involving Doe 1 and JR4.

Although Doe 1 cannot show actionable sexual harassment, BRUN presents to this Court a detailed account of how effectively and efficiently it addressed each of the alleged acts of misconduct in June 2017, December 2017, May 2018 and September 2019. It certainly is far from turning a blind eye and doing nothing.

***Swift and effective response to June 2017 report.***

The University learned of the May and June 2017 interactions of Doe 1 and JR4 on June 28, 2017, from Dr. Mathew Hecker ("Dr. Hecker"). On the same day, Officer Kristy connected with Doe 1. During this call, Officer Beitler: (1) gathered additional information about what had transpired; (2) ensured Doe 1 was at a safe place; (3) sought information and received direction about what Doe 1 hoped to achieve via UNLPD, which was a no contact directive. Again, on the same day, UNLPD connected with JR4 and directed him to cease all contact with Doe 1. Officer Beitler reported what she learned to IEC.

Simultaneously, on June 28, 2017, Lamoureaux sent Doe 1 a letter outlining the details of what he had learned from Officer Beitler and Dr. Hecker. In this letter, Lamoureaux expressly told Doe 1 that she had the option to file a complaint with both law enforcement and IEC and provided her with the resources that explained her rights and the University's responsibilities regarding complaints of sexual misconduct.

Then, on June 29, 2017, Lamoureaux and Officer Beitler met with Doe 1 to give her the opportunity to provide a detailed account of what happened and to get directions as to how she wanted to proceed. Once again, at this meeting, she expressed her interest in obtaining an official No Contact Order through an informal process. Doe 1 did not desire to file a complaint with IEC or pursue criminal prosecution.

On the same day (June 29), Lamoureaux communicated with JR4 and gave him the opportunity to respond to the allegations of Doe 1. JR4 admitted to contacting Doe 1 to get an answer to a question and to get closure. JR4 stated he is interested in an informal resolution and would agree to a No Contact Order.

In a matter of 2 days after learning of the interactions of JR4 and Doe 1, on June 30, 2017, an official No Contact Order was issued. JR4 was ordered to cease all contact and communication, verbal or non-verbal, with Doe 1. He was also instructed to not attend any classes at the University for which he was not currently registered and/or enrolled. He was

22

instructed that should he violate the No Contact Order, he would be charged with violating the Student Code of Conduct. He was told to contact IEC should he have any questions.

On the same day, Doe 1 was informed of the outcome. In this letter, Lamoureaux expressly stated that Doe 1 requested to resolve the matter through informal resolution. At no time did she tell Lamoureaux that this statement in his letter to her was erroneous.

This No Contact Order was effective until May 2018. As Doe 1 admitted, JR4 never texted or messaged her until May 2018. He never approached her. And, in fact, when JR4 contacted IEC to ask if it was possible to works things out with Doe 1, Lamoureaux reached out to Doe 1 to share that information with her in case she wanted to work it out with him or "find out if he has been bothering you at all." At that time, Doe 1 confirmed that JR4 "has not been bothering" her. When she expressed concern, he may not have moved on, Lamoureaux told her he "will advise him to avoid contact. If he does not listen, we will take further steps." And, Lamoureaux did just that.

### *Swift and effective response to December 2017 report.*

As detailed above, the December 2017 communication was not sent to or directed at Doe 1. Nor did JR4 ask the recipient to communicate any information to Doe 1. Regardless, Counley and UNLPD looked into this further. Particularly, with respect to Doe 1, Counley assessed whether the December 2017 communication to the non-party student violated the No Contact Order between Doe 1 and JR4. Counley determined it did not because it was not sent to Doe 1, and because it did not ask the recipient to pass any information to Doe 1.

With that said, IEC and UNLPD directed JR4 to continue the no contact with Doe 1 and to cease all contact with the recipient of the December 2017 messages. Furthermore, the University restricted JR4's access to Morrison Center and prohibited him from entering that building. When Doe 1 asked for JR4's lab to be moved, it was moved. In addition, UNLPD created a safety plan with her, at which time she was offered a police escort if she ever wanted one—which she never did.

