IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JANE DOE 1 and JANE DOE 2,

        Plaintiffs,

    vs.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA,

        Defendant.

Case No. 4:20-cv-03081

---

**BRIEF IN SUPPORT OF BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA'S DAUBERT MOTION TO EXCLUDE EXPERT TESTIMONY**

---

Submitted by:

Susan K. Sapp, #19121
Lily Amare, #25735
CLINE WILLIAMS WRIGHT JOHNSON
   & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

     AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

September 3, 2024

## TABLE OF CONTENTS

I.    BACKGROUND ................................................................................. 3

II.   PROFERRED EXPERTS .................................................................. 9

III.  LEGAL STANDARD ....................................................................... 13

IV.   ARGUMENT..................................................................................... 17

    A.    DOHERTY'S AND VERZILLI'S TESTIMONY MUST BE EXCLUDED BECAUSE EMOTIONAL DISTRESS DAMAGES ARE UNAVAILABLE IN TITLE IX CASES.................................................................................................. 19

    B.    DOHERTY IS NOT QUALIFIED....................................................... 23

    C.    DOHERTY'S AND VERZILLI'S TESTIMONY MUST BE EXCLUDED BECAUSE THEIR OPINIONS CANNOT BE TIED TO THE ALLEGED DELIBERATE INDIFFERENCE. ................................................................ 25

    D.    DOHERTY'S AND VERZILLI'S TESTIMONY WITH RESPECT TO DOE 1 MUST BE EXCLUDED BECAUSE DOHERTY'S ASSESSMENT OF WORK DISABILITY AND EARNING CAPACITY ARE UNRELIABLE.......................... 29

    E.    DOHERTY'S AND VERZILLI'S TESTIMONY WITH RESPECT TO DOE 2 MUST BE EXCLUDED BECAUSE DOHERTY'S ASSESSMENT OF WORK DISABILITY AND EARNING CAPACITY ARE UNRELIABLE.......................... 42

    F.    VERZILLI'S PROFFERED TESTIMONY WITH RESPECT TO DOE 1 AND 2 MUST BE DISMISSED. ............................................................................. 46

V.    CONCLUSION................................................................................... 48

The Board of Regents of the University of Nebraska ("BRUN" or "Board of Regents") respectfully submits this Brief in support of its Daubert Motion to Exclude the testimony and opinions of Plaintiffs' proffered Experts.

## I.     BACKGROUND

A more complete recitation of the facts in this case can be found in BRUN's contemporaneously filed Brief in Support of its Motion for Summary Judgment and the Statement of Undisputed Material Facts. BRUN incorporates the Statement of Undisputed Material Facts filed contemporaneously herewith. The following facts are of particular relevance to this motion.

### *Plaintiff Jane Doe 1 ("Doe 1")*

Doe 1 graduated with her Ph.D. in Biological Sciences, with specialization in Genetics, Cellular and Molecular Biology from the University of Nebraska-Lincoln ("University"). From 2016 through 2019, Doe 1 expressed her goal of graduating with her degree in 2020. In fact, in May 2018, she expressed her goal of graduating in August 2020. Doe 1 graduated successfully with a Grade Point Average ("GPA") of 4.0 in August 2020.

Doe 1 was in a relationship with John Roe 4 ("JR5") for approximately one year and a half, until they broke up in April 2017. In May and June 2017, JR4 communicated with Doe 1, despite Doe 1 telling him she no longer wanted to communicate with him. JR4 never threatened Doe 1 prior to May 2017 or in any of the messages in May and June 2017.  On June 28, 2017, the University of Nebraska-Lincoln Police Department ("UNLPD") and the Institutional Equity and

3

Compliance ("IEC") learned about the interactions of JR4 and Doe 1. Effective June 30, 2017, IEC issued a No-Contact Order between Doe 1 and JR4.

Since June 2017, JR4 has never approached Doe 1. At no time has JR4 threatened to harm Doe 1 physically. JR4 has never communicated with Doe 1, other than May 2018. In May 2018, JR4 sent one email to Doe 1, which Doe 1 reported to the University. The University immediately investigated the matter. After investigation, the University concluded JR4 had violated three sections of the Student Code of Conduct and levied a sanction. Doe 1 appealed twice, which appeal was administered in accordance with the University's rules and procedure. Ultimately, JR4 was placed on probation for the duration of his time at the University; the No-Contact Order was ordered to continue; and JR4 was restricted from accessing Morrison Center, where Doe 1 worked. After January 2019, Doe 1 did not see JR4.

Doe 1 began to report mental health struggles prior to June 28, 2017 (the day Doe 1 and JR4's interactions were reported to IEC). On June 1, 2017, Doe 1 was diagnosed with relationship distress with an intimate partner and anxiety disorder, unspecified. Then, on July 7, 2017, she was diagnosed with adjustment disorder with anxiety. Doe 1 does not have a diagnosis of Post-Traumatic Stress Disorder ("PTSD").

Notably, there is no assessment—objective or otherwise—of the permanency of Doe 1's mental health conditions. There is no assessment of whether she has attained maximum medical improvement ("MMI"). There are no

restrictions or limitations for any of Doe 1's diagnoses assigned by any of Doe 1's medical providers. None of her medical providers have attributed Doe 1's diagnoses to actions or inactions or deliberate indifference of the University. There are no designated experts opining with respect to any of these elements outlined in this paragraph.

The facts show that, in August 2020, Doe 1 graduated with a 4.0 GPA with her desired degree. Then, immediately thereafter, Doe 1 was gainfully employed as a Scientist in the department of Immunology at Adjuvance Technologies, Inc. ("Adjuvance"). She held this position from August 2020 to February 2022. [Ex. GGGG, Initial Report of Doherty for Doe 1 at 16.] She earned $84,000 and received benefits such as health insurance and retirement benefits. [Id. at 16.]

When the Immunology program was shut down in February 2020, she applied for and secured a Director of Research position at National Multiple Sclerosis Society. [Ex. GGGG, Initial Report of Doherty for Doe 1 at pp. 15 - 16.] She lives and works remotely from Austin, Texas. [Id. at p. 14.] Doe 1's performance evaluation is positive. [Ex. Z, Dep. of Doe 1 at 260:5:13.] At the time of her deposition, she earned approximately 107,000 per year and received benefits such as health insurance and retirement benefits. [Ex. Z, Dep. of Doe 1 at 275:4-15.]

### *Plaintiff Jane Doe 2 ("Doe 2")*

Doe 2 was a student at the University from August 2015 through May 2018. Throughout her time at the university, Doe 2 was unsure as to whether she wanted to pursue a Ph.D. at the University. While at the University, Doe 2 did not submit a memorandum of courses indicating her intent to pursue a Ph.D. In May 2018, Doe 2 successfully graduated with a Masters of Art in Political Science and a minor in Geography.

Doe 2 claims John Roe 5 ("JR5") subjected her to sexual harassment prior to August 2017. In August 2017, Doe 2 contacted Lincoln Police Department ("LPD") to prompt an investigation into these allegations. From approximately August 2017 until November 2017, Doe 2 worked secretly with LPD. Doe 2 did not want IEC to learn about her allegations against JR5.

On November 3, 2017, IEC, for the first time, learned of Doe 2's allegations of sexual harassment against JR5. Shortly thereafter, IEC reached out to Doe 2 to gather additional information about the allegation. Doe 2 agreed to meet with IEC on November 21, 2017, and submitted a formal complaint with IEC.

From approximately November 2017 until April 6, 2018, IEC investigated Doe 2's allegations thoroughly. During the pendency of this investigation, Doe 2 requested accommodations in the form of: waiting to notify JR5 until she left town (approximately a month and a half from November 3, 2017); waiting a lengthy period of time to review and respond to JR5's written response (approximately a month); and waiting a lengthy period of time to retrieve and

6

review the evidence collected and maintained by Lincoln Police Department (approximately 3 months). Specifically with respect to the evidence maintained by LPD, Doe 2 wanted IEC to review the surreptitiously recorded phone calls between Doe 2 and JR5.

IEC was able to review the recordings on March 7 and 14, 2018. After giving Doe 2 and JR5 the opportunity to review and respond to the information IEC gathered during the review of the recordings, IEC issued its findings on April 6, 2018, including a 48-page Investigation Report. IEC found JR5 violated the Student Code of Conduct. The recommended sanction was expulsion of JR5.

