# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

JANE DOE 1 and JANE DOE 2,

Plaintiffs,

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA,

Defendant.

Case No. 4:20-cv-03081

---

## PLAINTIFFS' OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

*I.*     *STANDARD OF REVIEW* .................................................................................... **3**

*II.*     *ARGUMENT* ........................................................................................................ **3**

    **A.**    **BRUN had substantial control over JR4 and JR5 and the context of Plaintiffs' harassment** ............................................................................................................... **4**

       *i.*    *Doe 1* ............................................................................................................ 5

       *ii.*    *Doe 2* ........................................................................................................... 9

    **B.**    **Plaintiffs' sexual harassment was severe, pervasive, and objectively offensive** ........ **12**

       *i.*    *Doe 1* .......................................................................................................... 12

       *ii.*    *Doe 2* .......................................................................................................... 17

    **C.**    **BRUN had actual notice of JR5's abuse in November 2017** ......................................... **19**

    **D.**    **BRUN's failure to appropriately respond to JR4 and JR5's harassment amounted to deliberate indifference** ................................................................................................. **20**

       *i.*    *Doe 1* .......................................................................................................... 20

       *ii.*    *Doe 2* .......................................................................................................... 29

    **E.**    **BRUN's deliberate indifference made Plaintiffs vulnerable to further harassment, which they experienced, and caused them to miss out on educational opportunities** ....... **35**

       *i.*    *Doe 1* .......................................................................................................... 36

       *ii.*    *Doe 2* .......................................................................................................... 38

    **F.**    **Damages** ........................................................................................................... **40**

       *i.*    *Emotional distress damages* ........................................................................... 40

       *ii.*    *Compensatory damages* ................................................................................ 42

*III.*     *CONCLUSION* ................................................................................................. **52**

# I.      STANDARD OF REVIEW

Summary judgment is warranted only if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the movant bears the initial burden of informing the court of the basis for the motion and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).  The facts must be viewed in the light most favorable to the non-moving party.  *Id.*  "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has the obligation to come forward with specific facts showing that there is a genuine issue for trial."  *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021) (quoting *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 844 (8th Cir. 2015)).

# II.      ARGUMENT

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1618(a).  "Sexual harassment, including student-on-student sexual harassment" is "a form of sex discrimination for Title IX purposes."  *Shank*, 993 F.3d at 573.  A school may be liable under Title IX for sexual harassment when it is "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control."  *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003)).  In cases involving student-on-student harassment, such as here, the discrimination must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to educational opportunities or benefits provided by the school."  *Id.* (quoting *Davis v. Monroe Cnty. Bd. of Educ.*,

526 U.S. 629, 650 (1999)).  Finally, for liability to attach, "the institution's deliberate indifference must 'cause[] students to undergo harassment' or 'make them liable or vulnerable to it.'"  *Shank*, 993 F.3d at 573 (quoting *Davis*, 526 U.S. at 645).

### A. BRUN had substantial control over JR4 and JR5 and the context of Plaintiffs' harassment

BRUN first asserts that it lacked the requisite substantial control over Plaintiffs' harassers. (No. 130 at 8-9.)  An institution may only be "liable for situations in which it 'exercises substantial control over both the harasser and the context in which the known harassment occurs.'"  *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001) (quoting *Davis*, 526 U.S. at 646). Considerations such as whether the harassment occurred on school grounds or during school hours are relevant, however the "[m]ore important[]" consideration is the institution's disciplinary authority over the students involved.  *S.C. v. Metro. Gov't of Nashville & Davidson Cnty.*, 86 F.4th 707, 716 (6th Cir. 2023) (quoting *Davis*, 526 U.S. at 646).

Several courts have recognized that a school may be liable under Title IX where the harassment at issue occurred over social media or other electronic forums or means of communication.  *See, e.g., id.* (holding "it would be erroneous to conclude as a matter of law that schools lack substantial control over student social media messages").  And in *Feminist Majority Foundation v. Hurley,* the Fourth Circuit held that the university maintained substantial control under Title IX where harassing messages were sent via a social media application taking into account, among other things, that the messages specifically targeted students and that the university had means of addressing the harassment, such as by "clearly communicat[ing] to the student body that the [u]niversity would not tolerate sexually harassing behavior either in person or online."  911 F.3d 674, 687-89 (4th Cir. 2018).

   *i.*     ***Doe 1***

   Based on a review of the context of JR4's harassing conduct, a reasonable jury could conclude that BRUN had substantial control over JR4 and the context in which the harassment occurred. JR4 began a pattern of harassing behavior towards Doe 1 with hundreds of text messages sent in May and June 2017. (Def. Ex. X, No. 125-30). These texts were sent at all hours of the day—morning, afternoon, evening, and night. (Def. Ex. X, No. 125-30). He also sent Doe 1 harassing Facebook messages, phone calls, and emails. (Def. Ex. N, No. 125-19 at 15). Some messages were sent while Doe 1 and JR4 were attending academic conferences sponsored by the University and during which Doe 1 was presenting her research on behalf of the University, while others were sent after Doe 1 and JR4 had returned to Lincoln. (Pl. Ex. 1, Doe 1 Dep. 74:8-20, 79:3-15; Def. Ex. C, No. 125-4 at 2-3; Def. Ex. L, No. 125-17 at 2; Def. Ex. O, No. 125-20 at 12:536-538). JR4 also attempted to log into Doe 1's email account. (Pl. Ex. 6 at 9; Def. Ex. N, No. 125-19 at 1; Def. Ex. L, No. 125-17 at 2).

   On June 28, 2017, UNLPD Officer Jordan Newman issued JR4 a verbal no-contact directive, telling him to "cease all contact" with Doe 1. (Def. Ex. L, No. 125-17 at 4). In October 2017, UNL's Deputy Title IX Coordinator, Jeff Lamoureaux, emailed Doe 1 that he had been contacted twice by JR4 "asking if it was possible to work things out with you." (Def. Ex. F, No. 125-7 at 2). Lamoureaux wrote, "I wanted to share this information with you *in case you wanted to work it out with him . . . .*" *Id.* (emphasis added). Given the history of harassment, Doe 1 was understandably concerned about this communication and felt JR4 was using Lamoureux as a third party to contact her. (Def. Ex. V, No. 125-28 at 3).

   In November 2017, JR4 began attending Doe 1's journal club meetings, at which she regularly presented. (Pl. Ex. 6 at 9; Pl. Ex. 1, Doe 1 Dep. 56:25, 57:1, 59:18-25, 60:1-4). On December 6, 2017, Doe 1 saw JR4 drive by and worried he was following her. (Pl. Ex. 6 at 9).

Also in December 2017, JR4 sent harassing and threatening messages to Doe 1's roommates and classmate who had reported him. (Pl. Ex. 1, Doe 1 Dep. 110:16-25, 111:1-5; Def. Ex. W, No. 125-29 at 2; Def. Ex. EE, No. 126-8 at 2; Def. Ex. M, No. 125-18 at 1; Def. Ex. AA, No. 126-4; Def. Ex. V, No. 125-28 at 3). The messages included threats to share extremely embarrassing information about Doe 1 and threats to "wage war" on her academic advisor. (Def. Ex. AA, No. 126-4; Def. Ex. V., No. 125-28 at 18-19; Def. Ex. EE, No. 126-8 at 2). JR4 then did email other classmates with sensitive information Doe 1 had shared in confidence with him while they were dating. (Pl. Ex. 1, Doe 1 Dep. 118:8-21; Def. Ex. V, No. 125-28 at 3).

In January 2018, Doe 1 again reported that JR4 was attending her journal club/department-related talks, to try to make her feel uncomfortable. (Def. Ex. M, No. 125-18 at 4). She specifically noted that JR4 had not presented before and that this was the first year he began attending. (Pl. Ex. 7). Then came JR4's aggressive and harassing May 5, 2018 email to Doe 1, a clear violation of the no-contact directive. (Def. Ex. N, No. 125-19 at 1-2; Def. Ex. V, No. 125-28 at 19). JR4 sent this email while Doe 1 was attending another conference to present her work for the University. (Pl. Ex. 1, Doe 1 Dep. 148:13-21, 149:1-4; Def. Ex. V, No. 125-28 at 4). The day before JR4 sent this email, Doe 1 saw him staring at her from across the street. (Def. Ex. O, No. 125-20 at 11:484-487). Also in spring 2018, JR4 sent multiple harassing and threatening Facebook messages to Doe 1's friend who had reported his conduct, calling him sexually derogatory names and stating that he would have "kicked [his] faggot teeth in." (Def. Ex. V, No. 125-28 at 3).

Although JR4 lacked card access to Morrison Center, where Doe 1's office and lab were located, she reported seeing him there on several occasions. (Pl. Ex. 1, Doe 1 Dep. 156:10-22, 157:16-23, 176:20-25, 177:1, 209:1-18, 210:7-25, 211:1-9; Def. Ex. N, No. 125-19 at 3, 19; Def. Ex. FF, No. 126-9; Pl. Ex. 9; Pl. Ex. 10; Def. Ex. V, No. 125-28 at 5). Doe 1 also reported that

JR4 regularly walked through her office hours. (Pl. Ex. 6 at 10; Pl. Ex. 9 at 3). At least once, Doe 1 looked out of her office window and saw JR4 looking at her. (Def. Ex. V, No. 125-28 at 5). In September 2019, JR4 posted a derogatory message via an online forum called "DearUNL" regarding Doe 1 and others' Title IX complaints. (Pl. Ex. 13; Pl. Ex. 14).

JR4's conduct included both virtual harassment and in-person stalking, on campus and at University-sponsored conferences. The harassment was directed at another UNL student—Doe 1. JR4 also contacted several other UNL students, and both threatened to and did spread rumors which risked damaging Doe 1's reputation at the University and her relationship with her advisor. That much of JR4's conduct occurred via digital forums did not absolve UNL of an obligation to act under Title IX. *S.C.*, 86 F.4th at 716; *Feminist Majority Found.*, 911 F.3d at 687-89. UNL's ability to control the situation is illustrated by the actions it did eventually take, including the verbal no-contact directive, permanent no-contact order, and restrictions to JR4's building access. (Def. Ex. L, No. 125-17 at 4; Def. Ex. W, No. 125-29 at 2; Def. Ex. EE, No. 126-8 at 2). The no-contact order specifically prohibited "text messages, phone calls, e-mails, instant messages, messages on Facebook or other social networking sites . . . [including] direct or indirect contact . . . through friends or other third party actors." (Pl. Ex. 13 at 1). As discussed further below, UNL could have done more, such as undertaking a formal investigation after JR4's initial harassment in 2017, sanctioning JR4 after his initial violations of the no-contact order via Doe 1's roommates and Lamoreaux, limiting JR4's access to Doe 1's lab and workplace and actually enforcing those restrictions (no restrictions were recommended until September 18, 2018), and providing Doe 1 accommodations such as allowing changes to her class schedule and providing her a parking pass to avoid walking alone on campus. Emboldened by UNL's lack of action and his unrestrained access to Doe 1, JD4's conduct escalated, and he contacted Doe 1's peers, sent her the May 2018

derogatory email, attended her journal club meetings and presentations, stalked her during office hours, and posted a derogatory message online.

BRUN's argument that "Doe 1 admitted JR4 never approached her while on University premises," (No. 130 at 8), misrepresents the stalking behaviors described above. It is also irrelevant whether at any given period, Doe 1 was taking classes or at UNL working on her dissertation. (*See* No. 130 at 8). The Student Code of Conduct "applies to student conduct which occurs from the time of enrollment through the actual awarding of a degree" regardless of whether classes are in session. (Def. Ex. P, No. 125-22 at 3). The Student Code explicitly provides, "Sexual misconduct by or against a student may be investigated by the University whether it is alleged to have been committed on or off campus." (*Id*. at 16). Although some of JR4's messages were sent while Doe 1 and JR4 were attending academic conferences, considerations of the parties' physical locations in those instances is of low relevance to the control analysis because the messages were sent digitally. Regardless, the record establishes that both events were sponsored by UNL, and that Doe 1 attended the conferences to present her work on behalf of UNL. (Pl. Ex. 1, Doe 1 Dep. 79:3-8, 148:19-21, 149:1-4). Moreover, the Student Code applies to conduct that occurs off University premises "if the conduct is determined by the Dean of Students to adversely affect the University community [or] its members . . . ." (Def. Ex. P, No. 125-22 at 3). Given the language of the Student Code and the fact the UNL's Office of Institutional Equity and Compliance ("IEC") eventually investigated JR4's harassing messages and issued sanctions, a reasonable jury could conclude that UNL did exercise substantial control over the context of the harassing messages sent during academic conferences. (Def. Ex. W, No. 125-29).

