## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, | Case No. 4:20-cv-03081 |
| Plaintiffs, | |
| vs. | |
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, | |
| Defendant. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S DAUBERT
## MOTION TO EXCLUDE EXPERT TESTIMONY AND OPINIONS

NOW COME Plaintiffs Jane Doe 1 ("Doe 1") and Jane Doe 2 ("Doe 2") by and through their attorneys and respectfully submit this Brief in Opposition to Defendant's Motion to Exclude Expert Testimony (the "Motion") (ECF No. 123) filed by Defendant Board of Regents of the University of Nebraska in the above-captioned litigation.

## STATEMENT OF FACTS

Defendant seeks to exclude and limit testimony from Plaintiffs' expert witnesses, Josephine Doherty and Andrew Verzilli, experts in vocational rehabilitation and economics, respectively, who have been retained to testify on Plaintiffs' lost earning capacity and future wages. As set forth below, both are highly credentialed and qualified to testify on the matters for which they are proffered. Despite this, Defendant ignores the expert witnesses' relevant experience to argue that they are unqualified to offer expert opinions. Defendant also mischaracterizes the expert witnesses' reports and testimony, arguing in conclusory fashion that their opinions are irrelevant

1

and prejudicial. In fact, each expert witness is reputable in their respective field and provides thoughtful analysis grounded in their relevant area of expertise.

Josephine Doherty is proffered as an expert in vocational rehabilitation and life care planning, and her specialized knowledge, experience, and expertise will be helpful to the trier of fact in determining issues related to Plaintiffs' career prospects and loss of earning capacity due to the events forming the basis of this suit. Doherty has a B.S. degree in Human Services, master's degrees in Psychology and Community Counseling, and a PhD in Clinical Psychology.[1] (*See* Def. Ex. YYY, No. 128-19; Pl. Ex. 3, Doherty Dep. 36:11-19). With almost 30 years of experience in the field of vocational rehabilitation, Doherty is a Licensed Professional Counselor and Certified Rehabilitation Counselor, a member of the National Board for Certified Counselors and the American Board of Vocational Experts and possesses an International Psychometric Evaluation Certification. (*Id*.). For over 10 years, Doherty has served as Director, Rehabilitation Therapist, and Psychological Examiner for Comprehensive Assessment & Rehabilitations Services, Inc., where she has, among other things, provided vocational and earning capacity assessments to individuals with physical and mental disabilities and acquired physical and/or mental impairments that impact professional life expectancy. (*Id*.). She has also concurrently served as a vocational expert for the U.S. Social Security Administration (SSA) since 2008. (*Id*.).

Andrew Verzilli is a qualified economist proffered to opine on economic damages in the form of loss of wages and future earnings. Verzilli holds a B.S. in Business Administration and an M.B.A. in Finance from Drexel and LaSalle Universities, respectively. (Pl. Ex. 5). He has been an economist and principal of Verzilli Consulting Group since 1994. (*Id*.). In that role, he has provided economic and financial analysis, prepared numerous reports on earning capacity estimates, and

---

[1] During her work on this case, Doherty was in the process of completing her PhD coursework, and her degree was conferred in August 2024.

has testified as an expert economist in state and federal courts across the country. (*Id.*). Verzilli has also served as adjunct professor at Drexel University, where he taught Principles of Macro and Microeconomics for seven years, and has been published and appeared as a guest lecturer on economic issues many times over the past 30 years. (*Id.*).

Considering the depth and breadth of Doherty's and Verzilli's experience and their formal training and credentials, both are exceedingly qualified in their respective fields and will be helpful to the factfinder in determining material issues related to understanding and quantifying the impact of the events at issue in this suit on the Plaintiffs' lives; both now and in the future.

To the extent that Defendant takes issue with the materials that the expert witnesses relied upon in forming their opinions, this goes to weight and credibility rather than the admissibility of the testimony. Therefore, Defendant's Motion should be denied.

## LEGAL STANDARD

The admissibility of an expert witness' testimony is governed by Federal Rules of Evidence 702 and 703. Rule 702 governs the admission of expert witness testimony in federal court by establishing criteria for the admissibility of such testimony, with a focus on qualifications, reliability, and relevance to the case at hand. Specifically, Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

(*Id.*; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). The overarching inquiry envisioned by Rule 702 is the validity – and thus the evidentiary relevance and reliability – of the principles that

3

underlie a proposed expert submission. (*Daubert*, 509 U.S. at 594-95). In making that determination of whether an individual may offer expert testimony under Rule 702, "the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.'" (*Id.* (citing FED. R. EVID. 702, Advisory Committees Notes to 2000 Amendments)).

Rule 702 has been analyzed by courts under the applicable standard in *Daubert*, which requires the trial judge to act as a "gatekeeper," determining whether the proposed expert testimony meets these criteria and should be admitted as evidence in the case. (*Id.* at 597). *Daubert* confirms that an expert witness' proposed testimony "must be supported by appropriate validation . . . based on what is known," and "must be derived by the scientific method." (*Id.* at 590). Further, "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." (*Id.* at 591-92). *Daubert* makes it clear that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." (*Id.* at 579.). This Court has long held that a court should consider whether expert testimony proffered in the case is sufficiently tied to the facts of the case such that it will aid the trier of fact in resolving a factual dispute at issue. (*Lancaster v. BNSF Ry. Co.,* 75 F.4th 967 (8th Cir. 2023) (citing *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1055 (8th Cir. 2000) and quoting *Daubert*, 509 U.S. at 590)).

The *Daubert* standard is flexible, and the criteria for assessing expert testimony can vary depending on the nature of the case and the specific field of expertise. The factors analyzed in *Daubert* do not constitute a "definitive checklist or test." (*Daubert*, 509 U.S. at 593, aff'd by *Kumho*, 526 U.S. at 150). This flexibility allows judges to tailor their assessments to specific circumstances. *Daubert* clarifies that Rule 702 allows an expert witness to offer a "wide latitude" of opinions, including "those… not based on firsthand knowledge or observation." (*Id.* at 592).

4

*Kumho* clarified: "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." (*Kumho*, 526 U.S. at 141-42 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997)). The Supreme Court concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." (*Id.* at 152).

Moreover, nothing in *Daubert* changed the fundamental rule that the factual basis of an expert opinion "goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (*Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). As such, questions of conflicting evidence are meant to be left for the jury's determination. (*Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 930 (8th Cir. 2001) (citing *Hose*, 70 F.3d at 976)). "The rejection of expert testimony is the exception and not the rule." (FED. R. EVID. 702, Advisory Committee Notes to 2000 Amendments). As the *Daubert* Court noted, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (509 U.S. at 595). The Eighth Circuit has upheld the evidentiary standard detailed in *Daubert* and *Kumho*. (*See Bonner*, 259 F.3d at 929-930). That standard is not only flexible but is tied intricately to the facts of an individual case — this Court has held that "'not every guidepost outlined in *Daubert* will necessarily apply to expert testimony depending on the facts of the case.'" (*Fitzpatrick v. Louisville Ladder Group*, Case No. 8:99CV29 (D. Neb. Mar. 19, 2001) (quoting *Jaurequi v. Carter Manufacturing Co., Inc.,* 173 F.3d 1076, 1082 (8th Cir. 1999)). The Eighth Circuit has also held that the *Daubert* reliability factors

should only be relied upon to the extent that they are relevant. (*Jaurequi*, 173 F.3d at 1083 (citing

*Pestel v. Vermeer Mfg. Co.*, 64 F.3d 382, 384 (8th Cir. 1995)).

