**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, | Case No. 4:20-cv-03081 |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO** |
| | **DEFENDANT'S STATEMENT OF** |
| v. | **MATERIAL FACTS AND** |
| | **ADDITIONAL MATERIAL FACTS** |
| BOARD OF REGENTS OF THE | |
| UNIVERSITY OF NEBRASKA, | |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**STATEMENT OF MATERIAL FACTS**

1. **Undisputed.**

2. **Undisputed.**

3. **Undisputed.**

4. **Undisputed.**

5. **Undisputed.**

6. **Undisputed.**

7. **Undisputed.**

8. **Undisputed.**

9. **Undisputed.**

10. **Undisputed.**

11. **Undisputed.**

12. **Undisputed.**

13. **Undisputed.**

1

14.    **Undisputed.**

15.    **Undisputed.**

16.    **Undisputed.**

17.    **Undisputed.**

18.    **Undisputed.**

19.    **Undisputed.**

20.    **Undisputed.**

21.    **Undisputed.**

22.    **Undisputed.**

23.    **Undisputed.**

24.    **Undisputed.**

25.    **Undisputed.**

26.    **Undisputed.**

27.    **Undisputed.**

28.    **Undisputed.**

29.    **Undisputed.**

30.    **Undisputed.**

31.    **Undisputed.**

32.    **Undisputed.**

33.    **Undisputed.**

34.    **Undisputed.**

35.    **Undisputed.**

36.    **Undisputed.**

37.    **Disputed.**  Some BRUN employees were responsible employees.  (Pl. Ex. 31, 32).
The Student Code of Conduct does not define responsible employees (*see* Def. Ex. P, No. 125-22),
and Defendant has not provided any evidence defining responsible employees or their obligations.
Therefore, Barton may have been a responsible employee with an obligation to respond to
allegations of sexual misconduct.

38.    **Undisputed.**

39.    **Undisputed.**

40.    **Undisputed.**

41.    **Undisputed.**

42.    **Undisputed.**

43.    **Undisputed.**

44.    **Undisputed.**

45.    **Undisputed.**

46.    **Undisputed.**

47.    **Undisputed**

48.    **Undisputed.**

49.    **Undisputed.**

50.    **Undisputed.**

51.    **Undisputed.**

52.    **Undisputed.**

53.    **Undisputed.**

54.    **Undisputed.**

55.    **Undisputed.**

3

56.    **Undisputed.**

57.    **Undisputed.**

58.    **Undisputed.**

59.    **Disputed in part and undisputed in part.**  Going into graduate school, Doe 1's primary plan was to go into higher education. She was considering pursuing a career at a research institution or teaching college. However, as she went through her graduate training and experience with the Title IX office, she became disillusioned with higher education. She was afraid that she would not feel comfortable or be successful working in higher education.  (Doe 1 Dec. at ¶ 15).

60.    **Undisputed.**

61.    **Undisputed.**

62.    **Undisputed.**

63.    **Undisputed.**

64.    **Undisputed.**

65.    **Undisputed.**

66.    **Undisputed.**

67.    **Undisputed.**

68.    **Undisputed.**

69.    **Undisputed.**

70.    **Undisputed.**

71.    **Undisputed.**

72.    **Undisputed.**

73.    **Undisputed.**

74.    **Undisputed.**

75.    **Undisputed.**

76.    **Undisputed.**

77.    **Undisputed.**

78.    **Undisputed.**

79.    **Undisputed.**

80.    **Undisputed.**

81.    **Undisputed.**

82.    **Disputed.**  JD4 asked Doe 1 multiple times if she was afraid of him, and he continued to contact her about getting back together after she told him he was making her uncomfortable multiple times. He also called her things like "fake as fuck."  Altogether, this made her feel afraid of him.  (Doe 1 Dec. at ¶ 16).

83.    **Undisputed.**

84.    **Undisputed.**

85.    **Undisputed.**

86.    **Undisputed.**

87.    **Undisputed.**

88.    **Disputed.**    The relevant portion of Lamoureaux's declaration reads: "JR4 acknowledged his prior relationship with Doe 1 and Doe 1's request for him to stop contacting her. JR4 stated he continued to contact Doe 1 to get an answer to a question and to get closure. JR4 stated he had no intention of making any further contact with Doe 1."  (Lamoureaux Dec., No. 125-1 at ¶ 18).  The investigative report also only refers to inadmissible hearsay.  (Def. Ex. C, No. 125-4 at 4). This is inadmissible hearsay and may not be considered by this Court pursuant to Fed. R. Evid. 801 and 802.

5

89.    **Disputed.**    The relevant portion of Lamoureaux's declaration reads: "At this meeting, JR4 also expressed his interest in an informal resolution and stated he would agree to a No Contact Order." (Lamoureaux Dec., No. 125-1 at ¶ 18).  The investigative report also only refers to inadmissible hearsay.  (Def. Ex. C, No. 125-4 at 4). This is inadmissible hearsay and may not be considered by this Court pursuant to Fed. R. Evid. 801 and 802.

90.    **Undisputed.**

91.    **Undisputed.**

92.    **Undisputed.**

93.    **Undisputed.**

94.    **Undisputed.**

95.    **Undisputed.**

96.    **Undisputed.**

97.    **Undisputed.**

98.    **Undisputed.**

99.    **Undisputed.**

100.    **Undisputed.**

101.    **Undisputed.**

102.    **Undisputed.**

103.    **Undisputed.**

104.    **Undisputed.**

105.    **Undisputed.**

106.    **Undisputed.**

107.    **Undisputed.**

108.    **Undisputed.**

109.    **Undisputed.**

110.    **Undisputed.**

111.    **Undisputed.**

112.    **Undisputed.**

113.    **Undisputed.**

114.    **Undisputed.**

115.    **Undisputed.**

116.    **Undisputed.**

117.    **Undisputed.**

118.    **Undisputed.**

119.    **Undisputed.**

120.    **Undisputed.**

121.    **Undisputed.**

122.    **Undisputed.**

123.    **Undisputed.**

124.    **Undisputed.**

125.    **Undisputed.**

126.    **Undisputed.**

127.    **Undisputed.**

128.    **Disputed in part and undisputed in part.**  JR4's lab was moved—down the hall a little bit—but that was achieved by Doe 1 on her own initiative, working with her department. (Pl. Ex. 1, Doe 1 Dep. 234:19-22).

