IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, | **CASE NO. 4:20-CV-3081** |
| Plaintiffs, | |
| vs. | **DEFENDANT'S RESPONSES TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS** |
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, | |
| Defendant. | |

Pursuant to NECivR 56.1(c), the Board of Regents of the University Nebraska ("BRUN") provides the following concise responses to Plaintiffs' Statement of Additional Facts ("Plaintiffs' Statement of Facts") [Doc. No. 141, pp. 20 – 38]:

1.  BRUN disputes ¶ 1 of Plaintiffs' Additional Statement of Facts ("Plaintiffs' Statement") in part. Specifically, BRUN disputes the characterization of the statements set forth in Paragraph 1 as occurring "upon ending" of their romantic relationship. Doe 1 ended her romantic relationship with JR4 on or about April 2, 2017. [Doc. No. 126-6 at 3.] When she broke up with him, JR4 "said okay. And he left." [Doc. No. 126-3 at 78:15 – 74:14.] JR4 and Doe 1 did not communicate again until mid-May when they attended a conference, the preparation and planning of which occurred prior to their breakup. [Doc. No. 126-6 at 3 & 5.] After they came back from the conference, Doe 1 texted JR4 to find time to grab her thermos. [Doc. No. 125-30 at 1.] With that said, BRUN admits that on May 17 and thereafter in May and June, Doe 1 told JR4 she was not interested in getting back together. In addition, BRUN does not dispute that, on June 1, 2017, Doe 1 told him she considered further communication from JR4 to be "harassment." [Doc. No. 125-30 at 8.]

2.  BRUN disputes ¶ 2 of Plaintiffs' Statement in part. BRUN does not dispute there were text messages exchanged between JR4 and Doe 1 in May and June 2017, but

BRUN disputes the obscure characterization of the number of messages as "hundreds." BRUN attached the entirety of the text messages exchanged between Plaintiff and JR4 as evidence in support of its Motion for Summary Judgment. [*See* Doc. No. 125-30.]  BRUN further disputes and objects to the characterization of the messages as "a pattern of harassing behavior," as that is a legal conclusion and argumentative. In fact, to the contrary, when Plaintiff was asked about the general gist of the messages from JR4 in May and June 2017, she described it as "he wanted to try to get back together again. He wanted to communicate with me. He wanted to meet in person in order to work out our relationship." [Doc. No.128-2 at 86:8 – 14; Doc. No. 129, ¶ 83; Doc. No. 141, ¶ 83.] In addition, Doe 1 admitted JR4 did not threaten to harm her physically, did not use offensive sexual connotations, nor did he engage in any name calling in any of the messages from May and June 2017. [Doc. No.  129, ¶¶ 83, 84, and 85; Doc. No. 141, ¶ 83, 84, and 85.]

3.      In response to ¶ 3 of Plaintiffs' Statement, BRUN disputes and further states that the texts were sent at various times of the day, but not at "all times of the day." [*See* Doc. No. 125-30.]

4.      BRUN disputes ¶ 4 of Plaintiffs' Statement in part. BRUN does not dispute that Doe 1 reported that JR4 communicated with Doe 1 via Facebook, emails and phone calls in May and June 2017. BRUN disputes and objects to characterization of the messages as "harassing" as that is a legal conclusion, argumentative, and not supported by any citation to competent evidence in the record. Doe 1 has failed to provide any of the Facebook messages and emails from May and June 2017. In addition, Doe 1 did not provide a copy of any of the Facebook messages and emails from JR4 to her in May and June 2017 to Jeff Lamoureaux ("Lamoureaux") or to Meagan Counley ("Counley"). [Supplemental Declaration of Lamoureaux, ¶ 3; Supplemental Declaration of Meagan Counley ("Supp. Dec. of Counley"), ¶ 5.]

5.      BRUN disputes ¶ 5 of Plaintiffs' Statement. [*See* Doc. No. 125-30.] As Doe 1

testified, the general gist of the messages from JR4 in May and June 2017 was that "he wanted to try to get back together again. He wanted to communicate with me. He wanted to meet in person in order to work out our relationship." [Doc. No.128-2 at 86:8 – 14; Doc. No. 129, ¶ 83; Doc. No. 141, ¶ 83.] Throughout the messages, there was only one time that JR4 used the phrase "fake as fuck," and the word "heartless." [Doc. No. 125-30 at 6.] Otherwise, a thorough read of the messages does not support the conclusion that his messages were "vacillating" between apologetic and critical. [Doc. No. 125-30.]

6.    BRUN does not dispute ¶ 6 of Plaintiffs' Statement. BRUN further states that this is a statement already included in BRUN's Statement of Undisputed Material Facts ("BRUN's Statements"), which Doe 1 admitted. [*See* Doc. No. 129, ¶¶ 64, 71, and 82 - 85; Doc. No. 141, ¶¶ 64, 71, and 82 - 85.]

7.    BRUN disputes ¶ 7 of Plaintiffs' Statement in part. BRUN admits Doe 1 told JR4 she felt "uncomfortable." However, JR4's message to Doe 1 asking whether she was afraid of him, came before she told him she felt "uncomfortable." There were only two text messages from May 20, 2017, where JR4 asked Doe 1 whether she was afraid of him. [Doc. No. 125-30 at 3.]  In response, she stated "[JR4] please stop calling and texting me. I do not feel comfortable having dinner with you." [Doc. No. 125-30 at 4.] JR4 asked her why she did not feel comfortable, and expressed "I would never do anything to hurt you." [Id.] Doe 1 responded "because I broke up with you and I want to stay broken up for good. And you've been trying to convince me to change my mind and flooding me with texts and calls. And we've already had plenty of time to discuss things. So I don't want to meet with you." [Id.]

8.    BRUN disputes ¶ 8 of Plaintiffs' Statement. This allegation is rebutted by Doe 1's admissions to BRUN's Statements. [*See* Doc. No. 129, ¶ 117; Doc. No. 141, ¶ 117.] To respond in substance, as set forth in BRUN's Statement, in the messages to Tina[1], JR4

---

[1] A pseudonym.

described an event where another UNL affiliate was rumored to have shown genitalia to a board of interviewers and asked Tina to respond to his messages in order to bring to light how the department chair [academic advisor of Doe 1 and former academic advisor of JR4] started this false rumor about the UNL affiliate. [Id.] Furthermore, as Doe 1 admitted, JR4 stated he has an embarrassing story about Doe 1 that he could tell other people but expressly stated, "I don't do that shit even though you people have single handedly made me incapable of making friends with anyone at the NCV." [Id.] Nowhere in the messages does JR4 threaten to spread rumors about Doe 1 or the Department Chair/Academic Advisor. [Id.] Rather, JR4 stated that the Department Chair/Academic Advisor spreads rumors about others, in violation of the student code of conduct. [Id.; Doc. No. 126-4.] Furthermore, JR4, with respect to the story he has about Doe 1, stated he will "never tell anyone," and does not "do that shit." [Doc. No. 126-4 at 2.]

9.     BRUN does not dispute ¶ 9 of Plaintiffs' Statement. BRUN further states that this is a statement already included in BRUN's Statement, which Plaintiff admitted. [*See* Doc. No. 129, ¶ 117; Doc. No. 141, ¶ 117.]

10.     BRUN disputes ¶ 10 of Plaintiffs' Statement in part.  BRUN admits that JR4 stated he should spread the embarrassing story he has of Doe 1 but continues in the same paragraph, "I won't do any of that and you two can keep all the people from the NCV and innovation campus. I'm 10x the person either of you are . . . ." [Doc. No. 126-4 at 2.]

11.     BRUN disputes ¶ 11 of Plaintiffs' Statement as it misrepresents what is stated in the evidence. JR4 stated: "I'll never tell anyone my dirt I have on [Doe 1] because I wouldn't want her to be embarrassed through grad school (and his [sic] story is extremely embarrassing, [Doe 1] would die of embarrassment knowing her). I just thrill [sic] it's sad that you guys have no problem ruining my graduate school social life while I specifically won't do that to [Doe 1]. . ." [Doc. No. 126-4 at 2.]

12.     BRUN does not dispute ¶ 12 of Plaintiffs' Statement.

13.    BRUN disputes ¶ 13 of Plaintiffs' Statement in part. JR4 did state the quoted phrase unless Doe 1's roommate responded to him in fifteen minutes. However, as set forth in ¶ 117 of BRUN's Statement, which Doe 1 admitted, JR4 was stating that he was going to report that the department chair started a false rumor about the UNL affiliate and the event surrounding that false rumor as described in Paragraph 117. [Doc. No. 126-4; Doc. No. 126-3 at 113:4 – 115:25.]

14.    BRUN does not dispute ¶ 14 of Plaintiffs' Statement. However, this paragraph contains immaterial and irrelevant facts, as this deals with Doe 1's academic advisor, rather than Doe 1.

15.    BRUN does not dispute ¶ 15 of Plaintiffs' Statement.

16.    BRUN does not dispute ¶ 16 of Plaintiffs' Statement.

17.    BRUN disputes ¶ 17 of Plaintiffs' Statement in part. To the extent Doe 1 is referring to the communication on May 5, 2018 [Doc. No. 125-19], BRUN admits. To the extent Doe 1 is referring to any other communication or events, including the communication in December of 2017 to Tina, BRUN disputes. [*See* Doc. No. 129, ¶¶ 118, 119, 177, & 178; Doc. No. 141, ¶¶ 118, 119, 177, & 178.] Specifically, Doe 1 admitted that, in the messages to Tina, JR4 did not ask Tina to pass along any of the messages to Doe 1 or ask Tina to tell Doe 1 to communicate with JR4. [Doc. No. 219, ¶ 118; Doc. No. 141, ¶ 118.]

18.    BRUN disputes ¶ 18 of Plaintiffs' Statement. On June 28, 2017, Lamoureaux sent a letter to Doe 1 expressly stating that she had the right and the option to file complaints with both law enforcement and IEC. [Doc. No. 129, ¶ 70, 71, & 72; Doc. No. 141, ¶ 70, 71, & 72.] Moreover, as set forth in BRUN's Statement ¶ 86—which Doe 1 admitted—at the meeting on June 30, Lamoureaux advised Doe 1 of her reporting options and the process, and Doe 1 elected to report the incident to both entities but "was not desirous of criminal prosecution, nor did she want to file a complaint with IEC." [Doc. No. 129, ¶ 86; Doc. No.

5

141, ¶ 86.] Furthermore, Doe 1 admitted BRUN's Statement ¶ 87, wherein it states that at the June 30 meeting "Doe 1 again expressed her desired goal of obtaining a No Contact Order." [Doc. No. 129, ¶ 87; Doc. No. 141, ¶ 87.]   Based on Lamoureaux's June 30 communication with Doe 1 and his communication with JR4 on the same day, June 30, 2017, Lamoureaux informed Doe 1 of the outcome and expressly stated in the letter that Doe 1 "informed IEC" that she wished to resolve the matter through "informal resolution." [Doc. No. 129, ¶¶ 90-94; Doc. No. 141, ¶¶ 90-94.]

19.    BRUN disputes ¶ 19 of Plaintiffs' Statement for the same reasons as provided in ¶ 18 *supra*, BRUN incorporates herein as though fully set forth herein. In addition, Plaintiff admitted that it was IEC that issued the permanent No Contact Order. [Doc. No. 129, ¶¶ 90-94; Doc. No. 141, ¶¶ 90-94.]  In fact, Lamoureaux provided in his June 30 letter (after his meeting with Doe 1 on the same day), outlining the determination, that the reported behavior "could be a violation of Student Code of Conduct, ***Appendix A, Stalking***. Stalking is defined as a knowing and willful course of conduct directed at a specific person...with the intent to injure, terrify, threaten or intimidate. In order to determine whether a violation of the university's policy prohibiting sexual misconduct occurred, the standard of proof required is a preponderance of evidence, i.e., the evidence demonstrates that is more likely than not that the conduct occurred." [*See* Doc. No. 129, ¶ 90; Doc. No. 141, ¶ 90.]

