IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA,<br><br>　　　　　Defendant. | **CASE NO. 4:20-CV-3081** |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S DAUBERT MOTION**

Submitted by:

Susan K. Sapp, #19121
Lily Amare, #25735
CLINE WILLIAMS WRIGHT JOHNSON
　& OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

　　　AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

Dated:  January 6, 2025.

1

The Board of Regents of the University of Nebraska ("BRUN" or "Board of Regents") respectfully submits this Reply Brief in Support of its Daubert Motion ("Motion").

## I. ARGUMENT

The crux of Plaintiffs' opposition to Defendant's Motion is based on an erroneous understanding of Plaintiffs' obligation under the Federal Rules of Evidence. Plaintiffs misstate the legal standard for the use of expert testimony in a civil proceeding and seem to urge this Court to disregard the amendment to FED. R. EVID. 702 ("Rule 702") by relying on Eighth Circuit cases from pre-Rule 702 amendment. Plaintiffs fail to understand that, as the party offering the expert testimony, they have the burden to establish that such testimony is admissible under Rule 702 and *Daubert*. The *Daubert* analysis applies not just to scientific testimony, but to all proposed expert testimony, including testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999). Instead of carrying their burden, Plaintiffs rely heavily on the "broad latitude," "flexible" standards, and "considerable leeway" they say is afforded to the trial court in determining issues of admissibility to survive this Motion. [Doc. No. 139, at pp. 5-7.]

As discussed in BRUN's opening Brief, the most recent amendment has clarified and emphasized that the "proponents of expert testimony must establish admissibility of the proffered evidence by preponderance of the evidence." *See Just. v. Bestway (USA), Inc.*, No. 4:22-CV-00050-AGF, 2024 WL 4650851, at *3 (E.D. Mo. Oct. 31, 2024) ("The advisory committee's note clarifies that this amendment does not impose any new, specific procedures, but instead 'is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702.'") (citing Fed. R. Evid. 702 advisory committee's note to 2023 amendment). Further, as the advisory committee

2

stated: "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." *See* FED. R. EVID. 702, advisory committee notes to 2023 amendment. In addition, "Rule 702(d) has been amended to emphasize that the reliability analysis applies to each opinion offered." *Just*, No. 4:22-CV-00050-AGF, 2024 WL 4650851, at *3 (citing FED. R. EVID. 702 advisory committee's note to 2023 amendment). *See also Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 790 (8th Cir. 2024), reh'g denied, No. 23-1375, 2024 WL 4499662 (8th Cir. Oct. 16, 2024) (noting that FED. R. EVID. 702 had a relaxed requirement for expert witnesses ***prior*** to the 2023 amendment, although, even pre-amendment, "the Supreme Court has held that courts still have a gatekeeping role to assure that evidence admitted is both relevant and reliable.").

Accordingly, Plaintiffs' argument that the standard under *Daubert* for determining reliability of principles and methodology provided by an expert is a "flexible one" and their application of this standard to the experts in this case is erroneous. Specifically, this Court should reject Plaintiffs' argument that they are entitled to provide expert testimony despite failing to meet the requirements of the Federal Rules of Evidence and *Daubert*, and without subjecting such testimony to judicial analysis as to its reliability and relevance. *Daubert*, 509 U.S. 579, 594-595 (discussing, *not the flexibility in discretion of the judge to allow testimony in the absence of a reliable method*, but flexibility of analysis to look *beyond* whether principles and methods are "generally acceptable," under the previous standard, to determine the ultimate reliability of the underlying principles and methods). This Court should also reject Plaintiffs' proposition that the application of the expert's methodology are questions of weight and not admissibility.

3

A.  **THE PROFFERED OPINIONS ARE IRRELEVANT TO THIS CASE.**

    1.  **Plaintiffs must confront *Cummings* because it applies to Title IX cases.**

Plaintiffs admit that the "*Cummings* ruling may impact Title IX cases," but argue that "*Cummings* is not a Title IX case." [Doc. No. 139, p. 8.] In support, Plaintiffs rely entirely on inapplicable case law that pre-date *Cummings.* [Doc. No. 139, p. 8.] As thoroughly discussed in the Reply Brief in Support of BRUN's Motion for Summary Judgment—and repeated herein, for purposes of preserving BRUN's argument—although *Cummings* dealt with the Rehabilitation Act and the Affordable Care Act ("ACA"), the reasoning underlying the holding mandates the same conclusion in a Title IX case.

