IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JANE DOE 1 and JANE DOE 2,

       Plaintiffs,

vs.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA,

       Defendant.

**CASE NO. 4:20-CV-3081**

---

## REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Submitted by:

Susan K. Sapp, #19121
Lily Amare, #25735
CLINE WILLIAMS WRIGHT JOHNSON
    & OLDFATHER, L.L.P.
1900 U.S. Bank Building
233 South 13th Street
Lincoln, Nebraska 68508
(402) 474-6900
ssapp@clinewilliams.com
lamare@clinewilliams.com

    AND

Bren H. Chambers, #23150
Deputy General Counsel
University of Nebraska
3835 Holdrege Street
Lincoln, NE 68583-0745
(402) 472-1201
bchambers@nebraska.edu

January 6, 2025

The Board of Regents of the University of Nebraska ("BRUN" or "Board of Regents") respectfully submits this Reply Brief in support of its Motion for Summary Judgment ("Motion").

## I.    INTRODUCTION

As highlighted in BRUN's Response to Plaintiffs' Additional Statement and herein, Plaintiffs' opposition to Defendant's Motion is premised on a distorted narrative and speculation that is proven otherwise by Plaintiffs' testimony at their respective depositions, the uncontroverted evidence before this Court, and BRUN's uncontroverted Statement of Material Undisputed Facts ("BRUN's Statements"). For the reasons stated herein and BRUN's opening Brief, BRUN respectfully asks this Court to enter judgment in its favor.

## II.    DEFENDANT'S REBUTTAL TO PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50.

BRUN set forth 355 Statements. [*See* Doc. No.  129.] Out of the 355 Statements, Plaintiffs *admitted 338* of them. [*See* Doc. No.  141.] The Plaintiffs unsuccessfully attempted to create a dispute regarding the remaining 17 Statements. Plaintiffs' quibbles with these facts are neither genuine nor material.

### A.    PARAGRAPH 37: DONA-GENE BARTON ("BARTON").

Plaintiffs' response to BRUN's Statement ¶ 37 is a palpable attempt to conjure a dispute where none exists. Paragraph 37 provides that Barton did not have authority to respond to and investigate allegations of sexual misconduct by students. This

2

statement was appropriately supported by two declarations of individuals with personal knowledge of whether Barton had authority to investigate and respond to allegations of sexual misconduct.

Plaintiffs allege that "Barton **may** have been a responsible employee with an obligation to respond to allegations of sexual misconduct." [Doc. No. 141, ¶ 37 (emphasis added).] In support, Plaintiffs cite to two documents [*See* Doc. Nos. 143-10 and 143-11], via the declaration of Doe 1 [*See* Doc. No. 143, ¶ 13 and 14].

BRUN objects to Doc. Nos. 143-10 and 143-11 on the grounds that each document lacks foundation, constitutes inadmissible hearsay, is irrelevant, and lacks proper authentication. "Federal courts consider 'all admissible evidence' on a motion for summary judgment." *Doe by next friend Rothert v. Chapman*, 30 F.4th 766, 770 (8th Cir. 2022) (citation omitted). Relatedly, FED. R. CIV. P. 56(c)(2) provides for a party to object to summary judgment materials cited in support of a fact based on admissibility.

Doe 1 or any of the unnamed authors lack the foundation necessary to attest whether Barton had the authority to respond to and investigate allegations of sexual misconduct by students. Barton was an Assistant Professor at the University, Department of Political Science. [Doc. No. 129, ¶ 36; Doc. No. 141, ¶ 36.] Doe 2 was a graduate student in the Department of Political Science. Barton's involvement in this case is only with respect to Doe 2. [Doc. No. 129, ¶ 36; Doc. No. 141, ¶ 36.] Doe 1 was a Ph.D. student in the School of Biological Sciences, with specialization in Genetics, Cell and Molecular Biology. Doe 1 was not at all involved in Doe 2's Title IX investigation and appeal. [*See* Doc. No. 126-3, at 222:15 – 20.] Doe 1 did not even know any of the co-Plaintiffs (which includes Doe 2) in this case until 2019. [Doc. No. 216-3 at 218:12 – 220:25, 221:17 – 222:4.] There is no evidence that Doe 1 or any of

3

the unnamed authors know Barton or are familiar with her role at the University. Accordingly, Doe 1 or any of the unnamed authors of Doc. Nos. 143-10 and 143-11 do not have personal knowledge as to whether Barton had the authority to respond to and investigate allegations of sexual misconduct by students, and the information contained therein is irrelevant to this matter.

The documents also lack proper authentication, as required under NECivR 7.1(c). *See also Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 636 n.20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of FED. R. CIV. P. 56(e).").

In *Cordray v. 135-80 Travel Plaza, Inc.*, 356 F. Supp. 2d 1011, 1016 (D. Neb. 2005), this Court dealt with a similar issue. In *Cordray*, the plaintiff "attached a copy of a one-page note, appearing to have been made on two different dates in May of 2001, reciting something about Young looking at the plaintiff's breasts." *Id.* at 1015, n.5. The district court assessed whether this document was properly authenticated for purposes of summary judgment, and concluded it was not, and held they were not. *Id.*

Similarly in this case, Doc. No. 143-10 is a document which purports to set forth demands. The document fails to bear any information as to who authored the document, when or for what purpose. With respect to Doc. No. 143-11, the document bears Tina's name, but there is no affidavit from Tina authenticating this document. It is apparent that Doe 1 did not write this document because she attests that she was only involved with reviewing and editing this document. [*See* Doc. No. 143, ¶ 14.] In addition, there is no information as to when this document was written, who actually wrote it, the purpose of this letter, and whether it was sent to the intended recipient.

4

Finally, Doc. Nos. 143-10 and 143-11 are inadmissible hearsay documents, and there is no exception to hearsay that would be applicable to these documents. "Hearsay" is an out of court statement offered "to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). Hearsay is excluded unless specifically excepted by the rules. FED. R. EVID. 802. *Brunsting v. Lutsen Mountains Corp.,* 601 F.3d 813, 817 (8th Cir. 2010) ("[I]nadmissible hearsay evidence cannot be used to defeat summary judgment."). *See Novotny v. Tripp Cnty., S.D.,* 664 F.3d 1173, 1178 (8th Cir. 2011) (holding "statements of fact in … letters [from the South Dakota Department of Agriculture] amount to inadmissible hearsay and, as such, are insufficient to defeat summary judgment".). Accordingly, we respectfully ask this Court to strike and not consider Doc. Nos. 143-10, 143-11, and Doc. No. 143, ¶¶ 13 & 14 for any purpose.

The competent evidence in the record proves that Barton did not have the authority to investigate or the authority to recommend or take disciplinary action against students pursuant to an investigation into alleged sexual misconduct. See Plaintiffs' admissions of BRUN's Statements ¶¶ 22 – 36 and 38 – 39. [*See* Doc. No. 141.]  Plaintiffs also admitted that Barton did not have authority to recommend or take disciplinary action against students pursuant to an investigation into the alleged sexual misconduct. [*See* Doc. No. 129, ¶ 38; Doc. No. 141, ¶ 38.]

**B.    PARAGRAPH 59: PLAINTIFF'S POSITION AFTER SHE GRADUATED.**

Doe 1 purports to dispute ¶ 59 of BRUN's Statement. Paragraph 59 was wholly supported by Plaintiff's own testimony under oath:

Q. Let's talk about your first job. What was your first job?
**A. I was a scientist at a vaccine company.**
Q. And that was actually a job that you found even before graduating; correct?
**A. Yes.**
Q. And you applied for this position and wanted this position; correct?

**A. Correct.**
Q. And you got the position; correct?
**A. Yes.**

[Doc. No. 126-3 at 259:19 – 260:6.] Doe 1's attempt to rebut this statement with inconsistent attestation should be rejected. *See Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365–66 (8th Cir. 1983) (summary judgment appropriate if party files an affidavit in an attempt to abandon prior testimony given under oath); *see also Blackwell v. DaimlerChrysler Corp.*, 399 F. Supp. 2d 998, 1004 (E.D. Mo. 2005) (collecting cases).

**C.    PARAGRAPHS 82, 88, 89 AND 128: COMMUNICATION REGARDING JR4 IN JUNE 2017.**

Plaintiffs purport to dispute BRUN's Statements ¶¶ 82, 88, 89, and 128 by either putting their own spin on the allegations or objecting to BRUN's evidence used to support the statements.

Doe 1's response to ¶ 82 is unrelated to what is stated therein and fails to negate any of the information in ¶ 82.

With respect to the additional information Doe 1 sets forth in ¶ 82, BRUN incorporates herein its response to Plaintiffs' Statement of Additional Facts, ¶¶ 5 & 7, which BRUN incorporates herein as though fully set forth herein.

Similarly, in response to ¶ 128, Plaintiffs provide additional facts that are immaterial. The fact of the matter is Doe 1's request to move JR4's lab to another location was granted, and Doe 1 does not dispute this fact. [*See* Doc. No. 129, ¶ 128; Doc. No. 141, ¶ 128.]

As it relates to  BRUN's Statements ¶¶ 88 and 89, Plaintiffs purport to object to Doc. No. 121-1, ¶ 18, (Lamoureaux's declaration), and Doc. No. 125-4 at 4 (a portion

of the June 30 Doe 1 Investigation Report) on the grounds of inadmissible hearsay. [*See* Doc. No. 141, ¶¶ 88–89.] They are wrong.

Lamoureaux was the Title IX Coordinator and Investigator at the University from April 2016 through October 2017. [Doc. No. 129, ¶ 31; Doc. No. 141, ¶ 31.] On June 28, 2017, after IEC was notified of the events involving Doe 1 and JR4, Lamoureaux was assigned to investigate the matter. [Dec. of Lamoureaux, ¶ 5.] As part of his investigation, on June 30, 2017, Lamoureaux met with Doe 1 and JR4, separately. [Supplemental Declaration of Lamoureaux ("Supp. Dec. of Lamoureaux"), ¶ 7.] Per IEC procedure, Lamoureaux prepared an investigation report, wherein he documented pertinent information related to the investigation, including the information provided by and to the parties involved. [*See* Doc. No. 125-4 at 5.] Lamoureaux documented the information he received from Doe 1 and JR4 contemporaneously, and finalized his investigation report on June 30, 2017—the same date he met with Doe 1 and JR4. [*See* Doc. No. 125-4 at 5; Supp. Dec. of Lamoureaux, ¶¶ 8–11.]

Doc. No. 125-4 and Doc. No. 121-1, ¶ 18 demonstrate that the University had conducted an investigation and disclosed the information that the University had relied on in making its decision. In other words, Lamoureaux's attestation in his declaration and the Investigation Report can be used as non-hearsay. Paramount to this analysis is recognizing that Plaintiffs' remaining claims are Title IX, deliberate indifference claims. As such, what the University learned and the impact it had on the University's analysis and its conclusion are central to the University's defense. *See Crimm v. Missouri Pac. R. Co.*, 750 F.2d 703, 709 (8th Cir. 1984) (holding handwritten notes and an investigative report prepared by a managing agent of the defendant can be used to demonstrate that the defendant "had conducted an investigation and to

disclose the information that MoPac [defendant] had relied on in making its decision," as a non-hearsay document.). *See also Wolff v. Brown*, 128 F.3d 682, 685 (8th Cir. 1997) (following *Crimm* and holding "internal documents relied upon by the employer in making an employment decision" . . ." "are relevant and admissible because they help explain (or may help explain) the employer's conduct."); *United States v. Leonard-Allen*, 739 F.3d 948, 954 (7th Cir. 2013) ("A witness's statement is not hearsay if the witness is reporting what he heard someone else tell him for the purpose of explaining what the witness was thinking at the time at the time or what motivated him to do something."); and *Ames v. Bonneville Joint Sch. Dist. No. 93*, No. 4:22-CV-00364-DKG, 2024 WL 4368139, at *7–8 (D. Idaho Oct. 1, 2024) (holding a Title IX Written Determination can be properly considered in deciding a motion for summary judgment because it "may be presented in a form that would be admissible during trial;" for instance, it can be "admitted through testimony by Jackson [author of the written determination], the investigators, or the other individuals who participated in the investigation; as a public record; or under another exception to the hearsay rule. Fed. R. Evid. 402, 602, 801(d)(2), 803(8).").

