## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, | |
| Plaintiffs, | **4:20CV3081** |
| v. | |
| BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, | **MEMORANDUM AND ORDER** |
| Defendant. | |

Plaintiffs Jane Doe 1 ("Doe 1") and Jane Doe 2 ("Doe 2" and together, the "plaintiffs")[1] claim that officials at the University of Nebraska – Lincoln ("UNL") were deliberately indifferent to instances of sexual harassment and assault they suffered while they attended UNL (Filing No. 29). They seek relief under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq*., for damages they assert they incurred as a result. Now before the Court is defendant Board of Regents of the University of Nebraska's (the "Board")[2] Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(a). For the reasons that follow, that motion is granted.

---

[1]Doe 1 and Doe 2 are pseudonyms for the individual plaintiffs involved in this matter. The Court previously granted the parties' joint request to allow the plaintiffs to proceed under those pseudonyms and maintain their anonymity during these proceedings (Filing No. 70). *See Cajune v. Ind. Sch. Dist. 194*, 105 F.4th 1070, 1077 (8th Cir. 2024) (discussing the "limited circumstances" under which a party may "proceed under a fictitious name"). That approach—which the parties have diligently followed—remains appropriate given the particular circumstances of this case.

[2]Under Nebraska law, the Board serves as the governing body for the University of Nebraska system (the "university"). *See* Neb. Rev. Stat. §§ 85-103, 85-106; *see also* Neb. Rev. Stat. § 85-105 (giving the Board the capacity to "sue and be sued").

## I.     BACKGROUND

### A.     Doe 1

Doe 1 attended UNL as a graduate student in its Biological Sciences Department (the "department") from August 2015 to August 2020.  She specialized in genetics, cell and molecular biology, and aimed to graduate with her Ph.D. within five years.

Doe 1 started dating a male graduate student in her program, John Roe 4 ("Roe 4"),[3] during the 2016 spring semester.  The couple dated for about a year until April 2017, when Doe 1 broke things off.

On the evening of June 27, 2017, a UNL student reported an incident involving Doe 1 and Roe 4 to Matthew Hecker ("Hecker"), then UNL's Dean of Students.  Hecker notified the UNL Police Department ("UNLPD") and Office of Institutional Equity and Compliance ("IEC") of the report the next day.  UNLPD Officer Kristy Beitler ("Officer Beitler") contacted Doe 1 that day to follow up on the report.

Doe 1 told Officer Beitler that she had been receiving messages from Roe 4 that included "pleas of getting back together, apologies, and calling her mean and heartless for not responding to him."  She explained that she did not believe Roe 4 posed any immediate danger to himself or others, confirming that he had not made any threats toward her or himself, had never exhibited any violent behavior, and did not have access to weapons.  Doe 1 also stated she was out of town at the time in a safe place.

Officer Beitler informed Doe 1 that UNLPD would give Roe 4 a no-contact directive and provided her with information about resources offered by the IEC and Voices of Hope, a local organization sponsored by UNL to provide confidential resources to individuals affected by sexual violence and abuse.  That same day, UNLPD Officer Jordan Newman

---

[3]On the parties' joint motion, the Court also permitted the non-party "Roes" in this case to remain anonymous.

verbally directed Roe 4 to cease all contact with Doe 1. Roe 4 told UNLPD that he had been contacting Doe 1 to get closure and an "answer [to] one last question."

In her conversation with Officer Beitler, Doe 1 also expressed her interest in obtaining a formal, permanent No Contact Order. On June 28, Officer Beitler met with Hecker, Tamiko Strickman ("Strickman"), UNL's Title IX Coordinator, and Jeff Lamoureaux ("Lamoureaux"), UNL's Deputy Title IX Coordinator and Investigator, and discussed the situation. Lamoureaux followed up with Doe 1 that day, sending a letter acknowledging the IEC was notified that she "may have been subjected to sexual harassment or violence." The letter further explained her options to file complaints with local law enforcement, the IEC, or both. Lamoureaux enclosed additional information about the university's responsibility to respond to complaints of sexual misconduct, its reporting and investigation process, and various resources available to her.

On June 29, Officer Beitler informed Doe 1 that UNLPD had given Roe 4 a no-contact directive. Doe 1 did not express further concerns or need for assistance at that time. Doe 1 met with Lamoureaux and Officer Beitler the next day and further elaborated on her relationship and communication with Roe 4. She reported that Roe 4 expressed his desire to continue their relationship during a conference trip they attended as part of their graduate program. At that time, Doe 1 informed him she was not interested in dating him and that they should not continue a friendship.

Doe 1 explained at that meeting how Roe 4 repeatedly pleaded to continue their relationship over text on May 17, 2017. Doe 1 again informed him she was not interested in dating him and told him to stop contacting her. Roe 4 nonetheless continued contacting Doe 1 through texts, emails, phone calls, and social media messages. That led Doe 1 to remove and block Roe 4 on her social media accounts. In recalling these events, Doe 1 again reaffirmed to Lamoureaux and Officer Beitler that Roe 4's messages were not explicitly threatening or sexual.

Doe 1 claims Lamoureaux told her that his office could not help as her allegations did not constitute sexual harassment and that her only option was to pursue an informal no-contact order. The Board disputes that recollection, asserting Lamoureaux advised her of her options to file complaints and outlined his determination that Roe 4's behavior could constitute stalking in a letter sent to Doe 1 that day. Ultimately, Doe 1 decided to report the incident to the IEC and UNLPD but not file a formal complaint. She again expressed her goal to obtain a No Contact Order.

Lamoureaux spoke with Roe 4 that same day. Roe 4 acknowledged Doe 1's requests to stop contacting her and again explained his desire to get answers and closure. He informed Lamoureaux that he did not intend to contact Doe 1 further and would agree to a No Contact Order as part of an informal resolution.