23

"Colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Papish v. Bd. of Curators of Univ. of Mo.,* 410 U.S. 667, 670, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973). The First Amendment applies with equal force on college campuses as in the wider community. *Healy,* 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266. Speech that occurs off-campus through personal devices also diminishes a school's ability to regulate that speech. *See, e.g., Mahanoy Area School Dist. v. B.L. by and through Levy,* 141 S.Ct. 2038, 2046-47 594 U.S. 180, 191 (2021). Under Title IX, an educational institution is not liable when it refrains from a form of disciplinary action that would expose it to *constitutional* or statutory claims. *Feminist Majority Found. v. Hurley,* 911 F.3d 674 (4th Cir. 2018); Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Accordingly, it is entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims. An institution cannot be directly liable for its indifference where it lacks the authority to take remedial action- such as when a disciplinary response to the alleged harassment would violate other inalterable legal commitments, such as a public institution's duty to uphold the First Amendment. *Davis,* 526 U.S. at 650.

Once again, from June 2017 through May 2018, JR4 never approached Doe 1 or talked to her, other than interaction in the course of taking the same class.

### Swift and effective response to May 2018 report.

UNLPD responded to Doe 1's May 6 email almost instantaneously. After advising her regarding safety, UNLPD and IEC set up a time to meet with Doe 1. Prior to the scheduled time, when University got repeated notice from the boyfriend of Doe 1 with respect to his concern for Doe 1's safety, Tami Strickman ("Strickman") and Officer Eric Fischer ("Officer Fischer") arranged a meeting with Doe 1 on May 10, 2017. Contrary to what Doe 1 alleges in her Complaint about the May 10 meeting, it is clear from the transcript that the meeting was conducted professionally and respectfully. Strickman did introduce herself. Officer

Fischer explained the confusion after the University received several emails from Doe 1's boyfriend. At this meeting, Strickman communicated Doe 1's options with regard to pursuing a complaint that JR4 violated the University's Student Code of Conduct.

Thereafter, IEC, through Counley, thoroughly investigated the May 5th incident. In addition, Counley investigated all of the reported incidents including the May and June 2017 interaction, December 2017 interaction, and other reported interactions with other non-party students. During the investigation, Doe 1 was provided an opportunity to provide a detailed account of her allegations against JR4; provided an opportunity and did provide information and documents in support of her complaint; informed of the investigation process and her rights and options; informed of resources available to her; provided the opportunity and did review and inspect statements and documents generated by Counley as part of her investigation into the allegations against JR4; provided the opportunity and did respond to JR4's response to her allegation in detail; provided the opportunity to provide any and all information that she thought was pertinent to the investigation; provided the opportunity to and did provide questions she wanted Counley to ask of JR4; and provided information and documents.

During the investigation, Doe 1 was informed that JR4's presence in the Morrison Center was still restricted but that he was being let in for a collaboration with a faculty member who resides in Morrison Center.

After considering all documents and information, including information provided by witnesses, Counley found JR4 violated Student Code of Conduct, Appendix A, Section 10ii, Stalking and Sections 5 and 9 of the Student Code of Conduct. She recommended one-year probation and maintaining the No Contact Order that was in place. To note, a violation under the Student Code of Conduct does not mean it met the standards or elements of Title IX claim. Counley's determination is whether JR4 violated the Student Code of Conduct, not whether the allegations meet definitions under Title IX.

Both JR4 and Doe 1—in accordance with the appeal rights they were provided—appealed. Doe 1 was provided an adequate opportunity to process and present information to the hearing officer. After a hearing, the hearing officer affirmed the decision that JR4 violated all three sections of the Student Code of Conduct but extended the probation to be for the duration of JR4's time at the University and added that JR4's access to Morrison Center is to be restricted. Specifically, JR4 was only to enter and be present in Morrison Center for academic purposes between the hours of 8 a.m. and 5 p.m., Monday through Friday.

Doe 1 appealed once more. The decision of the hearing officer was affirmed.

BRUN understands Doe 1 was not satisfied with the imposed sanctions. However, dissatisfaction does not amount to deliberate indifference. As stated above, "Title IX is not a procedure for courts to second-guess disciplinary decisions made by school administrators." *Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th 419, 423.