JR5 appealed 7 days after the appeal deadline passed. JR5 claimed he did not receive the findings letter that was sent to him. Because IEC did not utilize a delivery or read receipt on the email sent to JR5, the University could not confirm delivery. Based on that the University granted his request. The appeal was then administered in accordance with the University's rules and procedures. The hearing panel affirmed IEC's findings and the sanction of expulsion. JR5 appealed again; this time within the time frame allowed by the University's rules and procedures. This appeal was also administered in accordance with the University's rules and procedures. The ultimate decision was a permanent expulsion of JR5.

Doe 2 began to report mental health struggles prior to November 3, 2017 (the day Doe 2's allegations of sexual harassment against JR5 was reported to IEC). Specifically, Doe 2 reported the following symptoms to medical providers:

7

feelings of PTSD, OCD, Trichotillomania, stress eating, severe anxiety, sleep disturbance, and attention issues. Prior to November 2017, Doe 2 reported to her medical provider a history of depression, anxiety, PTSD and gastrointestinal issues. Prior to November 2017, Doe 2 was diagnosed with generalized anxiety disorder-severe with panic attacks, Trichotillomania, Obsessive Compulsive Disorder, Attention deficit disorder predominate inattentive type. Moreover, on April 20, 2018, a PTSD diagnosis was added.

Again, in Doe 2's case, there is no assessment—objective or otherwise—of the permanency of Doe 2's mental health conditions. There is no assessment of whether she has attained maximum medical improvement ("MMI"). There are no restrictions or limitations for any of Doe 2's diagnoses assigned by any of Doe 2's medical providers. None of her medical providers have attributed Doe 2's diagnoses to actions or inactions or deliberate indifference of the University. There is no assessment that Doe 2 is unable to pursue a Ph.D. because of her diagnoses. There are no designated experts opining with respect to any of these elements outlined in this paragraph.

After Doe 2 graduated with her Master's, she taught as an instructor at the University until August 2020. She travelled to India from October 2018 to January 2019. From August 2019 to present, Doe 2 has been working at Caregility. [Ex. AAAA, Initial Report of Doherty for Doe 2 at p. 13.] From August 2019 to March 2022, she served as a Technical Writer. Then, in March 2022,

she became the Compliance Specialist. [Id.] In 2023, she was earning approximately $64,000, with health and retirement benefits.

## II.    PROFERRED EXPERTS

Both Plaintiffs have designated Doherty and Verzilli as experts. To keep the opinions linear, BRUN outlines the opinions for each Plaintiff separately.

### *Doherty's and Verzilli's opinions with respect to Doe 1.*

Doherty was hired for purposes of "vocational evaluation for the purpose of determining [Doe 1's] earning capacity due to ongoing post-traumatic anxiety related to lack of supportive services, including apprising her of her Title IX rights, while enduring on ongoing sexual harassment by a fellow student in her graduate program at the University of Nebraska—Lincoln." [Ex. GGGG, Initial Report of Doherty at p. 1; Ex. HHHH, Supplemental Report of Doherty.]

Relying on Doe 1's medical record and subjective information provide by Doe 1, Doherty claims Doe 1 is a "worker with disability, who has experienced a reduced earning capacity." [Id. pp. 19 – 20.] Specifically, along with an extensive list of uncorroborated factual allegations and conclusory allegations, Doherty purports to offer the following opinions:

- Doe 1 was not offered appropriate support by the University;

- Doe 1 experienced ongoing anxiety-related trauma since unfortunate "stalking incidents" that occurred while she was a graduate student, "as the University of Nebraska-Lincoln did not offer her appropriate supports;"

9

- Doe 1 has experienced PTSD symptomology, which has adversely impacted her work;

- Doe 1 has experienced "'impairments' as associated with ongoing PTSD symptomatology," which in Doe 1's case is a decreased concentration secondary to severe anxiety-related trauma;

- Because the impairments result in reduced efficiency, she has a work disability. Primarily, Doe 1 has to work 10 to 11 hours per day, to complete 8 hours work;

- And, therefore, instead of her current job which pays $104,000" she should be earning the average salary of an individual who works in the position of "scientific research and development services specialist," which is $162,240.

Verzilli is designated to serve as an economic consultant. [Ex. IIII, Report of Verzilli for Doe 1; Ex. JJJJ, Supplemental Report of Verzilli for Doe 1.] The only documents Verzilli reviewed and relied upon are the Second Amended Complaint, the vocational report prepared by Doherty, and various publications or source documents as cited in his report. [Id.]

Verzilli is expected to opine that Doe 1's present compensation would increase over the next 10 years to reach the estimated earning capacity in Ms. Doherty's report of $162,240. The $162,240 is the same figure Doherty claimed in her report Doe 1 should be earning in 2023. Verzilli assumed benefits would constitute five percent of the earnings. Verzilli added the present value of the

10

benefits as a separate line item but failed to know and account for the benefits she receives from her current position. Relying on his 10-year assumption and adding benefits as a separate line item, Verzilli calculated Doe 1's future loss of earning capacity as: $1,531,472.

### *Doherty's and Verzilli's opinions with respect to Doe 2*

Doherty was employed as an expert for vocational evaluation of Doe 2 "for the purpose of determining her earning capacity due to ongoing anxiety-related trauma associated with sexual assaults and abuse she endured while a student with the University of Nebraska—Lincoln (UNL). Specifically, when she reached out to UNL for support with the Title IX process, the unlawful behavior on the part of the student who abused her was both minimized and inappropriately handled." [Ex. AAAA, Initial Report of Doherty for Doe 2; Ex. BBBB, Supplemental Report of Doherty for Doe 2.]

Doherty took a similar approach with Doe 2—relied only on Doe 2's medical records and subjective information provided by Doe 2 to gather information specific to Doe 2. [Id.] Doherty's report is littered with uncorroborated and conclusory factual allegations, and statements that are false. The following highlights the false narrative provided to Doherty:

- Doe 2 experienced a significant deterioration of her mood functioning, particularly in terms of depressive symptomology and posttraumatic anxiety because "her plea for help was met with resistance;"

11

- That Doe 2's PTSD treatment not only relates to the abusive relationship, but more concerning when Doe 2 reached out to the University for support with the Title IX process, her needs and safety came secondary to JR5;

- Because Doe 2's rights to a fair Title IX process were not granted, thereby resulting in a deterioration in her mental health state, she was unable to progress with her doctoral degree as planned and simply graduated with a master's degree;

- Because she did not progress educationally, she has been working in a position that is not remotely related to her field of choice, political science;

- Because Doe 2 was precluded from completing her educational training as she had planned, she is "considered a worker with a disability," who experienced a reduced earning capacity;

- Doe 2 possesses a "work disability because she is unable to complete an eight- hour day without significant interruptions due to psychologically-based reasons;" and

- Therefore, instead of $64,000, she should be earning the median annual wages of an individual with a doctoral degree, which was $99,268 in 2021.

[Id.]

Relying on Doherty's vocational assessment, Verzilli calculated the future loss of earning capacity for Doe 2. [Ex. CCCC, Report of Verzilli for Doe 2.] The only documents Verzilli reviewed and relied upon are the Second Amended Complaint, the vocation report prepared by Doherty, and various publications or

source documents as cited in his report. [Id.] Verzilli assumed benefits would constitute five percent of the earnings.

Verzilli relied on the $99,268 figure provided by Doherty. He took a similar approach of adding the present value of benefits as a separate line item but failed to know and account for the benefits Doe 2 receives from her current position. Based on that, Verzilli calculated Doe 2's future loss of earning capacity as: $1,034,014.

For purposes of both Doe 1 and Doe 2, it is clear Doherty's and Verzilli's testimony is being offered not to prove actual damages in this matter, but rather, to show the jury some amount, any amount, that Doe 1 and 2 can claim as "damages" in support of their respective claims against BRUN. To highlight, in both Plaintiffs' cases, exclusion of Doherty's testimony will have a domino effect on Verzilli's testimony. Doherty and Verzilli should be denied the opportunity to testify because their opinion is premised on speculation and hearsay, and their opinions were rendered using an unreliable method or principle.