UNL had ample means of controlling and disciplining JR4 for harassment. UNL also had substantial control over the context of the harassment, which occurred both in person—on

University premises—as well as via texts, calls, and online messages. The harassment involved JR4 targeting another UNL student—Doe 1, threatening to harm her academic reputation, harassing her peers, and spreading rumors about UNL faculty. JR4 even contacted Doe 1 via Lamoureux, who inexplicably passed along JR4's message asking if Doe 1 wanted to work things out with him. (Def. Ex. F, No. 125-7 at 2). Thus, viewing the facts in the light most favorable to Doe 1, a reasonable jury could conclude that UNL exercised substantial control over JR4 and the context of the harassment.

### ii.    *Doe 2*

Likewise, a reasonable jury could conclude that UNL exercised substantial control over JR5 and the context in which his harassment of Doe 2 occurred. JR5 sexually assaulted Doe 2 three times. (Def. Ex. RR, No. 127-2 at 3-6). BRUN argues that because these assaults occurred off campus at privately-owned residences, it cannot be subject to liability under Title IX. (No. 130 at 9-10). But the Student Code of Conduct applied to conduct that occurred off University premises "if the conduct is determined by the Dean of Students to adversely affect the University community [or] its members . . . ." (Def. Ex. P, No. 125-22 at 3). Further, BRUN gave itself jurisdiction to investigation all allegations of sexual misconduct against students, regardless of location: "Sexual misconduct by or against a student may be investigated by the University whether it is alleged to have been committed on or off campus." (*Id.* at 16). Thus, BRUN had disciplinary authority over JR5, which it exercised in investigating each of his assaults and ultimately expelling him. (Def. Ex. RR, No. 127-2 at 48). In fact, UNL rejected JR5's argument that it lacked jurisdiction, explaining that "nonconsensual sexual intercourse[] is so severe that its purported occurrence against a community member can be presumed to adversely affect the University community [and] its members . . . ." (Def. Ex. TTT, No. 128-14 at 2). *See, e.g., Owens*

*v. La. State Univ.*, No. 21-242-WBV-SDJ, 2023 WL 8880377, at *8-9 (M.D. La. Dec. 22, 2023) (holding that a reasonable jury could find the substantial control element satisfied in the context of off-campus harassment where the university's disciplinary authority over harassers extended to off-campus housing pursuant to the terms of the student code of conduct); *Doe v. Bd. of Supervisors of the Univ. of La. Sys.*, No. 22-00338-BAJ-SDJ, 2023 WL 143171 at *19-20 (M.D. La. Jan. 10, 2023) (holding that a university's codes of conduct, rules, policies, and disciplinary action against an assailant in another context provided a reasonable basis to find substantial control); *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 883 (W.D. Tex. 2019) (actionable Title IX claims based on assaults occurring at off-campus apartment and a restaurant parking lot); *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1097 (10th Cir. 2019) (actionable Title IX claims based on rapes occurring at off-campus fraternity houses and vehicles); and *Doe I v. Baylor Univ.*, 240 F. Supp. 3d 646, 654 (W.D. Tex. 2017) (actionable Title IX claims based on sexual assault occurring "at a house near campus")).

While in two cases BRUN cites, courts found that universities lacked substantial control in the context of off-campus sexual assaults, these opinions did not analyze the schools' disciplinary authority over the assailants, instead focusing on the privately-owned nature of the establishments where the assaults occurred. *Ostrander v. Duggan*, 341 F.3d 745, 750-51 (8th Cir. 2003); *Roe v. Saint Louis Univ.*, No. 4:08-cv-1474, 2012 WL 6757558, at *8 (E.D. Mo., Dec. 31, 2012), *aff'd*, 746 F.3d 874, 883 (8th Cir. 2014). Here, Doe 2 has presented facts pertaining to BRUN's control over JR5 in the form of the Student Code of Conduct and disciplinary action it took, which should be given due weight along with the location of the assaults. *Davis*, 526 U.S. at 646-47 (concluding that "recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual

harassment and the harasser is *under the school's disciplinary authority*") (emphasis added).  The Supreme Court's guidance on the "substantial control" element necessitates case-by-case analysis of the factual circumstances surrounding a given instance of sexual harassment, and thus, BRUN's attempt to paint a bright-line rule precluding liability for off-campus sexual assaults is misplaced. *Id.*; *see also Brown v. Arizona*, 82 F.4th 863, 878 (9th Cir. 2023) (noting that location is only one factor when analyzing a school's control over the context of harassment and considering the school's disciplinary authority over the harasser, among other factual considerations).  Given UNL's exercise of its clear disciplinary authority over JR5, the question of whether it had substantial control over JR5 and the context of the harassment should be presented to the jury.

Importantly, BRUN does not argue that it lacked substantial control over the other numerous instances of sexual harassment Doe 2 experienced, namely JR5's unwanted touching of her thigh during orientation (Pl. Ex. 2, Doe 2 Dep. 241:1-10; Def. Ex. RR, No. 127-2 at 4); heckling her during a presentation causing her to leave the classroom mid-presentation (Pl. Ex. 2, Doe 2 Dep. 125:7-24, 127:2-7; Def. Ex. RR, No. 127-2 at 4-5); breaking into her apartment (Def. Ex. RR, No. 127-2 at 5); calling Doe 2 and her friends "cunts" at a department social (Pl. Ex. 2, Doe 2 Dep. 114:15-25, 115:1-19; Def. Ex. RR, No. 127-2 at 8, 35); showing up unannounced at her office (Pl. Ex. 2, Doe 2 Dep. 61:23-25, 62:1-5; Pl. Ex. 19 at 2-3); posting a harassing Facebook profile picture of Doe 2 and her friend intoxicated (Pl. Ex. 2, Doe 2 Dep. 182:4-11, 19-23, 273:8-14; Pl. Ex. 25); sending a nude photograph of her to IEC (Def. Ex. 127-1 at 9); sending threats during the investigation (Pl. Ex. 2, Doe 2 Dep. 191:13-17; Def. Ex. JJJ, No. 128-4 at 7; Pl. Ex. 18 at 2-5; Pl. Ex. 20 at 1; Pl. Ex. 23 at 2-3, 7-8; Def. Ex. RR, No. 127-2 at 7); and spreading rumors about her to professors and peers (Pl. Ex. 2, Doe 2 Dep. 108:19-25, 109:1-19, 111:3-5, 8-18, 171:13-20, 172:9-19, 179:7-12, 180:11-25; Def. Ex. RR, No. 127-2 at 26).  Accordingly, BRUN's

substantial control over JR5's harassing conduct (aside from the sexual assaults) remains unchallenged.  *Cf. F.T.C. v. Neiswonger*, 580 F.3d 769, 775 (8th Cir. 2009) (noting arguments raised for the first time in reply brief are waived).

### B. Plaintiffs' sexual harassment was severe, pervasive, and objectively offensive

BRUN next argues that certain instances of harassment Plaintiffs experienced were not "so severe, pervasive, and objectively offensive" such that it "deprive[d] [them] of access to the educational opportunities or benefits provided to the school."  (No. 130 at 10-18); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Davis*, 526 U.S. at 650).

### i.    *Doe 1*

As to Doe 1, BRUN discusses certain incidents of harassment in isolation, arguing that each instance was not "severe" and "pervasive."  However, BRUN both misconstrues the content of JR4's harassing messages and leaves out other instances of harassment, painting an incomplete picture of the severe and persistent harassment Doe 1 endured.  With respect to JR4's hundreds of harassing text messages, as well as phone calls and Facebook messages to Doe 1 in May and June 2017, Defendant cherry-picks a few messages and asserts that JR4 was merely asking Doe 1 to "sit down and talk with him about their relationship."  (No. 130 at 12).  As the record demonstrates, Doe 1 had already had lengthy discussions with JR4 about their relationship, told JR4 she was not interested in getting back together, and told him that she considered further communication from him to constitute harassment.  (Def. Ex. X, No. 125-30 at 1, 4, 8; Pl. Ex. 1, Doe 1 Dep. 75:3-7).  Yet, JR4 did not stop—he persistently contacted her, vacillating between being apologetic and critical of Doe 1 (*e.g.*, accusing her of sharing information about him and calling her "fake as fuck" and heartless) to try to get her to respond.  (Def. Ex. X, No. 125-30 at 6, 8, 14).  It is clear from the messages that he wanted to get back together with Doe 1—asking for a "second chance," telling

her he did not want to "give up on this," saying "I need to know if there is any way we could get together . . . in the future," etc. (Def. Ex. X, No. 125-30 at 1, 2, 5, 7-9). At one point, Doe 1 told JR4 his messages were making her uncomfortable, but he still did not stop, asking, "[a]re you afraid of me or something?" (Def. Ex. X, No. 125-30 at 3). A reasonable jury could easily reject JR4 and BRUN's characterization of the messages as merely seeking closure after the end of a relationship and view them for what they are: textbook sexual harassment. *Doe v. Pennridge Sch. Dist.*, 413 F. Supp. 3d 393, 403 (E.D. Pa. 2019) (recognizing ex-boyfriend's demand to get back together as sexual harassment "as a matter of course") (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n.3 (3rd Cir. 1990)).

Moving on to JR4's December 2017 messages to Doe 1's roommate, BRUN argues that the contents of the messages were non-threatening. (No. 130 at 13-15). However, JR4 vacillated between threatening to spread rumors about Doe 1 and her academic advisor and stating that he would not spread those rumors to try to get Doe 1's roommate to respond to him. (Def. Ex. AA, No. 126-4). JR4 stated that he had "an extremely embarrassing story" that he "could tell people about [Doe 1]" but also said he doesn't "do that shit." (Def. Ex. AA, No. 126-4 at 1). He later said, "I should spread my embarrassing story I have of [Doe 1]." (Def. Ex. AA, No. 126-4 at 2). He then said he *wouldn't* share the story, while simultaneously emphasizing that the story "[was] extremely embarrassing" and that "[Doe 1] would die of embarrassment." (Def. Ex. AA, No. 126-4 at 2).

JR4 similarly stated that he "could [ ] shit on [Doe 1's academic advisor] all day every day with everything I know about her but I don't." (Def. Ex. AA, No. 126-4 at 1). After it became apparent to JR4 that Doe 1's roommate was choosing not to respond, JR4 said he would in fact share the rumor about Doe 1's academic advisor to "take[] that cunt down" unless the roommate

responded in fifteen minutes.  (Def. Ex. AA, No. 126-4 at 2).  JR4 did end up sending the email

about Doe 1's academic advisor, as he threatened.  (Pl. Ex. 1, Doe 1 Dep. 118:8-12; Def. Ex. V,

No. 125-28 at 3).  In these texts to Doe 1's roommate, JR4 also called Doe 1 and her friends "mean

little gossip girls" and "cunts" and called Doe 1 an "attention whore."  (Def. Ex. AA, No. 126-4 at

2).

        Examining JR4's messages to Doe 1's roommate as whole, a reasonable jury would very

likely view the messages as threatening based on JR's repeated threats to spread an embarrassing

story about Doe 1.  At one point, JR4 states that he would not spread rumors about Doe 1's advisor

only to change his mind and act on his earlier threat.  This illustrates that it would have been

reasonable for Doe 1 not to take him at his word about not spreading the embarrassing story about

her.  BRUN also asserts that there was no no-contact order between JR4 and the roommate at the

time, (No. 130 at 13), yet as one investigation report notes, JR4 "was aware of the nature of the

relationships between [Doe 1 and her roommate], and knew that [the roommate] would share the

messages with [Doe 1]."  (Def. Ex. EE, No. 126-8 at 2).  In fact, UNL Title IX investigator Meagan

Counley initially, verbally told Doe 1 that the messages to her roommate constituted a violation of

the no-contact order (before later concluding they did not) and UNLPD Officer Eric Fischer

advised Doe 1 that it would be beneficial to ask the University why it did not find the messages to

constitute a breach of the no-contact order.  (Pl. Ex. 1, Doe 1 Dep. 126:9-12, 135:18-23).

        Finally, BRUN asserts that JR4's messages to Doe 1's roommate are not sex-based

harassment, but rather, harassment based on "personal animus regarding prior events."  (No. 130

at 14).  This argument ignores the context in which the messages were sent—after JR4's persistent

harassment of Doe 1 seeking to restart their romantic relationship.  After the no-contact directive

between JR4 and Doe 1 was implemented, JR4 began contacting Doe 1's roommates and

14

classmates instead, unable to move on from the relationship. This context, combined with the derogatory, gender-based language used in the messages (*i.e.*, JR4 calling Doe 1 and her roommate "cunts" and "gossip girls" and calling Doe 1 an "attention whore") brings the messages well into the realm of sexual harassment. (Def. Ex. AA, No. 126-4 at 2). *See Pennridge Sch. Dist.*, 413 F. Supp. 3d at 403 (finding "[h]arassment by a former paramour is considered sexual harassment even when some of the harassing conduct appears gender neutral") (citing *Krebs v. New Kensington-Arnold Sch. Dist.*, No. 16-610, 2016 WL 6820402, at *3-4 (W.D. Pa. Nov. 17, 2016)). It is not surprising that JR4 was found to have violated the Student Code of Conduct for sexual misconduct, albeit under a different standard. (Def. Ex. W, No. 125-29; Def. Ex. EE, No. 126-8).