At the same time, Rule 703 helps ensure that expert opinions in court are based on reliable

and relevant information. Rule 703 sets out the requirements for the bases of expert opinions and

the types of evidence that experts can rely on when forming their opinions. Specifically, Rule 703

requires:

> If experts in the particular field would reasonably rely on those kinds
> of facts or data in forming an opinion on the subject, they need not
> be admissible for the opinion to be admitted. But if the facts or data
> would otherwise be inadmissible, the proponent of the opinion may
> disclose them to the jury only if their probative value in helping the
> jury evaluate the opinion substantially outweighs their prejudicial
> effect.

"Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the

jury must such testimony be excluded." (*U.S. v. Lopez*, 880 F.3d 974, 980 (8th Cir. 2018) (citing

*Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997) and quoting

*Hose*, 70 F.3d at 974)). In essence, Rule 703 allows expert witnesses to give their opinions or

inferences in court, while requiring that those opinions be based on facts or data that are both

reasonably reliable and of a type that experts in that particular field would typically rely upon when

forming their opinions.

"As long as the expert's scientific testimony rests upon 'good grounds, based on what is

known' it *should be tested by the adversary process with competing expert testimony and cross-

examination, rather than excluded by the court at the outset.*" (*Johnson v. Mead Johnson & Co.,

LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (quoting *Daubert*, 509 U.S. at 590, 596) (emphasis added)).

Courts have long upheld the rights of parties to present expert testimony founded in reliable and

repeatable scientific methodology. (*See State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009); *State*

*v. Gleaton*, 316 Neb. 114 (2024); *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022); and *Farm & Garden Ctr., L.L.C. v. Kennedy*, 26 Neb. App. 576, 921 N.W.2d 615 (2018)). In *Streit v. Halverson*, the U.S. District Court for the Western District of Missouri concluded that the expert economic witness' "testimony on impairment to wages and benefits [was] sufficiently reliable." (No. 17-4225-CV-WJE, 2018 WL 3763811, at *10 (W.D. Mo. Aug. 8, 2018)). There, the expert had "reviewed all of the relevant materials," which included: the complaint, the plaintiff's taxes over several years, and the case information form. (*Id*.) The expert witness calculated the plaintiff's "remaining life expectancy using data from the National Center for Health Statistics (National Vital Statistics Reports, 2017) and used statistical averages published by the Bureau of Labor Statistics and the Federal Reserve to determine wage growth, interest rates, and consumer prices over the relevant time period." (*Id*.) The district court found that "economists are permitted to give testimony to show that raises in income or promotions would most probably occur." (*Id*.)

Here, the proposed testimony and expert reports of Doherty and Verzilli reflect opinions that are well-founded and reliable, and their testimony will be relevant and helpful to the trier of fact. Their proposed testimony and expert reports meet the standards for admissibility under both the Federal Rules of Evidence and *Daubert* and, therefore, should not be excluded.

## **ARGUMENT**

### A. ***Cummings* Is Not Applicable**

For Defendant to incur liability under Title IX, "it must be (1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control." (*Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) (internal citation omitted)). A school can be held liable under Title IX in situations in which it "exercises substantial control over both the harasser and the context in which the known harassment occurs." (*Id*., quoting *Shrum ex. rel. Kelly v. Kluck*, 249 F.3d 773,

782 (8th Cir. 2001)). Defendant frequently cites to *Cummings v. Premier Rehab Keller*, 142 S.Ct. 1562, 596 U.S. 212 (2022), and argues that in Title IX lawsuits, emotional damages are unavailable. However, the damages incurred by Plaintiffs in this matter are not barred by *Cummings*.

### i. *Plaintiffs are Not Requesting Emotional Distress Damages*

*Cummings* is irrelevant to the issues at hand and the proposed testimony of Plaintiffs' expert witnesses. These witnesses will testify to Plaintiffs' vocational abilities and earning capacity, which have been impacted by their work disabilities – *not* to a calculated cash value of their emotional distress. The fact that Plaintiffs suffer from work disabilities created by psychological conditions does not equate those damages to emotional distress damages. If this Court were to exclude Plaintiffs' experts because they will proffer opinions about the nature and impact of work disabilities, such a holding would go far beyond the scope of *Cummings*.

### ii. *Even if Plaintiffs' Damages are Emotional Distress Damages, They Should be Available in Title IX Claims*

While the *Cummings* ruling may impact Title IX cases, *Cummings* is not a Title IX case. (*See Doe v. Purdue Univ., et al.,* No. 4:18-cv-89, 2022 WL 2828238 at *4 (N.D. Ind. July 20, 2022); *Coleman v. Cedar Hill Indep. Sch. Dist.*, No. 3:21-CV-2080-D, 2022 WL 1470957, *3 n.2 (N.D. Tex. May 10, 2022) *But see Faller v. Two Bridges Reg. Jail*, No. 2:21-cv-00063-GZS, 2022 WL 17260763 (D. Me. Nov. 2, 2022) (applying *Cummings* to Title II of the ADA); *Party*, 2022 WL 17459745 at *4 (applying *Cummings* to Title IX); *Doe v. City of Pawtucket,* No. 17-365, 2022 WL 4551953, at *2 (D.R.I. Sept. 29, 2022) ("While the Supreme Court's holding in Cummings was limited to the ACA and RA, the opinion's underlying reasoning forces the same conclusion for Title IX."); *Doe v. Bd. of Educ. of Albuquerque Pub. Sch.*, No. 1:21-cv-01199-LF-SCY, 2022 WL 6582110, *2 (D. N.M. Sept. 13, 2022) (claiming erroneously that *Cummings* itself ruled on

Title IX)). Title IX plaintiffs have long been found to be entitled to any appropriate remedies based on longstanding common law principles. (*Barnes v. Gorman*, 536 U.S. 181, 189 (2002); *Franklin v. Gwinnett Cty. Pub. Schs.,* 503 U.S. 60, 66-68 (1992)). In 1979, the Supreme Court found that Title IX contains an implied right of action. (*See Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979)*; see also Franklin*, 503 U.S. at 66-68 (citing *Bell v. Hood*, 327 U.S. 678, 684 (1946))). It has also held that any appropriate relief may be granted as a result absent an explicit act of Congress to limit the availability of such damages. (*Bell*, 327 U.S. at 684). "[I]t is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use *any available remedy to make good the wrong done*." (*Id*.). Instead of narrowing all available relief, Congress has confirmed that all "remedies (including remedies both at law and in equity) are available" under Title IX "to the same extent as such remedies are . . . in the suit against any public or private entity other than a State." (*Franklin*, 503 U.S at 72-73 (citing 42 U.S.C. § 2000d–7(a)(2) (emphasis added)). *See also Cummings*, 142 S. Ct. at 1570 (internal citations omitted)).

Further, *Cummings* is tied to Spending Clause legislation, which relies upon a recipient's consent and notice for enforcement. The Supreme Court itself gave notice of the availability of emotional distress damages in Title IX actions in the 1983 case *Guardians Association v. Civil Service Commission of City of New York.* In *Guardians,* the Court found that recipients of federal funds may be "held liable for *extraordinary harm due to special circumstances* . . . [they] knew or had reason to know . . . made *such extraordinary injury probable."* (463 U.S. 582, 597 (1983)).

*Guardians* dealt with a class action claim filed by law enforcement officers alleging that the NYPD's use of entry-level employment tests violated Title VI of the Civil Rights Act of 1964. Plaintiffs argued that the tests had a racially disproportionate impact that caused Black and

9

Hispanic officers to be hired later than white officers, which in turn led to them being laid off at

disproportionate rates (due to the "hired last, fired first" policy used by the NYPD at the time).