129. **Undisputed.**

130. **Undisputed.**

131. **Undisputed.**

132. **Undisputed.**

133. **Undisputed.**

134. **Undisputed.**

135. **Undisputed.**

136. **Undisputed.**

137. **Undisputed.**

138. **Undisputed.**

139. **Undisputed.**

140. **Undisputed.**

141. **Undisputed.**

142. **Undisputed.**

143. **Undisputed.**

144. **Undisputed.**

145. **Undisputed.**

146. **Undisputed.**

147. **Undisputed.**

148. **Undisputed.**

149. **Undisputed.**

150. **Undisputed.**

151. **Undisputed.**

152.    **Undisputed.**

153.    **Undisputed.**

154.    **Undisputed.**

155.    **Undisputed.**

156.    **Undisputed.**

157.    **Undisputed.**

158.    **Undisputed.**

159.    **Undisputed.**

160.    **Undisputed.**

161.    **Undisputed.**

162.    **Undisputed.**

163.    **Undisputed.**

164.    **Undisputed.**

165.    **Undisputed.**

166.    **Undisputed.**

167.    **Undisputed.**

168.    **Disputed in part and undisputed in part.**  The Morrison Center restriction expressly gave JR4 permission to enter Morrison Center including to attend seminars that Doe 1 regularly attended and at which she presented.  (Def. Ex. EE, No. 126-8 at 2; Def. Ex. FF, No. 126-9 at 2-3).

169.    **Disputed.**  Doe 1 did not provide anything.  Sue Moore and UNL decided the outcome of the hearing and determined what restrictions would be placed on JD4.  Doe 1 did not

have any role in the decision-making process, (Def. Ex. EE, No. 126-08), and did not agree with the determination, (No. 29 ¶ 322).

170.    **Disputed in part and undisputed in part.**  Doe 1 emailed Moore about her concerns and was simply told that if JR4 attended any seminars (including her presentations), the no-contact order would be in place.  (Def. Ex. FF, No. 126-9 at 2-3).

171.    **Undisputed.**

172.    **Undisputed.**

173.    **Undisputed.**

174.    **Undisputed.**

175.    **Undisputed.**

176.    **Undisputed.**

177.    **Undisputed.**

178.    **Undisputed.**

179.    **Disputed.**  Plaintiffs are unable to find this evidence as cited.  The citation states "[Id. ___.]," but this is allegedly a statement by Moore, and the prior citation is to Counley's declaration, (No. 125-21), and this statement cannot be found in the cited document (*id.*).[1]

180.    **Undisputed.**

181.    **Undisputed.**

182.    **Undisputed.**

183.    **Undisputed.**

184.    **Undisputed.**

---

[1] "Each numbered paragraph shall contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph. Failure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the [summary judgment] motion." Neb. Civ. R. 56(a)(2).

185. **Undisputed.**

186. **Undisputed.**

187. **Undisputed.**

188. **Undisputed.**

189. **Undisputed.**

190. **Undisputed.**

191. **Undisputed.**

192. **Undisputed.**

193. **Undisputed.**

194. **Undisputed.**

195. **Undisputed.**

196. **Undisputed.**

197. **Undisputed.**

198. **Undisputed.**

199. **Undisputed.**

200. **Undisputed.**

201. **Undisputed.**

202. **Undisputed.**

203. **Undisputed.**

204. **Undisputed.**

205. **Undisputed.**

206. **Undisputed.**

207. **Undisputed.**

208. **Undisputed.**

209. **Undisputed.**

210. **Undisputed.**

211. **Undisputed.**

212. **Undisputed.**

213. **Undisputed.**

214. **Undisputed.**

215. **Undisputed.**

216. **Undisputed.**

217. **Undisputed.**

218. **Undisputed.**

219. **Undisputed.**

220. **Undisputed.**

221. **Undisputed.**

222. **Undisputed.**

223. **Undisputed.**

224. **Undisputed.**

225. **Undisputed.**

226. **Undisputed.**

227. **Undisputed.**

228. **Undisputed.**

229. **Undisputed.**

230.    **Disputed in part and undisputed in part.**  Doe 2 did not particularly remember what she was physically experiencing in that moment because IEC asked her what she remembered feeling and I said I didn't really notice what I was feeling in terms of physical sensations. Doe 2's brain questioned if it was a dream when she woke up because she just had snapshot memories. She remembered an image of falling in the ditch and then nothing until another snapshot memory of looking up in the bathroom mirror and seeing JD4 had her leaned over the sink and was very clearly having sex with her. Doe 2 believes she also vomited and then did not remember anything else until she woke up and asked JD4 if he had sex with her while she was vomiting in his sink.  (Doe 2 Dec. at ¶ 25).

231.    **Disputed in part and undisputed in part.**  With respect to Doe 2's statement that the thigh touching incident was "not an assault," she meant that JD4 did not rape her at the orientation. In her mind, she always conflates rape and sexual assault, so what she intended to communicate is that she was not raped at the orientation. (Doe 2 Dec. at ¶ 26).

232.    **Undisputed.**

233.    **Undisputed.**

234.    **Undisputed.**

235.    **Undisputed.**

236.    **Undisputed.**

237.    **Undisputed.**

238.    **Undisputed.**

239.    **Undisputed.**

240.    **Undisputed.**

241.    **Undisputed.**

242.     **Undisputed.**

243.     **Undisputed.**

244.     **Undisputed.**

245.     **Undisputed.**

246.     **Undisputed.**

247.     **Undisputed.**

248.     **Undisputed.**

249.     **Undisputed.**

250.     **Undisputed.**

251.     **Undisputed.**

252.     **Undisputed.**

253.     **Undisputed.**

254.     **Undisputed.**

255.     **Undisputed.**

256.     **Undisputed.**

257.     **Undisputed.**

258.     **Undisputed.**

259.     **Undisputed.**

260.     **Undisputed.**

261.     **Undisputed.**

262.     **Undisputed.**

263.     **Undisputed.**

264.     **Undisputed.**

265.    **Undisputed.**

266.    **Undisputed.**

267.    **Undisputed.**

268.    **Undisputed.**

269.    **Undisputed.**

270.    **Undisputed.**

271.    **Undisputed.**

272.    **Undisputed.**

273.    **Undisputed.**

274.    **Undisputed.**

275.    **Undisputed.**

276.    **Undisputed.**

277.    **Undisputed.**

278.    **Undisputed.**

279.    **Undisputed.**

280.    **Undisputed.**

281.    **Undisputed.**

282.    **Undisputed.**

283.    **Undisputed.**

284.    **Undisputed.**

285.    **Undisputed.**

286.    **Undisputed.**

287.    **Undisputed.**

288.    **Undisputed.**

289.    **Undisputed.**

290.    **Undisputed.**

291.    **Undisputed.**

292.    **Undisputed.**

293.    **Undisputed.**

294.    **Undisputed.**

295.    **Undisputed.**

296.    **Undisputed.**

297.    **Undisputed.**

298.    **Undisputed.**

299.    **Undisputed.**

300.    **Undisputed.**

301.    **Disputed in part and undisputed in part.**    I had asked advantages or disadvantages; it was out of confusion as to why UNL kept making settlement offers that achieved far less than would proceeding with the route I was on. Why would I want to accept offers for him to be able to come back on campus and do this to someone else? In short, I was questioning what benefit would this have to me after he already lost, kind of asking, "Why would you even ask me to do this, is there something I am missing here?"  (Doe 2 Dec. at ¶ 27).