20.    BRUN disputes ¶ 20 of Plaintiffs' Statement for the same reasons as provided in ¶¶ 18 and 19 *supra*, which BRUN incorporates as though fully set forth herein.

21.    BRUN disputes ¶ 21 of Plaintiffs' Statement for the same reasons as provided in ¶¶ 18 and 19 *supra*, which BRUN incorporates as though fully set forth herein. Furthermore, Doe 1 admitted she never contacted Lamoureaux with any questions or concerns about the informal process or the fact that a full investigation was not conducted. [Doc. No. 129, ¶ 95; Doc. No. 141, ¶ 95.] In addition, Doe 1 admitted she never contacted

Lamoureaux to indicate any of the statements included in the June 30 letter were a misrepresentation of what she had asked of IEC, including the statement that she informed IEC that she wished to resolve the matter through informal resolution and was seeking a permanent No Contact Order.  [Doc. No. 129, ¶ 96; Doc. No. 141, ¶ 96.] In fact, in an interview on May 2018, when she was asked about what she was seeking from IEC in June 2017, Doe 1 responded, "I guess I just wanted to be left alone." [Doc. No. 125-20, at 8:357 – 9:380.] Finally, there is no evidence in the record that Doe 1 reported this interaction to BRUN as a violation of the June 2017 No Contact Order or "sexual harassment."

22.    BRUN disputes ¶ 22 of Plaintiffs' Statement. Lamoureaux was the Title IX Deputy Coordinator and Investigator from June through October 2017. As Doe 1 admitted, Lamoureaux was simply sharing the information that JR4 had approached him asking if it was possible to work things out with Doe 1. [Doc. No. 129, ¶¶ 109 & 110; Doc. No. 141, ¶¶ 109 & 110.]  No information was communicated from JR4 to Doe 1 via Lamoureaux. [Id.] In fact, Lamoureaux told her "I wanted to share this information with you in case you wanted to work it out with him or find out if he has been bothering you at all."  [Id.]

23.    BRUN disputes ¶ 23 of Plaintiffs' Statement in part. BRUN does not dispute JR4 contacted Tina, Doe 1's roommate in December 2017. [*See* Doc. No. 162-4.] BRUN disputes the use of the phrase "harassment escalating" as a legal conclusion, argumentative, and unsupported by citation to competent evidence in the record. Furthermore, BRUN disputes that the conclusory statement that he threatened to harm Doe 1's reputation at the University as unsupported by the evidence cited, and for the reasons set forth in Paragraphs 8 through 11 *supra*, which BRUN incorporates as though fully set forth herein. *See also* Plaintiff's admissions to BRUN's statements, Doc. No. 129, ¶¶ 112–119 & Doc. No. 141, ¶¶ 112-119. Moreover, to the extent Doe 1 purports to imply that there were other messages (other than Doc. No. 126-4) that were reported as violating the No Contact Order to IEC in December 2017 and January 2018, BRUN disputes it. [*See* Supp. Dec. of Counley,

¶ 6.] There is no evidence in the record of any messages from JR4 to peers, other than to the former student [*see* ¶ 71 *infra*] and her roommates [one discussed herein, and the other discussed in ¶ 63 *infra*.]

24.     BRUN disputes ¶ 24 of Plaintiffs' Statement. At the initial meeting on or about December 11, 2017, with Doe 1, Counley would not have conclusively stated that JR4 violated the No Contact Order, as Counley had not yet fully reviewed and investigated the matter. [Supp. Dec. of Counley, ¶ 7.] In addition, Counley had not yet communicated with JR4. [Id.] And, in fact, this paragraph is negated by the very email sent by Doe 1 to Counley on January 11, 2018, where Doe 1 asked Counley for more information about the investigation into whether JR4 had broken the no-contact order. Doe 1 also asked to meet and discuss the investigation and see a written report of the outcome. [Supp. Dec. of Counley, ¶ 8; Exhibit MMMM, Email Communication between Doe 1 and Counley from January 11, 2018.]

25.     BRUN does not dispute ¶ 25 of Plaintiffs' Statement.

26.     BRUN disputes ¶ 26 of Plaintiffs' Statement in part. On January 11, 2018, Doe 1 emailed Counley asking for information regarding the investigation into the December 2017 communication with Tina and asking for time to meet with Counley. [Supp. Dec. of Counley, ¶ 8; Exhibit MMMM, Email Communication between Doe 1 and Counley from January 11, 2018.] Thereafter, the following exchange occurred between Doe 1 and Counley:

***Email from Doe 1 to Counley on January 18, in relevant part:***

I wanted to follow up on the email I sent last week. I would still like to meet and discuss the investigation.

***Counley responded as follows:***

Yes, I replied to you on January 16th and gave you my availability, but I did not hear back from you. I have some availability left today, or I can schedule something with you next week. Let me know what will work for you.

***Email response from Doe 1:***
Sorry I see that email now []. I confused your email thinking it was from Morgan with Voices for Hope. Sorry about the confusion. Would you have time available early next

week?

***Email response Counley:***
I can meet on Monday or Wednesday anytime between 8 am and 5 pm.

Thereafter, a meeting was set for January 25, 2018, upon Doe 1's request. [Id.]

27.     BRUN disputes ¶ 27 of Plaintiffs' Statement. [Supp. Dec. of Counley, ¶ 9.]

28.     BRUN disputes ¶ 28 of Plaintiffs' Statement. The issue before IEC was whether the messages to Tina violated the permanent No Contact Order. [Doc. No 129, ¶¶ 112 – 130; Doc. No. 141, ¶¶ 112 - 130.] Counley did look into the matter and determined that the messages did not violate the No Contact Order. [Doc. No. 129, ¶ 125; Doc. No. 141, ¶125.] Furthermore, Doe 1 admitted that BRUN provided the following accommodations in December 2017 and January 2018:

- On December 14, 2017, Counley and Officer Fischer gave JR4 a directive not to contact Doe 1 and her roommates. [Doc. No. 129, ¶ 120; Doc. No. 141, ¶ 120.]

- On January 13, 2018, Doe 1 was offered police escort, which she never used. [*See* Doc. No. 129, ¶¶ 123, 130; Doc. No. 141, ¶¶ 123, 130.]

- In Spring 2018, Doe 1 asked her department for accommodation to attend seminar other than the required BIOS 915A. This request was granted. [*See* Doc. No. 129, ¶ 126; Doc. No. 141, ¶ 126.]

- From December 2017 on, JR4's keycard access was restricted from accessing Morrison Center, and was only being let in to collaborate with a faculty member who offices in Morrison Center. [*See* Doc. No. 129, ¶¶ 129, 156; Doc. No. 141, ¶ 129, 156.]

- On January 13, 2018, UNLPD engaged and created a safety plan for Doe 1. Furthermore, at this time, Doe 1 reported that JR4 was attending the same seminars but that he had not caused any incident at that time. [*See* Doc. No. 129, ¶ 122; Doc. No. 141, ¶ 122.]

29.     BRUN objects and disputes ¶ 29 of Plaintiffs' Statement to the extent it describes JR4's messages to Doe 1's roommate as "harassing messages," as it is not

9

supported by competent evidence in the record, is a legal conclusion and argumentative. BRUN does not dispute that, on December 14, 2017, Counley and Officer Fischer met with JR4 and gave him a directive not to contact Doe 1 or her roommates. [*See* Doc. No. 129, ¶ 120; Doc. No. 141, ¶ 120.]

30.    BRUN disputes ¶ 30 of Plaintiffs' Statement for the reasons set forth in ¶ 28 *supra*, and incorporates the reasons as though fully set forth herein.

31.    BRUN does not dispute ¶ 31 of Plaintiffs' Statement solely for purposes of the pending Motion.

32.    BRUN does not dispute ¶ 32 of Plaintiffs' Statement, solely for purposes of the pending Motion.

33.    BRUN disputes ¶ 33 of Plaintiffs' Statement. The evidence upon which Doe 1 relies does not reflect what is stated in ¶ 33. In fact, Doe 1 admitted that when she met with Officer Fischer on December 13, 2017, she did not express any other safety concerns, other than the messages to her roommates. [Doc. No. 129, ¶ 119; Doc. No. 141, ¶ 119.] Furthermore, when she met with Officer Fischer on January 13, 2018, Doe 1 reported that JR4 was attending seminars she is attending but that he had not caused any incident at that time. [*See* Doc. No. 129, ¶ 122; Doc. No. 141, ¶ 122.]

34.    BRUN does not dispute ¶ 34 of Plaintiffs' Statement, solely for purposes of the pending Motion.

35.    BRUN disputes ¶ 35 of Plaintiffs' Statement in part. BRUN disputes the characterization of the messages as "threatening." Doe 1 has admitted that JR4 has never threatened to harm her physically. [Doc. No. 129, ¶ 180; Doc. No. 141, ¶180.] At no point was there any threat to harm Doe 1's person. [Doc. No. 129, ¶ 189; Doc. No. 141, ¶189.] In the December 2017 messages to Tina, there was no threat to harm Doe 1 in any way, nor was there any request to pass any information to Doe 1 via Tina. [Doc. No. 129, ¶ 118; Doc. No. 141, ¶ 118.] Furthermore, JR4 did not ask Tina to tell Doe 1 to communicate with him.

10

[Id.] BRUN does not dispute Doe 1 sought accommodations with respect to the classes she was taking with JR4.

36.    BRUN disputes ¶ 36 of Plaintiffs' Statement. Counley did not "deny" the request for accommodation. [*See* Doc. No. 129, ¶¶ 105, 126; Doc. No. 141, ¶¶ 105, 126.]  Rather, Counley told Doe 1 to communicate directly with her advisor and department chair to arrange for the appropriate accommodation. [Supp. Dec. of Counley, ¶ 10.] In fact, with respect to BIOS 915A, Genetic, Cellular and Molecular Biology, a course both Doe 1 and JR4 are required to take as part of their graduation program, Doe 1 was permitted to attend another seminar, rather than the required BIOS 915A. [Doc. No. 129, ¶¶ 105, 126; Doc. No. 141 ¶¶ 105, 126.] Furthermore, with respect to the Signal Transduction class, Doe 1 worked directly with the Department Chair, Debora Brown, to seek accommodation from the course professor, Dr. Franco Cruz. [Supp. Dec. of Amare, ¶ 4;  Exhibit VVVV, Email communication between Doe 1 and Deborah Brown.] Doe 1 admitted Dr. Brown sent the email to Dr. Franco-Cruz and, then, they met with Dr. Franco-Cruz to discuss. At that time, Dr. Franco-Cruz was informed that there was a permanent no-contact order between Doe 1 and JR4, and Doe 1 received reassurance that JR4's grading of her work would not impact her grade. [Doc. No. 126-3:131:1 – 133:4.] Doe 1 decided to not request to take the class remotely. [Doc. No. 125-20 at 29:1261 – 1271.]  Doe 1 received "A" in the class and the course concluded with no incident whatsoever. [Doc. No. 126-3 at 131:1 – 133:4; Doc. No. 125-10.]