This Court has addressed a similar argument in *Abdulsalam v. Bd. of Regents of Univ. of Nebraska*, No. 4:22-CV-3004, 2023 WL 4266378, at *5 (D. Neb. June 29, 2023). In that case, this Court held, even though *Cummings* did not involve a Title IX claim, there is "no reason why its logic would not apply to Title IX claims," because "*Cummings* was predicated on the fact that the Rehabilitation Act and Affordable Care Act are 'Spending Clause statutes.'" *Id.* (collecting cases). Therefore, "*Cummings* applies with full force here." *Id.* (citation omitted).

Indeed, the Supreme Court of the United States has held that Title IX is Spending Clause Legislation and "much in the nature of a contract." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640, (1999). Title IX operates in the manner of "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998)

    As Spending Clause legislation, a private right of action for damages under Title IX is permitted only under certain limited circumstances. *Cannon v. University of*

4

*Chicago,* 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 76 (1992). This is because "legislation enacted pursuant to the spending power is much in the nature of a contract, and the legitimacy of Congress' exercise of its power to condition funding on state compliance with congressional conditions rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Davis,* 526 U.S. at 655.

This fundamental principle warrants the application of the holding in *Cummings* to a Title IX case. As thoroughly explained in BRUN's opening Brief, the Supreme Court in *Cummings* expressly stated that the Rehabilitation Act, ACA, Title IX, and Title VI were adopted pursuant to the Spending Clause, and that the types of damages recoverable are limited to those available for contract claims. *Cummings,* 142 S. Ct. at 1570. Specifically, the Supreme Court held emotional distress damages are not available under the Spending Clause statutes. *Id.* at 1571.

In addition, Plaintiffs' reliance on *Guardians Ass'n v. Civ. Serv. Comm'n of City of New York,* 463 U.S. 582 (1983) and *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1 (1981), to argue that federal funding recipients had notice of availability of emotional distress damages in Title IX actions, is futile. Neither case addresses whether "emotional distress" damages were available in Spending Clause legislation, and they do not stand for the principle proposed by Plaintiffs. In fact, these cases support BRUN's position. Notably, *Pennhurst* was extensively cited in *Cummings* in support of the holding therein.

In *Pennhurst,* the relevant question before the Court was "Did Congress intend in [42 U.S.C.] § 6010 to create enforceable rights and obligations?" *Pennhurst,* 451 U.S. at 15. To discern "congressional intent," the Supreme Court analyzed "Congress' power to legislate, namely, Congress' power to enforce the Fourteenth Amendment and its power

5

under the Spending Clause to place conditions on the grant of federal court." *Id.* After a thorough analysis, the Court held the legislation in question was "enacted pursuant to the Spending Clause, which is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* at 17. Accordingly, *Pennhurst* did not address whether special form of damages—damages for emotional distress damages—may be recovered under legislation enacted pursuant to Spending Clause. Rather, the case stands for the holding that "legislation enacted pursuant to the spending power is much in the nature of contract." *Id.*

Moreover, as the District Court in *Beasley v. Alabama State Univ.*, 3 F. Supp. 2d 1304, 1320 (M.D. Ala. 1998) properly summarized:

> the notice issue addressed in *Pennhurst* and *Guardians Ass'n* pertained not to the adequacy of notice regarding the availability of a monetary-damages remedy, but rather to the adequacy of notice regarding the specific conditions with which funding recipients must comply to remain eligible for continued funding, and the related question of whether the states' ability to withdraw from participation and avoid compliance with unwanted federal obligations was respected.
>
> …
>
> As the foregoing analysis indicates that the Supreme Court has addressed the spending clause's notice requirement only with reference to the specific conditions of conduct (*e.g.,* nondiscrimination, etc.) imposed upon the recipients of federal financial assistance by the legislation.
>
> …
>
> Given this underlying rationale, there is no reason why the Supreme Court's holdings regarding the spending clause's notice requirement should be extended, as the defendants urge here, to the analytically-distinct question of whether states have received adequate notice as to the remedies that may be available for violations of the conditions imposed by spending clause statutes.

Hence, this Court should decline to extend the holdings in *Pennhurst* and *Guardians* in the manner that Plaintiffs propose, and instead apply the Supreme Court's holding in

*Cummings*, limiting damages to those only available under well founded principles of contract law.