Furthermore, Doc. No. 125-4 is admissible as evidence under records of regularly conducted activity (business records) exception to the hearsay rule. *See* Fed. R. Evid. 803(6) (outlining the elements to qualify for records of regularly conducted activity).

For instance, in *Crimm*, 750 F.2d at 709, the Eighth Circuit Court held the handwritten notes and the investigative report were business records because:

> MoPac [defendant] had a written policy requiring that in an investigation of sexual harassment the conversations of those interviewed "should be documented through written memoranda." Shoener [manager] was directed to conduct an investigation and to prepare such memoranda. Shoener took handwritten notes during the interviews and

8

> added to them shortly after the interviews. The typewritten report was prepared from the notes. Only six or seven days elapsed from the beginning of the investigation to the completion of the report. The notes and report were prepared nine months before any complaint or suit had been filed and the notes and report were maintained at the MoPac office.

See also *Wolff*, 128 F.3d at 685 (holding internal memoranda were admissible, in Title VII case, under business records exception to hearsay rule).

Similarly, the Investigation Report [Doc. No. 125-4] meets each of the elements of the business records exception under FED. R. EVID. 803(6). It is a regular practice and procedure of IEC to draft an investigation report when allegations of sexual misconduct are reported to IEC. [*See* Supp. Declaration of Meagan Counley ("Supp. Dec. of Counley"), ¶ 3; Supp. Dec. of Lamoureaux, ¶ 6.] Lamoureaux documented his communication with JR4 the same day that he met with JR4 (June 30). [Supp. Dec. of Lamoureaux, ¶ 10.] Plaintiffs have not presented any evidence that shows that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.[1] Accordingly, Plaintiffs' objections to Doc. No. 129, ¶¶ 88 and 89, Doc. No. 125-4 at 4 and Doc. No. 125-1, ¶ 18 should be overruled.

**D.   PARAGRAPHS 168, 169, 170, & 179: REPORT IN MAY 2018 AND SEPTEMBER 2019.**

Doe 1 fails to dispute ¶¶ 168 and 170 in any material fashion but attempts to provide additional allegations. Specifically, in response to ¶ 168, she provides that the Morrison Center restriction expressly gave JR4 permission to enter Morrison Center including attending seminars that Doe 1 regularly attended and at which she presented. BRUN does not deny that JR4's access to Morrison center was restricted. Specifically, Sue Moore ("Moore") provided that JR4 may only enter and be present in

---

[1]  *See* Doc. No. 141, ¶ 58 of Plaintiffs' Statement where Plaintiffs rely on statements contained in Doc. No. 125-4.

Morrison Center for academic purposes between the hours of 8 a.m. and 5 p.m., Monday through Friday. Moore defined "academic purposes" as only attending meetings with Eric Weaver, committee members, securing reagents, collaborating with specific labs, and attending scheduled seminars. [*See* Doc. No. 126-8.] Furthermore, in 2019, JR4 was made to attend Journal Club via zoom, and JR4 was precluded from attending completely when Doe 1 presented. [*See* Doc. No. 129, ¶ 184; Doc. No. 141, ¶ 184.] However, BRUN disputes the statement to the extent Doe 1 purports to present "regularly." Doe 1 testified that she presents once a semester. [Doc. No. 126-3, at 58:19 – 59:21.]

In response to ¶ 168, Doe 1 misrepresents the content of Moore's response to her. BRUN points this Court to the substantive and detailed response provided by Moore to Doe 1 found in Doc. No. 126-9.

BRUN Statements ¶¶ 169 and 179 contained erratum. Specifically, BRUN Statement ¶ 169 should have stated: "Moore provided that JR4 . . ." rather than "Doe 1 provided that JR4...." Furthermore, ¶ 179 inadvertently omitted a citation to the record. ¶ 179 should have read: Ex. JJ, Letter from Sue Moore to Doe 1 dated October 29, 2019, which is found at Doc. No. 126-13. To the extent Plaintiffs are asking the court to disregard the foregoing fact based on scrivener's errors, this Court should decline the invitation to do so and admit this material fact.

E.    **PARAGRAPHS 230 AND 231:    COMPLAINTS/REPORTS OF SEXUAL MISCONDUCT AGAINST JR5 IN NOVEMBER 2017.**

In response to BRUN's Statement, ¶¶ 230 and 231, Doe 2 utilizes sham attestations to dispute the statements therein. With respect to ¶ 230, in the statement Doe 2 provided to Meagan Counley ("Counley"), which Doe 2 was provided the opportunity to review and correct any misstatements therein, admitted she "does not

remember feeling any penetration . . . ." [*See* Doc. No. 127-2 at 4; Supp. Dec. of Counley, ¶ 24.] Furthermore, Doe 2 was questioned about this particular alleged event at her deposition. At that time, Doe 2 affirmed she "couldn't physically feel it, . . . ." [Doc. No. 128-2, at 201:13: 15 – 16.]

Moreover, Doe 2's attempt to pivot away from her admission as it relates to ¶ 231 should be rejected. Considering the context of the questions and answers, Doe 2's attempt to explain away her admission should not be condoned. Specifically, Doe 2 testified as follows:

> Q. Correct. You were claiming that he [JR5] sexually harassed you in March of 2016; correct?
> A. Yeah. In my mind, again, like I didn't accept that to be real. But, yea, at the Saint Patrick's Day event.
> Q. But that is what you reported to Title IX, correct?
> A. That that happened?
> Q. Correct.
> A. Yes. I let them know about that, yes.
> Q. And you also claimed August of 2016; correct?
> A. Claimed what in August of 2016?
> Q. That he touched you **inappropriately**; correct?
> A. ***Oh, at the orientation? Yea. Not an assault.***

[*See* Doc. No. 126-2, at 369:9 - 29.] In fact, in other parts of her testimony, Doe 2 described an event where she was cornered by an individual in India (wholly unconnected to this case) as "assault[]." [See Doc. No. 126-2, at 26:1 – 28:1.] Accordingly, there is no question that Doe 2 understood and understands the meaning of "assault," under the circumstance she uttered it.

For these reasons, we respectfully ask this Court to strike ¶ 25 and 26 of Doc. No. 144, and to admit BRUN's Statements ¶¶ 230 and 231.

11

F.  **PARAGRAPHS 301, 329, 330, 332, AND 340: JR5'S REQUEST FOR A HEARING AND JR5'S APPEAL TO CHANCELLOR'S OFFICE.**

With respect to ¶ 301, Doe 2 does not dispute that Tami Strickman ("Strickman") explained to her the advantages and disadvantages of accepting the settlement offer. Accordingly, the Court should deem this fact undisputed.

In response to ¶ 332, Doe 2 stated "JR5 provided a nude photo of Doe 2 to Counley." JR5 submitted to Counley a topless picture of Doe 2, to support his claim that Doe 2 continued engaging in consensual sexual relationship with JR5 after the alleged sexual assaults. [Doc No. 129, ¶ 335; Doc. No. 141, ¶ 335.] Doe 2 did the same: submitted a sensitive image of another woman to Counley. [Doc. No. 129, ¶ 334; Doc. No. 141, ¶ 334.]

The plain and ordinary meaning of "disseminate"—word used in ¶ 332—is "to spread information, knowledge, etc. so that it reaches many people." *Disseminate*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/english/disseminate?q=disseminate (last visited January 3, 2025). *See also Disseminate, Cambridge Dictionary*, https://dictionary.cambridge.org/dictionary/english/disseminate (last visited January 3, 2025) ("To spread or give out something, especially news, information, ideas, etc., to a lot of people."). There is no evidence that JR5 "disseminated" the any sensitive pictures of Doe 2.

Finally, Doe 2's purported objections to Doc. No. 127-1 at ¶ 71 – 73 (Declaration of Counley), and Doc. No. 127-02, at 37, 40 on the basis of hearsay should be rejected for the same reasons set forth in Section II.C. *supra*, which BRUN incorporates herein as though fully set forth herein.  [*See* Doc. No. 141, ¶ 329, 330, and 340.]

Specific to these documents, Counley served as Title IX Investigator and Deputy Title IX Coordinator at the University and investigated the reported complaint involving Doe 2 and JR5.  [Doc. No. 129, ¶¶ 30, 224 - 229; Doc. No. 141, ¶¶ 30, 224 – 229.] As part of her investigation, Counley interviewed Doe 2, JR5, and the witnesses identified by Doe 2 and JR5. [Supp. Dec. of Counley, ¶ 33.] Counley took handwritten notes during the interviews, and also, to the extent the witnesses agreed to the recording, Counley recorded the interview. [Supp. Dec. of Counley, ¶ 34.] Per IEC procedure, Counley prepared the Investigation Report, wherein she documented pertinent information about the investigation, including the information provided by and to Doe 2, JR5, and the other witnesses, contemporaneously, and finalized her investigation report on April 6, 2018.   [*See* Doc. No. 127-2; Supp. Dec. of Counley, ¶¶ 34 – 38.]

As discussed in Section II.C *supra*, which BRUN incorporates herein, Doc. No. 127-1 at ¶¶ 71 – 73 (Declaration of Counley), and Doc. No. 127-02, at 37, 40, can be used as non-hearsay. Moreover, the entirety of Doc. No. 127-02 is admissible under the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6). [*See* Doc. No. 127-2; Supp. Dec. of Counley, ¶¶ 34 – 38.][2] Accordingly, Plaintiffs' objections to Doc. No. 129, ¶ 329, 330, and 340;  Doc. No. 127-1 at ¶ 71 – 73 and Doc. No. 127-02, at 37, 40 should be overruled.

---

[2] *See* Doc. No. 141, ¶¶ 101 – 106, 110-113, 115-116, 125, 131, 140 – 144, 153, 158 of Plaintiffs' Statements, where Plaintiffs rely on statements contained in Doc. No. 127-02.

III.    **DEFENDANT'S OBJECTIONS TO PLAINTIFFS' EVIDENCE AND ADDITIONAL STATEMENT OF FACTS**

To successfully oppose the pending Motion, "the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Onyiah v. St. Cloud State Univ.*, 5 F.4th 926, 931 (8th Cir. 2021) (citation omitted). To establish a dispute is "genuine," the nonmoving party must demonstrate that the evidence is such that it could cause a reasonable jury to return a verdict in its favor. *Liberty Lobby, Inc.*, 477 U.S. at 247. The mere existence of a scintilla of evidence in support of the non-movant's position is insufficient. *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (quoting *Anderson,* 477 U.S. at 247).

Plaintiffs' bald accusations and allegations are insufficient to withstand BRUN's Motion for Summary Judgment.   Plaintiffs must "demonstrate the existence of ***specific facts*** that create a genuine issue for trial,"   and "sufficient probative evidence," "more than mere speculation, conjecture, or fantasy.*" Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (emphasis added) (citation and quotation omitted).

As shown in BRUN's Responses to Plaintiffs' Additional Statements and below, the totality of Plaintiffs' statements are their own unsubstantiated allegations, which are inconsistent with the testimony provided by the Plaintiffs and every other witness, and the relevant, competent and uncontroverted evidence in this case.  Even viewing the facts in the light most favorable to Plaintiffs, the Court is not obligated to "accept unreasonable inferences or sheer speculation as fact." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

In addition, the Court may only consider evidence that is competent and would be admissible at trial.  FED. R. CIV. P. 56(c), (e); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d

1307, 1310 (8th Cir. 1993). "Determinations as to the admissibility of evidence lie within the sound discretion of the district court, . . . even at summary judgment." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 818 (8th Cir. 2010)).