That day, Lamoureaux sent a letter to Doe 1 summarizing her allegations and the IEC's actions. He notified her that Roe 4's behavior could potentially qualify as stalking under the university's Student Code of Conduct (the "Code of Conduct") and again explained UNL's process for investigating such violations and the standard of proof for imposing disciplinary measures. Lamoureaux's letter also memorialized both parties' desire to resolve the matter informally and stated a permanent No Contact Order would be issued and remain in effect while Roe 4 attended UNL, directing him to "not have any contact, direct or indirect," with Doe 1. Doe 1 was informed that the IEC did not fully investigate her allegations or issue a determination based on their informal resolution. Lamoureaux never received any response from Doe 1 with concerns, questions, or objections about the information contained in the letter.

Strickman issued a No Contact Order that day. Her letter directed Roe 4 "to immediately cease all contact and all communication, verbal or non-verbal, with" Doe 1, "not attend any classes . . . for which [he was] not currently registered," and not "loiter[] around any classroom in which [Doe 1] is attending." He was warned that violating the

No Contact Order could result in a report to UNLPD and further disciplinary action by UNL.

Over the next few weeks, Doe 1 and Lamoureaux discussed some questions Doe 1 had about the No Contact Order.  Lamoureaux first spoke to Doe 1 about her previous discussions with her advisor, family members, and friends about the situation and told her that she should keep the matter "as confidential as possible."  On July 19, 2017, Doe 1 further inquired about the terms of the No Contact Order in relation to a required course she and Roe 4 were to take together during the 2017-2018 academic year.  Lamoureaux initially explained that "it would be expected" that they may see each other in class but that they both should "avoid interaction as much as possible."

Lamoureaux offered to meet with Doe 1 in person to discuss her concerns about being in class with Roe 4.  He informed Doe 1 that, under the No Contact Order, the parties could still see each other as long as Roe 4 did not initiate contact with Doe 1.  Eventually, Doe 1 and Roe 4 took the course together without incident.  According to Doe 1, Roe 4 never communicated with or approached her during class.

On October 17, 2017, Lamoureaux contacted Doe 1 to inform her that Roe 4 had asked him on multiple occasions "if it was possible to work things out with [her]."  Lamoureaux told Doe 1 that he had advised Roe 4 "that he needed to move on" but wanted to share the information with her to find out if she wanted to work things out with him or if she had been bothered by him at all.  Doe 1 responded that she had not been bothered by Roe 4 but did not want to speak with him.  She stated she was concerned that Roe 4 "was using Lamoureaux as a third party to contact her."

Doe 1 further expressed her concern to Lamoureaux that Roe 4 had not moved on and asked if there were any steps she should take to address the situation.  She also asked if she could speak with her advisor about the situation, stating she "would feel more comfortable in the lab during the day and evenings if she was aware" of what was going

5

on.  Lamoureaux responded, "I will advise him to avoid contact.  If he doesn't listen we will take further steps."  He then contacted Roe 4 to tell him Doe 1 was not interested in speaking with him and direct him not to initiate contact with her.  Roe 4 complied with those orders for the time being.

On December 7, 8, and 11, Roe 4 texted Doe 1's roommate Tina.[4]  In the bulk of those texts, Roe 4 expressed his frustration over the fallout of his breakup with Doe 1, blaming her and her friends for ruining his graduate-school experience.  In that vein, Roe 4 called Doe 1 an "attention whore" and referred to her, Tina, and their friends as "mean little gossip girls" among other offensive descriptions.

While complaining about how others had spoken about him, he mentioned he had embarrassing information about Doe 1 that he "should spread" but that he did not "do that shit."  Roe 4 further made profane, negative statements complaining about Doe 1's advisor and threatened to "take [her] down" by sharing rumors he knew about her.  Roe 4 did not ask Tina to pass along his comments or tell her to have Doe 1 contact him.

On the morning of December 13, Roe 4 emailed Doe 1's other roommate, Hannah.  He complained about Doe 1's academic advisor, accusing her of spreading rumors about another UNL graduate student's alleged inappropriate conduct.  Roe 4 also told Hannah things Doe 1 purportedly shared with him in confidence while they dated, including negative comments about her.

That day, Doe 1 and Tina met with Meagan Counley ("Counley")—then a Title IX Investigator and Deputy Title IX Coordinator at UNL—and UNLPD Officer Eric Fischer ("Officer Fischer") after reporting Roe 4's messages.  Doe 1 confirmed at that meeting that she had no other concerns beyond the messages.  The next day, Counley and Officer Fischer met with Roe 4 and directed him not to contact Doe 1 or her roommates.  Doe 1 was

---

[4]The parties have utilized pseudonyms for various non-parties' names to protect the anonymity of the Does and Roes.  The Court follows suit.

promptly notified of that directive.  Around that time, UNLPD also restricted Roe 4 from accessing the Morrison Center, a controlled-access building on UNL's campus that housed a number of the department's laboratories, including one in which Doe 1 taught.

Counley continued investigating the incident and later determined that Roe 4's messages to Tina did not violate the No Contact Order.  She relayed that conclusion to Doe 1 in January 2018.  Counley and Doe 1 met later that month to discuss the investigation after Doe 1 sought additional clarity on her findings and conclusion.  When deposed in this case, Doe 1 stated Counley told her she could not file a formal complaint at that time. Counley, however, maintains she "did not tell Doe 1 that she [could not] file a formal complaint in December 2017 or January 2018."

Doe 1 met with Officer Fischer about a month later to create a safety plan.  Doe 1 explained that Roe 4 was attending the same seminars as her but had not caused any issues. Officer Fischer reminded Doe 1 that she could call UNLPD for a police escort.

Doe 1 contacted the department to express her concerns about attending classes with Roe 4.  She initially sought an accommodation for courses that semester from Counley, who states she advised her that she would need to work with the department itself to address the issue.  Doe 1 claims that response was a denial of her request for accommodations; the Board sees things differently.   Upon her request, the department granted her an accommodation to attend a different course to fulfill her requirements and avoid attending class with Roe 4.  The department also moved the classroom in which Roe 4 was assigned to teach so it would be further from Doe 1's classroom.

Still, Doe 1 and Roe 4 attended another course together that semester.  Roe 4 never talked to her personally or approached her outside of the classroom.  Doe 1 never asked for a police escort.