For instance, in *Doe v. Dardanelle School District*, 928 F.3d 722 (8th Cir. 2019), the Court held that there was no deliberate indifference where the school's response was the vice principal and a counselor "discuss[ing] the incident with" the accused student, and "sternly talk[ing] to [him] about proper behavior." *Id.* at 726. Then, in response to a second report of sexual assault, occurring in an economics class, the vice principal "and the resource officer questioned [the accused student] extensively and [he] denied the incident." *Id.* The two then told the economics instructor "about keeping a light on during movies and informed her that some inappropriate touching had been alleged." *Id.* They also told the teacher to separate the accused student and the accuser, and "eventually moved" the accuser to a different class. *Id.* at 777-78. This, too, was "not clearly unreasonable in light of the known circumstances." *Id.* at 778. *See also Thomas v. Bd. of Trustees of the Neb. State Colls.*, 667 Fed. Appx. 560 (8th Cir. 2016) (unpublished) (holding no deliberate indifference where the school responded to allegations of sexual harassment (continuous inappropriate

comments and asking a student to kiss him) by sanctioning the accused individual "with online education activities and 10 hours of community service, neither of which he completed," and allowed him to remain on campus over the plaintiff's objection, which led to the plaintiff being assaulted); and *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 325 (6th Cir. 2017) (holding that when evaluating deliberate indifference, courts must consider the institution's "overall response" to the report).

Accordingly, Doe 1 cannot show BRUN's actions or inactions were deliberate indifference, i.e. clearly unreasonable.

**2. BRUN'S appropriate and reasonable response under the circumstances involving Doe 2 and JR5.**

Similarly in Doe 2's case, the moment IEC learned of the alleged sexual harassments, Counley launched an investigation.

The evidence outlined in the Statement of Undisputed Facts establishes BRUN took the allegations of harassment seriously and conducted an investigation immediately after receiving the details of the allegations on November 21, 2021. Thereafter, BRUN took the appropriate disciplinary and remedial action—namely, expulsion of JR5.

In this case, it is undisputed that Doe 2 was provided ample opportunity to provide all allegations of harassing behavior to BRUN. Specifically, during Counley's investigation, Counley communicated (in person, via email, and phone) with Doe 2 and her advisor to get all information and documents that pertained to Doe 2's allegations of harassment by JR5. Furthermore, she communicated with both JR5 and all of the witnesses (to the extent they were willing to provide information to Counley) to get all information and documents pertinent to Doe 2's allegations.

It was only after a thorough investigation that Counley generated and provided a 58-page investigation report and finding letter to Doe 2 and JR5. Therein, Counley outlined information and documents she received from Doe 2, JR5, and witnesses, her assessment

of credibility of the information and documents received, and her findings along with her reasoning.

To the extent Doe 2 alleges the investigation took a lengthy period and that amounted to deliberate indifference, that argument must also fail. Even in circumstances where a school delayed the response, courts have held: "A school's delayed response constitutes deliberate indifference if it prejudices the plaintiff or if the delay was a deliberate attempt to sabotage the plaintiff's complaint or its orderly resolution." *Emily O. v. Regents of the Univ. of California*, No. CV-20-08159-AB-JEM, 2021 WL 1535539, at *6 (C.D. Cal. Mar. 9, 2021) (quoting *Karasek,* 956 F.3d at 1106 (citing *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006))). "As a reminder, the requisite culpability for deliberate indifference is more than "a negligent, lazy or careless response" and "Plaintiff must demonstrate that the school's actions amounted to an official decision not to remedy the discrimination." *Id.* at *8.

In this matter, for approximately three and a half months, Doe 2 conducted her own secret investigation with LPD, thereby preventing IEC from learning about the alleged sexual harassment and pursuing an investigation.

Once IEC learned of the alleged sexual harassment on November 21, 2017, IEC conducted an investigation from November 21, 2017 (the day Doe 2 filed a formal complaint) until April 6, 2018—4 months and 2 weeks. During the investigation, Counley arranged and interviewed approximately 20 witnesses, not counting Doe 2 and JR5. [Ex. RR, Investigation Report.] Counley reviewed and considered over 200 pages of documents provided by either Doe 2 or JR5.