### III.    LEGAL STANDARD

Federal Rules of Evidence Rule ("Rule") 702 tasks this Court with the gatekeeping role of ensuring an expert's opinion is relevant and reliable. *Shipp v. Murphy*, 9 F.4th 694, 700 (8th Cir. 2021) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Rules 702 and 703, as interpreted in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of an expert witness' testimony.

13

Rule 702 requires experts have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702; *see Lauzon v. Senco Prod., Inc.,* 270 F.3d 681, 686 (8th Cir. 2001) (internal citation omitted) ("Evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact."). Moreover, experts are qualified by their "knowledge, skill, experience, training, or education." *Adams v. Toyota Motor Corp.,* 867 F.3d 903, 915 (8th Cir. 2017) (explaining that the district court must determine whether the expert has "knowledge and experience [in] the relevant discipline.") (citation omitted).

The proposed opinion must be reliable or trustworthy. The court's inquiry into the reliability of the proposed opinion is three dimensional. One, the proponent of the testimony "must show that "the testimony is based on sufficient facts or data." FED. R. EVID. 702(b). This means that an expert's opinions must be based on more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. Two, the proponent must demonstrate that "the testimony is the product of reliable principles and methods." FED. R. EVID. 702(c). "[T]o satisfy the reliability requirement, the proponent of the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 757–58 (8th Cir.). Three, the expert must apply the principles and methods to the facts of the case. *See*

FED. R. EVID. 702(d). In doing so, the expert must employ the "same level of intellectual rigor" in their testimony as the practice of an expert in their relevant field. *Marmo*, 457 F.3d at 757 (quoting *Kumho Tire Co.*, 526 U.S. at 152). All the requirements of Rule 702 must be met as a precondition to admissibility. *General Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997).

"A court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'" *Marmo*, 457 F.3d 748 (8th Cir. 2006) (quoting *General Elec. Co.*, 522 U.S. at 146). If an "expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005).

The party proffering expert testimony carries the burden of establishing its admissibility by preponderance of the evidence. *Polski v. Quigley Corp.*, 538 F.3d 836, 841 (8th Cir. 2008). In 2023, Rule 702 was amended to clarify the application of the preponderance standard. Specifically, Rule 702 was amended to add the language bolded below and remove the stricken language:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if **the proponent demonstrates to the court that it is more likely than not that**:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert**'s** ~~has reliably applied~~ **opinion reflects a reliable application of** the principles and methods to the facts of the case.

Rule 702. These criteria are drafted in the conjunctive, and so subsections (a) through (d) must all be met for expert testimony to be admissible.

The advisory committee notes explain that the new language in the opening paragraph was intended to emphasize the preponderance standard generally applicable to admissibility determinations, stating: "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." *Id.,* advisory committee notes to 2023 amendment. Thus, only "once the court has found it more likely than not that the admissibility requirement has been met," will an "attack by the opponent . . . go only to the weight of the evidence." *Id.*

The amendment was "made necessary by courts that have failed to apply correctly the reliability requirements of that rule." *Id.* The notes also clarify that the preponderance standard under Rule 104(a)—rather than Rule 104(b)— applies not only to the three criteria relevant to reliability, but also to the expert's qualifications and to whether the proffered testimony will be helpful to the trier of fact. *Id.*

# IV.    ARGUMENT

Understanding each Plaintiffs claims against BRUN is paramount when assessing Doherty's and Verzilli's expert opinions in this matter. The only claim that remains to be litigated is each Plaintiff's respective Title IX, deliberate indifference claim. A complete analysis of Title IX, deliberate indifference claims is found in the contemporaneously filed Brief in Support of the Motion for Summary Judgment. To highlight, for BRUN to incur liability under Title IX, "it must be (1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control.'" *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) (citation omitted). BRUN can only be liable under Title IX for situations in which it "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* (quoting *Shrum ex. rel. Kelly v. Kluck*, 249 F.3d 773,782 (8th Cir. 2001)). Moreover, BRUN's conduct—the alleged deliberate indifference—must "cause the student to undergo harassment or make them liable or vulnerable to it." *Doe. v. Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th 419, 424 (8th Cir. Aug. 15, 2023) (quoting *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021))(cleaned up).   In Title IX lawsuits, emotional damages are unavailable. *See Cummings v. Premier Rehab Keller*, P.L.L.C., 596 U.S. 212 (April 28, 2022).

As a preliminary matter, Doherty's offered opinions are irrelevant to Plaintiffs' claims. There is no use for such opinions other than to confuse the trier of fact as to the damages that are available under a Title IX claim. In

17

addition, Doherty is not qualified to testify, nor is her testimony premised on reliable facts. Doherty has provided no reliable method or principles by which she evaluated the "work disability" and the loss of earning capacity. Doherty has failed to employ reliable principles to determine whether the University has violated Title IX (to the extent she plans to opine with respect to that) or whether the University engaged in the actions or inactions the Plaintiffs claim. And, certainly, Doherty cannot show that the alleged "working disability," "impairment," or the claimed "loss of earning," were caused by the actions or inactions of the University.

Plaintiffs' attempt to prove a loss of income resulting from the alleged violations are not probative. The materials reviewed by Doherty to arrive at her proffered opinion consist only of the Plaintiffs' medical records, subjective information provided by the Plaintiffs' and various publications and sources that are either wholly irrelevant to this matter or are community data that is not sufficiently tailored to the Plaintiffs. [Exs GGGG, HHHH, AAAA, BBBB.]

As provided above, the exclusion of Doherty's opinions necessitates exclusion of Verzilli's opinions. In addition to that, Verzilli's opinions have their own issues of: (1) not being congruent with Doherty's opinion; and (2) failing to appropriately account for retirement benefits.

**A.    DOHERTY'S AND VERZILLI'S TESTIMONY MUST BE EXCLUDED BECAUSE EMOTIONAL DISTRESS DAMAGES ARE UNAVAILABLE IN TITLE IX CASES.**

Doherty's and Verzilli's testimony are premised on Plaintiffs claimed emotional distress, which is not recoverable under Title IX, and therefore, irrelevant.[1] "This Court acts as a gatekeeper, ensuring that only relevant and reliable scientific evidence is admitted at trial." *Gutherless v. Union Pac. R.R. Co.*, No. 8:20CV442, 2021 WL 5958355, at *1–2 (D. Neb. Dec. 16, 2021) (citation omitted).

A private right of action for damages under Title IX, as Spending Clause legislation, is permitted only under limited circumstances. *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992). On April 28, 2022, the U.S. Supreme Court, in *Cummings v. Premier Rehab Keller PLLC*, addressed whether emotional distress is appropriate relief in a private right action to enforce a Spending Clause statute, such as Title IX. 596 U.S. 212 (2022). The Court in *Cummings* found that Congress did not give clear notice to funding recipients that they could be held liable for emotional distress damages. *Id.* at 215. In reaching this conclusion, the Court relied on an earlier case, *Barnes v. Gorman*, 536 U.S. 181 (2002), which held that remedies for a violation of a Spending Clause statute are limited to "those remedies 'that [are] normally available for contract actions.'" *Cummings*,

---

[1] The matter of emotional distress damages is also addressed in the contemporaneously filed Brief in Support of Summary Judgment and is repeated herein to ensure BRUN does not waive this argument.

596 U.S. 1t 214. The Supreme Court in *Cummings* followed *Barnes* and affirmed a Fifth Circuit decision that held emotional distress damages are not available to a private party suing for a violation of a Spending Clause statute, because such damages are not traditionally available in a breach of contract action. *Id.* at 229-30.

In *Cummings*, the plaintiff was a deaf and legally blind person who was denied accommodation by a health-care provider, which the plaintiff alleges caused emotional distress and humiliation and caused the plaintiff to seek services elsewhere. *Id.* at 218. The plaintiff filed suit under the Rehabilitation Act and the Affordable Care Act. *Id.* The Supreme Court explained the Rehabilitation Act, ACA, Title IX, and Title VI were adopted pursuant to the Spending Clause, and therefore, the types of damages recoverable are limited to those available for contract claims. *Id.* at 218-19. The U.S. Supreme Court in *Cummings* found no consensus rule allowing contract damages for emotional disturbance, emotional distress, or mental pain and suffering. *Id.* Therefore, the Supreme Court held there was no grounds to conclude that federal funding recipients were on clear notice of this potential remedy. *Id.*

Although *Cummings* was brought under the Rehabilitation Act and the ACA, the Supreme Court's analysis applies to all Spending Clause statutes adopted by Congress, including Title IX. The Court's opinion specifically identifies Title IX along with the Rehabilitation Act and the ACA, and cites *Gebser*, a Title IX case, when discussing remedies in Spending Clause cases.