This was not the end of JR4's sexual harassment of Doe 1. On May 5, 2018, JR4 sent an email to Doe 1 full of derogatory, gender-based language, for example, telling Doe 1 she was not a "strong independent women [sic]," and calling her a "cowardly little girl," a "cunt bitch," "fucking cunt coward weak little girl," and, in all caps, a "STUPID CUNT BITCH," among other things. (Def. Ex. N, No. 125-19 at 2). This was a clear violation of the no-contact order. (Def. Ex. V, No. 125-28 at 19). Moreover, Doe 1 learned that JR4 had still not moved on as late as September 2019 when he posted "Get a fucking life you stupid cunts" on the "DearUNL" forum where Doe 1 and others had shared their experiences with Title IX violations. (Pl. Ex. 13; Pl. Ex. 14).

BRUN omits several other instances of harassing conduct. BRUN ignores Lamoureux's October 2017 email to Doe 1 passing along JR4's message seeking to work things out with Doe 1, (Def. Ex. F, No. 125-7 at 2); JR4's sudden appearance at Doe 1's journal club meetings where she regularly presented (Pl. Ex. 6 at 9); Doe 1's December 6, 2017 report that she saw JR4 drive by and was concerned he was following her (*id*. at 9); JR4's messages to Doe 1's other roommate and

her classmate who reported her (Pl. Ex. 1, Doe 1 Dep. 173:3-14; Def. Ex. V, No. 125-28 at 3-4); Doe 1's January 2018 report that JR4 had recently begun attending department-related talks (Def. Ex. M, No. 125-18 at 4); and JR4's other in-person stalking behaviors, including staring at Doe 1 from across the street, walking through Doe 1's office hours, and looking in her office window (Pl. Ex. 6 at 10; Pl. Ex. 9 at 2; Def. Ex. V, No. 125-28 at 5; Def. Ex. O, No. 125-20 at 11:484-487).

In sum, drawing all inferences in Plaintiffs' favor, a reasonable jury could find that the harassment Doe 1 faced both directly and via third parties in the form of threats, gender-based insults, and stalking behavior amounted to "severe, pervasive, objectively offensive" sexual harassment such that it "deprive[d] [her] of access to the educational opportunities or benefits provided to the school." *Culver-Stockton Coll.*, 865 F.3d at 1057 (quoting *Davis*, 526 U.S. at 644-45); *see, e.g., Pogorzelska v. Vandercook Coll. of Music*, No. 19-cv-5683, 2023 WL 3819025, at *18 (N.D. Ill. June 5, 2023) (finding severe harassment not precluded as a matter of law on summary judgment where harasser appeared on a friend's phone via FaceTime while the plaintiff was sitting behind her and where the harasser sat near plaintiff in class following no-contact order); *Pennridge Sch. Dist.*, 413 F. Supp. at 401, 404 (holding that a reasonable jury could find sexual harassment severe and pervasive based on abusive ex-boyfriend's demands to get back together, harasser's friends using gender-based insults like "bitch" and "whore," and stalking behavior).

Because of JR4's harassment, Doe 1 reported several times feeling unsafe on campus, and she altered her behavior and schedule in multiple ways to minimize contact with JR4. (Pl. Ex. 1, Doe 1 Dep. 133:15-25, 145:1-10, 156:10-15, 159:14-19, 208:3-25, 209:1-18; Def. Ex. N, No. 125-19 at 3, 18; Pl. Ex. 9 at 2; Pl. Ex. 11 at 2; Def. Ex. V, No. 125-28 at 4-5). Doe 1 sought accommodations for required courses she would have to take with JR4 and reported feeling sick to her stomach sitting in the same class as him. (Pl. Ex. 1, Doe 1 Dep. 55:4-21, 62:7-12; Def. Ex.

V, No. 125-28 at 4). Doe 1 also arranged with her professor to switch out of a required seminar, which caused her to miss opportunities to present. (Pl. Ex. 1, Doe 1 Dep. 54:2-22; Def. Ex. W, No. 125-29 at 2; Def. Ex. V, No. 125-28 at 4). Because she felt unsafe on campus, Doe 1 avoided working on campus after dark and on the weekends and purchased a parking pass to avoid walking long distances on campus. (Pl. Ex. 1, Doe 1 Dep. 208:3-16; Pl. Ex. 8 at 2; Def. Ex. W, No. 125-29 at 2; Def. Ex. V, No. 125-28 at 4). In addition, Doe 1's graduation was delayed three months due to her inability to focus on her research, the need to take two short breaks from school, and the time delay caused by changing her committee members to avoid conflicts of interest with JR4's advisors. (Pl. Ex. 1, Doe 1 Dep. 237:3-6, 238:2-15, 239:6-25, 240:15-24, 242:10-24, 246:19-24; Def. Ex. V, No. 125-28 at 4). Viewing the undisputed facts in the light most favorable to Doe 1, the question of the severity and pervasiveness of the harassment she experienced should be decided by the jury. *Nissen v. Cedar Falls Cmty. Sch. Dist.*, No. 20-cv-2098-CJW-MAR, 2022 WL 873612, at *16 (N.D. Iowa Mar. 23, 2022) (noting that "whether pervasiveness is adequately met is an appropriate question for the jury-not the Court"); *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1311-12 (10th Cir. 2020) (finding "matters of degree—such as severity and pervasiveness—are often best left to the jury").

### ii.    *Doe 2*

With respect to Doe 2, BRUN argues that she cannot prove that she was sexually assaulted in March 2016 and that JR5's unwanted touching of her thigh during a presentation was not sexual harassment. (No. 130 at 17-18). First, construing the facts in Doe 2's favor, a reasonable jury could conclude that JR5 sexually assaulted Doe 2 in March 2016 following the St. Patrick's Day party. In her deposition, Doe 2 described having only had two beers, but that JR5 dragged her out of the party and told her she was embarrassing him. (Pl. Ex. 2, Doe 2 Dep. 199:15-18). She felt

more intoxicated than she normally would, given the amount of alcohol she had consumed.  (Def. Ex. RR, No. 127-2 at 4).  Soon after she left the party, Doe 2 "felt like [her] legs turned to rubber bands" and she had difficulty walking.  (Pl. Ex. 2, Doe 2 Dep. 199:18-21; Def. Ex. RR, No. 127-2 at 4).  The next thing she remembered was falling into a ditch when exiting of JR5's car at the end of his driveway.  (Pl. Ex. 2, Doe 2 Dep. 199:21-23; Def. Ex. RR, No. 127-2 at 4).  Doe 2 also remembered looking in the mirror in JR5's guest bathroom and seeing JR5 standing behind her without clothes on, moving in a way that suggested he was having sex with her from behind.  (Pl. Ex. 2, Doe 2 Dep. 201:15-18; Def. Ex. RR, No. 127-2 at 4).

UNL's IEC found that there was insufficient evidence to determine if JR5 violated University policy with respect to the March 2016 sexual assault due, in part, to the fact that Doe 2 reported that she did not feel contact or penetration during the assault.  (Def. Ex. RR, No. 127-2 at 48).  Although Doe 2 did not recall feeling contact or penetration, a reasonable jury could conclude that JR5 sexually assaulted her in March 2016 based either on the context of the assault described above (Doe 2 feeling more intoxicated than normal, suddenly losing her ability to walk normally, JR5 leading her away and taking her to his home, etc.) or because being drugged impaired her memory of the assault.  Doe 2 also reported feeling "outside of [her] body" while witnessing the assault in the mirror.  (Pl. Ex. 2, Doe 2 Dep. 201:5).  In addition, two other women came forward about another assault JR5 perpetrated at the same party one year before.  (Pl. Ex. 2, Doe 2 Dep. 199:4-7).  Thus, Doe 2 has presented sufficient evidence from which a reasonable jury could conclude she was sexually assaulted by JR5 in March 2016.

Second, a reasonable jury could find that JR5 stroking Doe 2's thigh during a presentation at orientation in August 2016 was unwelcome and part of a pattern of JR5's sexual harassment and abuse towards Doe 2.  At the time of this incident, Doe 2 had an on-again, off-again relationship

with JR5, and JR5 knew Doe 2 wanted their relationship to remain a secret in the department.  (Pl. Ex. 2, Doe 2 Dep. 241:1-10; Def. Ex. RR, No. 127-2 at 4).  Thus, the thigh touch was unwanted and made Doe 2 feel uncomfortable.  (Pl. Ex. 2, Doe 2 Dep. 241:5-6; Def. Ex. RR, No. 127-2 at 4).  The investigation report notes that JR5 touched at least two other students' thighs, which corroborates JR5's use of unwanted touching during class as a form of harassment.  (Def. Ex. RR, No. 127-2 at 28, 32, 39).  Based on Doe 2's testimony that the thigh touch was unwelcome, as well as JR5's history of harassing his classmates by touching their thighs during class, a reasonable jury could conclude that the August 2016 incident was sexual harassment.

BRUN's separate argument that this incident, in isolation, does not constitute "severe, pervasive, and objectively offensive" conduct is beside the point. The thigh-touching incident is just one among many instances of sexual harassment Doe 2 experienced, outlined in detail above, including multiple sexual assaults, threats, the disruption of her presentation, breaking into her apartment, showing up at her office, and calling her a "cunt" at a department social.  BRUN does not, unsurprisingly, assert that these other incidents either on their own or collectively fall short of the "severe, pervasive, and objectively offensive" requirement.  Given that BRUN failed to raise that argument in its opening brief, it should be considered waived.  *Cf. Neiswonger*, 580 F.3d at 775.

### C.  BRUN had actual notice of JR5's abuse in November 2017

BRUN asserts that it did not have actual knowledge of JR5's sexual harassment and assaults of Doe 2 until November 21, 2017.  (Doc. 130 at 20).  Doe 2 agrees.  In Spring 2017, Doe 2 and several classmates reported some of JR5's harassing conduct to Dona-Gene Barton, an associate professor in the political science department, including JR5 heckling Doe 2 during class and breaking into her apartment.  (Def. Ex. RR, No. 127-2 at 29, 34; Pl. Ex. 30).  The students also

informed Barton of JR5's sexual harassment of another student whom JR5 called sexually derogatory names at a school function. (Def. Ex. RR, No. 127-2 at 29).

However, Doe 2 and other students decided to drop the complaint and did not reach out to IEC at that time. (*Id*. at 34). Doe 2 did not report the subsequent sexual assaults until fall 2017 due to the ongoing police investigation during which Doe 2 sought to obtain a recorded admission of rape by JR5, which she ultimately succeeded in doing.

### D. BRUN's failure to appropriately respond to JR4 and JR5's harassment amounted to deliberate indifference

BRUN also asserts that UNL was not deliberately indifferent, which requires a finding that the intuition's "response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that UNL was deliberately indifferent in its response to JR4 and JR5's sexual harassment.

### i.    *Doe 1*

Based on BRUN's failure to adequately address JR4's persistent sexual harassment, its actions were not reasonable as a matter of law. A reasonable jury could find that UNL's repeated denial of Doe 1's right to file a complaint, its perpetuation of and failure to adequately respond to JR4's violations of the no-contact order, and its failure to provide further accommodations to restrict contact by JR4 despite his reported stalking behaviors amounted to deliberate indifference.

Following JR4's harassing texts, calls, and messages in May and June 2017, UNL's IEC erroneously informed Doe 1 that she could not file a complaint. Although Lamoureux sent Doe 1 a boiler-plate letter explaining a student's right to file formal complaints with law enforcement and IEC, in Lamoureux's subsequent meeting with Doe 1, he informed her that she could not file a complaint with IEC. (Pl. Ex. 1, Doe 1 Dep. 82:19-25, 83:1-15, 93:7-14, 97:16-25, 98:1-3). In

that June 30th meeting, Lamoureux told Doe 1 that IEC could not help her because this was "regular harassment" and not sexual harassment. (*Id.* at 91:23-25; 92:1-4, 11-21; Def. Ex. O, No. 125-20 at 8:345-351). Lamoureux told Doe 1 that her *only option* was to informally pursue a mutual no-contact order. (Pl. Ex. 1, Doe 1 Dep. 92:1-6). BRUN asserts (without citation to the record) that in the June 30th meeting, "Doe 1 did not desire to file a complaint with IEC . . . ." (No. 130 at 22).[1] Thus, there is a dispute of material fact as to whether Doe 1 wanted to file a formal complaint following JR4's persistent sexual harassment between May and June 2017. Doe 1 made clear in her deposition that she did want to file a complaint, but that Lamoureux told her she did not have that option. (Pl. Ex. 1, Doe 1 Dep. 97:4-18, 98:2-3). Fortunately, JR4 agreed to a mutual no-contact order. BRUN otherwise provided Doe 1 with no other accommodations or interim safety measures at that time. As discussed above, after the no-contact directive was issued, Lamoureaux contacted Doe 1 on JR4's behalf asking if it was possible to "work things out"— which Doe could not have made clearer she did not want to do. (Def. Ex. F, No. 125-7 at 2; Def. Ex. V, No. 125-28 at 3). Doe 1 understandably felt that JR4 was using Lamoureaux as a third party to contact her, in violation of the no-contact order. (Def. Ex. V, No. 125-28 at 3). This incident also demonstrates IEC's failure to grasp the nature of the situation and to take Doe 1's safety seriously.