Finding that the tests constituted unintentional discrimination by NYPD, the Court held that there

had not been sufficient notice to the NYPD as a recipient of federal funds that they may be liable

for damages on a Title VI claim. (*Id.*) The Court upheld its ruling in *Pennhurst State School v.*

*Halderman*, stating:

> We have also indicated that "make whole" remedies are not
> ordinarily appropriate in private actions seeking relief for violations
> of statutes passed by Congress pursuant to its "power under the
> Spending Clause to place conditions on the grant of federal funds."
> …This is because the receipt of federal funds under typical
> Spending Clause legislation is a consensual matter: the State or other
> grantee weighs the benefits and burdens before accepting the funds
> and agreeing to comply with the conditions attached to their receipt.
> Typically, before funds are advanced, the appropriate federal official
> will determine whether the grantee's plan, proposal or program will
> satisfy the conditions of the grant or other extension of federal funds,
> and the grantee will have in mind what its obligations will be. When
> in a later private suit brought by those for whose benefit the federal
> money was intended to be used it is determined, contrary to the
> State's position, that the conditions attached to the funds are not
> being complied with, it may be that the recipient would rather
> terminate its receipt of federal money rather than assume the
> unanticipated burdens.

(*Guardians*, 463 U.S. at 596 (internal citations omitted)). Focusing on the line between

anticipated and unanticipated burdens, the Court went on:

> Since the private cause of action under Title VI is one implied by the
> judiciary rather than expressly created by Congress, we should
> respect the foregoing considerations applicable in Spending Clause
> cases and take care in defining the limits of this cause of action and
> the remedies available thereunder. Because it was found that there
> was no proof of intentional discrimination by respondents, I put
> aside for present purposes those situations involving a private
> plaintiff who is entitled to the benefits of a federal program but who
> has been intentionally discriminated against by the administrators of
> the program. In cases where intentional discrimination has been
> shown, there can be no question as to what the recipient's obligation
> under the program was and no question that the recipient was aware

> of that obligation. In such situations, it may be that the victim of the intentional discrimination should be entitled to a compensatory award, as well as to prospective relief in the event the state continues with the program.

(*Id.* at 597).

The *Guardians* Court was clear: a recipient's failure to prevent the known risks of sexual harassment or violence under Title IX authorized plaintiffs to seek emotional distress damages based on the Court's recognition of such an exception in cases of intentional discrimination in violation of civil rights statutes and based on the Court's clear notice to recipients of the same.

### iii.    The Fourteenth Amendment to the U.S. Constitution

Even if this court finds that *Guardians* did not provide Defendant with sufficient notice to be held liable for damages under the Spending Clause, this Court is not bound by the damages limitation specified in *Cummings*. Title IX  may be authorized by the Spending Clause – but it is not *solely* authorized under the Spending Clause. Title IX is also authorized under Section 5 of the Fourteenth Amendment. (U.S. Const. amend. XIV, § 5). Congress has authority to pass legislation under multiple Constitutional provisions. *Cummings* does not address the possibility of emotional distress damages being available under Title IX pursuant to Section 5 of the Fourteenth Amendment. (*See Franklin*, 503 U.S. at 75, n.8 (declining to decide whether Congress used this source of authority without foreclosing the inquiry because damages would be available under either constitutional source for Title IX)). Both the Sixth and Eighth Circuits have recognized Congress' authority to enact Title IX under Section 5. (*Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997) (finding Congress had the authority to pass Title IX pursuant to § 5 of the Fourteenth Amendment); *Prinsloo v. Ark. State Univ*., 112 F.3d 514 (8th Cir. 1997) (affirming *Crawford*); *Franks v. Kentucky Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998)).

11

Of note, in *Franklin*, the Supreme Court did not rely solely upon a contract analogy, instead concluding that "a money damages remedy is available under Title IX for an intentional violation irrespective of the constitutional source of Congress' power to enact the statute." (*Franklin*, 503 U.S. at 75, n.8.) Further, the *Franklin* Court recognized that Congress has made no effort either "to restrict the right of action recognized in *Cannon* . . . or to alter the traditional presumption in favor of any appropriate relief for violation of a federal right," such that the Court "cannot say . . . that Congress has limited the remedies available to a complainant in a suit brought under Title IX." (*Id*.). Congressional action indicates intent for emotional distress damages to be available under Title IX. Title IX is a civil rights statute. Section 5 of the Fourteenth Amendment is the source of authority identified by Congress when enacting the Civil Rights Remedies Equalization Act in 1987. (42 U.S.C. § 2000d-7). The same source of authority would apply to Title IX as a civil rights statue.

Plaintiffs maintain that their damages are economic, *not* emotional distress damages. However, even if the Court were to find that the damages were emotional distress damages, they should still be permitted because Title IX is not solely authorized by the Spending Clause, and emotional distress damages are still available to legislation authorized by Section 5 of the Fourteenth Amendment.

**B.  <u>Plaintiffs' Expert Witnesses Must Not Be Excluded</u>**

Defendant argues that Plaintiffs' expert witnesses Doherty and Verzilli should be excluded because their opinions are premised on speculation and hearsay and were rendered using unreliable methods or principles. This is not the case, for the reasons outlined below.

### i.  *Expert Josephine Doherty Must Not Be Excluded*

Defendant first argues that Doherty's offered opinions are irrelevant to Plaintiffs' claims and that their purpose is to confuse the trier of fact about the damages available under a Title IX claim. Ms. Doherty's opinions serve the critical function of *explaining* the vocational damages Plaintiffs have suffered. She is not proffering testimony to the trier of fact that emotional damages are available post-*Cummings*. Rather, her opinion analyzes Plaintiffs' lost wages, income, and professional opportunities—and was formed based on her years of professional training and experience and her thorough review of the relevant records. Doherty's offered opinions relate to Plaintiffs' work disabilities suffered and how those disabilities have impacted their professional lives and earning capacities.

### 1.  Doherty is Fully Qualified to Testify

In its Motion and throughout its examination of Doherty during her deposition, Defendant has repeatedly attempted to attack Doherty's credibility with baseless arguments. Defendant argues that Doherty is unqualified to testify in this matter. In fact, Doherty is extremely well-educated and respected in her field. She has almost 30 years of experience in vocational rehabilitation and has served as a vocational expert for the past 16 years. Indeed, *Daubert* confirms that experts are to be qualified by "knowledge, skill, experience, training *or* education" rather than in a narrow sense as Defendant attempts to argue. (*Daubert*, 509 U.S. at 594-95 (citing FED. R. EVID. 702, Advisory Committee Notes to 2000 Amendment)). Doherty has relevant education, training, experience and skill in spades.

Further, the testimony Defendant cites from Ms. Doherty's deposition, in which she explains that her role with SSA is to review restrictions of an individual and determine whether said individual is capable of competitive employment from a vocational perspective, is supportive

13

of her qualification as a vocational expert in this matter. If anyone is qualified to proffer an expert opinion about someone's vocational and earning capacity regarding disabilities or impairments that impact professional life expectancy, it is Doherty.

### 2. Doherty's Testimony of Specialized Knowledge Will Help the Trier of Fact to Determine Facts in Issue

Defendant argues that Doherty must be disqualified as an expert witness because she is not a legal expert, and her opinions proffered do not address or relate to deliberate indifference. However, Plaintiffs have never attempted to assert that Doherty is a legal expert. In fact, had Doherty provided a legal conclusion as to whether UNL was deliberately indifferent in violation of Title IX, that would have been a reasonable basis for Defendant to argue that this Court should exclude her testimony. (*See, e.g., Estes v. Moore*, 993 F.2d 161, 163 (8th Cir. 1993) (citing *Kostelecky v. NL Acme Tool/NL Indus. Inc.,* 837 F.2d 828, 830-31 (8th Cir. 1988))). Defendant writes: "Courts have required expert testimony to establish causation where a plaintiff alleges an injury which a lay person would not normally understand to result [from] the conduct of the defendant or where the cause of the injury is not obvious." (No. 131 at 25). While that legal standard is correct, expert witness testimony of deliberate indifference is not necessary or even legally admissible. Neither Doherty's nor Verzilli's expert opinions are being offered to prove Plaintiffs' damages were caused by Defendant's deliberate indifference, nor should they be: that is a genuine issue of material fact which the trier of fact is responsible for analyzing.