302.    **Undisputed.**

303.    **Undisputed.**

304.    **Undisputed.**

305.    **Undisputed.**

306.    **Undisputed.**

307.    **Undisputed.**

308.    **Undisputed.**

309.    **Undisputed.**

310.    **Undisputed.**

311.    **Undisputed.**

312.    **Undisputed.**

313.    **Undisputed.**

314.    **Undisputed.**

315.    **Undisputed.**

316.    **Undisputed.**

317.    **Undisputed.**

318.    **Undisputed.**

319.    **Undisputed.**

320.    **Undisputed.**

321.    **Undisputed.**

322.    **Undisputed.**

323.    **Undisputed.**

324.    **Undisputed.**

325.    **Undisputed.**

326.    **Undisputed.**

327.    **Undisputed.**

328.    **Undisputed.**

329.    **Disputed.**   The relevant portion of Counley's declaration reads: "[A]ll of the witnesses I talked to stated they have never witnessed that."  (Counley Dec., No. 127-1 at ¶ 73).  The investigative report also only refers to inadmissible hearsay.  (Def. Ex. RR, No. 127-02 at 37, 40.).  This is inadmissible hearsay and may not be considered by this Court pursuant to Fed. R. Evid. 801 and 802.

330.    **Disputed.**  The relevant portion of Counley's declaration reads: "When I asked JR5 with respect to this, JR5 denied this accusation. He also stated his concealed carry permit had expired and does not carry his gun with him anywhere anymore."  (Counley Dec., No. 127-1 at ¶ 73).  This is inadmissible hearsay and may not be considered by this Court pursuant to Fed. R. Evid. 801 and 802.

331.    **Undisputed.**

332.    **Disputed.**  JR5 provided a nude photo of Doe 2 to Counley. (Def. Ex. 127-1 at 9; Pl. Dec. ¶ 20; Counley Dec., No. 127-1 at ¶ 64).

333.    **Undisputed.**

334.    **Undisputed.**

335.    **Undisputed.**

336.    **Undisputed.**

337.    **Undisputed.**

338.    **Undisputed.**

339.    **Undisputed.**

340.    **Disputed.** The relevant portion of Counley's declaration reads: "When I inquired about this, JR5 stated it was accidental and was on his Facebook, without him realizing that it posted, for maximum of one hour. JR5 stated he was trying to get the picture off of Facebook to

18

submit it to me in support of his own arguments. JR5 stated he took it down as soon as he realized

the accident.  JR5 reported he was not even friends with Doe 2 on Facebook." (Counley Dec., No.

127-1 at ¶¶ 71-72).  This is inadmissible hearsay and may not be considered by this Court pursuant

to Fed. R. Evid. 801 and 802.

     341.    **Undisputed.**

     342.    **Undisputed.**

     343.    **Undisputed.**

     344.    **Undisputed.**

     345.    **Undisputed.**

     346.    **Undisputed.**

     347.    **Undisputed.**

     348.    **Undisputed.**

     349.    **Undisputed.**

     350.    **Undisputed.**

     351.    **Undisputed.**

     352.    **Undisputed.**

     353.    **Undisputed.**

     354.    **Undisputed.**

     355.    **Undisputed.**

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**Jane Doe 1**

1.  Upon ending their romantic relationship, Doe 1 told JR4 she was not interested in getting back together and told him that she considered further communication from him to constitute harassment.  (Def. Ex. X, No. 125-30 at 1, 4, 8; Pl. Ex. 1, Doe 1 Dep. 75:3-7).

2.  JR4 began a pattern of harassing behavior towards Doe 1 with hundreds of text messages sent in May and June 2017.  (Def. Ex. X, No. 125-30).

3.  These texts were sent at all hours of the day.  (Def. Ex. X, No. 125-30).

4.  JR4 also sent Doe 1 harassing Facebook messages, phone calls, and emails.  (Def. Ex. N, No. 125-19 at 15).

5.  JR4 persistently contacted Doe 2, vacillating between being apologetic and critical of Doe 1 (*e.g.*, accusing her of sharing information about him and calling her "fake as fuck" and heartless) to try to get her to respond.  (Def. Ex. X, No. 125-30 at 6, 8, 14).

6.  JR4 asked Doe 2 for a "second chance," telling her he did not want to "give up on this," saying "I need to know if there is any way we could get together . . . in the future," etc.  (Def. Ex. X, No. 125-30 at 1, 2, 5, 7-9).

7.  Doe 1 told JR4 his messages were making her uncomfortable, but he still did not stop, asking, "[a]re you afraid of me or something?"  (Def. Ex. X, No. 125-30 at 3).

8.  JR4 threatened to spread rumors about Doe 1 and her academic advisor and stated that he would not spread those rumors to try to get Doe 1's roommate to respond to him.  (Def. Ex. AA, No. 126-4).

9.  JR4 stated that he had "an extremely embarrassing story" that he "could tell people about [Doe 1]" but also said he doesn't "do that shit."  (Def. Ex. AA, No. 126-4 at 1).

20

10. JR4 said, "I should spread my embarrassing story I have of [Doe 1]." (Def. Ex. AA, No. 126-4 at 2).

11. JR4 then said he *wouldn't* share the story, while simultaneously emphasizing that the story "is extremely embarrassing" and that "[Doe 1] would die of embarrassment." (Def. Ex. AA, No. 126-4 at 2).

12. JR4 stated that he "could [ ] shit on [Doe 1's academic advisor] all day every day with everything I know about her but I don't." (Def. Ex. AA, No. 126-4 at 1).

13. JR4 said he would share the rumor about Doe 1's academic advisor to "take[] that cunt down" unless Doe 2's roommate responded to him in fifteen minutes. (Def. Ex. AA, No. 126-4 at 2).

14. JR4 did end up sending the email about Doe 1's academic advisor, as he threatened. (Pl. Ex. 1, Doe 1 Dep. 118:8-12; Def. Ex. V, No. 125-28 at 3).

15. In texts to Doe 1's roommate, JR4 called Doe 1 and her friends "mean little gossip girls" and "cunts" and called Doe 1 an "attention whore." (Def. Ex. AA, No. 126-4 at 2).