37.    BRUN does not dispute ¶ 37 of Plaintiffs' Statement.

38.    BRUN does not dispute ¶ 38 of Plaintiffs' Statement.

39.    BRUN does not dispute ¶ 39 of Plaintiffs' Statement.

40.    BRUN does not dispute ¶ 40 of Plaintiffs' Statement.

41.    BRUN does not dispute ¶ 41 of Plaintiffs' Statement.

42.    BRUN does not dispute ¶ 42 of Plaintiffs' Statement.

43.    BRUN disputes ¶ 43 of Plaintiffs' Statement. Strickman told Doe 1 the following

with respect to her options, which such conversation was recorded and transcribed in Doc. No. 125-20. Specifically, Strickman stated: "You can file a complaint with the Title 9 office," which such process was explained to her as follows "when you file a formal complaint basically what you would be saying is, um 'I want you to look into this situation fully. [] you can use my name, you can inform, [] [JR4] that I brought forth this investigation. I want to be kept informed of the investigation as it moves forward. And I want to be notified of the outcome at the end of it." [Doc. No. 125-20, at 24:1040 – 1078.] Strickman then explained Doe 1's option to file an anonymous complaint and her option to decline to file a complaint. [Id.; Doc. No. 129, ¶ 141; Doc. No. 141, ¶ 141.] Moreover, when Doe 1 asked a particular question as it relates to the June 2017 and December 2017 occurrences, Strickman expressly stated that all of the "factual information would be part of this investigation," and if appealed, "they [appeal panel] can consider facts and cir-circumstances that you bring forward related to all of your interaction with [JR4.] It's up to that panel to determine how much weight to give to each situation and they make that determination and decide what an appropriate sanction would be . . . ." [Doc. No. 125-20, at 30:1341 – 1348; 32:1398 – 1411.] In fact, as Doe 1 admitted, she did submit a formal complaint including those incidents that occurred prior to May 2018. [*See* Doc. No. 129, ¶¶ 144 & 145; Doc. No. 141, ¶ 144 & 145; Doc. No. 126-3 at 162:1 – 164:2.] Doe 1 further admitted that, in May 2018 and thereafter, IEC investigated all of the alleged occurrences in May – June 2017, December 2017, and April – May 2018, and took all of those facts into consideration when it made its determination and recommendation for sanction. [Doc. No. 129, ¶¶ 146 and 159 - 162; Doc. No. 141, ¶¶ 146 and 159 – 162; Doc. No. 125-28.]

44.    BRUN disputes ¶ 44 of Plaintiffs' Statement for the same reasons as set forth in ¶ 43 *supra*, which BRUN incorporates as though fully set forth herein.

45.    BRUN does not dispute ¶ 45 of Plaintiffs' Statement.

46.    BRUN does not dispute ¶ 46 of Plaintiffs' Statement. BRUN further states that

Doe 1 knew and was told that JR4's keycard access was restricted from accessing Morrison Center and he was only being let in for a visit for a collaboration with a faculty member who offices in Morrison Center. [*See* Doc. No. 129, ¶¶ 129, & 156; Doc. No. 141, ¶¶ 129 & 156.]

47.    BRUN does not dispute ¶ 47 of Plaintiffs' Statement.

48.    BRUN disputes ¶ 48 of Plaintiffs' Statement for the same reasons as set forth in Paragraph 43 *supra,* which BRUN incorporates as though fully set forth herein. Furthermore, this statement is belied by documentary evidence. Specifically, on May 23, 2018, Doe 1 submitted an intake form, wherein she included all of her allegations. [*See* Doc. No. 125-24.] When she met with Counley on May 24, 2018, she provided information related to all of the allegations set forth in Doc. No. 125-24. [*See* Doc. No. 125-25, audio recording of Doe 1's interview on May 24, 2018, which was provided to the Court on thumb drive.] On May 24, 2018, Counley sent Doe 1 a letter, therein incorporating all of Doe 1's allegations (including the May – June 2017, December 2017, and April – May 2018 events). [*See* Doc. No. 125-26.] Finally, Counley investigated all of Doe 1's allegations pertaining to the alleged events pre- May and in May 2018. [*See* Doc. No. 125-28.]

49.    BRUN disputes ¶ 49 of Plaintiffs' Statement. [*See* Supp. Dec. of Counley, ¶ 18.] In fact, as Doe 1 admitted, JR4 never approached her while she was on campus or attempted to talk to her while she was on campus from June 2017 through her graduation from the University in August 2020.  [Doc. No. 129, ¶¶ 182-185; Doc. No. 141, ¶¶ 182-185.]

50.    BRUN disputes ¶ 50 of Plaintiffs' Statement. The evidence cited does not support the information contained in ¶ 50. Specifically, the evidence cited is Doe 1's testimony with respect to her communication with Counley in January of 2018, while the information contained in ¶ 50 refers to May 2018 meeting with Counley. [*See* Doc. No. 126-3, at 142:6 – 145:25.] In fact, Doe 1 did not take any courses with JR4 in Summer of 2018 or after. [*See* Doc. No. 125-10.]

51.    BRUN does not dispute ¶ 51 of Plaintiffs' Statement.

52.    BRUN disputes ¶ 52 of Plaintiffs' Statement. [Supp. Dec. of Counley, ¶ 12.]  In fact, in the May 24, 2018 letter Counley sent Doe 1, Counley stated: "Please be assured UNL cares deeply about the safety and educational atmosphere of students. As such, the university takes seriously such complaints, thoroughly investigates them and takes appropriate action to eliminate and prevent sexual misconduct. Our office conducts neutral investigations of sexual harassment and violence complaints. We also provide education to the campus community and support to students who have suffered sexual harassment or violence. Your safety and security is of utmost importance to us." [Doc. No. 125-26 at 1.]

53.    BRUN does not dispute ¶ 53 of Plaintiffs' Statement.

54.    BRUN does not dispute ¶ 54 of Plaintiffs' Statement.

55.    BRUN does not dispute ¶ 55 of Plaintiffs' Statement.

56.    BRUN disputes ¶ 56 of Plaintiffs' Statement. [Supp. Dec. of Counley, ¶ 13.]

57.    BRUN disputes ¶ 57 of Plaintiffs' Statement. Doe 1 admitted that she "asked the lab in which JR4 taught be moved. This request was granted and JR4's lab was moved." [Doc. No. 129, ¶ 128; Doc. No. 141, ¶ 128.]

58.    BRUN disputes ¶ 58 of Plaintiffs' Statement. The evidence cited does not support the allegation contained in this paragraph. Doe 1 reported that on or about May 11, 2017, Doe 1 and JR4 went to a conference. [Doc. No. 125-4, at 2.] They returned to Lincoln on May 16, 2017. [Doc. No. 125-4 at 2.] Thereafter, on May 17, after Doe 1 messaged JR4 about retrieving her thermos, JR4 began sending her messages about their relationship. [Doc. No.  125-30 at 1.] During the May 24, 2018, interview, Doe 1 stated:

we bought our plane tickets and stuff together . . .  so went together to this conference and on the plane he would talk to me and he talked for . . .and then after that I thought that we had talked about it enough and but it was when we returned from the trip that he started that same the next day after we returned from the trip that he started texting me and kept calling. . .

[Doc. No. 126-6 at 3, 5-6.] In fact, Doe 1 did not present any communication between JR4 and her prior to May 17, 2017, which she alleges to be "harassing." [Doc. No. 125-4 at 2 –

14

3.] Furthermore, there is no evidence that JR4 attended the conference Doe 1 attended at the end of June 2017. [Id.; Doc. No. 126-3 at 79:2 – 8.] With respect to the May 5, 2018, message from JR4 to Doe 1, JR4 sent that email to Doe 1's non-UNL email address, in the middle of the night. [Doc. No. 129, ¶132.] Accordingly, competent evidence in the record does not support the allegations contained in ¶ 58.

59.    BRUN disputes ¶ 59 of Plaintiffs' Statement in part. There is no evidence presented other than Doe 1's speculation that JR4 *may* have attempted to log into Doe 1's email account. Moreover, to the extent Doe 1 is insinuating that the email account is a UNL affiliated email account, BRUN disputes that as there is no competent evidence in the record to support this contention. In fact, Doe 1 admitted in an email that it was her non-UNL email address. [*See* Doc. No. 129, ¶ 132; Doc. No. 141, ¶ 132.] Furthermore, there is no evidence in the record to support that, other than the passing remark on May 6, 2018, that Doe 1 reported this to IEC to be investigated. [Supp. Dec. of Counley, ¶ 14.] In addition, BRUN objects to Doc. Nos. 143-1 as hearsay document, as thoroughly discussed in Section II & III of the Reply Brief.

60.    BRUN does not dispute ¶ 60 of Plaintiffs' Statement.

61.    BRUN disputes ¶ 61 of Plaintiffs' Statement. Doe 1 attended Journal Club in Fall 2017 and Spring 2018. [Doc. No. 126-3, at 58:19 – 59:21.] She presented only once in each Fall 2017 and Spring 2018 semesters. [Id.] In Spring 2019, JR4 was made to attend Journal Club via zoom, and when she requested that JR4 not be allowed to attend the session in which she presented, her request was granted. [Doc. No. 129, ¶ 184; Doc. No. 141, ¶ 184.] Doe 1 did not attend Journal Club in the Fall of 2019 or Spring 2020 because she was no longer in the building and had moved to Pannier laboratory located in Chase Hall. [Id.; Doc. No. 129, ¶ 49; Doc. No. 141, ¶ 49.] During her deposition, when Doe 1 was asked if it was her testimony that JR4 had never come to the journal club prior to summer of 2017, she responded "No that is not correct." [Doc. No. 126-3 at 58:2 – 18.] When she

was asked if he had been to Journal Club prior to summer of 2017, she answered, "I don't know, but possibly infrequently or rarely. I am not sure." [Id.] When she was asked "if a person collaborates with a lab in Morrison Center, will they be able to -- will they be part of the population that this seminar [Journal Club] is geared for?" Doe 1 answered "Potentially." [Id.] In fact, as Doe 1 admitted, JR4 was collaborating with a faculty member who offices in Morrison Center. [Doc. No. 129, ¶ 156; Doc. No. 141, ¶156.]  Throughout the time she attended Journal Club, JR4 never asked her questions, never approached her, and never talked to her. [Doc. No. 126-3 at 60:1 – 18.]

62.     BRUN disputes ¶ 62 of Plaintiffs' Statement. The document used to support this paragraph is an inadmissible hearsay document. Furthermore, Doe 1, during her interview on May 24, 2018, stated that, on December 6, 2017, it was Tina that encountered JR4 in Lincoln, on 27th Street and Fair Street, Lincoln, Nebraska. [Doc. No. 125-25, at 14:44 – 17:40 minutes.] When Tina was asked about the December 6, 2017, encounter, she confirmed that she saw him at a stop light on 27th Street and Fair Street. [Supp. Dec. of Counley, ¶ 15; Ex. NNNN, Audio Recording of Tina's Interview; Supp. Dec. of Amare, ¶ 6; Exhibit ZZZZ, Transcript of the Audio Recording of Tina's Interview at 7.]  In December 2017 or May 2018, Doe 1 never reported that JR4 drove by her and that she "was worried he was following her." [Supp. Dec. of Counley, ¶ 16.]

63.     BRUN disputes ¶ 63 of Plaintiffs' Statement in part. BRUN denies the characterization of the messages as "harassing" as it is unsupported by citation to competent evidence in the record, and because it is a legal conclusion and argumentative. BRUN denies the characterization of the person as "classmate," as there is no evidence in the record that supports this characterization. With that said, in December 2017, Doe 1 and Tina reported the messages Tina received from Doe 1, and, specifically, Doe 1 wanted Title IX office to see if these messages violated the Permanent No Contact Order between JR4 and Doe 1. [Doc. No. 129, ¶¶ 116 - 125; Doc. No. 141, ¶¶ 116 - 125.] Doe 1 also forwarded the

email JR4 sent to her other roommate, which BRUN will refer to herein as Hannah[2], titled "Deborah Brown," to Counley. [Supp. Dec. of Counley, ¶ 17; Exhibit OOOO, Email from Doe 1 to Counley forwarding another email.] As Doe 1 confirmed during her deposition, there was no other communication involving JR4 that was brought to UNLPD and IEC in December 2017. [Doc. No. 126-4 at 117:20 – 119:1.] There was no threat or harassing behavior towards Doe 1 in this message. [Id.] Doe 1 did not report any other communication involving JR4 in December 2017. After the December 2017 events were resolved in January 2018, there was no further communication between IEC and Doe 1, until she sent an email to IEC on May 6, 2018. [*See* Doc. No. 129, ¶ 132; Doc. No. 141, ¶ 132; Supp. Dec. of Counley, ¶ 19.]