Then, relying on yet another erroneous reading of case law, Plaintiffs argue that Title IX "may be authorized by the Spending Clause – but it is not solely authorized under the Spending Clause." [Doc. No. 139 at p. 11.] In other words, they argue that "Title IX is also authorized under Section 5 of the Fourteenth Amendment." [Id.] Plaintiffs cite *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997) and *Prinsloo v. Ark State Univ.*, 112 F.3d 514 (8th Cir. 1997). However, yet again, these cases do not stand for the propositions taunted by Plaintiffs.

In *Crawford*, the defendants argued congress enacted Title IX pursuant to the Spending Clause, and therefore § 5 of the Fourteenth Amendment does not give congress the ability to abrogate the states' immunity to Title IX claims. When considering whether congress had the ability to abrogate the states' immunity, the Eighth Circuit Court only considered whether congress *could have* enacted Title IX under Fourteenth Amendment enforcement clause. Specifically, it stated "The resolution of the defendants' contention therefore turns on whether Congress, as an objective matter, could have enacted Title IX pursuant to § 5 of the Fourteenth Amendment." *Crawford*, 109 F.3d at 1283. The Eighth Circuit Court concluded congress *could have*. *Id.* However, the Eighth Circuit Court *did not* hold Title IX *was enacted* pursuant to § 5 of the Fourteenth Amendment. *Id.*

Indeed, a similar argument was rejected by this Court. In *Abdulsalam*, No. 4:22-CV-3004, 2023 WL 4266378, at *5, this Court held "contrary to what she asserts in her brief, *Crawford* does not stand for the proposition 'that at least some of' Title IX 'derives from Section 5 of the Fourteenth Amendment.'" And both the Eighth Circuit and the Supreme Court have expressly stated that Title IX was enacted pursuant to the

7

Spending Clause. *See Cummings,* 142 S.Ct. at 1569-70; *Davis,* 526 U.S. at 655; *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 76 (1992); *Gross v. Weber,* 186 F.3d 1089, 1092 (8th Cir. 1999). Therefore, there is no denying that *Cummings* applies to this case and that it is relevant to the assessment of the experts subject to this Motion.

### 2.  There is no denying that the proffered opinions are rebranded emotional distress damages.

Plaintiffs argue—with no substance—that Plaintiffs are not requesting emotional distress damages. This argument is betrayed by the expert reports Plaintiffs disclosed pursuant to FED. R. CIV. P. 26, and the testimony of the two experts subject to this Motion.

Doherty, in her expert report for Doe 1, wrote: "Doe 1 was referred for a vocational evaluation for purpose of determining ***her earning capacity due to ongoing post-traumatic anxiety***. . . ." [Doc. No. 126-16, at 1.] She wrote, in evaluating Doe 1, "I have considered the vocational and occupational impact of her ***emotional trauma*** . . . ," and defined "disability." [Doc. No. 126-16, at 2.] Then, Doherty, in approximately 13 pages, extensively discussed Doe 1's history with emotional distress and the various mental health conditions of Doe 1. Specifically, she discussed Doe 1's medical record, including Doe 1's mental health conditions and emotional distress issues; the various mental health symptoms that Doe 1 experienced pre- and post- notice to the University; and the DSM-5 criteria for PTSD, therein outlining the various anxiety-related trauma Doe 1 alleges, including intrusive thoughts about anxiety, mood related functionality issues, etc. [*See* Doc. No. 126-16, at 6 – 19.] It is then that Doherty presents her "vocational analysis," wherein she states, as follows, in relevant part:

> [Doe 1[ has been plagued by continual PTSD symptomatology, which has adversely impacted work. **As reflected in the medical and psychological records, as well as during the clinical/vocational interview, [Doe 1] has experienced "impairments" as associated with ongoing PTSD symptomatology. In vocational terms, an impairment refers to a**