## A.     18 OF PLAINTIFFS' ADDITIONAL STATEMENTS OF FACTS ARE UNSUPPORTED BY ADMISSIBLE EVIDENCE.

BRUN objects to Plaintiffs' Statements, Doc. No. 141, ¶¶ 59, 61, 62, 67, 72, 75, 76, 81, 83, 84, 88, and the following documents cited in support:  Doc No. 143-1, Doe 1's  Response to Interrogatories (Exhibit 6); Doc. No. 143-4, September 2018 appeal (Exhibit 9); and Doc. No. 1438-8, September 2019 complaint (Exhibit 13), on the grounds each of the documents constitute inadmissible hearsay. Moreover, BRUN objects to Plaintiffs' Statements, Doc. No. 141, ¶¶ 93, 94, 95, 160, 165, 166, & 167 and the following documents cited in support: Doc. No. 126-16, Initial Expert Report of Doherty for Doe 1; Doc. No. 126-17, Supplemental Expert Report of Doherty for Doe 1; Doc. No. 128-21, Initial Expert Report of Doherty for Doe 2; Doc. No. 128-21, Supplemental Expert Report of Doherty for Doe 2; and Doc. No. 128-23, Expert Report of Andrew Verzilli for Doe 2. To the extent Plaintiffs attempt to use any of the other expert reports [Doc. Nos. 126-18, and 126-19], which are the Initial Expert Report of Andrew Verzilli for Doe 1 and Supplemental Expert Report of Andrew Verzilli for Doe 1, respectively, BRUN objects on the grounds each document lack foundation, constitute inadmissible hearsay, and are irrelevant.

"[I]nadmissible hearsay evidence cannot be used to defeat summary judgment." *Higgins v. Union Pac. R.R. Co.*, 303 F. Supp. 3d 945, 962 (D. Neb. 2018), *aff'd,* 931 F.3d 664 (8th Cir. 2019) (quoting *Brunsting,* 601 F.3d at 817).  In order to admit hearsay within hearsay "each part of the combined statements" must conform with an exception to the hearsay rule. FED. R. EVID. 805.

**First,** because none of the expert reports (outlined in the first paragraph of this section) are neither notarized nor made under penalty of perjury, they are mere hearsay and inadmissible. In addition, generally, expert reports are hearsay and inadmissible. *See Bruhn Farms Joint Venture v. Fireman's Fund Ins. Co., No. 13-CV-4106-CJW, 2017 WL 752282, at *9 (N.D. Iowa Feb. 27, 2017)* (finding an expert's report is hearsay and inadmissible); *United States v. Lasley, No. 14-CR-45-LRR, 2014 WL 6775539, at *6 (N.D. Iowa Dec. 2, 2014)* (finding an expert's written report is hearsay and not admissible under the residual exception); *Sargent v. Farmers Ins. Exch., No. 4:03CV00255 JMM, 2005 WL 8164290, at *1 (E.D. Ark. Mar. 7, 2005)* (finding an expert's report is inadmissible hearsay); *Dvorak v. United States, No. CIV. 01-1415 RHK/AJB, 2002 WL 34715899, at *2 (D. Minn. Oct. 30, 2002)* (barring admission of written expert report as hearsay); *Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 728 (6th Cir. 1994)* ("Rule 702 permits the admission of expert opinion testimony not opinions contained in documents prepared out of court."); *Rainforest Cafe, Inc. v. Amazon, Inc., 86 F. Supp. 2d 886, 904 (D. Minn. 1999)* (holding same).

Further, the expert reports contain a selective recitation of information provided by Doe 1 and 2, and are littered with uncorroborated and conclusory factual allegations, and statements that are outright false. [*See* Doc. No. 131, Brief in Support of Daubert Motion.] Notably, Plaintiffs do not provide any evidence demonstrating the experts or any other medical record hold any causation opinion in this case. Doherty herself has testified that she is not diagnosing anybody [Doe 1 and Doe 2] with PTSD and has testified she has not made any assessment whether any of the mental or physical conditions and symptomologies of Doe 1 and Doe 2 were caused by the University's response to the allegations of sexual harassment, thereby making these paragraphs immaterial and irrelevant. [*See* Doc. No. 128-20 at 172:24 –

10; 175:24-176:3, 273:16 -23, 288:19-22.] [*See also* Doc. No. 129, ¶¶ 190 – 196, 342–355; Doc. No. 141, ¶¶ 190-196 & 342-355.]

**Second**, Plaintiffs incorporate as evidence Doe 1's interrogatory answers, the appeal document that Doe 1 submitted to BRUN in September 2018, and the complaint Doe 1 sent to BRUN in September 2019, to oppose summary judgment. [Doc. Nos. 143-1, 143-4, and 143-8. ] The information contained in these documents consist of out of court statements and are being offered for its "truth." Consequently, these documents are categorically hearsay and should be stricken and not be relied on for purposes of opposing summary judgment.

**B.    PARAGRAPHS 15 AND 16 OF DOE 1'S DECLARATION [DOC. NO.  143] SHOULD BE STRICKEN AND DISREGARDED AS SHAM ATTESTATION.**

The Eighth Circuit has addressed "the troublesome issue of whether summary judgment may be granted when one of the parties after giving a deposition later files an affidavit with directly contrary statements." *City of St. Joseph, Mo. v. Sw. Bell Tel., 439 F.3d 468, 475 (8th Cir. 2006)* (quoting *Camfield Tires, Inc.*, 719 F.2d at1363). "[I]t is well-settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *Garang v. City of Ames, 2 F.4th 1115, 1122 (8th Cir. 2021)* (citing *Button v. Dakota, Minn. & E. R.R. Corp., 963 F.3d 824, 830 (8th Cir. 2020)*). "An affidavit is a sham affidavit and should be disregarded if it contradicts prior testimony or is a sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before." *Id.* (internal citations omitted).

In Paragraph 15 of Plaintiff's Declaration, Plaintiff states that she wanted to pursue a career in a research institution or teaching college. This is contrary to what

she testified under oath: that this was a position she **wanted and applied** for before graduating with her Ph.D. from the University. [Doc. No. 126-3, at 261:1 – 7.]

Moreover, Paragraph 16 of Doe 1's Declaration provides a self-serving testimony with vague description of interaction with JR4 and how it made her feel. Specifically, it fails to provide the time frame of the alleged communications and the time in which Doe 1 was "afraid" of JR4. To the extent she is talking about communication with JR4 after June 2017, it is contrary to her testimony under oath and also her response to BRUN's Statements. Specifically, JR4 did not approach her, contact her or disturb her in any way from the time the permanent No Contact Order was issued on June 30, 2017, until May 2018. [Doc. No. 129, ¶¶ 111, 127, 182; 141, ¶¶ 111, 127, 182.] In and after May 2018, other than the email on May 5, 2018, JR4 and Doe 1 did not have any other communication. [Doc. No. 129, ¶ 181; Doc. No. 141, ¶ 181.] Doe 1 did not see JR4 in 2019 or 2020, other than at a hearing for a protection order in October 2019. [Doc. No. 129, ¶ 189; Doc. No. 141, ¶ 189.] Moreover, Doe 1 admitted that JR4 has never threatened to harm her physically. [Doc. No. 129, ¶ 180; Doc. No. 141, ¶ 180.] As Doe 1 admitted, "at no time was the University aware of any verbal or nonverbal conduct of JR4 where he threatened to harm Doe 1 physically." [Doc. No. 129, ¶ 189; Doc. 141, ¶ 189.] Accordingly, Doe 1 cannot create a "sham" issue of fact in an effort to defeat summary judgement by filing an affidavit directly contradicting prior deposition testimony and including therein a conclusory statement.

With respect to the communication in May and June 2017, Doe 1 testified "[T]he general sentiment was that he wanted to try to get back together again. He wanted to communicate with me. He wanted to meet in person in order to work out our relationship." [Doc. No. 126-3 at 82:8 – 14.] The entirety of their text exchanges between Doe 1 and JR4 in May and June 2017 is found at Doc. No. 125-30. There

18

were only two text messages from May 20, 2017, where JR4 asked Doe 1 whether she is afraid of him. [Doc. No. 125-30 at 3.] In response, she stated "[JR4] please stop calling and texting me. I do not feel comfortable having dinner with you." [Doc. No. 125-30 at 4.] JR4 asked her why she did not feel comfortable, and expressed "I would never do anything to hurt you." [Id.] Doe 1 responded "because I broke up with you and I want to stay broken up for good. And you've been trying to convince me to change my mind and flooding me with texts and calls. And we've already had plenty of time to discuss things. So I don't want to meet with you." [Id.] Otherwise, Doe 1 admitted that JR4 has never approached her wanting to talk to her. Doe 1 also admitted that JR4 has never threatened to harm her physically. [Doc. No. 126-3 at 75:8 – 15, 82:4 – 14, 85:10 – 2.] Doe 1 also admitted that JR4 had never exhibited violence or aggressive behavior in May and June 2017, or thereafter. [Doc. No. 126-3, 85:10-18.] Accordingly, Doe 1's attempt to use this "sham" declaration should be rejected to the extent described herein.

## IV.    ARGUMENT

### A.    THERE ARE NO RECOVERABLE DAMAGES IN THIS CASE.

#### 1.    *Cummings* bars recovery of emotional distress.

Plaintiffs argue that, because there is no binding authority requiring this Court to extend *Cummings* to Title IX actions, that this Court should decline to do so in this case. [*See* Doc. No. 138, at 40.] This reasoning fails to understand that, although *Cummings* dealt with the Rehabilitation Act and the ACA, the reasoning underlying the holding mandates the same conclusion in a Title IX case.

This Court has addressed a similar argument in *Abdulsalam v. Bd. of Regents of Univ. of Nebraska*, No. 4:22-CV-3004, 2023 WL 4266378, at *5 (D. Neb. June 29, 2023). In that case, this Court held, even though *Cummings* did not involve a Title IX

claim, there is "no reason why its logic would not apply to Title IX claims," because "Cummings was predicated on the fact that the rehabilitation Act and Affordable care Act are 'spending Clause statutes." *Id.* (collecting cases). Therefore, "*Cummings* applies with full force here." *Id.* (citation omitted).

Indeed, the Supreme Court of the United States has held that Title IX is Spending Clause Legislation and "much in the nature of a contract." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640, (1999). Title IX operates in the manner of "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).

This fundamental principle warrants the application of the holding in *Cummings* to a Title IX case. As thoroughly explained in the opening Brief, the Supreme Court in *Cummings* expressly stated that the Rehabilitation Act, ACA, Title IX, and Title VI were adopted pursuant to the Spending Clause, and that the types of damages recoverable are limited to those available for contract claims. *Cummings*, 142 S. Ct. at 1570. And, the Supreme Court held emotional distress damages are not available under the Spending Clause statutes. *Id.* at 1571.

The only sound conclusion that is consistent with the decision of the highest court of the United States and this Court's prior holding is: emotional distress damages are unavailable in a private suit to enforce Title IX.

Plaintiffs' attempt to convince this Court to apply a special rule from the Restatement (Second) of Contracts, with respect to 'reliance interest,' is unavailing. It is unclear how the Restatement section they cite applies to Plaintiffs' cases, as there is no application of the rule to the particular facts of this case.

20

Regardless, in *Cummings*, the Supreme Court rejected such an argument. *Cummings*, 596 U.S. at 222. Specifically, in *Cummings,* Cummings argued "several contract treatises put forth the special rule that 'recovery for emotional disturbance' is allowed in a particular circumstance: where 'the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result.'" *Id.* at 223. Cummings cited to Restatement (second) of Contracts § 353, which is a postcursor to the section Plaintiffs cite.