On May 5, 2018, Doe 1 received an email from "John Smith" while both she and Roe 4 were attending a conference in Austin, Texas.  As Doe 1 immediately suspected,

Roe 4 sent the email using a pseudonym. In that email, Roe 4 launched a profanity-laden tirade against Doe 1, telling her she was not a "strong independent wom[a]n" but rather a "cowardly little girl." He called her a "cunt bitch," "fucking cunt coward weak little girl," and "STUPID CUNT BITCH." She forwarded the message to Counley and Officer Fischer on May 6, at which time she also stated she believed Roe 4 may have attempted to log into her personal email account. Officer Fischer immediately responded and set up a meeting for May 11, 2018.

On May 9, Doe 1's boyfriend visited the IEC to express his concern about Doe 1's safety. He also emailed several university officials—including members of the Board, the Chancellor, and the President—explaining his great concern for Doe 1's safety and dissatisfaction with UNL's response. Based on those reports, UNLPD and the IEC contacted Doe 1 on May 10th to ensure she was safe. Officer Fischer called Doe 1, who agreed to meet with UNLPD and Strickman that day.

At the meeting, Doe 1 stated that she did not know her boyfriend sent the emails and that her only contact with Roe 4 was through the reported "John Smith" email. Strickman and Officer Fischer requested Doe 1 send the email's header information to help identify the IP address of the sender. Strickman further reviewed the email's contents with Doe 1, asking her what she thought each line meant. Doe 1 told Strickman and Officer Fischer that Roe 4 seemed "very unstable" and that she was "definitely afraid of him" and "afraid to be on campus."

In response, they addressed Doe 1's concerns over Roe 4's presence in the Morrison Center. Officer Fischer took down information about the dates and times Doe 1 had seen Roe 4 in the building. Strickman again ensured that Doe 1 was aware of her options under Title IX to address the situation, including by pursuing a formal complaint, filing an anonymous complaint, or declining to file a complaint.

Doe 1 met with Counley and Officer Fischer the next day. At that time, Doe 1 asked Counley what she and the IEC had done to make sure UNL was providing a safe learning environment for her. Doe 1 claims that Counley replied that was not her job. The Board disputes that statement and points to Counley's written statements to Doe 1 that her "safety and security [was] of the utmost importance."

On May 14, 2018, Doe 1 informed the IEC that she wished to pursue a formal complaint and investigation against Roe 4. A few days later, she secured a protection order against Roe 4 from the County Court of Lancaster County, Nebraska. Roe 4 was served with that order on May 21, 2018.

Doe 1 filed an intake form with the IEC on May 23, 2018. Counley met with Doe 1 the next day to give her an opportunity to provide a detailed account of her allegations. In a letter sent to Doe 1 that day, Counley outlined those allegations and informed Doe 1 that UNL had initiated a formal investigation into her complaints. That letter also detailed the IEC's "neutral investigation" procedures, the rights and responsibilities created by Title IX, and further resources Doe 1 could access.

Counley immediately began conducting interviews. During the investigation, Doe 1 took advantage of opportunities made by IEC to review and inspect statements and documents Counley generated, respond to Roe 4's response to her allegations, provide questions she wanted Counley to ask Roe 4, and offer further relevant information. Counley was regularly in touch with Doe 1 throughout the process, first updating her on June 6, 2018.[5]

---

[5]During this investigation, Counley learned that, in May 2018, Roe 4 messaged over Facebook the individual who initially reported his behavior toward Doe 1. Roe 4 referenced the individual's sexuality, called him derogatory names, and threatened to have his teeth "kicked . . . in." According to the Board, those messages were investigated separately as they involved another former student.

9

On June 15, UNLPD issued a stalking citation to Roe 4.  Two weeks later, Counley contacted Doe 1, notifying her that UNL's investigation would exceed sixty days.  On July 10, Counley and Officer Fischer met with Doe 1 and gave her additional updates. They spoke again a week later, at which time they addressed Doe 1's concerns over Roe 4's continued presence in the Morrison Center.  Counley and Officer Fischer assured Doe 1 that Roe 4 did not have keycard access to the building but was being let in to collaborate with a faculty member.

Counley issued her determination in a letter to Doe 1 on July 27, 2018, sixty-four days after the formal investigation commenced.  She concluded that the greater weight of the evidence showed that Roe 4 violated the Code of Conduct (Filing No. 125-22), namely its provisions regarding (1) stalking, (2) "[p]hysical abuse, verbal abuse, threats, intimidation, [and] harassment," and (3) "fail[ing] to comply with direction of University officials or law enforcement officers."  Counley recommended Roe 4 receive one year of probation and continue under the no-contact directive.

Both Doe 1 and Roe 4 appealed the recommended sanctions.  On August 13, 2018, Associate Director for Student Conduct Sue Moore ("Moore") sent Doe 1 a letter informing her that the appeals had been received and explaining the process.  After a pre-hearing conference, a hearing on Doe 1's appeal was held on September 7, 2018, with Moore serving as the hearing officer.

Moore notified Doe 1 of the outcome of the hearing on September 18, 2018. Specifically, she upheld Counley's finding that Roe 4 had violated three provisions of the Code of Conduct and largely agreed with Counley's sanctions.  Moore further determined Roe 4's probation should last for the duration of his time at UNL and his access to the Morrison Center should be restricted.  With regard to the latter, Moore provided that Roe 4 could only visit the Morrison Center at specific times and for pre-approved "academic purposes."

10

Doe 1 remained concerned about Roe 4's access to the Morrison Center and possible attendance at seminars she would attend and at which she might present. Moore confirmed she would contact the appropriate personnel to determine which seminars Roe 4 may be required to attend and assured Doe 1 the no-contact order would remain in effect should he be present.

Again, both Doe 1 and Roe 4 appealed the decision. Laurie Bellows ("Bellows"), then the Interim Vice Chancellor for Student Affairs, served as the appeal officer. Bellows notified Doe 1 on October 4 of her appointment and explained the process to follow. On October 30, Bellows affirmed Moore's decision.