In addition, the length of the investigation was also contributed to by Doe 2's requests for accommodation, which were granted. When Doe 2 initially reported the matter to IEC on November 21, 2017, she asked Counley to hold off from notifying JR5 until Doe 2 left town for break. Counley accommodated Doe 2's requests and notified JR5 on December 21,

28

2017—after Doe 2 left town on December 19, 2017. In addition, Doe 2 sought accommodation in the form of a lengthy period of time to review and respond to the information and written statement provided by JR5—from January 19, 2018 through February 13, 2018. This was granted. Doe 2 also requested Counley wait to receive audio recordings (and the transcripts) of phone conversations between Doe 2 and JR5 from LPD. Counley did not get access to these materials until March 7, 2018. *See Pearson v. Logan Univ.*, 937 F.3d 1119, 1126–27 (8th Cir. 2019) (holding the University was not deliberately indifferent for delaying the investigation, where delays were attributed to the student's delay in dropping her anonymity, requestion for additional time to prepare written statement, intervening holiday break). Therefore, the 4 months and 2 weeks investigation period cannot be deliberately indifferent.

After this thorough investigation, Counley made her findings and issued her recommendation of expulsion of JR5.

Then, on April 23, 2018, JR5 contacted the University notifying them he did not receive the April 6, 2018 letter notifying him of the findings. JR5 demanded a hearing, because the University did not employ delivery or read-receipt functionality when sending the letter to JR5, it was not able to confirm delivery of the letter. Therefore, the decision was made to accommodate this request. This decision is not clearly unreasonable—particularly when a failure to accommodate this request would expose the University to constitutional or statutory claims of failure to provide due process (notice and hearing) to JR5 who would lose his student status.

Doe 2 was immediately notified of this appeal. Furthermore, the appeal process was explained to her in detail. Most importantly, Doe 2 was told that Jake Johnson ("Johnson"), as the University's prosecutor, would be the one to present information in support of IEC's decision of finding and expulsion. Doe 2 was also told that she is encouraged but not required to attend this hearing. Throughout the appeal process, Johnson and others were

responsive to Doe 2's emails and addressed her questions. Furthermore, Doe 2 and her attorney were also provided the opportunity to provide their position at the pre-hearing conference with respect to what evidence they want to be included in the Hearing Packet and what ought to be redacted.

When JR5 requested the hearing be held at the end of July, Johnson communicated with both parties adequately and considered their respective positions and arguments. It was then that Johnson landed on the hearing date of May 31, 2018. This was adequate time for all involved parties to review and prepare for the hearing—considering the unredacted Hearing Packet was 535 pages and the redacted Hearing Packet was 314 pages.

Furthermore, when the University received the two offers of settlement from JR5, one of which included an offer for JR5 to leave the University for the duration of Doe 2's education, they communicated it to Doe 2 immediately. When Doe 2 declined the offer, the hearing was conducted as planned on May 31, 2018.

At the hearing, both JR5 and Doe 2 were provided the opportunity to provide information and evidence to the hearing panel. Doe 2 declined to offer any evidence, other than providing a victim impact statement. The University presented evidence and testimony in support of IEC's findings and proposed sanctions. The hearing panel affirmed both the findings and the sanction—to expel JR5.

Thereafter, on June 15, 2018, JR5 appealed within the time period allowed by the Student Code of Conduct. The appeal was processed efficiently and effectively. Laurie Bellows issued a six-page decision on July 26, 2018—therein addressing various issues raised by JR5 and his attorney. [Ex. TTT.]

Throughout this process and through her graduation, Doe 2 did not even see JR5 on University premises other than the May 31 hearing. JR5 has never messaged Doe 2 from the time he was notified of the allegations on December 21, 2017, through the date of her deposition in 2024.

**E.     PLAINTIFFS CANNOT SHOW BRUN'S DELIBERATE INDIFFERENCE CAUSED THEM TO UNDERGO HARASSMENT OR MAKE THEM LIABLE OR VULNERABLE TO IT.**

For BRUN to be held liable under Title IX, BRUN's deliberate indifference must "cause students to undergo harassment or make them liable or vulnerable to it." *Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th at 424 (quoting *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021)) (cleaned up). "The reason is that Title IX creates liability for schools that accept federal funding only if they 'subject' the student to abuse." *Id.* (citing 20 U.S.C. § 1681(a); *cf. Du Bois v. Bd. of Regents of the Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021)). In other words, an educational institution is only deliberately indifferent if its actions cause or made the individual vulnerable to *actual* further harassment. *See e.g. Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th at 424 (holding "[l]inking the college's actions or inactions to emotional trauma the plaintiff experienced in the wake of sexual harassment or assault, even if proven, is not enough."); *Shank,* 993 F.3d at 573 (holding this standard required plaintiff to demonstrate a "'causal nexus' between the college's conduct ***and the student's experience of sexual harassment or assault***;" in other words, there must be a causal nexus between an institution's action or inaction and the plaintiff's experience of *actual* further sexual harassment or assault.).