Since the issuance of *Cummings*, the U.S. District Court for the District of Nebraska applied *Cummings* to a Title IX case. *See Abdulsalam v. Bd. of Regents of Univ. of Nebraska*, No. 4:22-CV-3004, 2023 WL 4266378, at *5 (D. Neb. June 29, 2023). So have many other courts. *See* also *Party v. Arizona Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 17459745, at *3 (D. Ariz. Dec. 6, 2022) (applying *Cummings* to Title IX claim and holding "non-contractual damages (including emotional distress and reputational harm damages) are no longer valid."); *Doe next friend of Doe v. City of Pawtucket*, No. CV 17-365-JJM-LDA, 2022 WL 4551953 (D.R.I. Sept. 29, 2022) (holding *Cummings* applies to Title IX claims, and therefore, emotional damages are unavailable in Title IX claims); and *Doe 1 v. Curators of Univ. of Missouri*, No. 19-CV-04229-NKL, 2022 WL 3366765, at *3 (W.D. Mo. Aug. 15, 2022) (holding that *Cummings* applies to plaintiffs' Title IX claims.) Therefore, it is clear *Cummings* applies to all Spending Clause statutes, including Title IX.

Therefore, as a matter of law, *Cummings* precludes liability in damages for emotional distress and other non-economic damages in lawsuits brought under Title IX.

Doherty's and Verzilli's loss of earning capacity opinions are directly tied to Plaintiffs 'claimed emotional distress. Specifically, Doherty relied on review of Plaintiffs' mental health records and her own assessment of the symptomology of the Plaintiffs' alleged Post-Traumatic Stress Disorder to assess loss of earning capacity for each of the Plaintiffs. Doherty opined that because the Plaintiffs

possess a disability related to their mental health diagnosis, they have experienced a reduced earning capacity. Specifically, with respect to Doe 1, Doherty wrote:

> As reflected in the medical and psychological records, as well as during the clinical/vocational interview, [Doe 1] has experienced "impairments" as **associated with ongoing PTSD symptomatology**. In vocational terms, an impairment refers to a specific limitations, which in this particular case refers to a mental limitation. The impairments [Doe 1] experiences **relate to decreased concentration secondary to severe anxiety-related trauma**. Because these impairments result in reduced efficiency, in turn this results in a work disability. A work disability occurs when a worker's ability to produce is adversely impacted. In [Doe 1's] particular case, her work disability is associated with the fact that she needs to work longer hours, such as working 10 to 11 hours per day in both her previous and current positions, in order to complete 8 hours' worth of work.

[Ex. GGGG, Initial Report of Doherty for Doe 1 at pp. 19 -20 ] (emphasis added).

With respect to Doe 2, Doherty wrote:

> Regretfully, [Doe 2] **started to experience anxiety-related trauma** due to an abusive relationship. . . .During this time when her plea for help was met with resistance, [Doe 2] experienced a significant deterioration in her mood functioning, particularly in terms of depressive symptomatology and posttraumatic anxiety.
> …
> Due to the abusive relationship, [Doe 2] initially **sought mental health treatment** with UNL in October of 2016, which was approximately five months into their dating relationship. At the time, she was diagnosed with adjustment anxiety. She initially started with psychotherapy which then progressed to psychiatric care, and she received a host of diagnoses until she was ultimately diagnosed with posttraumatic stress disorder, specifically associated with her then former abusive relationship with Mr. Pirsch.

. . .

Ultimately, because [Doe 2]'s rights to a fair Title IX process were not granted, thereby resulting in a deterioration in ***her mental health state***, she was unable to progress with her doctoral degree as planned. As a result, she simply graduated with a master's degree. Because she did not progress educationally, she has been working in a position that is not remotely related to her field of choice, political science.

Within the context of the vocational interview, [Doe 2] was interviewed with respect to DSM-5 criteria relating to posttraumatic stress disorder. As indicated in the <u>current mental health</u> <u>symptoms</u> section of this report, [Doe 2] ***meets full diagnostic criteria for posttraumatic stress disorder, which at this juncture would be considered "prolonged***."

. . .

[Doe 2] possesses a work disability because she is unable to complete an eight- hour day without significant ***interruptions due to psychologically-based reasons***.

[Ex. AAAA, Doherty's Initial Report with respect to Doe 2 at 19-20.] (emphasis added) Then, by virtue of Doherty's assessment and opinion that the Plaintiffs suffer a work disability as a result of the claimed emotional distress, Verzilli calculated future earning capacity. [Ex. CCCC, Report of Verzilli for Doe 2.] The expert reports are self-explanatory that the opinions of Doherty and Verzilli are, in sum and substance, emotional distress damages; hence, they must be excluded in their entirety.

## B.    DOHERTY IS NOT QUALIFIED.

"[E]xperts or skilled witnesses will be considered qualified if, and only if, they possess special skill or knowledge respecting the subject matter involved so

superior to that of persons in general as to make the expert's formation of a judgement a fact of probative value." *Turner v. Moen Steel Erection, Inc.,* No. 806CV227, 2007 WL 1658683, at *7 (D. Neb. June 5, 2007) (quoting *Hoffart v. Hodge*, 9 Neb. App. 161, 173, 609 N.W.2d 397, 407 (2000)).

Doherty's formal education consists of a Bachelor of Science degree in Human Services, a Master of Science degree in Community Counseling, and a Master of Art degree in psychology. [Ex. YYY, Doherty Curriculum Vitae.] Doherty has been a Rehabilitation Case Manager at Keystone Rehabilitation Incorporated from 1996 to 2001; a psychological Evaluator/Cognitive Rehabilitation Therapist at Allied Services, Psychology Department from 1999 to 2014; and a Mental health Therapist/Psychological Examiner at Comprehensive Assessment and Rehabilitation Services, Inc. from 2012 to present. Doherty also serves as an independent contractor at Social Security Administration from 2008 to present. When asked about her Social Security Administration experience, Doherty explained that her function is to review records and determine, based on functional limitations of the Social Security applicant, whether there are jobs available to that applicant. [Ex. DDDD, Dep. of Doherty at 30:2 -34:22.] Essentially, Doherty's role is to review the restrictions of the individual and determine whether the individual was capable of competitive employment from a vocational perspective. [Id.]

Doherty's education and experience do not lend support for Doherty's qualification to opine on the issues of whether the Plaintiffs' have a "work

disability." Specifically, Doherty testified that she relied on the definition of disability under the American with Disabilities Act ("ADA"). As Doherty admitted, she is not a "legal expert," and therefore is not qualified to assess "work disability." Nor can Doherty be allowed to testify as to whether the requested accommodations of Plaintiffs for their purported limitations or restrictions are reasonable under the ADA or any other laws.

In addition, Doherty does not have training or expertise to perform a labor market assessment or wage assessment, including for the occupations of Plaintiffs. Simply stated, Doherty does not have "sufficient 'specialized knowledge [to] help the trier of fact to **understand the evidence or to determine a fact in issue**.'" *Shipp*, 9 F.4th at 701 (emphasis added) (quoting Fed. R. Evid. 702(a)).

## C. DOHERTY'S AND VERZILLI'S TESTIMONY MUST BE EXCLUDED BECAUSE THEIR OPINIONS CANNOT BE TIED TO THE ALLEGED DELIBERATE INDIFFERENCE.

No expert has been designated to testify that any of Plaintiffs' mental health conditions or physical ailments were caused by the University's response to Plaintiffs' alleged report of sexual harassment. "Courts have required expert testimony to establish causation where a plaintiff alleges an injury which a lay person would not normally understand to result [from] the conduct of the defendant or where the cause of the injury is not obvious." *Haycraft v. Flat Land Transp, Inc.*, No. 2:09CV23MLM, 2010 WL 3001860, at *2 (E.D. Mo. July 28, 2010). *See Kovacic v. Ponstingle*, No. 1:05CV2746, 2014 WL 4715859, at *2 (N.D. Ohio Sept. 22, 2014) (holding plaintiffs may not testify as to causation).