Given BRUN's failure to appropriately respond to the hundreds of unwelcome messages JR4 sent to Doe 1, it is unsurprising that JR4's harassment escalated to contacting Doe 1's

---

[1] Because of BRUN's failure to support its assertion with citations to the record here (and elsewhere in its brief, identified throughout), it has not met its initial burden of pointing to which evidence in the record demonstrates a lack of a material dispute for trial. BRUN has also failed to comply with Neb. Civ. R. 7.1(a)(2)(A). While BRUN submitted a separate Statement of Facts, there is here, and elsewhere in their brief, no link between these facts and their legal arguments. *See also* Neb. Civ. R. 7.1 ("a party who does not follow this rule may be considered to have abandoned in whole or in part that party's position on the pending motion").

roommates and peers in the department, using more extreme language and threatening to harm Doe 1's reputation at the University. (Def. Ex. AA, No. 126-4; Pl. Ex. 1, Doe 1 Dep. 110:16-25, 11:1-5, 118:8-12; Def. Ex. V, No. 125-28 at 3). Following JR4's December 2017 messages to Doe 1's roommates, Doe 1 met with Counley, who informed Doe 1 that the messages were a breach of the no-contact order. (Pl. Ex. 1, Doe 1 Dep. 120:22-25, 135:16-23, 136:4-6). Later, in January 2018, Counley informed Doe 1 that she had determined that the messages *did not* constitute a breach of the no-contact order. (*Id*. at 142:18-21). This change makes little sense given that Counley received a copy of the messages prior to her initial communication with Doe 1. (*Id*. at 136:19-25). Moreover, Doe 1 was only informed of this finding after her Voices of Hope advocate reached out to Counley, who apparently had forgotten to share that information with Doe 1 despite having previously told Doe 1 that she would follow up about the breach of the no-contact order. (*Id*. at 136:3-6, 141:2-6, 20-25; 142:1-5). Doe 1 then again asked to file a formal complaint. (*Id*. at 141:8-9, 143:3-5, 147:17-18). In addition, at her meeting with Counley, Doe 1 reiterated her prior concerns that she felt unsafe taking courses with JR4. (*Id*. at 145:6-10). Yet IEC did not permit Doe 1 to file a formal complaint, nor did it provide any further accommodations. (*Id*. at 142:16-21, 147:17-18).

After JR4's harassing messages to Doe 1's roommate, Officer Fischer reached out to JR4 and told him not to contact Doe 1's roommates. (*Id*. at 123:17-25). Given that IEC refused to investigate the messages, Doe 1's only option was safety planning with Officer Fischer, who advised her to avoid walking alone on campus (which she understandably considered impractical advice). (*Id*. at 126:1-7, 21-23). Fischer was also seemingly perplexed by IEC's determination that JR4 had not violated the no-contact order, telling Doe 1 that he thought it would be beneficial to ask the University why it made that determination. (*Id*. at 126:9-12). Despite this early

22

indication that the mutual no-contact order was ineffective, UNL did nothing more than tell JR4 to stop (again).

In January 2018, Doe 1 reiterated her concerns to Officer Fischer about JR4's attendance at the journal club meetings where she presented.  (Pl. Ex. 7).  Fischer did nothing to address this concern.  Doe 1's advocate from the non-profit Voices of Hope provided Doe 1 with a phone number for a police escort, but as Doe 1 explained, it was not feasible to call and wait for an escort each time she had to move about campus, which she did frequently to attend classes and seminars and to get to work.  (Pl. Ex. 1, Doe 1 Dep. 126:15-25, 127:1-24).

In addition, before the start of the spring semester in 2018, Doe 1 met with Meagan Counley to request an accommodation so that she would not be required to sit in an eight-person, discussion-based class with her harasser, as well as a required seminar course.  (*Id*. at 55:4-21, 56:9-11, 133:10-25).  Doe 1 told Counley that she felt unsafe taking classes with JR4, especially following the threatening messages he sent to her roommates.  (*Id*. at 133:19-22).  Counley denied that request, refusing to even speak with Doe 1's professor about the situation.  (*Id*. at 133:24-25, 134:1-5).

The only measure put in place at the time—the no-contact order—did not adequately deter JR4 from continuing his pattern of harassing conduct towards Doe 1, as illustrated by JR4's sexually derogatory May 5, 2018 email sent directly to Doe 1.  Following receipt of this email, Doe 1 met with Title IX Coordinator Tami Strickman and Officer Fischer.  (Def. Ex. N, No. 125-19 at 3).  Fischer urgently summoned Doe 1 to the police station even though she had previously scheduled a meeting for the following day.  (Pl. Ex. 1, Doe 1 Dep. 153:6-8, 13-16).  Due to the last-minute change, Doe 1 felt unprepared and was not able to bring her advocate.  (*Id*. at 159:19-23).  She was taken to a room in the police station and her boyfriend who had accompanied her to

23

the meeting was not permitted to stay with her. (*Id*. at 153:23-25). During that meeting, Strickman inexplicably asked Doe 1 to go through the email from JR4 line by line and tell her what she thought each line meant. Why Strickman asked Doe 1 to explain what JR4 meant when he said, "[d]on't refer to yourself as a strong, independent woman ever again," for example, is unclear. (Def. Ex. O, No. 125-20 at 16:690-691). Strickman also asked Doe 1 to provide a list of all the awards she had received as a graduate student, lending credence to JR4's accusation that Doe 1 had not actually deserved or earned them. (Def. Ex. O, No.125-20 at 17:748-759).

Strickman then presented Doe 1 with three options: file a complaint regarding the single email, file a complaint anonymously regarding the single email, or do nothing. (Pl. Ex. 1, Doe 1 Dep. 155:16-20). Strickman told Doe 1 that she could not file a complaint about the entire situation, including JR4's prior harassing conduct, telling Doe 1 that she had waived her right to file a complaint as to those events having previously agreed to informal resolution. (*Id*. at 156:2-6). During that meeting, Doe 1 told Strickman and Fischer that JR4 "seems very unstable" and that she was "definitely afraid of him and [ ] definitely afraid to be on campus." (Def. Ex. O, No. 125-20 at 3:135, 4:136-137). Fischer's contemporaneous notes also indicate that Doe 1 was still "very concerned" about seeing JR4 in Morrison Center, as he supposedly lacked key card access to that building. (Def. Ex. N, No. 125-19 at 3).

The next day, Doe 1 attended the previously scheduled meeting with Meagan Counley, Officer Fischer, and her advocate. (Pl. Ex. 1, Doe 1 Dep. 158:23-25, 159:1-2). During this meeting, Counley reiterated that Doe 1 could only file a complaint regarding the most recent email. (*Id*. at 159:9-12). Doe 1 also expressed her concerns again about unsafe conditions on campus. (*Id*. at 159:14-18). She asked Counley what she and IEC had done to make campus a safe learning environment for her. (*Id*. at 159:16-18). In response, Counley stated that was not her job. (*Id*. at

159:18-19). Doe 1 chose to file a formal complaint based on the May 5, 2018 email. (*Id*. at 161:19-20).

In early July 2018, Doe 1 repeated her concern about seeing JR4 in Morrison Center to Officer Fischer. (Def. Ex. N, No. 125-19 at 18). Around this time, Fischer learned that a secretary was letting JR4 into the building. (*Id*. at 19). On July 27, 2018, after an investigation, IEC issued a report finding that JR4 had engaged in sexual misconduct and stalking and that he failed to comply with the direction of University officials or law enforcement in violation of the Student Code of Conduct. (Def. Ex. W, No. 125-29 at 1). The report specifically found that JR4 had violated the no-contact order by sending Doe 1 the May 5, 2018 email. (Def. Ex. W, No. 125-29 at 2; Pl. Ex. 1, Doe 1 Dep. 167:13-25, 168:1-10). IEC recommended sanctions of one year probation ("a formal written reprimand") and a continuation of the existing no-contact order. (Def. Ex. W, No. 125-29 at 2). This constituted a continuation of the status quo even after JR4 was officially found to have breached the existing no-contact order, demonstrating its ineffectiveness.

In the beginning of fall semester 2018, JR4 was teaching in a lab directly across the hall from Doe 1. (Pl. Ex. 1, Doe 1 Dep. 234:16-25, 235:1-3). Doe 1 requested an accommodation from IEC seeking to move JR4's lab. (*Id*. at 234:23-25). This request was denied. (*Id*. at 234:21-22, 235:6-7). BRUN mischaracterizes this event, asserting that "[w]hen Doe 1 asked for JR4's lab to be moved, it was moved." (No. 130 at 23) (no citation to the record). JR4's lab was moved—down the hall a little bit—but that was achieved by Doe 1 on her own initiative, working with her department. (Pl. Ex. 1, Doe 1 Dep. 234:19-22). Doe 1 also requested a parking pass to avoid walking long distances alone on and to and from campus, but that request was denied. (*Id*. at 208:3-12).

In September 2018, following a hearing, IEC issued a determination letter which added one additional sanction limiting JR4's access to Morrison Center to between 8 a.m. and 5 p.m. for academic purposes only. (Def. Ex. EE, No. 126-8 at 2). This was also a continuation of the status quo, as JR4 continued to be permitted to enter Morrison Center where Doe 1 conducted research and worked. In fact, this additional "sanction" expressly gave JR4 permission to enter Morrison Center including to attend seminars that Doe 1 regularly attended and at which she presented. (Def. Ex. EE, No. 126-8 at 2; Def. Ex. FF, No. 126-9 at 2-3). Doe 1 emailed the hearing officer about her concerns and was simply told that if JR4 attended any seminars (including her presentations), the no-contact order would be in place. (Def. Ex. FF, No. 126-9 at 2-3). As Doe 1 summarized in her September 27, 2018 letter appealing the hearing determination, "[JR4] can enter my place of work, teaches across the hall from me at the same time, walks through my TA office hours weekly, and can attend seminars at which I am presenting." (Pl. Ex. 9 at 2). After the final determination, Doe 1 continued seeing JR4 without notice in Morrison Center in the subsequent months. (Pl. Ex. 10). When she followed up about enforcement of the sanctions in December 2018, Jake Johnson told her the new building restrictions would have only been in place the previous week, over two months after the sanctions were issued. (Pl. Ex. 10 at 2).

JR4's harassing message submitted to the online "DearUNL" forum in September 2019 violated the spirit of the no-contact order and demonstrated that JR4 remained a threat to Doe 1. (Pl. Ex. 13, Pl. Ex. 14). Following this message, Doe 1 filed a formal complaint. (Pl. Ex. 13). IEC issued a letter finding that the message was not directed at Doe 1, despite having been posted in response to an article describing Doe 1 and other students' experiences of sexual harassment while attending UNL. (Pl. Ex. 12; Def. Ex. JJ, No. 126-13). UNL took no further action.

After Doe 1 transferred buildings to Chase Hall, she requested that JR4's limited building access also be transferred. (Pl. Ex. 1, Doe 1 Dep. 197:18-20, 214:3-7). This request was denied. (*Id*. at 197:21-22, 214:3-10). Accordingly, after Doe 1 transferred buildings, there were *no* restrictions in place to prevent or deter JR4 from accessing Doe 1's lab and workplace. As Doe 1 explained, she would often work alone in her lab or in the basement of Chase Hall after hours. (*Id*. at 198:2-14, 199:16-22).

In sum, after JR4's initial barrage of hundreds of messages to Doe 1 in May and June 2017 and after JR4's subsequent threatening messages in December 2017 to Doe 1's roommates, IEC told Doe 1 that she could not file a complaint. Then, after JR4's May 2018 email to Doe 1, IEC told her she could only file a complaint about the most recent message, because she had waived her right to formally seek redress for those incidents. This was even though the most recent message was a clear continuation of a pattern of harassing conduct and that Doe 1 had up until that point been denied the right to file a complaint. UNL did not take JR4's violations of the no-contact orders seriously (merely telling him to stop) and even personally perpetuated JR4's harassment of Doe 1 via Lamoureaux.