Doherty's specialized knowledge as a vocational expert is asserted to help the trier of fact understand how Plaintiffs' work disabilities impact their professional lives, earning capacity, and vocational potential. Doherty has not been retained to assess causation or deliberate indifference on behalf of Defendant. Rather, Doherty will provide testimony about the effect of Plaintiffs' work

14

disabilities on their vocational abilities, which will in turn help the trier of fact determine the impact of Defendant's deliberate indifference.

In her deposition, Doherty testified to her qualification as a vocational expert and her extensive education and experience. (Pl. Ex. 3, Doherty Dep. 36:11-45:15). Doherty has held various positions including her current position as licensed counselor and therapist. She has almost 30 years of experience in the field of vocational rehabilitation; is a Licensed Professional Counselor (LPC) and Certified Rehabilitation Counselor (CRC); a member of the National Board for Certified Counselors (NCC) and the American Board of Vocational Experts (ABVE); and possesses an International Psychometric Evaluation Certification (IPEC). (*Id.*). Doherty has also served as a vocational expert for SSA since 2008 and testified extensively in her deposition about how her methodology in the type of vocational analysis she conducted in this case is more thorough than that of an SSA hearing. Doherty said:

> [T]his… is different than the vocational reports that I complete… in Social Security hearings they talk more about unskilled versus semiskilled, the frequency of contact with the general public. Those types of restrictions or vocational testimony are very cut and dry because there is no preparation for the Social Security hearing. I don't review extensive records. I don't interview the claimant. It's a completely different type of assessment and testimony than what I prepared for today or any other earning capacity assessments… I do read the job history, but I don't complete an analysis ahead of time…I am not apprised of the person's perceived capabilities until the time of the hearing. That is not available to me. That is offered to me by the administrative law judge at the time of the hearing. They purposefully do not want us to have that information, one, because why have a hearing if you are not going to take what the plaintiff has to say into consideration for the hearing. So they want to talk to the claimant, get things from their perspective. And two, they don't want us to prepare. They want us to listen and to respond specifically to the questions asked and in real-time. So it's kind of just a different type of analysis, and it's just not something that you can thoroughly prepare for other than reading the work history.

(Pl. Ex. 3, Doherty Dep. 31:18-25; 32:1-5, 9-25; 33:1-3).

15

Doherty was clear that her methodology and preparation for a report as a vocational expert is far more detailed than for a SSA hearing. Whereas she cannot prepare for an SSA hearing other than reading work history, as a vocational expert, she addresses job history but also reviews other extensive records, evaluates data, and—importantly—interviews the claimant. Doherty has specialized knowledge from her years of education, training, and experience, and she is able to clearly and concretely explain her methods, use of records and data, and conclusions. This, in combination with her expertise and qualifications, demonstrates that Doherty has training and experience in determining vocational disabilities, and must be given the opportunity to opine for for the factfinder on such matters.

### 3. Doherty's Testimony is Grounded in Sufficient Facts and Data as Required Under Rule 702

Defendant argues that Ms. Doherty has not premised her testimony on reliable facts and as such her testimony should be excluded as unreliable. But just because Defendant does not like a fact does not make it unreliable. It is disingenuous for Defendant to imply that by speaking with Plaintiffs about their experiences, Doherty somehow derailed her expert analysis of their professional standing—especially considering that, had she neglected to interview Plaintiffs, Defendant would undoubtedly have argued her analysis was incomplete and lacked foundation.

Doherty reviewed Plaintiffs' medical records and past employment information along with interviewing them. Doherty reviewed substantial records in making her analysis, and used reliable data including but not limited to data from the PA Labor Force, The PA Department of Labor-Bureau of Wage Statistics, The Occupational Outlook Handbook 2020 Edition, The Enhanced Occupational Outlook Handbook, The Dictionary of Occupational Titles (DOT), The Classification of Jobs (COJ), O*Net, Job Browser Pro/SkillTRAN, the Vocational Diagnosis and Assessment of Residual Employability (VDARE), SSA research (www.ssa.gov), the PA Center for

Workforce Information & Analysis, the Gamboa-Gibson New Work Life Expectancy Tables - Revised 2015, the New Guide to Occupational Exploration, Determining Economic Damages - Martin & Weinstein 8/2012, and the Economic Research Institute (ERI), and Assessing the Worth of a Child in Personal Injury Litigation Cases as authored by Roger O. Weed, PhD (January/February 2000, Rehabilitation Professional). (Def. Ex. GGGG, No. 126-16 at 1; Def. Ex. AAAA, No. 128-21 at 1). This data, which Defendant refers to as unreliable "community data" that is not sufficiently tailored to Plaintiffs, is in fact national data relied upon by experts in the field. As Doherty testified: "I relied upon national data to allow the most flexibility and accuracy." (Pl. Ex. 3, Doherty Dep. 90:17-18). Defendant has provided no expert testimony to refute Doherty's assertion.

In her deposition, Doherty explained in detail why she utilized the data that she did and how her analysis was tailored specifically to Plaintiffs:

> Q. Do you know anything about the economy or labor market in Lincoln, Nebraska?
>
> A. …the short answer is no… my assessments…were not specific to those areas. My assessments were more tailored to the two women whom I assessed.
>
> Q. Do you know anything about the economy or labor market in Texas?
>
> A. …I have completed evaluations for Social Security in the Texas labor market. Also, both evaluations are based upon national data. That is, the data, wage data, statistical data I offered were based upon national standards not only to allow for their current state, but to take into account these are two young individuals who may not necessarily have committed to residing in a specific labor market, and earning capacity assessment is reflective of one's earning capacity throughout their work life, not just today. And considering the chronological age and considering assessing an individual whose injuries occurred while they were still matriculating, the most accurate means of completing such an assessment is to offer national data to allow more flexibility in terms of where those individuals may live.

> Q. Did you ask either woman where they want to live?
>
> A. We discussed where they were at the present time. I remember [Doe 1] was residing in… She was not specifically committed to staying there. And [Doe 2] did not make a specific commitment as to where she wanted to live in the long term."

(*Id.* at 88:4-9, 14-25; 89:1-17). Defendant itself quotes an explanation Doherty provides about why she used Bureau of Labor Statistics (BLS) data.

> The reason why…is basically to substantiate the basis… it's my opinion that workers with a disability have difficulty maintaining employment or being underemployed or being employed in an area other than their career. And the data put forth by the BLS substantiates that. That is…why I used that information.

(*Id.* at 222:5-11). Doherty explained that the use of national data such as the BLS was a part of her analysis, not the crux of it. It can be reasonably argued that the purpose of data gathered and published by agencies like the BLS is for use in vocational assessments. Defendant's objection to the use of BLS data does not mean that Doherty's use of the data is unreliable. Defendant could have retained its own expert to counter Doherty's interpretation of the data but chose not to.