16. On May 5, 2018, JR4 sent an email to Doe 1 telling her she was not a "strong independent women [sic]," and calling her a "cowardly little girl," a "cunt bitch," "fucking cunt coward weak little girl," and, in all caps, a "STUPID CUNT BITCH," among other things. (Def. Ex. N, No. 125-19 at 2).

17. This was a violation of the no-contact order. (Def. Ex. V, No. 125-28 at 19).

18. Although Lamoureux sent Doe 1 a letter explaining a student's right to file formal complaints with law enforcement and IEC, in Lamoureux's subsequent meeting with Doe 1, he informed her that she could not file a complaint with IEC. (Pl. Ex. 1, Doe 1 Dep. 82:19-25, 83:1-15, 93:7-14, 97:16-25, 98:1-3).

19. In that meeting, Lamoureux told Doe 1 that IEC could not help her because this was "regular harassment" and not sexual harassment. (*Id*. at 91:23-25; 92:1-4, 11-21; Def. Ex. O, No. 125-20 at 8:345-351).

20. Lamoureux told Doe 1 that her only option was to informally pursue a mutual no-contact order. (Pl. Ex. 1, Doe 1 Dep. 92:1-6).

21. Doe 1 wanted to file a complaint, but Lamoureux told her she did not have that option. (Pl. Ex. 1, Doe 1 Dep. 97:4-18, 98:2-3).

22. JR4 used Lamoureaux as a third party to contact Doe 1, in violation of the no-contact order. (Def. Ex. V, No. 125-28 at 3).

23. JR4's harassment escalated to contacting Doe 1's roommates and peers in the department, using more extreme language and threatening to harm Doe 1's reputation at the University. (Def. Ex. AA, No. 126-4; Pl. Ex. 1, Doe 1 Dep. 110:16-25, 11:1-5, 118:8-12; Def. Ex. V, No. 125-28 at 3).

24. Following JR4's December 2017 messages to Doe 1's roommates, Doe 1 met with Counley, who informed Doe 1 that the messages were a breach of the no-contact order. (Pl. Ex. 1, Doe 1 Dep. 120:22-25, 135:16-23, 136:4-6).

25. Later, in January 2018, Counley informed Doe 1 that she had determined that the messages *did not* constitute a breach of the no-contact order. (*Id*. at 142:18-21).

26. Doe 1 was only informed of this finding after her Voices of Hope advocate reached out to Counley, who apparently had forgotten to share that information with Doe 1 despite having previously told Doe 1 that she would follow up about the breach of the no-contact order. (*Id*. at 136:3-6, 141:2-6, 20-25; 142:1-5).

27. Doe 1 then again asked to file a formal complaint. (*Id*. at 141:8-9, 143:3-5, 147:17-18).

22

28. BRUN did not permit Doe 1 to file a formal complaint, nor did it provide any further accommodations. (*Id*. at 142:16-21, 147:17-18).

29. After JR4's harassing messages to Doe 1's roommate, Officer Fischer reached out to JR4 and told him not to contact Doe 1's roommates. (*Id*. at 123:17-25).

30. Doe 1's only option was safety planning with Officer Fischer, who advised her to avoid walking alone on campus (which she considered impractical advice). (*Id*. at 126:1-7, 21-23).

31. Doe 1 requested a parking pass to avoid walking long distances alone on and to and from campus, but that request was denied. (*Id*. at 208:3-12).

32. Fischer told Doe 1 that he thought it would be beneficial to ask the University why it made the determination not to allow her to file a formal complaint. (*Id*. at 126:9-12).

33. In January 2018, Doe 1 reiterated her concerns to Officer Fischer about JR4's attendance at the journal club meetings where she presented. (Pl. Ex. 7).

34. Before the start of the spring semester in 2018, Doe 1 met with Meagan Counley to request an accommodation so that she would not be required to sit in an eight-person, discussion-based class with her harasser, as well as a required seminar course. (*Id*. at 55:4-21, 56:9-11, 133:10-25).

35. Doe 1 told Counley that she felt unsafe taking classes with JR4, especially following the threatening messages he sent to her roommates. (*Id*. at 133:19-22).

36. Counley denied that request, refusing to even speak with Doe 1's professor about the situation. (*Id*. at 133:24-25, 134:1-5).

37. After JD4's May 5, 2018 email, Doe 1 met with Title IX Coordinator Tami Strickman and Officer Fischer. (Def. Ex. N, No. 125-19 at 3).

38. Fischer urgently summoned Doe 1 to the police station even though she had previously scheduled a meeting for the following day. (Pl. Ex. 1, Doe 1 Dep. 153:6-8, 13-16).

23

39. Due to the last-minute change, Doe 1 felt unprepared and was not able to bring her advocate. (*Id*. at 159:19-23).

40. Doe 1 was taken to a room in the police station and her boyfriend who had accompanied her to the meeting was not permitted to stay with her. (*Id*. at 153:23-25).

41. During that meeting, Strickman asked Doe 1 to go through the email from JR4 line by line and tell her what she thought each line meant. (Def. Ex. O, No. 125-20 at 16:690-691).

42. Strickman also asked Doe 1 to provide a list of all the awards she had received as a graduate student. (Def. Ex. O, No.125-20 at 17:748-759).

43. Strickman then presented Doe 1 with three options: file a complaint regarding the single email, file a complaint anonymously regarding the single email, or do nothing. (Pl. Ex. 1, Doe 1 Dep. 155:16-20).

44. Strickman told Doe 1 that she could not file a complaint about the entire situation, including JR4's prior harassing conduct, telling Doe 1 that she had waived her right to file a complaint as to those events having previously agreed to informal resolution. (*Id*. at 156:2-6).

45. Doe 1 told Strickman and Fischer that JR4 "seems very unstable" and that she was "definitely afraid of him and [ ] definitely afraid to be on campus." (Def. Ex. O, No. 125-20 at 3:135, 4:136-137).

46. Doe 1 was still "very concerned" about seeing JR4 in Morrison Center, as he supposedly lacked key card access to that building. (Def. Ex. N, No. 125-19 at 3).

47. The next day, Doe 1 attended the previously scheduled meeting with Meagan Counley, Officer Fischer, and her advocate. (Pl. Ex. 1, Doe 1 Dep. 158:23-25, 159:1-2).

48. During this meeting, Counley reiterated that Doe 1 could only file a complaint regarding the most recent email. (*Id*. at 159:9-12).

49. Doe 1 also expressed her concerns again about unsafe conditions on campus. (*Id*. at 159:14-18).

50. Doe 1 said she felt unsafe taking courses with JR4. (*Id*. at 145:6-10).

51. Doe 1 asked Counley what she and IEC had done to make campus a safe learning environment for her. (*Id*. at 159:16-18).