64.    BRUN disputes ¶ 64 of Plaintiffs' Statement in part. BRUN does not dispute that JR4 did state he was waging war on his former Academic Advisor and the Department Chair, as it relates to his perceived notion that the Academic Advisor started a rumor involving a UNL affiliate. [*See* Doc. No. 126-24.] Once again, BRUN disputes that he threatened to share the embarrassing information about Doe 1, as set forth in ¶¶ 8, 10, and 11 *supra*, which BRUN incorporates by reference as though fully set forth herein.

65.    BRUN disputes ¶ 65 of Plaintiffs' Statement. Doe 1 misstates and mischaracterizes the evidence and testimony. Doe 1 testified that she does not know whether JR4 spread the embarrassing story to other people and confirmed she had not heard about it from other people. [Doc. No. 126-3, at 117:7 – 16.] With respect to the information about the UNL Affiliate, Doe 1 testified that she did not tell JR4 the rumor involving the UNL Affiliate in confidence. [Doc. No. 29, at 114:1 – 25.] In addition, JR4 was under the impression that Doe 1 had told Tina and Hannah about the rumor involving the UNL Affiliate. [Supp. Dec. of Counley, ¶ 17, 19; Ex. OOOO Email from JR4 to Hannah on

---

[2] BRUN is using a pseudonym for this student.

17

December 13, 2017.] Other than this email, Doe 1 did not produce any other communications where JR4 revealed sensitive information, nor did she provide such document to IEC. [Supp. Dec. of Counley, ¶ 19; Supp. Dec. of Amare, ¶ 5.] Nor is such evidence before this Court, including the content of such "sensitive information."

66. BRUN disputes ¶ 66 of Plaintiffs' Statement in part. The evidence does not support that JR4 was attending journal club/department-related talks to make her feel uncomfortable. Nor does the evidence support with respect to "department related talks." BRUN incorporates the reasons set forth in ¶¶ 28 and 61 *supra.*

67. BRUN disputes ¶ 67 of Plaintiffs' Statement. BRUN objects to this allegation as unsupported by any citation to competent. The evidence utilized in support of this Paragraph is an inadmissible hearsay document. Furthermore, BRUN disputes ¶ 67 for the same reasons as set forth in ¶ 61 *supra*, which BRUN incorporates as though fully set forth herein.

68. BRUN disputes ¶ 68 of Plaintiffs' Statement in part. BRUN does not dispute that JR4 sent an email to Doe 1 on May 5, 2018. [Doc. No. 125-23.] However, BRUN disputes and objects to the characterization of the email as "aggressive and harassing," as unsupported by any citation to competent evidence in the record, and as a legal conclusion, argumentative and lacking foundation.

69. BRUN disputes ¶ 69 of Plaintiffs' Statement to the text it characterizes the message as "aggressive and harassment," as argumentative and legal conclusion. Otherwise, BRUN does not dispute that JR4 sent Doe 1 a message on May 5, 2018 and that this message violated the No Contact Order.

70. BRUN disputes ¶ 70 of Plaintiffs' Statement. Doe 1 reported that she saw JR4 outside of the convention center, where they were both attending a conference. JR4 was across the street from her and was standing in line to get coffee. [Doc. No. 126-6 at 8 and 9.] Doe 1 stated she does not know if they had eye contact as they were across the street from each other. [Id.] She stated he saw her standing across the street, and when she looked

at him, he looked away. [Doc. No. 126-6 at 8; Doc. No. 125-8 at 4.]

71.    BRUN does not dispute  ¶ 71 of Plaintiffs' Statement but further states that BRUN was not aware of this message until after IEC began investigating the May 5, 2018, email to Doe 1. [Supp. Dec. of Counley,  ¶ 20.] This was investigated separately as the messages involved another former student. [Id.]

72.    BRUN disputes ¶ 72 of Plaintiffs' Statement. The appeal was concluded on October 30, 2018. [Doc. No. 129, ¶ 173; Doc. No. 141, ¶ 173.] Doe 1 admitted that she knew that the sanctions provided that JR4 could have access to Morrison Center for academic purposes between the times of 8:00 a.m. to 5:00 p.m. Doe 1 admitted that she cannot recall seeing JR4 after 5:00 p.m. in the Morrison Center. [Doc. No. 129, ¶ 176; Doc. No. 141, ¶ 176.] Doe 1 also admitted that she knew since December 2017 that his keycard was restricted from accessing Morrison Center. [Doc. No. 129, ¶ 129; Doc. No. 141, ¶ 129.] Doe 1 also knew, even during the pendency of the investigation pursuant to the May 2018 report, that JR4's presence in the Morrison Center was restricted, that he did not have keycard access to Morrison Center but that he was being let in for a collaboration with a faculty member who offices in Morrison Center. [Doc. No. 129, ¶ 156; Doc. No. 141, ¶ 156.] Moreover, Doe 1 admitted to Beal that she knew when JR4 was coming to Morrison Center because she had access to the schedule for the laboratory he was utilizing. [Doc. No. 143-5.]  Doe 1 did not see JR4 on campus the entire Spring 2019 Semester (January 2019 through May 2019) because JR4 was suspended from the school for the entire Spring 2019 semester. [Doc. No. 129, ¶ 181; Doc. No. 141, ¶ 181.] Then, in Fall 2019, Doe 1 transferred to Pannier's lab located in Chase Hall, and Doe 1 never saw JR4 at Chase Hall. [Doc. No. 129 ¶ 185; Doc. No. 141, ¶ 185.]  In fact, Doe 1 admitted that she never saw JR4 in 2019 or 2020. [Doc. No. 129, ¶ 186; Doc. No. 141, ¶ 186.]

73.    BRUN disputes ¶ 73 of Plaintiffs' Statement for the same reasons as set forth in ¶ 72 *supra*, which BRUN incorporates herein as though fully set forth herein.

74.    BRUN disputes ¶ 74 of Plaintiffs' Statement in part. BRUN does not dispute that Johnson stated, "***as far as I know***, access to the buildings would only have been restricted last week." However, to the extent Doe 1 is attempting to insinuate that JR4's access to Morrison Center was not restricted prior to late November, BRUN disputes for the reasons set forth in ¶ 72 *supra*. Johnson was not involved with Doe 1's matter until the appeal and would not be privy to information provided to Doe 1 prior to the appeal. [*See* Supp. Dec. of Counley, ¶ 21.]

75.    BRUN disputes ¶ 75 of Plaintiffs' Statement.  BRUN objects to the allegations contained herein as unsupported by any citation to competent evidence in the record, and as argumentative and lacking foundation with respect to the statement. The evidence does not support the allegation that it was JR4 who sent the message to the online "Dear UNL" forum. In fact, Doe 1 admitted that she did not have an IP address that would narrow down the identity of the sender of the message. [Doc. No. 143-7.] Moreover, the submission did not include Doe 1's initials or her name. [Doc. No. 143-9.] The submission also states: "if you can't convince the kangaroo court that is Title IX that you were violated then you have no case," which in Doe 1's case is not correct; i.e. JR4 was found to have violated the Student Code of Conduct. [Doc. No. 129, ¶¶ 160, 162, & 168; Doc. No. 141, ¶¶ 160, 162, & 168.] BRUN also objects to this allegation as legal conclusion, argumentative and lacking foundation with respect to the statements "harassing message," "violated the no-contact order," and "demonstrated that JR4 remained a threat to Doe 1."

76.    BRUN does not dispute ¶ 76 of Plaintiffs' Statement.

77.    BRUN disputes ¶ 77 of Plaintiffs' Statement in part. IEC did not issue the letter. Ms. Moore was the one who notified Doe 1 of the outcome of the preliminary investigation. BRUN does not dispute that Laurie Bellows ("Bellows") determined that the submission was not directed to or at Doe 1. BRUN disputes that the alleged submission was "in response to an article describing Doe 1 and other students' experiences of sexual harassment while

attending UNL." [*See* Doc. No. 143-7.] Specifically, Doe 1 misstates and misrepresents the content of the evidence. In the evidence cited [Doc. No. 143-7], Doe 1 stated that she participated in a "Daily Nebraska article," and speculated that JR4 may have seen that article and figured that she was associated with the Dear UNL website. [Id.] Doe 1 does not state that the submission was in response to the "Daily Nebraska article." [Id.] In fact, during her deposition, Doe 1 testified that the submission was in response to a Petition that was posted on the Dear UNL website, and she did not remember the content of the Petition. [Doc. No. 126-3, at 217:16 – 218:14.] Doe 1 also testified that the Daily Nebraska article was not done through Dear UNL, nor was it organized or focused on Dear UNL. [Doc. No. 126-3, at 221: 7 – 21.]

78.    BRUN does not dispute ¶ 78 of Plaintiffs' Statement.

79.    BRUN disputes ¶ 79 of Plaintiffs Statement only to the extent the allegations insinuate that JR4 had access to Chase Hall. Doe 1 admitted that both Pannier laboratory and her office in Chase Hall were controlled access rooms, meaning an individual needed a key to access these areas. [Doc. No. 129, ¶ 185; Doc. No. 141, ¶ 185.]

80.    BRUN does not dispute ¶ 80 of Plaintiffs' Statement to the extent it is limited to her time in Chase Hall prior to March 2020. After March 2020, because of COVID, Doe 1 did not use or visit any of the laboratories located at the University. [Doc. No. 129, ¶ 50 – 52; Doc. No. 141, ¶¶ 50 – 52.] Doe 1 never saw JR4 in Chase Hall. [Doc. No. 129, ¶¶ 49 185; Doc. No. 141, ¶¶ 49 & 185.]

81.    BRUN disputes ¶ 81 of Plaintiffs' Statement. BRUN objects to Doc. Nos. 143-1 & 143-4 and the statements therein as unsworn, inadmissible hearsay. [*See* Section II & III of the Reply Brief.] Furthermore, Doe 1 provided the following testimony under oath:

> Q. Has [JR4] ever come into the room or the lab that you were in while you were working between the times of . . . . spring of 2017 through summer of 2020?
> **A. Into the lab?**
> Q. Correct.
> **A. I'm just thinking.**

Q. Okay.

**A. Likely during the spring of 2017, but no specific instances that I remember.**

Q. And in the spring of 2017 before you broke up or after?

**A. Before.**

Q. And after you broke up, you have never seen him in your action – in your lab; is that correct?

**A. Not in the lab but in the building.**

. . .

Q. How has he shown that he can bypass his – the locks already?

**A. He had been in Morrison Center despite having his card access taken away.**

Q. And you were told he was being let in by a secretary; correct? For a collaboration that he was doing at Morrison Center; Correct?

**A. Correct**

Q. And you have never seen him after 5:00 p.m. is that correct?

**A. I don't recall. I may have. I don't recall.**

. . .

Q. And you were told why and how he got into the Morrison access; correct?

**A. Correct. But when he was in the building, he had open access to the full building.**

Q. and how do you know that?

**A. Because he was in the building.**

. . .

Q. When you saw him, where exactly are you seeing him?

**A. I'm seeing him the hallway, in the conference rooms.**

Q. Okay. And you have to pass by and walk by hallways to get to seminars; correct?

**A. Correct.**

Q. And you have to pass by hallways to get to the lab; correct?

**A. Yes, I do, mm – hmm.**

Q. And does he as well?

**A. Yes. So we can both be in the hallway.**

. . .