8

> **specific limitations [sic], which in this particular case refers to a mental limitation. The impairments [Doe 1] experiences relate to decreased concentration secondary to severe anxiety-related trauma.** *Because these impairments result in reduced efficiency, in turn this results in a work disability. A work disability occurs when a worker's ability to produce is adversely impacted. In [Doe 1's] particular case, her work disability is associated with the fact that she needs to work longer hours, such as working 10 to 11 hours per day in both her previous and current positions, in order to complete 8 hours' worth of work.* Unfortunately, her previous work in the research lab was unsuccessful, but with her current job, she is working from home. Because she is essentially functioning in a sheltered capacity at home, her employer is unaware of her self-imposed accommodations, which are accommodations that are typically above and beyond the norm.
>
> ….
> [Doe 1] possesses a true work disability, and because ***her anxiety-related trauma has occurred*** well over a five year timespan, the work disability is considered "chronic" in nature. [Doe 1] has attempted several courses of individua[l] psychotherapy, and yet in currently interviewing **her** with respect to PTSD symptomatology, she meets full criteria.

[Doc. No. 126-16 at 19 – 20.] [emphasis added.] Then, based on this "disability" related to "mental impairments," Doherty goes on to opine that Doe 1 suffered a "loss of earning capacity."

Doherty's report with respect to Doe 2 is similar to that of Doe 1. Specifically, Doherty wrote: "[Doe 2] was referred for a vocational evaluation for the purpose of determining her ***earning capacity due to ongoing anxiety-related trauma associated with sexual assaults and abuse she endured while a student with the*** University of Nebraska—Lincoln (UNL)." [Doc. No. 128-21 at 1.] [emphasis added.] Doherty wrote, in evaluating Doe 2: "I have considered the vocational and occupation impact of her trauma associated with . . . ." [Doc. No. 128-21, at 2.] Similarly, here, Doherty, in approximately 12 pages, extensively discussed Doe 2's history with emotional distress and the various mental health conditions of Doe 2. Specifically, she discussed Doe 2's medical record, including her mental health conditions and the various emotional distress issues; the various mental health symptoms that Doe 2

9

experienced before and while she was at the University, and thereafter; and the DSM-5 criteria for PTSD, therein outlining the various anxiety-related trauma Doe 2 alleges, including intrusive thoughts about anxiety, mood dysfunction issues, focus issues, feeling of isolation, anxiety-related trauma and stress, etc. [*See* Doc. No. 128-21, at 5 – 19.] Then, based on that assessment, Doherty engages in "vocational analysis":

> Regretfully, [Doe 2] started to **experience anxiety-related trauma** due to an abusive relationship…During this time when her plea for help was met with resistance, [Doe 2] **experienced a significant deterioration in her mood functioning, particularly in terms of depressive symptomology and posttraumatic anxiety**.
>
> Within the context of the vocational interview, [Doe 2] was interviewed with respect to DSM-5 criteria relating to posttraumatic stress disorder. As indicated in the current mental health symptoms section of this report, [Doe 2] **meets full diagnostic criteria for posttraumatic stress disorder**, which at this juncture would be considered "prolonged." **Because [Doe 2] was precluded from completing her educational training as she had planned, she is considered a worker with a disability, who experienced a reduced earning capacity**. [Doe 2] possesses a work disability because **she is unable to complete an eight hour day without significant interruptions due to psychologically-based reasons**. With [Doe 2]'s current job as a technical writer/compliance specialist, she is earning approximately $64,000 annually plus benefits. Because she is working from home, she is afforded the opportunity to offer herself several self-imposed accommodations as outlined above. Current annual earnings are in contrast to the median annual earnings of individuals with a doctoral degree. . . .

[*See* Doc. No. 128-21 at pp. 19-21.]

Courts have held that damages related to emotional distress—like the one discussed in Doherty's reports—are not recoverable under *Cummings*. For instance, in *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, No. 3:20-CV-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023), the plaintiffs alleged "[a]s a direct and proximate result of the Defendant's discrimination, [they] suffered mental, emotional, and psychological injuries which may be permanent. It has also caused pain, suffering, and has caused [them and their parents] to incur medical expenses." The defendants filed a motion to dismiss, arguing that Plaintiffs are only seeking emotional damages as relief, which are

10

no longer recoverable under the Rehabilitation Act and the ADA pursuant to the decision in *Cummings*. *Id.* at *3.

The plaintiffs argued they were not seeking emotional damages but, "rather seeking compensatory damages for severe mental, emotional, psychological injuries, and pain, suffering, and medical expenses." *Id.* at *2 (internal quotation marks omitted). The plaintiffs argued the damages they sought were different than what *Cummings* dealt with because "the plaintiffs were diagnosed with PTSD, which 'can cause physical symptoms' and is 'also associated with long-term physical health conditions like diabetes and heart disease,' and they incurred medical costs to treat their condition." *Id.* at *4.