The Supreme Court rejected Cumming's argument reasoning that the Spending Clause jurisprudence instructs courts to "inquire whether a remedy is '***traditionally***,' '***generally***,' or '***normally*** available for contract actions." *Id.* at 223 (emphasis added). The Court further held that Cumming's urging of the Court to disregard the requirement to apply only those remedies that "are normally available for contract actions," would bring about an "untenable result in any context, let alone one in which our cases require 'clear notice' regarding the liability at issue." *Id* at 226. The Supreme Court further reasoned that "even if it were appropriate to treat funding recipients as aware that they may be subject to 'rare' contract-law rules that are 'satisfied only in particular settings,' . . . funding recipients would still lack the requisite notice that emotional distress damages are available under the statutes at issue. That is because the Restatement's formulation—that such damages are available where 'the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result,' see Restatement (Second) of Contracts § 353—does not reflect the consensus rule among American jurisdictions." *Id.* at 226. The Supreme Court, after thorough analysis of the state of the law across the nation, concluded that:

> In the end, it is apparent that the closest our legal system comes to a universal rule—or even a widely followed one—regarding the availability of emotional distress damages in contract actions is "the conventional

> wisdom ... that [such] damages are for highly unusual contracts, which do not fit into the core of contract law." *Id.* at 230, citing Hoffman, 81 Fordham L. Rev., at 1230. As to which "highly unusual contracts" trigger the exceptional allowance of such damages, the only area of agreement is that there is no agreement. There is thus no basis in contract law to maintain that emotional distress damages are "traditionally available in suits for breach of contract." . . . .

*Id.* at 229–230. Accordingly, no rule from the Restatement (Second) Contracts would change the holding that emotional distress damages are not available under Title IX.

Plaintiffs rely on *B.R. v. F.C.S.B.*, No. 1:19-cv-917, 2024 WL 1254826, at *6 – 7 (E.D. V. Feb. 26, 2024), *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, No. 3:20-CV-11-MAB, 2023 WL 348320, at *2 (S.D. Ill. Jan. 20, 2023), and *Brown v. Zeta Charter Sch.*, No. 23 CIV. 5593 (DEH), 2024 WL 4265691, at *5 (S.D.N.Y. Sept. 23, 2024) and further argue *Cummings* does not bar the type of medical expenses they allege in this case. Plaintiffs' presentations of the holding in these cases are distorted, and the cases are easily distinguishable. [Doc. No. 138 at pp. 46 - 47.]

In *Pennington*, the plaintiffs alleged "[a]s a direct and proximate result of the Defendant's discrimination, [they] suffered mental, emotional, and psychological injuries which may be permanent. It has also caused pain, suffering, and has caused [them and their parents] to incur medical expenses." The defendants filed a motion to dismiss arguing that plaintiffs are only seeking emotional damages as relief, which are no longer recoverable under the Rehabilitation Act and the ADA pursuant to the decision in *Cummings*. *Id.* at *3.

The plaintiffs argued they were not seeking emotional damages but, "rather seeking compensatory damages for severe mental, emotional, psychological injuries, and pain, suffering, and medical expenses." *Id.* at *2 (internal quotation marks omitted). The plaintiffs argued the damages they sought were different than what

22

*Cummings* dealt with because "the plaintiffs were diagnosed with PTSD, 'which can cause physical symptoms' and is 'also associated with long-term physical health conditions like diabetes and heart disease,' and they incurred medical costs to treat their condition." *Id.* at *4.

The *Pennington* court found plaintiff's argument unconvincing and reasoned that the plaintiffs were simply attempting "to rebrand their request for damages for 'mental, emotional, psychological injuries' and 'pain and suffering' as something other emotional damages." *Id.* The court explained:

> Whether it is labeled like Plaintiffs in the instant case or labeled as "humiliation, frustration, and emotional distress," like in *Cummings,* its all the same concept. The labels are all variations of the same principal that the defendant's actions caused the plaintiff a "highly unpleasant mental reaction"—*i.e.*, emotional distress. *Emotional Distress*, BLACK'S LAW DICTIONARY (11th ed. 2019). *See also* RESTATEMENT (SECOND) OF TORTS § 46 cmt. j ("Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea."). Additionally, Plaintiffs did not provide citations to any legal authority to support their suggestion that damages for severe emotional responses and diagnosable psychiatric conditions, as opposed to simple "humiliation" or "frustration," are recoverable. . . ., and the Court has no reason to believe that is true when the Supreme Court in *Cummings* did not distinguish between degrees of emotional distress.

*Id.* Based on this analysis, the court held the "plaintiffs' request for 'compensatory damages' for 'mental, emotional, and psychological injuries' and 'pain [and] suffering' is nothing more than a request for emotional damages, which is no longer permitted. Consequently, this damages request is stricken." *Id.* at *4.

In *Pennington*, the court also addressed whether a request for medical expenses attributed to treatment of physical injury sustained in the course of bullying was recoverable. Particularly, the plaintiff alleged he was stabbed in the arm with a pencil by another student and had to have it surgically removed and that he was hospitalized

due to suicidal ideations. *Id.* at \*3. The court held that this is the type of "compensatory damages for economic losses, which *Cummings* did not preclude." *Id.* at \*3 - \*4.

Similarly, *B.R.* is distinguishable from this case. In *B.R.*, the district court first held, "certain categories of damages sought by B.R. clearly fall into *Cummings'* prohibition on emotional distress damages. The following damages sought by B.R. fall squarely within that prohibition: (i) emotional distress, fear, and anxiety; (ii) mental anguish; (iii) humiliation and embarrassment; (iv) personal and social limitations; (v) loss of dignity; (vi) depression, anxiety, fear, emotional distress, mental anguish; (vii) nightmares and flashbacks; (viii) eating disorders and other psychiatric disabilities and deficits; (ix) physical manifestations of emotional or psychiatric distress; (x) emotional deficits; and (xi) loss of enjoyment of life and life's pleasures." *Id.* at 511. The court further held that any medical treatment costs associated with these conditions are barred by *Cummings*. *Id.* at 512.

In *B.R.*, the court also addressed the question of whether damages connected to PTSD, where the B.R. provided "uncontroverted evidence in the form of expert opinions by her own and by FCSB's experts that PTSD is the result of structural and functional changes to the brain as a result of the assault," is barred by *Cummings*. *Id.* at 513. The court first held that Title IX plaintiffs may recover for physical injuries. Then, the court addressed the defendant's argument that PTSD is not a physical injury but a proxy for the kind of emotional injuries barred under *Cummings*. With respect to that argument, the district court held:

> To that end, FCSB offers no expert opinions or factual implications to counter B.R.'s evidence. Although FCSB attempts to categorize this determination as one that the Court can make as a matter of law, the kind of injury sustained by B.R. and the origination of that injury and whether it is caused by a change to the structure of her brain appears

heavily fact-bound and FCSB has introduced no facts, expert or otherwise, regarding B.R.'s PTSD. FCSB further asserts that recognizing PTSD as a physical ailment would open the door to all forms of mental and emotional distress damages contrary to *Cummings*. Not so. **The limiting principle would be that the damages must be connected to physical changes wrought by a physical injury**.

*Id.* at 514 (emphasis added).

In this case, there are no expert opinions or factual implications connecting any mental health conditions to physical changes, nor are there any expert opinions connecting the alleged mental health diagnosis of both Plaintiffs to actions or inactions of BRUN. With respect to Doe 1, the uncontroverted facts are as follows:

- Doe 1's medical record or expert opinion does not show a diagnosis of PTSD. [*See* Doc. No. 129, ¶ 190; Doc. No. 141, ¶ 190; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10;  175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

- On June 1, 2017—prior to reporting the incident involving JR4—Doe 1 was diagnosed with relationship distress with an intimate partner and anxiety, disorder, unspecified. On or about July 6, 2017, Doe 1 was diagnosed with Adjustment Disorder with Anxiety. [*See* Doc. No. 129, ¶ 191; Doc. No. 141, ¶ 191.]

- No experts have been disclosed to opine that any of Doe 1's diagnosis was caused by actions or inactions of the University, or the alleged deliberate indifference of the University. Nor does Doherty opine with respect to this. [*See* Doc. No. 129, ¶ 192, 193; Doc. No. 141, ¶ 192, 193; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10;  175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

- There is no medical record that opines that Doe 1's alleged symptoms and diagnoses were caused by the University's actions or in actions, or the alleged deliberate indifference of the University. [*See* Doc. No. 129, ¶ 194 – 95; *See* Doc. No. 141, ¶ 194 – 95; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10; 175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

The uncontroverted facts with respect to Doe 2 are as follows:

- Prior to November 2017—In other words, prior to BRUN receiving actual notice of the alleged sexual harassments—Doe 2 reported the following symptoms to her medical providers: feelings of PTSD, OCD, Trichotillomania, stress eating, severe anxiety, sleep disturbance, and attention issues. Prior to November 2017, to her medical provider, Doe 2 reported a **history of** depression, anxiety, PTSD and gastrointestinal issues. [*See* Doc. No. 129, ¶ 342 - 343; Doc. No. 141, ¶¶ 342 – 343.]

- Prior to November 2017, Doe 2 was diagnosed with generalized anxiety disorder-severe with panic attacks, Trichotillomania, Obsessive Compulsive

Disorder, Attention deficit disorder predominate inattentive type. Moreover, on April 20, 2018, a PTSD diagnosis was added. [*See* Doc. No. 129, ¶ 344; Doc. No. 141, ¶ 344.]

- There are no experts opining that any of Doe 2's diagnoses were caused by actions or inactions of the University, or the deliberate indifference of the University. Nor does Doherty opine with respect to this. [*See* Doc. No. 129, ¶¶ 345 -346; Doc. No. 141, ¶¶ 345 – 346; Doc. No. 128-24, Dep. of Doherty at 172:24 – 10;  175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

- There is no medical record that opines that Doe 2's alleged symptoms and diagnoses were caused by the University's actions or inactions, or by the deliberate indifference of the University's actions or inactions. [*See* Doc. No. 129, ¶ ¶ 347 - 348; Doc. No. 141, ¶¶ 347-348.]

- Doe 2 has not disclosed any experts to opine on the issue of whether any physical ailment was caused by a mental health condition, or by any mental health condition caused by the alleged deliberate indifference or actions or inactions of the University. Nor does Doherty opine with respect to this. [*See* Doc. No. 129, ¶ ¶ 353-355; Doc. No. 141, ¶¶ 353-354; [Doc. No. 128-24, Dep. of Doherty at 172:24 – 10;  175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

- Doherty did not diagnose Doe 2 with PTSD. [Doc. No. 128-24, Dep. of Doherty at 172:24 – 10;  175:24 – 176:3, 273:16 – 23, 288:19 – 22.]

*See. e.g. Doe v. Fairfax Cnty. Sch. Bd.*, No. 118CV00614MSNIDD, 2023 WL 424265, at *5–6 (E.D. Va. Jan. 25, 2023) (holding "while Plaintiff asserts that she produced invoices relating to expenses for counseling and medical treatment for stomach-related issues, . . . the Court finds these damages 'resemble varying forms or descriptions of emotional distress' and are therefore unavailable under *Cummings*," and "finding that the medical expenses Plaintiff seeks to recover are proxies for impermissible emotional distress damages, the Court will preclude Plaintiff from presenting such evidence at trial.").

It is apparent Plaintiffs' claims of alleged PTSD, and any and all other medical expenses related to the other diagnosis of Doe 1 and Doe 2 squarely fits what the court in *Pennington* described as a rebranded request for damages for mental, emotional, psychological injuries and pain and suffering as something other than emotional damages. Furthermore, these request damages are too speculative—as there is no

causation opinion as to any of the diagnosis or alleged symptoms—to constitute traditional contractual remedies under *Cummings*. Because such a request for expenses is not allowed under *Cummings*, both Doe 1 and Doe 2's requests must be barred.

It goes without saying that any claimed loss of educational opportunities and loss of earning capacity which are predicated on the alleged mental health conditions of Doe 1 and Doe 2 must also be barred. Doherty ***directly*** tied Plaintiffs' alleged disability related to their mental health diagnosis to the reduced earning capacity. [*See* Doc. No. 126-16 at pp. 19-20; Doc. No. 126-17; Doc. No. 128-21 at 17 – 21; Doc. No. 128-22.] Then Verzilli calculated damages relying on Doherty's assessment. Accordingly, Doe 1 and Doe 2's claim for loss of earning and loss of educational opportunity tied to the alleged mental health must also be dismissed.