That December, Assistant Vice Chancellor for Student Affairs Jake Johnson ("Johnson") informed Doe 1 about Roe 4's limited use of the Morrison Center. Doe 1 expressed her desire to be notified when Roe 4 would be present in the Morrison Center, noting her concern that she had continued to see him "fairly frequently in the last year." Johnson told Doe 1 that Roe 4's faculty collaborator stated that he had no pending appointments at that time but that they would notify him when any such appointments were made. Johnson again advised Doe 1 that she could contact him, the department, Moore, or UNLPD if she saw Roe 4 in "an area where he should not have access."

Doe 1 remained aware that Roe 4 would have some access to the Morrison Center during the day and admittedly did not recall seeing him after hours. In fact, Doe 1 did not see Roe 4 at all from December 2018 through May 2019 as Roe 4 had been suspended for the entire Spring 2019 semester. Doe 1 was aware of his suspension.

Nearly a year later, in September 2019, Doe 1 submitted a formal complaint to UNL's Office of Student Conduct and Community Standards. Her complaint concerned a comment made on a public, non-university website titled "DearUNL." In response to a form on the website inviting testimonials, the individual commented, "Get a fucking life you stupid cunts. If you can't convince the kangaroo court that is Title IX that you were

11

violated then you have no case. Go fuck yourselves."  Based on the way the individual partially identified himself, Doe 1 was concerned that the sender was Roe 4.  Moore informed Doe 1 about a month later that her preliminary investigation found that, even if the sender was Roe 4, the communication was not directed at Doe 1 and thus did not violate the No Contact Order.

Doe 1 graduated from her Ph.D. program in August 2020.  As she admits, from June 2017 through August 2020, Roe 4 never approached her, attempted to talk to her in person, or came into any of the rooms where she taught or worked on campus.  Roe 4 and Doe 1 at times walked by each other on campus.  Doe 1 never reported that Roe 4 had either indirectly or directly threatened her during that time.

Doe 1 alleges the university's reporting and investigation process "was more stressful and difficult than the stalking she experienced."  The Board refutes Doe 1's claims that the university's response was insufficient and somewhat disputes the nature and severity of the effect the experience had on her educational opportunities and mental health.[6]  The parties agree, however, that a psychologist diagnosed Doe 1 with "relationship distress with an intimate partner and anxiety disorder" in June 2017, as well as "Adjustment Disorder with Anxiety" in July of that year.  Doe 1 further asserts that she suffers from symptoms of post-traumatic stress disorder ("PTSD"), including trouble concentrating, hypervigilance, intrusive thoughts, sleep dysfunction, and suicidal thoughts.

She claims her decreased productivity from the events "resulted in delaying her graduation from May to August 2020."  The Board disagrees.  It points to a May 2018 meeting at which Doe 1 identified August 2020 as the time of her projected graduation, which Doe 1 does not dispute.   Doe 1 also states she abandoned her goal of going into

---

[6]Some of those disagreements are the subject of the Board's pending motion to exclude the plaintiffs' experts. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593-95 (1993) (discussing the district court's duty to ensure an expert's testimony is reliable). Because those matters do not determine the present motion, the Court does not discuss them here.

higher education after she became "disillusioned" by the Title IX process and her experience at UNL.

### B.    Doe 2

Doe 2 began her studies toward a Master of Arts in Political Science at UNL in August 2015.  Around February 2016, Doe 2 became romantically involved with John Roe 5 ("Roe 5"), a political science Ph.D. student.  The two students dated on and off through July 2017.  For most of that time, Doe 2 kept their relationship a secret.

In April 2017, Doe 2 expressed to Roe 5 that she wished to remain in an unattached sexual relationship with him.  She told him their romantic relationship had emotionally harmed her, but she believed they could remain in a sexual relationship as she thought he would not physically harm her.

Unfortunately, that trust did not last.  Doe 2 contacted Voices of Hope in August 2017 alleging that Roe 5 sexually assaulted her and seeking resources.  She received confidential services from Morgan Beal ("Beal"), an advocate at Voices of Hope.  Around that time, Doe 2 also reported the allegations to the Lincoln Police Department ("LPD").  LPD promptly began investigating.

Throughout the Fall 2017 semester, Doe 2 remained in contact with Roe 5 while she attempted to gather evidence related to her allegations.  From that time through her graduation in May 2018, Doe 2 never attended the same classes as Roe 5.  Roe 5 did not approach Doe 2 any time after November 2017.

Doe 2 confided in Dona-Gene Barton ("Barton"), an Assistant Professor in the Political Science Department, sometime in the middle of October 2017.  She informed her about the alleged assault but asked her to keep the information confidential.  At that time, Doe 2 did not want the IEC to learn about her allegations against Roe 5.  Still, Barton contacted the IEC in early November 2017 and reported that a student had informed her of Roe 5's inappropriate conduct.

Counley reached out to Doe 2 shortly after hearing from Barton and gave Doe 2 an opportunity to provide more information with respect to her allegations against Roe 5. Doe 2 was unhappy as she did not want the IEC's Title IX officers to get involved. Nevertheless, Doe 2 and Counley met on November 21, 2017, to discuss her rights and options under Title IX and the availability of other resources. Doe 2 informed Counley she needed more time to decide how she wished to proceed.

Doe 2 filed a formal complaint against Roe 5 with the IEC later that day. She alleged that Roe 5 assaulted her in his home at the beginning of their relationship in March 2016 while she was incapacitated from intoxication. Doe 2 further described an August 2016 incident in which Roe 5 stroked her leg during an orientation presentation. Finally, she reported that Roe 5 sexually assaulted her twice in July 2017 at her apartment.

Doe 2 also reported instances of alleged emotional abuse. According to Doe 2, Roe 5 criticized and humiliated her during a class presentation on March 14, 2017, shortly after Doe 2 learned he was cheating on her. After those comments heightened Doe 2's nerves, Roe 5 continued to make comments critical of Doe 2 to a classmate. Doe 2 further broke down. Following a conversation during which Doe 2 possibly informed Roe 5 she was uncomfortable owning a firearm in her mental state, Roe 5 entered Doe 2's apartment[7] that day and took her firearm. Doe 2 called the police and was taken to the hospital.