**1.  Doe 1 cannot show BRUN's actions or inactions caused her to experience actual further sexual harassment or assault.**

As shown above, there was no actionable sexual harassment in Doe 1's case. Throughout her time at the University, Doe 1 was able to attend all education programs and activities without being approached by JR4 or having personal interaction with him. Doe 1 was also able to teach her classes and do her research without JR4 coming into the rooms in which she was working.

Even assuming the December 2017 and May 2018 interactions qualify as actionable harassment under Title IX, Doe 1 cannot point to any link between actions or inactions of BRUN in the way it responded to the June 2017 report or with regard to the December 2017

and May 2018 interactions. In June 2017, there was no allegation that JR4 was harassing the non-party students to whom the messages were sent. Accordingly, there was no No-Contact Order between JR4 and the recipients of the December 2017 messages. However, when the University learned of the December 2017 interaction, it provided a no-contact directive to JR4 not to communicate with the implicated non-party students. And the interaction with these non-party students stopped. Although it is true that JR4 sent an email to Doe 1 in May 2018, that email still cannot be linked to any actions or inactions of BRUN. In fact, Brun's interventions worked for approximately a year. Even Doe 1 confirmed in October 2017 that JR4 had not been bothering her. Accordingly, the No-Contact Order issued in June 2017 cannot be linked to the May 2018 email. Finally, since January 1, 2019, Doe 1 did not have any interaction with JR4 at all.

Accordingly, BRUN is entitled to judgment in its favor with respect to Doe 1's Title IX, deliberate indifference claim.

### 2. Doe 2 did not suffer further harassment after November 21, 2017.

Doe 2 admitted she did not even see JR5 after November 21, 2017, other than the May 31 hearing. Doe 2 does not have any evidence whatsoever that JR5 distributed sensitive pictures of Doe 2 after November 21, 2017. It is correct JR5 provided one sensitive picture of Doe 2 in support of his argument that Doe 2 continued engaging in a sexual relationship with him after the alleged sexual harassment of March 2016, August 2016, and July 2017. Doe 2 also provided sensitive image of another woman she surreptitiously took off of JR5 tablet to IEC.

With respect to the Facebook picture post, the picture is presented to this Court to showcase that there is nothing sensitive about it. This picture was accidental and the posting lasted for a maximum of one hour. When it happened, Doe 2 was not even linked with JR5 on Facebook. BRUN did not have substantial control over the context—a private post of a student on his own social media. Further, attempting to punish students for a

private social media post of this nature would almost certainly run afoul of the First Amendment. Accordingly, Doe 2 cannot show any actionable sexual harassment after November 21, 2017. Nor can she show that actions or inactions of BRUN caused Doe 2 to experience these alleged acts or any other harassment.

Accordingly, BRUN is entitled to judgment in its favor with respect to Doe 2's Title IX, deliberate indifference claim.

**F.     PLAINTIFFS CANNOT SHOW ANY DAMAGES THAT ARE RECOVERABLE UNDER TITLE IX.**

In the Second Amended Complaint, Doe 1 and Doe 2 allege they suffered:

General, special, incidental, and consequential injury and damages, past, present, and future, in an amount that shall be fully proven at the time of trial. These past, present, and future damages include but are not limited to the following: a. Pain, suffering, and emotional distress; b. Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; c. Medical and medical-related expenses; d. Pharmaceutical expenses; e. Loss of education and educational opportunities; f. Loss of employment and earning capacity; g. Travel and travel-related expenses; h. Prevention from performing daily activities and obtaining the full enjoyment of life; i. Expenses and psychological treatment, therapy, and counseling; j. Loss of the ability to perform as athletes on their chosen teams; k. A loss of society and companionship; and l. All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances."

[Filing No. 20, Damages.] None of these are recoverable.

**1. Plaintiffs cannot recover damages related to emotional distress, reputational harm or punitive damages.**

A private right of action for damages under Title IX, as Spending Clause legislation, is permitted only under limited circumstances. *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992). This is because "legislation enacted pursuant to the spending power is much in the nature of a contract, and the legitimacy of Congress' exercise of its power to condition funding on state compliance with congressional conditions rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Davis*, 526 U.S. at 655.