25

Doherty testified she has not made an assessment of whether any of the mental health conditions of Doe 1 and Doe 2 were caused by the University's actions or inactions (pieced together from various parts of the deposition):

Q. And you have told me in your prior deposition that you are not diagnosing anybody [Doe 1 and Doe 2] with PTSD; correct?

A. **Correct.**

Q. And there are no notation in any of her [Doe 1] medical records stating that her alleged mental condition was caused by the university's response; correct?

A. **Correct.**

Q. And you are not making an assessment that the alleged mental health situation were caused by the university's response; correct?

A. **Correct.**

Q. And there is no notation in any of her medical records stating that her [Doe 2] alleged mental health conditions were caused by the university's response to the allegations of sexual harassment; correct?

A. **Correct.**

Q. Nor are you opining so; correct?

A. **Correct.**

Q. Nor any of the medical providers or you are opining that these physical symptoms [referring to Doe 2's alleged physical symptoms] were caused by the university's response to the Title IX report; correct?

A. **No.**

Q. And you are not a medical doctor; correct?

A. **Correct.**

Q. So you have not assessed her for any medical conditions that may be going on physically rather than mentally; correct?

A. **Correct.**

[Ex. DDDD, Dep. of Doherty at 172:24 – 10;  175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

26

Nor can Doherty or Verzilli testify to causation. A person may not testify as an expert witness unless that person has an adequate basis and proper foundation for their opinion. Specifically, FED. R. EVID. 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Plaintiffs' experts certainly do not have an adequate basis or proper foundation. Doherty's basis of investigation of the facts entailed reviewing the medical record of the Plaintiffs and talking to the Plaintiffs. Doherty testified she did not talk to any of the other individuals involved, including: JR4, JR5, Meagan Counley, Tami Strickman, Jeff Lamoureaux, and Morgan Beal. Doherty did not review any deposition transcripts. Doherty testified she did not review any of the Title IX related documents. The following exchange highlights Doherty's perspective with respect to her efforts, or lack thereof, to get a holistic picture of what transpired, including the University's response (compilation of testimony):

> Q. And, again, you have not assessed whether or not these particular things about the university are correct or true; correct?
>
> A. **That assertion was based upon [Doe 2]'s self-report.**
>
> Q. And you have relied on that without any additional investigation into the issue; correct?
>
> A. **I -- again, I am not a *Title IX investigator*. This was based upon her report.**

27

...

Q. (By Ms. Amare) Do you know about the meeting between Title IX, Officer Kristy, and [Doe 1] on June 29, 2017?

A. **Other than what she described to me, no, but, again, I didn't have specific dates because [Doe 1] was based upon -- was offering her information based upon her free recall, not referring to a journal or anything. So I did not have specific dates.**

Q. And you have not asked for any documents about it; correct?

A. **I -- I specifically asked for anything...**

Q. Ms. -- go ahead.

A. **I -- but I did. So I don't -- I can answer it then. I -- so I asked for anything relevant, such as depositions, educational records, vocational records, anything that was relevant for my analysis. So I would not know that such a document exists, but I -- you know, but I would consider that irrelevant to the -- me, but that's all I can say.**

Q. Your testimony is that you consider that irrelevant to you; correct?

A. **Right. Because I am not an investigator.**

...

Q. You have mentioned multiple times now that you are not an investigator; correct?

A. **Correct.**

Q. And your statement about with her lack of support by the university, you are just taking her word that there was a lack of support; correct?

A. **In addition -- in addition to her report to me, it was also referenced in her psychological and psychiatric records.**

Q. And, again, that is a subjective information that is being provided to the medical providers**;**

A. **Correct.**

[Ex. DDDD, Dep. of Doherty at 284:2 – 10; 157:5 – 158:11; 172:15 – 173:10.] In other words, Doherty did not review any of the records that relate to the alleged sexual harassment or the University's response to Plaintiffs' allegations of sexual harassment, including the pertinent records being provided to the Court

28

contemporaneously herewith. Nor did Verzilli. [Ex. IIII, JJJJ, CCCC.] When she was asked the specifics of each of Plaintiffs' allegations she relied upon, it was evident Doherty did not conduct even the slightest research into the context surrounding their allegations.

This means Doherty and Verzilli cannot testify based on a reasonable degree of medical or professional certainty that mental health conditions and their symptoms were caused by the alleged sexual harassment or by how the University handled the complaints of alleged sexual harassment. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)) ("a court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'"). Accordingly, Doherty's and Verzilli's opinions are inadmissible because, as a matter of law, it is insufficiently definite to establish causation and thus speculative, not helpful to the trier of fact, and irrelevant.

## D.    DOHERTY'S AND VERZILLI'S TESTIMONY WITH RESPECT TO DOE 1 MUST BE EXCLUDED BECAUSE DOHERTY'S ASSESSMENT OF WORK DISABILITY AND EARNING CAPACITY ARE UNRELIABLE.

Doherty's expert testimony is fundamentally unsupported and is speculative. "While the factual basis of an expert opinion generally goes to its credibility rather than its admissibility, . . . expert testimony that is 'speculative, unsupported by sufficient facts, or contrary to the facts of the case' is inadmissible . . . ." *Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 970 (8th Cir. 2023) (citations omitted). *See Lancaster*, 75 F.4th at 970 (citing *Hartley v. Dillard's, Inc.*,

310 F.3d 1054, 1061 (8th Cir. 2002) (expert opinion that is "so fundamentally unsupported that it can offer no assistance to the jury" should be excluded.) In other words, "opinion testimony is admissible only if it is 'relevant to the task at hand.'" *In re Pork Antitrust Litig.*, No. CV 18-1776 (JRT/JFD), 2023 WL 2696497, at *6 (D. Minn. Mar. 29, 2023) (citing *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786). "This means that the Court should consider whether the 'opinion offered by the expert is sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute.'" *Id.* (citing *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001)).

In addition, Doherty fails to articulate reliable methodology and reasoning for her conclusions. "[V]ague and conclusory" testimony and "stock phrase[s]", unsupported by "articulated reasoning", is not sufficient. *Innogenetics, N.V. v. Abbott Labs*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (citation omitted).

First, Doherty's assessment of Doe 1 utilizing DSM-V diagnostic criteria for post-traumatic stress disorder must be disregarded completely. Doherty is adamant that she did not diagnose Doe 1 with PTSD. Doherty also acknowledged that none of Doe 1's medical providers have diagnosed Doe 1 with PTSD. Yet, she assesses Doe 1's symptomology and concludes that Doe 1 has been "plagued by continual PTSD symptomatology, which has adversely impacted work." It is apparent that Doherty's opinion is based solely on Doe 1's design for purposes of litigation, and that Doherty has not considered, has no opinion on, and cannot reliably testify to the issue of PTSD with respect to Doe 1.

Second, Doherty's claim that Doe 1 possesses a chronic, work disability is wholly unsupported and unreliable. As a threshold matter, Doherty's legal opinions and conclusions as to "disability" are inadmissible. Specifically, Doherty testified that her definition of "disability" is from the ADA. [Ex. DDDD, Dep. of Doherty at 133:5 – 12.] Meaning, she is attempting to offer an opinion as to whether the restrictions or limitations of Doe 1 are considered a disability under the ADA. In addition to the fact that she is not qualified to provide such an opinion, such an opinion is inadmissible as it is a legal conclusion. *See Doe v. Bd. of Regents of Univ. of Nebraska*, No. 4:20CV3036, 2022 WL 3566990, at *2 (D. Neb. Aug. 18, 2022) (holding to the extent the expert "proposes to offer an opinion as to whether the Board's investigation contravened Title IX, the opinion is inadmissible in these circumstances."). *See also S. Pine Helicopters, Inc. v. Phx. Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible."); and *Williams v. Wal-Mart Stores, Inc.*, 922 F.2d 1357, 1360 (8th Cir. 1990) (noting expert "testimony is not objectionable merely because it embraces an ultimate issue" but can be excluded "if it is so couched in legal conclusions that it supplies the fact finder with no information other than what the witness believes the verdict should be.").