Throughout this time, Doe 1 repeatedly expressed concerns about JR4's unfettered access to her places of work and study and specifically reported stalking behaviors such as walking through her office hours and attending her journal club presentations. IEC denied Doe 1's requests for accommodations to avoid being in the same classes with JR4, to move JR4's lab from directly across the hall from her, and for a parking pass to avoid walking long distances on campus alone. Even after BRUN imposed some limitation on JR4's access to Morrison Center where Doe 1 conducted research and worked, this sanction was not enforced and was meaningless given JR4's history of entering the building despite his lack of key card access. Even more egregiously, after

27

Doe 1's lab was moved to Chase Hall, BRUN denied Doe 1's request to transfer the sanction limiting his access to her building despite having previously determined such a restriction was necessary to keep Doe 1 safe.  Accordingly, a reasonable jury could find that BRUN's response to JR4's harassment was clearly unreasonable.  *See, e.g., Pogorzelska*, 2023 WL 3819025, at \*19-20 (N.D. Ill. Jun. 5, 2023) (allowing deliberate indifference claim to proceed to trial where school responded to violations of a no-contact order with a mere "talking-to" and failed to provide further accommodations despite inevitable run-ins with harasser on campus).

The *Dardanelle* case BRUN cites in which the Eighth Circuit affirmed the district court's grant of summary judgment on a Title IX claim is not comparable.  In that case, the first reported incident of "sexual assault" involved the assailant merely accidentally bumping into the plaintiff during a kickball game.  *Jane Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 724 (8th Cir. 2019).  In addition, the school doubted the veracity of the second report of sexual assault given that the assailant denied the incident and no other students sitting at the table witnessed the assault, which took place during class.  *Id.* at 724, 727.  Here, UNL was put on notice of persistent sexual harassment by JR4, and JR4 admitted to most of the complained-of conduct—thus, more was required of UNL.  The other case BRUN cites, *Thomas v. Board of Trustees of the Nebraska State Colleges*, involved two isolated and brief incidents of harassment with the harasser "pestering" two students and asking one of them for a kiss, followed by the alleged rape and murder of a third student.  No. 8:12-cv-412, 2015 WL 4546712, at \*11 (D. Neb. July 28, 2015), *aff'd on appeal*, 667 F. App'x 560 (8th Cir. 2016) (unpublished).  Given the unrelated and relatively minor nature of the first two incidents, the court found the commensurately minor sanctions imposed not clearly unreasonable as a matter of law.  *Id.* at \*14.  By comparison, the instant case involves the persistent harassment of a single student who repeatedly notified UNL that the no-contact order was

ineffective and inadequate to protect her on campus, yet it imposed no further meaningful sanctions.

### ii.    Doe 2

A reasonable jury could similarly conclude that the University's response to JR5's sexual harassment and assaults was deliberately indifferent due to the complete lack of interim measures during the eight-month investigation and appeals process along with UNL's unjustified delays, which effectively forced Doe 2 to withdraw from her PhD program prior to receiving a final decision.

After Doe 2 met with IEC on November 21, 2017, Megan Counley waited one month before contacting JR5.  On January 8, 2018, Counley sent Doe 2 a letter informing her that the investigation would exceed sixty days.  (Def. Ex. XX, No. 127-8).  The only reason cited for the delay was IEC's delay in contacting JR5.  (*Id*.).  Yet, after Doe 2's meeting with IEC on November 21, 2017, Doe 2 requested, via her advocate from Voices of Hope, Morgan Beal, that IEC hold off *a few days* (until Monday, November 27, 2017) to contact JR5.  (Pl. Ex. 22; Pl. Ex. 23 at 1).  Beal assured Doe 2 that it was unlikely IEC would contact JR5 prior to that Monday, as the office would be closed Thursday and Friday of that week for Thanksgiving.  (Pl. Ex. 22).  Beal then passed along Counley's message that she would wait until Monday, November 27th to contact JR5.  (Pl. Ex. 23 at 2).  Doe 2 requested a status update from Counley on December 11, 2017.  (Def. Ex. UU, No. 127-5 at 1).  In response, Counley said she was reaching out to and interviewing witnesses. Counley indicated she would be reaching out to JR5 "in the near future" and told Doe 2 that she would contact him the day after Doe 2 left for winter break.  (Def. Ex. UU, No. 127-5 at 1). Counley finally contacted JR5 on December 21, 2017.  (Def. Ex. VV, No. 127-6).  Thus, Doe 2 initially requested that IEC hold off in contacting JR5 for a few days in conjunction with

Thanksgiving break; but after learning Counley had not yet contacted JR5 upon her return, the plan to contact JR5 was pushed to after her departure for winter break. Counley did not explain why she had not contacted JR5 on November 27th and never told Doe 2 that holding off on contacting JR5 in November or December would delay the progress of the investigation.

Moreover, Doe 2's motivation for seeking to hold off on contacting JR5 was concern for her safety and the hope that protective measures could be put in place prior to JR5 finding out about her complaint. (Pl. Ex. 2, Doe 2 Depo. 232:2-8, Pl. Ex. 21 at 4). During her meeting with IEC on November 21, 2017, IEC was unable to assure Doe 2 that her safety would be protected if she provided information and if JR5 were to be notified of the investigation. (Pl. Ex. 2, Doe 2 Dep. 232:2-8; Pl. Ex. 21 at 4). Doe 2 worried that if JR5 were to be notified of her complaint and found out about her attempts to record him discussing the sexual assaults he would "show up at [her] apartment and shoot [her]." (Pl. Ex. 2, Doe 2 Dep. 231:21-25; 232:1-8). UNL did not implement *any* safety measures at this time. This is notwithstanding the fact that the Student Code of Conduct in place at the time stated that, minimally, "'No contact directives are to be issued in writing to persons involved in any alleged sexual misconduct promptly after the University receives notice of a complaint." (Def. Ex. P, No. 125-22 at 18).

Although there were delays in obtaining all the recorded calls between Doe 2 and JR5 pertaining to admissions about the sexual assaults from the Lincoln Police Department ("LPD"), Doe 2 furnished her own copy of audio of the most relevant call to IEC on December 18, 2017. (Pl. Ex. 2, Doe 2 Dep. 254:17-22; Pl. Ex. 24; Def. Ex. RR, No. 127-2 at 43-47). In addition, while Doe 2 requested additional time to review JR5's submission (including on the weekend, which was denied), she only did so with the understanding that it would not delay the investigation. (Pl. Ex. 2, Doe 2 Dep. 268:5-15; Def. Ex. ZZ, No. 127-10 at 1-2).

Following Counley's decision letter issued on April 6, 2018 informing the parties of a seven-day deadline to appeal, JR5 filed a late notice of appeal on April 23, 2018. (Def. Ex. DDD, No. 127-14; Def. Ex. EEE, No. 127-15). UNL allowed the appeal to proceed. (Def. Ex. NNN, No. 128-8). Further, before the hearing, IEC pressured Doe 2 to settle on two occasions—after Doe 2 had already received a favorable outcome. These efforts to pressure Doe 2 to mediate both violated the Student Code's prohibition on the use of mediation to resolve sexual assault cases and were used in conjunction with further delays or threats of delay to pressure Doe 2 to settle with JR5. (Def. Ex. P, No. 125-22 at 20).

On May 7, 2018, Jake Johnson and Meagan Counley met with Doe 2 to discuss a settlement offer. (Pl. Ex. 27 at 3-4). Counley specifically requested that Doe 2 attend this meeting alone, without her advocate. (Pl. Ex. 2, Doc 2 Dep. 293:1-4, 20-25; 294:7-11). The same day that Doe 2 rejected this offer, IEC asked to delay the hearing a week. (Pl. Ex. 27 at 3). Then, on the eve of the hearing, which had already been postponed a week to May 31, 2018, Tami Strickman called Doe 2 to communicate another settlement offer from JR5. (*See* Def. Ex. GGG, No. 127-18). Doe 2 said she was not interested in settling, but Strickman pressured Doe 2 to accept the offer, telling Doe 2 that she should recognize that she could lose and that she should consider the offer if she wanted to ensure JR5 was off campus. (Pl. Ex. 2, Doe 2 Dep. 308:16-21). Strickman asked Doe 2 to respond by that afternoon and told her that the hearing would likely need to be rescheduled yet again. (Pl. Ex. 2, Doe 2 Dep. 308:3-11, 309:21-22). Doe 2 responded by 5:00 p.m., rejecting the offer via email, and minutes later, Strickman responded stating that, "[a]s we discussed," they would need to postpone the hearing to a date within the next couple of weeks. (Def. Ex. GGG, No. 127-18 at 2). Despite these obstacles, the hearing proceeded the following day—on May 31st.

(Pl. Ex. 2, Doe 2 Dep. 311:16-20).  A final decision denying JR5's appeal was finally issued on July 26, 2018.  (Def. Ex. TTT, No. 128-14).

After Doe 2 met with IEC on November 21, 2017, JR5 engaged in further harassment; yet UNL still did not take any steps to protect Doe 2.  While Doe 2 was meeting with IEC on November 21, 2017, JR5 sent Doe 2 an email inviting her to a speaking event featuring the same prosecutor who was reviewing the LPD's investigation of Doe 2's sexual assaults.  (Pl. Ex. 23 at 7-9; Def. Ex. RR, No. 127-2 at 7).  UNL was aware of JR5's history of using his position as an attorney with connections in the community as a means of intimidating Doe 2.  (Def. Ex. RR, No. 127-2 at 4). UNL also knew that JR5 had a history of sending threatening messages to Doe 2 in conjunction with her pursuit of both the LPD investigation and Title IX investigations against him.  In August 2017, the day after Doe 2 met with LPD, JR5 sent messages to her insinuating that she set his barn on fire and shot a bullet through his bedroom window.  (Def. Ex. JJJ, No. 128-4 at 21-23; Def. Ex. RR, No. 127-2 at 7).  Separately, JR5 used a phrase that was the same as one used by Morgan Beal, Doe 2's advocate, so she became concerned he was listening in on her calls and began using a different phone provided by Voices of Hope.  (Def. Ex. JJJ, No. 128-4 at 21-23).  In addition, a witness told Counley during the Title IX investigation that in Spring 2017 that JR5 told Doe 2 that he was friends with the prosecutor and that no one would take her word over his.  (Def. Ex. RR, No. 127-2 at 34).  Despite JR5's documented history of using threats to intimidate Doe 2 and deter her from seeking help, IEC did not investigate JR5's November 21st email, nor did it offer so much as a no-contact order either at the time of the first meeting with Doe 2 in November or after JR5 was notified in December 2017.

Nor did IEC take further steps after JR5's Facebook post in February 2018 in which JR5 changed his profile picture to an embarrassing photo of Doe 2 and her classmate (who had also

filed a Title IX complaint). (Pl. Ex. 2, Doe 2 Dep. 182:19-23; Pl. Ex. 25). Nor after his sending of a nude photograph to Counley during the investigation, which caused Doe 2 to feel both intimidated and degraded. (Def. Ex. 127-1 at 9; Doe 2 Dec. ¶ 20).

In Fall 2017, JR5 was taking a class across the hall from Doe 2's office. (Pl. Ex. 2, Doe 2 Dep. 62:1-5; 284:3-8, Pl. Ex. 19 at 3). Doe 2 requested an accommodation to address this, but UNL did nothing to move JR5's class or to otherwise protect Doe 2 despite their proximity on campus, even after his post-notice harassment. (Pl. Ex. 2, Doe 2 Dep. 284:3-8). In her meeting with Officer Fischer in early January 2018 after winter break, Doe 2 reported feeling unsafe on campus, including when alone at night on her bike. (*Id*. at 284:10-16; 285:2-4). Fischer offered his number, but no safety measures were implemented. (*Id*. at 261:7-17; 285:7-11).

UNL knew JR5 owned a gun and had carried a concealed weapon on campus in the past. (*Id*. at 212:24-25; 249:5-6; Def. Ex. RR, No. 127-2 at 7). Counley's declaration notes that witnesses reported that they had not seen JR5 carrying a weapon on campus. (No. 127-1 at 10). This is unsurprising given that JR5 carried a small handgun *in his pocket* and had two other smaller guns that he *concealed*. (Def. Ex. RR, No. 127-2 at 7). UNL was also aware of an incident in which JR5 pulled a gun on his neighbor. (*Id*.). Yet IEC took no steps to address the risks posed to Doe 2 by JR5 considering his history of carrying guns on campus.