Defendant argues that Doherty's assessment of Doe 1 utilizing DSM-V diagnostic criteria for post-traumatic stress disorder (PTSD) must be disregarded because Doherty did not diagnose Doe 1 with PTSD. This argument is inaccurate and bizarre. Doherty, who was pursuing her PhD at the time of her report, is now qualified to diagnose someone with PTSD as she has since been; regardless, she was not retained to provide medical treatment or diagnoses to Doe 1 or Doe 2. (*See* Def. Ex. YYY, No. 128-19; Pl. Ex. 3, Doherty Dep. 36:11-19). She was retained as a vocational expert. Given her credentials, she is qualified to speak about the symptomology she observed during her interviews with Plaintiffs, especially as she is not making a formal diagnosis but rather explaining her observations. Doherty addressed this in her deposition testimony:

> Q. Have you consulted with a licensed psychologist for purposes of …[Doe 2] or [Doe 1]?

18

> A. No. As I stated, I have been a licensed professional counselor since 2001. I have completed numerous evaluations of PTSD. Furthermore, a licensed psychologist is not needed for a vocational assessment. I possess a certification as a certified rehabilitation counselor, and I have also been accepted by the American Board of Vocational Experts as an examiner of individuals…for the purposes of earning capacity assessments.

(Pl. Ex. 3, Doherty Dep. 51:12-23).

Defendant argues that Doherty's testimony must be excluded because she uses the ADA definition of "disability" in her practice of analyzing vocational issues. This is a Catch-22: If Doherty made up her own definition of disability, Defendant would no doubt have objected to that. Regardless, Doherty did not utilize the ADA definition of "disability" to reach a legal conclusion about whether Plaintiffs were individuals with disabilities. Rather, she used the definition to aid her analysis of how Plaintiffs' work disabilities impacted them. Again, Defendant could have, but did not, offer any counter expert testimony to support using a different definition of disability in this context.

Defendant argues that Doherty's testimony must be excluded due to lack of a rehabilitation plan. Doherty explained that a rehabilitation plan was not necessary for Doe 1 because she self-accommodated:

> Q. Do you factor in accommodations when you are trying to determine functional limitation?
>
> A. Yes... It's outlined in the report.
>
> Q. And how do you determine accommodations for the position?
>
> A. [I]n this particular case… she was self-accommodating her work in terms of work -- when she would be distracted and unable to focus, she would work longer days in order to get her job done… that's a self-accommodation…the fact is because she can't work…within the confines of the typical eight-hour workday -- and granted… professionals from time-to-time work late, but because on a regular basis she had to work longer, that's the work disability...

19

Q…she's not getting her pay deducted or anything because she's working longer; correct?

A. No. She's working…longer for the same pay she would get if she was working eight hours a day.

Q. Do you know when she's experiencing anxiety during the day whether or not she takes time off from work to try to gather herself?

A. She's stated both. She may need to take a break or switch tasks. Even then… if she takes a break, that extends the workday. If she switches tasks, then it just disrupts the fluency… she does try to still work, but sometimes she needs to take breaks.

Q. Okay. And she will take a break for a bit of time, and then in the afternoon or the evening she will come back and work on it when her anxiety is gone; correct?

A. I don't know if it's specifically when her anxiety is gone. I would probably say when it's reduced or lessened.

Q. Have you asked her that question?

A. Yes…[S]he basically described frequent symptoms of anxiety which are more tolerable since she's working from home mostly, but she does have frequent symptoms of anxiety…

Q. With accommodations, I asked you what you do to determine accommodations. You have told me that you have talked to [Doe 1] about it, but are there other things that you ought to do when you are trying to determine an accommodation for a position?

A. I don't know of any other accommodations that could be instituted in this position other than working longer, allowing herself to…have breaks when her emotions impact her concentration. Those are typically, by and large, the most significant accommodations you can give an individual with specific posttraumatic stress disorder or anxiety, which would be just kind of intrusive thoughts and feelings of guardedness when she does not want them… it basically creates secondary problems with attention, and those would be two other ways of helping.

(*Id*. at 134:4-136:18).

Q. And what is a rehabilitation plan?

A. Basically, a plan for someone to move forward with their work in spite of a disability.

Q. Are you aware of any rehabilitation plan for [Doe 1]?

A. No.

…

Q. Have you asked for it?

A. So I don't believe there is a need for a rehabilitation plan because, again, she's receiving…self-imposed accommodations. So there is not a rehabilitation plan. I would say that in my synopsis I describe that she's self-accommodating… at the present time that's working for her… she's working in a work-from-home environment. She's not exposed to others…she is working longer hours or into the evening to compensate for her attentional difficulty secondary to anxiety during the day.

(*Id*. at 184:10-185:6).

A. So the current position, she is being accommodated because she's working from home and works the longer hours. What [Doe 1] conveyed to me and what my experience indicates is that for any job, not just in a scientific job, is that if the person feels safe and secure in their current job and they are getting the accommodations they need, then it's unlikely they are going to switch a job for the fear of the unknown. Because typically in an interview if an individual is speaking of accommodations, that could inhibit their ability to get the job... most individuals would not accommodate or discuss accommodations in an employment interview for that same reason. And there is that fear of the unknown of switching. I mean, she's self-accommodating right now. Why would she switch to another job. Except for the fact that she wanted to work in a more scientific job, why would she switch not knowing if an employer was going to accommodate her to the same extent. And from what she has said…now that she's working from home and it's helped alleviate anxiety because… she's not interacting with others directly, that she is not so inclined to explore other careers that are…in person.

(*Id*. at 198:8-199:10).

Doherty testified, "[T]he longer an individual self-accommodates and/or avoids, the more challenging it is for them to re-integrate." (*Id*. at 197:22-25). Defendant mischaracterizes Doherty's testimony as admitting that both positions Doe 1 has held provided accommodations. This is not true. Doe 1 *self-accommodated* within the confines of her roles. No accommodations were provided by her employers.

Defendant attacks Doherty's analysis regarding access to the labor market. Doherty's deposition testimony clearly explained her conclusions:

> Q. What is access to the labor market?
>
> A. …her ability to have the full range of jobs that an individual with a non-work-related disability would have or work disability would have.
>
> …
>
> A. [A]ccess to the labor market… means does she have the full scope and wealth of jobs available to her that a non-disabled or non-work-disabled individual would have.
>
> Q. And does that take accommodations into consideration?
>
> A. …[B]y and large it depends…on the specific job requirements of the position, if there is a specific productivity requirement in terms of needing to meet deadlines or in terms of not having access to a facility within the confines of when she needs to be there.
>
> Q. And you are not opining that she does not have full access of the labor market; correct?
>
> A. I explain further in the report, it's not access as much as workers with a disability…have less opportunities in the event an employer can't offer those accommodations or is unwilling.

(*Id*. at 186:19-187:24).

> Q. And there is nothing that indicates or tells us that the labor market in her particular field would not provide an accommodation; correct?
>
> A. [B]ased upon my experience not all employers will allow employees to remain at their workstation or at the office or at the building indefinitely or into the evening. Sometimes for security they do not allow employees later in the evening…. [I]n my experience the larger the company, sometimes the more difficulty you have in terms of flexibility in terms of working longer hours because then it becomes an issue of offering access to all if those are her own self-imposed accommodations.

(*Id*. at 188:4-18).

22

Defendant argues that Doherty's analysis of wages and income potential is inaccurate and unreliable. These arguments ultimately stem from Defendant's disagreement with Doherty's conclusions, which is not a proper basis to exclude her as an expert.  As Doherty explained:

> A. I am responsible for offering current data. And the most current data is put forth by the BLS. The data in terms of those specific sources tend to be dated.
>
> Q. What do you mean, "dated"?
>
> A. As in not current. As in the BLS is performing constant analyses in terms of wages and data as per occupation and occupational field; however, the other types of publishments are not on an ongoing basis…it is not uncommon to refer to such a publication and to perhaps see publications refer to positions from less than the most current occupational year, which in this case would be… 2022.
>
> Q. So you know that the publication that I just referred to, which is the particular designation of the different types of subcategories included within the scientific research and development services, are updated yearly?
>
> A. Right. They are updated yearly, but then the analyses aren't necessarily completed within the most recent proximate year.