52. Counley stated that was not her job. (*Id*. at 159:18-19).

53. In early July 2018, Doe 1 repeated her concern about seeing JR4 in Morrison Center to Officer Fischer. (Def. Ex. N, No. 125-19 at 18).

54. Fischer learned that a secretary was letting JR4 into the building. (*Id*. at 19).

55. In the beginning of fall semester 2018, JR4 was teaching in a lab directly across the hall from Doe 1. (Pl. Ex. 1, Doe 1 Dep. 234:16-25, 235:1-3).

56. Doe 1 requested an accommodation from IEC seeking to move JR4's lab. (*Id*. at 234:23-25).

57. This request was denied. (*Id*. at 234:21-22, 235:6-7).

58. Some messages were sent while Doe 1 and JR4 were attending academic conferences sponsored by the University and during which Doe 1 was presenting her research on behalf of the University, while others were sent after Doe 1 and JR4 had returned to Lincoln. (Pl. Ex. 1, Doe 1 Dep. 74:8-20, 79:3-15; Def. Ex. C, No. 125-4 at 2-3; Def. Ex. L, No. 125-17 at 2; Def. Ex. O, No. 125-20 at 12:536-538).

59. JR4 also attempted to log into Doe 1's email account. (Pl. Ex. 6 at 9; Def. Ex. N, No. 125-19 at 1; Def. Ex. L, No. 125-17 at 2).

60. On June 28, 2017, UNLPD Officer Jordan Newman issued JR4 a verbal no-contact directive, telling him to "cease all contact" with Doe 1. (Def. Ex. L, No. 125-17 at 4).

61. In November 2017, JR4 began attending Doe 1's journal club meetings, at which she regularly presented.  (Pl. Ex. 6 at 9; Pl. Ex. 1, Doe 1 Dep. 56:25, 57:1, 59:18-25, 60:1-4).

62. On December 6, 2017, Doe 1 saw JR4 drive by and worried he was following her.  (Pl. Ex. 6 at 9).

63. Also in December 2017, JR4 sent harassing and threatening messages to Doe 1's roommates and classmate who had reported him.  (Pl. Ex. 1, Doe 1 Dep. 110:16-25, 111:1-5; Def. Ex. W, No. 125-29 at 2; Def. Ex. EE, No. 126-8 at 2; Def. Ex. M, No. 125-18 at 1; Def. Ex. AA, No. 126-4; Def. Ex. V, No. 125-28 at 3).

64. The messages included threats to share extremely embarrassing information about Doe 1 and threats to "wage war" on her academic advisor.  (Def. Ex. AA, No. 126-4; Def. Ex. V., No. 125-28 at 18-19; Def. Ex. EE, No. 126-8 at 2).

65. JR4 then did email other classmates with sensitive information Doe 1 had shared in confidence with him while they were dating.  (Pl. Ex. 1, Doe 1 Dep. 118:8-21; Def. Ex. V, No. 125-28 at 3).

66. In January 2018, Doe 1 again reported that JR4 was attending her journal club/department-related talks, to try to make her feel uncomfortable.  (Def. Ex. M, No. 125-18 at 4).

67. Doe 1 specifically noted that JR4 had not presented before and that this was the first year he began attending.  (Pl. Ex. 7).

68. On May 5, 2018, JR4 then an aggressive and harassing email to Doe 1, a clear violation of the no-contact directive.  (Def. Ex. N, No. 125-19 at 1-2; Def. Ex. V, No. 125-28 at 19).

69. JR4 sent this email while Doe 1 was attending another conference to present her work for the University.  (Pl. Ex. 1, Doe 1 Dep. 148:13-21, 149:1-4; Def. Ex. V, No. 125-28 at 4).

70. The day before JR4 sent this email, Doe 1 saw him staring at her from across the street. (Def. Ex. O, No. 125-20 at 11:484-487).

71. Also in spring 2018, JR4 sent multiple harassing and threatening Facebook messages to Doe 1's friend who had reported his conduct, calling him sexually derogatory names and stating that he would have "kicked [his] faggot teeth in." (Def. Ex. V, No. 125-28 at 3).

72. Although JR4 lacked card access to Morrison Center, where Doe 1's office and lab were located, she reported seeing him there on several occasions. (Pl. Ex. 1, Doe 1 Dep. 156:10-22, 157:16-23, 176:20-25, 177:1, 209:1-18, 210:7-25, 211:1-9; Def. Ex. N, No. 125-19 at 3, 19; Def. Ex. FF, No. 126-9; Pl. Ex. 9; Pl. Ex. 10; Def. Ex. V, No. 125-28 at 5).

73. After the final determination in her appeal, Doe 1 continued seeing JR4 without notice in Morrison Center in the subsequent months, even after his access had been restricted. (Pl. Ex. 10).

74. When Doe 1 followed up about enforcement of the sanctions in December 2018, Jake Johnson told her the new building restrictions would have only been in place the previous week, over two months after the sanctions were issued. (Pl. Ex. 10 at 2).

75. JR4's harassing message submitted to the online "DearUNL" forum in September 2019 violated the spirit of the no-contact order and demonstrated that JR4 remained a threat to Doe 1. (Pl. Ex. 13, Pl. Ex. 14).

76. Following this message, Doe 1 filed a formal complaint. (Pl. Ex. 13).

77. IEC issued a letter finding that the message was not directed at Doe 1, despite having been posted in response to an article describing Doe 1 and other students' experiences of sexual harassment while attending UNL. (Pl. Ex. 12; Def. Ex. JJ, No. 126-13).

78. After Doe 1 transferred buildings to Chase Hall, she requested that JR4's limited building access also be transferred. (Pl. Ex. 1, Doe 1 Dep. 197:18-20, 214:3-7).

79. This request was denied. (*Id*. at 197:21-22, 214:3-10).

80. Doe 1 she would often work alone in her lab or in the basement of Chase Hall after hours. (*Id*. at 198:2-14, 199:16-22).

81. Doe 1 also reported that JR4 regularly walked through her office hours. (Pl. Ex. 6 at 10; Pl. Ex. 9 at 3).

82. At least once, Doe 1 looked out of her office window and saw JR4 looking at her. (Def. Ex. V, No. 125-28 at 5).

83. In September 2019, JR4 posted a derogatory message via an online forum called "DearUNL" regarding Doe 1 and others' Title IX complaints. (Pl. Ex. 13; Pl. Ex. 14).