Q. Has he ever approached you outside of the classroom in spring of 2018?

**A. No.**

Q. Has he ever approached you after summer of 2017 outside of a classroom?

**A. Outside of a classroom?**

Q. Correct.

**A. No.**

[Doc. No. 126-3, at 48:5 – 22; 209:11 – 22; 210:12 - 211:9; 56:15 – 22.]

82.    BRUN disputes ¶ 82 in part. BRUN does not dispute that Doe 1 and JR4 saw

each other "when he walked by" outside but, disputes the characterization of the event as "looking at her." As Doe 1 stated, her office is in the front of the building, with a huge window. [Doc. No. 126-5 at 10 and 11.]

83.     BRUN disputes ¶ 83 in part for the same reasons provided in ¶ 75 and 77 *supra*, which BRUN incorporates as though fully set forth herein. Specifically, BRUN is only admitting that there was a comment submitted by someone on a Dear UNL website.

84.     BRUN disputes ¶ 84 of Plaintiffs' Statement. BRUN disputes this paragraph to the extent it exaggerates utilizing phrases such as "several times" and "multiple ways." BRUN also disputes and objects to ¶ 84 of Plaintiffs' Statement to the extent it states "because of JR4's harassment," as unsupported by any citation to competent evidence in the record and as legal conclusion and argumentative. Furthermore, Doe 1 admitted that, in June 2017, Doe 1 shared with Officer Beiter and Lamoureaux that she has never witnessed any threatening behavior or conduct that would cause her concern for her safety. [Doc. No. 129, ¶ 82; Doc. No. 141, ¶ 82.] In December 2017, other than the message to Tina, Doe 1 did not express any condition that shows an unsafe environment on campus. [*See* Doc. No. 141, ¶¶ 112 – 130.] Indeed, as Doe 1 admitted, JR4 never approached her while she was on campus or attempted to talk to her while she was on campus from June 2017 through her graduation from the University in August 2020.  [Doc. No. 129, ¶¶ 182-185; Doc. No. 141, ¶¶ 182-185.] BRUN also incorporates its responses to ¶¶ 35 and 50 *supra*.

85.     BRUN disputes ¶ 85 of Plaintiffs' Statement in part. BRUN does not dispute that she asked for accommodation for courses, as detailed in ¶ 36 *supra* and within BRUN's Statements on the same subject matter. BRUN disputes the allegation that she reported "feeling sick to her stomach sitting in the same class as him," as it is not supported by any citation to competent evidence in the record. In fact, the one course she took with JR4 in Fall 2017, Doe 1 admitted JR4 did not initiate any contact with her, never approached her in class and did not recall him ever talking to her in that class. [Doc. No. 129, ¶¶ 106-108;

23

Doc. No. 141, ¶¶ 106-108.]    In fact, in October 2017, Doe 1 wrote "[JR4] has not been

bothering me. . . ." [Doc. No. 129, ¶ 109; Doc. No. 141, ¶ 109.]

    86.    BRUN disputes ¶ 86 of Plaintiffs' Statement in part. BRUN does not dispute

that Doe 1 was allowed to switch and take another course, rather than the required seminar.

However, BRUN disputes that Doe 1 missed opportunities to present as there is no evidence

in the record that supports this allegation.

    87.    BRUN disputes ¶ 87 of Plaintiffs' Statement in part. BRUN admits that Doe 1

bought a parking pass, and she did so prior to May 2018.  [Doc. No. 12-6 at 9.] However,

BRUN disputes the remaining allegation as the evidence cited does not support the

contention that she avoided working on campus after dark and on the weekends. BRUN

disputes the contention that she felt unsafe on campus, as Doe 1 had testified under oath

that, from June 2017 through her graduation from the University in August 2020, JR4 never

approached her or attempted to talk to her in person. [Doc. No. 129, ¶ 189; Doc. No. 141,

¶189.] Moreover, Doe 1's own ¶ 80 states as follows: "Doe 1 she [sic] would often work alone

in her lab or in the basement of Chase Hall after hours." [Doc. 141, ¶ 80.]

    88.    BRUN disputes ¶ 88 of Plaintiffs' Statement in part for the same reasons

provided in ¶¶ 75 and 77 *supra,* which BRUN incorporates as though fully set forth herein.

Specifically, BRUN is only admitting that there was a comment submitted on a Dear UNL

website.

    89.    BRUN disputes ¶ 89 of Plaintiffs' Statement as the allegations set forth herein

are unsupported by competent evidence in the record. Moreover, the evidence cited does not

support the contention that she changed her work habit by avoiding staying on campus

after dark. Specifically, as Doe 1 admitted, the Annual Reports Doe 1 submitted prior to the

alleged occurrences in June 2017 and after provide that Doe 1 expressed her desire and

goal to graduate in 5 years. [Doc. No. 129, ¶ 44; Doc. No. 141, ¶ 44.] In the most critical

Annual Report for the 2017-2018 Academic Year, Doe 2 stated she planned to graduate in

"August 2020." [Doc. No. 125-14 at 1.] Moreover, Doe 1 told IEC, on May 24, 2018, that her projected graduation month and year was "August 2020." [Doc. No. 129, ¶ 45; Doc. No. 141, ¶ 45.] Indeed, Doe 1 graduated in 5 years, in August 2020.  Moreover, Doe 1 decided to serve as a visiting scholar at Trudeau Institute located in Saranac Lake, NY, for eight weeks, from June to July 2019. [*See* Doc. No. 129, ¶ 54; Doc. No. 141, ¶ 54.] Doe 1 testified that, while there, she finished the experiments she needed to complete her research. [*See* Doc. No. 126-3, at 273:10 – 274:2.] After March 2020, because of COVID, Doe 1 did not use or visit any of the laboratories located at the University. [Doc. No. 129, ¶¶ 50 – 52; Doc. No. 141, ¶¶ 50 – 52.] Doe 1 never saw JR4 in Chase Hall. [Doc. No. 129, ¶¶ 49 & 185; Doc. No. 141, ¶¶ 49 & 185.] And, as Doe 1's own ¶ 80 states: "Doe 1 she [sic] would often work alone in her lab or in the basement of Chase Hall *after hours*." [Doc. No. 141, ¶ 80 (emphasis added).] And, while at Chase Hall, the truth of the matter is, as Doe 1 had testified under oath, from June 2017 through her graduation from the University in August 2020, JR4 never approached her or attempted to talk to her in person. [Doc. No. 129, ¶¶ 182 & 189; Doc. No. 141, ¶¶ 182 & 189.]

As it relates to switching committee members, Doe 1 testified that all of the committee members she wanted to switch never told her that they could not be impartial as it relates to serving as her committee member; they never told her that they perceived a conflict; and they never told her they did not want to serve as her committee members. [Doc. No. 126-3 at 275:23 – 7.] Doe 1 made this decision in 2019 because these two individuals served as committee members for JR4. [Doc. No. 126-3 at 239:4 – 11.]

90.     BRUN disputes ¶ 90 of Plaintiffs' Statement of the allegations, for the same reason as set forth in ¶¶ 87 and 89 *supra*, which BRUN incorporates as though fully set forth herein.

91.     BRUN disputes ¶ 91 of Plaintiffs' Statement of the allegations, for the same reason as set forth in ¶¶ 87 and 89 supra, which BRUN incorporates as though fully set

forth herein.

92.     BRUN disputes ¶ 92 of the allegations, for the same reason as set forth in ¶ 89 supra, which BRUN incorporates as though fully set forth herein.

93.     BRUN disputes and objects to ¶ 93 of the Plaintiffs' Statement. BRUN objects to the utilization of Doc. No. 126-16 to support a factual allegation in the Statement of Undisputed Facts as it is unsworn reports and inadmissible hearsay. Moreover, as Doe 1 admitted, on June 1, 2017—prior to BRUN being notified of the event surrounding JR4— she was diagnosed with relationship distress with an intimate partner and anxiety disorder, unspecified. In addition, on or about July 6, 2017, Doe 1 was diagnosed with Adjustment Disorder with Anxiety. [*See* Doc. No. 129, ¶¶ 190 & 191; Doc. No. 141, ¶¶ 190 & 191.]

94.     BRUN disputes and objects to ¶ 94 of Plaintiffs' Statement of the allegations. BRUN objects to the utilization of Doc. No. 126-16 and Doc. No. 126-17 to support a factual allegation in the Statement of Undisputed Facts, on the grounds they are unsworn reports and inadmissible hearsay, and objects to the unsworn, hearsay statements contained within the reports detailing a selective recitation of information provided by Doe 1, and as they are littered with uncorroborated and conclusory factual allegations and statements that are outright false. Furthermore, as Doe 1 admitted, there are no experts disclosed to opine that any of Doe 1's diagnoses were caused by actions or inactions of the University. [Doc. No. 129, ¶ 192; Doc. No. 141, ¶ 192.] There is no medical record that opines that Doe 1's alleged symptoms and diagnoses were caused by alleged actions or inaction of the University or the deliberate indifference of the University. [Doc. No. 129, ¶¶ 194 & 195; Doc. No. 141, ¶¶ 194 & 195.] Moreover, as Doe 1 admitted, on June 1, 2017—prior to BRUN being notified of the event surrounding JR4—she was diagnosed with relationship distress with an intimate partner and anxiety disorder, unspecified. In addition, on or about July 6, 2017, Doe 1 was diagnosed with Adjustment Disorder with Anxiety. [*See* Doc. No. 129, ¶¶ 190 & 191; Doc. No. 141, ¶¶ 190 & 191.]

95.    BRUN disputes ¶ 95 of Plaintiffs' Statement of the allegations, for the reasons provided in ¶ 94 *supra*, which BRUN incorporates as though fully set forth herein. Furthermore, BRUN objects to the utilization of Doc. No. 128-21 to support a factual allegation in the Statement of Undisputed Facts, on the grounds it is an unsworn reports and inadmissible hearsay, and objects to the unsworn, hearsay statements contained within the report detailing a selective recitation of information provided by Doe 1, and as it is littered with uncorroborated and conclusory factual allegations, and statements that are outright false. Furthermore, see Doe 2's admissions in response to BRUN's Statements ¶¶ 342 – 355, which BRUN incorporates as though fully set forth herein. [Doc. No. 129, ¶¶ 342-355; Doc. No. 141, ¶¶ 342-355.]

96.    BRUN disputes ¶ 96 of Plaintiffs' Statement of the allegations for the same reasons set forth in ¶ 89, 93, 94, & 95 *supra*, which BRUN incorporates as though fully set forth herein.

97.    BRUN does not dispute ¶ 97 of Plaintiffs' Statement of the allegations.

98.    BRUN disputes ¶ 98 of Plaintiffs' statement, only to the extent it states "because of Doe 1's graduation delay," for the same reasons provided in ¶ 89 and 91 *supra*, which BRUN incorporates as though fully set forth herein.

99.    BRUN disputes ¶ 99 of Plaintiffs' Statement only to the extent it insinuates that she submitted a formal Application for Admission into the Ph.D. program.  [*See* Doc. No. 129, ¶ 202; Doc. No. 141, ¶ 202.]

100.    BRUN does not dispute ¶ 100 of Plaintiffs' Statement.

101.    In response to ¶ 101 of Plaintiffs' Statement, BRUN objects to this allegation as unsupported by any citation to competent evidence in the record, and as a legal conclusion and argumentative.  BRUN also objects to this allegation as vague, because ¶ 101 fails to identify the alleged "sexual assault."  BRUN does not dispute that Doe 2 submitted a formal complaint with IEC against JR5, alleging four instances of alleged

"sexual assault." [Doc. No. 129, ¶ 229; Doc. No. 141, ¶ 229.]

102.    BRUN does not dispute ¶ 102 of Plaintiffs' Statement.

103.    BRUN disputes ¶ 103 of Plaintiffs' statement. Doe 2 misstates and mischaracterizes testimony and evidence. Specifically, Doe 2 testified that in August 2016, Doe 2 and JR5 were dating. [Doc. No. 129, ¶¶ 230 & 231; Doc. No. 141, ¶ 230 & 231.] There is no competent evidence in the record that Doe 2 expressed to JR5 that the alleged touch was unwelcome. In fact, Doe 2 testified that it was not "an assault." [Id.]