The *Pennington* court found plaintiffs' argument unconvincing, and reasoned that the plaintiffs were simply attempting "to rebrand their request for damages for 'mental, emotional, psychological injuries' and 'pain and suffering' as something other emotional damages." *Id.* The court explained:

> Whether it is labeled like Plaintiffs in the instant case or labeled as "humiliation, frustration, and emotional distress," like in *Cummings*, its all the same concept. The labels are all variations of the same principal that the defendant's actions caused the plaintiff a "highly unpleasant mental reaction"—*i.e.*, emotional distress. *Emotional Distress*, BLACK'S LAW DICTIONARY (11th ed. 2019). *See also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. j ("Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea."). Additionally, Plaintiffs did not provide citations to any legal authority to support their suggestion that damages for severe emotional responses and diagnosable psychiatric conditions, as opposed to simple "humiliation" or "frustration," are recoverable. . . ., and the Court has no reason to believe that is true when the Supreme Court in *Cummings* did not distinguish between degrees of emotional distress.

*Id.* Based on this analysis, the court held "plaintiffs' request for 'compensatory damages' for 'mental, emotional, and psychological injuries' and 'pain [and] suffering' is nothing

11

more than a request for emotional damages, which is no longer permitted. Consequently, this damages request is stricken." *Id.* at \*4. *See also B.R. v. F.C.S.B.*, 718 F. Supp. 3d 504, 511 (E.D. Va. 2024) (holding certain categories of damages sought in a Title IX case by the plaintiff "fall squarely within that prohibition [*Cummings'* prohibition]: (i) emotional distress, fear, and anxiety; (ii) mental anguish; (iii) humiliation and embarrassment; (iv) personal and social limitations; (v) loss of dignity; (vi) depression, anxiety, fear, emotional distress, mental anguish; (vii) nightmares and flashbacks; (viii) eating disorders and other psychiatric disabilities and deficits; (ix) physical manifestations of emotional or psychiatric distress; (x) emotional deficits; and (xi) loss of enjoyment of life and life's pleasures.").

Accordingly, it is apparent that these alleged reduced earning capacity opinions—both Doherty's and Verzilli's opinions and testimonies (Verzilli relied upon the vocational report prepared by Doherty)—are directly tied to the alleged symptomology of PTSD, mental health diagnosis, and mental, emotional and psychological injuries claimed by the Plaintiffs. For these reasons, BRUN respectfully asks this Court to grant its Motion.

**3. The proffered opinions are extraneous and irrelevant as they are wholly unconnected to the alleged deliberate indifference, or the actions or inaction of BRUN.**

An expert's expertise must be "relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. A court should not concern itself with a proposed expert's knowledge, skill, experience, training, or education in extraneous and irrelevant matters. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible."). "This means that the Court should consider whether the 'opinion offered by the expert is sufficiently related to the facts of the case such that it will aid the jury in resolving the factual dispute.'" *Id.* (citing *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 694 (8th Cir. 2001)).

12

Plaintiffs have utterly failed to connect the alleged reduced earning capacity to the actions or inactions of BRUN. Rather, they argue that they need not prove that the alleged mental health conditions are connected to any alleged deliberate indifference. [Doc. No. 139 at p. 14.] They are mistaken.

The only claim that remains is the Title IX deliberate indifference claim. This means any and all claimed damages must have been caused by alleged deliberate indifference. Causation opinions are even more important in this case because the undisputed facts show that Doe 1 and Doe 2 had mental health conditions prior to their respective Title IX reports to BRUN; i.e. before BRUN was even aware of the alleged issues they had with JR4 and JR5. As laid out in BRUN's Reply Brief in Support of its Motion for Summary Judgment, the undisputed facts, with respect to Doe 1 are:

- Doe 1's medical record or expert opinion does not show a diagnosis of PTSD. [*See* Doc. No. 129, ¶ 190; Doc. No. 141, ¶ 190; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10; 175:24 – 176:3, 273:16 – 23, 288:19 – 22.]
- On June 1, 2017—prior to reporting the incident involving JR4—Doe 1 was diagnosed with relationship distress with an intimate partner and anxiety, disorder, unspecified. On or about July 6, 2017, Doe 1 was diagnosed with Adjustment Disorder with Anxiety. [*See* Doc. No. 129, ¶ 191; Doc. No. 141, ¶ 191.]
- No experts have been disclosed to opine that any of Doe 1's diagnosis was caused by actions or inactions of the University, or the alleged deliberate indifference of the University. Nor does Doherty opine with respect to this. [*See* Doc. No. 129, ¶¶ 192-93; Doc. No. 141, ¶¶ 192-93; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10; 175:24 – 176:3, 273:16 – 23, 288:19 – 22.]
- There is no medical record that opines that Doe 1's alleged symptoms and diagnoses were caused by the University's actions or in actions, or the alleged deliberate indifference of the University. [*See* Doc. No. 129, ¶¶ 194 – 95; Doc. No. 141, ¶¶ 194 – 95; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10; 175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

The uncontroverted facts with respect to Doe 2 are as follows:

- Prior to November 2017—in other words, prior to BRUN receiving actual notice of the alleged sexual harassments—Doe 2 reported the following symptoms to her medical providers: feelings of PTSD, OCD, Trichotillomania, stress eating, severe anxiety, sleep disturbance, and attention issues. Prior to November 2017, to her medical provider, Doe 2 reported a ***history of*** depression, anxiety, PTSD

13

- and gastrointestinal issues. [*See* Doc. No. 129, ¶¶ 342 - 343; Doc. No. 141, ¶¶ 342 – 343.]

- Prior to November 2017, Doe 2 was diagnosed with generalized anxiety disorder-severe with panic attacks, Trichotillomania, Obsessive Compulsive Disorder, Attention deficit disorder predominate inattentive type. Moreover, on April 20, 2018, a PTSD diagnosis was added. [*See* Doc. No. 129, ¶ 344; Doc. No. 141, ¶ 344.]

- There are no experts opining that any of Doe 2's diagnoses were caused by actions or inactions of the University, or the deliberate indifference of the University. Nor does Doherty opine with respect to this. [*See* Doc. No. 129, ¶¶ 345 – 346; Doc. No. 141, ¶¶ 345 – 346; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10; 175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

- There is no medical record that opines that Doe 2's alleged symptoms and diagnoses were caused by the University's actions or inactions, or by the deliberate indifference of the University's actions or inactions. [*See* Doc. No. 129, ¶¶ 347 - 348; Doc. No. 141, ¶¶ 347 - 348.]

- Doe 2 has not disclosed any experts to opine on the issue of whether any physical ailment was caused by a mental health condition, or by any mental health condition caused by the alleged deliberate indifference or actions or inactions of the University. Nor does Doherty opine with respect to this. [*See* Doc. No. 129, ¶¶ 353-355; Doc. No. 141, ¶¶ 353-354; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10; 175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

- Doherty did not diagnose Doe 2 with PTSD. [Doc. No. 128-24, Dep. of Doherty at 172:24 – 10; 175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

There are no expert opinions connecting any mental health conditions to physical symptoms, conditions, ailments, or changes, nor are there any expert opinions connecting the alleged mental health diagnosis of both Plaintiffs to actions or inactions of BRUN. In other words, the opinions of Doherty and Verzilli—which are directly tied to the mental health conditions of Plaintiffs—are irrelevant as they are unconnected to the actions or inactions of BRUN. *See Lancaster v. BNSF Ry. Co.,* 75 F.4th 967, 970 (8th Cir. 2023) (citing *Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1061 (8th Cir. 2002)) (expert opinion that is "so fundamentally unsupported that it can offer no assistance to the jury" should be excluded). And proving causation is strictly the Plaintiffs' burden.

14

### B.  DOHERTY'S AND VERZILLI'S OPINIONS ARE UNRELIABLE AND UNHELPFUL.

Plaintiffs ignore that they must establish admissibility of the proffered opinion by preponderance of the evidence. In response, other than extensively quoting from the deposition testimonies of Doherty and Verzilli, Plaintiffs fail to address BRUN's arguments in any substantive manner. Accordingly, Plaintiffs cannot overcome the reliability issue discussed in BRUN's opening brief—both in terms of facts and methodology.