**2.      Plaintiffs' Amended Complaint does not seek nominal damages and their attempt to rebrand unrecoverable damages as nominal damages should be rejected.**

Plaintiffs did not request nominal damages in their Amended Complaint, and their attempt to add such request for damages at the tenth hour should be swiftly rejected. Even if they did, Plaintiffs' attempt to rebrand their emotional distress as nominal damages should be rejected. None of the cases Plaintiffs cite are similar to the circumstances of this case. Rather, the U.S. District Court for the District of Rhode Island dealt with a similar issue where plaintiffs failed to include a request for nominal damages but raised it at the motion for summary judgment. *Doe next friend of Doe v. City of Pawtucket*, 633 F. Supp. 3d 583, 591 (D.R.I. 2022). In that case, the district court concluded as follows:

> The Court finds that Plaintiffs possess no claim for nominal damages even were they able to pursue it now. Nominal damages are intended to be a substitute for a lack of damages or damages that cannot be proven. Restatement (Second) of

Contracts, *supra*, § 346(2). They are not a substitute for damages that might be proven but are otherwise unavailable. *Contra id.* § 346 cmt. b, illus. 1. Therefore, to the extent that Plaintiffs seek nominal damages for harm that is properly characterized as emotional distress, the Court rejects such a facial rebranding, As the United States District Court for the Eastern District of New York observed, "Plaintiffs cannot salvage their … claim merely by recasting their request for relief [seeking emotional distress damages] as seeking nominal damages." *Hejmej v. Peconic Bay Med. Ctr.*, No. 17-cv-782 (JMA)(SIL), 2022 WL 5429675, 2022 U.S. Dist. LEXIS 119114, at *25 (E.D.N.Y. July 5, 2022) (citations omitted) (internal quotation marks omitted)

*Id.* A similar outcome is warranted in this case.

### 3. Plaintiffs cannot show that they incurred special damages caused by the University's alleged deliberate indifference.

Plaintiffs have shifted to generalized claims for loss of or reduced earning capacity or lost employment opportunities, which fail under *Cummings* because they are too speculative. As the Court in *B.R.* noted there are "only two cases [the undersigned could not find additional cases] addressing lost earning capacity in relation to a Title IX claim:" *Doe v. Fairfax Cnty. Sch. Bd.*, No. 118CV00614MSNIDD, 2023 WL 424265, at *6 (E.D. Va. Jan. 25, 2023) and *Doe v. Trustees of Dartmouth College*, 699 F.Supp.3d 171 (D.N.H. Oct. 18, 2023). *B.R.*, 718 F. Supp. 3d at 516. Relying on these cases, the district court in *B.R.* explained:

Authorities generally recognize that "[c]onsequential damages for lost earning capacity may be awarded in breach of contract cases where a plaintiff alleges 'the loss of identifiable professional opportunities' " and where a plaintiff "alleges and proves with specificity that the defendant's breach actually adversely influenced or affected job opportunities.' " *Fairfax Cnty. Sch. Bd*, 2023 WL 424365 at *6 (citing 24 *Williston on Contracts* § 66.4 (4th ed. 2022)). More specifically, the Fourth Circuit has held, in the context of a breach of contract action, that plaintiffs must plead and prove "future identifiable professional opportunities that would have been available to [them] absent the breach" and that were contemplated by the parties when they formed the contract. *Rice*, 203 F.d at 288-89. The Fourth Circuit held that, absent such pleading and proof, "such consequential damages are simply too speculative and the contracting parties cannot reasonably be presumed to have anticipated such damages at the time they entered into a contract." *Id.*

*Id.* at 515-16. "Consequential damages relating to lost economic opportunities are not recoverable simply because a plaintiff specifies an aspirational position, as they must have been anticipated or contemplated at the time of contracting." *Id.*

Here, Plaintiffs have failed to point to any identifiably professional opportunities they lost and that the actions or inactions of the University actually adversely influenced or affected job opportunities. In fact, the expert reports they produced provide that their loss of earning capacity was caused by their alleged mental disability—a disability that is unconnected to any actions or inactions of the University.

In addition, Doe 1's claim for damages tied to the alleged delay of graduation must fail because Doe 1's shifting explanation is proof that it is speculative. Specifically, when cornered with the uncontroverted evidence that Doe 1 has always intended to graduate within 5 years and identified August 2020 as her graduation date in one of the most critical Annual Report for the 2017-2018 and during her interview in May 2018, Doe 1 shifted her claim from 8 months of graduation delay [See Doc. No. 126-20 at 8, Initial disclosure] to a 3-month graduation delay [Doc. No. 138 at 49]. Such an approach must not be condoned.

The same goes for Doe 2's claim with respect to her Ph.D. The uncontroverted evidence is that Doe 2 had the option to continue her Ph.D., but she chose not to because she did not want to be in Lincoln, Nebraska. She was not obligated to make her decision prior to the final determination on July 28, 2018. The July 26, 2018, email from Barton stating the Department will cover the application fee and giving Doe 2 yet additional time to make up her mind is solid proof of that. Even though Doe 2 knew that BRUN had decided to expel JR5 (the maximum consequence the University

can levy), she chose not to pursue her Ph.D. This too cannot be tied to actions or inactions of BRUN.

Moreover, none of the other damages alleged by the Plaintiffs can be tied to the alleged deliberated indifference of BRUN. Plaintiffs' argument is entirely dependent on bare unsupported allegations contained in Plaintiffs' Additional Statement, which must be rejected as thoroughly discussed in BRUN's Responses to Plaintiff's Additional Statements. Specifically, Doe 1 claims she is entitled to compensatory damages for the following: missing the opportunity to present when she asked for and took an alternate seminar; changing her work habits; parking fee; and for seeing JR4 on campus. Yet, the uncontroverted evidence is that JR4 has never approached Doe 1 or talked to her while she was on campus and has never threatened to harm her physically. Doe 1 also received various protective measures, including key controlled labs and offices.

Doe 2 claims compensatory damages for: negative impact of her educational experience because she kept shorter office hours; her grades suffered; expenses related to travel to India, and to and from Lincoln, Nebraska; and expenses related to relocation. The same fate must meet these claims: dismissal. Again, Doe 2 never saw JR5 on campus after November of 2017, other than the Title IX hearing. Nor did she ever talk to JR5 after November 2017. Accordingly, and for the reasons discussed in Sections B and C below, as it relates to both Doe 1 and Doe 2, BRUN was not deliberately indifferent, nor can Doe 1 or 2 show that these alleged claimed damages, or any of the damages claimed in their Amended Complaint, were caused by BRUN's deliberate indifference.

**B.     PLAINTIFFS CANNOT ESTABLISH THAT BRUN WAS DELIBERATELY INDIFFERENT BASED ON POST-ASSAULT THEORY OR A CAUSAL NEXUS BETWEEN THE ALLEGED DELIBERATE INDIFFERENCE TO ACTUAL EXPERIENCE OF HARASSMENT.**

BRUN will not repeat its arguments regarding the appropriateness of its responses when it received notice. Instead, BRUN will point out the deficiencies of Plaintiffs' argument.

**1.     The undisputed record shows BRUN was not deliberately indifferent in how it responded to Doe 1.**

By and large, Doe 1 does not contest that BRUN took numerous steps to address her concerns. Nonetheless, Doe 1 argues that BRUN's response to the alleged events "were not reasonable as a matter of law." [Doc. No. 138, at p. 20.] This is an erroneous application of a negligence standard, rather than "deliberate indifference" standard this Court is required to apply in Title IX cases.

Deliberate indifference "is not a mere 'reasonableness' standard," but it imposes a much more stringent burden of proof on Title IX plaintiffs. *Davis,* 526 U.S. at 642. In *Davis*, the U.S. Supreme Court "limited liability only where the district itself intentionally acted in clear violation of Title IX." *Id.*

Applying the correct and stringent standard of "deliberate indifference," BRUN's response dispels any notion of deliberate indifference. In this case, in response to the report made on June 28, 2017, it is undisputed that BRUN responded in the following ways:  (1) On June 28, 2017, UNLPD directed JR4 to cease all contact with Doe 1; and (2) on June 30, 2017, Lamoureaux met with Doe 1 and JR4, separately, and, based on the information and directive he received form Doe 1 and JR4, IEC issued a No Contact Order. [Doc. No. 129, ¶ 69; Doc. No. 141, ¶ 69.]

Doe 1 argues that IEC told her that she cannot file a formal complaint. That is contrary to the ***contemporaneously documented*** events of June 2017 and the letter

that she admitted she received on June 28, 2017, which documented therein her desire to resolve the matter informally.  Specifically, Doe 1 admits the following:

- On June 28, 2017, Lamoreaux sent her a letter, stating therein "***You [Doe 1] have the option to file complaints with*** both law enforcement and ***our office.***" [Doc. No. 129, ¶ 71; Doc. No. 141, ¶ 71 (emphasis added).]
- On June 28, 2017, Doe 1 told Officer Beitler that she was interested in obtaining a No Contact Order. [Doc. No. 129, ¶ 71; Doc. No. 141, ¶ 71.]
- On June 30, 2017, she again expressed to Officer Beitler and Lamoureaux her desired goal of obtaining a No Contact Order. [Doc. No. 129, ¶ 87; Doc. No. 141, ¶ 87.]

Lamoureaux documented his meeting with JR4 and Doe 1 contemporaneously, wherein he stated that he advised Doe 1 of her reporting options and IEC process. [Doc. No. 125-4 at 2.] He further documented that during his meeting with her, "Complainant elected to report the incident to both entities, but she was not desirous of criminal prosecution and she did not want to file a complaint with IEC. Complainant was interested in resolving the matter informally." [Id.] In fact, after his meeting with Doe 1, Lamoureaux sent Doe 1 a letter therein stating that the behavior reported, if determined to be his intent, could be a violation of the Student Code of Conduct, Appendix A, Stalking. [Doc. No. 129, ¶ 90; Doc. No. 141, ¶ 90.] Lamoureaux further stated, consistent with what he stated in his investigation report:

> During our investigation, ***you informed IEC that you wished to resolve the matter through information resolution***. You were seeking a permanent NO Contact Order between the parties. Respondent indicated he was in agreement with a permanent No Contact Order. . . ..

[Doc. No. 129, ¶¶ 91 & 92; Doc. No. 141, ¶¶ 91 & 92.]

Doe 1 never contacted Lamoureaux to indicate any of the statements included in the June 30 letter were a misrepresentation of what she had asked of IEC, including the statement that she informed IEC that she wished to resolve the matter through informal resolution and was seeking a permanent No Contact Order. [Doc. No. 129, ¶ 96; Doc. No. 141, ¶ 96.] In May 2018, Doe 1 confirmed that in June 2017, she was

32

simply seeking a no contact order. Specifically, Doe 1 stated: "I guess I just wanted to be left alone." [Doc. No. 125-20, at 8:357 – 9:380.]

Consistent with her desire to obtain a Permanent No Contact Order, BRUN issued a Permanent No Contact Order. [*See* Exhibit UUUU, No Contact Order dated June 30, 2017.]

JR4 observed the No Contact Order from the time it was issued until May 2018. It is correct that Doe 1 and JR4 attended courses that they were both required to attend in Fall 2017 and Spring 2018. In Fall 2017, Doe 1 admitted (1) JR4 did not initiate any contact with her during the BIOS 915A class; (2) JR4 never approached her in class; and (3) she does not recall JR4 ever talking to her in that class. In October 2017, Doe 1 even confirmed that JR4 had not been "bothering her." [Doc. No. 129, ¶ 107.]   In Spring 2018, Doe 1 and JR4 took one course together, Signal Transduction, a course that is offered every other Spring semester. During the entirety of the course, JR4 never talked to her in a personal manner or approached her outside of the classroom.