Counley summarized these allegations in a letter sent to Doe 2 on November 28, 2017. That letter informed Doe 2 that the IEC had started investigating her allegations against Roe 5 and detailed the procedure and standards involved in its Title IX investigations. Doe 2 was again advised of her rights and the resources available to her through UNL. She requested that Counley wait to notify Roe 5 of the investigation until

---

[7] Doe 2 now asserts that Roe 5 "broke into [her] apartment," but the parties agree that she had previously given Roe 5 the keypad-code to her apartment.

after she left town for break.  Doe 2 now states that she was worried Roe 5 would come to her apartment and shoot her upon hearing of her complaint.[8]

On November 30, 2017, Beal reached out to Doe 2 to notify her that Officer Fischer was able to meet with her the next day as part of the investigation.  Doe 2 declined the offer to meet at that time.  Around then, UNLPD agreed to keep Doe 2's firearm upon her request.

On December 11, 2017, Doe 2 informed Counley that she would be leaving town the next week on December 19th.  Counley waited to notify Roe 5 until December 21.[9] That day, she sent a letter to Roe 5 notifying him of the allegations against him and the ongoing Title IX investigation.  Counley informed him that his alleged conduct may be in violation of the Code of Conduct's provisions prohibiting sexual assault and harassment. Her letter further provided Roe 5 an opportunity to respond to Doe 2's allegations and offer evidence.

Counley notified Doe 2 that day of her communication with Roe 5.  From then on, Doe 2 and Roe 5 ceased all communication.

On January 8, 2018, Counley notified Doe 2 and Roe 5 that the investigation would exceed sixty days.  As Counley noted to Doe 2, some of that delay was attributable to her request that the IEC hold off on notifying Roe 5 of her allegations.  Later that week, Doe 2, Beal, and Officer Fischer met for a safety-planning meeting at which Officer Fischer offered to assign Doe 2 a UNLPD companion to escort her around campus.  Though she

---

[8]Roe 5 owned at least one firearm and had a concealed-carry permit until June 2017, when the permit expired.  The parties dispute whether he ever carried a firearm on campus or the extent of UNL's knowledge of his possession of firearms.

[9]Doe 2 now takes issue with how long Counley waited to notify Roe 5 of her complaint.  She states that, through her conversations with Beal, she was under the impression that Counley would only wait to inform him during Thanksgiving break— around November 27, 2017.  Once Doe 2 and Counley spoke in early December, Counley informed her she would contact Roe 5 the day after Doe 2 left for winter break.

reported feeling unsafe to Officer Fischer, Doe 2 did not take him up on the offer. In fact, Doe 2 never asked for any accommodations from the IEC for the duration of the investigation.

On January 16, 2018, Counley updated Doe 2 about the investigation and shared a list of witnesses identified by Roe 5. Roe 5 provided a detailed, 106-page response to Doe 2's complaint the next day. Counley notified Doe 2 of his response on January 19. Among other things, Doe 2 was given opportunities to provide evidence, review and inspect documents, and respond to Roe 5's response to her allegations. Counley also granted Doe 2's requests for additional time to respond to Roe 5's statement and have an attorney review the document.

The IEC's investigation continued through the Spring 2018 semester. Doe 2 met with Counley in mid-February, at which time she responded to Roe 5's statement and answered the questions he posed. Following a months-long effort to gather information from LPD that Doe 2 flagged as important to the investigation, Counley finally received access to recorded phone calls and transcripts maintained by LPD in March 2018. Doe 2 was allowed to review those records on March 16 and again on March 20 at her request.

On April 6, 2018, Counley issued her Investigation Report and sent a letter to Doe 2 summarizing her findings. Counley found that the greater weight of the evidence supported a finding that Roe 5 sexually assaulted Doe 2 in one of the reported July 2017 instances, thereby violating the Code of Conduct. Her investigation did not find sufficient evidence to discipline Roe 5 for the other alleged instances of abuse.

As Counley further explained in her letter, she recommended that Roe 5 be expelled without the possibility of readmission based on her finding that he sexually assaulted Doe 2. Counley sent a similar letter to Roe 5 the same day. Both parties were informed that they could request a hearing or administrative resolution within seven days if they disagreed with Counley's conclusions.

Roe 5 belatedly contacted Johnson and requested a hearing on April 23, 2018, claiming that he did not receive Counley's letter. On April 24, Johnson granted his request and notified Doe 2 that the matter would be heard by the University Conduct Board (the "conduct board"). That week, Johnson informed Doe 2 that he needed an additional two to three weeks to schedule the hearing in light of the limited availability of conduct board members and staff at that time.

On April 30, Johnson reported to Doe 2 that the hearing would be held on May 23, 2018, with a pre-hearing conference on May 16, 2018. In that letter, he explained that Roe 5's appeal challenged whether the sexual assault allegation was supported by a preponderance of evidence to constitute a violation of the Code of Conduct. Johnson further outlined the hearing process for Doe 2, explaining that he would present information in support of the allegation and that Counley would testify to the findings of her investigation. Doe 2 was informed that she was encouraged but not required to attend the hearing and was given an opportunity to submit any documents supporting her allegations by May 14.

On May 7, Johnson provided Doe 2 a description of the information Counley gathered as part of her investigation. That day, Johnson, Counley, Beal, and Doe 2 met to discuss a resolution offer from Roe 5 through which he agreed to accept a two-year suspension. Doe 2 declined the offer. Johnson memorialized that conversation in an email to Doe 2 later that day. He also relayed the request he received from Roe 5's attorney to move the hearing to the end of June. Doe 2 informed Johnson that she opposed delaying the hearing.

Johnson contacted Roe 5 the next day, informing him that Doe 2 rejected his offer. Johnson further explained that the requested extension would be unreasonable under UNL's policies but that he would consider moving the hearing to the last week in May to accommodate his attorney's schedule. After some pushback from Roe 5, Johnson

17

rescheduled the hearing for May 31.  He informed Doe 2 of the updated hearing date on May 15.

The pre-hearing conference was held on May 16.  Doe 2 and her attorney attended the conference and together presented their positions and arguments.  Doe 2 later reviewed the lengthy finalized hearing packet on May 29.