On April 28, 2022, the U.S. Supreme Court, in *Cummings v. Premier Rehab Keller PLLC*, addressed whether emotional distress is appropriate relief in a private right action to enforce a Spending Clause statute, such as Title IX. 142 S.Ct. 1562 (2022). The Court in *Cummings* found that Congress did not give clear notice to funding recipients that they could be held liable for emotional distress damages. *Id.* at 1580. In reaching this conclusion, the Court relied on an earlier case, *Barnes v. Gorman*, 536 U.S. 181 (2002), which held that remedies for a violation of a Spending Clause statute are limited to "those remedies 'that [are] normally available for contract actions.'" *Cummings*, 142 S.Ct. at 1571. In *Barnes,* the Court held that punitive damages are not available to enforce the Rehabilitation Act, because punitive damages are not "traditionally" available for breach of contract. 536 U.S. at 185, 187.

The Supreme Court in *Cummings* followed *Barnes* and affirmed a Fifth Circuit decision that held emotional distress damages are not available to a private party suing for a violation of a Spending Clause statute, because such damages are not traditionally available in a breach of contract action. *Id.* at 1576.

In *Cummings*, the plaintiff was a deaf and legally blind person who was denied accommodation by a health-care provider, which the plaintiff alleges caused emotional distress and humiliation and caused the plaintiff to seek services elsewhere. *Cummings*, 142 S.Ct. at 1568. The plaintiff filed suit under the Rehabilitation Act and the Affordable Care Act. The Supreme Court explained the Rehabilitation Act, ACA, Title IX, and Title VI were adopted pursuant to the Spending Clause, and therefore, the types of damages recoverable are limited to those available for contract claims. *Id.* at 1569. The U.S. Supreme Court in *Cummings* found no consensus rule allowing contract damages for emotional disturbance, emotional distress, or mental pain and suffering. *Id.* Therefore, the Supreme Court held there was no grounds to conclude that federal funding recipients were on clear notice of this potential remedy. *Id.*

Although *Cummings* was brought under the Rehabilitation Act and the ACA, the Supreme Court's analysis applies to all Spending Clause statutes adopted by Congress, including Title IX. The Court's opinion specifically identifies Title IX along with the Rehabilitation Act and the ACA, and cites *Gebser*, a Title IX case, when discussing remedies in Spending Clause cases.

In fact, on June 23, 2023, the U.S. District Court for the District of Nebraska applied *Cummings* to a Title IX case. *See Abdulsalam v. Bd. of Regents of Univ. of Nebraska*, No. 4:22-CV-3004, 2023 WL 4266378, at *5 (D. Neb. June 29, 2023). So have many other courts. *See* also *Party v. Arizona Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 17459745, at *3 (D. Ariz. Dec. 6, 2022) (applying *Cummings* to Title IX claim and holding "non-contractual damages (including emotional distress and reputational harm damages) are no longer valid."); *Doe next friend of Doe v. City of Pawtucket*, No. CV 17-365-JJM-LDA, 2022 WL 4551953 (D.R.I. Sept. 29, 2022) (holding *Cummings* applies to Title IX claims, and therefore, emotional damages are unavailable in Title IX claims); and *Doe 1 v. Curators of Univ. of Missouri*, No. 19-CV-04229-NKL, 2022 WL 3366765, at *3 (W.D. Mo. Aug. 15, 2022) (holding that *Cummings* applies to plaintiffs' Title IX claims.) Therefore, it is clear *Cummings* applies to all Spending Clause statutes, including Title IX.

Therefore, as a matter of law, *Cummings* precludes liability in damages for emotional distress, punitive damages, and other non-economic damages in lawsuits brought under Title IX, and the Plaintiffs' claims for such damages should be dismissed.

Any attempt to characterize emotional distress related damage as economic damage should be declined. Specifically, as provided above, the Plaintiffs seek medical and medical-related expenses, pharmaceutical expenses, expenses of psychological treatment, therapy, and counseling. In addition, Plaintiffs seek loss of employment earning capacity. All of these alleged expenses are related to the Plaintiffs' alleged mental health conditions/emotional distress.