Doherty plainly agrees that a vocational assessment must be based on rehabilitation plan, access to the labor market, placeability, earning capacity and labor force participation. "Rehabilitation plan" is "a plan for someone to move forward with their work in spite of a disability." [Ex. DDDD, Dep. of Doherty at

183:22 – 184:10.] "Access to the labor market" refers to her "ability to have the full range of jobs that an individual with a non-work-related disability would have or work disability would have." [Ex. DDDD, Dep. of Doherty at 186:19 – 188:24.] "Placeability" is "whether or not they can secure a job." [Ex. DDDD, Dep. of Doherty at 191:3 – 191:11.] "Earning capacity" is "what a person is capable of earning." [Ex. DDDD, Dep. of Doherty at 191:12 – 191:14.] Labor force participation is "whether a person is employed or unemployed." [Ex. DDDD, Dep. of Doherty at 191:15 – 191:16.] Doherty has failed to appropriately assess each of these factors.

In this case, Doe 1 graduated with her Ph.D. in August 2020 with a 4.0 GPA. During her time at the University, she served as a Research Assistant, as a Fellow for the Molecular Mechanisms of Disease predoctoral training program and as Teaching Assistant for laboratory courses. [Statement of Undisputed Facts, ¶ 46 – 47.] Although there was no requirement to publish articles while she was pursuing her Ph.D. at the University, Doe 1 published a total of five articles, three of which were after 2017. [Statement of Undisputed Facts, ¶ 46.] All this she accomplished while she successfully completed the required courses and dissertation for her rigorous program.

Immediately after graduation, Doe 1 secured a position she desired. [Ex. Z, Dep. of Doe 1 at 259:19-260:21.] In this role, she "led the immunology team, which  was a team responsible for the preclinical testing of the vaccine and

vaccine product efficacy for that company." [Id.] Doe 1 described this position as follows:

> Duties included leading a team of research associates and postdoctoral researchers to design and execute all non-GLP preclinical testing of adjuvant and vaccine products. As a member of the Senior Leadership Team, participated in strategic discussions and decisions. Presentation of technical information to current and potential partners to facilitate successful experimental design. Frequent communication of complex scientific data and literature to the entire company, including non-scientific staff.

[Ex. Y, Doe 1, Resume.] Doe 1 had a positive performance evaluation at this position. [Ex. Z, Dep. of Doe 1 at 259:19 - 260:21.]

When the Immunology program was shut down, within a matter of two months, she secured a position as the Director of Research at the National Multiple Sclerosis Society—a position which paid almost $20,000 more than her previous position as a Scientist. [Ex. Z, Dep. of Doe 1 at 275:4-15.] In this role, she performs the following functions:

> Act as a program for a portfolio of fellowship and training awards and grants. Coordinate grant application submission and review. Manage awards in the granted stage and assist awardees during grant execution. Vice-director of a review committee composed of people affected by MS to provide patient centered feedback on applications, requires communication of complex ideas to non-scientists. Participate in research investment strategy development. Organize and execute multi-day scientific conferences. Develop and lead a workgroup focused on enhancing diversity in the MS research workforce.

[Ex. Y, Doe 1, Resume.] Although she works remotely, she is required to occasionally travel to New York a few times a year, and travels to conferences across the country several times per year, including outside of the United States. Doe 1's performance evaluation has been positive. [Ex. GGGG, Initial Report of Doherty at 16.] Accordingly, Doe 1 does not have any issue with placeability and labor force participation.

Doherty failed to assess Doe 1's rehabilitation plan and acknowledged Doe 1 did not have such plan, as Doe 1 is already "self-accommodating." [Ex. DDDD, Dep. of Doherty at  183:22 – 185:6.] Doherty testified:

> Q. All right. Going back to the rehabilitation plan, you have stated that she is receiving accommodation and, therefore, you didn't think that she needed a re- -- needed a rehabilitation plan; correct?
>
> A. **Well, that basically is her plan, so no further plan is needed.**
>
> Q. And you are not opining in this case that her disability prevents her from getting a pharmaceutical position; correct?
>
> A. **I am not.**

[Ex. DDDD, Dep. of Doherty at 186:8 – 19.]

Doherty also failed to assess Doe 1's access to the labor market. In fact, it is evident she is not qualified to do so. Doherty testified Doe 1's access to the labor market, including the opportunity for accommodation, depends "on the specific job requirements of the position, if there is a specific productivity requirement in terms of needing to meet deadlines or in terms of not having access to a facility within the confines of when she needs to be there." [Ex. DDDD, Dep. of Doherty at 187:1–17.] When Doherty was asked whether she

34

assessed whether Doe 1's choice of field would provide accommodation, Doherty relied on anecdotal, personal perception to state that large pharmaceutical companies may not provide accommodation.

This proposed testimony of Doherty that Doe 1's access to the labor market may be hindered because of opportunity for accommodation is an unfair extrapolation based on Doherty's two efforts with respect to employees wholly unrelated to this case. Doherty did not identify these individuals and their positions. There is no comparison of their degrees and positions with Doe 1's. Moreover, as Doherty admitted, there is no method or standards referred to or used by her to determine Doe 1 's access to the labor market. Generalized statements pertaining to sociological norms incapable of being tested are inadmissible under Rule 702 and *Daubert*. *See Marmo*, 457 F.3d at 758 ("a court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert'"). As Doherty admitted, there is no method or standards referred to or used by her to determine Doe 1 's access to the labor market.

Indeed, Doherty does not have evidence regarding Doe 1's field. Doherty admitted she did not review Doe 1's job description, nor did she talk to any of Doe 1's supervisors or coworkers with respect to this position. [Ex. DDDD, Dep. of Doherty at 106:10 – 19.] Doherty did not review Doe 1's job search efforts upon graduating with her Ph.D. how many positions she applied for, how many offers she had, the type of positions she was applying for, the range of salary of the positions she was applying, or any of the job postings. Doherty did not review

documents related to Doe 1's job search efforts after her previous employment ended. Doherty did not rely on any specific publication, documents, or software for her opinions. [Ex. DDDD, Dep. of Doherty at 189:16 – 190:5; 182:6 – 183:15] Doherty did not even know Doe 1's GPA or her grades while she was at the University. [Ex. DDDD, Dep. of Doherty at 143:4 – 17.]

The truth of the matter in this case—as Doherty admitted—is both positions Doe 1 held have provided accommodations, and Doe 1 has not experienced any issues with respect to that. [Ex. DDDD, Dep. of Doherty at 188:19-24.]

In addition, Doherty is not qualified to testify with respect to access to the labor market for Doe 1's field. Doherty admitted she did not do any labor market analysis particular to the field of Doe 1. Doherty is not aware of any literature, publication or software that supports her opinion. [Dep. at Doherty at 190:11-17.] Accordingly, it is evident that Doherty does not have a "sufficient 'specialized knowledge [to] help the trier of fact to understand the evidence and to determine a fact in issue." *Shipp*, 9 F.4th at 701.

Doherty's attempt to use community data, which is not tailored to the facts of this case to support her work disability analysis, must be rejected. Before incorporating community data into a methodology, an expert must explain how the community data fits the individual. For example, in *Toor v. HomeGoods, Inc.*, No. CV 16-1132, 2018 WL 901720, at *2 (D.N.J. Feb. 15, 2018) an expert offered a vocational economic assessment of a plaintiff's loss of earning capacity after

the plaintiff was injured when a metal display shelf collapsed and struck him in the head. Since the accident, the plaintiff had returned to his work as a software engineer, lost no time at his job, and received a promotion. *Id.* At 3. Plaintiff's expert opined that the injury reduced plaintiff's work life expectancy from 29.1 years to 16.2 and relied on statistical data published by the U.S. Census Bureau to create a "statistical cohort of similar persons". *Id.* At 2-3. The court held that the reliance on the data published by the U.S. Census Bureau, as generalized community data, was inappropriate as it was not sufficiently tailored to the facts of the case. *Id.* It is not sufficient to claim that "fit" exists. In conclusion, the expert's testimony was found to be irrelevant and lacking in probative value.