Taking into account the circumstances of the case, including the severe nature of Doe 2's allegations (rape), JR5's history of sending intimidating threats to Doe 2, JR5's history of carrying concealed weapons (including on campus), the close proximity of JR5's class and Doe 2's office, and JR5's post-notice harassment indicating he did not grasp the seriousness of the allegations against him or respect the Title IX process, a reasonable jury could conclude that UNL's failure to provide any interim safety measures to Doe 2 at any point during the investigation or appeals

process amounted to deliberate indifference.  In addition, IEC was aware of the parallel LPD investigation and the existence of recorded conversations in which JR5 purportedly confessed to sexually assaulting Doe at the outset of the Title IX investigation and received Doe 2's copy of one of the recorded confessions in December 2017.  (Pl. Ex. 2, Doe 2 Dep. 254:17-22; Pl. Ex. 24; Def. Ex. RR, No. 127-2 at 43-47).

Despite this stark evidence, no interim measures were implemented.  These measures could have included a no-contact order, limitations on JR5's access on campus, moving JR5's class, or placing JR5 on probation or suspension.  BRUN has pointed to no evidence in the record that it took steps to keep Doe 2 safe outside of Officer Fischer providing his phone number to her.  Based on these circumstances, UNL's response was not reasonable as a matter of law.  *See, e.g., Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 WL 1563424, at *4 (D. Conn. Mar. 26, 2003) (finding school's failure to provide academic or other accommodations immediately following claim of sexual assault clearly unreasonable).

A reasonable jury could also find that the protracted Title IX process amounted to deliberate indifference, especially given the lack of interim measures.  *See Williams v. Bd. of Regents Univ.*, 477 F.3d 1282, 1296-97 (11th Cir. 2007) (finding deliberate indifference adequately alleged when eleven-month delay in scheduling disciplinary hearing—at which time two assailants no longer attended the university—which effectively forced plaintiff to withdraw).  Due to the lengthy investigation process followed by the delayed appeals process (taking approximately eight months total), IEC did not send Doe 2 a final decision until after her graduation in May 2018.  (Def. Ex. TTT, No. 128-14; Pl. Ex. 15).  Critically, prior to receiving a final decision, Doe 2 had to decide whether to continue to pursue a PhD or to graduate in May 2018 with only a master's degree.  (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-7; Pl. Ex. 26 at 2; Pl.

Ex. 28; Pl. Ex. 29 at 6). In Spring 2016, Doe 2 sought admission to the PhD program, (Pl. Ex. 16), and at the end of 2017, she passed her comprehensive exams at the PhD level, qualifying to proceed with the next stages of the doctoral program, (Pl. Ex. 17). She did not want to give up on her PhD but felt that she could not breathe on campus. (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-7; Pl. Ex. 28 at 5). With no safety precautions in place and JR5's continued presence on campus, she could not commit to staying to pursue her PhD prior to confirmation that JR5's expulsion would be upheld. (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-7; Pl. Ex. 26 at 2; Pl. Ex. 28 at 5; Pl. Ex. 29 at 6). Doe 2 sought more time to make this decision, but she ultimately had to provide an answer so that her advisor could complete teaching assignments. (Pl. Ex. 2, Doe 2 Dep. 322:3-9; Pl. Ex. 28). Thus, IEC's initial delays in reaching out to JR5, its decision to allow JR5's late appeal to proceed, and its multiple scheduling delays to accommodate JR5's schedule cost Doe 2 the opportunity to finish her degree. At this point, due to the complete lack of interim measures, Doe 2 had no assurances that in the event JR5 was allowed to remain on campus, UNL would ensure her safety. Accordingly, UNL's actions following Doe 2's notice of sexual assault were not reasonable as a matter of law.

### E. BRUN's deliberate indifference made Plaintiffs vulnerable to further harassment, which they experienced, and caused them to miss out on educational opportunities

BRUN asserts that, pursuant to *Doe v. Board of Trustees of Nebraska State Colleges*, 78 F.4th 419, 424 (8th Cir. 2023), and *Shank v. Carleton College*, 993 F.3d 567, 573 (8th Cir. 2021), Plaintiffs must demonstrate that its deliberate indifference "cause[d] or made [Plaintiffs] vulnerable to *actual* further harassment." (No. 130 at 31). Yet, in both *Board of Trustees* and *Shank*, the Eighth Circuit recited the well-established rule from *Davis*: for liability to attach, an institution's deliberate indifference "must cause students to undergo harassment *or make them liable or vulnerable to it*." *Bd. of Trs. of Neb. State Colls.*, 78 F.4th at 424 (quoting *Shank*, 993

F.3d at 573) (emphasis added); *see also Davis*, 526 U.S. at 645. Moreover, in both cases, the Eighth Circuit found that the plaintiffs had failed to link the universities' action or inaction to more than "emotional trauma" that the plaintiffs experienced following sexual harassment or assault. *Bd. of Trs. of Neb. State Colls.*, 78 F.4th at 424; *Shank*, 993 F.3d at 576. That is not the case here.

### i.    *Doe 1*

Unlike in *Board of Trustees* and *Shank*, Doe 1 has provided evidence of specific instances of harassing conduct following her initial report of harassment in June 2017. In addition to experiencing further harassment, Doe 1 has demonstrated that UNL's failure to adequately respond caused more than emotional harm and denied her full access to her educational benefit by causing her to switch to a different seminar, miss opportunities to present, limit working hours on campus, take time off from school, change committee members, and delay her graduation—cognizable harm under Title IX. *See Shank*, 993 F.3d at 576.

As discussed in detail above, after JR4's initial sexual harassment in May and June 2017, IEC did not permit Doe 1 to file a complaint, and thus, JR4 received no formal reprimand or sanction of any kind—leaving Doe 1 vulnerable to further harassment. (Pl. Ex. 1, Doe 1 Dep. 97:16-25, 98:1-3). While JR4 agreed to a mutual no-contact order, this was inadequate to deter him from continuing to harass Doe 1. In November 2017, JR4 began stalking Doe 1 by attending her journal club meetings. (Pl. Ex. 6 at 9; Pl. Ex. 1, Doe 1 Dep. 56:25, 57:1, 59:18-25, 60:1-4). He also drove by her in December 2017, causing her to believe he was following her. (Pl. Ex. 6 at 9). The inadequacy of the no-contact order was further demonstrated by JR4's December 2017 harassing and threatening emails to Doe 1's roommates and peers (Pl. Ex. 1, Doe 1 Dep. 110:16-25, 111:1-5; Def. Ex. W, No. 125-29 at 2; Def. Ex. EE, No. 126-8 at 2; Def. Ex. M, No. 125-18 at 1; Def. Ex. AA, No. 126-4; Def. Ex. V, No. 125-28 at 3). These messages included threats to harm

Doe 1's reputation and constituted a violation of the no-contact order, because as the subsequent September 2018 investigation report notes, JR4 "was aware of the nature of the relationships between [Doe 1 and her roommate], and knew that [the roommate] would share the messages with [Doe 1]."  (Def. Ex. EE, No. 126-8 at 2; Def. Ex. AA, No. 126-4).  Yet, in response, IEC *again* denied Doe 1 her right to file a complaint and provided no further accommodations or sanctions. (Pl. Ex. 1, Doe 1 Dep. 142:16-21, 147:17-18).  IEC also denied Doe 1's requests for academic accommodations and did nothing to limit JR4's access to Doe 1 in Morrison Center.  (*Id.* at 133:19-25, 134:1-5).

These failures left Doe 1 vulnerable to further harassment which she experienced in the form of in-person stalking, (Def. Ex. M, No. 125-18 at 4; Pl. Ex. 7), and the subsequent vulgar and harassing May 2018 email, (Def. Ex. N, No. 125-19 at 1-2).  Even after the formal investigation and imposition of sanctions, Doe 1 continued to see JR4 in Morrison Center and reported that the sanctions were unenforced.  (Pl. Ex. 1, Doe 1 Dep. 234:17-22; Pl. Ex. 10).  As Doe 1 explained in her appeal letter, she continued to feel unsafe as, "[JR4] can enter my place of work, teaches across the hall from me at the same time, walks through my TA office hours weekly, and can attend seminars at which I am presenting."  (Pl. Ex. 9 at 2).  In addition to these frequent, forced run-ins and JR4's stalking behaviors, JR4 demonstrated his continued harassing intent in his September 2019 "DearUNL" post.  (Pl. Ex. 14).  This harassing behavior indicated JR4 still posed a threat to Doe 1, yet UNL took no further action.  (Def. Ex. JJ, No. 126-13 at 2).  After Doe 1 transferred buildings to Chase Hall, UNL put no restrictions in place to prevent or deter JR4 from accessing Doe 1's lab and workplace.  (Pl. Ex. 1, Doe 1 Dep. 197:18-22).

Given UNL's inadequate protections, Doe 1 reported that she had to "adapt," such as by avoiding being on campus after dark despite needing to work long hours to complete her research

and studies and switching to a different seminar which caused her to miss opportunities to present. (*Id.* at 127:6-7; Pl. Ex. 8 at 2; Def. Ex. V, No. 125-28 at 4). These disruptions impacted Doe 2's ability to make progress on her work, ultimately resulting in a delayed graduation. (*Id.* at 238:2-15, 13-15; 246:22-24). Thus, viewing the facts in the light most favorable to Doe 1, a reasonable jury could find that BRUN's inadequate response caused Doe 1 to undergo further harassment and caused her cognizable harm under Title IX.

### ii.    *Doe 2*

Doe 2 has also provided evidence of specific instances of harassing conduct following her initial report of sexual harassment and assault to IEC on November 21, 2017. Following her initial report, UNL put *no* interim measures in place, leaving her vulnerable to further harassment. After Doe 2's first meeting with IEC, JR5 sent a threatening email regarding the county prosecutor to intimidate Doe 2 from pursuing her complaint against him. (Pl. Ex. 23 at 7-9; Def. Ex. RR, No. 127-2 at 7). Then, in February 2018, JR5 changed his profile picture to a photo showing Doe 2 and her classmate intoxicated. (Pl. Ex. 2, Doe 2 Dep. 182:19-23; Pl. Ex. 25). JR5 also inappropriately sent a nude photo of Doe 2 to Counley during the investigation, causing Doe 2 to feel embarrassed and intimidated, fearing that JR5 would send additional damaging or sensitive photos of Doe 2 that he possessed. (Def. Ex. 127-1 at 9; Pl. Dec. ¶ 20).

BRUN asserts that JR5's Facebook post was unintentional and not harassing. (No. 130 at 32-33). However, a reasonable jury could find otherwise considering JR5's history of using embarrassing photographs to control Doe 2's behavior, (Pl. Ex. 23 at 2; Pl. Ex. 2, Doe 2 Dep. 180:9-25), and that the photograph included both Doe 2 and another student who filed a sexual harassment complaint with IEC, (Pl. Ex. 2, Doe 2 Dep. 182:6-11). In addition, the photo depicted Doe 2 in an unflattering way, with her eyes half-closed sitting at a bar with an alcoholic beverage,

which could harm her professional reputation. (*Id*. at 182:19-23). As discussed above, courts have found that schools are not absolved of liability where harassment occurs over social media. *See S.C.*, 86 F.4th at 716. UNL had disciplinary control over JR5 and could have, minimally, issued a no-contact order and investigated the above incidents to determine whether they were retaliatory and intended to prevent Doe 2 from pursuing her Title IX complaint. A reasonable jury could similarly view JR5 sending a nude photograph of Doe 2 to Counley as harassing conduct. BRUN claims this photo constitutes appropriate evidence of JR5 and Doe 2's relationship, (No. 130 at 32); however, a reasonably jury could disagree based on the nature of the photograph as well as JR5's history of using photographs as a means of intimidating Doe 2 and the fact that the photograph was taken a year before the assault. (Pl. Ex. 23 at 2; Pl. Ex. 2, Doe 2 Dep. 180:9-25; Doe 2 Dec. ¶ 21).

Further, UNL's failure to act after JR5's reported post-notice harassment caused Doe 2 more than emotional harm in the form of a denial of her full educational benefits. *See Shank*, 993 F.3d at 573. Doe 2 testified that, given UNL's continued failure to ensure her safety on campus, she minimized her time on campus, coming to campus only to teach and to attend classes. (Pl. Ex. 2, Doe Dep. 262:3-10). She also held shortened office hours. (*Id*. at 262:5-6). In addition, due to JR5's entirely uninhibited access to Doe 2 on campus for the duration of the investigation and appeals process, Doe 2 had to withdraw from the PhD program to avoid the possibility of further harm from JR5. (*Id*. at 326:20-25, 327:1-16; Pl. Ex. 26 at 2; Pl. Ex. 28 at 5; Pl. Ex. 29 at 6). Accordingly, viewing the facts in the light most favorable to Doe 2, a reasonable jury could find that BRUN's inadequate responses left her vulnerable to further harassment, which she experienced, and denied her full access to her educational benefits.