(*Id*. at 231:16-232:5, 232:13).

> Q. [Y]ou are stating that the subcategories don't get updated every year?
>
> …
>
> A. They do. They are updated annually, but it's not always based upon current data, and it's not as comprehensive as BLS in terms of being more nationwide.

(*Id*. at 232:23-233:4).

Regarding Doe 2, Defendant argues that Doherty's reliance on national wage data was unreliable because she looked at data for someone with a PhD in general, not specifically political science. Doherty explained:

> Q. Did you research job prospects for international analyst or academia with a Ph.D. degree in political science?

> A. [That] was just people with a doctoral-level degree in general. I did look specifically at political science. And political science was actually a higher wage…around $130,000 annually for a political science career.

(*Id*. at 311:8-15). She went on:

> [C]onsistent with my testimony before, political science is a general field, and then within that there is academia and there is government jobs primarily… this is basically the mean of those jobs… when I refer to that approximate $130,000 would be kind of the mean wage of all persons working in the general field of political science, whether it be academia, government, or the media.

(*Id*. at 311:8-15).

Doherty also explained why she looks at educational and work attainment in a vocational evaluation, not merely jobs for which someone applied.

> [I]n no certain terms when I complete a vocational analysis would I include the wages of jobs for which a person applied. Typically with a vocational analysis it's based upon their educational attainment and work they have…performed as opposed to potential jobs they applied to because vocational analysis is based upon…in both cases the jobs that they're…currently performing as well as their aspirations based upon where they were at while they were matriculating with the University... I feel as though… the indication that I didn't do a wage analysis based upon jobs which she applied to is deemed as being remiss, but in actuality that *is not taken into consideration when completing a vocational analysis by any expert*. In particular with [Doe 2] I used the Ph.D. earning because that was actually a lower and more conservative figure. When you looked at what she would have made had she been able to establish a career in political science, her earnings would be much more significant, which is… contained in the information on public domain by the Bureau of Labor Statistics.

(*Id*. at 314:14-315:15 (emphasis added)).

Defendant's disagreement with Plaintiffs' experts' conclusions does not make their methods and analysis unreliable, nor does it mean that their input would not aid the factfinder.

Defendant's objections to Doherty's conclusions should not be addressed via motion practice, but rather an opposing expert opinion and testimony. Defendant chose not to introduce such evidence.

Doherty demonstrated sufficient knowledge, training, and experience. Should Defendant wish to cross-examine Doherty on perceived weaknesses in her data or ask that she perform alternative calculations based other data at trial, it is entitled to do so. It is not, however, entitled to have her opinions excluded on this basis.

### 4. Doherty's Testimony is the Product of Reliable Principles and Methods

Doherty's methodology and the principles she relied upon in preparing her report are reliable and relevant to the questions of whether Plaintiffs have work disabilities and, in turn, how those disabilities impact their professional lives and vocational and earning capacities.

Despite Defendant's broad and factually unsupported statement that Doherty "did not conduct even the slightest research into the context surrounding [Plaintiffs'] allegations," (No. 131 at 29), Doherty was not engaged to determine causation, nor was she obligated to contact Defendant to inquire about its opinions on the allegations Plaintiffs made against it. Causation is a determination for the factfinder. Defendant admits in its Motion that Doherty showed sufficient understanding of the necessity of rehabilitation plans, access to the labor market, place-ability, earning capacity, and labor force participation in vocational assessments. (*Id*. at 31-32). Defendant's argument that Doherty inappropriately assessed each factor is a question for the factfinder. As the Eighth Circuit has held, "[T]he standard is that only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded," not "whenever Defendant disagrees with the conclusions of an expert witness," as is the case here. (*Lopez*, 880 F.3d at 980 (citing *Arkwright*, 125 F.3d at 1182, and quoting *Hose*, 70 F.3d at 974)).

To avoid redundancy, Plaintiffs note that Doherty's methods, use of data, review of records, and analysis was consistent between Plaintiffs and raise the same responses to Defendant's arguments about Doherty's work on behalf of Doe 2 as with Doe 1. Of particular note regarding Doe 2, however, is Defendant's argument that Doherty's testimony must be excluded because she accepted Doe 2's statement that she was pursuing a PhD at UNL and therefore looked at PhD data as opposed to master's degree data. Whether obtaining a PhD was the goal for Doe 2, or was attainable for her, is a question for the trier of fact. If Defendant believed that a proper vocational analysis of Doe 2 would have focused on master's degree data, it could have engaged an expert to make such an argument. It did not.

The question of whether Doherty reached reliable conclusions is a question for the finder of fact following careful consideration of her offered opinions and the available evidence. She should therefore be permitted to provide expert testimony, and Defendant's Motion should be denied

### ii.     Expert Andrew Verzilli Must Not Be Excluded

Defendant argues that Verzilli's offered opinions are irrelevant to Plaintiffs' claims and that their purpose is to confuse the trier of fact about the damages available under a Title IX claim. Like Doherty, Verzilli's offered opinions serve the critical function of explaining the economic damages Plaintiffs have suffered in this case.

### 1.  Verzilli is Fully Qualified to Testify

In its Motion and throughout its examination of Verzilli during his deposition, Defendant attacks Verzilli's credibility with baseless arguments. Verzilli is extremely well-educated and respected in his field. He holds both a B.S. in Business Administration and an M.B.A. in Finance from Drexel and LaSalle Universities, respectively. (Pl. Ex. 5). He has been an economist and

principal of his consulting group since 1994. (*Id.*). He has years of experience providing economic and financial analysis and preparing reports on earning capacity estimates. Verzilli has testified as an expert economist in state and federal courts across the country. (*Id.*). He has also served as an adjunct professor at Drexel University, and taught Principles of Macro and Microeconomics for seven years. (*Id.*). He has been published and appeared as a guest lecturer on issues related to economics on numerous occasions over a period of 30 years. (*Id.*). Verzilli is a well-qualified economist offered to opine on economic damages in the form of loss of wages and future earnings and should be permitted to testify in this matter.

> ### 2. Verzilli's Testimony of Specialized Knowledge Will Help the Trier of Fact to Determine Facts in Issue

Defendant argues that because Verzilli relied upon Doherty's vocational report in conducting his analysis, his testimony must be excluded. This is baseless. As Verzilli explained in his deposition, his role was to provide present-value analysis of wages and calculate wage loss over time as an economic expert, not to make vocational assessments: "I am not a vocational expert. I am an economist… I applied the basic economic framework to… Doherty's vocational opinions..." (Pl. Ex. 4, Verzilli Dep. 8:21-24). It is not within Verzilli's realm of expertise to make a vocational assessment and proffer a vocational opinion. Had he done so, Defendant would have had reason to object to his testimony because he is not qualified to offer such an opinion. Verzilli's statement that he was not qualified to profess on a vocational issue does not mean he is not qualified to make an economic assessment.

Verzilli's specialized knowledge as an economic expert is asserted to help the trier of fact understand the economic impact of Plaintiffs' work disabilities, particularly regarding long-term ramifications. Like Doherty, Verzilli was not retained to opine about causation or deliberate indifference by Defendant. Rather, Verzilli assessed the economic impact of Plaintiffs' work

27

disabilities, which will help the trier of fact determine the impact of Defendant's deliberate indifference on Plaintiffs.