84. Because of JR4's harassment, Doe 1 reported several times feeling unsafe on campus, and she altered her behavior and schedule in multiple ways to minimize contact with JR4. (Pl. Ex. 1, Doe 1 Dep. 133:15-25, 145:1-10, 156:10-15, 159:14-19, 208:3-25, 209:1-18; Def. Ex. N, No. 125-19 at 3, 18; Pl. Ex. 9 at 2; Pl. Ex. 11 at 2; Def. Ex. V, No. 125-28 at 4-5).

85. Doe 1 sought accommodations for required courses she would have to take with JR4 and reported feeling sick to her stomach sitting in the same class as him. (Pl. Ex. 1, Doe 1 Dep. 55:4-21, 62:7-12; Def. Ex. V, No. 125-28 at 4).

86. Doe 1 also arranged with her professor to switch out of a required seminar, which caused her to miss opportunities to present. (Pl. Ex. 1, Doe 1 Dep. 54:2-22; Def. Ex. W, No. 125-29 at 2; Def. Ex. V, No. 125-28 at 4).

87. Because she felt unsafe on campus, Doe 1 avoided working on campus after dark and on the weekends and purchased a parking pass to avoid walking long distances on campus. (Pl. Ex. 1, Doe 1 Dep. 208:3-16; Pl. Ex. 8 at 2; Def. Ex. W, No. 125-29 at 2; Def. Ex. V, No. 125-28 at 4).

88. Doe 1 learned that JR4 had still not moved on as late as September 2019 when he posted "Get a fucking life you stupid cunts" on the "DearUNL" forum where Doe 1 and others had shared their experiences with Title IX violations.  (Pl. Ex. 13; Pl. Ex. 14).

89. Doe 1's graduation was delayed three months due to her inability to focus on her research, the need to take two short breaks from school, and the time delay caused by changing her committee members to avoid conflicts of interest with JR4's advisors.  (Pl. Ex. 1, Doe 1 Dep. 237:3-6, 238:2-15, 239:6-25, 240:15-24, 242:10-24, 246:19-24; Def. Ex. V, No. 125-28 at 4).

90. Because Doe 1 felt unsafe on campus, she was forced to change her work habits by avoiding staying on campus after dark and on the weekends despite the need to work long hours in the lab, negatively impacting her productivity.  (Pl. Ex. 8 at 2; Def. Ex. V, No. 125-28 at 4-5; Pl. Ex. 1, Doe 1 Dep. 208:3-16).

91. Doe 1's decreased productivity, the need to change advisors to avoid sharing committee members with JR4, and the need to take periods of time off from school also impacted her ability to enjoy the full benefits of her doctoral program and resulted in delayed graduation.  (Pl. Ex. 1, Doe 1 Dep. 236:10-25, 237:1-6, 238:2-15, 239:9-25, 240:15-25, 241:1-4, 16-24; 242:10-17, 21-24; 246:22-24; Def. Ex. V, No. 125-28 at 4).

92. Doe 1 had indicated in annual reports (2015-2016 and 2016-2017) that she planned to graduate in Spring of 2020.  (Def. Ex. H, No. 125-12; Def. Ex. I, No. 125-13).

93. Prior to the trauma she experienced at UNL, Doe 1 had no history of psychiatric care.  (Def. Ex. GGGG, No. 126 at 16 at 13).

94. After JR4's harassment and UNL's lack of response, she sought mental health care for anxiety, depression, trouble sleeping, eating disorders, and suicidal ideation, requiring medication. (Def. Ex. GGGG, No. 126-16; Def. Ex. HHH, No. 126-17; Pl. Ex. 1, Doe 1 Dep. 269:12-15).

95. Doe 2 received psychiatric care after JR5's sexual harassment and assaults, and the protracted Title IX investigation and appeals process, during which she did not feel adequately protected. (Def. Ex. AAAA, No. 128-21 at 10-11).

96. JR4's harassment and UNL's inadequate response caused Doe 1 to experience decreased productivity and to arrange accommodations which resulted in delaying her graduation from May to August 2020. (Pl. Ex. 1, Doe 1 Dep. 236:10-25, 238:3-6, 239:6-25, 240:15-25, 241:1-4, 16-24; 242:10-17, 21-24; 246:22-24; Def. Ex. V, No. 125-28 at 4; Def. Ex. H, No. 125-12; Def. Ex. I, No. 125-13).

97. Doe 1 obtained an offer for this job before her graduation, but was not able to begin working until August 2020, the same month she completed her doctorate. (Pl. Ex. 1, Doe 1 Dep. 42:6-8; 259:21-23; Def. Ex. Y, No. 126-2 at 1).

98. Because of Doe 1's graduation delay, she incurred additional fees at UNL. (Pl. Ex. 1, Doe 1 Dep. 247:3-4).

### Jane Doe 2

99. In Spring 2016, Doe 2 sought admission to the PhD program, (Pl. Ex. 16).

100.    At the end of 2017, she passed her comprehensive exams at the PhD level, qualifying to proceed with the next stages of the doctoral program. (Pl. Ex. 17).

101.    JR5 sexually assaulted Doe 2 three times. (Def. Ex. RR, No. 127-2 at 3-6).

102.    The Student Code of Conduct stated, "'No contact' directives are to be issued in writing to persons involved in any alleged sexual misconduct promptly after the University receives notice of a complaint." (Def. Ex. P, No. 125-22 at 18).

103.    JR5 engaged in unwanted touching of Doe 2's thigh during orientation. (Pl. Ex. 2, Doe 2 Dep. 241:1-10; Def. Ex. RR, No. 127-2 at 4).

104.    JR5 heckled Doe 2 during a presentation causing her to leave the classroom mid-presentation. (Pl. Ex. 2, Doe 2 Dep. 125:7-24, 127:2-7; Def. Ex. RR, No. 127-2 at 4-5).

105.    JR5 broke into Doe 2's apartment. (Def. Ex. RR, No. 127-2 at 5).

106.    JR5 called Doe 2 and her friends "cunts" at a department social. (Pl. Ex. 2, Doe 2 Dep. 114:15-25, 115:1-19; Def. Ex. RR, No. 127-2 at 8, 35).

107.    JR5 showed up unannounced at Doe 2's office. (Pl. Ex. 2, Doe 2 Dep. 61:23-25, 62:1-5; Pl. Ex. 19 at 2-3).

108.    JR5 posted a harassing Facebook profile picture of Doe 2 and her friend intoxicated. (Pl. Ex. 2, Doe 2 Dep. 182:4-11, 19-23, 273:8-14; Pl. Ex. 25).

109.    In March 2016 following a St. Patrick's Day party, JR5 dragged Doe 2 out of the party and told her she was embarrassing him even though she had only consumed two beers. (Pl. Ex. 2, Doe 2 Dep. 199:15-18).