104.    BRUN disputes and objects to ¶ 104 of Plaintiffs' Statement, as unsupported by any citation to competent evidence in the record and as argumentative, as it relates to the use of the word "heckled." BRUN does not dispute that Doe 2 used the word "heckled" when she described this incident to IEC. However, the details of the incident show that she was not "heckled." [*See* Doc. No. 129, ¶ 232; Doc. No. 141, ¶ 232.]

105.    BRUN disputes ¶ 105 of Plaintiffs' Statement. Doe 2 gave JR5 the code for her keypad for her apartment, and JR5 accessed her apartment using that code. [Doc. No. 172 at 5.]

106.    BRUN disputes ¶ 106 of Plaintiffs' Statement. JR5 did not refer to Doe 2 as a "cunt." Rather, he stated: "Your [cunt] friends talked shit about me and said everyone should go to BW3s and not tell me. Joe[3] told them off. Good to know I had one friend there." [Supp. Dec. of Counley, ¶ 22; Ex. QQQQ, Text Communication between JR5 and Doe 2.]

107.    BRUN disputes ¶ 107 of Plaintiffs' Statement. On August 29, 2017, Doe 2 emailed Beal about JR5's visit. [Supp. Dec. of Amare, ¶ 7; Exhibit WWWW, Email exchange between Beal and Doe 1 about JR5's visit.]  Therein, Doe 2 stated: "He just showed up." When asked if she was ok, Doe 2 stated:

> ***I wasn't expecting him this early***, so I walked back in and sat down at my desk. Immediately, there was a knock. I looked at my watch and thought it

___

[3] BRUN is using a pseudonym for this individual.

> was too early for him to be here, so I stupidly answered thinking it had to be one of my officemates returning to the office for a book or something. What do I do? I just said I am kind of in the middle of something closed and locked the door, but I feel too scared to leave. I will totally f up everything up if I get a police officer to escort me out. Plus, I am now fully shaking and crying, so I don't want … to just walk out and pass anyone, especially him.

*Id.* From August 2017 until November 2017, Doe 2 communicated with JR5, and attempted to meet with him to gather evidence and information as it relates to the allegations of sexual assault. [Doc. No. 129, ¶¶ 219 & 220; Doc. No. 141, ¶¶ 219 & 220.]

108.   BRUN disputes and objects to ¶ 108 of Plaintiffs' Statement, as unsupported by any citation to competent evidence in the record, and as legal conclusion and argumentative to the extent it describes the picture as "harassing," and "intoxicated." [*See* Doc. No. 128-16, at 2 (subject picture).]

109.   BRUN disputes ¶ 109 of Plaintiffs' Statement, as unsupported by any citation to competent evidence in the record. Specifically, during her interview with IEC, Doe 2 provided the following statement—a statement she reviewed and approved—regarding the March of 2016 email, which reads in relevant part:

> In March 2016, Complainant attended a St. Patrick's Day function at Respondent's law firm, Berry Law Firm. Complainant advised she felt more intoxicated than she normally would have been for the amount of alcohol she consumed at the party. Complainant had difficulty walking and remembered Respondent pulled Complainant away from others at the party. Respondent drove Complainant to his house, near Ashland. Complainant advised Respondent did not force her to leave, and she had planned to leave with Respondent after the part…..

[Supp. Dec. of Counley, ¶ 23; Exhibit RRRR, Email Communication between Counley and Doe 2 regarding setting up time to review Doe 2's statement; Doc. No. 127-2 at 4.]

110.   BRUN does not dispute ¶ 110 of Plaintiffs' Statement.

111.   BRUN disputes ¶ 111 of Plaintiffs' Statement only to the extent it states Doe 2 began experiencing difficulty with walking after she left the party. Doe 2 had difficulty walking while at the party. [Doc. No. 127-2 at 4.]

112.    BRUN disputes ¶ 112 of Plaintiffs' Statement to the extent she states "the next thing she remembers." [*See* Doc. No. 127-2 at 4.] Doe 2 recalled JR5 stopping his car at the mailbox. Doe 2 stated there was a ditch on each side of that road. Doe 2 got out of the vehicle and fell into the ditch. [Id.]

113.    BRUN disputes ¶ 113 of Plaintiffs' Statement, to the extent she insinuates that JR5 indeed had sex with her that night. Specifically, Doe 2 admitted she "does not remember feeling any penetration." [Doc. No. 127-2 at 4.] During her deposition, Doe 2 affirmed she "couldn't physically feel it, . . . ." [Doc. No. 128-2, at 201:15–16.]

114.    In response to ¶ 114, BRUN objects and disputes this allegation as unsupported by any citation to competent evidence in the record. Specifically, during her deposition, Doe 2 testified ". . . I felt outside of my body, so she mentioned that I couldn't feel, so that's why she had decided it didn't happen." [Doc. No. 128-2, at 201:1 – 7.] In addition, BRUN disputes and objects to ¶ 114 as legal conclusion and argumentative to the extent it describes the alleged event as "assault." [*See* Doc. No. 127-2 at 4.] In fact, when Doe 2 asked JR5 in the morning whether he had sex with her while she was vomiting, JR5 denied doing so, and stated that was "disgusting." [Id.]

115.    BRUN objects and disputes ¶ 115 as unsupported by any citation to competent evidence in the record, and as legal conclusion and argumentative to the extent it describes what was reported as "harassing conduct." Specifically, in the process of IEC investigating Doe 2's allegations against JR5, another student, Joe[4] was interviewed. During his interview, Joe reported comments made by JR5 sometime in late September or early October 2016. This incident did not involve Doe 2. [Doc. No. 127-2 at 28.] Joe reported that he talked to Dona-Gene Barton about JR5's comments at the banquet, and that two other students also reported concerns they had to Dona-Gene at that time. [Doc. No. 127-2 at 29.]

---

[4] BRUN is using a pseudonym for this student.

30

They all planned to speak with IEC but, to Joe's knowledge, no one followed through. [Id.] There were no other concerns that Joe reported to Dona-Gene Barton. [Doc. No. 127-2 at 29.]

116.    BRUN disputes ¶ 116 of Plaintiffs' Statement, as unsupported by any citation to competent evidence in the record. Specifically, there is no evidence that JR5 called any other student "sexually derogatory names," and that this was reported to Barton. [Doc. No. 127-2 at 29.]

117.    BRUN does not dispute ¶ 117 of Plaintiffs' Statement.

118.    BRUN disputes ¶ 118 of Plaintiffs' Statement. Doe 2 did not even report the alleged sexual harassment until end of Fall 2017. Specifically, Doe 2 submitted her formal complaint on November 21, 2017.  [*See* Doc. No. 129, ¶ 229; Doc. No. 141, ¶ 229.] Doe 2 requested accommodation that Counley wait to notify JR5 until after Doe 2 had left town for break, which such request was granted. [Doc. No. 129, ¶¶ 242 & 243; Doc. No. 141, ¶¶ 242 & 243.] Doe 2 also expressed her gratitude that Counley was holding off notifying JR5 until she left town on December 19, 2017. Counley notified JR5 of the alleged sexual assault on December 21, 2017. [Doc. No. 129, ¶ 244; Doc. No. 141, ¶ 244.] This was after the last day of fall classes. [Supp. Dec. of Counley, ¶ 24.] Specifically, last day of classes for the Fall 2017 was December 9, 2017. [Id.] Fall semester final exams were conducted from December 11, 2017, through December 15, 2017. [Id.]  In fact, as Doe 2 admitted in response to BRUN's Statement, in Fall 2017 and Spring 2018, Doe 2 and JR5 did not take the same classes. [Doc. No. 129, ¶ 221; Doc. No. 141, ¶ 221.] Doe 2 also knew that JR5 was only taking night classes. [Id.] In addition, Doe 2 admitted that she knew JR5 was not taking summer classes during the summer of 2018 semester. [Doc. No. 129, ¶ 341; Doc. No. 141, ¶ 341.] As Doe 2 admitted, after she made her report to IEC, the only place she would have seen JR5 was at the Title IX hearing. [Doc. No. 129, ¶ 327; Doc. No. 141, ¶ 327.]

119.   BRUN disputes ¶ 119, as it is unsupported by any citation to competent evidence in the record. With respect to the citation to Plaintiffs' deposition, Doe 2 misstates her testimony. Doe 2 did not testify as described in ¶ 119. During her deposition, Doe 2 was asked by what she meant by a statement she made to Dona-Gene about assurances she was hoping to receive from IEC. [*See* Doc. No. 128-2, at 231:7 – 232:19.] Specifically, Doe 2 testified: "Well, here I put, for example, in the hypothetical scenario that there is outside evidence I could release, they would have to inform him of what entity furnished that evidence and how exactly it was sourced. So I think in terms of the record, I was scared of him finding out that I was recording him." [Doc. No. 128-2 at 231:16-22.] IEC told her they could not assure that they would not tell him from where information was sourced. [Doc. No. 128-2, at 231:23 – 232:1.] When asked if there were any other assurances she was hoping to get at that meeting, she testified there were no assurances that she was hoping to get at that meeting, except that she did not want to be at her apartment when he was notified and did not want to be recorded.  [Doc. No. 128-2, at 232:2 – 19.] Indeed, both of these requests were granted. [*See* Doc. No. 128-2, at 232:2 – 19; Doc. No. 129, ¶¶ 242, 243; Doc. No. 141, ¶¶ 242, 243.] Moreover, even Doe 2 stated that she felt like she can "trust them [Counley and Ryan Fette]." [*See* Doc. No. 144-7 at 4.]

120.   BRUN disputes ¶ 120 of Plaintiffs' Statement, only to the extent Doe 2 insinuates that JR5 has made such a threat. In fact, Doe 2 testified that JR5 has never threatened to shoot her. [Doc. No. 128-2, at 232:20 – 22.]

121.   BRUN does not dispute ¶ 121 of Plaintiffs' Statement.

122.   BRUN disputes ¶ 122 in part. BRUN does not dispute that the January 8 letter to Doe informing her that the Title IX investigation would take more than sixty days stated, "As you are aware, you requested we wait an extended period before contacting Respondent, and we agreed." [Doc. No. 127-28.] However, that was not the "only reason." After he was informed of the alleged sexual assault on December 21, 2017, JR5 also requested time that

IEC provide time for him to consult with an attorney, before speaking to IEC. [Supp. Dec. of Counley, ¶ 25; Ex. SSSS, letter from Counley to JR5 on January 8, 2018.]

    123.   BRUN does not dispute ¶ 123 of Plaintiffs' Statement.

    124.   In response to ¶ 124 of Plaintiffs' Statement, BRUN does not dispute that Doe 2 expressed her concern that she did not want to be at her apartment when JR5 was informed of her allegations against him. [*See* Doc. No. 128-2, at 232:2 – 8.] Furthermore, Doe 2 stated that she wants to make sure she has a "protection order and/or other precautions in place before he finds out about all that." [Doc. No. 144-7.]

    125.   BRUN disputes ¶ 125 only to the extent Doe 2 insinuates that this was the only time he sent her such an invite to a speaking event hosted by LIBA and that JR5 was aware of the Title IX investigation. In fact, Doe 2 testified that he sent her various events hosted by LIBA, beginning 2016. [Doc. No. 128-2, at 165:12 – 166:1.] JR5 was communicating with her on November 21, 2017, because he was not informed of the Title IX report (upon Doe 2's express request) and he thinks he and Doe 2 are still "friendly." [Doc. No. 128-2, at 221:3 – 223:19.] When Doe 2 communicated with Vince Powers about with LIBA invite, he wrote: "It's good that you are pursuing the Title IX complaint. There is a four-year statute of limitations from date of wrongful act to file civil suit in a civil suit, so no hurry. As for the email I don't know why he sent it. ***Maybe he thinks he can impress you.*** Joe Kelly is a nice person who is an elected official so he has many friends. I seriously doubt if Joe hangs out with [JR5]. The LIBA government group us [sic] fairly small. I have spoken to it a few times. It's not a big deal at all. Best to have no contact with [JR5]. Thanks for keeping us apprised." [Doc. No. 144-6.] Moreover, there is no evidence that JR5 was aware of the Title IX or the LPD investigation.