In analyzing the soundness of an expert opinion under *Daubert*, "among the factors to consider is whether the 'expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). "Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case." *Concord Boat Corp.*, 207 F.3d at 1056. *See also Marmo v*, 457 F.3d at 758 (quoting *Gen. Elec. Co.*, 522 U.S. at 146) ("A court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert'"); *Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (if an "expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded.").

15

...

To highlight, without being redundant, with respect to Doe 1, Doherty testified that she did not complete or consider a "rehabilitation plan," because Doe 1 was already self-accommodating, and therefore "no further plan is needed." [Doc. No. 128-24 at 184:13 – 185:1.] When asked whether she is opining in this case whether Doe 1's disability prevents her from getting a pharmaceutical position, Doherty responded, "I am not." [Doc. No. 128-24 at 186:8 – 9.] This means that Doe 1's disability does ***not*** prevent her from getting the types of positions Doherty claims Doe 1 could have gotten.

In addition, Doe 1 does not deny that Doherty utilized resources that encompass an entire field and all levels of experience, without any tie to Doe 1's salary of her first position; the types of jobs that Doe 1 wants; Doe 1's work history; or Doe 1's level of experience, chosen career, or chosen area of residence of Lincoln, Nebraska (location of the University from which Doe 1 graduated). Such a random selection of data, with no or little tether to this particular case must be dismissed as pure speculation. As the Court in *B.R.*, 718 F. Supp. 3d at 516 explained:

> Authorities generally recognize that "[c]onsequential damages for lost earning capacity may be awarded in breach of contract cases where a plaintiff alleges '***the loss of identifiable professional opportunities***' " and where a plaintiff "alleges and proves with specificity that the defendant's breach actually adversely influenced or affected job opportunities.' " *Fairfax Cnty. Sch. Bd*, 2023 WL 424365 at *6 (citing 24 *Williston on Contracts* § 66.4 (4th ed. 2022)). More specifically, the Fourth Circuit has held, in the context of a breach of contract action, that plaintiffs must plead and ***prove "future identifiable professional opportunities that would have been available to [them] absent the breach***" and that were contemplated by the parties when they formed the contract. *Rice*, 203 F.3d at 288-89. The Fourth Circuit held that, absent such pleading and proof, "such consequential damages are simply too speculative and the contracting parties cannot reasonably be presumed to have anticipated such damages at the time they entered into a contract." *Id.*

*Id.* at 515-16. "Consequential damages relating to lost economic opportunities are not recoverable simply because a plaintiff specifies an aspirational position, as they must have been anticipated or contemplated at the time of contracting." *Id.*

16

The same outcome is warranted with respect to the opinions related to Doe 2. Doherty failed to make an assessment as to any identifiable loss of professional opportunity with respect to wage assessment of political science positions with a Master's degree in comparison to those with a Ph.D. degree. Rather, Doherty used wages for any and every field that employs individuals with a Ph.D. degree—***not just political science but any degree***—when calculating the supposed "loss of earning." This must not be allowed.

## II. CONCLUSION

For the reasons set forth herein and in Defendant's opening Brief, Defendant respectfully requests the Court grant its Motion to Exclude Plaintiffs' experts and strike their respective opinions.

Dated this 6th day of January, 2025.

        BOARD OF REGENTS OF THE
        UNIVERSITY OF NEBRASKA, Defendant

By:   /s/ Lily Amare
       Susan K. Sapp #19121
       Lily Amare #25735
       CLINE WILLIAMS WRIGHT
        JOHNSON & OLDFATHER, L.L.P.
       1900 U.S. Bank Building
       233 South 13th Street
       Lincoln, NE 68508
       (402) 474-6900
       ssapp@clinewilliams.com
       lamare@clinewilliams.com

        AND

       Bren H. Chambers, #23150
       Deputy General Counsel
       University of Nebraska
       3835 Holdrege Street
       Lincoln, NE 68583-0745
       (402) 472-1201
       bchambers@nebraska.edu

**CERTFICATE OF COMPLIANCE**

I, Lily Amare, hereby certify that this Reply Brief complies with the limits set forth in NECivR 7.1(d). Further, based on the Word Count function of Microsoft Word 2013 word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify this Reply Brief contains 5546 words.

I further certify that no generative artificial intelligence program was used in drafting this document.

/s/ Lily Amare
Lily Amare

**CERTIFICATE OF SERVICE**

I hereby certify that on January 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/ Lily Amare
Lily Amare

4923-9200-8707, v. 1