Doe 1 argues that BRUN should have determined that JR4 violated the No Contact Order when he messaged her roommate in December 2017 and points to minor imperfections (which are not true, as discussed below) in BRUN's response. This, in essence, is a collateral attack on the merits of BRUN's findings. As the Eighth Circuit Court in *Does 1-2 v. Regents of the Univ. of Minnesota*, held: "'Federal courts are not a forum for general appellate review of university disciplinary proceedings.'" 999 F.3d 571, 582 (8th Cir. 2021) (quoting *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020)); *see also Doe v. Dardanelle School District*, 928 F.3d 722, 725 (8th Cir. 2019) (holding deliberate indifference requires more than negligence and is meant to prevent second guessing of administrative decisions).  The law does

33

not call for a University investigator to follow every line of inquiry proposed by either of the parties.

Furthermore, critiques of such minor components of BRUN's response cannot prove deliberate indifference. "Deliberate indifference is an extremely high standard to meet," and as such, even "negligent delays ... or responses that most reasonable persons could have improved upon do not equate to deliberate indifference." *I.F. v. Lewisville Ind. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019). *See also Dardanelle Sch. Dist.*, 928 F.3d at 725 (explaining deliberate indifference requires more than mere negligence); *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 793 (7th Cir. 2022) ("[A] plaintiff cannot prove gender discrimination by merely identifying mistakes or imperfections in the process.").

The reality is, from December 13, 2017, to January 13, 2018, Counley did investigate the December 2017 event. [Doc. No. 129, ¶¶ 124-25; Doc. No. 141, ¶¶ 124-25.] Counley determined that the messages to Tina in December 2017 did not violate the June 30 No Contact Order because, in the messages to Tina, JR4 did not ask Tina to pass along any of the messages to Doe 1 or ask Tina to tell Doe 1 to communicate with JR4, which Doe 1 does not dispute. [Doc. No. 129, ¶ 107; Doc. No. 141, ¶ 107.] Furthermore, although JR4 mentions some embarrassing story he has about Doe 1, JR4 repeatedly expressed that he would never share that with anyone.

Doe 1 spins a story about how Counley forgot to inform her of the outcome of her investigation, or how Counley changed her mind from initially stating that the messages violated the No Contact Order to no violation of the No Contact Order. As thoroughly discussed in Defendant's Response to Plaintiffs' Additional Statements, ¶ 24 and 26, these allegations are not true.

34

Moreover, Doe 1 claims that the alleged events that occurred pre-May 2018 were not taken into consideration when IEC investigated the May 2018 event. This too is fabricated. The uncontroverted evidence proves neither Strickman nor Counley told Doe 1 that she could not file a complaint in May 2018, with respect to the pre-May 2018 events. In fact, they were all investigated and taken into consideration. [See Doc. No. 125-20 at 30:1341 – 1348; 32:1398 – 1411 (transcript of Doe 1's interview with Strickman and Fischer in May 2018); Doc. No. 29, ¶¶ 144-146, 159 - 162; Doc. No. 141, ¶¶ 144-146, 159 - 162; Doc. No. 126-3 at 162:1 – 164:2; and Doc. No. 125-28.]

Doe 1 takes issue with various aspects of the investigation into the May 2018 and September 2019 events, including how Counley and the hearing board evaluated the evidence and the sanctions they imposed. As stated above, "Title IX is not a procedure for courts to second-guess disciplinary decisions made by school administrators." *Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th at 423. Imperfections do not amount to deliberate indifference.

In addition, to the extent Doe 1 takes issue with the sanction imposed by BRUN, it is important to note that the University could be subject to a Title IX erroneous outcome claim by alleged perpetrators for "decision[s] that [are] against the substantial weight of the evidence and inconsistent with ordinary practice on sanctions," as it gives "rise to an inference of bias." *Wells by & through Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 591 (8th Cir. 2023) (quoting *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020). *See, e.g.*, *Davis*, 526 U.S. at 649; *Doe 7 v. Bd. of Regents Southeast Missouri State Univ.*, case no. 1:20cv00172, 2002 WL 1421515 at *5, 8-9 (E.D. Mo. May 5, 2022) (finding the deliberate indifference standard affords school administrators flexibility in responding to reports of sexual misconduct and protects all but actions that are clearly unreasonable).

35

Finally, Doe 1's argument that BRUN did not provide her with accommodations is also belied by the undisputed record:

- On December 14, 2017, Counley and Officer Fischer gave JR4 a directive not to contact Doe 1 and her roommates. [Doc. No. 129, ¶ 120; Doc. No. 141, ¶ 120.]

- On January 13, 2018, Doe 1 was offered police escort, which she never used. [*See* Doc. No. 129, ¶¶ 123, 130; Doc. No. 141, ¶¶ 123, 130.]

- In Spring 2018, Doe 1 asked her department for accommodation to attend seminar other than the required BIOS 915A, which such request was granted. [*See* Doc. No. 129, ¶ 126; Doc. No. 141, ¶ 126.]

- In Spring 2019, Doe 1 asked the lab in which JR4 taught be moved. This request was granted and JR4's lab was moved. [*See* Doc. No. 129, ¶ 128; Doc. No. 141, ¶ 128.]

- From December 2017 on, JR4's keycard access was restricted from accessing Morrison Center, and was only being let in for a visit for a collaboration with a faculty member who offices in Morrison Center. [*See* Doc. No. 129, ¶¶ 129, 156; Doc. No. 141, ¶ 129, 156.]

- On January 13, 2018, UNLPD engaged and created a safety plan for Doe 1. Furthermore, at this time, Doe 1 reported that JR4 was attending same seminars but that he had not caused any incident at that time. [*See* Doc. No. 129, ¶ 122; Doc. No. 141, ¶ 122.]

- Doe 1 admitted that in 2019, JR4 was made to attend Journal Club via zoom. When Doe 1 requested that JR4 not be allowed to attend the session in which she presented, her request was granted. [Ex. Z, Dep. of Doe 1  at 215:15 – 216:21.]

These accommodations and the sanctions imposed were more than appropriate in light of the circumstances of this matter. Specifically, in this case, Doe 1 admitted that:

- JR4 has never threatened to harm her physically. [Doc. No. 129, ¶ 180; Doc. No. 141, ¶ 180]

- From June 2017 through her graduation from the University in August 2020, JR4 never approached her or attempted to talk to her in person. [Doc. No. 129, ¶ 182; Doc. No. 141, ¶ 182.]

- From June 2017 through her graduation from the University in August 2020, JR4 never came into any of the rooms from which she taught or worked. [Ex. Z, Dep. of Doe 1  at 48:5 – 22.]

- Doe 1 never saw JR4 in Chase Hall. [Ex. Z, Dep. of Doe 1 at 200:3 – 8.]

- Other than a hearing for a civil protection order in October 2019, Doe 1 never saw JR4 in 2019 or 2020. [Ex. Z, Dep. of Doe 1 at 212:17 – 213:8.]

36

- At no time did Doe 1 report JR4 was bothering her in class. [Dec. of Counley, Doe 1, ¶ 46.]

- At no time after June 2017 did Doe 1 report JR4 came into any of the rooms from which she taught or used for research. [Dec. of Counley, Doe 1, ¶ 45.]

- At no time was the University aware of any verbal or nonverbal conduct of JR4 where he threatened to harm Doe 1 physically. [Dec. of Counley, Doe 1, ¶ 44.]

- The Brown and Pannier laboratories from which Doe 1 taught were controlled access laboratories, meaning an individual needed either a keycard or a key to access these laboratories. [Doc. No. 129, ¶¶ 47 - 49 ; Doc. No. 141, ¶¶ 47-49.] There is no evidence that JR4 had keycard access to these rooms.

- Doe 1's office in Morrison Center and Chase Hall were controlled access rooms, meaning an individual needed a key to access these areas. [Id.] There is no evidence that JR4 had keycard access to these rooms.

- After March 2020, the University was shut down because of COVID, and because of that, Doe 1 did not use or visit any of the laboratories located at the University. [Doc. No. 129, ¶ 51 ; Doc. No. 141, ¶ 51.]

Accordingly, because the undisputed evidence shows BRUN was not deliberately indifferent, BRUN respectfully asks this Court to enter judgment in its favor.

### 2. The undisputed record shows BRUN was not deliberately indifferent in how it responded to Doe 2.

Doe 2 relies on unsubstantiated allegations and misrepresentations to argue a "reasonable jury" could conclude BRUN was deliberately indifferent. Almost all, if not all, of the factual arguments Doe 2 presents are contradicted by the undisputed evidence in the record, including Doe 2's own deposition testimony.

***First***, Doe 2 seems to argue that IEC should not have waited until December 19, 2017, to notify JR5. There is no question that Doe 2 communicated she did ***not*** want to be in her apartment when JR5 was notified. Doe 2 testified:

Q. And he – it was actually your request to Title IX that they do not communicate with him or contact him about your Title IX report until after the break?
**A. No. Until I left town for the break.**
Q. Okay. That's – you wanted them to wait to tell him; correct?
**A. Yea. I didn't want to be at my apartment, yes.**

37

[Doc. No. 128-2 at 223:4 – 12.] If Counley notified JR5 on November 27, 2017, Counley would have gone against Doe 2's wish not to be at her apartment when JR5 was notified. This is because, on November 27, 2017, all students, including Doe 2, would have been back from Thanksgiving break. [Supp. Dec. of Counley, ¶ 38.] As such, BRUN waited until December 19 to notify JR5—for which Doe 2 was thankful— to accommodate Doe 2's request.

*Second*, Doe 2 concocts yet another story and states she "furnished her own copy of the audio," further alluding that BRUN should not have been waiting for the rest of the audio from LPD; but this assumption should be rejected. [Doc. No. 138, at p. 30.] It is true that there were audio recordings in Doe 2's possessions; but there were additional audio recordings that LPD had, that Doe 2 wanted BRUN to consider before making a final decision. [Doc. No. 128-2 at 254:23 – 255:14.] Per Doe 2's support person, the audio recordings that LPD had were "***imperative to the investigation***." [Supp. Dec. of Amare, ¶ 8; Exhibit XXXX, Email communication between Counley Doe 2 in January 2018.] In fact, Counley relied upon those recordings for her conclusion. [Doc. No. 127-2.] Again, BRUN heeded Doe 2's and Beal's request to wait and consider the LPD audio recordings.

*Third*, Doe 2 misrepresents the two meetings where BRUN communicated a resolution offer it received from JR5.  Doe 2 was not pressured, and she was allowed to have a representative with her both times. Specifically, Doe 2 does not dispute, and even testified under oath, that Beal attended the May 7 meeting. [*See* Doc. No. 129, ¶ 286; 141, ¶ 286; Doc. No. 128-2, at 365:11 – 366:25.] On May 30, 2018, Doe 2 was not allowed to have Beal with her because she wanted Elizabeth Govaerts (her attorney) to attend the meeting and University policy dictated that only one support person could attend. [Doc. No. 128-2, 366:6 – 367:4; Supp. Dec. of Counley, ¶ 27.]

Moreover, at the May 30, 2018, meeting, Strickman explained the advantages and disadvantages of accepting the settlement offer, and Doe 2 admitted that Strickman did not tell her she had to accept the offer. [Doc. No. 129, ¶ 301, 302; Doc. No. 141, ¶¶ 301, 302.] Even yet, when Doe 2 asked for additional time to provide a definitive answer, it was granted. Accepting her decision to decline those offers, the University prosecuted the matter on appeal.

**Fourth**, Doe 2 misrepresents and argues that JR5 engaged in further harassment after November 21, 2017. Doe 2 admitted:

- After December 21, 2017—the date JR5 was notified of Doe 2's complaint filed with IEC—JR5 never communicated with Doe 2 orally or in writing. [Doc. No. 129, ¶ 323, Doc. No. 141, ¶ 323.]
- After November 2017, JR5 had never approached Doe 2. [Doc. No. 129, ¶ 325, Doc. No. 141, ¶ 325.]
- The only place Doe 2 would have seen JR4 after November 2017 was at the Title IX hearing. [Doc. No. 129, ¶ 327; Doc. No. 141, ¶ 327.]