Roe 5 submitted another resolution offer that week.  On May 30, Johnson and Strickman met with Doe 2 to inform her of the offer.  Strickman discussed the advantages and disadvantages of different routes Doe 2 could take.  In Doe 2's words, Strickman reminded her that she "could lose" at the hearing and advised her to "consider [the] offer" since it would result in Roe 5 being off campus.  Doe 2 claims this made her feel pressured to accept Roe 5's offer.  After receiving a written copy of his proposed terms, Doe 2 declined Roe 5's offer that afternoon.

The May 31 hearing lasted over three hours.  The conduct board consisted of three individuals affiliated with UNL.  Johnson and Roe 5—who was accompanied by his attorney[10]—each presented their cases.  Doe 2 was present but declined to make any statements of her own.  After deliberating, the conduct board announced that they found Roe 5 responsible for violating the Code of Conduct.

Moving onto the matter of sanctions, the conduct board heard recommendations from Johnson, Doe 2, and Roe 5.  Johnson explained his recommendation for expulsion.  Doe 2 read a victim-impact statement and asked that Roe 5 be expelled.  Roe 5 urged that he not be expelled and instead be allowed to take a leave of absence.  The conduct board

---

[10]As Johnson explained to Roe 5, an attorney is allowed to serve as a student's advisor at conduct board hearings but is not allowed "to advocate for [the student] or represent [them] in the hearing."  The student themself is "expected to do that with [the attorney's] assistance."

deliberated and decided that Roe 5 should be expelled. A formal letter notifying the parties of the conduct board's findings was sent on June 6.

Roe 5 appealed that decision on June 15, asserting a variety of complaints regarding the hearing process and sanction. Bellows served as the appeal officer. She notified Doe 2 of the appeal on June 22, giving her an opportunity to submit a written response and informing her such appeals are usually resolved within fourteen days. Doe 2 expressed her agreement with the conduct board's decision but otherwise declined to respond to Roe 5's arguments. On July 26, Bellows issued her decision denying the appeal and affirming the conduct board's determination.

Doe 2 claims that, during the course of the investigation, Roe 5 threatened her and spread rumors about her to their peers. In support, she points to instances in which Roe 5 allegedly "insisted that she set his barn on fire and shot a bullet through his bedroom window," told a peer that she was mentally unstable, and invited her to an event involving a local prosecutor who had reviewed her case. The Board aptly points out that the bulk (if not all) of those events occurred before Roe 5 received notice of the investigation and emphasizes the dearth of evidence of those incidents. The Board maintains the IEC never received any reports during the investigation that Roe 5 had communicated with Doe 2.

Regardless, Doe 2 was undoubtedly affected by Roe 5's abuse. Before she filed her complaint, Doe 2 was diagnosed with "generalized anxiety disorder-severe with panic attacks, Trichotillomania, Obsessive Compulsive Disorder, [and] Attention deficit disorder predominate inattentive type." In April 2018, a psychologist diagnosed her with PTSD. Though the parties dispute Doe 2's plans to pursue further education, she asserts she had intended to seek a doctorate degree but was unable to because of her anxiety from her experience with Roe 5.

19

### C.    Procedural History

On July 20, 2020, Doe 1, Doe 2, and several other plaintiffs (the "original plaintiffs") brought this lawsuit (Filing No. 1) alleging the university's "response to each of [their] sex discrimination complaints was insufficient" and failed to comply with various legal requirements.  In all, the original plaintiffs claimed that the university and its officials violated Title IX, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., the due process and equal protection provisions in the U.S. and Nebraska constitutions, and the Charter of the University of Nebraska (the "Charter"), Neb. Rev. Stat. § 85-101 *et seq*. They also asserted state-law claims for negligence, negligence per se, negligent infliction of emotional distress, and breach of contract.

The original plaintiffs' initial complaint named as defendants the Board, the university, UNL, and a slew of university officials—including Bellows, Johnson, Strickman, Lamoureaux, Counley, and Moore.  A few months later, they amended their complaint (Filing Nos. 28, 29), removing the university, UNL, and many of the named officials, as well as their state constitutional claims and their claim for negligence per se.

In April 2021, defendants Pete Jeyaram, Bellows, Johnson, Hecker, Strickman, Lamoureaux, Counley, Ryan Fette, Briana Pallas-Sears, Moore, Sandra Chavez, Jamie Peer, and the Board (the "defendants") moved to dismiss (Filing No. 40) the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).  In the alternative, they asked that the Court sever each plaintiff's claims into separate proceedings against the relevant defendants.  *See* Fed. R. Civ. P. 20(b), 21.  The original plaintiffs responded (Filing No. 44), consenting to the dismissal of all of their claims except those arising under Title IX and the Equal Protection Clause of the U.S. Constitution.  They otherwise opposed the defendants' requests.

After considering the parties' supplemental briefing (Filing Nos. 54, 55), the Court granted the defendants' Rule 12(b)(6) motion in part and denied it in part (Filing No. 56). *See Thomas v. Bd. of Regents of Univ. of Neb.*, No. 4:20CV3081, 2022 WL 1491102, at *1

(D. Neb. May 11, 2022). First taking up the original plaintiffs' Title IX claims, the Court found only Doe 1 and Doe 2's allegations were sufficient to state a plausible claim of deliberate indifference. The Court further determined that "[n]one of the plaintiffs [had] alleged facts sufficient to show [the university] retaliated against them" as a result of their protected activity. *Id.* at *16.

Moving on to their equal protection claims, the Court noted that—despite multiple opportunities to amend their complaint and provide supplemental briefing—the original plaintiffs had still failed to clarify that theory for relief. It dismissed those claims on qualified-immunity grounds, finding the original plaintiffs did little to demonstrate the individual defendants had violated a clearly established right. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). The Court further concluded their allegations were factually insufficient to state an actionable equal-protection claim. Based on those dismissals, the Court found severance was unnecessary.