The court's analysis in *J.C. v. Bd. of Regents of Univ. Sys. of Georgia*, is instructive. No. 1:20-CV-4445-JPB, 2023 WL 4938054, at *4 (N.D. Ga. Aug. 1, 2023). In *J.C.*, the plaintiff requested damages related to counseling and psychiatric treatment. There, the court analyzed that these requested damages, instead of arising from claimed injury from the denial of educational benefits or opportunities, it related directly to the alleged emotional harm suffered by the plaintiff, in other words, her emotional distress. And, the court looked at and cited to several courts "where the medical expenses for psychological or mental harm are, in sum and substance, emotional distress damages":

> *See Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-00614, 2023 WL 424265, at *6 (E.D. Va. Jan. 25, 2023) (excluding evidence of "expenses for counseling and medical treatment for stomach-related issues" as "proxies for impermissible emotional distress damages"); *Oley Valley Sch. Dist.*, 2023 WL 1453143, at *4 (granting summary judgment to the defendant on the plaintiff's claims "for past, present and future medical expenses based on emotional distress such as bipolar disorder, anxiety, humiliation, embarrassment, frustration and alcohol and drug addiction and past, present and future emotional pain and suffering/mental distress"); *K.G. v. Woodford Cnty. Bd. of Educ.*, No. 5:18-555, 2022 WL 17993127, at *3 (E.D. Ky. Dec. 29, 2022) ("[C]ompensatory damages are inappropriate in this case because the only injuries that the plaintiffs have arguably alleged, if at all, are emotional in nature."), appeal dismissed sub nom. *K.G. ex rel. Doe v. Woodford Cnty., Ky. Bd. of Educ.*, No. 23-5083, 2023 WL 3198809 (6th Cir. Mar. 30, 2023); *see also, e.g., M.R. v. Burlington Area Sch. Dist.*, No. 21-CV-1284, 2023 WL 4826471, at *5 (E.D. Wis. July 27, 2023) (in a Title VII case, deciding to "join the greater number of courts that have concluded that the mental health treatment costs sought to be recovered are mere proxies for emotional distress damages and therefore unrecoverable").

Based on this, the court correctly concluded that expenses for counseling and psychiatric treatments are not recoverable under Title IX. *Id.*

The same is true in this case—both Doe 1 and 2's medical expenses, including expenses related to mental health, physical ailments, pharmaceuticals, emotional support animals (cost of dog)—are, in sum and substance, emotional distress damages.

In addition, the loss of earning capacity claim is directly tied to the emotional distress damages. Specifically, Plaintiffs' expert (Josephine Doherty)—who will not survive a Daubert challenge—relied on her assessment of the symptomology of the Plaintiffs' alleged Post-Traumatic Stress Disorder to assess loss of earning capacity for each of the Plaintiffs. [See

Ex. GGGG, Initial Report of Doherty for Doe 1; Ex. HHHH, Supplemental Report of Doherty for Doe 2; Ex. AAAA, Initial Report of Josephine Doherty for Doe 2; Ex. BBBB, Supplemental Report of Doherty for Doe 2.] Specifically, Ms. Doherty opined because the Plaintiffs possess a disability related to their mental health diagnosis, they have experienced a reduced earning capacity. [Id.] Relying on Ms. Doherty's assessment and opinion, Andrew Verzilli ("Mr. Verzilli") calculated damages for each Plaintiffs. Because the damages assessed by Mr. Verzilli is directly tied to the alleged emotional distress damages of Plaintiffs, these too must be dismissed. [See Ex. IIII, Report of Verzilli for Doe 1; Ex. JJJJ, Supplemental Report of Verzilli for Doe 1.]

**2.  Plaintiffs have not suffered any special damages as a result of BRUN's alleged deliberate indifference.**

Doe 1 alleges: (1) her graduation was delayed from December 2019 to August 2020; (2) she incurred damages when she had to buy a parking pass in May 2018 and August 2018; and (3) she quit her on-campus job as Graduate Studies Ambassador after she no longer felt comfortable promoting a university that was putting her in harm's way. [See Exhibit KKKK, Doe 1 Initial Disclosure.] It is impossible for Doe 1 to show that these alleged damages are a result of the alleged Title IX violation.

From the initial stages of Doe 1's Ph.D. program at the University until she graduated, Doe 1's plan was to graduate in 2020. Specifically, during her interview on May 10, 2018, Doe 1 expressly reported her plan to graduate in August 2020. Doe 1 did not have any interaction with JR4 from May 5, 2018 on. She took all classes she needed for her program and utilized rooms she needed for her research and teaching. Doe 1 graduated with her Ph.D., in her desired specialization, in August 2020—as she intended. Accordingly, any and all damages related to the alleged delay in graduation from December 2019 to August 2020 cannot be logically linked to the alleged Title IX violation.