In this case, Doherty relies on a U.S. Bureau of Labor data with respect to workers with a disability. Specifically, Doherty states:

> Workers with a disability experience a reduced earning capacity as compared to nondisabled workers. This is because workers with a disability are more likely to be under-employed, and they have difficulty sustaining work on a full-time basis as compared to nondisabled workers. This notion is supported by the United States Bureau of Labor Statistics as outlined in the February 23, 2023 Persons with a Disability: Labor Force Characteristics News Release regarding data from 2022. As outlined in this report, workers with a disability were employed at a lower rate as compared to nondisabled workers. In particular, workers with a disability were employed at a rate of 21.3% in 2022 as compared to nondisabled workers, who were employed at a rate of 65.4%.

[Ex. GGGG, Initial Report of Doherty for Doe 1 at 20.] Doherty makes no effort to tailor this data to the facts of the case. In fact, when questioned about it, Doherty testified as follows:

37

Q. Do you know what the purpose of the publication is?

A. **So they basically provide an annual summary of workforce characteristics. So the purpose of their report is basically to look at trends over time in terms of who was employed, workers with disabilities that are employed at a higher rate. The -- they look specifically at the unemployment rate. They look at the unemployment rate by industry, by age, educational attainment.**

**So, I mean, there is various reasons for that report, but generally one of the main things is to look at workers with a disability versus nondisabled workers.**

Q. Do you know how the BLS defined unemployed for that purpose -- for purposes of that definition, that publication?

A. **Right. So their definition is someone who is not working, who is actively looking for work.**

Q. And [Doe 1] does not fit this particular

A. **Correct. And I don't assert -- just to be clear, I don't assert that she does at the present time meet -- she -- she's not considered unemployed or not employed. The reason why I look at this is basically to substantiate the basis. You know, it's my opinion that workers with a disability have difficulty maintaining employment or being underemployed or being employed in an area other than their career. And the data put forth by the BLS substantiates that. That is the reason why I used that information.**

Q. This report does not differentiate between minor and severe disabilities; correct?

A. **It does not.**

Q. It does not differentiate between physical and mental disabilities; correct?

A. **It does not.**

Q. It does not differentiate between disabilities that affect a person's ability to work

and those that do not; correct?

A. **That is somewhat addressed in terms of -- well, in terms of the figures, right. It does not specifically address the type.**

Q. It includes disabilities that are self-report and also medically determined; correct?

A. **It does.**

38

> Q. The table does not factor an individual's type of employment; correct?
>
> A. **Correct.**
>
> Q. It provides that half of all people with a disability were age 65 and over, nearly three times larger than the share for those with no disabilities; correct?
>
> A. **Correct.**

[Ex. DDDD, Dep. of Doherty at 220:22 – 223:9.] This utter failure to identify, use, or rely on publications that are sufficiently tied to the facts of Doe 1's case makes Doherty's testimony irrelevant, lacking in probative value, and wholly unreliable. In sum, there is too great of an analytical gap between the data and the opinion offered with respect to work disability.

There is also a great leap in Doherty's analysis of reduced earning capacity, particularly when applying the alleged work disability. Specifically, Doherty, via the Bureau of Labor, hand-picks a higher paying position that she thinks Doe 1 should have and earn. This is precarious given the fact that, during her deposition, Doherty admitted she is not opining that Doe 1 cannot get her a desired position. Specifically, she testified:

> Q. And you are not opining in this case that her disability prevents her from getting a pharmaceutical position; correct?
>
> A. **I am not.**

[Ex. DDDD, Dep. of Doherty at 186:15 – 18.] Indeed, Doe 1 did have the "Scientist" position right after she graduated, for which she had a positive performance evaluation. There is no opinion that Doe 1 cannot go and get this "higher-paying" position provided she has the qualification, with the alleged work disability. "Expert evidence may be excluded if the court determines that there

39

is simply too great an analytical gap between the data and the opinion proffered."
*Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (citation omitted).

Finally, while assessing wages, Doherty utilized a resource that encompassed the wages of an entire field and all levels of experience. The use of assumptions, broad generalizations, and non-specific information can only serve one purpose: to inflate Doe 1's claim for loss of earnings. This is evident since Doherty completely ignores the salary of Doe 1's first position as a scientist—the type of position that Doe 1 wants. Doherty also ignores the salary of Doe 1 at her current position, without appropriately assessing whether the position is in line with her Ph.D. degree.

Rather Doherty resorts to utilizing the "average" statistics, as opposed to specialized information or adjustments, to reflect Doe 1's work history, level of experience, and chosen career, in order to create an impression that Doe 1 has greater lost earning capacity than the evidence supports.

Specifically, Doherty uses data collected from employers of all sizes, in metropolitan and non-metropolitan areas in every state and the District of Colombia. Doherty utilized the category of "scientific research and development services" specialist, which includes major groups unrelated to Doe 2's field, such as, management occupation, architecture and engineering, business occupations, healthcare support, farming, fishing and forestry occupations, etc. This category includes various occupations ranging in average salary of 30,000 to 300,0000.

In addition, although Doherty admitted that Doe 1 currently lives in Austin, Texas and planned to live there, she failed to consult wage estimates for Texas. [Ex. DDDD, Dep. of Doherty at 131:6 – 18.] Nor did she consult wage estimates for Nebraska (location of the University from which Doe 1 graduated) or New York (the location of Doe 1's current employer). Doherty failed to distinguish wages of individuals based on experience level and education level. Doherty failed to look into the positions for which Doe 1 was applying in August 2020 and February 2022, and their respective ranges of salary. Doherty failed to do additional research, particular to Doe 1's field.

Accordingly, such an opinion of loss of income and future earnings is far too speculative to be admitted into evidence. *See e.g., Hogland v. Town & Country Grocer of Fredericktown Missouri, Inc.*, No. 3:14CV00273 JTR, 2015 WL 3843674, at *27 (E.D. Ark. June 22, 2015) (holding because there is *no evidence* supporting the expert's opinion of future earnings based on a career mobility theory that, based on his guess, the plaintiff would have moved to a different city or state, places that have higher paying jobs in her field, his testimony about that theory is far too speculative to be admitted into evidence).

Because Verzilli used the $162,240 figure from Doherty's report to calculate future loss of earning—without any additional assessment—his proffered testimony must also be excluded.

**E.    DOHERTY'S AND VERZILLI'S TESTIMONY WITH RESPECT TO DOE 2 MUST BE EXCLUDED BECAUSE DOHERTY'S ASSESSMENT OF WORK DISABILITY AND EARNING CAPACITY ARE UNRELIABLE.**

Doherty's proffered testimony is based upon factual information that is entirely unsupported. Specifically, it is premised on the allegation that Doe 2 was enrolled in a Ph.D. program at the University and that she would have graduated in 2020 and began employment in 2021. Doherty testified she relied on Doe 1's report that she was on target to complete a Ph.D. in Political Science. [Ex. DDDD, Dep of Doherty at 303: 8 – 12.] Doherty did not review documents related to the Political Science Ph.D. program. She did not assess whether adding a geography minor would add to the years in which Doe 2 would graduate. Contrary to Doherty's assumption, the evidence is clear that Doe 2 was not in the Ph.D. program at the University. In fact, Doe 2 was not sure she wanted to pursue her Ph.D. during her time at the University.

Because this underlying factual information is entirety unsupported, the premise that Doe 2 would have finished her Ph.D. in 2020 is speculative and any opinion based thereupon should be excluded, i.e. Doherty's and Verzilli's entire report.

Doherty's assessment of reduced earning capacity based on the assumption that Doe 2 abandoned her Ph.D. is irrelevant to this case. Specifically, Doherty testified that she does not opine that Doe 2 is unable to pursue a Ph.D. program because of her mental health. [Ex. DDDD, Dep. of Doherty at 277: 1 8 – 23.] Accordingly, Doherty cannot testify with respect to reduced earning capacity

related to the Ph.D. abandonment when it cannot be linked, based on reasonable medical certainty, that it was caused by the alleged "work disability," or mental health of Doe 2.

Assuming solely for purposes of argument that Doe 2 was pursuing a Ph.D. at the University, Doherty failed to opine on the crux of the issue in this case— which is providing a wage assessment of political science positions with a Master's degree in comparison to those with a Ph.D. degree. The failure to address this important issue renders Doherty's opinions—which compares Doe 2's non-political science affiliated position with a Ph.D of any field—irrelevant to this case.