## F. Damages

BRUN argues that the Supreme Court's decisions in *Cummings v. Premier Rehab Keller P.L.L.C.*, 142 S.Ct. 1562, 142 S.Ct. 2853, *reh'g denied* (2022) and *Barnes v. Gorman*, 536 U.S. 181 (2002), holding that emotional distress damages and punitive damages, respectively, are not available for violations of the Rehabilitation Act of 1973 apply with equal force to Title IX, another Spending Clause statute.  (No. 130 at 33-39).  This Court is not bound to apply *Cummings* or *Barnes* to Plaintiffs' Title IX claims, as the Eighth Circuit has not yet addressed the applicability of these cases to claims arising under Title IX.  Even if it does, Plaintiffs' claims for other compensatory and consequential damages remain recoverable post-*Cummings*.

### i.     *Emotional distress damages*

*Cummings* was, as stated, a case involving the availability of damages in private actions under the Rehabilitation Act and the Affordable Care Act, not Title IX, and there is no binding authority requiring this Court to extend *Cummings* to Title IX actions.  The lynchpin of the *Cummings* decision is the Court's holding that recovery in private actions brought in accordance with legislative acts passed under the Spending Clause should be limited to those remedies traditionally available in actions for breach of contract, which have not traditionally allowed damages for mental anguish.

*Cummings* and its progeny cite to the Restatement (Second) of Contracts in defining "traditional" contract remedies that remain available in Spending Clause cases.  According to the Restatement, "[e]very breach of contract gives the injured party a right to damages against the party in breach," and subject to certain limitations, "the injured party is entitled to recover for all loss actually suffered."  Restatement (Second) of Contracts §§ 346, 347 (1981). The Restatement explains that, "[o]rdinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had" upon entering

the contract.  The court will therefore "attempt[ ] to put him in as good a position as he would have

been . . . had there been no breach." Restatement (Second) of Contracts § 344(a) (1981).

This "expectation interest," however, is not the only interest that may be protected.  *Id.*  If

the beneficiary of the contract "changed his position in reliance on the contract by, for example,

incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make

other contracts . . . the court may recognize a claim based on his reliance rather than on his

expectation."  *Id.*  "The interest protected in this way is called "'reliance interest.'"  *Id.*  Remedies

to protect these interests are non-exclusive.  Restatement (Second) of Contracts § 345(a) (1981).

Damages in cases of contractual breach

> are ordinarily based on the injured party's expectation interest and
> are intended to give him the benefit of his bargain by awarding him
> a sum of money that will, to the extent possible, put him in as good
> a position as he would have been in had the contract been performed.

Restatement (Second) of Contracts § 347 (1981).  In some cases, "the sum awarded will do this

adequately as, for example, where the injured party has simply had to pay an additional amount to

arrange a substitute transaction and can be adequately compensated by damages based on that

amount."  *Id.*  In other cases, however, "the sum awarded cannot adequately compensate the

injured party for his disappointed expectation as, for example, where a delay in performance has

caused him to miss an invaluable opportunity."  *Id.*  Such losses are described as follows:

> Items of loss other than loss in value of the other party's
> performance are often characterized as incidental or consequential.
> Incidental losses include costs incurred in a reasonable effort,
> whether successful or not, to avoid loss, as where a party pays
> brokerage fees in arranging or attempting to arrange a substitute
> transaction.  Consequential losses include such items as injury to
> person or property resulting from defective performance.

*Id.* (internal citations omitted).  However, the Restatement cautions, "[t]he terms used to describe the type of loss are not, however, controlling, and the general principle is that all losses, however described, are recoverable."  *Id.* (emphasis added).

### ii.     *Compensatory damages*

In addition to emotional distress damages, Plaintiffs seek compensatory damages in the form of lost educational opportunities, medical expenses, lost earning capacity, and other special damages.  The Supreme Court has held that compensatory damages are available for intentional violations of Title IX.  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 70-71, 76 (1992).  Thus, even where courts have found that *Cummings* bars claims for emotional distress damages under Title IX, they have still found that "there is nothing in the decision that bars a plaintiff from seeking other forms of compensatory damages under these three statutes."  *A.T. v. Oley Valley Sch. Dist.*, No. CV 17-4983, 2023 WL 1453143, at *4 (E.D. Pa. Feb. 1, 2023) (denying summary judgment and permitting plaintiffs to proceed to trial on claims for lost income, lost opportunity, fringe benefits, attorney fees, costs, and any other non-emotional distress damages); *see also Doe v. Univ. of Miss.*, No. 3:18-CV-138-DPJ-ASH, 2024 WL 3011133, at *4-5 (S.D. Miss. June 14, 2024) (allowing plaintiff to seek damages for lost educational opportunities); *McGowan v. S. Methodist Univ.*, 715 F.Supp.3d 937,  955-56 (N.D. Tex. 2024) (allowing claim for compensatory damages for medical expenses related to physical injuries and loss of educational opportunities and benefits to proceed where plaintiff presented evidence of loss of opportunities to compete and to earn scholarships); *see also Luke v. Lee Cnty.*, No. 1:20-CV-388 (W.D. Tex. Sep 20, 2023) (holding in ADA case that expectation damages are not precluded as a matter of law under *Cummings*); *N.S. v. W. Pa. Sch. for Blind Children*, No. 2:24-cv-0219 (W.D. Pa. Sep 23, 2024) (finding that compensatory damages are recoverable under the ADA and Section 504); *A.W. v. Coweta Cnty.*

*Sch. Dist.*, No. 22-14234 (11th Cir. Aug 7, 2024) (allowing claims for physical harm, compensation for lost educational benefits, remediation, and nominal damages to proceed under the ADA).

Plaintiffs have adequately supported their requests for these damages, which are cognizable under Title IX and should proceed to a jury. Each category is addressed below.

### a. Lost educational opportunities

Both Plaintiffs are entitled to seek compensatory damages for loss of educational opportunities resulting from UNL's deliberate indifference to sexual harassment they experienced. Because "[l]ost educational opportunities lie at the heart of Title IX private right of action cases," several courts have found such damages remain available post-*Cummings*. *Doe v. Univ. of Miss.*, 2024 WL 3011133, at *4-5; *Doe v. Fairfax Cnty. Sch. Bd.*, No. 1:18-cv-614, 2023 WL 424265, at *5 (E.D. Va. Jan. 25, 2023) (damages claim for lost educational opportunities permitted where, following sexual assault, plaintiff's academic performance and class attendance declined, and where plaintiff modified her behavior, isolated herself, and missed end-of-year concert to avoid seeing her harasser); *McGowan*, 715 F.Supp.3d at 955-56 (allowing claim for compensatory damages for loss of educational opportunities where plaintiffs lost opportunities to compete in athletics and opportunities to earn scholarships); *J.C. v. Bd. of Regents of the Univ. Sys. of Ga.*, 2023 WL 4938054, at *2-4 (allowing lost-educational-opportunities damages where plaintiff alleged that "after feeling unsupported and revictimized by the inaction by staff and other officials at [the university]," she "no longer felt that [the university] was a safe place for [her] to continue [her] studies" and withdrew before completing her degree). As the *Fairfax* court explained,

> Although it is true that principles of contract law place the burden on the plaintiff to prove damages with reasonable certainty… compensatory damages that are not based upon specific monetary harm but stem directly from lost opportunities suffered as a result of

> discrimination can nonetheless serve as a basis for damages in private right of action cases based on Spending Clause statutes. Accordingly, this Court finds that such losses of educational opportunities remain recoverable post-*Cummings* and that it would be premature at this time to preclude Plaintiff from presenting evidence related to compensatory damages for lost educational opportunities and benefits.

2023 WL 424265, at *5 (internal citations omitted).

i.   Doe 1

Following JR4's sexual harassment, Doe 1 sought academic accommodations to avoid taking classes with JR4, which IEC denied. She managed to personally obtain an accommodation by speaking with her professor, who allowed her to take a different seminar to avoid contact with JR4. However, taking this alternate seminar denied her the opportunity to present in front of her class as well as to see her classmates' presentations. (Pl. Ex. 1, Doe 1 Dep. 54:2-22; Def. Ex. W, No. 125-29 at 2; Def. Ex. V, No. 125-28 at 4). Because Doe 1 felt unsafe on campus, she was forced to change her work habits by avoiding staying on campus after dark and on the weekends despite the need to work long hours in the lab, negatively impacting her productivity. (Pl. Ex. 8 at 2; Def. Ex. V, No. 125-28 at 4-5; Pl. Ex. 1, Doe 1 Dep. 208:3-16). Doe 1's decreased productivity, the need to change advisors to avoid sharing committee members with JR4, and the need to take periods of time off from school also impacted her ability to enjoy the full benefits of her doctoral program and resulted in delayed graduation. (Pl. Ex. 1, Doe 1 Dep. 236:10-25, 237:1-6, 238:2-15, 239:9-25, 240:15-25, 241:1-4, 16-24; 242:10-17, 21-24; 246:22-24; Def. Ex. V, No. 125-28 at 4).

BRUN disputes that Doe 1's graduation was delayed. With no citation to the record, BRUN claims that in an interview in May 2018, Doe 1 stated that her projected graduation was August of 2020. (No. 130 at 37). Even if this were the case, Doe 1 had indicated in earlier annual reports (2015-2016 and 2016-2017) that she planned to graduate in Spring of 2020. (Def. Ex. H,

No. 125-12; Def. Ex. I, No. 125-13).  By late May 2018, Doe 1 had been sexually harassed multiple times and told by IEC that she could not file a complaint about the harassment; thus, it would make sense that, by this point, JR4's harassment and UNL's lack of a response were contributing to her anticipation of delayed graduation.  Thus, based on Doe 1's testimony and her academic reports, a reasonable jury could find Doe 1's graduation was delayed approximately three months from May 2020 to August 2020.

BRUN also asserts that any delay cannot be linked to the alleged Title IX violation.  (No. 130 at 37).  Yet, as discussed in detail above, following JR4's harassing messages in December 2017 and May 2018, UNL took no further meaningful action, and thus, JR4 maintained full access to Doe 1's place of work and study.  She continued to see him in her building, was forced to teach across the hall from him, and reported that he walked through her office hours weekly.  (Pl. Ex. 6 at 10; Def. Ex. N, No. 125-19 at 3; Pl. Ex. 9 at 2; Pl. Ex. 10).  As such, Doe 1 should be permitted to seek damages for loss of educational opportunities.

ii.   <u>Doe 2</u>

Following JR5's sexual assaults, JR5 remained on campus, even taking a class across the hall from Doe 2's office in Fall 2017.  (Pl. Ex. 2, Doe 2 Dep. 62:1-5, 284:3-8; Pl. Ex. 19 at 2-3).  Because of UNL's failure to implement any safety precautions, Doe 2 greatly limited her time on campus and kept shorter office hours—thereby negatively impacting her educational experience.  (Pl. Ex. 2, Doe 2 Dep. 262:3-10; Doe 2 Dec. at ¶ 22).  Her grades also suffered, and she was forced to take an "incomplete."  (Pl. Ex. 15; Doe 2 Dec. at ¶ 22).  Doe 2 ultimately decided to graduate with just a master's degree in May 2018 and forgo completion of the doctoral degree on which she had already made significant progress.  (Pl. Ex. 15; Doe 2 Dec. at ¶ 23).  At the time Doe 2 had to make this decision, IEC had already found JR5 responsible for sexual misconduct and

45

recommended his expulsion from UNL, (Def. Ex. RR, No. 127-2 at 48), yet he maintained full access to campus until completion of the appeals process with no interim measures in place. (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-16; *see* Def. Ex. TTT, No. 128-14). Given these circumstances, BRUN's claim that there was "nothing preventing" Doe 2 from continuing her studies at UNL rings hollow. (No. 130 at 39). Based on JR5's continued access to campus with no interim measures in place to protect Doe 2 during the investigation and appeals process, a reasonable jury could find that Doe 2's decision to prematurely leave UNL with only a master's degree resulted from UNL's deliberate indifference to JR5's harassment. Thus, Doe 2 should be permitted to seek damages for lost educational opportunities.

   *b.  Medical expenses*

   BRUN asserts that medical-related expenses, pharmaceutical expenses, and expenses for psychological treatment, therapy, and counseling are precluded under *Cummings* as proxies for emotional distress damages. (No. 30 at 35-37). However, courts have recognized that damages for medical expenses remain available post-*Cummings*, including for the treatment of ailments like post-traumatic-stress disorder ("PTSD"), that have components of both psychological and physical harm. *See B.R. v. F.C.S.B.*, No. 1:19-cv-917, 2024 WL 1254826, at *6-7 (E.D. Va. Feb. 26, 2024) (permitting claim for medical expenses for treatment of PTSD); *Pennington v. Flora Comm. United Sch. Dist. No. 35*, No. 3:20-cv-11, 2023 WL 348320, at *2-4 (S.D. Ill. Jan. 20, 2023) (finding medical expenses for treatment of both physical and psychological injuries, including PTSD, not precluded by *Cummings*); *Brown v. Zeta Charter Sch.*, No. 23 Civ. 5593 (S.D.N.Y. Sep 23, 2024) (finding medical expenses and therapy costs available under the ADA and the Rehabilitation Act).