In his deposition, Verzilli testified to his qualifications as an economic expert and his extensive education and experience:

> I started…after my undergraduate degree more as an… economic analyst…[in] June of '88. After my MBA degree, my role increased as an economist in the firm. And in 1994 I became [my father's] partner. Then we worked after that…up to about 2007. Dad became ill. And I just changed it to Verzilli Consulting Group….

(*Id*. at 21:5-21).

Verzilli has worked as an economic consultant for almost 30 years. His education, training, and experience give him the necessary knowledge to provide a reliable economic analysis of the Plaintiffs' damages in this case. His testimony will aid the factfinder in understanding those damages.

### 3.  Verzilli's Testimony is Grounded in Sufficient Facts and Data as Required Under Rule 702

Verzilli analyzed Doe 1's earning loss due to the impact of her work disability. (Def. Ex. IIII, No. 126-18 at 2). He analyzed Doe 2's earning loss due to the delay in the completion of her Ph.D. program and the impact of her work disability. (Def. Ex. CCCC, No. 128-3 at 2-3). Verzilli reviewed the Second Amended Complaint; Doherty's Vocational Report; and various publications and source documents as part of his data sources including but not limited the Center for Retirement Research, the SSA, the BLS and the Journal of Forensic Economics. (Def. Ex. IIII, No. 126-18 at 1, 3-4; Def. Ex. CCCC, No. 128-3 at 1, 3-4).

Defendant attacks the facts and data Verzilli used. In his deposition, Verzilli explained, "I reviewed the reports for [Plaintiffs]. I double-checked, went through about the different sources…I looked over Ms. Doherty's vocational reports." (Pl. Ex. 4, Verzilli Dep. 7:12-15).  He said, "I then

applied the normal basic economic framework… doing the present-value analysis, but I accepted

the opinions of Ms. Doherty." (*Id.* at 19:7-10). He described the information he relied upon for

Doe 1:

> Q. You were told [Doe 1] graduated with her Ph.D. in August of 2020; correct?
>
> A. That's my understanding.
>
> Q. And you knew that she held a position, that she was employed with Adjuvance Technologies, Incorporated, as a scientist from August of 2020 to February of 2022; correct?
>
> A. That's correct…
>
> Q. Were you told how much she was earning from this position?
>
> A. I will double-check. I am not sure if Ms. Doherty had that in her report.... [I]t was noted the salary was like 84,000…
>
> Q. Did she say anything with respect to benefits that she received from that position?
>
> A. Health insurance and 401(k) plan.
>
> Q. Did she provide information with respect to those other than stating that she was receiving health insurance and employee benefits, and 401(k)?
>
> A. No.
>
> Q. And… the plaintiff secured this position while she was in school...?
>
> A. I don't know if I made an assumption. I mean, I knew she started there in August and she had earned her degree. So…it would imply that she may have interviewed for it prior…I would think she may have.
>
> Q. She then switched to a new position in April of 2022; correct?
>
> A. That's correct.
>
> Q. And you were told that she earns approximately $104,000; correct?
>
> A. That's correct.
>
> Q. Do you know whether or not she receives bonuses?
>
> A. I am not sure.

Q. Do you know whether she receives employee benefits?

A. …[M]y understanding, there is health insurance.

Q. Anything else?

A. …I would assume there may be some kind of retirement program or a 403(b) plan.

Q. You were not provided details of that information; correct?

A. No.

Q. Did you ask for it?

A. No. I wasn't doing past lost earnings, so I didn't really ask for that. If I was…doing like a past lost earnings, I would have, but…in my review of Ms. Doherty's vocational opinion and the impact, I was looking more at what her potential was… from what she's doing now… I would look more into with those types of jobs and the economy and the benefits she would get, not specifically what her job was at the time.

(*Id.* at 29:6-31:23).

While Verzilli relied in part upon Doherty's expert vocational opinion, he verified her data sources.

Q. … [Y]ou were copying Ms. Doherty's opinion that [Doe 1]'s pre-injury earning capacity is representative of average earnings for scientific research and development services specialists; correct?

A. Yeah. I don't know if I copied it. I mean, the -- I had quote -- there were quotes I did, but I -- that was my words from her opinion, but… it's pretty standard…

Q. Do you have any background and information with respect to scientific research and development services specialists?

A. I am an economist. So I look at jobs… all the time… over my years I have seen that category. I am not an employability specialist… but in terms of those types of jobs and those salaries… my background is -- economics is about how we produce income, but that would be what my… education, experience, and what I do in looking at earnings…

Q. You would not know whether [Doe 1] is entitled to the title of scientific research and developmental services specialist; correct?

A. [T]hat's a vocational question… In terms of economics, what the earnings are is -- you know, what that job pays is an economic

question. Identifying that it -- was that job that someone could have done is more of a vocational issue…I relied on Ms. Doherty's opinion.

Q. And you state that is approximately… $162,240 annually that she has opined; correct?

A. That's correct.

Q. This is also a number that was generated by Ms. Doherty..?

A. That is correct.

Q. And you took that at face value; correct?

A. When you -- I mean, she got it from the -- let me double-check the cite… [T]hat came from the Bureau of Labor Statistics… when I see those figures, I look at the OES survey… I saw that's where she got it, so I know… that data is solid, but… she identified what category.

Q. Did you go look at the BLS?

A. I did.

Q. And what did you find about the information that she generated?

A. That… was consistent with what I saw in the OES. Oh, I am sorry. Occupational Employment Wage Survey.

Q. And you identified that the number that she is quoting, $162,240, is correct..?

A. …that's how I read it, yes.

Q. But you did not analyze whether or not that number is appropriate for [Doe 1]; correct?

A. That's a different question… [T]hat's a vocational issue… that would be Ms. Doherty's opinion as to what… [Doe 1's] posi- -- potential was and that that position is appropriate given her background, education, and experience, skills and talents in the vocational analysis…

Q. So my understanding is correct that you have not analyzed whether or not the number 162,240 is appropriate for [Doe 1] based on her experience and such; correct?

A. Right. Other than… that number is from the Bureau of Labor Statistics, and that number is solid, but that's a vocational issue if that's… relevant to [Doe 1].

Q. And the BLS does not actually break it down by entry level, mid-level, and such; correct?

31

A. They do. What -- how they do it is the definition. Entry level generally is the 10th to 25th percentile; so the low end. And then there is an average, which is an average of the population. Then there is a median, which is half -- half or below, half or above. Then there is a 75th and 90th percentile. And that's generally the experienced. So in terms of what is entry level, you are generally going to be at the lower end, the 10th to 25th percentile.

Q. Do you know… where the 162 lies?

A. …my understanding was the average… I recall it being the average.

Q. And you don't know whether or not that average number is appropriate for [Doe 1's] experience; correct?

A. [T]hat's a vocational issue.

(*Id*. at 31:24-35:23).    Verzilli relied upon Doherty's vocational report for the vocational analysis.

His mathematical and economic calculations are his own:

A. …I assumed that by age 40. So I didn't assume that 162,000 as of today. I gave it some time…it's an average and she's at the beginning…of her career, I gave it a ten-year period to get to that level.

Q. How did you come up with that ten-year period?

A. It's…kind of looking at what we just talked about; experience, entry…and it's from the…American Community Survey, which has earnings by age and education… I look at that data and you look at the distribution, you generally are going to see that average is picked up in about.. ten years or so, around ten years…by the early 40s. And so I just…looked at it that way because I did recognize that…[Doe 1] finished in 2020…she's now…coming up on four years into her experience. She wouldn't have started out at 162,000…. The question is at what point would that 162,000 -- with her experience generally would take about…ten years from my report… she was already close to three years. So it's about 13, 14 years of her experience… then you get to the 40s or early 40s, that 40 to 45 is where that average kicks in. People with Ph.Ds… don't start out at 22. Generally you are in the 25 to 30 range, depending on the program you go into. So that's where you are seeing that 10 to 15 years to get to the average…10 years from the time I did my report, which would actually be 13 years into her career.

Q. The American community standards that you mentioned –

A. Yes.

Q. -- that does not take into account the level of experience; it only takes into account the age and education. Correct?

A. Right. But that age…it's a cross-section, but we know in economics that there is a concept called the Mincer equation that as you do your job and you gain experience…your earnings grow because of that, essentially. …[T] there is a little more to it. I am just kind of summarizing the basic framework. And just like an attorney, you know, you start out as an associate. As you gain experience, you gain experience in a trial setting, you are getting clients, your employer recognizes that. And that progression generally is, you know, associate and you move up to partner at some point. You know, that's…called productivity. So when you look at that cross-section, it takes a point in time.…[N]ow, the data starts 18 to 24. So for a college graduate you are really not 18. You know, you are going to be, you know, mid or early 20s, 22. And then it goes 25 to 29. And it goes in five-year basic increments all the way up… through retirement. And then when you look at that data, it shows it grows…quicker early on, and then it kind of levels off. So that cross-section data is capturing the experience.…[T]he older individuals, that when they take the survey, someone in their 40s with a Ph.D., on average, is earning more than someone starting out in their mid 20s. So it's capturing that experience over the life cycle. And that's how we look at it.

Q. Is that number a national number, or is that specific to a particular labor market?

A. The American Community Survey is a national estimate. It's a national survey. So when you look at all of that data, because…when you are talking about the age education data…it's not regionalized. It's an average.

Q. And there are information that you are able to gather with respect to regional labor markets; correct?

A. You can look at…those jobs. So that survey that Ms. Doherty looked at…is national.…[Y]ou can look at the state, and then you can do it by what's called MSA, metropolitan statistical area. So…for me, the Philadelphia -- I think it's Philadelphia, Camden, Wilmington MSA. So…that same job, I could look nationally. I could look in Philadelphia. I could look in Pennsylvania. Pennsylvania goes one step further.…[B]ut we can get it by county too. ...I am in…Montgomery County. I can get Bucks County, Lehigh, Lancaster, all those…counties in Pennsylvania.…

Q. And the BLS generally provides a national average as well; correct?

33

A. [T]hat survey is national. You can do state, and you can do metropolitan statistical area. They may have the county too. I don't recall because…more of my work is in Pennsylvania. So sometimes I try to pull county data. And Pennsylvania has a specific website that has all that same data, but then you can pull it out by county. I just don't recall what it was here.

Q. You…testified earlier that [Doe 1] would not have earned 162 right after the Ph.D. and, therefore, …you assumed that she would be earning 162 in ten years. Do you remember that testimony?

A. Yeah. I gradually grew the 104 to 162 in ten years.

Q. Have you researched what [Doe 1] should have been earning immediately after the Ph.D.?

A. I did not. I did not do that analysis.

Q. And you don't know whether the salary that [Doe 1] was receiving after the Ph.D. was an appropriate salary for her level of experience; correct?

A. The salary…she got in August of 2020 at Adjuvance Technologies, that 80, that low 80s, I didn't really look at that. I can't say. I don't want to speculate because I really didn't look into that.

Q. And the same thing for the…one after; correct?

A. Her current job?

Q. Correct.

A. No.... I took that as it means that that's what she's earning. I didn't do anything, any analysis into that other than that was what her present salary was….

Q. And what is the growth rate from 104,000 to 162,240?

A. If I can find my calculator, I can tell you.

…

Q. Okay. Does 4.5 percent sound about right?

A. Without inflation, …that probably sounds right, but…I will give it to you.... I got 4.54. Is that what you said?

Q. Correct.

A. …that's real growth. So that's just without the inflation or… the normal wage growth…

Q. .…[Y]ou said inflation. Did you take into account inflation when you were doing your calculation?

34

> A. I took into account normal wage growth, which…would include inflation. That's correct.
>
> Q. And what would that be?
>
> A. 3 percent. So what happens is the 104…to get there in ten years is… 4-and-a-half percent, but then because we're doing this in present value, that 4-and-a-half percent is above normal wage growth because of the present value function. That's what I was trying to point out.

(*Id.* at 35:24-45:19).

Defendants ask the Court to remove the opportunity for the factfinder to deliberate on Verzilli's testimony; but that is not what Rule 702 and *Daubert* permit. *Kumho* clarified that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." (*Kumho*, 526 U.S. at 141-42 (citing *General Electric Co.*, 522 U.S. at 143)). "The trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." (*Id.* at 152).

Again, *Daubert* allows for experts to offer opinions "that are not based on firsthand knowledge or observation." 509 U.S. at 592.  Verzilli explained all the steps of his analysis in his deposition and clarified the data sources and publications he used. He testified that the American Community Survey, which includes data on productivity, life cycle increases, and inflation was accurately considered in determining Plaintiffs' earning capacities. (*Id.*).

Should Defendants wish to cross-examine Verzilli on perceived weaknesses in his data or ask that he perform alternative calculations based other assumptions, they are entitled to do so. They are not, however, entitled to have his opinions excluded on this basis.

### 4. Verzilli's Testimony is the Product of Reliable Principles and Methods

Verzilli's methodology and the principles he relied upon in preparing his report are reliable and relevant to the questions of how Plaintiffs' work disabilities impact their economic potential and earning capacities. Like Doherty, Verzilli was not engaged to determine causation because causation is a determination for the factfinder. Defendant's argument that Verzilli inappropriately relied upon Doherty's vocational assessment is disingenuous and is ultimately a question for the factfinder. "[T]he standard is that only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." (*Lopez*, 880 F.3d at 980 (citing *Arkwright*, 125 F.3d at 1182, and quoting *Hose*, 70 F.3d at 974)). Verzilli's opinion is well-supported with reliable, nationally published data and supported by his years of experience.

Verzilli's methods, use of data, review of records, and analysis were consistent between Plaintiffs and raise the same responses to Defendant's arguments about Verzilli's work on behalf of Doe 2 as with Doe 1. If Defendant believed that a proper economic analysis would have focused on different data or utilized different methods, it could have engaged an expert to make such an argument. It did not.

The question of whether Verzilli reached reliable conclusions is a question for the factfinder following careful consideration of his offered opinions and the available evidence. Verzilli is a well-qualified expert economist whose method is sound, and his opinions will be relevant and helpful to the trier of fact in determining material issues at trial He should therefore be permitted to provide expert testimony, and Defendant's Motion should be denied.

## CONCLUSION

Plaintiffs respectfully request that this Court deny Defendant's Motion.

36

DATED: November 1, 2024                    Respectfully submitted,

                                           */s/ Elizabeth K. Abdnour*
                                           Elizabeth K. Abdnour
                                           0081795 (OH), P78203 (MI)
                                           Megan N. Mitchell
                                           2102019 (AK), 53803 (CO), P87312 (MI)
                                           ABDNOUR WEIKER, LLP
                                           500 E. Michigan Ave., Ste. 130
                                           Lansing, MI 48912
                                           (517) 994-1776
                                           (614) 417-5081
                                           liz@education-rights.com
                                           megan@education-rights.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with the limits set forth in Neb. Civ. R. 7.1(d). Further, based on the Word Count function of Microsoft Word for Mac word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify that this Brief contains 11,980 words.

                            */s/ Elizabeth K. Abdnour*
                            Elizabeth K. Abdnour

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic system.

                            */s/ Elizabeth K. Abdnour*
                            Elizabeth K. Abdnour