110.    Doe 2 felt more intoxicated than she normally would, given the amount of alcohol she had consumed. (Def. Ex. RR, No. 127-2 at 4).

111.    Soon after she left the party, Doe 2 "felt like [her] legs turned to rubber bands" and she had difficulty walking. (Pl. Ex. 2, Doe 2 Dep. 199:18-21; Def. Ex. RR, No. 127-2 at 4).

112.    The next thing Doe 2 remembered was falling into a ditch when exiting of JR5's car at the end of his driveway. (Pl. Ex. 2, Doe 2 Dep. 199:21-23; Def. Ex. RR, No. 127-2 at 4).

113.    Doe 2 also remembered looking in the mirror in JR5's guest bathroom and seeing JR5 standing behind her without clothes on, moving in a way that suggested he was having sex with her from behind. (Pl. Ex. 2, Doe 2 Dep. 201:15-18; Def. Ex. RR, No. 127-2 at 4).

114.    Doe 2 felt "outside of [her] body" while witnessing the assault in the mirror. (Pl. Ex. 2, Doe 2 Dep. 201:5).

115.    In Spring 2017, Doe 2 and several classmates reported some of JR5's harassing conduct to Dona-Gene Barton, an associate professor in the political science department, including JR5 heckling Doe 2 during class and breaking into her apartment.  (Def. Ex. RR, No. 127-2 at 29, 34; Pl. Ex. 30).

116.    The students also informed Barton of JR5's sexual harassment of another student whom JR5 called sexually derogatory names at a school function.  (Def. Ex. RR, No. 127-2 at 29).

117.    In Fall 2017, JR5 was taking a class across the hall from Doe 2's office.  (Pl. Ex. 2, Doe 2 Dep. 62:1-5; 284:3-8, Pl. Ex. 19 at 3).

118.    Doe 2 requested an accommodation to address this, but UNL did nothing to move JR5's class or to otherwise protect Doe 2 despite their proximity on campus, even after his post-notice harassment.  (Pl. Ex. 2, Doe 2 Dep. 284:3-8).

119.    During her meeting with IEC on November 21, 2017, IEC was unable to assure Doe 2 that her safety would be protected if she provided information and if JR5 were to be notified of the investigation.  (Pl. Ex. 2, Doe 2 Dep. 232:2-8; Pl. Ex. 21 at 4).

120.    Doe 2 worried that if JR5 were to be notified of her complaint and found out about her attempts to record him discussing the sexual assaults he would "show up at [her] apartment and shoot [her]."  (Pl. Ex. 2, Doe 2 Dep. 231:21-25; 232:1-8).

121.    On January 8, 2018, Counley sent Doe 2 a letter informing her that the Title IX investigation would exceed sixty days.  (Def. Ex. XX, No. 127-8).

122.    The only reason cited for the delay was IEC's delay in contacting JR5.  (*Id.*).

123.    Yet, after Doe 2's meeting with IEC on November 21, 2017, Doe 2 requested, via her advocate from Voices of Hope, Morgan Beal, that IEC hold off *a few days* (until Monday, November 27, 2017) to contact JR5.  (Pl. Ex. 22; Pl. Ex. 23 at 1).

124.     Doe 2's motivation for seeking to hold off on contacting JR5 was concern for her safety and the hope that protective measures could be put in place prior to JR5 finding out about her complaint.  (Pl. Ex. 2, Doe 2 Depo. 232:2-8, Pl. Ex. 21 at 4).

125.     While Doe 2 was meeting with IEC on November 21, 2017, JR5 sent Doe 2 an email inviting her to a speaking event featuring the same prosecutor who was reviewing the LPD's investigation of Doe 2's sexual assaults.  (Pl. Ex. 23 at 7-9; Def. Ex. RR, No. 127-2 at 7).

126.     Beal assured Doe 2 that it was unlikely IEC would contact JR5 prior to that Monday, as the office would be closed Thursday and Friday of that week for Thanksgiving.  (Pl. Ex. 22).

127.     Beal then passed along Counley's message that she would wait until Monday, November 27th to contact JR5.  (Pl. Ex. 23 at 2).

128.     Doe 2 requested a status update from Counley on December 11, 2017.  (Def. Ex. UU, No. 127-5 at 1).

129.     Counley indicated she would be reaching out to JR5 "in the near future" and told Doe 2 that she would contact him the day after Doe 2 left for winter break.  (Def. Ex. UU, No. 127-5 at 1).

130.     Counley finally contacted JR5 on December 21, 2017.  (Def. Ex. VV, No. 127-6).

131.     Although there were delays in obtaining all the recorded calls between Doe 2 and JR5 pertaining to admissions about the sexual assaults from the Lincoln Police Department ("LPD"), Doe 2 furnished her own copy of audio of the most relevant call to IEC on December 18, 2017.  (Pl. Ex. 2, Doe 2 Dep. 254:17-22; Pl. Ex. 24; Def. Ex. RR, No. 127-2 at 43-47).

132.     While Doe 2 requested additional time to review JR5's submission (including on the weekend, which was denied), she only did so with the understanding that it would not delay the investigation.  (Pl. Ex. 2, Doe 2 Dep. 268:5-15; Def. Ex. ZZ, No. 127-10 at 1-2).

133.     In her meeting with Officer Fischer in early January 2018 after winter break, Doe 2 reported feeling unsafe on campus, including when alone at night on her bike.  (*Id*. at 284:10-16; 285:2-4).

134.     Fischer offered his number, but no safety measures were implemented.  (*Id*. at 261:7-17; 285:7-11).

135.     On May 7, 2018, Jake Johnson and Meagan Counley met with Doe 2 to discuss a settlement offer.  (Pl. Ex. 27 at 3-4).

136.     Counley specifically requested that Doe 2 attend this meeting alone, without her advocate.  (Pl. Ex. 2, Doc 2 Dep. 293:1-4, 20-25; 294:7-11).

137.     The same day that Doe 2 rejected this offer, IEC asked to delay the hearing a week. (Pl. Ex. 27 at 3).

138.     On the eve of the Title IX hearing, which had already been postponed a week to May 31, 2018, Tami Strickman called Doe 2 to communicate another settlement offer from JR5. (*See* Def. Ex. GGG, No. 127-18).

139.     Strickman pressured Doe 2 to accept the offer, telling Doe 2 that she should recognize that she could lose and that she should consider the offer if she wanted to ensure JR5 was off campus.  (Pl. Ex. 2, Doe 2 Dep. 308:16-21).

140.     JR5 threatened Doe 2 during the Title IX investigation. (Pl. Ex. 2, Doe 2 Dep. 191:13-17; Def. Ex. JJJ, No. 128-4 at 7; Pl. Ex. 18 at 2-5; Pl. Ex. 20 at 1; Pl. Ex. 23 at 2-3, 7-8; Def. Ex. RR, No. 127-2 at 7).

141.     JR5 spread rumors about Doe 2 to professors and peers. (Pl. Ex. 2, Doe 2 Dep. 108:19-25, 109:1-19, 111:3-5, 8-18, 171:13-20, 172:9-19, 179:7-12, 180:11-25; Def. Ex. RR, No. 127-2 at 26).

142.     UNL was aware of JR5's history of using his position as an attorney with connections in the community as a means of intimidating Doe 2.  (Def. Ex. RR, No. 127-2 at 4).

143.     UNL also knew that JR5 had a history of sending threatening messages to Doe 2 in conjunction with her pursuit of both the LPD investigation and Title IX investigations against him. In August 2017, the day after Doe 2 met with LPD, JR5 sent messages to her insinuating that she set his barn on fire and shot a bullet through his bedroom window.  (Def. Ex. JJJ, No. 128-4 at 21-23; Def. Ex. RR, No. 127-2 at 7).

144.     JR5 carried a small handgun in his pocket and had two other smaller guns that he concealed.  (Def. Ex. RR, No. 127-2 at 7).

145.     UNL was also aware of an incident in which JR5 pulled a gun on his neighbor. (*Id*.).

146.     IEC did not send Doe 2 a final decision until after her graduation in May 2018. (Def. Ex. TTT, No. 128-14; Pl. Ex. 15).

147.     Prior to receiving a final decision, Doe 2 had to decide whether to continue to pursue a PhD or to graduate in May 2018 with only a master's degree.  (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-7; Pl. Ex. 26 at 2; Pl. Ex. 28; Pl. Ex. 29 at 6).

148.     Doe 2 did not want to give up on her PhD but felt that she could not breathe on campus.  (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-7; Pl. Ex. 28 at 5).

149.     Doe 2 sought more time to make this decision, but she ultimately had to provide an answer so that her advisor could complete teaching assignments.  (Pl. Ex. 2, Doe 2 Dep. 322:3-9; Pl. Ex. 28).

150.     Doe 2 had to withdraw from the PhD program to avoid the possibility of further harm from JR5.  (*Id*. at 326:20-25, 327:1-16; Pl. Ex. 26 at 2; Pl. Ex. 28 at 5; Pl. Ex. 29 at 6).

151.    The UNL Student Code of Conduct applied to conduct that occurred off University premises "if the conduct is determined by the Dean of Students to adversely affect the University community [or] its members . . . ." (Def. Ex. P, No. 125-22 at 3).

152.    BRUN gave itself jurisdiction to investigation all allegations of sexual misconduct against students, regardless of location: "Sexual misconduct by or against a student may be investigated by the University whether it is alleged to have been committed on or off campus." (*Id.* at 16).

153.    BRUN had disciplinary authority over JR5, which it exercised in investigating each of his assaults and ultimately expelling him. (Def. Ex. RR, No. 127-2 at 48).

154.    BRUN rejected JR5's argument that it lacked jurisdiction over Doe 2's claims, explaining that "nonconsensual sexual intercourse[] is so severe that its purported occurrence against a community member can be presumed to adversely affect the University community [and] its members . . . ." (Def. Ex. TTT, No. 128-14 at 2).

155.    Because of UNL's failure to implement any safety precautions, Doe 2 greatly limited her time on campus and kept shorter office hours—thereby negatively impacting her educational experience. (Pl. Ex. 2, Doe 2 Dep. 262:3-10; Doe 2 Dec. at ¶ 22).

156.    Doe 2's grades also suffered, and she was forced to take an "incomplete." (Pl. Ex. 15; Doe 2 Dec. at ¶ 22).

157.    Doe 2 ultimately decided to graduate with just a master's degree in May 2018 and forgo completion of the doctoral degree on which she had already made significant progress. (Pl. Ex. 15; Doe 2 Dec. at ¶ 23).

158.    At the time Doe 2 had to make this decision, IEC had already found JR5 responsible for sexual misconduct and recommended his expulsion from UNL, (Def. Ex. RR, No. 127-2 at 48).

159.     JR5 maintained full access to campus until completion of the appeals process with no interim measures in place.  (Pl. Ex. 2, Doe 2 Dep. 326:20-25, 327:1-16; *see* Def. Ex. TTT, No. 128-14).

160.     Experts Josephine Doherty and Andrew Verzilli both relied on Doe 2's withdrawal from the PhD program and resultant graduation with only a master's degree in assessing her lost future earnings.  (Def. Ex. CCCC, No. 128-23 at 2; Def. Ex. AAAA, No. 128-21 at 5).

161.     After her unexpected withdrawal from her PhD program, Doe 2 was unsure about next steps in her career.  (Pl. Ex. 2, Doe 2 Dep. 328:9-23).

162.     On a professor's encouragement, Doe 2 decided to go to India, where she had previously worked, to do research and plan next steps.  (*Id*. at 328:16-23).

163.     Part of her motivation for going to India was to get away from JR5, including the possibility of further retaliation for her Title IX complaint.  (*Id*. at 329:7-23).

164.     While in India, Doe 2 applied to positions with local nongovernmental organizations.  (*Id*. at 333:24-25, 334:1-13).

**<u>Both Plaintiffs</u>**

165.     Plaintiffs' expert, Josephine Doherty, found both Plaintiffs to meet the full criteria for PTSD symptomology.   (Def. Ex. GGGG, No. 126-16 at 20; Def. Ex. AAAA, No. 128-21 at 20).

166.     Doe 1's symptoms include difficulty with focus and concentration, intrusive thoughts, sleep dysfunction, suicidal thoughts, and hypervigilance.  (Def. Ex. GGGG, No. 126-16 at 17-20).

167.     Doe 2's symptoms include flashbacks, panic attacks, depression, post-traumatic anxiety, and hypervigilance.  (Def. Ex. AAAA, No. 128-21 at 15-20).

DATED: November 1, 2024                    Respectfully submitted,

                                           */s/ Elizabeth K. Abdnour*
                                           Elizabeth K. Abdnour
                                           0081795 (OH), P78203 (MI)
                                           Megan N. Mitchell
                                           2102019 (AK), 53803 (CO), P87312 (MI)
                                           ABDNOUR WEIKER, LLP
                                           500 E. Michigan Ave., Ste. 130
                                           Lansing, MI 48912
                                           (517) 994-1776
                                           (614) 417-5081
                                           liz@education-rights.com
                                           megan@education-rights.com


### CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2024, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic system.

                                           */s/ Elizabeth K. Abdnour*
                                           Elizabeth K. Abdnour