    126.   BRUN does not dispute ¶ 126 of Plaintiffs' Statement.

    127.   BRUN does not dispute ¶ 127 of Plaintiffs' Statement

    128.   BRUN does not dispute ¶ 128 of Plaintiffs' Statement

129.  BRUN does not dispute ¶ 129 of Plaintiffs' Statement.

130.  BRUN does not dispute ¶ 130 of Plaintiffs' Statement.

131.  BRUN disputes ¶131 as unsupported by the evidence in the record. In the December 18, 2017, email, Doe 2 was still contemplating whether she should provide the audio recording to Title IX. Doe 2 testified that she did not provide the audio recording by December 18, 2017. [Doc. No. 128-2, at 254:11 – 22.] As Doe 2 stated, there is audio that Doe 2 had but there was additional audio that LPD had. [Doc. No. 128-2, 254:1 – 25.] In an email exchange with Doe 2, Beal stated, it is "imperative that we give them as much as possible," including statements made on the audio recording that Doe 2 had, and statements made on the audio recording LPD had. [Doc. No. 144-10.] Both Doe 2 and Morgan were attempting to get the LPD audio in January and February, and Beal specifically stated, "Would you like me to follow up with Matt regarding the transcripts? I really believe those are imperative to the investigation. I think reaching out to Vince/Elizabeth might be a good idea.. . ." [Supp. Dec. of Amare, ¶ 8; Exhibit XXXX, Email communication between Counley Doe 2 in January 2018.]

132.  BRUN disputes ¶ 132 of Plaintiffs' Statement, to the extent it states that Doe 2's request for additional time was done with the understanding that "it would not delay the investigation." The fact of the matter is that Doe 2, via her support person Beal, sought approximately three weeks of time to review and respond to JR5's statement. [*See* Doc. Nos. 127-10, 127-11, 127-12.]  This, in and of itself, would delay the investigation. During her deposition, Doe 2 stated that she thinks she mentioned in an email that this would not "hold up the investigation." Nowhere in the emails exchanged wherein Doe 2 or Beal asked for additional time did Doe 2 state that her request was conditioned on agreement that it would not "hold up" or "delay" the investigation. [*See* Doc. Nos. 127-10, 127-11, 127-12.]  BRUN does not dispute that her request to review during the weekend was denied, as IEC office is closed during the weekends. [Supp. Dec. of Counley, ¶ 26.]

133.   BRUN does not dispute ¶ 133 of Plaintiffs' Statement.

134.   BRUN disputes ¶ 134 of Plaintiffs' Statement. Doe 2 testified that she did not request a particular accommodation at that time. Officer Fischer offered to assign a UNLPD companion to walk her to places. [Doc. No. 129, ¶ 250; Doc. No. 141, ¶ 250.] Doe 2 did not take him up on his offer because she does not "recall ever needing to." [Id.]

135.   BRUN does not dispute ¶ 135 of Plaintiffs' Statement.

136.   BRUN disputes ¶ 136 of Plaintiffs' Statement.   Doe 2 did not dispute the statement that Beal attended the May 7 meeting. [*See* Doc. No. 129, ¶ 286; Doc. No. 141, ¶ 286]. In fact, when questioned about it, Doe 2 admitted as such during her deposition. [*See* Doc. No. 128-2, at 365:11 – 366:25.] It was on May 30, 2018, that Doe 2 was not allowed to have Beal with her, and this was because she wanted Elizabeth Govaerts to attend the meeting. [Doc. No. 128-2, 366:6 – 367:4.] At this time, it was University policy to allow only one support person to be present during meetings with University personnel. [Supp. Dec. of Counley, ¶ 23.]

137.   BRUN does not dispute ¶ 137 of Plaintiffs' Statement.

138.   BRUN does not dispute ¶ 138 of Plaintiffs' Statement.

139.   BRUN disputes ¶ 139 of Plaintiffs' Statement, to the extent it characterizes it as "pressured Doe 2 to accept the offer," as it is argumentative and unsupported by competent evidence in the record. At this meeting, Strickman communicated the advantages and disadvantages of accepting this resolution offer and gave Doe 2 additional time to provide a definitive response to the offer. [*See* Doc. No. 127-17, ¶ 16.]

140.   BRUN disputes ¶ 140 of Plaintiffs' Statement as unsupported by competent evidence, argumentative and conclusory. All the evidence cited by Doe 2 refers to events before IEC began its investigation on November 21, 2017 (the date Doe 2 filed a formal complaint), except for one which is an email sent to Doe 2 on November 21, 2017 (prior to

JR5 being notified of the Title IX complaint). Moreover, none of the evidence cited shows that JR5 threatened Doe 2. Specifically:

- Doc. No. 128-4 at 7 is an email communication between Beal and Doe 2 on August 15, 2017 (approximately two and half months before she filed her formal complaint with IEC). In addition, Doc. No. 128-4 does not show that JR5 "threatened" her in any way.

- Doc. No. 144-4 is an email communication between Beal and Doe 2 from August 20, 2017, to August 23, 2017 (approximately two and half months before Doe 2 filed her formal complaint with IEC). In addition, this document does not show that JR5 "threatened" Doe 2 in any way.

- Doc. No. 144-6 refers to an email between Doe 2 and her attorneys regarding an email that Doe 2 received from JR5 while she was in the meeting with Counley and Fette on November 21, 2017, wherein he invited her to a LIBA event where Joe Kelly was scheduled to speak. Similarly, Doc. No. 144-9, at 7 – 8 is an email between Doe 2 and Beal again referencing the LIBA email from JR5 to Doe 2. Doe 2 has admitted that JR5 was not aware of the Title IX investigation at that time. Moreover, he has previously invited her to LIBA events. [Id.] *See also* Doc. No. 144-9 at 8 wherein Doe 2 states: "He does typically email me invites when we are getting along...."  Nowhere in this message did JR5 threaten her. [Supp. Dec. of Counley, 28; Ex. TTTT, Email communication from JR5 to Doe 2 on November 21, 2017.]

- Doc. No. 128-4 at 7 is part of the summary of Doe 2's interview on November 21, 2017, wherein Doe 2 refers to interactions involving JR5 that occurred months prior to November 21, 2017, except for the LIBA email which occurred on November 21, 2017.

141.  BRUN disputes ¶ 141 of Plaintiffs' Statement. The evidence Doe 2 cites does

not support the conclusion that "JR5 spread rumors about Doe 2 to professors and peers." In fact, Doe 2 admitted that she did not know the content of JR5's conversation with Dona-Gene Barton, and in fact Dona-Gene Barton did not even confirm that the information she received about Doe 2 experiencing mental health struggles came from JR5. [Doc. No. 128-2, 173:1 – 174:15.] Doe 2 could not even pinpoint the individuals she claimed JR5 told information about her. [Doc. No. 128-2, at 179:23 – 8.] Doe 2 confirmed that she doesn't remember if JR5 ever sent a picture of Doe 2 to others. [Doc. No. 128-2 at 181:1 – 4.] When pressed for specifics, Doe 2 admitted that JR5 was not telling the information about her to others but that he has stated certain things to her and also included some information in his Title IX response letter (defending himself). [Doc. No. 128-2 at 181:1 – 25.] Simply stated, Doe 2 could not identify any specific instances where JR5 "spread rumors" about her to professors and peers. There is no competent evidence in the record providing facts about the alleged rumors, including to whom these alleged rumors were spread.

142.   BRUN disputes ¶ 142 of Plaintiffs' Statement in part. Doe 2 did not provide evidence to IEC where JR5 intimidated Doe 2 using his position as an attorney with connections in the community, nor was it aware of any "history" of such. [Supp. Dec. of Counley, ¶ 29.] Nor does the evidence relied upon lead to such conclusion. However, BRUN does not dispute that Doe 2 stated so during her interview on December 21, 2017. [*See* Doc. No. 127-2 at 4.]

143.   BRUN disputes ¶ 143 Plaintiffs' Statement. BRUN is unaware of any evidence where JR5 sent any "threatening" messages to Doe 2 as it relates to the LPD investigation and Title IX investigations against him. [Supp. Dec. of Counley, ¶ 30.] In fact, Doe 2 kept the LPD investigation a secret for a period of time and there is no evidence that JR5 knew of the LPD investigation prior to December 21, 2017. In addition, JR5 was not notified of the Title IX investigation until December 21, 2017. Moreover, as Doe 2 admitted, JR5 never communicated with Doe 2 orally or in writing after December 21, 2017. [Doc. No. 129, ¶

323; Doc. No. 141, ¶ 323.] Nor was there any report to IEC that JR5 messaged, texted, or communicated with Doe 2 in any way after November 2017. [Doc. No. 129, ¶ 326; Doc. No. 141, ¶ 326.]

144.   BRUN disputes ¶ 144 of Plaintiffs' Statement. Doe 2 admitted that she never saw JR5 carry his concealed weapon from June 2017 on, after his concealed carry permit expired. [Doc. No. 129, ¶ 328; Doc. No. 141, ¶ 328.] Furthermore, the witnesses Doe 2 claimed would have seen JR5 carry guns on campus denied ever seeing him with a gun on campus. [Doc. No. 129, ¶ 329; Doc. No. 141, ¶ 329.] Moreover, JR5 denied carrying a gun on campus, and reported his concealed carry permit had expired and he did not carry his gun with him anywhere. [Doc. No. 129, ¶ 330; Doc. No. 141, ¶ 330.]

145.   BRUN disputes ¶ 145 of Plaintiffs' Statement. Doe 2 reported that Respondent bragged to another student, Joe, about pulling a gun on his neighbor, when his neighbor came to JR5's house and yelled at JR5 for an incident involving JR5's dog and the neighbor's ducks. [Doc. No. 127-2 at 7.] When Counley questioned Joe about this, Joe did not remember JR5 ever telling him this story. [Doc. No. 127-2 at 7.]

146.   BRUN disputes ¶ 146 of Plaintiffs' Statement in part. Although Doe 2's Masters degree was conferred on May 5, 2018, Doe 2 continued to teach at the University, pursuant to a grant provided to graduate students, from June 2018 through August 2018. [*See* Doc. No. 129, ¶ 208; Doc. No. 141, ¶ 208.]

147.   BRUN disputes ¶ 147 of Plaintiffs' Statement. Doe 2's communication with her advisor in June and July 2018 is illuminating. Specifically, in July 2018, Doe 2 communicated with Barton regarding her option to continue her Ph.D., at which time Barton told her that the Department will cover the application fee to switch her from Masters to Ph.D. [Doc. No. 128:2 at 322:12 – 325:19.] Specifically, Barton provided, "We'll take care of transferring the funds ***whenever [Doe 2] is ready to complete the new application***," thereby giving Doe 2 additional time. [Id.; Supp. Dec. of Amare, ¶ 9; Exhibit YYYY, Email

38

Exchange between Doe 2, Barton and Business Office in July 2018.] Even on July 28, 2018, Doe 2 had still not made up her mind about the Ph.D. program and was given yet additional time to decide. [Id.; Doc. No. 128-2, at 324:24 – 326:19.]

148.    BRUN does not dispute ¶ 148 of Plaintiffs' Statement. However, to the extent Doe 2 is insinuating that this was only campus related, BRUN disputes it. Specifically, as Doe 2 admitted, she did not want to be in Lincoln, Nebraska. [*See* Doc. No.128-2, at 330:3 – 6.]

149.    BRUN disputes ¶ 149 of Plaintiffs' Statement to the extent she implies that she was not provided additional time. In fact, in the very evidence Doe 2 relies upon, Burton wrote to Doe 2, June 15, 2018, and said, "Please don't worry about this. As I said, if you need it you can have more time to make your decision. Even if it is a couple of weeks, that should be fine. Please get feeling better. Let me know if there is anything I can do. You will be in thoughts." [Doc. No. 144 -15 at 4.] In addition, as stated previously, even on July 28, 2018, it is apparent Burton is still holding the Ph.D. position open for Doe 2. [*See* ¶ 147 *supra.*]

150.    BRUN disputes ¶ 150 of Plaintiffs' Statement. In Summer 2018, JR5 was not taking any classes. [*See* Doc. No. 129, ¶ 341; Doc. No. 141, ¶ 341.] After JR5 was notified of the Title IX complaint, JR5 never approached Doe 2 while she was on campus. [*See* Doc. No. 129, ¶ 326; Doc. No. 141, ¶ 326.]   After November 2017, JR5 never texted, messaged, or communicated with Doe 2 in any way. [*See* Doc. No. 129, ¶ 326; Doc. No. 141, ¶ 326.] In fact, by July 29, 2017, a final decision was made by the University—denying JR5's appeal. [Doc. No. 129, ¶ 322; Doc. No. 141, ¶ 322.] Effective July 29, 2018, JR5 was expelled from the University, which is a permanent separation of the student from the university without the possibility of readmission. [*See* Doc. No. 127-14 at 4.]

151.    BRUN disputes ¶ 151 of Plaintiffs' Statement only to the extent it fails to provide the entire provision as it relates to the jurisdiction of the University Student Code of

Conduct with respect to conduct that occurred off University premises. Specifically, the Student Code of Conduct states that the Student Code of Conduct shall apply to conduct that occurs "Off University premises, if the conduct is determined by the Dean of Students to adversely affect the University community, its members, its reputation or the pursuit of its objectives." [Doc. No. 125-22, at 3.]

152.    BRUN disputes ¶ 152 of Plaintiffs' Statement. The Student Code of Conduct provides:

1.  The Student Code shall apply to conduct that occurs:
    a.  On University premises, including all University of Nebraska locations, physical campuses and any University affiliated programs located in other states or countries.
    b.  Off University premises, if the conduct is determined by the Dean of Students to adversely affect the University community, its members, its reputation or the pursuit of its objectives.
2.  The Student Code applies to student conduct which occurs from the time of enrollment through the actual awarding of a degree, even if the conduct occurs prior to the start of classes or is discovered after a degree is awarded.

[Doc. No. 125-22, at 3.] In fact, even the provision cited by Doe 2 provides: "Student misconduct by or against **may** be investigated by the University whether it is alleged to have been committed on or off campus." [Doc. No. 125-22, at 17.]

153.    BRUN does not dispute ¶ 153 of Plaintiffs' Statement.

154.    BRUN does not dispute ¶ 154 of Plaintiffs' Statement.

155.    BRUN disputes ¶ 155 of Plaintiffs' Statement. Doe 2 misstates testimony. Doe 2 was able to go to her own classes. [Doc. No. 128-2, at 262:1-16.] Doe 2 was able to teach the classes she was assigned to teach. [Id.] Doe 2 was required to hold office hours, and she did. [Id.] The office that Doe 2 had in the building could only be accessed by individuals who had key to the office. [*See* Doc. No. 128-2 at 210:9 – 25.] Doe 2 admitted that JR5 never showed up at locations she was at when she was on campus. [Doc. No. 128-2 at 262:11 – 16.] To the extent she did not want to be on campus, Doe 2 worked "from elsewhere." [Id.] Moreover, Doe 2 knew JR5 attended only night classes in Spring 2018. [Doc. No. 129, ¶ 221;

Doc. No. 141, ¶ 221.] Doe 2 knew JR5 did not attend any classes in Summer 2018. [Doc. No. 129, ¶ 341; Doc. No. 141, ¶ 341.] Doe 2 never saw JR5 after November 2017, other than the Title IX hearing they both attended. [Doc. No. 129, ¶ 327; Doc. No. 141, ¶ 327.] In fact, when asked whether she took Fischer up on his offer to assign a UNLPD companion, she stated she did not because she did not "recall [she] ever needed to." [Doc. No. 129, ¶ 250; Doc. No. 141, ¶ 250.] There is simply no evidence to support the allegation contained in ¶ 155 of Plaintiffs' Statement.

156.    BRUN disputes ¶ 156 of Plaintiffs' Statement. Doe 2 took two courses, Political Geography and Survey Design and Analysis in Fall 2017, for which she received A+ and A, respectively. [Doc. No. 126-23.] Doe 2 took one course in Spring 2018, Core-Seminar International Policies, for which she received A-. Doe 2 received an incomplete for her dissertation because she decided not to pursue her Ph.D. and abandoned her dissertation. [Doc. No. 126-3; Doc. No.128-2 at 49:16 – 25.]

157.    BRUN objects and disputes ¶ 157 of Plaintiffs' Statement to the extent she states she "had already made significant progress," as lacking foundation and unsupported by competent evidence. During her deposition, Doe 2 was asked whether she knew how many hours are required to complete a Ph.D. program in political science, Doe 2 stated: "Oh, I did at the time at the time. I don't recall anymore." [Doc. No. 128-2 at 50:1-5.] Moreover, Doe 2 admitted that how long it would take for her to complete a Ph.D. with political science and with specialization would depend on how fast a student works on their research and dissertation. [Doc. No. 128-2 at 52:18- 53:2.]

158.    In response to ¶ 158 of Plaintiffs' Statement, BRUN disputes to the extent it insinuates that Doe 2 had to make a decision in May 2018 for the same reasons set forth in ¶ 147 *supra*, which is incorporated as though fully set forth herein. BRUN does not dispute that IEC found JR5 responsible for sexual misconduct and recommended his expulsion from the University.

159.  BRUN disputes ¶ 159 of Plaintiffs' Statement, as the evidence cited does not support the allegation that JR5 maintained "full access" to campus. In fact, Doe 2 herself testified that the office she had in the building could only be accessed by individuals who had the key—which were her and the two students who used that office, and janitorial personnel. Generally speaking, there are certain areas at the University of Nebraska that cannot be accessed by students, unless provided a key card access. [Supp. Dec. of Counley, ¶ 31.]

160.  BRUN disputes and objects to ¶ 160 of Plaintiffs' Statement. BRUN objects to the utilization of Doc. No. 128-23 and Doc. No. 128-21 to support a factual allegation in the Plaintiffs' Additional Statement, on the grounds they are an unsworn reports and inadmissible hearsay, and objects to the unsworn, hearsay statements contained within the reports detailing a selective recitation of information provided by Doe 2, and as they are littered with uncorroborated and conclusory factual allegations, and statements that are outright false.  [See Doc. No. 131 at 6-9, 11-13 & 48, Brief in Support of Daubert Motion to Exclude Expert Testimony.]  Moreover, even if considered, the evidence does not support the statement contained in ¶160. Specifically, Doherty wrote: Doe 2 "was referred for a vocational evaluation for the purpose of determining her earning capacity due to ongoing anxiety-related trauma associated with sexual assaults and abuse she endured while a student with the University of Nebraska—Lincoln (UNL)." [Doc. No. 128-21 at 1.] Doherty stated: "Because [Doe 2] was precluded from completing her educational training as she had planned, she is considered a worker with a disability, who experienced a reduced earning capacity. [Doe 2] possesses a work disability because she is unable to complete an eighthour day without significant interruptions due to psychologically-based reasons." Doherty failed to make an assessment as to any identifiable loss of professional opportunity with respect to wage assessment of political science positions with a Master's degree in comparison to those with a Ph.D. degree. Rather, Doherty used wages for any and every field that employs

individuals with a Ph.D. degree—not just political science but any degree—when calculating the supposed "loss of earning." [*See* Doc. No. 128-21, at 1 and 19-21.]

161.   BRUN disputes ¶ 161 of Plaintiffs' Statement only to the extent it states, "after her unexpected withdrawal from her Ph.D. program." Doe 2 admitted that she had been continuously contemplating whether she wanted to pursue a Ph.D. in Political Science. [*See* Doc. No. 129, at ¶¶ 201 – 203; Doc. No. 141, ¶¶ 201-203; Doc. No. 128-2 at 122:11 – 14, 225:7 – 18, 322:12 – 326:19.]

162.   BRUN disputes ¶ 162 of Plaintiffs' Statement to the extent it characterizes it as "encouragement." Doe 2 testified that on June 27, 2018, she was still contemplating whether she should leave the University and go to India in October 2018. [Doc. No. 128-2 at 328:1 – 25.] When she talked to a professor about India, the professor "suggested that" she go to India. [Id.] Otherwise, Doe 2 was encouraged to continue her Ph.D. [Doc. No. 128-2 at 56:16 – 56:21.]

163.   BRUN disputes and objects to ¶ 163 as unsupported by any citation to competent evidence in the record, and as argumentative and lacking foundation with respect to the statement "further retaliation for her Title IX complaint," BRUN does not dispute that Doe 2 went to India as she did not want to be in Lincoln, Nebraska. [Doc. No. 128-2 at 330:3 – 6.] BRUN further states that Doe 2 testified that if JR5 decided to file a lawsuit against her, she wanted him to come deliver it in India. [Doc. No. 128-2 at 329:24 – 2.]

164.   BRUN does not dispute ¶ 164 of Plaintiffs' Statement.

165.   BRUN disputes and objects to ¶ 165 of Plaintiffs' Statement. BRUN objects to the utilization of Doc. Nos. 128-21 and 126-16 to support a factual allegation in the Statement of Undisputed Facts, on the grounds they are unsworn reports and inadmissible hearsay. BRUN further objects to the unsworn, hearsay statements contained within the reports detailing a selective recitation of information provided by Doe 1 and 2, and as they are littered with uncorroborated and conclusory factual allegations, and statements that are

43

outright false.  [*See* Doc. No. 131 at 6-9, 11-13 -48, Brief in Support of Daubert Motion to

Exclude Expert Testimony.] Furthermore, Doherty herself has testified that she is not

diagnosing anybody [Doe 1 and Doe 2] with PTSD and has testified she has not made any

assessment whether any of the mental or physical conditions and symptomology were

caused by the University's response to the allegations of sexual harassment, thereby making

this paragraph immaterial and irrelevant. [Doc. No. 128-20 at 172:24 – 10; 175:24-176:3,

273:16 -23, 288:19-22.]

166.  BRUN disputes and objects to ¶ 166 of Plaintiffs' Statement for the same

reasons as set forth in ¶ 165 *supra*, which BRUN incorporates as though fully set forth

herein.

167.  BRUN disputes and objects to ¶ 167 of Plaintiffs' Statement for the same

reasons as set forth in ¶165 *supra*, which BRUN incorporates as though fully set forth

herein.

Dated this 6th day of January, 2025.

<div style="margin-left: 40%">

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA, Defendant

By:    /s/ Lily Amare
       Susan K. Sapp #19121
       Lily Amare #25735
       CLINE WILLIAMS WRIGHT
        JOHNSON & OLDFATHER, L.L.P.
       1900 U.S. Bank Building
       233 South13th Street
       Lincoln, NE 68508
       (402) 474-6900
       ssapp@clinewilliams.com
       lamare@clinewilliams.com

          AND

       Bren H. Chambers, #23150
       Deputy General Counsel
       University of Nebraska
       3835 Holdrege Street
       Lincoln, NE 68583-0745
       (402) 472-1201
       bchambers@nebraska.edu

</div>

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

                       /s/ Lily Amare
                       Lily Amare

45