Nor was there any report to IEC that JR5 approached Doe 2 after November 2017, or that JR5 messaged, texted or communicated with Doe 2 in any way after November 2017. [Doc. No. 129, ¶ 323, Doc. No. 141, ¶ 323.] All of the communications and events Doe 2 points to occurred pre-November 21, 2017, and one communication was on November 21, 2017. [*See* BRUN's Responses to Plaintiffs' Additional Statement of Facts, ¶ 140]. And none of the alleged messages were "threatening" or "intimidating" to Doe 2. In other words, all the communications between Doe 2 and JR5 occurred while Doe 2 was maintaining communication and staying friendly, in order to surreptitiously record her conversations with JR5.

**Fifth**, Doe 2 states that JR5 had a firearm and brought it to school and purports that BRUN ignored her allegation. She makes a similar allegation with respect to the Facebook picture that was inadvertently posted for a maximum of one hour. Counley did not disregard these allegations. She interviewed JR5 and the other

individuals Doe 2 identified as having information on this subject matter. JR5 denied carrying a gun on campus and reported that his concealed carry permit had expired, and reported he did not carry his gun with him anywhere. The individuals Doe 2 listed as witnesses all stated they have never seen a gun on him on campus. In fact, Doe 2 herself admitted that she never saw JR5 carry his concealed weapon from June 2017 on.

When Doe 2 reported that JR5 bragged to another student, Joe, about pulling a gun on his neighbor, when his neighbor came to JR5's house and yelled at JR5 for an incident involving JR5's dog and the neighbor's ducks, Counley interviewed Joe. [Doc. No. 127-2 at 7.] Joe did not remember this story. [Doc. No. 127-2 at 7.]

With respect to the Facebook picture, Counley communicated with JR5 and reviewed the picture that was inadvertently posted. The picture was produced to this Court to showcase that it is far from how Doe 2 describes it.

The undisputed reality is that JR5 had never threatened to harm Doe 2 physically, using a gun or any other object. [Doc. No. 128-2 at 232: 20-22.] In fact, in April 2017, Doe 2 expressed to JR5 that "she did not believe that he would physically harm her, and that she wanted to remain in an unattached sexual relationship with him." [Doc. No. 219, ¶ 214; Doc. No. 421, ¶ 214.] JR5 never talked to Doe 2 or approached her after November 2017. JR5 took only night classes in Spring 2018 and did not take any classes in the Summer of 2018. And, ultimately, BRUN's decision, after investigation and appeal, was to expel JR5: *a permanent separation of the student from the University without the possibility of readmission*. [See Doc. No. 127-14 at 4.]

Further, the truth of the matter is when Doe 2 finally agreed to meet with Officer Fischer for safety planning purposes, although she did not request

accommodation at that point, she was offered a UNLPD companion to walk her to places. [*See* Doc. No. 129, ¶ 250; Doc. No. 141, ¶ 250.] Other than accommodation in terms of waiting to notify JR5, Doe 2 did not request any other accommodation from Counley. [*See* Doc. No. 129, ¶ 251; Doc. No. 141, ¶ 251.]

The facts discussed herein are key distinguishing features from the case that Doe 2 relies on: *Kelly v. Yale Univ.*., No. 3:01-cv-15591, 2003 WL 1563424, at 4 (D. Conn. Mar. 26, 2003 (the Title IX plaintiff repeatedly requested that the University provide her with alternative housing and provide her with academic modifications, during the pendency of the grievance procedures); *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1296–97 (11th Cir. 2007) (University waited for the UGA police to perform an investigation, but even after it received a final report in April 2020, the University waited eight months to schedule a hearing).

**Sixth**, Doe 2 argues that the University should have taken disciplinary action against JR5 (by suspending him or placing him on probation) prior to the completion of the investigation and adjudication of her claims. But case law cautions against placing the label of sexual misconduct on alleged perpetrators because it comes with its own legal risks to the educational institution. *See generally John Does 1-2 v. Regents of the University of Minnesota, 999 F.3d 571, 583 (8th Cir. 2021)* (discussing pre-deprivation due process); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 868 (8th Cir. 2020) (discussing the rights of a student accused of sexual misconduct); *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, 72 (1st Cir. 2019) (discussing pre-deprivation process in Title IX cases). See also 34 C.F.R. §§ 106.30 & 106.45 (describing "supportive measures" as being "non-disciplinary" and "non-punitive"). Thus, asking BRUN to punish or sanction JR5 prior to a finding of

responsibility against him is inappropriate and BRUN's failure to do so cannot constitute "deliberate indifference."

**Finally**, this Court should reject the blatant lie that Doe 2 had to decide as to whether to proceed with a Ph.D. prior to the final decision on July 28, 2018. In addition to the fact that Doe 2 was teaching a course at the University through August 2018, the July 26, 2018, email from Barton is enlightening: ". . . . the department will cover the application fee of $40. We will transfer the funds **whenever Doe 2 is ready to complete the new application**. . . ." No doubt exists that Doe 2 was welcome to pursue her Ph.D. after she learned of the decision on July 28, 2018—but she declined to do so because she simply did not want to be in Lincoln, Nebraska.

At the risk of sounding like a broken record, it bears repeating that imperfections in the process do not equate to deliberate indifference. *See Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010) ("Deliberate indifference is a stringent standard of fault that cannot be predicated upon mere negligence.") (internal citations omitted). Nor does Doe 2 have a "Title IX right to make particular remedial demands." *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019).

## C. PLAINTIFFS FAILED TO SHOW CAUSAL NEXUS BETWEEN THE ALLEGED DELIBERATE INDIFFERENCE TO ACTUAL EXPERIENCE OF HARASSMENT.

Binding Eighth Circuit authority requires Plaintiffs to show causal nexus between the alleged deliberate indifference and actual further harassment.

Reduced to its essence, Plaintiffs were simply dissatisfied with BRUN's response. However, dissatisfaction does not amount to deliberate indifference, or that the deliberate indifference caused actual further sexual harassment.

In *K.T.*, the Eighth Circuit, addressing the plaintiff's post-notice actions, required the alleged deliberate indifference to cause the assault. *K.T. v. Culver-*

*Stockton Coll.*, 865 F.3d 1054 (8th Cir. 2017). In *K.T.*, the plaintiff alleged Culver-Stockton College was responsible for deliberate indifference in allowing an initial assault to occur and in its post-notice actions. She alleged as a result of the University's inaction she sustained "substantial mental and emotional distress . . . ." *Id.* at 1058. The Eighth Circuit held there was no "causal nexus between Culver-Stockton's inaction and K.T.'s experience sexual harassment," and found "[a]t most, these allegations link the College's inaction with emotional trauma K.T. claims she experienced following the assault." *Id.* "Thus, while K.T. was dissatisfied with the result, based on the allegations in the complaint, the response cannot be characterized as deliberate indifference that caused the assault." *Id.*

Furthermore, the Eighth Circuit's application of the requirement of causal nexus to the facts of the case in *Shank* further supports BRUN's application of this requirement to Doe 1 and Doe 2's circumstances. *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021). In *Shank*, the plaintiff, an undergraduate student at Carleton College, alleged two male students assaulted her in the college dormitories and sued the College for deliberate indifference in responding to her allegations of sexual assault, based on the College's post-notice conduct.

The plaintiff argued that the College was deliberately indifferent in several respects, including failing to allow her to participate more fully in the sexual misconduct adjudication, failing to remove posters on campus that had her alleged assailant's picture, and requiring or coercing her to meet one on one with her alleged assaulter, alone and in a closed room.

The Court held that none of these actions or inactions caused plaintiff to undergo harassment or made her vulnerable to harassment. *Shank*, 993 F.3d at 575. Addressing the allegation of the non-removal of the poster, the Court held "**even**

***assuming the posters qualify as sexual harassment for the purposes of Title IX liability***," the non-removal did not amount to deliberate indifference. *Id.* at 576 (emphasis added). As such, the Court did not suggest mere vulnerability to possible future harassment was enough; rather, for purposes of its analysis, it assumed she experienced actual further sexual harassment by the presence of the posters. *Id.* at 576. With respect to the meeting between the plaintiff and her assailant, the Court found plaintiff was not required to attend the meeting. But, again, the Court noted that even if plaintiff was required to attend the meeting, "it was far from clear that such a requirement would have been a violation of Title IX, because Shank presented no evidence the meeting 'caused' her to experience sexual harassment or made her 'vulnerable to [sexual harassment].'" *Id.* at 575 (citing *Davis* at 645).

The plaintiff in *Shank* further alleged the College mishandled a second allegation of sexual misconduct brought by Shank. The Court held "a Title IX plaintiff must demonstrate a 'causal nexus' between the college's conduct and the student's *experience* of sexual harassment." *Id.* at 993 (quoting *K.T.*, 865 F.3d at 1058). "Linking a college's actions or inactions to emotional trauma the plaintiff experienced in the wake of a sexual harassment or assault, even if proven, ***is not enough***." *Id.* (emphasis added).

Doe 1 cannot show causal nexus between the alleged deliberate indifference to any actual further harassment. After the No Contact Order was issued in June 2017, in October 2017, Doe 1 confirmed that JR4 had not been bothering her. After JR4 was directed not to communicate with Doe 1's roommate in December 2017, JR4 did not communicate with Doe 1's roommate. Although unfortunately JR4 sent an email to Doe 1 in May 2018, this email cannot be linked to any actions or inaction of BRUN.

Similarly, Doe 2 did not suffer further actual harassment. Doe 2 admits that she did not see JR5 after November 2017. Nor did Doe 2 and JR5 communicate, orally or in writing, after November 2017. The Facebook picture or the picture that JR5 submitted to IEC in his defense, cannot be said "sexual harassment," and they certainly cannot be linked to any actions or inactions of the University. The Facebook picture that was inadvertently posted was on Facebook for a maximum of one hour (JR5 removed after he realized his mistake), and the sensitive picture that JR5 submitted to IEC was deleted from the system. Other than mere speculation, Doe 2 does no present any evidence that JR5 communicated sensitive information to others or "spread rumors" after November 21, 2017. Nor was there any report to BRUN that he shared sensitive information about her after November 2017. [Supp. Dec. of Counley, ¶ 39.] Hence, Doe 2 cannot show any deliberate indifference, actual further harassment, or that any deliberate indifference caused actual further harassment.

**D. PLAINTIFF CANNOT ESTABLISH BRUN HAD SUBSTANTIAL CONTROL OVER JR4 AND JR5'S CONTEXT OF HARASSMENT.**

Doe 1 lumps random sighting of JR4 on campus and communication about JR4 as "sexual harassment," to argue that BRUN had substantial control over the context of the harassment. That she cannot do. As thoroughly discussed above, JR4 never approached her while Doe 1 was on campus, and she did not even see JR4 the entire 2019 and 2020. And, Doe 1 testified under oath that JR4 may have attended journal club prior to summer of 2017, and admitted she "was not sure." Further, Doe 1 admitted that the journal club is also potentially geared towards students who were collaborating with faculty members who office in Morrison Center. [Doc. No. 126-3 at 58:2 – 18.] Doe 1 admitted that JR4 was pursuing the same Ph.D. she was and collaborating with a faculty member in Morrison Hall. [Doc. No. ¶ 129, ¶156; Doc. No.

45

141, ¶ 156.] Regardless, Doe 1 never, ever reported that Doe 1 was harassing her or bothering her while she was on school grounds. No evidence of such exists. *See Doe v. Univ. of Arkansas – Fayetteville*, 974 F.3d 858, 868 (8th Cir. 2020) (illustrating that a university's sexual misconduct disciplinary procedures must protect the interests of a student victim of sexual assault as well as those of a student accused of sexual assault).

During her deposition, when Doe 1 was asked if it was her testimony that JR4 had never come to the journal club prior to summer of 2017, she responded "No that is not correct." [Doc. No. 126-3 at 58:2 – 18.] When she was asked if he had been to Journal Club prior to summer of 2017, she answered, "I don't know, but possible infrequently or rarely. I am not sure." [Id.] When she was asked "if a person collaborates with a lab in Morrison Center, will they be able to -- will they be part of the population that this seminar [Journal Club] is geared for?" Doe 1 answered "Potentially." [Id.] In fact, JR4 was collaborating with a faculty member who offices in Morrison Center. [Doc. No. 129, ¶ 156; Doc. No. 141, ¶156.] Throughout the time she attended Journal Club, JR4 never asked her questions, never approached her, and never talked to her. [Doc. No. 126-3 at 60:1 – 18.]

Nor can Doe 1 show actual knowledge or notice of this alleged harassing/discriminatory conduct. As the Eighth Circuit explained:

> The actual notice standard is quite onerous, and favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the student (which do not *expressly* allege sexual abuse of that student) fall short of creating actual notice. *See, e.g., Gebser*, 524 U.S. at 291, 118 S.Ct. 1989 (finding that "a complaint from parents of other students charging only that [the teacher] had made inappropriate comments during class ... was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student"); *Flaherty*, 623 F.3d at 585 (finding that "inappropriate" and "suggestive" text messages could not impute actual notice because

the messages "did not go so far as to suggest actual sexual conduct or sexual abuse") . . .

*KD v. Douglas Cty. Sch. Dist. No. 001*, 1 F.4th 591, 598 (8th Cir. 2021). Accordingly, Doe 1 cannot show that any communication from her to BRUN that she saw JR4 at Morrison  (she had been told he was coming into Morrison to collaborate with an individual) or he was in a class room with her (but was not bothering her) cannot be viewed as sexual harassment or discrimination based on the information she provided to Lamoureaux, Officer Beitler, Strickman, Counley, and others. The same goes to Lamoureaux's communication with her in October 2017. In other words, the question cannot be whether BRUN had substantial control over matters for which the University did not have actual knowledge. Rather, the question before this Court is whether BRUN had substantial control over the alleged "harassment" in May and June 2017, December 2017, and May 2018.

As thoroughly discussed in its opening Brief, they were not. In June of 2017, the only messages Doe 1 produced to Lamoureaux were text messages from JR4 in May and June 2017. [Supp. Dec. of Lamoureaux, ¶ 3.] Doe 1 shifts her story that she received the May and June 2018 messages while they were attending academic conference—that is not true. [*See* Defendant's Response to Plaintiffs' Additional Statement of Facts, ¶ 1, 58.] Doe 1 reported that on or about May 11, 2017, Doe 1 and JR4 went to a conference. [Doc. No. 125-4, at 2.] They returned to Lincoln on May 16, 2017. [Doc. No. 125-4 at 2.] Thereafter, on May 17, after Doe 1 messaged JR4 about retrieving her thermos, JR4 began sending her messages about their relationship. [Doc. No.  125-30 at 1.] During May 24, 2018, interview, Doe 1 stated:

> we bought our plane tickets and stuff together . . .  so went together to this conference and on the plane he would talk to me and he talked for . . .and then after that I thought that we had talked about it enough and but it was when we returned from the trip that he started that same the

47

next day after we returned from the trip that he started texting me and kept calling. . .

[Doc. No. 126-6 at 3, 5-6.] In fact, Doe 1 did not present any communication between JR4 and her prior to May 17, 2017, she alleges to be "harassing." [Doc. No. 125-4 at 2 – 3.] Moreover, there is no denying that Doe 1 was not taking classes in mid-May and June 2017 because she was solely working on her dissertation; meaning, she was not taking any classes.

With respect to Doe 2, Doe 2 seems to argue for the first time that JR5's alleged "heckling," "breaking into her apartment, "showing up unannounced at her office," "posting a harassing Facebook profile picture of Doe 2 and her friend intoxicated," and "sending a nude photograph of her to IEC" are "sexual harassment" under Title IX. As provided above, "the actual notice standard is quite onerous," unprofessional conduct towards students and vague complaints about interactions with others will not do. Accordingly, Doe 1's attempt to include each and every collateral information she provided to Counley about various interactions with JR4 as "sexual harassment" should be rejected.

Furthermore, each of Doe 2's allegations must be supported by "sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Mann,* 497 F.3d at 825. The undisputed evidence in this matter show that none of these alleged events were sexual harassment under Title IX. To highlight:

| DOE 2'S ALLEGATION | THE UNDISPUTED FACT AND EVIDENCE |
|---|---|
| Unwanted touching of thigh in August 2016 | Doe 2 testified that was "not an assault." [Doc. No. ¶ 219, ¶231.] Doe 2 admitted they were dating in August of 2016. [Doc. No. ¶ 219, ¶231.] There is no evidence in the record that Doe 2 communicated to him that his touch was unwanted. |

| | |
|---|---|
| Alleged Heckling | On March 14, 2017, Doe 2 had to give a presentation. She was upset because she suspected JR5 was cheating on her. During the presentation, JR5 commented on a spelling error and said "duplicitous." When she took a break, she over heard JR5 say "bridge too far." |
| Alleged breaking into room | On the same day on March 14, 2017, Doe 2 told JR5 that she did not feel comfortable possessing a gun. Thereafter, JR5 entered her apartment and took her firearm. On that day, Doe 2 made a comment that she wanted to die and was taken to Bryan.<br><br>This all occurred at her private apartment. |
| Alleged calling of Doe 2 and her friends "cunts" | JR5 did not refer to Doe 2 as "cunt." [See Defendant's Response to Plaintiff's Additional Statement, ¶ 106.] |
| Showing up unannounced at her office | Doe 2 maintained communication with JR5 through November 2017 because. In fact, she was expecting JR5 that day but that he came earlier than she thought. |
| Allegation of posting a "harassing" Facebook profile picture | When asked about the picture on Facebook, JR5 reported he was downloading the picture off of his Facebook to provide to Counley when he accidentally posted it. JR5 reported he did not realize that the picture was posted on Facebook briefly for an hour or less. When he realized, JR5 took it down. JR5 reported to Counley that he was not even Facebook friends with Doe 2 at the time. [Doc. No. 129, ¶340.]<br><br>See the entirely decent picture of Doe 2. [*See* Doc. No. 28-16 at 2.] |
| Alleged sending of threats | There is no evidence in the record of "threats" sent to Doe 2 after IEC was notified. Indeed, as Doe 2 admitted, JR5 never communicated with Doe 2 orally or in writing after December 21, 2017. Nor was there any report to IEC that JR5 messaged, texted, or communicated with Doe 2 in any way after November 2017. [Doc. No. 129, ¶¶ 323, 326; Doc. No. 141, ¶¶ 323, 326.]<br><br>[*See also* Defendant's Responses to Plaintiffs' Additional Statement of Facts, ¶ 143.] |

| | |
|---|---|
| Allege spreading rumors about her | Briefly, Doe 2 could not identify any specific instances where JR5 "spread rumors" about her to professors and peers. There is no competent evidence in the record providing facts about the alleged rumors (what was it even about), including to whom these alleged rumors were spread.<br><br>*See* Defendant's Responses to Plaintiffs' Additional Statement of Undisputed Facts, ¶ 141, for details. |

In addition, Plaintiffs' reliance on the language of the Student Code of Conduct to argue "substantial control" is similarly unavailing. In support, Plaintiffs cite to non-binding authority, such as *Owens v. Louisiana State Univ.*, No. CV 21-242-WBV-SDJ, 2023 WL 8880377, at *8 (M.D. La. Dec. 22, 2023) and *Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 650 F. Supp. 3d 452, 468–69 (M.D. La. 2023). However, both of these district courts held the way they did because there was no clear guidance from their Circuit. *See Owens v. Louisiana State Univ.*, No. CV 21-242-WBV-SDJ, 2023 WL 8880377, at *9 (M.D. La. Dec. 22, 2023) ("Without clear guidance from the Fifth Circuit regarding whether sexual assault that occurs off-campus can satisfy the control element, the Court looks to decisions from district courts in this Circuit which have found that off-campus rape and assault "*is* actionable."); *Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, 650 F. Supp. 3d 452, 468–69 (M.D. La. 2023) (cited to other circuit case law and held that the Plaintiff's allegation establish a plausible basis to conclude that the University also exercised substantial control over "the context" where she was raped, even if the rape occurred off-campus," and that these allegations will benefit from evidentiary development to determine the full extent of the connection. . . ."). Moreover, the other cases that Plaintiffs rely upon—*Doe 1 v.*

*Baylor Univ.*, 240 F. Supp. 3d 646, 660 (W.D. Tex. 2017), *Lozano v. Baylor Univ.,* 408 F. Supp. 3d 861, 899 (W.D. Tex. 2019) and *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1098 (10th Cir. 2019)—did not address the question of whether the defendants had substantial control over the harasser or the context in which the known harassment occurs.

To the contrary, there is binding authority in the Eighth Circuit. *See Doe v. Bd. of Trustees of the Nebraska State Colleges,* 78 F.4th 419, 424 (8th Cir. 2023) ("Title IX requires a school to be in a position to control the situation, know of it, and still exhibit indifference."); and *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014) (Holding the University cannot be liable for deliberate indifference under Title IX, where the alleged rape occurred at off campus party); and *Ostrander v. Duggan,* 341 F.3d 745, 750–51 (8th Cir. 2003) (holding that the plaintiff has failed establish substantial control, under Title IX, over both the harasser and the context in which the known harassment occurred because it failed to offer sufficient evidence to establish the 507 premises, where the alleged sexual assault occurred, were owned, possessed, or controlled by the fraternity).

Plaintiffs argue that because BRUN relied on the provision of its student code of conduct to respond to their report of concerns with respect to JR4 and JR5, they should be deemed to have substantial control over Title IX. This argument epitomizes the phrase "no good deed goes unpunished."  Furthermore, it disregards the fact that BRUN did ***not*** argue that BRUN did not exercise control over the harasser.

A similar argument was rejected in *Roe v. St. Louis Univ.*, 746 F.3d 874, 884 (8th Cir. 2014). There, the "the National Women's Law Center argues that the University had disciplinary control over the rapist because he was a student and that universities may control certain off campus behavior due to the nature of the

relationship between students and the institution." *Id.* In response, the Eight Circuit held: "The Supreme Court has made it clear, however, that to be liable for deliberate indifference under Title IX, a University must have had control over the situation in which the harassment or rape occurs." *Id.* In fact, The Court encouraged Universities to take action even when Title IX is not applicable: "Nevertheless, this case illustrates why it would be beneficial for colleges and universities to help protect the safety of their students by developing educational programs about sexual assault and its consequences, whether or not the offensive acts occur on or off the campus." *Id. See also Brown v. State,* 23 F.4th 1173, 1182 (9th Cir. 2022) (holding "disciplinary authority over a student is *not enough* to establish that the school controls the locations or contexts where a student is found."). *cf. Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246, 258, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009) (Title IX is not the "exclusive mechanism for addressing gender discrimination in schools," and allowing § 1983 suits based on the Equal Protection Clause).

Considering the uncontroverted evidence in the record, there is nothing that suggests that the University controlled—let alone substantially controlled—the context of the harassment.

BOARD OF REGENTS OF THE
UNIVERSITY OF NEBRASKA,
Defendant

By:    /s/ Lily Amare
        Susan K. Sapp #19121
        Lily Amare #25735
        Cline Williams Wright
          Johnson & Oldfather, L.L.P.
        1900 U.S. Bank Building
        233 South13th Street
        Lincoln, NE 68508
        (402) 474-6900
        ssapp@clinewilliams.com
        lamare@clinewilliams.com

            AND

        Bren H. Chambers, #23150
        Associate General Counsel
        University of Nebraska
        3835 Holdrege Street
        Lincoln, NE 68583-0745
        (402) 472-1201
        bchambers@nebraska.edu

## CERTFICATE OF COMPLIANCE

I, Lily Amare, hereby certify that this Reply Brief complies with the limits set forth in NECivR 7.1(d). Further, based on the Word Count function of Microsoft Word 2013-word processing software, applied to include all text, including the caption, headings, footnotes, and quotations, I certify this Reply Brief contains 16,998 words.

I further certify that no generative artificial intelligence program was used in drafting this document.

        /s/ Lily Amare
        Lily Amare

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.

/s/ Lily Amare
Lily Amare

4934-2459-3923, v. 4