The original plaintiffs appealed (Filing No. 60), but the Court of Appeals for the Eighth Circuit quickly dismissed their interlocutory appeal for lack of jurisdiction. *See Thomas v. Bd. of Regents of Univ. of Neb.*, No. 22-2233, 2022 WL 17496052, at *1 (8th Cir. June 17, 2022). The matter continued to discovery. A while later, the Court granted (Filing No. 85) the Board's Motion to Strike Jury Demand (Filing No. 77). *See Doe 1 v. Bd. of Regents of Univ. of Neb.*, No. 4:20CV3081, at *2 (D. Neb. May 18, 2023).

This motion for summary judgment came in September 2024. After multiple extensions (Filing Nos. 135, 148, 152, 155, 159), the motion finally became ripe on January 6, 2025.

## II.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56, the Court "must grant a motion for summary judgment if the moving party shows that there are no genuine disputes of material

fact and that it is entitled to judgment as a matter of law." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). The principle purpose of that "procedure 'is to isolate and dispose of factually unsupported claims or defenses.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The moving party bears the burden of "informing the district court of the basis for its motion and [] identify[ing] the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Id.*; *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). It can fulfill that relatively modest burden either by "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden" at trial or by "produc[ing] evidence negating an essential element of the nonmoving party's case." *Id.*; *see also Celotex*, 477 U.S. at 322.

In response, the nonmoving party must "submit[] evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 U.S. at 1042 (quoting *Celotex*, 477 U.S. at 324). Those facts must not merely assert the existence of some factual dispute, but one that is "outcome determinative under prevailing law." *Corkrean v. Drake Univ.*, 55 F.4th 623, 630 (8th Cir. 2022) (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). A triable issue only exists where that evidence demonstrates a reasonable fact finder could find in favor of the nonmoving party. *See Canning v. Creighton Univ.*, 995 F.3d 603, 610 (8th Cir. 2021).

When ruling on a summary-judgment motion, the Court considers any evidence that could be presented in an admissible form at trial. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001 (8th Cir. 2019). It also views genuinely disputed facts "in the light most favorable to the nonmovant." *Canning*, 995 F.3d at 610; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007). In making its determination, the Court does not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any fact issue."

*First Baptist Church v. Zurich Am. Ins. Co.*, 129 F.4th 488, 493 (8th Cir. 2025) (quoting *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021)).

### B.    Analysis

Only the plaintiffs' claims seeking to hold the Board liable under Title IX remain. That law was enacted primarily "to avoid the use of federal resources to support discriminatory practices" like sexual harassment and assault and "provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979); *see also Roe v. St. Louis Univ.*, 764 F.3d 874, 881 (8th Cir. 2014). Of course, those principles prohibit educational institutions from enacting policies or programs that are discriminatory themselves. *See*, *e.g.*, *Cannon*, 411 U.S. at 690-94 (female applicant to medical school denied admission based on sex); *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 581-82 (2021) (women not provided equitable athletic opportunities). But Title IX also makes it unlawful for a federally-funded university to inadequately respond to other forms of known discrimination in its programs. *See Gebser v. Lago Vista Ind. Sch. Dist.*, 425 U.S. 274, 290-91 (1998); *cf. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (stating "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct").

In certain circumstances, "[e]ducational institutions may be liable for deliberate indifference to known acts of harassment by one student against another." *Roe*, 764 F.3d at 882; *see also Gebser*, 524 U.S. at 290 (deciding the institution's "response must amount to deliberate indifference to discrimination" to be actionable under Title IX); *Davis*, 526 U.S. at 633 (adopting that same standard for cases involving peer-to-peer harassment). Such claims require a showing that, among other things, "the institution was: (1) 'deliberately indifferent,' (2) 'to known acts of discrimination,' (3) 'which occurred under its control.'" *Shank v. Carleton Coll.*, 993 F.3d 567, 573 (8th Cir. 2021).

The deliberate-indifference standard is a demanding one. *See Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010); *see Roe*, 746 F.3d at 882 (explaining the "standard is intended

to afford flexibility to school administrators"). It requires a plaintiff demonstrate that the institution's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Unless their response is clearly unreasonable, the Court "refrain[s] from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.

As such, the Court will not find that an institution was deliberately indifferent based on the plaintiff's mere "dissatisfaction with the school's response." *Maher v. Iowa State Univ.*, 915 F.3d 1210, 1213 (8th Cir. 2019). As the Eighth Circuit and Supreme Court have made clear, individuals impacted by "'peer harassment' do not 'have a Title IX right to make particular remedial demands.'" *Id.* (quoting *Davis*, 526 U.S. at 648).

On this record, the plaintiffs are not able to satisfy that onerous burden. After carefully considering the circumstances surrounding UNL's response to Doe 1 and Doe 2's allegations, the Court finds there is no genuine dispute as to whether the university was deliberately indifferent.[11] *See Davis*, 526 U.S. at 649 (stating "there is no reason why courts . . . could not identify a response as not 'clearly unreasonable' as a matter of law" on a motion for summary judgment); *Maher*, 915 F.3d at 1213.

In Doe 1's case, UNL officials acted immediately upon hearing from a third party about Roe 4's potential harassment. Officer Beitler met with Doe 1 the same day UNL received notice of that report. At that meeting, Officer Beitler gathered information about what had happened, clarified whether there were any threats to Doe 1's or other's safety, assured Doe 1 that Roe 4 would be given a no-contact directive, and provided further resources about the IEC and Voices of Hope's services. Roe 4 received the no-contact directive that same day.

---

[11]Based on that conclusion, the Court does not address other issues briefed by the parties, including whether the university's response "'cause[d] the plaintiffs] to undergo harassment' or 'make them liable or vulnerable to it.'" *Shank*, 993 F.3d at 573 (quoting *Davis*, 526 U.S. at 630).

Officer Beitler also met with Strickman, Lamoureaux, and Hecker that same day. After their meeting, Lamoureaux immediately sent Doe 1 a letter acknowledging her allegations of potential sexual harassment and informing her of her options to file complaints with the IEC and local law enforcement. *See Shank*, 993 F.3d at 574 (stating the plaintiff failed to establish deliberate indifference where the "undisputed facts show that [the official] advised" her about the school's "process and her right to file a complaint). Two days later, Doe 1 met with Lamoureaux and Officer Beitler. Ultimately, Doe 1 informed UNL officials that she wished to obtain a No Contact Order. Roe 4 agreed to a No Contact Order after speaking with Lamoureaux on June 30, 2017, just two days after the university received any notice of the situation. Strickman promptly issued that No Contact Order and warned Roe 4 that any noncompliance could subject him to further investigation and discipline.

No part of that response could reasonably be construed as deliberate indifference. *See Doe v. Bd. of Trs. of the Neb. State Colls.*, 78 F.4th 419, 424 (8th Cir. 2023) (concluding a college was not deliberately indifferent when it "acted promptly . . . upon learning of the assault," "issued a mutually binding no-contact order," and initiated an investigation). UNL officials acted swiftly and diligently to assess the situation, address Doe 1's safety, and attempt to resolve the issue of Roe 4's harassing communication. *See id.* (describing the college's response as "prompt, extensive, substantive, directed to protect and assist [the plaintiff], and not clearly unreasonable"). Their remedy, the agreed-upon No Contact Order specifically sought by Doe 1, was not clearly unreasonable based on their knowledge of the situation.

Over the next few months, there were no reports of any harassing behavior from Roe 4. Though Doe 1 was uncomfortable attending the same course as him, he never approached her during or outside of class. Lamoureaux answered any questions Doe 1 had about the situation and followed up to see if Roe 4 had bothered her at all. He continued to direct Roe 4 to avoid contact with Doe 1.

25

When the IEC and UNLPD were notified of Roe 4's messages to Doe 1's roommates, UNL did not merely maintain the status quo as she seems to assert. In addition to again directing Roe 4 to comply with the existing No Contact Order, Counley and Officer Fischer further ordered him to cease contacting her roommates. UNLPD also restricted Roe 4's access to the Morrison Center around this time. As Doe 1 admits, Counley continued to investigate the matter.

Following that report, Officer Fischer met with Doe 1 to create a safety plan. Doe 1 again confirmed that Roe 4 had not caused any issues in class. Officer Fischer offered Doe 1 a police escort. Until May 2018, the IEC learned of no new harassment or threats toward Doe 1 from Roe 4.

When UNL was notified of the "John Smith" email to Doe 1, Officer Fischer responded promptly to set up a meeting. UNL officials accounted for Doe 1's safety and met with her earlier than planned after hearing of further concern over the incident. Strickman and Officer Fischer immediately began gathering information to investigate the email and again address Doe 1's concerns about Roe 4's presence in the Morrison Center.

In time, Doe 1 filed a complaint with the IEC, which quickly began investigating her allegations. University officials remained in contact with Doe 1, providing information about the investigation and addressing her questions. UNLPD issued Roe 4 a stalking citation a few weeks into the IEC's investigation. When the investigation concluded in late July 2018, Counley found Roe 4 had violated the Code of Conduct and recommended one year of probation on top of the existing no-contact directive. After both sides appealed, Moore lengthened that term of probation and further restricted Roe 4's access to the Morrison Center. Though Doe 1 remained uneasy knowing Roe 4 was in the Morrison Center at times, he never approached her or threatened her in her remaining time at UNL.

Doe 1 did not receive the response she hoped for from the university. And the Court does not question that she may not have always felt entirely understood or protected by

UNL officials. But no reasonable fact finder could conclude that the university was deliberately indifferent to her situation. Its response was prompt, conscious of her safety, and responsive to the changing information they received about Roe 4's harassment. That approach cannot be clearly unreasonable.

The same is true with regard to the UNL's response to Doe 2's allegations. Doe 2 points to the lack of interim measures implemented during the investigation against Roe 5 and the length of that investigation as evidencing deliberate indifference. Neither suffices to meet that stringent standard here.

To start, the lack of interim measures cannot be construed as clearly unreasonable in light of Doe 2's expressed wishes and other surrounding circumstances. Had the university immediately instituted any such measures, it would have gone against Doe 2's request that Roe 5 not receive notice of the matter until she was away from campus. *Cf. Pearson v. Logan Univ.*, 937 F.3d 1119, 1126 (8th Cir. 2019) (explaining that "limiting the scope of an investigation out of respect for a Title IX complainant's desire for confidentiality does not by itself constitute deliberate indifference"). After Roe 5 was notified of the investigation, he did not ever contact Doe 2. Doe 2 also admits that she never requested any accommodations from the IEC during the investigation and that she rejected Officer Fischer's offer to assign her a UNLPD escort. *See Maher*, 915 F.3d at 1213 (concluding a university was not deliberately indifferent where it offered two reasonable solutions to a student's complaints that the student rejected).

Nor is this a case where the school "fail[ed] to respond in any way over a" prolonged period. *Davis*, 526 U.S. at 649; *cf. Williams v. Bd of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1296-97 (11th Cir. 2007) (finding a university was deliberately indifferent when it "waited almost eleven months to take corrective action" despite the conclusion of a police investigation into the incident). Over the course of the so-called "delay" in this case, the IEC gathered information, interviewed witnesses, communicated with the parties, and accommodated the schedules of several required participants in scheduling the hearing.

Especially given the severe punishment Roe 5 ultimately faced, the Court cannot say this deliberate approach was clearly unreasonable based on the record. *See Davis*, 526 U.S. at 649 (stating "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims"). There is therefore no genuine dispute over whether the university was deliberately indifferent in responding to Doe 2's allegations.

## III.    CONCLUSION

It is undeniable that UNL's response did not fully satisfy the plaintiffs or entirely quell all of their concerns. But that does not warrant holding the university liable under Title IX. *See Shank*, 993 F.3d at 574 (explaining the question in these cases "is not whether [the school's] policy should have been more comprehensive"). Based on the record in this case, no reasonable factfinder could conclude the university's response amounted to deliberate indifference. Therefore,

IT IS ORDERED:

1.    Defendant the Board of Regents of the University of Nebraska's Motion for Summary Judgment (Filing No. 122) is granted.

2.    Its Motion to Exclude Expert Testimony (Filing No. 123) is denied as moot.

3.    This case is dismissed with prejudice.

4.    A separate judgment will be entered.

Dated this 9th day of May 2025.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge

28