As to the alleged damages related to parking and the on-campus job, Doe 1 admits JR4 never approached her in person. He never threatened to harm her physically. He never

followed her around campus. And, as it relates to the on-campus job, she resigned not because of the alleged deliberate indifference, but because of her desire not to support the University. Accordingly, these alleged damaged cannot be linked to the alleged Title IX violation.

Doe 2 claims all sorts of damages with no reason or rhyme as to how they are linked to the alleged deliberate indifference. [See Ex. WWW, Document produced by Doe 2 with respect to damages.] None can be linked to the alleged deliberate indifference. Below is a categorization of the damages she claims and an explanation of how they are not and cannot be linked to the alleged Title IX violation:

- **First category of damages that ought to be dismissed:** loans taken to fund tuition prior to receiving the department fund or any money owed to foundations from which Doe 2 received benefits. Doe 2 was awarded a funding package in May 2017. Accordingly, these alleged loans and monies provided to her by foundations were incurred prior to May 2017, i.e. prior to any alleged report of sexual harassment.

- **Second category of damages that ought to be dismissed:** flight to India and other associated costs related to this and other travel. Doe 2 decided to go to India after she graduated from the University and after teaching American Politics until August 2018. She left for India in October 2018. She left "to create the space to heal far away from the people and places that triggered the fear, stress, and anxiety I was experiencing." [Ex. WWW, Document produced by Doe 2 with respect to damages.] In other words, directly connected to emotional distress, and ought to be dismissed for the reasons provided in Section F.1. Furthermore, when questioned about it during her deposition, Doe 2 testified she also left because she was afraid of being sued by JR5 or afraid he was going to make her life difficult. Doe 2 cannot link any of her travel expenses to or from Lincoln, Nebraska to the alleged deliberate indifference.

- **Third category of damages that ought to be dismissed:** cost of extra rent in order to stay in Nebraska during Summer 2018. The hearing on this matter occurred on May 31, 2018—a hearing she was not required to attend. After April 2018, she was not required to stay in Lincoln, Nebraska for purposes of the Title IX proceedings. Moreover, Doe 2 accepted a position as an instructor to teach a class in-person at the University in the summer 2018—meaning she needed to stay in Lincoln, NE in the summer 2018 to fulfill her teaching responsibilities.

- **Fourth category of damages that ought to be dismissed:** cost related to her decision not to pursue her Ph.D. Doe 2 never saw JR5 on University premises after November 2017, other than the hearing. There was nothing preventing her from engaging in any of the educational programs offered by the University. She knew prior to the beginning of the Fall 2018 semester that JR5 was ***expelled*** from the University—the maximum consequence the University can levy. Yet, she decided not to submit an official application and pursue her Ph.D., because, as she testified, she did not want to be in Lincoln, Nebraska anymore.

Accordingly, all alleged damages of Doe 2 are not and cannot be linked to the alleged deliberate indifference of BRUN.

## VI.    CONCLUSION

For the reasons set forth herein, Defendant respectfully requests the Court grant its Motion for Summary Judgment.

Dated this 3rd day of September, 2024.

39

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA, Defendant

By:     /s/ Lily Amare
        Susan K. Sapp #19121
        Lily Amare #25735
        Cline Williams Wright
          Johnson & Oldfather, L.L.P.
        1900 U.S. Bank Building
        233 South13th Street
        Lincoln, NE 68508
        (402) 474-6900
        ssapp@clinewilliams.com
        lamare@clinewilliams.com

                AND

        Bren H. Chambers, #23150
        Deputy General Counsel
        University of Nebraska
        3835 Holdrege Street
        Lincoln, NE 68583-0745
        (402) 472-1201
        bchambers@nebraska.edu

### CERTFICATE OF COMPLIANCE

I, Lily Amare, hereby certify that this Brief complies with the limits set forth in NECivR 7.1(d). Further, based on the Word Count function of Microsoft Word 2013-word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify this Brief contains 12,975 words.

### CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

                /s/ Lily Amare
                Lily Amare

4858-7245-2057, v. 6