Moreover, Doherty's opinion that Doe 2 possesses a chronic work disability is wholly unsupported and unreliable. To avoid redundancy, BRUN incorporates the arguments set forth in this Brief in Section D, paragraphs 1, 2, 4, 5, 13, 14, 15 16, , as though fully set forth herein.

Similar to Doe 1's case, Doherty failed to assess the vocational assessment factors as it relates to Doe 2. Doe 2 graduated with a Master's in Political Science with a 3.56 GPA. During her time at the University, she served as a Teaching Assistant, and then right after her graduation, she served as the main instructor for a course at the University. After she completed teaching, Doe 2 decided to go to India. Doherty did not know the reason for such travel.

Since she returned from India, Doe 2 has been gainfully employed, first as a Technical Writer, and then a promotion to Compliance Specialist. Doherty described Doe 2's role as follows:

> **Description:** Ms. ▮▮▮▮ stated that she was initially hired as a technical writer. In this role, she would essentially write a guide, such as a software installation guide, for facilities or hospitals. She explained that during the COVID-19 pandemic, she was assigned duties in both the technical writing and compliance departments. About one year ago, she was transferred to primarily function in the compliance department as a specialist. In this position, Ms. ▮▮▮▮ assists the compliance manager in maintaining ISO certifications and ensures compliance standards are met based upon federal and state laws. Specifically, she creates documentation to show customers or auditors how to maintain certifications for cybersecurity or ISO standards. She also handles complaints and/or audits, and she will provide information from records to the company's customers. Ms. ▮▮▮▮ indicated that she is sometimes required to complete tasks outside of her department, including cost analyses or research related to adoption of telehealth platforms. She has been performing her job remotely since the spring of 2020.

Doherty does not assess Doe 2's rehabilitation plan. Doherty does not assess whether Doe 2 can pursue her Ph.D. at the University of Nebraska or another University. Doherty does not assess whether Doe 2's alleged work disability or mental health condition prevents Doe 2 from getting a position in the field of Political Science. As such, her assessment of "work disability" brings no probative value.

Doherty will not be able to provide an assessment of the labor market in the field of Political Science, both for individuals with a master's degree and a Ph.D. Doherty testified she did not review Doe 2's job description, nor did she talk to any of Doe 2's supervisors or coworkers with respect to this position. [Ex. DDDD, Dep. of Doherty at 106:10 – 19.] Doherty did not review Doe 2's job search

efforts upon graduating with her Masters, including how many positions she applied for, how many offers she had, the type of positions she was applying for, the range of salary of the positions she was applying, or any of the job postings. In addition, Doherty did not assess the labor market particular to Doe 2's career choice—to become an international analyst or to work in academia.

Doherty's wage assessment for the political science field is a shot in the dark. Doherty utilized a resource that encompassed the wages for any and every field that employs individuals with a Ph.D. degree. This is a prime example of the use of assumptions and non-specific information that can only serve to inflate Doe 2's loss of earning. Doherty did not consider Doe 2's level of experience or field. Doherty did not consider Doe 2's chosen career—academia or international analysis. There is simply no reasonable justification as to why Doherty used a data collected from employers of all sizes, in metropolitan and non-metropolitan areas in every state and the District of Colombia, for any position. There is also no reasonable justification as to why Doherty did not perform a wage assessment for the area in which Doe 2 is living—Lincoln, Nebraska. Such an opinion of loss of income and future earnings is far too speculative and utilizes unreliable methodology.

In other words, it is apparent Doherty utilized such unreliable methodology and facts that it transforms both her opinions and Verzilli's opinions into irrelevant, speculative guesswork, with absolutely no probative value. They must be excluded.

45

**F.   VERZILLI'S PROFFERED TESTIMONY WITH RESPECT TO DOE 1 AND 2 MUST BE DISMISSED.**

In addition to the reasons provided above, Verzilli's proffered testimony with respect to Doe 1 must be excluded because his opinion is incongruent with Doherty's opinion.

Verzilli did not do his own research with respect to how much Doe 1 should be earning. He testified:

Q. You -- for both of the reports that you drafted for [Doe 1] and [Doe 2] you did not perform a labor market study for Lincoln, Nebraska; correct?

A. **I -- I am sorry. I did not provide a specific regional analysis for Texas.**

Q. And, in fact, you did not provide any analysis, and you relied on the vocational report prepared by Ms. Doherty; is that correct?

A. **That's correct in terms of the vocational issues. I then applied the normal basic economic framework, applying -- basically doing the present-value analysis, but I accepted the opinions of Ms. Doherty.**

Q. To the extent that her opinion is wrong, that would substantially aff- -- that would have a substantial impact on your report; correct?

A. **Ye- -- I don't want to say if they're wrong, but if you change an assumption, then it does change my -- you know, my opinion.**

. . .

Q. And you state that is approximately 162,000 -- $162,240 annually that she has opined; correct?

A. **That's correct.**

Q. This is also a number that was generated by Ms. Doherty; is that correct?

A. **That is correct.**

…

Q. But you did not analyze whether or not that number is appropriate for [Doe 1]; correct?

A. **That's a different question. That's -- that's correct. I -- that's a vocational issue. So that's some -- that would be Ms. Doherty's**

46

**opinion as to what, you know, [Doe 1's] posi- -- potential was and that that position is appropriate given her background, education, and experience, skills and talents in the vocational analysis. That was something Ms. Doherty identified.**

...

Q. You did not do additional research to make sure that her opinions were appropriate and correct; correct?

A. **I can't -- I can't assess a vocational opinion. That's not within my area of expertise.**

Q. Got it.

[Ex. EEEE, Dep. of Verzilli at 18:16 – 21, 19:3 – 16, 33:10 – 16, 34:11 – 20., 80:13 -17.]

As such, he relied upon the following opinion of Doherty:

In contrast, according to data put forth by the Bureau of Labor Statistics, Occupational Employment and Wage Information, for "scientific research and development services" specialists, such highly skilled individuals on average yield an annual rate of pay of $162,240.00. This is in specific contrast to [Doe 1's] current earnings.

[Ex. GGGG, Initial Report of Doherty for Doe 1 at p. 20.] Verzilli then misapplied

Doherty's opinion when he calculated Doe 1's future loss of earning. Specifically,

he assumed, with no foundation, Doe 1's present compensation would increase

over the next 10 years to $162,240. To the extent Verzilli attempts to justify the

"10 years" as life cycle of employment, such argument should be declined as

Verzilli himself admitted that he did not do any research with respect to Doe 1's

occupation, including what she should be earning. As he said it, this is not his

"area of expertise." Accordingly, his entire calculation of future loss of earning

for Doe 1 must be excluded as Verzilli is not qualified to opine as to life cycle of employment particular to Doe 1, is speculative and unreliable.

Moreover, Verzilli failed to appropriately account for retirement benefits for both Plaintiffs. Verzilli admitted he did not know the Plaintiffs' retirement benefits. Verzilli admits that, if different than his assumption, he would have to adjust his calculation. Accordingly, the addition of the present value of retirement benefits for both Plaintiffs ought to be struck as it is based on insufficient data particular to Doe 1 and Doe 2.

For instance, in *Cole v. Homier Distrib. Co.,* Cole brought claims related to Homier's termination of their distributorship agreement. 599 F.3d 856, 859—60 (8th Cir. 2010). Cole's damages expert formed his opinion based on all of Cole's lost profits but failed to account for the fact that the parties had a separate, continuing dealership agreement that Homier had not terminated. *Id.* at 865. Because the expert's "report indicates that he was either unaware of or disregarded these facts," his lost-profits analysis was "unsupported by the record." *Id.* The court concluded that "exclusion of that analysis is proper, as it can offer no assistance to the jury." *Id.*

In this case, the same outcome is warranted.

## V.    CONCLUSION

For the foregoing reasons, BRUN respectfully requests the Court grant its Motion to Exclude Expert Testimony and Opinions offered by the above-mentioned experts.

48

## CERTFICATE OF COMPLIANCE

I, Lily Amare, hereby certify that this Brief complies with the limits set forth in NECivR 7.1(d). Further, based on the Word Count function of Microsoft Word 2013 word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify this Brief contains 11,971 words.

/s/ Lily Amare
Lily Amare

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/ Lily Amare
Lily Amare

4887-2973-1803, v. 5