In *Pennington*, the court found that the plaintiffs had alleged damages beyond emotional distress where they had alleged that they incurred medical expenses to treat PTSD which "can cause physical symptoms" and is "associated with long-term physical health conditions like diabetes and heart disease." 2023 WL 348320, at *2-4. The court noted that the plaintiffs had "very clearly requested medical expenses, which the allegations attribute to treatment for physical injuries they suffered as a result of bullying, *as well as treatment for the psychological injuries* [ ] (alleging that [the plaintiff] was stabbed in the arm with a pencil by another student and had to have it surgically removed and that [the plaintiff] was hospitalized due to suicidal ideations)." *Id.* (emphasis added). The court concluded, "[T]hese are compensatory damages for economic losses, which *Cummings* did not preclude." *Id.*

More recently, in *B.R. v. F.C.S.B.*, the court noted that although "PTSD is often thought of conceptually as a mental health disorder," the plaintiff had asserted that "PTSD is the result of structural and functional changes to the brain as a result of [trauma]," and that "pharmacological . . . chemical changes in the brain . . . drive the symptoms of PTSD." 2024 WL 1254826, at *6 (internal quotations omitted). Given the "heavily fact-bound" nature of the categorization of PTSD as either a physical or psychological ailment, the court found that damages associated with treatment of PTSD were not precluded as a matter of law under *Cummings*. *Id.* at *7.

Here, Plaintiffs seek compensatory damages for the cost of medical expenses associated with the treatment of both psychological and physical diagnoses (PTSD). Prior to the trauma she experienced at UNL, Doe 1 had no history of psychiatric care. (Def. Ex. GGGG, No. 126 at 16 at 13). After JR4's harassment and UNL's lack of response, she sought mental health care for anxiety, depression, trouble sleeping, eating disorders, and suicidal ideation, requiring medication. (Def. Ex. GGGG, No. 126-16; Def. Ex. HHH, No. 126-17; Pl. Ex. 1, Doe 1 Dep. 269:12-15). Doe

47

2 received psychiatric care after JR5's sexual harassment and assaults, and the protracted Title IX investigation and appeals process, during which she did not feel adequately protected. (Def. Ex. AAAA, No. 128-21 at 10-11). She received treatment including counseling and medication for attention deficit disorder, adjustment disorder, trichotillomania, anxiety, panic attacks, and PTSD. (Def. Ex. AAAA, No. 128-21 at 5-6, 10-11; Pl. Ex. 2, Doe 2 Dep. 81:5-9, 102:9-11, 120:2-9). Because Plaintiffs are not merely seeking emotional distress damages, but rather damages for economic loss in the form of medical expenses for psychiatric treatment, this request should proceed to trial. *Pennington*, 2023 WL 348320, at *2-4.

In addition, Plaintiffs' expert, Josephine Doherty, found both Plaintiffs to meet the full criteria for PTSD symptomology. (Def. Ex. GGGG, No. 126-16 at 20; Def. Ex. AAAA, No. 128-21 at 20). Doe 1's symptoms include difficulty with focus and concentration, intrusive thoughts, sleep dysfunction, suicidal thoughts, and hypervigilance. (Def. Ex. GGGG, No. 126-16 at 17-20). Doe 2's symptoms include flashbacks, panic attacks, depression, post-traumatic anxiety, and hypervigilance. (Def. Ex. AAAA, No. 128-21 at 15-20). In addition, Doe 2 was diagnosed with and received treatment for PTSD in April 2018. (Def. Ex. XXX, No. 128-18 at 14). As discussed above, PTSD has been recognized as a condition caused by physical changes in the brain following trauma that can result in long-term physical health conditions. *B.R.*, 2024 WL 1254826, at *6-7; *Pennington,* 2023 WL 348320, at *2-4. Considering the evolving science on the physiological causes of PTSD, as reflected in evolving caselaw, Plaintiffs' claims for medical expenses related to treatment of PTSD symptoms should not be precluded as a matter of law. *Id.*

c. *Lost earning capacity/lost wages*

Plaintiffs seek damages for lost earning capacity because of their PTSD symptomology and having to either delay or forgo obtaining their degrees. Several courts have recognized the

availability of lost earning capacity damages in Title IX actions post-*Cummings*. *See, e.g., Doe v. Univ. of Miss.*, 2024 WL 3011133, at *5-8 (finding lost earning capacity damages available post-*Cummings* while concluding that the request was too speculative based on the evidence presented); *Doe v. Fairfax Cnty. Sch. Bd.*, 2023 WL 424265, at *6 (same); *see also J.C. v. Bd. of Regents of the Univ. Sys. of Ga.*, 2023 WL 4938054, at *4 (permitting claim for lost wages to proceed).

BRUN claims that lost earning capacity damages should be precluded under *Cummings* because they are based in part on Doherty's assessment of Plaintiffs' PTSD symptomology (which Defendant erroneously characterizes as a purely emotional harm). (No. 130 at 36-37). However, as discussed above, PTSD has been recognized as a physical injury, and thus courts have recognized that compensatory damages related to PTSD are available post-*Cummings*. *B.R.*, 2024 WL 1254826, at *6-7; *Pennington,* 2023 WL 348320, at *2-4. Accordingly, Plaintiffs' reliance on the impact of their persistent PTSD symptoms resulting from the underlying Title IX violations to assess their decreased earning capacity does not contravene the holding in *Cummings*.

Regardless, JR4's harassment and UNL's inadequate response caused Doe 1 to experience decreased productivity and to arrange accommodations which resulted in delaying her graduation from May to August 2020. (Pl. Ex. 1, Doe 1 Dep. 236:10-25, 238:3-6, 239:6-25, 240:15-25, 241:1-4, 16-24; 242:10-17, 21-24; 246:22-24; Def. Ex. V, No. 125-28 at 4; Def. Ex. H, No. 125-12; Def. Ex. I, No. 125-13). Because of her delayed graduation, Doe 1 experienced a delay in starting her first job post-graduation. She obtained an offer for this job before her graduation, but was not able to begin working until August 2020, the same month she completed her doctorate. (Pl. Ex. 1, Doe 1 Dep. 42:6-8; 259:21-23; Def. Ex. Y, No. 126-2 at 1). Thus, Doe 1 is entitled to lost wages resulting from this delay. *See J.C. v. Bd. of Regents of the Univ. Sys. of Ga.*, 2023 WL 4938054, at *4 (permitting claim for lost wages due to delay in obtaining degree).

As for Doe 2, the lack of interim safety measures following JR5's sexual harassment and assaults and the delayed Title IX process resulted in her decision to withdraw from her PhD program: prematurely ending her studies at UNL with a master's degree. (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-7; Pl. Ex. 26 at 2; Pl. Ex. 28; Pl. Ex. 29 at 6). Possessing only a master's degree rather than a PhD has significantly impacted her future earning capacity. Because these damages resulted from the denial of her educational benefits, they are compensatory damages available under Title IX. *See J.C. v. Bd. of Regents of the Univ. Sys. of Ga.*, 2023 WL 4938054, at *3-4. Plaintiffs' experts, Josephine Doherty and Andrew Verzilli, both relied on Doe 2's withdrawal from the PhD program and resultant graduation with only a master's degree in assessing her lost future earnings. (Def. Ex. CCCC, No. 128-23 at 2; Def. Ex. AAAA, No. 128-21 at 5). Given that these damages fall squarely in the realm of compensatory damages permissible under Title IX, Doe 2's damages claim for lost future earnings should proceed to trial.

### d. Other Special Damages

BRUN asserts that Plaintiffs are not entitled to seek various special damages. For the reasons stated below, Plaintiffs have adequately supported these requests.

### i.    Doe 1

BRUN asserts that Doe 1 is not entitled to damages stemming from her delayed graduation. Yet, based on the factual circumstances discussed in detail above, a reasonable jury could find that Doe 1's graduation was delayed by approximately three months as explained above. In addition to the resulting lost wages, addressed above, Doe 1 has provided evidence that, because of the delay, she incurred additional fees. (Pl. Ex. 1, Doe 1 Dep. 247:3-4).

BRUN also argues that Doe 1's request for costs from having to purchase a parking pass to avoid walking long distances alone should be barred because, as it asserts (with no citation to

the record), "Doe 1 admits JR4 never approached her in person." (No. 130 at 37). This ignores evidence that JR4 stalked Doe 1 at an academic conference (Def. Ex. O, No. 125-20 at 11:484-487); drove by her in what she felt was an attempt to follow her (Pl. Ex. 6 at 9); began attending her journal club meetings (*id*. at 9; Pl. Ex. 1, Doe 1 Dep. 56:25, 57:1, 59:18-25, 60:1-4); walked through her office hours (Pl. Ex. 6 at 10; Pl. Ex. 9 at 2); looked into her first-floor office window (Def. Ex. V, No. 125-28 at 5); and that she bumped into him several times walking at night, causing her to feel unsafe (Def. Ex. V, No. 125-28 at 4). Doe 1 requested a parking pass from UNL to feel safer getting around and to and from campus, but this request was denied. (Pl. Ex. 1, Doe 1 Dep. 208:3-9). Based on this evidence, Doe 1's claim for the cost of the parking pass should proceed to the jury.

ii. Doe 2

BRUN asserts that Doe 2 is not entitled to costs associated with her travel to India after her graduation and other travel to/from Nebraska. (No. 130 at 38). After her unexpected withdrawal from her PhD program, Doe 2 was unsure about next steps in her career. (Pl. Ex. 2, Doe 2 Dep. 328:9-23). On a professor's encouragement, Doe 2 decided to go to India, where she had previously worked, to do research and plan next steps. (*Id*. at 328:16-23). Part of her motivation for going to India was to get away from JR5, including the possibility of further retaliation for her Title IX complaint. (*Id*. at 329:7-23). While in India, Doe 2 applied to positions with local nongovernmental organizations. (*Id*. at 333:24-25, 334:1-13). Thus, the cost of Doe 2's travel to and from India constitutes consequential damages resulting from her need to relocate following her unexpected and premature departure from UNL and are cognizable under Title IX. *See Abdulsalam v. Bd. of Regents of the Univ. of Nebraska*, No. 4:22-cv-3004, 2023 WL 4266378, at *4 (D. Neb. June 29, 2023) (suggesting that the plaintiff could assert claim for moving expenses

51

but finding that she had failed to plead facts in support where she did not end up relocating). Similarly, due to the unexpected nature of her decision to leave UNL, upon returning home from India, Doe 2 could not financial support herself having not yet obtained stable employment.  (Doe 2 Dec. ¶ 24).    Thus, she moved in with her mother in New Jersey and incurred costs traveling to and from Nebraska where she was attempting to secure employment.  (Pl. Ex. 2, Doe 2 Dep. 356:4-11).  These costs similarly represent available consequential damages.

e. *Nominal damages*

If Plaintiffs could not prove actual damages, they would be entitled to nominal damages for the harms resulting from UNL's deliberate indifference.  *See Doe v. Fairfax Cnty. Sch. Bd.*, 2023 WL 424265, at *5, n.2 (noting possible use of jury instruction regarding nominal damages where actual damages found to have "no monetary value" even where such damages were not claimed in complaint); *see also Jimenez v. Eagle Pass Indep. Sch. Dist.*, No. DR-21-CV-0048-AM/JAC, 2024 WL 629402, at *3 (W.D. Tex. Feb. 14, 2024) (finding nominal damages available in ADA case and, if awarded, also attorney's fees and costs); *Nieves v. The Plaza Rehab. & Nursing Ctr.*, No. 1:20-cv-01191 (JLR) (OTW), 2023 WL 4763945, at *10 (S.D. N.Y. July 26, 2023) (same in Rehabilitation Act case).

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion for Summary Judgment.


DATED: November 1, 2024                    Respectfully submitted,

                                          */s/ Elizabeth K. Abdnour*
                                          Elizabeth K. Abdnour
                                          0081795 (OH), P78203 (MI)
                                          Megan N. Mitchell

2102019 (AK), 53803 (CO), P87312 (MI)
ABDNOUR WEIKER, LLP
500 E. Michigan Ave., Ste. 130
Lansing, MI 48912
(517) 994-1776
(614) 417-5081
liz@education-rights.com
megan@education-rights.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with the limits set forth in Neb. Civ. R. 7.1(d).

Further, based on the Word Count function of Microsoft Word for Mac word processing software,

applied to include all text, including the caption, headings, footnotes, and quotations, I certify that

this Brief contains 17,715 words.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic system.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour